## PROOF OF SERVICE

I am employed in Alameda County, California. I am over the age of eighteen (18) years and not a party to the within action. My business address is 1330 Broadway, Suite 1450, Oakland, CA 94612. On December 28, 2006, I served copies of the within: **PETITION FOR REVIEW**

X    **BY ELECTRONIC MAIL:** I caused said document(s) to be transmitted to the email address(es) of the addressee(s) designated.:

Robert M. Schwartz
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Email: rschwartz@omm.com

X    **BY U.S. MAIL:** I caused such envelope to be deposited in the mail at Oakland, California, addressed to the addressee(s) designated on the attachment hereto and sent via first class mail to each individual listed below:

Court of Appeal
Second Appellate District
Division One
300 So. Spring St., 2nd Floor
North Tower
Los Angeles, CA 90013

Office of the District Attorney
Appellate Division
320 West Temple Street, Suite 540
Los Angeles, Ca 90012-3266

The Honorable Howard J. Schwab
Commissioner Bruce Mitchell
Los Angeles Superior Court
9425 Penfield Avenue, F46
Chatsworth, CA 91311

Michele VanGelderen
Consumer Unit
Office of the Attorney General
300 South Spring Street, 5th Floor
Los Angeles, CA 90013

James M. Nelson
Mark Graski
Seyfarth Shaw
400 Capitol Mall, Suite 2350
Sacramento, CA 95814

Robert M. Schwartz
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on December 28, 2006.

Lorelei C. Badar

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

|  |  |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Case No. 93:05-MD-527 RM (MDL 1700)<br><br>CHIEF JUDGE MILLER<br>MAGISTRATE NUECHTERLEIN<br><br>**SUPPLEMENTAL DECLARATION OF LYNN ROSSMAN FARIS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DISCOVERY RELATED TO INTERNATIONAL BROTHERHOOD OF TEAMSTERS** |

I, LYNN ROSSMAN FARIS, state:

1.    I am an attorney duly licensed to practice law in the State of California, before various U.S. District Courts, the Ninth Circuit Court of Appeals, the District of Columbia, and the United States Supreme Court. I am a co-lead counsel for Plaintiffs in this litigation.

2.    Attached hereto is a true and correct copy of the following document, which was produced by Plaintiffs in discovery:

Exh. Z    Letter from Paul Callahan, Vice President, Contrator Relations, dated July 10, 2006. (PKS0002786)

Exh. AA    Letter from Dan Sullivan, dated Sept. 8, 1998. (PIA0000050)

-1-

I swear under penalty of perjury under the laws of the State of California and the United

States that the foregoing is true and correct. Executed on <u>December 29, 2006</u> at Oakland,

California.

Lynn Rossman Faris

820

# EXHIBIT Z


Ground

July 10, 2006

**Dear independent contractor,**

As you may know, Teamster organizers and UPS drivers have been distributing union membership information to contractors at a number of targeted FedEx Ground and Home Delivery terminals through-out our system. Numerous contractors are asking why this Teamster-UPS driver's alliance is engaging in these activities.

The Teamsters have lost hundreds of thousands of members' jobs in recent years, principally due to unreasonably restrictive work rules, customer service disruptions caused by strikes, ever-rising membership costs (e.g., monthly dues, fees, fines and assessments), and higher incidence of member mistreatment. This dramatic loss of members and their dues revenue has put a tremendous financial strain on the union, which explains why the Teamsters are aggressively seeking to organize new dues-paying members. Because of this, the Teamsters have their eyes on FedEx Ground and Home Delivery contractors.

Over the years, FedEx Ground and Home Delivery contractors have consistently rejected union representation in order to control their own destiny and the opportunity they have to grow their businesses. We have always vigorously defended our independent contractor relationship because it truly is beneficial to our contractors, our company, and our mutual customers. Over 100 state and federal agency and court decisions have supported the independent contractor model, and the few decisions that have reached a contrary conclusion are being appealed. We will continue to grow with contractors who want the opportunity to own and develop their own businesses. However, the growth and success of our independent contractor business relationship has proven costly to UPS (in terms of lost package volume) and the Teamsters (in terms of declining membership and dues revenue.)

For these reasons, we can expect them to attack our mutual business relationship by any means possible — lawsuits, organizing campaigns, strikes, picketing, etc. And when our business model is threatened, no one is hurt more than you — our independent contractors. Contrary to what the Teamsters and their attorneys think, you should not be forced to give up your independence. Judging from the number of letters I receive every week, your independence is something you're very proud of and is something that we'll fight to maintain.

One fact that you know better than anyone else (and the Teamsters obviously do not know) is that by providing the industry's best service, you helped FedEx Ground succeed and have significantly enhanced the value of your investments in the process. The Teamsters — and these lawsuits that the union is promoting — erroneously claim that you have no equity in your routes, that you own nothing

*(Continued)*



other than your trucks, and that you are "employees" who have no control over your business. Regardless of how anyone feels about the company, most of you know the value of your businesses is real.

There is no doubt that we have issues to address at some FedEx Ground and Home Delivery terminals. We are working hard to improve operations. In my opinion, a union would not be helpful to our mutual business relationship. Our future success, and the success of your businesses, will require all of us to work closely to improve operations and address issues for the benefit of everyone here, as well as our customers. I look forward to working with all of you in achieving that end.

I hope that no one will be misled by the Teamsters and sign on to anything that the union is trying to sell. However, if anyone is considering supporting the union, I want to encourage you to get the facts about the union <u>first.</u>[1]

I look forward to working with you  If you have any questions, please feel free to talk with me or any manager.

Sincerely,

Paul Callahan
Vice President, Contractor Relations

---

[1] *Unionfacts.com* is one source that you may want to consider.

PKS0002786823

# EXHIBIT AA

**RPS**

*An FDX Company*

Daniel J. Sullivan
President and
Chief Executive Officer

RPS, Inc.
P.O. Box 108
Pittsburgh, PA 15230
Tel (412) 269-1000
Fax (412) 859-5687

September 8, 1998

Dear Contractor

More than three and a half years ago, we advised you of a case before the National Labor Relations Board (NLRB) involving RPS's Ontario and Pomona, California terminals. The NLRB's Regional Director in Los Angeles made an initial ruling that P&D contractors at Ontario and Pomona were "employees," not contractors. We appealed that ruling and in April 1995, the NLRB in Washington, D.C. began reviewing the case.

On September 4, 1998, we finally received a decision from the NLRB. They ruled that Ontario and Pomona contractors are "employees." It's the same decision they gave us in Detroit nearly 12 years ago, and more than 20 other locations year after year since then.

Their decision today is just as wrong now as it was then! It's contrary to the findings of the IRS and numerous other federal and state agencies throughout the country and we intend to pursue every avenue of appeal available to us.

This process may start a whole new legal battle which could last for years and might even wind up before the U. S. Supreme Court. . . we're that serious about this issue.

We wanted you to know what's happening in this matter since the NLRB decision may cause rumors and speculation about RPS and its contractors. Let me assure you that RPS will not make any changes in our business relationship based on this wrong decision. There will be no changes in your contractual agreement with RPS, no changes in computing your settlement and no changes in any other area of our business relationship because of the NLRB's erroneous ruling. Again, the IRS, other federal and state agencies have agreed that RPS contractors are independent businessmen and women - and we intend for that relationship to continue in the future.

Remember, this most recent NLRB decision only applies to two specific terminals, Ontario and Pomona - nowhere else! Unfortunately for Ontario and Pomona, it may take many more years of legal wrangling before the issues involving these terminals are finally resolved. We will keep you updated on further developments.

If you have any questions, please see your Terminal, Hub or Linehaul managers or call Contractor Relations.

Sincerely

Dan Sullivan

DS/jjj
g:\glccmm\bbreese\1998\nlrbltr.doc

*Delivering more than your package.*™

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527 RM (MDL 1700) CHIEF JUDGE MILLER MAGISTRATE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) | |

**PROOF OF SERVICE**

## PROOF OF SERVICE

I am a citizen of the United States and am employed in Alameda County.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is 1330 Broadway, Suite 1450, Oakland, CA  94612.  On **December 29, 2006**, I served the following document(s):

1.    Plaintiffs' Opposition to Defendant's Motion to Compel Production of Discovery Related to Alleged Communications Between Plaintiffs' Counsel and Employees of the  International Brotherhood of Teamsters;

2.    Supplemental Declaration of Lynn Rossman Faris in Support of Plaintiffs' Opposition to Defendant's Motion to Compel Production of Discovery Related to International Brotherhood of Teamsters;

3.    Notice of Manual Filing; and

4.    Proof of Service

I, Lorelei Badar, hereby certify that on December 29, 2006, I electronically filed the foregoing document(s) with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| *Attorneys for Defendant* | |
|---|---|
| Evelyn L Becker | ebecker@omm.com |
| John Beisner | jbeisner@omm.com |
| Edward J Efkeman | eefkeman@fedex.com |
| Michael Garrison, Jr. | mgarrison@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael Kopp | mkopp@omm.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Robert M Schwartz | rschwartz@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Theodore B. Schroeder | tschroeder@omm.com |
| | |
| *Attorneys for Plaintiffs* | |
| William M. Audet | waudet@alexanderlaw.com |
| George A Barton | gbarton@birch.net |

| | |
|---|---|
| Joree G. Brownlow | joree@jbrownlow.com |
| Thomas J Brunner Jr | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| R. Bruce Carlson | bcarlson@carlsonlynch.com |
| Jerald R Cureton | jcureton@curetoncaplan.com |
| Susan E. Ellingstad | seellingstad@locklaw.com |
| Barry S. Fargan | bfagan@dibandfagan.com; dbrault@dibandfagan.com |
| Robert Firsten | rfirsten@firstenlaw.com |
| B. James Fitzpatrick | bjfitzpatrick@fandslegal.com; cswanston@fandslegal.com |
| Wood R Foster Jr | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| Alison G Fox | Alison.Fox@bakerd.com; lisa.maylum@bakerd.com; Melissa.bozzuto@bakerd.com; michelle.george@bakerd.com |
| Philip Stephen Fuoco | pfuoco@msn.com; josefchen@msn.com |
| Palmer Freeman | pfreeman@attorneyssc.com |
| Merrie Frost | frostlegal@aol.com |
| Salvatore G. Gangemi | sgangemi@gangemilaw.com |
| Martin S Garfinkel | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| R. Christopher Gilreath | chrisgil@sidgilreath.com |
| Clayton D Halunen | Halunen@youhaverights.info; thome@halunenlaw.com |
| John C Hamilton | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| Robert I Harwood | rharwood@whesq.com |
| Jack Hilmes | jhilmes@finleylaw.com; kdriscoll@finleylaw.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com; miller@workerlaw.com |
| Tom A Jerman | tjerman@omm.com |
| Ronald D. Kelsay | kelsay@cablelynx.com |
| Steve D. Larson | slarson@ssbls.com |
| Jordan M Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Robert McDaniel | remcdanielesq@aol.com |
| Tina L. Morin | tinamorin@miningcitylaw.com |
| Daniel O Myers | dmyers@rpwb.com |
| Steven A. Owings | sowings@owingslawfirm.com |
| Richard T Phillips | flip@smithphillips.com; alwelshans@smithphillips.com; Jason@smithphillips.com |
| Gary F Lynch | glynch@carlsonlynch.com |

| | |
|---|---|
| Paula Markowitz | LDICROSTA@markowitzandrichman.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T Regan | atr@zimmreed.com |
| J Gordon Rudd | jgr@zimmreed.com |
| Mark J. Schirmer | mschrimer@straus-boies.com |
| Dan S. Smith | addiealexis@verizon.net |
| James Staack | jims@staack-firm.com; ginger@staack-firm.com |
| Richard Tanenbaum | rt@lawyer.com |
| Donald R. Taylor | dtaylor@taylordunham.com; ddunham@taylordunham.com; surban@taylordunham.com; jtatum@taylordunham.com |
| Joni M Thome | Thome@youhaverights.info |
| Matthew T Tobin | matt@jhmmj.com |
| John E. Toma, Jr. | jtoma@tomazensen.com |
| Mark Wallace | mwallace@wwlaw.com |
| Peter N. Wasylyk | pnwlaw@aol.com |
| Michael J Watton | jdrewicz@Wattongroup.com |
| Charles Whestone | cwhetstone@attorneyss.com; cperkins@attorneyssc.com; rrikard@attorneyss.com |
| Melissa M. Zensen | mzensen@tomazensen.com |

/ / /

/ / /

/ / /

I also certify that on **December 29, 2006**, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

**BY REGULAR MAIL:** I caused such envelope to be deposited in the mail at my business address, addressed to the addressee(s) designated. I am readily familiar with LEONARD, CARDER's practice for collection and processing of correspondence and pleadings for mailing. It is deposited with the United States Postal Services on that same day in the ordinary course of business.

William T Fiala
LEWIS FISHER HENDERSON
 CLAXTON & MULROY
6410 Poplar Ave, Suite 300
Memphis, TN 38119

Aaron Roblan
Karen P Kruse
Carla Macaluso
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA 98101

Cheryl M Stanton
OGLETREE DEAKINS NASH
 SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ 07960

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Alan M Purdie
Purdie & Metz
P.O. Box 2659
Ridgeland, MS 39158

Patricia A Sullivan
EDWARDS ANGELL PALMER
 & DODGE LLP
2800 Financial Plaza
Providence, RI 02903

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

Michael R Reck
BELIN LAMSON MCCORMICK
 ZUMBACH FLYNN
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Oakland, California, on December 29, 2006.

Lorelei Badar

830

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

------------------------------------------------------- )
                                                         )
In re FEDEX GROUND PACKAGE                               )    Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                                 )    (MDL 1700)
PRACTICES LITIGATION                                     )
                                                         )
------------------------------------------------------- )
THIS DOCUMENT RELATES TO:                                )
                                                         )
ALL ACTIONS                                              )
------------------------------------------------------- )

**CERTIFICATE OF GOOD FAITH**
**IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DOCUMENTS**
**AND TESTIMONY IMPROPERLY DESIGNATED AS PRIVILEGED**
**BY DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.**

Pursuant to Federal Rules of Civil Procedure 26(c) and Local Rule 37.1(a) and (c), I,

Susan E. Ellingstad, Co-Lead Counsel for Plaintiffs in the above-captioned action, hereby certify

that counsel for Plaintiffs and Defendant conferred in good faith in an effort to resolve, without

court action, the dispute which is the subject of the Motion to Compel Documents and Testimony

Improperly Designated as Privileged, filed on November 10, 2006 (Dkt No. 394). I certify that

such efforts have been unsuccessful and consequently it is necessary to file the Motion. This

certification was inadvertently omitted from the filing of the Motion to Compel on November 10,

2006.

More specifically, I certify as follows:

1.     The relief requested by the Motion to Compel was the subject matter of many

discussions between counsel for Plaintiffs and Defendant. In addition to many discussions on

the record at various depositions, Plaintiffs' Co-Lead Counsel, Lynn Rossman Faris and I,

participated in several telephone conferences with counsel for Defendant, Michael McGuinness,

Esq., concerning the privilege designations and redactions at issue.  Counsel for Defendant has represented that Defendant stands by its designations.

    2.     Attached hereto as Exhibit A is a true and correct copy of an email exchange between myself and Mr. McGuinness, dated October 25, 2006, outlining Plaintiffs' objections to the designations on Defendant's privilege log and Mr. McGuinness's response.

    3.     I also respectfully refer the Court to my Affidavit in Support of Plaintiffs' Motion to Compel, dated November 10, 2006, and the exhibits thereto for a complete description of the meet and confers held by counsel at various depositions.

    I swear under penalty of perjury that the foregoing is true and correct.  Executed on this 2nd day of January, 2007 at Minneapolis, Minnesota.

                  s/Susan E. Ellingstad
                  Susan E. Ellingstad

365291-1

2

832

# EXHIBIT A

**Potteiger, Heather N.**

| | |
|---|---|
| **From:** | Drechsler, Sarah [SDrechsler@omm.com] |
| **Sent:** | Wednesday, October 25, 2006 4:57 PM |
| **To:** | Ellingstad, Susan E. |
| **Cc:** | lfaris@leonardcarder.com; rharwood@whesq.com |
| **Subject:** | Privilege Log - Sent on behalf of Mike McGuinness |

Susan,

The following addresses the issues raised in your e-mail below.

First, we have provided you with ample information to identify the individuals listed in the privilege log. All persons listed on the log have been identified by their first and last name. All in-house counsel are identified on the log with an "Esq." following their name. Outside counsel are identified by "Esq." and the name of the outside law firm to which they belong in parentheses, e.g., "Lewis Smoak, Esq. (Ogletree Deakins)." Also, we produced a number of FedEx organizational charts from which you can determine the position of most of the FedEx management and employees that are listed in the log. (See bates numbers FXG_GENNELL0008430, FXG_7386 -7458, FXG_7459 -7516, FXG_7517-7570, FXG_7571-7630, FXG000297935, FXG543262, FXG609725, FXG609726, FXG609727, FXG609728, FXG609729, FXG609730, FXG609731, FXG609734). I do not read the case that you cite, *Jones v. City of Indianapolis*, 216 F.R.D. 440, 449 (S.D. Ind. 2003), to require any individually created "cast of characters" to accompany the privilege log. In *Jones*, the court held that the defendants' identification of a document as "handwritten letter from 'Herb' to Mr. Allen" did not satisfy their burden to demonstrate attorney-client privilege, in part, because "the [c]ourt [was] unable to ascertain the identities of 'Herb' or 'Mr. Allen.'" We, in contrast, have provided you with the identities and positions of all persons listed on the privilege log. If you are aware of any authority requiring us to do more, please bring it to our attention and we will reevaluate our position.

Second, the "summaries of contractor policies prepared at the request of FedEx Ground's Legal Department" are properly designated as privileged. You first challenge the summaries on the basis that "they were sent to and from FedEx employees and no attorney is identified as a recipient or sender." The attorney-client privilege extends to and protects communications between corporate employees. In *Long v. Anderson University*, 204 F.R.D. 129, 134 (S.D.Ind., 2001), the court upheld an attorney-client privilege designation for an e-mail between a university's director of human resources and dean of students regarding legal advice that the director received from the university's legal counsel. The *Long* court cited *Johnson v. Sea-Land Service, Inc.*, 2001 WL 897185 *2 (S.D.N.Y. 2001), for the proposition that "[t]he attorney-client privilege affords confidentiality to communications *among clients, their attorneys, and the agents of both*, for the purpose of seeking and rendering an opinion on law or legal services, or assistance in some legal proceeding, so long as the communications were intended to be, and were in fact, kept confidential" (emphasis added).

You next challenge the summaries on the basis that "communications made by and to a corporate in-house counsel with respect to business matters, management decisions, or business advice are not protected by the attorney-client privilege." The fact that the summaries contain business information does not automatically mean that they are not protected requests for legal advice. According to the case that you cite, *Breneisen v. Motorola Inc.*, 2003 WL 21530440 (N.D. Ill.) at *3, to decide whether the privilege exists, "[the court] must examine whether the lawyer was acting as a lawyer rather than a business advisor or management decision maker." Generally, there is a presumption that a lawyer in the legal department of the corporation is giving legal advice. *Id.* Here, the summaries have been prepared at request of FedEx in-house counsel for the purpose of rendering legal advice regarding business and management decisions and policies. They are disclosures necessary to obtain informed legal advice. "While client documents produced in the ordinary course of business will not be protected by the privilege, documents-even those setting forth economic or business data-may be deemed privilege if they were intended to be confidential and were produced for the purpose of receiving legal advice." *Ziemack v. Centel Corp.*, 1995 WL 314526 at *5 (N.D.Ill. May 19, 1995); *see also In re Brand Name Prescription Drugs Antitrust Litigation*, 1995 WL 557412 (N.D.Ill.,1995) (holding that summaries regarding business and economic information prepared by corporate client at request of attorney for the purpose of giving legal advice concerning either potential or existing legislation which may affect client are privileged).

With regard to the specific documents that you identify, FXG112-152, these summaries are data compilations prepared for litigation-risk analysis by FedEx Ground Legal Department regarding contractor compliance with a certain policy. These summaries were prepared by Darma Taimuty, who possessed the technical expertise to produce this type of compilation, on behalf of and at the request of in-house attorney Anthony Spalvieri. These summaries were in fact circulated with a memo from attorney Spalvieri providing specific legal advice to FedEx managers on the importance of strict compliance with the contractor-related policy in question. Moreover, these documents were also created in anticipation of litigation and are protected by the work-product privilege. Fed.R.Civ.P. 26(b)(3). In *Breneisen*, the court held that factual summaries and chronological statements prepared by individual defendants and a human resources manager at the direction of counsel and in anticipation of litigation were protected by the work-product privilege, noting that the "work-product privilege extends beyond the attorney to documents prepared by a party's representative or agent." *Breneisen v. Motorola Inc.*, 2003 WL 21530440 at *4.

Please contact me if you would like to discuss any of the foregoing.

11/10/2006

Mike

---

**From:** Ellingstad, Susan E. [mailto:seellingstad@locklaw.com]
**Sent:** Monday, October 16, 2006 2:58 PM
**To:** McGuinness, Mike
**Cc:** Lynn Faris; Robert Harwood
**Subject:** Privilege Log

Dear Mike,

I wanted to bring to your attention two issues with respect to the privilege log produced by Defendant. First, you have not provided any type of "cast of characters" or "who's who" list, so that Plaintiffs can determine the identities and job titles of senders and recipients of communications. As you know, this type of list is customarily required; otherwise, the log will be deemed inadequate. *Jones v. City of Indianapolis*, 216 F.R.D. 440, 449 (S.D. Ind. 2003) (where court was unable to ascertain identities of persons listed on log, defendant could not meet burden in showing that documents were protected by privilege). We request that you provide us, as soon as possible, a list of names identifying each person's affiliation and job title.

Second, many documents are designated as attorney-client privileged even though they were sent to and from FedEx employees and no attorney is identified as a recipient or sender. Nevertheless, you have asserted the attorney-client privilege, claiming that the communications are "summaries" of contractor policies, which were prepared at the request of FedEx Ground's Legal Department. (*See e.g.*, FXG 112-152, from Darma Taimuty to Mike Mannion, cc'ing managers).

As you know, the mere request of information by in-house counsel does not automatically bring it within the realm of privilege. Communications made by and to a corporate in-house counsel with respect to business matters, management decisions, or business advice are not protected by the attorney-client privilege. 6 Moore's Federal Practice, § 26.49 (Matthew Bender 3d ed. 2002). Even where information is prepared by a defendant at the request of counsel, those communications are not automatically accorded privileged status. *Breneisen v. Motorola, Inc.*, No. 02 C 50509, 2003 WL 21530440 (N.D.Ill. Jul. 3, 2003).

A host of documents appear to relate to business matters of FedEx, such as changes to policies and procedures, and are not communications reflecting legal advice. You have also asserted the attorney client privilege during depositions with respect to any communications, even among all non-lawyers, relating to purely business matters such as policy and procedure changes.

We previously met and conferred about this issue in connection with our discussions on redactions. I understand from your prior responses that you do not intend to change your position with respect to the assertion of attorney client privilege, both during the depositions and as to the documents produced, over the categories of information described above. If this is not correct and you are willing to withdraw the assertion of privilege with respect to this type of communication, please contact me at your earliest convenience to discuss. Thank you.

Susan E. Ellingstad
Lockridge Grindal Nauen P.L.L.P.
Suite 2200
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
seellingstad@locklaw.com

*********

11/10/2006

This e-mail may contain information that is privileged, confidential or
otherwise protected from disclosure. If you are not the intended
recipient or otherwise have received this message in error, you are not
authorized to read, print, retain, copy or disseminate this message or
any part of it. If you are not the intended recipient or otherwise
have received this message in error, please notify us immediately
by e-mail, discard any paper copies and delete all electronic files
of the message.
**********

11/10/2006

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

------------------------------------------------------ )
                                                       )
In re FEDEX GROUND PACKAGE        )          Cause No.  3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT          )          (MDL 1700)
PRACTICES LITIGATION              )
                                                       )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:         )
                                                       )
ALL ACTIONS                       )
------------------------------------------------------ )

## CERTIFICATE OF SERVICE

I, Susan E. Ellingstad, hereby certify that on January 2, 2007, I electronically filed the

foregoing document:

    1.      Certificate of Good Faith in Support of Plaintiffs' Motion to Compel Documents
            and Testimony Improperly Designated as Privileged; and

    2.      Exhibit A.

with the Clerk of Court using the CM/ECF system which sent notification of such filings to the

following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |

| | |
|---|---|
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David G. Caperton** | dcaperton@omm.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; efink@leonardcarder.com; kzerger@leonardcarder.com |
| **Eric M. Fink** | efink@leonardcarder.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert I. Harwood** | rharwood@whesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Dorothy Anne Jarrell** | dajarrell@omm.com; prowen@omm.com; jdonovan@omm.com |

| | |
|---|---|
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Thomas P. Jirgal** | tjirgal@omm.com; jbanks@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com; jdonovan@omm.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; aardley@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| **Anh-Nguyet Tran LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@whesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |

| | |
|---|---|
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Robert G. Rikard** | rrikard@attorneyssc.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | matt@matthewtobinlaw.com |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Kirsten L. Zerger** | kzerger@leonardcarder.com |

I also certify that on January 2, 2007, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI  53202-4108

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Robert E McDaniel
THE MCDANIEL LAW OFFICES
4 Bicentennial Square
Concord, NH  03301
(New address:
755 North Main Street
Laconia, NH  03246)

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

James R Mulroy II
William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Beth A Ross
LEONARD CARDER LLP
1330 Broadway, Suite 1450
Oakland, CA  94612

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R. Taylor
TAYLOR & DUNHAM
327 Congress Ave #600
Austin, TX  78701
New address:
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI  02908

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN  55402

Dated: January 2, 2007

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

___s/Susan E. Ellingstad_____
Susan E. Ellingstad
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel:     (612) 339-6900
Fax:     (612) 339-0981

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| *All Coordinated Cases* | ) ) ) ) | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**OBJECTION TO PLAINTIFFS' UNTIMELY RULE 37.1
CERTIFICATION IN SUPPORT OF MOTION TO COMPEL
<u>PRIVILEGED DOCUMENTS AND TESTIMONY</u>**

FXG hereby objects to Plaintiffs' belated filing on January 2, 2007 of a Local Rule 37.1 certification in connection with their motion to compel with regard to the attorney-client privilege. The certification was not filed with the original motion on November 10, 2006. The document does not demonstrate that Plaintiffs raised the issues presented in the motion with FedEx Ground before they filed it, nor an effort to resolve each of the disputes that are the subject of the motion. For the foregoing reasons, as well as those presented in FedEx Ground's opposition papers and at the December 20, 2006 oral argument, FedEx Ground respectfully requests that the Court deny Plaintiffs' motion.

Dated:  January 4, 2006

Respectfully submitted,

By:    s/Thomas J. Brunner
         Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendants' Liaison and Lead Counsel*

## CERTIFICATE OF SERVICE

     I hereby certify that on the 4th day of January, 2007, I filed the foregoing ***OBJECTION TO PLAINTIFFS' UNTIMELY RULE 37.1 CERTIFICATION IN SUPPORT OF MOTION TO COMPEL PRIVILEGED DOCUMENTS AND TESTIMONY*** with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

     Susan E. Ellingstad
     sellingstad@locklaw.com

     Robert I Harwood
     rharwood@whesq.com

     Peter W. Overs, Jr.
     povers@whesq.com

     Lynn R Faris
     lfaris@leonardcarder.com

     John C Hamilton
     jch@hamiltonfirm.com
     hamiltonfirm@sbcglobal.net

By:    s/Alison G. Fox

BDDB01 4628204v1

844

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) THIS DOCUMENT RELATES TO ALL CASES |

**OPINION AND ORDER**

On December 20, 2006, this Court held an in-court hearing on three pending discovery matters.  For the following reasons, Plaintiffs' first motion to compel is **DENIED IN PART** and **GRANTED IN PART** [Doc. No. 327], Plaintiffs' second motion to compel is **DENIED WITHOUT PREJUDICE** [Doc. No. 389], and Plaintiff's third motion to compel is **DENIED WITHOUT PREJUDICE** [Doc. No. 394].

**I.    PROCEDURE**

On August 10, 2005, this multidistrict litigation case was transferred to the Northern District of Indiana pursuant to 28 U.S.C. § 1407 to perform consolidated pretrial proceedings. Plaintiffs' main contention for many of their claims is that Fedex was treating them as independent contractors when they were actually employees.  As a result, Plaintiffs seek a number of remedies that revolve around this issue including injunctive relief and damages.  On November 15, 2005, this Court entered an initial scheduling order where, pursuant to the parties' consent, discovery on liability and damages was bifurcated.

The current disputes are discovery disputes.  On August 8, 2006, Plaintiffs filed a motion to compel production of documents based on their requests numbered 22 and 63 from Defendant

FedEx Ground Package System Inc. (Fedex).  Request number 22 refers to materials relating to surveys and focus groups, and request number 63 refers to headcount materials.  On August 28, 2006, Fedex filed a response in opposition to Plaintiffs motion to compel.  On September 7, 2006, Plaintiffs filed a reply in support of their motion, and on September 14, 2006, Fedex filed a sur-reply.

On October 26, 2006, Plaintiffs filed their second motion to compel in which they seek to compel documents where portions have been unilaterally redacted by Fedex.  On November 13, 2006, Fedex filed its response in opposition to Plaintiffs' motion.  On November 28, 2006, Plaintiffs filed their reply.

On November 10, 2006, Plaintiffs filed their third motion to compel.  Plaintiffs seek to compel documents and testimony that it claims Fedex has improperly designated as privileged.  On December 8, 2006, Fedex filed a response in opposition to that motion, and on December 18, 2006, Plaintiffs filed their reply.

On December 20, 2006, this Court held an in-court hearing and heard arguments from counsel on all three motions.  This Court may rule on these motions pursuant to its referral order and 28 U.S.C. § 636(b)(1)(A).

**II.    ANALYSIS**

    A.    <u>Legal Standards</u>

Fed. R. Civ. P. 26 (b)(1) permits discovery into "any matter, not privileged, that is relevant to the claim or defense of any party."  Relevant information need not be admissible at trial so long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26 (b)(1).  For the purpose of discovery, relevancy will be construed

broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." Chavez v. Daimler Chrysler, 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351(1978)). Discovery under Rule 26, however, is not an invitation to the proverbial fishing expedition. The frequency or extent of the discovery methods otherwise permitted shall be limited by the court if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26 (b)(2).

This Court has broad discretion when deciding whether to compel discovery and may deny discovery to protect a party from oppression or undue burden. Fed. R. Civ. P. 26(c); Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1998) ("[D]istrict courts have broad discretion in matters related to discovery."); Gile v. United Airlines, Inc., 95 F.3d 492, 495-96 (7th Cir. 1996) ("The district court exercises significant discretion in ruling on a motion to compel."). In ruling on a motion to compel, "a district court should independently determine the proper course of discovery based upon the arguments of the parties." Gile, 95 F.3d at 496.

   B.    Plaintiffs' Motion to Compel # 1

Plaintiffs' first motion to compel deals with two requests, headcounts and requests for information relating to surveys and focus groups performed by Fedex.

      1.    Headcounts

3

Twice a year, each Fedex terminal manager makes a written individual assessment on how each independent contractor feels about his status as an independent contractor rather than an employee. The managers write short narratives explaining the reasons each individual favors being either an employee or independent contractor. Managers also report signs of dissatisfaction with the independent contractor model. Each independent contractor is identified by name on the headcount form. The managers also can provide any other comments that they desire on the headcount forms.

Plaintiffs' request for production number 62 seeks all of the headcount documents. Fedex complied and turned over the headcount documents, but Fedex redacted some of the information when they gave the headcount forms to Plaintiffs. Fedex redacted some of the comments and the names of the headcount forms. Plaintiffs' motion to compel focuses on this information, and Plaintiffs ask this Court to force Fedex to re-produce the headcount forms in an unredacted form.

Fedex, in its response, agrees to produce the redacted comments. However, Fedex still refuses to produce the names of the individuals on the headcount forms. Plaintiffs contend that they need the names of the individuals on the headcounts. Plaintiffs argue that Fedex terminated certain employees who did not support the independent contractor model. Consequently, if they can prove Fedex did terminate workers in this manner, then it suggests Fedex was treating the workers as employees in an at-will relationship rather than independent contractors. However, without the names, Plaintiffs claim they will not be able to essentially "link-up" the terminated employees with the appropriate headcount forms to support this contention.

4

Fedex contends that Plaintiffs are merely trying to obtain new class members and are forcing their names into relevancy for discovery purposes contrary to <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340 (1978).  This Court disagrees.  Despite any relation to future class members, the names of the individuals on the headcounts may lead to potential witnesses.  Those witnesses, whether part of a class or not, may provide testimony about their employment relationship with Fedex.  That testimony directly bears on the issues pertinent to whether they were employees or independent contractors, which is the fulcrum issue in this case.  Even if the names do not reveal evidence that Fedex singled out workers who did not support the independent contractor model as Plaintiffs suggest, they may conversely reveal the opposite to be true in that Fedex was not firing individuals because of their feelings about the independent contractor model.  Either way, this information is relevant to the fulcrum issue because it either supports or contradicts the allegation that Fedex workers were employees.  Plaintiffs are entitled to this evidence. Consequently, in accordance with Fed. R. Civ. P. 26(a)(1), the names may reasonably lead to relevant evidence.  Absent some showing of privilege or undue prejudice, Fedex must turn over the names.

Fedex contends that there are privacy issues at stake.  Fedex does not wish to disclose the information because some of it is sensitive and private.  More specifically, some of the headcount forms have poor remarks made by current Fedex managers about current Fedex workers.  Fedex claims that disclosing this information, the name of who the comments are about, may damage the working relationship between the Fedex managers and its workers.  Also, Fedex told its managers to speak freely and candidly on the forms and that now disclosing the forms would betray Fedex's promise of confidentiality to its terminal managers.

While Fedex's concerns are legitimate, they do not carry enough weight to prevent disclosure pursuant to Fed. R. Civ.P. 26. Fedex's concerns of embarrassment and internal problems will be avoided if this information is designated as "confidential" in accordance with the current protective order. This procedure will protect Fedex's legitimate concerns regarding its working relationship with its workers and the trust of its managers while at the same time provide the Plaintiffs with the legitimate discovery they seek.

Plaintiffs' motion to compel the headcount names is **GRANTED**. However, Fedex may classify the documents as confidential to address its privacy concerns.

2.    Focus Group Surveys

From 2000 through 2004, Fedex contracted Scarlett Surveys International to conduct company attitude surveys (Scarlett Surveys) among its workforce. In 2005, though, Fedex apparently engaged a new firm, Luntz Maslensky Strategic Research. Plaintiffs request numbered 22 seeks to produce the results of these surveys.

Fedex represented in-court, that it was willing, and worked with Plaintiffs to disclose the Scarlett Surveys. However, Fedex refuses to produce the Luntz Survey because it is protected by the work-product privilege. This Court agrees.

The work product doctrine shields materials a party prepares in anticipation of litigation. Mattenson v. Baxter, 438 F.3d 763, 767-68 (7th Cir. 2006). The purpose of the privilege is to establish a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny and interference by an adversary. Hobley v. Burge, 433 F.3d 946, 949 (7th Cir. 2006). Fed. R. Civ. P. 26(b)(3) provides that materials that contain mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the

6

litigation are out of bounds and are only discoverable if the seeking party shows a substantial

need and is unable to obtain the materials or their substantial equivalent without undue hardship.

Fed. R. Civ. P. 26(b)(3); Mattenson, 438 F.3d at 768.

This Court is persuaded that the Luntz survey is protected by the work-product privilege

for the following reasons: first, Fedex counsel Robert Schwartz (Schwartz) filed an affidavit and

stated in open court that the Luntz survey was commissioned, directed, supervised, and utilized

by him for the sole purposes of this litigation, and second, the results were discussed only with

members of the Fedex legal team.  Schwartz's statements do not merely constitute evidence that

the Luntz survey was work product, but an oath that it was work product made by an officer of

this Court.

Plaintiffs contend, though, that evidence exists that proves the Luntz survey was not

work product.  Plaintiffs sole piece of evidence is an email by Rob Ostrov, Fedex's vice

president of contractor relations, that they claim indicates the Luntz survey conducted for

business purposes.  Plaintiffs argue this refutes Schwartz's statement that the Luntz survey was

conducted purely for purposes of litigation.  Also, Plaintiffs argue that because the Scarlett

surveys had been done for business purposes in the past, the Luntz survey was a part of Fedex's

business practice of performing a business survey every year.  The only difference was this time

it was with a different firm, Luntz.

Even though Fedex had conducted similar surveys in the past through Scarlett, that does

not mean that the Luntz survey was for a business purpose and not performed in anticipation of

litigation.  Absent some other evidence, this Court will not reach the conclusion Plaintiffs argue.

Plaintiffs offer some evidence, the Rob Ostrov email, in support of this argument, but it is unconvincing. After reviewing the Ostrov email, it appears, at best, that it is merely a notice that the survey would be being conducted. The email states:

> Beginning this week an independent consulting organization has been engaged to conduct a telephone and email survey of our independent contractors. This is an effort on our part to better understand issues of concern to our contractors.
>
> This survey is being conducted by an outside independent group to assure contractors of the privacy of their individual responses. While we hope that contractors will agree to participate in this survey they are free to voluntar[i]ly [sic] participate or not as they so choose.
>
> FedEx is not selecting which contractors are going to be called or emailed. FedEx will also not be advised in any way of contractors who voluntarly agree to participate and those who choose not to. No individual contractor information will [be] [sic] identified or provided to the company by this independent organization.

Plaintiff's Motion to Compel #1 Ex. F-1. The email does not say Fedex is using this survey for any type of business purpose. In fact the email even seems to disassociate Fedex from the survey. The email does not clearly indicate the Luntz survey was being used for business purposes rather than for litigation. Even when the email is viewed in conjunction with the fact that Fedex performed surveys in the past, it simply is insufficient to conclusively contradict the statement and affidavit by Schwartz that the survey was done for purposes of litigation. At best, Plaintiffs have offered merely circumstantial evidence that suggests rather than proves that the Luntz survey was not commissioned purely for litigation purposes.

In summary, the Court is comfortable in concluding that the Luntz survey was commissioned by Fedex's counsel in anticipation of litigation. Plaintiffs have failed to prove

otherwise and they have failed to make any showing of a substantial need for the Luntz survey.

Plaintiffs motion to compel the Luntz surveys is **DENIED**.[1]

      C      <u>Plaintiff's Motion to Compel # 2</u>

Fedex provided to Plaintiffs a large variety of information where Fedex unilaterally redacted various parts of that discovery. In fact, counsel for both parties represented the documents range in the hundreds or thousands. The basis for Plaintiffs' second motion to compel seeks to compel Fedex to re-produce all of the redacted documents in un-redacted form.

Plaintiffs do not provide any clear cut categories of redacted information that they seek to compel. However, several of the examples included addresses and phone numbers of Fedex workers, names attached to electronic complaints in a Fedex suggestion box, and redactions based on possible legitimate privileges such as those that pertain to taxes.

Generally, the Federal Rules provide no procedural device for unilateral redaction by a party and it is a procedure that is not favored. <u>See</u> Fed. R. Civ. P. 26(c) "(the <u>court</u> . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." (emphasis added)). Further, this litigation has a protective order in place that prevents non-litigants from viewing sensitive information.

Fedex contends that some of the information is simply not relevant, and in conjunction with being not relevant, is protected by an expectation of privacy from any person's eyes. For example, Fedex claims some of the redacted information pertains to addresses of its employees.

---

[1]In their reply, Plaintiffs also make an argument that Schwartz committed an ethical violation that warrants disclosure of the discovery they seek. However, because Plaintiffs raised this argument for the first time in their reply, this Court will not address this motion. <u>See</u> <u>Wright v. United States</u>, 139 F.3d 551, 553 (7th Cir.1998) (argument not made in the initial brief is considered waived).

While Fedex does not assert any privacy interest of its own, it argues it redacted the information to protect the privacy interests of the Fedex worker who does have such an expectation. Further, Fedex argues that protective orders are not airtight and that leaks sometimes do and may occur.

This Court appreciates the confidentiality concerns Fedex has raised.  See e.g. Mattice v. Memorial Hospital, 203 F.R.D. 381, 386 (N.D. Ind. 2001).  Fedex's workers may have an interest in not having their home addresses, telephone numbers, names on their complaints, privileged tax information, or other information withheld from any person's eyes other than their own.  Some of this information may be irrelevant.  However, based on the representation of counsel, it appears the parties may be able to legitimately resolve this matter on their own.

Consequently, Plaintiffs' motion is **DENIED WITHOUT PREJUDICE**.  This Court **ORDERS** the parties to meet and confer and develop a procedure for redacting or withholding information that the parties agree is not relevant, protected by privacy interests, or subject to privilege.  For example, one procedure the parties may consider is to allow Plaintiffs counsel to view, but not use, all challenged redacted material.  If Plaintiffs' counsel agrees that the redacted material is not appropriate for discovery or of no value, the material may remain redacted.  On the other hand, if Plaintiffs' counsel disagrees with the redaction, Plaintiffs' counsel may then challenge Fedex's redaction in a specific and concrete manner.  If the parties cannot agree whether particular information is protected, then the parties may resubmit this issue to this Court for an in camera review of the particular matters.  Furthermore, because of the size of this litigation and the likely volume of material this Court will have to review, this Court may have to utilize the appointment of a special master pursuant to Fed. R. Civ. P. 53.  The party that loses the motion, then, will be forced to cover the costs associated with this procedure.

10

3.      Plaintiff's Motion to Compel #3

In Plaintiffs' third motion to compel, they seek various documents where they believe Fedex is improperly claiming redacted material is protected by the attorney client privilege. Plaintiffs' request is massive spanning approximately 8,000 pages and 2,500 documents.

This Court previously warned the parties in its March 24, 2006, order that the parties should pick their discovery battles carefully only after fully conferring in good faith to resolve the dispute before seeking court action, particularly because of the complexity and size of this multi-district litigation case. However, after hearing the arguments of counsel and considering the evidence submitted by Plaintiffs, it appears that the parties have failed to abide by this Court's warning, and they have not properly met and conferred to resolve this dispute on their own before seeking court action.

Under Fed. R. Civ. P. 37 and Local Rule 37.1, when a party moves to compel disclosure of discovery "[t]he motion must include a certification that the movant has in good faith conferred or attempted to confer with the person failing to make the discovery in an effort to secure the information or material without court action."[2] Fed. R. Civ. P. 37(a)(2)(A). The aggrieved party must attempt to confer with the unresponsive party in an attempt to obtain the desired material without court action. 8A Wright, Miller, and Marcus, Federal Practice and Procedure § 2285 (2d ed. 1994). Furthermore, the movant must include "the date, time, and place of the conference or attempted conference and the names of all persons participating therein." N.D.L.R. 37.1(a). If the parties are unable to reach agreement on the disclosure of

---

[2]Plaintiffs did not provide the required certification when they filed their motion to compel. However, they did file the certification on January 2, 2007. Though belated, this Court will not deny Plaintiffs' motion on the technicality that the certification was not filed at the same time their motion was filed. However, Plaintiffs are cautioned that failure to properly follow Fed. R. Civ. P. 37(a) in the future may result in adverse consequences.

discovery, they may seek court action to resolve the conflict.  Fed. R. Civ. P. 37(a).  However, it is not this Court's duty to become a third party to discovery disputes between the litigants.  Levy Ind. Slag Co. v. Int'l Union of Operating Eng'rs, 2006 WL 1765417 at 4 (N.D. Ind. 2006).

In the present case, Plaintiffs contend that they satisfied Local Rule 37.1(a) because they exchanged an email with Fedex, they discussed the issue numerous times at depositions with Fedex, and they had telephone conversations with Fedex counsel.  However, after examining the communications, this Court finds Plaintiffs and Fedex have not adequately met and conferred before Plaintiffs sought court action.

First, a single email sent by the Plaintiffs does not constitute an engagement in a conference to resolve the discovery dispute.  Fed. R. Civ. P. 37(a)  envisions a genuine two-way communication where the parties engage in a meaningful dialogue to resolve the issues without judicial intervention.  See generally Shuffle Master Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 171 (D.C. Nev. 1996).  One email message sent in each direction does not constitute meaningful discussion or serious negotiations to resolve the disputed discovery issue.  Cf. Hoelzel v. First Select Corp., 214 F.R.D. 634 (D.C. Colo. 2003) (indicating a single email indicating that party was going to file a motion to compel did not satisfy the meet and confer requirement).  Email may be an appropriate means of communication to satisfy Fed. R. Civ. P. 37(a), but it is not appropriate in this case where the substance of the emails merely recite each parties' general stance on the issue rather than any type of bartering or negotiations.   Especially given the size of the request and the complexity of multi-district litigation.  This communication simply does not represent meaningful dialogue or show an attempt at a such dialogue to satisfy Fed. R. Civ. P. 37(a).

12

Similarly, discussions about the attorney-client privilege issue at depositions do not constitute the type of negotiations envisioned by Fed. R. Civ. P. 37(a).  Most of the "discussions" that Plaintiffs have submitted as evidence appear as objections.[3]  An objection at a deposition hardly constitutes a conference in which the parties engage in a meaningful discussion on how to resolve the issue.  At best, an objection is merely indicative of a party's general stance or attorney's belief that the material is protected by the attorney-client privilege.  Furthermore, objections and discussions at depositions are often heated debates based on immediate emotions rather than an objective meeting specifically meant to resolve a conflict.  An objection and a disagreement with that objection by the questioning party are a far cry from a meet and confer contemplated by Fed. R. Civ. P. 37(a).

Finally, with regards to Plaintiffs' telephone communications with Fedex counsel, there is no evidence before this Court to determine the substance of those communications and whether they satisfy Fed. R. Civ. P. 37(a).  Plaintiffs' counsel submitted no written evidence and did not elaborate on the substance of the telephone conversations at the in-court hearing.  Further, counsel for Fedex represented at the in-court hearing that Plaintiffs never gave them a meaningful opportunity to meet and confer.  Based on the other evidence before this Court, the lack of evidence to show the content of the telephone conversations, and the representation of

---

[3]See Plaintiffs' Ex. D , Deposition of Dennis Oates, at 102 (attorney objecting and  instructing witness not to answer because he feels it invades attorney-client privilege); Plaintiffs' Ex. E, Deposition of Severn McMurtry, at 32-33, 148, 208 (statements by witness that he cannot answer because of attorney-client privilege and objections by Plaintiffs' attorney because she believes attorney-client privilege applies); Plaintiffs' Ex. F, Deposition of David McIntyre, at 99-104 (attorney instructing witness not to answer and general discussion between attorneys whether the objection is appropriate); Plaintiffs' Ex. G, Deposition of Heather D' Alesandro, at 81-86 (witness refusing to answer question because it was protected by the attorney-client privilege and attorney objecting for the same reason).

Fedex's counsel at the in-court hearing, this Court can only assume the phone conversations were also not a meaningful attempt to confer and resolve the discovery issues.

Given the size and complexity of this litigation, Plaintiffs should have made better attempts to resolve this discovery dispute before seeking judicial intervention pursuant to Fed. R. Civ. P. 37(a). The few communications that have taken place between Plaintiffs and Fedex could not reasonably resolve the attorney-client privilege issues with regards to all 8,000 pages of documents. This Court feels it is very likely that the parties will resolve the attorney-client privilege issues or at least reduce the request to fewer than the 8,000 pages of documents Plaintiffs seek. The representation of Fedex counsel of their willingness to resolve this dispute if they are given an opportunity to meet and confer reinforces this Court's belief. Consequently, Plaintiff's motion to compel is **DENIED WITHOUT PREJUDICE**.

This Court **ORDERS** the parties to meet and confer in much greater detail with regards to the particular documents that are allegedly subject to the attorney-client privilege. If the parties are still unable to agree whether certain documents, or all the documents, are protected by the attorney-client privilege, then Plaintiffs may re-file their motion. However, Plaintiffs are cautioned that a large motion to compel, even a fraction of the size of their current request of 8,000 pages, will require this Court to utilize a special master in accordance with Fed. R. Civ. P. 53. After the special master has made his review of the documents, this Court will issue its ruling and impose costs and possible sanctions upon the party that does not prevail. The parties are warned that this process could result in a large and unnecessary expense to either or both Plaintiffs and Fedex.

### III.    CONCLUSION

For the reasons stated, Plaintiffs' first motion to compel is **DENIED IN PART** and

**GRANTED IN PART** [Doc. No. 327], Plaintiffs' second motion to compel is **DENIED**

**WITHOUT PREJUDICE** [Doc. No. 389], and Plaintiff's third motion to compel is **DENIED**

**WITHOUT PREJUDICE** [Doc. No. 394].

       **SO ORDERED.**

Dated this 5th Day of January, 2007.


                 S/ChristopherA. Nuechterlein
                 Christopher A. Nuechterlein
                 United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

|  |  |
|---|---|
| IN RE FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527 RM (MDL 1700) |
|  | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO: ALL ACTIONS |  |

**PLAINTIFFS' MOTION TO QUASH**
**SUBPOENAS OF ABSENT CLASS MEMBERS**

Pursuant to Federal Rule of Civil Procedure Rule 45, and on the accompanying Memorandum of Law in Support and the Declaration of Robert I. Harwood, dated January 16, 2007, served herewith, plaintiffs hereby move to quash the document and deposition subpoenas issued by defendant to absent class members Mr. James Lester, Ms. Marie LaRoche, Mr. Niles Pinkham and Mr. David Glidden.

Dated: January 16, 2007

Respectfully submitted,

WECHSLER HARWOOD LLP

 s/Robert I. Harwood
Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel:    (212) 935-7400

Lynn Rossman Faris
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Tel:    (510) 272-0169

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900

**PLAINTIFFS' CO-LEAD COUNSEL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| IN RE FED EX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) |

Case No. 03:05-MD-527 RM
MDL Docket No. 1700

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS

Federal Rule of Civil Procedure 45(c)(3)(A)(iv) provides, in pertinent part, that a court "shall quash or modify [a] subpoena if it . . . (iv) subjects a person to undue burden." Courts have been uniform in their aversion to discovery of absent class members, in particular because such discovery unduly burdens people whose rights are being adjudicated in a representative manner. To avoid such an undue burden on absent class members, courts have required that a party must articulate a strong need for such discovery. With respect to the deposition of absent class members, courts have required an even more compelling need to justify the oftentimes grueling questioning incident thereto. Because defendant FedEx Ground Package Systems, Inc. ("FXG") has failed to articulate any legitimate reason - - let alone great necessity - - to take document and deposition discovery of the absent class members here, the subpoenas issued by FXG should be quashed.

## FACTUAL STATEMENT

On November 17, 2006, FXG served five document and deposition subpoenas to absent class members in Michigan, Mississippi, New Hampshire, and Texas.[1] Each of these absent class members were former named plaintiffs in the constituent actions pending in those states that are part of this MDL proceeding.  The document requests contained in each of the subpoenas were identical in scope to one another and as broad as those previously propounded by defendant on named plaintiffs.  During the meet and confer process, when pressed by plaintiffs to articulate a specific need for such discovery, FXG could only muster the vague rationale that it needed to know why these FXG drivers decided to cease being named plaintiffs.  See Harwood Decl., Ex. 7.

With respect to the two New Hampshire absent class members, FXG explained that it sought "to discover what inherent variation among the members of the putative class was lost when [plaintiffs] reduced the number of named Plaintiffs from 26 to 3."  Harwood Decl., Ex. 7. After it was explained to FXG in the course of the meet and confer process that the New Hampshire action as originally filed was a mass action that had been turned into a class action on amendment of the complaint early in 2006, thereby allowing a discrete number of drivers to step forward as representative plaintiffs, see Harwood Decl. Ex. 8, FXG essentially conceded that the depositions of these individuals were unnecessary.  Harwood Decl., Ex. 11.  Indeed, FXG explained: "The fact that these third parties were former plaintiffs in an action styled as a mass

---

[1] Copies of these subpoenas are annexed to the Declaration of Robert I. Harwood in Support of Plaintiffs' Motion to Quash, dated January 16, 2007 ("Harwood Decl.") as Ex. 1). The fact that the subpoenas at issue were issued in other states does not affect this Court's jurisdiction to rule on this motion to quash because of the powers granted an MDL court by 28 U.S.C. § 1407(b).

action and were never identified by Plaintiffs as putative class representatives in the pending class actions is a sufficient basis for us to reevaluate our need for their testimony." Id. Unfortunately, FXG predicated its sensible withdrawal of the subpoenas respecting these individuals on the enforcement of unnecessary subpoenas of former named plaintiffs in Michigan and Texas. Harwood Decl., Ex. 11.

Perhaps more disturbingly, FXG explained that it sought "to discover more about [the absent class members from Michigan and Texas, Messrs. Lester and Pinkham, respectively] whose removal you noticed just days before their scheduled depositions." Harwood Decl., Ex. 7. In other words, FXG wanted to know why these individuals withdrew as class representatives. Plaintiffs explained during the meet and confer process that this idle curiosity was insufficient to support the enforcement of a deposition subpoena of these individuals. Harwood Decl., Ex. 8. In a spirit of compromise, plaintiffs went so far as to offer affidavits from Messrs. Lester and Pinkham explaining the circumstances surrounding their withdrawal as class representatives. Harwood Decl. Ex. 13. Unfortunately, FXG refused this compromise, precipitating this motion to quash. Harwood Decl. ¶ __ & Ex. 13.

With respect to the absent class member from Mississippi, Ms. Lindsey, defendant explained that her deposition was necessary "because she was the contractor in privity with both my client and *Smith* Plaintiff John Lindsey." Harwood Decl., Ex. 7. While the relevance of Ms. Lindsey's testimony is tenuous, plaintiffs nevertheless agreed to allow her deposition to go forward. Accordingly, plaintiffs are not moving to quash the subpoena of Ms. Lindsey.

Under the teaching of Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir.), cert. denied, 419 U.S. 1070 (1974), and its progeny, discussed infra, FXG's purported reasons to

conduct the discovery are insufficient and its subpoenas of Messrs. Lester, Pinkham, Glidden and

Ms. LaRoche should be quashed.  It is important to note that to date, FXG has deposed 135

named plaintiffs and will have deposed over <u>150</u> plaintiffs by the close of discovery.  To the

extent that FXG seeks evidence of disparities between class members in connection with their

opposition to class certification, FXG has had more than ample discovery to develop such

evidence if it exists.

## ARGUMENT

"As a general rule, discovery cannot be had against absentee class members under Federal

Rule of Civil Procedure 33 as a matter of course." <u>Vernardo Chaffee v. A&P Tea Co.</u>, 197 WL

9308, at *1 (N.D. Ill. Apr. 6, 1987)(citing <u>Brennan v. Midwestern United Life Ins. Co.</u>, 450 F.2d

999, 1005 (7th Cir. 1971).[2]  "Named plaintiffs are always parties subject to discovery, while

absent class members are not subject to discovery except under special circumstances." <u>In re</u>

<u>Folding Carton Antitrust Litig.</u>, 83 F.R.D. 260 (N.D. Ill. 1979).  "[T]he ideas of a class action

and individualized discovery do not fit together well. . . .If joinder of all parties is impracticable,

propounding discovery like interrogatories, depositions, and requests to produce on an individual

basis is even more impracticable. *** Taken to its logical limits, individualized discovery would

prevent such actions from being litigated." <u>Adkins v. Mid-America Growers, Inc.</u>, 141 F.R.D.

466, 468 (N.D. Ill. 1992).  <u>See</u> <u>also</u> <u>Fischer v. Wolfinbarger</u>, 55 F.R.D. 129, 132 (W.D. Ky.

1971)("It is not intended that members of the class should be treated as if they were parties

---

[2] It has been held that for purposes of analyzing the propriety of discovery of absent class members, analyses under Rules 33, 34 and 45 are equivalent because "[a]ny other holding would allow Rule 45 to be used as an end-run around Rule 23." <u>In re Publication Paper Antitrust Litig.</u>, 2005 WL 1629633, at *2 (D. Conn. July 5, 2005).

plaintiff, subject to the normal discovery procedures, because if that were permitted, then the

reason for [Rule 23] would fail."); Wainwright v. Kraftco Corp., 54 F.R.D. 532, 534 (N.D. Ga.

1972)("Indeed, if class members were automatically deemed parties, all class actions would be

converted into massive joinders. Such a result would emasculate Rule 23.").

As FXG would seem to be aware, "[a]nother, perhaps more compelling, reason for not

subjecting absent class members to discovery is the fear that defendants will 'use burdensome

discovery requests as a method of unfairly reducing the number of class members.'" On the

House Syndication, Inc. v. Federal Express Corp., 203 F.R.D. 452, 456 (S.D. Cal. 2001)(denying

FedEx's application to obtain discovery from absent class members). "In this regard, a defendant

who subjects class members to [discovery] requires those members to take some affirmative

action to remain in the class, effectively creating an 'opt in' requirement which is inconsistent

with the 'opt out' provisions of Rule 23." Id. The breadth of FXG's document requests at issue

here certainly raise such doubts about the bona fides vel non of its motivations.

A party can only serve written discovery on absent class members where "the information

requested is necessary to trial preparation and [] the interrogatory is not designed 'as a tactic to

take undue advantage of the class members or as a stratagem to reduce the number of

claimants.'" Clark v. Universal Builders, Inc., 501 F.2d 324, 340 (7th Cir.), cert. denied, 419 U.S.

1070 (1974) (quoting Brennan, 450 F.2d at 1005)(emphasis added). A party seeking the

deposition of an absent class member likewise "has the burden of showing necessity and absence

of any motive to take undue advantage of class members." Clark, 501 F.2d at 341. However,

"[i]n light of the nature of the deposition process–namely, the passive litigants are required to

appear for questioning and are subject to often stiff interrogation by opposing counsel with a

865

concomitant need of counsel of their own–we are of the view that **the burden confronting the parties seeking the deposition testimony should be more severe than that imposed on the party requesting permission to use interrogatories**." Id. (emphasis added).

As detailed above, FXG has failed to show any necessity in conducting the discovery it seeks of these absent class members. Defendant has all but admitted that the only reason it seeks such discovery is to quench its desire to know why these former named plaintiffs decided to step down as class representatives.

To the extent disparities among class members might exist for purposes of commonality and typicality, as noted above, defendant will have conducted a stunning 150 depositions of plaintiffs - - ample opportunity to discover such differences. In New Hampshire, three named plaintiffs have been deposed, with three more to be conducted; in Texas, FXG has deposed five named plaintiffs; in Michigan, it has deposed three named plaintiffs. Whatever the case, it is clear that such motivation falls short of the necessity required to allow discovery of these absent class members. After exhaustive research, plaintiffs' counsel are unaware of a single authority sanctioning an attempt by a defendant to conduct discovery of withdrawing class representatives concerning the circumstances of their decision to withdraw.

In re Currency Conversion Fee Antitrust Litig., 2004 WL 2453927 (S.D.N.Y. Nov. 3, 2004) is directly on point. In that case, defendants sought to depose withdrawing plaintiffs "to learn about the circumstances surrounding their withdrawals." Id., at *2. After noting that "'the burden on the defendant to justify discovery of absent class members by means of deposition is particularly heavy,'" the Court explained that such discovery was inappropriate because it concerned individual and not common questions. Id. (quoting Redmond v. Moody's Investor

866

Serv., 1995 WL 276150, at *1 (S.D.N.Y. May 10, 1995).  See also Organization of Minority

Vendors, Inc. v. Illinois Central-Gulf R.R., 1987 WL 8997, at *1 (N.D. Ill. Apr. 2, 1987)

("Neither the pending motion to compel nor the response to this motion suggest why the

[plaintiffs] should be singled out from other class members for the requested discovery, and there

is no obvious reason to do so.  Thus it is concluded that the withdrawn plaintiffs are not required

to comply with outstanding discovery.")

   Even assuming such impetus to be sufficient, which it is not, defendants document

requests belie this curiosity.  Attached to each subpoena are identical lists of no less than twenty

overly broad categories of documents sought to be produced, including: "All documents that

support a claim that you were or should have been an employee of FedEx Ground"; "all

documents that relate to you [sic] or interaction with FedEx Ground customers"; and "all

business records that relate to your relationship with FedEx Ground."  Harwood Decl., Ex. 1.

Ever hopeful of developing its empty conspiracy theories, FXG's subpoenas also seek "all

documents relating to communication between you or your current and former counsel and the

International Brotherhood of Teamsters or any of its affiliates."  Id.  FXG has already conducted

unnecessary and tortuous questioning of 135 named plaintiffs to date in a desperate attempt to

find some shred of evidence to avert the certification of the classes in these consolidated actions.

FedEx's idle curiosity concerning the circumstances of the withdrawal of the former named

plaintiffs here is yet another thinly veiled attempt to harass members of the proposed classes.

This Court should not countenance such abusive discovery tactics.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that this Court grant its Motion to Quash the Subpoenas of Absent Class Members.

Dated: January 16, 2007

Respectfully submitted,

**HARWOOD FEFFER LLP**

By: _____

Robert I. Harwood (RH - 3286)
488 Madison Avenue, 8th Fl.
New York, NY 10022
Tel.: (212) 935-7400

Lynn Rossman Faris
LEONARD CARDER LLP
1330 Broadway Avenue, Suite 1450
Oakland, CA 94612
Tel.: (510) 272-0169

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900

*Co-Lead Counsel For Plaintiffs*

-8-

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| IN RE FED EX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) ) | Case No. 03:05-MD-527 RM MDL Docket No. 1700  CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) | |

## DECLARATION OF ROBERT I. HARWOOD IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS

I, Robert I. Harwood, hereby declare:

1.     I am a member of Wechsler Harwood LLP, counsel for Plaintiffs.  I make this declaration in support of  Plaintiffs' Motion to Motion to Quash Subpoenas of Absent Class Members.  All statements in this declaration are based on my personal knowledge unless otherwise indicated.

2.     Annexed hereto as Exhibit 1 are true and correct copies of document and deposition subpoenas served by defendant FedEx Ground Package Systems, Inc. ("FXG") on Ms. Debbie Lindsey, Mr. James Lester, Ms. Marie LaRoche, Mr, Niles Pinkham, and Mr. David Glidden  (collectively, "Former Named Plaintiffs").

3.     On Monday, December 11, 2006, K. Lee Blalack, II, Esq., counsel for FXG, and I conducted a telephone conference discussing our positions respecting the propriety of defendant's service of subpoenas on the Former Named Plaintiffs.  During this teleconference, I explained to Mr. Blalack that under the law of the Seventh Circuit, such subpoenas were

improper because FXG could not show that such discovery was necessary to their defenses in any of the actions at issue. Mr. Blalack agreed to take our position under advisement and to analyze the authority we cited to him during that call.

4.    On December 13, 2006, Mr. Blalack sent a letter to me purporting to explain how such subpoenas were proper under the applicable law. A true and correct copy of this letter is annexed hereto as Exhibit 2.

5.    The parties then exchanged correspondence clarifying each party's position with respect to the propriety of the subpoenas at issue.

6.    Annexed hereto as Exhibit 3 is a true an correct copy of my December 15, 2006 letter to Mr. Blalack.

7.    Annexed hereto as Exhibit 4 is a true and correct copy of Mr. Blalack's December 18, 2006 letter to me.

8.    Annexed hereto as Exhibit 5 is a true and correct copy of my December 21, 2006 letter to Mr. Blalack.

9.    Annexed hereto as Exhibit 6 is a true and correct copy of my December 22, 2006 email to Mr. Blalack correcting an error contained in my December 21, 2006 letter to him.

10.    Annexed hereto as Exhibit 7 is a true and correct copy of Mr. Blalack's December 22, 2006 letter to me. In this letter, Mr. Blalack explained that the only reason FXG wanted discovery from the Former Named Plaintiffs was to find out why they had decided to withdraw as named plaintiffs.

11.    Annexed hereto as Exhibit 8 is a true and correct copy of my December 26, 2006 letter to Mr. Blalack.

12.     Annexed hereto as Exhibit 9 is a true and correct copy of my January 3, 2007 email to Mr. Blalack.

13.     Annexed hereto as Exhibit 10 is a true and correct copy of my January 4, 2006 email to Mr. Blalack.

14.     Annexed hereto as Exhibit 11 is a true and correct copy of Mr. Blalack's January 5, 2007 letter to me.

15.     Annexed hereto as Exhibit 12 is a true and correct copy of my January 8, 2007 letter to Mr. Blalack.

16.     Annexed hereto as Exhibit 13 is a true and correct copy of an email exchange between me and Mr. Blalack from January 8, 2007 through January 10, 2007.

17.     Plaintiffs eventually agreed to allow the deposition of Ms. Lindsey to go forward, given that her testimony was arguably relevant as she had been the signatory to an Operating Agreement with FXG under which her husband operated a FXG delivery route.  See my email of January 8, 2007 contained in Exhibit 13 hereto.

18.     In a final effort to resolve the dispute between the parties and avert the instant motion, Plaintiffs offered to produce affidavits from the Former Named Plaintiffs to explain the circumstances under which they decided to withdraw as named plaintiffs.  See my email of January 8, 2007 contained in Exhibit 13 hereto.  Mr. Blalack's client rejected this proposal.  See

-3-

871

1/10/07 Blalack email to me Mr. James Lester, Ms. Marie LaRoche, Mr, Niles Pinkham, and Mr.

David Glidden  contained in Exhibit 13 hereto.

     I declare under penalty of perjury that the foregoing is true and correct.  Executed this

16th day of January, 2007, at New York, New York.

                                  Robert I. Harwood   (RH-3286)

# EXHIBIT 1

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

OUR FILE NUMBER
259075-3

November 17, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**BY HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

Ms. Debbie Lindsey
3126 Quartz Dr.
Hernando, MS 38632

**Re:**    *Subpoena in the Matter of In Re FedEx Ground Package System, Inc.
Employment Practices Litigation*

Dear Ms. Lindsey:

Please find enclosed a subpoena for testimony and production of documents in the above-referenced matter. The attached subpoena compels your testimony and production of documents at the dates, times and locations specified. Also included is a check for $64.27, which includes a witness appearance fee of $40 and roundtrip mileage compensation of $24.27 pursuant to Federal Rule of Civil Procedure 45(b)(1).

Please contact me if you have any questions.

Sincerely,

Evelyn L. Becker
for O'MELVENY & MYERS LLP

3870

**O'MELVENY & MYERS DC, LLP**
1625 EYE STREET, NW
WASHINGTON, DC 20006

7-11
520 6541

DATE November 16, 2006

PAY
TO THE
ORDER OF ***********Debbie Lindsey************    $ **64.27**

***************Sixty-four-dollars-twenty-seven-cents*************    DOLLARS

**M&T Bank**
Manufacturers and Traders Trust Company
60th & F Street Office

FOR ~~EXPENSES~~/259,075-003 Witness fee &
mileage     ⑈003870⑈ ⑆052000113⑇     191914407⑈

875

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

_____ Western _____    DISTRICT OF    _____ Tennessee _____

In re FedEx Ground Package System, Inc.,
Employment Practices Litgiation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  3:05-md-527-RLM-CAN

Northern District of Indiana

TO:  Debbie Lindsey
      3126 Quartz Dr.
      Hernando, MS 38632

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case. **THIS DEPOSITION WILL BE RECORDED BY STENOGRAPHER AND VIDEOGRAPHER**

| PLACE OF DEPOSITION   Henderson, Claxton & Mulroy, LLP / International Palace, Tower II<br>6410 Poplar Ave., Ste. 300 / Memphis, TN 38119 | DATE AND TIME<br>12/21/2006  8:30 am |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Attached Schedule A

| PLACE   Henderson, Claxton & Mulroy LLP / International Palace, Tower II<br>6410 Poplar Ave., Ste. 300 / Memphis, TN 38119 | DATE AND TIME<br>11/15/2006  8:30 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Evyn L. Becker_ -attorney for Defendant | 11-17-06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Evelyn L. Becker of O'Melveny & Myers LLP
1625 Eye St., NW / Washington, D.C. 20006     Tel: (202) 383-5300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE A

### Definitions

The following terms shall have the meanings as set forth below whenever used in this subpoena.

1. "Relate" or "related" means concerning, describing, evidencing, supporting or discussing the referenced matter.

2. "FedEx Ground" means FedEx Ground Package System, Inc., FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery, FedEx Corporation, and their subsidiaries, affiliates, divisions, employees, agents, and field representatives.

3. "Document" means any writing which is or ever has been in your actual or constructive possession, custody or control, or available or obtainable by you or of which you have knowledge, and includes without limitation all originals, copies, drafts, or other nonconforming copies of every kind.

4. "Person" means any natural person and any entity, including any corporation, association, or other business enterprise.

5. "You" or "your" means the person subject to this subpoena individually and all their attorneys, representatives, employees or agents.

6. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

7. "Any" shall be construed to mean "all," and vice versa.

### Documents to be Produced

The following documents must be produced pursuant to Rule 45 of the Federal Rules of Civil Procedure:

1. All documents that support a claim that you were or should have been an employee of FedEx Ground.

2. All documents that you submitted to any tax authority, including supporting documentation, invoices, correspondence cancelled checks, receipts or worksheets used to prepare your tax returns for the taxable years during which you contracted with FedEx Ground.

3. All documents that you submitted to any insurer while you contracted with FedEx Ground or relating to any period during which you contracted for FedEx Ground.

4. All documents related to any claims you made for workers' compensation, employee benefits, disability benefits, or unemployment benefits.

5. All documents that reflect any communications between you and any individual about your relationship with FedEx Ground.

6. All documents that relate to the retention, compensation, dismissal, insurance, worker's compensation, employee benefits, disability benefits, and/or unemployment benefits or any person or persons who assisted you in your performance of services for FedEx Ground.

7. All documents that relate to the purchase and/or sale of the truck you used to deliver packages pursuant to your contract with FedEx Ground.

8. All documents that relate to pickup and/or delivery services that you provided for FedEx Ground.

9. All documents that relate to your purchase or sale of, in whole or in part, any route or work area.

10. All documents that relate to you relationship or interaction with FedEx Ground customers.

11. All documents that relate to or reflect any expenses that you incurred in your capacity as a pickup and delivery driver with FedEx Ground.

12. All documents that relate to or reflect any communications that you may have had with FedEx Ground managers or other contractors.

13. All documents that relate to your financing of vehicles or other equipment used during your relationship with FedEx Ground.

14. All documents relating to your purchase of any equipment other than trucks or vans, such as hand-trucks, in connection with your relationship with FedEx Ground.

15. All documents sent to or received from you accountant or financial advisor that relate to income or expenses associated with your relationship with FedEx Ground.

16. All business records that relate to your relationship with FedEx Ground.

17. All documents that related to your relationship with FedEx Ground.

18. All documents that relate to your former claims against FedEx Ground.

19. All documents that relate to any jobs of independent contractor relationships with any trucking or package delivery service.

20. All documents relating to communication between you or your current and former counsel and the International Brotherhood of Teamsters or any of its affiliates.

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

OUR FILE NUMBER
259075-3

November 17, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**BY HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

James Lester
9825 Becket Rd.
Johannesburg, MI 49751

Re:    *Subpoena in the Matter of In Re FedEx Ground Package System, Inc.
        Employment Practices Litigation*

Dear Mr. Lester:

   Please find enclosed a subpoena for testimony and production of documents in the above-
referenced matter. The attached subpoena compels your testimony and production of documents
at the dates, times and locations specified. Also included is a check for $48.90, which includes a
witness appearance fee of $40 and roundtrip mileage compensation of $8.90 pursuant to Federal
Rule of Civil Procedure 45(b)(1).

   Please contact me if you have any questions.

                                        Sincerely,

                                        Evelyn L. Becker
                                        for O'MELVENY & MYERS LLP

**O'MELVENY & MYERS DC, LLP**
1625 EYE STREET, NW
WASHINGTON, DC 20006

7-11
520
8541

DATE November 16, 2006

PAY
TO THE
ORDER OF ***********James Lester****************

$ **48.90**

**************Forty-eight-dollars-ninety-cents**************    DOLLARS 🔒

**M&T Bank**
Manufacturers and Traders Trust Company
12th & F Street Office

FOR XXXXXXXXX/259,075-003 Witness fee &
mileage    ⑈003871⑈ ⑊052000113⑊    1919440?⑈

# United States District Court
# Eastern District of Michigan



## *Subpoena in a Civil Case and Return of Service Form*

| Plaintiff(s) | | Defendant(s) |
|---|---|---|
| In re FedEx Ground Package System, Inc., Employment Practices Litigation | v | |

| TO: | CASE NO. 3:05-md-527-RLM-CAN |
|---|---|
| James Lester 9825 Becket Rd. Johannesburg, MI 49751 | JUDGE    Judge Miller, Northern District of Indiana |

- [ ] SUBPOENA FOR ATTENDANCE AT TRIAL
- [X] SUBPOENA FOR ATTENDANCE AT A DEPOSITION
- [ ] DOCUMENT PRODUCTION REQUEST ONLY
- [ ] PROPERTY INSPECTION REQUEST ONLY

| COMMAND TO APPEAR | YOU ARE HEREBY COMMANDED to appear at the place, date and time specified below to give testimony in the above case, and, if so indicated, to bring certain documents with you. |
|---|---|

Place: Gaylord Hampton Inn
230 Dickerson Rd.
Gaylord, MI 49735

Date: 12/20/2006

Time: 8:30 A.M.

THIS DEPOSITION WILL BE RECORDED BY
STENOGRAPHER AND VIDEOGRAPHER

- [X] APPEARANCE WITH DOCUMENTS (SEE DESCRIPTION BELOW)
- [ ] APPEARANCE WITHOUT DOCUMENTS

| COMMAND FOR DOCUMENTS | YOU ARE HEREBY COMMANDED to have the following documents, objects or things delivered to the place listed below, or allow the inspection of the below-listed property at the date and time specified. |
|---|---|

Place: Miller, Cranfield, Paddock & Stone
150 West Jefferson
Suite 2500
Detroit, MI 48226-4415

Date: 12/13/2006

Time: 8:30 A.M.

Description of documents/items to be produced or property to be inspected:

**See Attached Schedule A**

| This subpoena is issued by (name, address and telephone number of attorney:) | Date of execution | Signature of issuing attorney/court officer |
|---|---|---|
| **Evelyn L. Becker** of **O'Melveny & Myers LLP** **1625 Eye St., NW** **Washington, DC 20006** | *11-17-06* On behalf of the [ ] Plaintiff [X] Defendant | *Eyn L Becker* |

INT-0129-MIE-4/92 REV. 4194

PAGE ONE OF TWO

Federal Rules of Civil Procedure
Rule 45

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or (iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

RETURN OF SERVICE

| Served on: | Place: |
|---|---|
| | |

| Date of Service | Amount of fees tendered | Printed name of server |
|---|---|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Return of Service is true and correct.

| Signature of Server | Address of Server |
|---|---|
| Date of execution | |

PAGE TWO OF TWO

# SCHEDULE A

## Definitions

The following terms shall have the meanings as set forth below whenever used in this subpoena.

1. "Relate" or "related" means concerning, describing, evidencing, supporting or discussing the referenced matter.

2. "FedEx Ground" means FedEx Ground Package System, Inc., FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery, FedEx Corporation, and their subsidiaries, affiliates, divisions, employees, agents, and field representatives.

3. "Document" means any writing which is or ever has been in your actual or constructive possession, custody or control, or available or obtainable by you or of which you have knowledge, and includes without limitation all originals, copies, drafts, or other nonconforming copies of every kind.

4. "Person" means any natural person and any entity, including any corporation, association, or other business enterprise.

5. "You" or "your" means the person subject to this subpoena individually and all their attorneys, representatives, employees or agents.

6. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

7. "Any" shall be construed to mean "all," and vice versa.

## Documents to be Produced

The following documents must be produced pursuant to Rule 45 of the Federal Rules of Civil Procedure:

1. All documents that support a claim that you were or should have been an employee of FedEx Ground.

2. All documents that you submitted to any tax authority, including supporting documentation, invoices, correspondence cancelled checks, receipts or worksheets used to prepare your tax returns for the taxable years during which you contracted with FedEx Ground.

3. All documents that you submitted to any insurer while you contracted with FedEx Ground or relating to any period during which you contracted for FedEx Ground.

4. All documents related to any claims you made for workers' compensation, employee benefits, disability benefits, or unemployment benefits.

5. All documents that reflect any communications between you and any individual about your relationship with FedEx Ground.

6. All documents that relate to the retention, compensation, dismissal, insurance, worker's compensation, employee benefits, disability benefits, and/or unemployment benefits or any person or persons who assisted you in your performance of services for FedEx Ground.

7. All documents that relate to the purchase and/or sale of the truck you used to deliver packages pursuant to your contract with FedEx Ground.

8. All documents that relate to pickup and/or delivery services that you provided for FedEx Ground.

9. All documents that relate to your purchase or sale of, in whole or in part, any route or work area.

10. All documents that relate to you relationship or interaction with FedEx Ground customers.

11. All documents that relate to or reflect any expenses that you incurred in your capacity as a pickup and delivery driver with FedEx Ground.

12. All documents that relate to or reflect any communications that you may have had with FedEx Ground managers or other contractors.

13. All documents that relate to your financing of vehicles or other equipment used during your relationship with FedEx Ground.

14. All documents relating to your purchase of any equipment other than trucks or vans, such as hand-trucks, in connection with your relationship with FedEx Ground.

15. All documents sent to or received from you accountant or financial advisor that relate to income or expenses associated with your relationship with FedEx Ground.

16. All business records that relate to your relationship with FedEx Ground.

17. All documents that related to your relationship with FedEx Ground.

18. All documents that relate to your former claims against FedEx Ground.

19. All documents that relate to any jobs of independent contractor relationships with any trucking or package delivery service.

20. All documents relating to communication between you or your current and former counsel and the International Brotherhood of Teamsters or any of its affiliates.

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

OUR FILE NUMBER
259075-3

November 17, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**BY HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

Marie LaRoche
144 Moose Club Park Rd.
Goffstown, NH 03045

Re:     *Subpoena in the Matter of In Re FedEx Ground Package System, Inc.*
        *Employment Practices Litigation*

Dear Ms. LaRoche:

Please find enclosed a subpoena for testimony and production of documents in the above-referenced matter. The attached subpoena compels your testimony and production of documents at the dates, times and locations specified. Also included is a check for $57.39, which includes a witness appearance fee of $40 and roundtrip mileage compensation of $17.39 pursuant to Federal Rule of Civil Procedure 45(b)(1).

Please contact me if you have any questions.

Sincerely,

Evelyn L. Becker
for O'MELVENY & MYERS LLP

3873

**O'MELVENY & MYERS DC, LLP**
1625 EYE STREET, NW
WASHINGTON, DC 20006

7-11
520 6541

DATE November 16, 2006

PAY
TO THE
ORDER OF **********Marie LaRoche*****************

$ **57.40**

************Fifty-seven-dollars-forty-cents******************

DOLLARS

**M&T Bank**
Manufacturers and Traders Trust Company
72th & F Street Office

FOR ~~XXXXXXXX~~/259,075-003 Witness fee &
Mileage

⑈003873⑈ ⑈052000113⑈   19194407⑈

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ New Hampshire

In re FedEx Ground Package System, Inc.,
Employment Practices Litigation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  3:05-md-527-RLM-CAN

Northern District of Indiana

TO:  Marie LaRoche
144 Moose Club Park Rd.
Goffstown, NH 03045

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.   THIS DEPOSITION WILL BE RECORDED BY STENOGRAPHER AND VIDEOGRAPHER

| PLACE OF DEPOSITION  Gallagher, Callahan & Gartrell PA / 214 North Main Street / Concord, NH 03302-1415 | DATE AND TIME  12/19/2006  1:30 pm |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached Schedule A

| PLACE  Gallagher, Callahan & Gartrell PA / 214 North Main Street / Concord, NH 03302-1415 | DATE AND TIME  12/12/2006  8:30 pm |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Evelyn L. Becker_ ~attorney for Defendant | 11-17-06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Evelyn L. Becker of O'Melveny & Myers LLP
1625 Eye St., NW  Washington, DC 20006    Tel: (202) 383-5300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                    DATE                         SIGNATURE OF SERVER

                                         _____
                                         ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

## SCHEDULE A

### Definitions

The following terms shall have the meanings as set forth below whenever used in this subpoena.

1. "Relate" or "related" means concerning, describing, evidencing, supporting or discussing the referenced matter.

2. "FedEx Ground" means FedEx Ground Package System, Inc., FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery, FedEx Corporation, and their subsidiaries, affiliates, divisions, employees, agents, and field representatives.

3. "Document" means any writing which is or ever has been in your actual or constructive possession, custody or control, or available or obtainable by you or of which you have knowledge, and includes without limitation all originals, copies, drafts, or other nonconforming copies of every kind.

4. "Person" means any natural person and any entity, including any corporation, association, or other business enterprise.

5. "You" or "your" means the person subject to this subpoena individually and all their attorneys, representatives, employees or agents.

6. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

7. "Any" shall be construed to mean "all," and vice versa.

### Documents to be Produced

The following documents must be produced pursuant to Rule 45 of the Federal Rules of Civil Procedure:

1. All documents that support a claim that you were or should have been an employee of FedEx Ground.

2. All documents that you submitted to any tax authority, including supporting documentation, invoices, correspondence cancelled checks, receipts or worksheets used to prepare your tax returns for the taxable years during which you contracted with FedEx Ground.

3. All documents that you submitted to any insurer while you contracted with FedEx Ground or relating to any period during which you contracted for FedEx Ground.

4. All documents related to any claims you made for workers' compensation, employee benefits, disability benefits, or unemployment benefits.

5. All documents that reflect any communications between you and any individual about your relationship with FedEx Ground.

6. All documents that relate to the retention, compensation, dismissal, insurance, worker's compensation, employee benefits, disability benefits, and/or unemployment benefits or any person or persons who assisted you in your performance of services for FedEx Ground.

7. All documents that relate to the purchase and/or sale of the truck you used to deliver packages pursuant to your contract with FedEx Ground.

8. All documents that relate to pickup and/or delivery services that you provided for FedEx Ground.

9. All documents that relate to your purchase or sale of, in whole or in part, any route or work area.

10. All documents that relate to you relationship or interaction with FedEx Ground customers.

11. All documents that relate to or reflect any expenses that you incurred in your capacity as a pickup and delivery driver with FedEx Ground.

12. All documents that relate to or reflect any communications that you may have had with FedEx Ground managers or other contractors.

13. All documents that relate to your financing of vehicles or other equipment used during your relationship with FedEx Ground.

14. All documents relating to your purchase of any equipment other than trucks or vans, such as hand-trucks, in connection with your relationship with FedEx Ground.

15. All documents sent to or received from you accountant or financial advisor that relate to income or expenses associated with your relationship with FedEx Ground.

16. All business records that relate to your relationship with FedEx Ground.

17. All documents that related to your relationship with FedEx Ground.

18. All documents that relate to your former claims against FedEx Ground.

19. All documents that relate to any jobs of independent contractor relationships with any trucking or package delivery service.

20. All documents relating to communication between you or your current and former counsel and the International Brotherhood of Teamsters or any of its affiliates.

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

OUR FILE NUMBER
259075-3

November 17, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**BY HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

Mr. Niles Pinkham
744 W. William Cannon Dr.
Apt. 3056
Austin, TX 78745

Re:    *Subpoena in the Matter of In Re FedEx Ground Package System, Inc.*
*Employment Practices Litigation*

Dear Mr. Pinkham:

Please find enclosed a subpoena for testimony and production of documents in the above-referenced matter. The attached subpoena compels your testimony and production of documents at the dates, times and locations specified. Also included is a check for $46.88, which includes a witness appearance fee of $40 and roundtrip mileage compensation of $6.88 pursuant to Federal Rule of Civil Procedure 45(b)(1).

Please contact me if you have any questions.

Sincerely,

Evelyn L. Becker
for O'MELVENY & MYERS LLP

**O'MELVENY & MYERS DC, LLP**
1625 EYE STREET, NW
WASHINGTON, DC  20006

DATE  November 16, 2006    7-11/520 6541

PAY
TO THE
ORDER OF ***********Niles Pinkman***************    $  **46.88**

***************Forty-six-dollars-eighty-eight-cents***************    DOLLARS

**M&T Bank**
Manufacturers and Traders Trust Company
12th & F Street Office

FOR ~~SC000000~~/259,075-003 Witness fee &
mileage

⑈00387 2⑈ ⑆052000113⑈    ⑈919440 7⑈

896

OAO88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

In re FedEx Ground Package System, Inc.
Employment Practices Litigation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   3:05-md-527-RLM-CAN
Northern District of Indiana

TO:   Niles Pinkham
744 W. William Cannon Dr.
Apt. 3056
Austin, TX 78745

YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

X   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. THIS DEPOSITION WILL BE RECORDED BY STENOGRAPHER AND VIDEOGRAPHER

| PLACE OF DEPOSITION   Affiliated Reporters 805 W. 10th St, ste 400 Austin, TX 78701 | DATE AND TIME 12/18/2006 8:30 AM |
|---|---|

X   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**See Attached Schedule A**

| PLACE Hillco Partners 823 Congress Ave. / Suite 900 Austin, TX 78701 | DATE AND TIME 12/11/2006 8:30 AM |
|---|---|

YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) Attorney for Defendant FedEx Ground Package System, Inc. | DATE 11-17-06 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Evelyn L. Becker or O'Melveny & Myers LLP
1625 Eye St., NW
Washington D.C., 20006                    Tel: (202) 383 5300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on

_____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance,
(ii)  requires a person who is not a party or an officer of a

party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B) If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert=s opinion or information not describing specific events or occurrences in dispute and resulting from the expert=s study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

### Definitions

The following terms shall have the meanings as set forth below whenever used in this subpoena.

1. "Relate" or "related" means concerning, describing, evidencing, supporting or discussing the referenced matter.

2. "FedEx Ground" means FedEx Ground Package System, Inc., FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery, FedEx Corporation, and their subsidiaries, affiliates, divisions, employees, agents, and field representatives.

3. "Document" means any writing which is or ever has been in your actual or constructive possession, custody or control, or available or obtainable by you or of which you have knowledge, and includes without limitation all originals, copies, drafts, or other nonconforming copies of every kind.

4. "Person" means any natural person and any entity, including any corporation, association, or other business enterprise.

5. "You" or "your" means the person subject to this subpoena individually and all their attorneys, representatives, employees or agents.

6. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

7. "Any" shall be construed to mean "all," and vice versa.

### Documents to be Produced

The following documents must be produced pursuant to Rule 45 of the Federal Rules of Civil Procedure:

1. All documents that support a claim that you were or should have been an employee of FedEx Ground.

2. All documents that you submitted to any tax authority, including supporting documentation, invoices, correspondence cancelled checks, receipts or worksheets used to prepare your tax returns for the taxable years during which you contracted with FedEx Ground.

3. All documents that you submitted to any insurer while you contracted with FedEx Ground or relating to any period during which you contracted for FedEx Ground.

4. All documents related to any claims you made for workers' compensation, employee benefits, disability benefits, or unemployment benefits.

5. All documents that reflect any communications between you and any individual about your relationship with FedEx Ground.

6. All documents that relate to the retention, compensation, dismissal, insurance, worker's compensation, employee benefits, disability benefits, and/or unemployment benefits or any person or persons who assisted you in your performance of services for FedEx Ground.

7. All documents that relate to the purchase and/or sale of the truck you used to deliver packages pursuant to your contract with FedEx Ground.

8. All documents that relate to pickup and/or delivery services that you provided for FedEx Ground.

9. All documents that relate to your purchase or sale of, in whole or in part, any route or work area.

10. All documents that relate to you relationship or interaction with FedEx Ground customers.

11. All documents that relate to or reflect any expenses that you incurred in your capacity as a pickup and delivery driver with FedEx Ground.

12. All documents that relate to or reflect any communications that you may have had with FedEx Ground managers or other contractors.

13. All documents that relate to your financing of vehicles or other equipment used during your relationship with FedEx Ground.

14. All documents relating to your purchase of any equipment other than trucks or vans, such as hand-trucks, in connection with your relationship with FedEx Ground.

15. All documents sent to or received from you accountant or financial advisor that relate to income or expenses associated with your relationship with FedEx Ground.

16. All business records that relate to your relationship with FedEx Ground.

17. All documents that related to your relationship with FedEx Ground.

18. All documents that relate to your former claims against FedEx Ground.

19. All documents that relate to any jobs of independent contractor relationships with any trucking or package delivery service.

20. All documents relating to communication between you or your current and former counsel and the International Brotherhood of Teamsters or any of its affiliates.

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C.  20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE  (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE  (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

OUR FILE NUMBER
259075-3

November 17, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**BY HAND DELIVERY**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

David Glidden
69 Amherst Rd.
Merrimack, NH 03054

Re:    *Subpoena in the Matter of In Re FedEx Ground Package System, Inc.*
       *Employment Practices Litigation*

Dear Mr. Glidden:

Please find enclosed a subpoena for testimony and production of documents in the above-referenced matter.  The attached subpoena compels your testimony and production of documents at the dates, times and locations specified.  Also included is a check for $65.08, which includes a witness appearance fee of $40 and roundtrip mileage compensation of $25.08 pursuant to Federal Rule of Civil Procedure 45(b)(1).

Please contact me if you have any questions.

Sincerely,

Evelyn L. Becker
for O'MELVENY & MYERS LLP

**O'MELVENY & MYERS DC, LLP**
1625 EYE STREET, NW
WASHINGTON, DC 20006

DATE November 16, 2006    7-11/520 8541

PAY
TO THE
ORDER OF  ***********David Glidden****************    $ **65.08**

***************Sixty-five-dollars-eight-cents*****************    DOLLARS 🔒

**M&T Bank**
Manufacturers and Traders Trust Company
12th & F Street Office

FOR  ~~Schroeder~~ /259,075-003 Witness fee &
mileage

⑈003874⑈ ⑆052000113⑆ 19191407⑈

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ New Hampshire

In re FedEx Ground Package System, Inc.,
Employment Practices Litigation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 3:05-md-527-RLM-CAN

Northern District of Indiana

TO:  David Glidden
     69 Amherst Rd.
     Merrimack, NH 03054

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.    THIS DEPOSITION WILL BE RECORDED BY STENOGRAPHER AND VIDEOGRAPHER

| PLACE OF DEPOSITION    Gallagher, Callahan & Gartrell PA / 214 North Main Street / Concord, NH 03302-1415 | DATE AND TIME    12/11/2006  8:30 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attached Schedule A

| PLACE    Gallagher, Callahan & Gartrell PA / 214 North Main Street / Concord, NH 03302-1415 | DATE AND TIME    12/3/2006  9:41 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Evelyn L. Becker  –attorney for Defendant | 11-17-06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Evelyn L. Becker of O'Melveny & Myers LLP
1625 Eye St., NW  Washington, DC 20006      Tel: (202) 383-5300

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| David Glidden | Express Mail |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

| Executed on | | |
|---|---|---|
| | DATE | SIGNATURE OF SERVER |
| | | ADDRESS OF SERVER |

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the mmmdemanding party to contest the claim.

# SCHEDULE A

### Definitions

The following terms shall have the meanings as set forth below whenever used in this subpoena.

1. "Relate" or "related" means concerning, describing, evidencing, supporting or discussing the referenced matter.

2. "FedEx Ground" means FedEx Ground Package System, Inc., FedEx Ground Package System, Inc. d/b/a FedEx Home Delivery, FedEx Corporation, and their subsidiaries, affiliates, divisions, employees, agents, and field representatives.

3. "Document" means any writing which is or ever has been in your actual or constructive possession, custody or control, or available or obtainable by you or of which you have knowledge, and includes without limitation all originals, copies, drafts, or other nonconforming copies of every kind.

4. "Person" means any natural person and any entity, including any corporation, association, or other business enterprise.

5. "You" or "your" means the person subject to this subpoena individually and all their attorneys, representatives, employees or agents.

6. Any noun used in the singular form shall be construed and applied so as to include the plural form also, and vice versa.

7. "Any" shall be construed to mean "all," and vice versa.

### Documents to be Produced

The following documents must be produced pursuant to Rule 45 of the Federal Rules of Civil Procedure:

1. All documents that support a claim that you were or should have been an employee of FedEx Ground.

2. All documents that you submitted to any tax authority, including supporting documentation, invoices, correspondence cancelled checks, receipts or worksheets used to prepare your tax returns for the taxable years during which you contracted with FedEx Ground.

3. All documents that you submitted to any insurer while you contracted with FedEx Ground or relating to any period during which you contracted for FedEx Ground.

4. All documents related to any claims you made for workers' compensation, employee benefits, disability benefits, or unemployment benefits.

5. All documents that reflect any communications between you and any individual about your relationship with FedEx Ground.

6. All documents that relate to the retention, compensation, dismissal, insurance, worker's compensation, employee benefits, disability benefits, and/or unemployment benefits or any person or persons who assisted you in your performance of services for FedEx Ground.

7. All documents that relate to the purchase and/or sale of the truck you used to deliver packages pursuant to your contract with FedEx Ground.

8. All documents that relate to pickup and/or delivery services that you provided for FedEx Ground.

9. All documents that relate to your purchase or sale of, in whole or in part, any route or work area.

10. All documents that relate to you relationship or interaction with FedEx Ground customers.

11. All documents that relate to or reflect any expenses that you incurred in your capacity as a pickup and delivery driver with FedEx Ground.

12. All documents that relate to or reflect any communications that you may have had with FedEx Ground managers or other contractors.

13. All documents that relate to your financing of vehicles or other equipment used during your relationship with FedEx Ground.

14. All documents relating to your purchase of any equipment other than trucks or vans, such as hand-trucks, in connection with your relationship with FedEx Ground.

15. All documents sent to or received from you accountant or financial advisor that relate to income or expenses associated with your relationship with FedEx Ground.

16. All business records that relate to your relationship with FedEx Ground.

17. All documents that related to your relationship with FedEx Ground.

18. All documents that relate to your former claims against FedEx Ground.

19. All documents that relate to any jobs of independent contractor relationships with any trucking or package delivery service.

20. All documents relating to communication between you or your current and former counsel and the International Brotherhood of Teamsters or any of its affiliates.

# EXHIBIT 2

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

**1625 Eye Street, NW**
**Washington, D.C. 20006-4001**

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
**www.omm.com**

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

December 13, 2006

OUR FILE NUMBER
**259075-3**

**VIA ELECTRONIC DELIVERY**

WRITER'S DIRECT DIAL
(202) 383-5374

Robert Harwood, Esq.
Weschler Harwood LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
**lblalack@omm.com**

> Re:    *Third Party Subpoenas of Former Named Plaintiffs*

Dear Rob:

I am writing in response to the telephonic meet and confer we held on Monday regarding the Rule 45 subpoenas that we have served upon five former named Plaintiffs in the MDL litigation.

As a preliminary matter, based on your representations on Monday, I am operating under the belief that you and your MDL co-counsel maintain an attorney-client relationship with these individuals even though they have been dismissed from the relevant cases. Therefore, you are authorized to represent their interests and to advance any objections that these individuals may wish to lodge to the subpoenas as third party discovery subjects. Your representation also means that I can conduct negotiations with you regarding these subpoenas through you and need not contact any other attorneys or these individuals directly. If my understanding is incorrect in this regard, please notify me immediately.

I have reviewed the authority that you cited during our meet and confer and I remain convinced that the subpoenas we have issued are proper. Broadly, the cases to which you referred me support FedEx Ground's position that discovery requests are properly issued to "absent class members," as you term these individuals, when they are probative of a claim or defense and when they are not issued for harassing or vexatious purposes. *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 341 (7th Cir. 1971) ("And, not unlike the use of interrogatories, the party seeking the depositions has the burden of showing necessity and absence of any motive to take undue advantage of the class members."); *Organization of Minority Vendors, Inc. v. Illinois Cent.-Gulf R.R.*, 1987 WL 8997, at *1 (N.D. Ill. 1987) ("In order to take discovery from class members, defendants must show that the information is necessary to their defense and not designed to take undue advantage of class members or to reduce the number of claimants."); *accord In re Folding Carton Antitrust Litig.*, 83 F.R.D. 260, 264 (N.D. Ill. 1979). In addition to

O'MELVENY & MYERS LLP
Robert Harwood, Esq., December 13, 2006 - Page 2

this authority, I would add *Brennan v. Midwestern United Life Insurance Co.*, which affirms that discovery of absent class members is permitted if "necessary or helpful to the proper presentation and correct adjudication of the principal suit." 450 F.2d 999, 1005 (7th Cir. 1971).

While I believe that the legal standard announced in the above cases presents no bar to the requested discovery, each of those cases is technically inapposite for a common reason. Each of these cases concerned the defendant's attempts to gain discovery from absent members of *previously certified classes*. By contrast, my client in this case seeks pre-certification discovery of putative class members in order to develop its arguments in response to your anticipated motions for class certification. This distinction alone justifies the validity of these discovery requests. *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982) ("There can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and conduct hearings to determine whether the prerequisites of Rule 23 are satisfied."); *Davenport v. Fowlkes*, 1988 WL 52098, at *2 (E.D. Pa. 1988) (permitting deposition testimony of 35 unnamed putative class members to proceed).

In addition to the necessity for the requested discovery to support my client's defense to class certification, we have served subpoenas only upon individuals who are particularly likely to have relevant information in a given case and to minimize the burdens presented by these subpoenas on third parties. Each of these individuals has previously been a litigant, either as a putative class representative or on an individual basis, in this litigation. In some cases, these individuals were parties to the litigation for years and notice of their pending dismissal was only provided on the eve of their scheduled depositions. In addition, each of these individuals has already responded to document requests served pursuant to Rule 34 and each has already answered interrogatories served by Defendant pursuant to Rule 33. Thus, while there may be some need for these third parties to perform modest due diligence to ensure that their document productions in response to the subpoenas are complete, there should be very little burden on the individuals other than making themselves available for the depositions themselves.

In addition, we have not sought discovery broadly from a random selection of absent class members or, for that matter, all of the former named plaintiffs who have been dismissed from the various MDL actions on the eve of their depositions. We have limited our subpoenas to former named plaintiffs in particular cases where we anticipate that the witnesses may be able to provide evidence helpful to the resolution of the particular cases. For example, one of the third parties on whom we have served a subpoena seeking documents and testimony was the individual who was the actual party in privity with FedEx Ground in relation to a non-contractor driver who remains a plaintiff in the MDL.

Finally, while you have dismissed these parties from the litigation, you have done so "without prejudice to [their] rights as a member of the class as defined [in the relevant complaints]." The merits of their claims against my client remain a relevant subject of this litigation.

I hope that you will be persuaded by my position and not object to the third-party depositions scheduled to go forward next week. If this is not the case, however, and you plan to

O'MELVENY & MYERS LLP

Robert Harwood, Esq., December 13, 2006 - Page 3


move to quash these subpoenas, please let me know by 4:00 PM on Thursday, December 14, 2006. We will agree to suspend these subpoenas provided, of course, that you agree to move quickly with respect to your motion to quash and work with us to schedule these depositions as quickly as possible should the Court deny your objections and affirm the validity of the subpoenas.

Should you have any questions regarding this matter, please contact me at your earliest convenience.

Very truly yours,


/s K. Lee Blalack, II

K. Lee Blalack, II
of O'MELVENY & MYERS LLP

cc (via electronic delivery):    Jordan Lewis, Esq.
                                Peter Overs, Esq.

DC1:690899.2

# EXHIBIT 3

# WECHSLER HARWOOD LLP
### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE: (212) 935-7400
TELECOPIER: (212) 753-3630

December 15, 2006

**By E-Mail and First Class Mail**

K. Lee Blalack, II, Esq.
O'Melveny & Myers LLP
1625 Eye Street NW, Suite 10
Washington, DC 20006-4001

     Re:    **Discovery of Absent Class Members**

Dear Lee:

     I write in response to your letter of December 13, 2006.

     First, you are correct in your assumption that we represent the subpoenaed individuals to the extent that we represent all absent members of the proposed class in the various litigations, and that you need not contact other attorneys concerning these subpoenas. We will contact these individuals to inform them that, given the current state of affairs, their depositions will not be taking place next week and that we will keep them advised of whether and when their depositions will occur.

     Second, your analysis suffers from a basic confusion between the concept of relevancy under Rule 26 and the heightened burden of a strong showing of necessity required to conduct depositions of absent class members under the authority that we mutually agree applies here. See Clark v. Universal Builders, Inc., 501 F.2d 324, 341 (7th Cir. 1973)("the burden confronting the party seeking deposition testimony should be more severe than that imposed on the party requesting permission to use interrogatories."). Although such discovery may be arguably relevant, nothing in your letter purports to show how the depositions you seek are <u>necessary</u> to the defense of your claims. Instead, your letter admits that, at most, the relevance of such discovery is limited to the vague possibility that "the witnesses <u>may</u> be able to provide evidence helpful to the resolution of the particular cases." (12/13/06 Blalack Ltr at 2 (emphasis added)). Moreover, the unilateral service of a subpoena without leave of court in this instance is also procedurally improper. Clark, 501 F.2d 324.

     Again, <u>Organization of Minority Vendors, Inc. v. Illinois Central-Gulf R.R.</u>, 1987 WL 8997 (N.D. Ill. 1987) is directly on point. There, defendants sought discovery of class representatives who had voluntarily withdrawn to become absent class members, just as the

WECHSLER HARWOOD LLP

K. Lee Blalack, II, Esq.
December 15, 2006
Page Two

subpoenaed individuals did here.  Because defendants could not show the necessity of such
discovery, the court denied it.  Such is precisely the case here.  Even assuming your client could
show the necessity of such discovery, the extraordinary and unduly burdensome device of a
deposition is certainly unwarranted.  Indeed, given the extensive document and written discovery
already had of certain of the subpoenaed individuals, we do not believe that the Court would
sanction the undue additional burden of a deposition.

        The authority you cite for the proposition that pre-certification discovery of absent class
members is proper is wholly inapposite (and outside of the Seventh Circuit).  Sirota v. Solitron
Devices, Inc., 673 F.2d 566 (2d Cir. 1982), had nothing to do with the issue of whether discovery
of absent class members is proper.  Instead, it stands for the unremarkable proposition that courts
may inquire into issues concerning the merits of a class action at the class certification stage to
the extent such issues are coextensive with an inquiry into whether the requirements of Rule 23
have been satisfied.  Your citation to Davenport v. Fowlkes, 1988 WL 52098 (E.D. Pa. 1988) is
equally unavailing.  That case involved the issue of whether discovery of absent class members
was warranted given the inherently complex issue of causation that presented itself in a purported
class action for physical injuries under a products liability theory.  Here, there are no such
inherently complex issues such as causation which might necessitate discovery of absent class
members.

        We urge you to reconsider your position.  Please contact me at your earliest convenience
to discuss this matter.

                                        Yours very truly,

                                        Robert I. Harwood

cc:     Jordan Lewis
        Lynn Rossman Faris
        Susan E. Ellingstad

915

# EXHIBIT 4

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

December 18, 2006

OUR FILE NUMBER
259075-3

**VIA ELECTRONIC DELIVERY**

WRITER'S DIRECT DIAL
(202) 383-5374

Robert Harwood, Esq.
Weschler Harwood LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
lblalack@omm.com

Re:    *Abeyance of Third Party Subpoenas of Former Named Plaintiffs*

Dear Rob:

I am writing in response to your letter of December 15, 2006.

It appears that our efforts to avoid the involvement of the Court in this discovery dispute have now run their course without success. Defendant intends to pursue deposition testimony from the five third party witnesses upon whom we served subpoenas in this litigation. However, consistent with our conversation of December 11, 2006 and my letter of December 13, 2006, I am relieving these witnesses of their obligation to appear for deposition next week as required by the subpoenas based upon your representation that these witnesses will move the Court promptly for a motion to quash the subpoenas pursuant to Rule 45(c).

I do not object to further negotiations regarding this matter, so long as the negotiations do no delay your moving the Court for relief prior to January 1, 2007. Should you wish to discuss this matter further, please contact me at your earliest convenience.

Very truly yours,

/s K. Lee Blalack, II
K. Lee Blalack, II
of O'MELVENY & MYERS LLP

cc (via electronic delivery):    Jordan Lewis, Esq.
                                 Peter Overs, Esq.

917

# EXHIBIT 5

# WECHSLER HARWOOD LLP

### 488 MADISON AVENUE
### NEW YORK, NEW YORK 10022

TELEPHONE: (212) 935-7400
TELECOPIER: (212) 753-3630

December 21, 2006

**By E-Mail**

K. Lee Blalack, II, Esq.
O'Melveny & Myers LLP
1625 Eye Street NW, Suite 10
Washington, DC 20006-4001

     Re:   Third Party Subpoenas of Absent Class Members

Dear Lee:

     I write in response to your letter of December 18, 2006.

     In my letter of December 15, 2006, I pointed out how defendant had failed to point to any special need for the testimony of the subpoenaed absent class members. Unless we receive s satisfactory explanation of such a special necessity, we will be forced to move to quash the subpoenas. In the event a motion is necessary, we will make it no later than January 5, 2006.

     If you think a further discussion would be fruitful, I would be happy to have it so that we may avoid involving the Court.

     Yours very truly,

     Robert I. Harwood

RIH:ggc
cc:  Jordan Lewis, Esq. (By E-mail)

# EXHIBIT 6

**Peter Overs**

| | |
|---|---|
| **From:** | Georgette Cupo |
| **Sent:** | Tuesday, January 16, 2007 10:50 AM |
| **To:** | Peter Overs |
| **Subject:** | FW: FXG - Third Party Subpoenas of Absent Class Members |

---

**From:** Georgette Cupo **On Behalf Of** Robert Harwood
**Sent:** Friday, December 22, 2006 2:50 PM
**To:** 'lblalack@omm.com'
**Cc:** 'jordanlewis@sbgdf.com'
**Subject:** FXG - Third Party Subpoenas of Absent Class Members

Dear Lee:

My letter to you from yesterday referenced moving no later than January 5, 2006.  Of course, that date should be January 5, 2007.

Have a nice holiday.

Yours very truly,

Robert I. Harwood

# EXHIBIT 7

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | **1625 Eye Street, NW** | NEWPORT BEACH |
| BRUSSELS | **Washington, D.C. 20006-4001** | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | **www.omm.com** | TOKYO |

December 22, 2006

OUR FILE NUMBER
259075-3

**VIA ELECTRONIC DELIVERY**

WRITER'S DIRECT DIAL
(202) 383-5374

Robert Harwood, Esq.
Weschler Harwood LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
**lblalack@omm.com**

Re:    *Third Party Subpoenas of Former Named Plaintiffs*

Dear Rob:

I am writing in response to your letter of December 21, 2006.

You wrote that we have not demonstrated a "special need" for conducting the depositions of five carefully selected former named Plaintiffs and that you will, therefore, seek to move the Court to quash the subpoenas served upon these individuals. I wish to briefly restate my position so that the record is clear.

First, my client does not need to demonstrate a "special need" in order to take the deposition testimony of these individuals pursuant to Rule 45. In contrast to each case that you have cited, there has been no class certified in these proceedings. The jurisprudence applicable to absent class members is inapposite in this matter.

Secondly, even if a heightened requirement does apply, it is not a "special need" or "special necessity" requirement, as you assert. Rather, the appropriate standard is whether the discovery is "necessary or helpful to the proper presentation and correct adjudication of the principal suit" and is not undertaken for vexatious purpose. *Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999, 1005 (7th Cir. 1971).

Finally, the limited testimonial discovery my client seeks meets this standard. As I have indicated earlier, we believe that each of these individuals is likely to have information that is highly relevant to class certification. For instance, we seek Ms. Lindsey's deposition because she was the contractor in privity with both my client and *Smith* Plaintiff John Lindsey. We seek Ms. LaRoche and Mr. Glidden's deposition because we seek to discover what inherent variation among the members of the putative class was lost when you reduced the number of named

O'MELVENY & MYERS LLP
Robert Harwood, Esq., December 22, 2006 – Page 2

Plaintiffs from 26 to 3.  In the case of Messrs. Pinkham and Lester, we seek to discover more about these individuals whose removal you noticed just days before their scheduled depositions.

I remain willing to continue negotiations if you think they will be helpful to reaching agreement on this dispute.

Very truly yours,

/s K. Lee Blalack, II
K. Lee Blalack, II
of O'MELVENY & MYERS LLP

cc (via electronic delivery):    Jordan Lewis, Esq.
Peter Overs, Esq.

DC1:692086.1

924

# EXHIBIT 8

WECHSLER HARWOOD LLP
488 MADISON AVENUE
NEW YORK, NEW YORK 10022

TELEPHONE: (212) 935-7400
TELECOPIER: (212) 753-3630

December 26, 2006

**By E-Mail and First Class Mail**

K. Lee Blalack, II, Esq.
O'Melveny & Myers LLP
1625 Eye Street NW, Suite 10
Washington, DC 20006-4001

Re:  **Discovery of Absent Class Members**

Dear Lee:

In response to your letter of December 22, 2006, let me make one last effort to convince you to abandon deposing certain absent class members.

Your continued reliance Brennan v. Midwestern United Life Ins. Co., 450 F.2d 999, 1005 (7th Cir. 1971), is misplaced. The issue is not whether "discovery" of absent class members prior to class certification is sometimes appropriate, but rather, whether a deposition of absent class members prior to class certification is appropriate. In a case decided after Brennan, the Seventh Circuit made it clear that "the burden confronting the party seeking deposition testimony should be more severe than that imposed on the party requesting to use interrogatories." Clark v. Universal Home Builders, Inc., 501 F.2d 324, 341 (7th Cir. 1973). Your persistence in arguing that deposition discovery of absent class members sought before a class is certified is somehow easier to obtain than the same discovery after a class is certified is of no moment. If anything, because absent members of a purported class are not yet parties to a litigation prior to a class being certified, there is even less justification - and an even higher burden - for seeking their depositions.

With specific regard to the New Hampshire absent class members, you may recall that the New Hampshire action was originally styled as a "mass action," not a class action. Once the complaint was amended to transform it to a class action, counsel and their clients thought it unnecessary to proceed with more than three proposed class representatives. There is simply no justifiable need to inquire about the alleged "inherent variation" between the members of the class. If this need were sufficient,

926

ISLER HARWOOD LLP

K. Lee Blalack, II, Esq.
December 26, 2006
Page Two

the deposition of every absent class member in every purported
class action would be necessary. Obviously, this is not the case,
and runs squarely against the fundamental efficiencies gained by
class actions.

Likewise, your "need" to discover the reason why Messrs.
Pinkham and Lester decided not to continue as class representatives
is insufficient. Idle curiosity hardly constitutes a showing that
such discovery is "necessary or helpful" to your defense.
Concerning Ms. Lindsey, we will consider your reasoning for taking
her deposition and get back to you shortly. But in any event, you
have already deposed upward of a 100 of the named plaintiffs. Do
you really believe that you "need" to now start deposing absent
class members, and that that attempt will be favorably entertained?

Yours very truly,

Robert I. Harwood

cc:  Jordan Lewis, Esq.
     Lynn Rossman Faris, Esq.
     Susan E. Ellingstad, Esq.

# EXHIBIT 9

**Peter Overs**

---

| | |
|---|---|
| **From:** | Georgette Cupo |
| **Sent:** | Tuesday, January 16, 2007 10:51 AM |
| **To:** | Peter Overs |
| **Subject:** | FW: FXG - Subpoenas of Absent Class Members |

---

**From:** Georgette Cupo **On Behalf Of** Robert Harwood
**Sent:** Wednesday, January 03, 2007 5:04 PM
**To:** 'lblalack@omm.com'
**Subject:** FXG - Subpoenas of Absent Class Members

Lee-

I am getting back to you concerning the subpoena of Ms. Lindsey.  While we do not agree with you that the necessity of her deposition has been sufficiently demonstrated as required by applicable Seventh Circuit law, we believe that her signing of an operating agreement under which a current plaintiff brings claims is at least arguably relevant.  Accordingly, we are willing to allow you to take her deposition if you agree to drop the subpoenas of the other four absent class members.

We hope this concession will provide a compromised solution with respect to all the outstanding subpoenas and obviate the need to bother the Court with a motion to quash.

Robert I. Harwood

# EXHIBIT 10

**Peter Overs**

| | |
|---|---|
| **From:** | Georgette Cupo |
| **Sent:** | Tuesday, January 16, 2007 10:51 AM |
| **To:** | Peter Overs |
| **Subject:** | FW: FXG - Subpoenas of Absent Class Members |

**From:** Georgette Cupo **On Behalf Of** Robert Harwood
**Sent:** Thursday, January 04, 2007 5:05 PM
**To:** 'lblalack@omm.com'
**Subject:** FXG - Subpoenas of Absent Class Members

Lee,

I emailed you yesterday offering a compromise. I'd appreciate a response from you on my proposal before going forward with a motion before Judge Nuechterlein.

Thanks.

RIH

# EXHIBIT 11

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | **1625 Eye Street, NW** | NEWPORT BEACH |
| BRUSSELS | **Washington, D.C. 20006-4001** | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE **(202) 383-5300** | SHANGHAI |
| LONDON | FACSIMILE **(202) 383-5414** | SILICON VALLEY |
| LOS ANGELES | **www.omm.com** | TOKYO |

January 5, 2007

OUR FILE NUMBER
259075-3

**VIA ELECTRONIC DELIVERY**

WRITER'S DIRECT DIAL
(202) 383-5374

Robert Harwood, Esq.
Weschler Harwood LLP
488 Madison Avenue, 8th Floor
New York, New York 10022

WRITER'S E-MAIL ADDRESS
lblalack@omm.com

Re:    ***Third Party Subpoenas of Former Named Plaintiffs***

Dear Rob:

I am writing in response to your e-mail message of January 3, 2006.

I welcome your decision to reconsider your position on the third party deposition of Ms. Lindsey. In the same spirit of compromise, my client is prepared to offer a counter-proposal to avoid the costs and the burden to the Court of yet another of Plaintiffs' discovery motions. Although we believe we have the right to deposition testimony from all of the third parties to whom we issued subpoenas, we are prepared to forego the depositions of Ms. LaRoche and Mr. Glidden. The fact that these third parties were former plaintiffs in an action styled as a mass action and were never identified by Plaintiffs as putative class representatives in the pending class actions is a sufficient basis for us to reevaluate our need for their testimony.

With respect to third parties, Messrs. Pinkam and Lester, however, FedEx Ground will continue to insist on the enforcement of the subpoenas to those two former named plaintiffs in existing MDL class actions. Accordingly, we hope that you will agree to proceed with the depositions of Ms. Lindsey, and Messrs. Pinkham and Lester and will not move to quash Defendant's Rule 45 subpoenas to each of those former named plaintiffs.

If this compromise is not acceptable to these individuals, then you should proceed with the filing of the motion to quash all of the Rule 45 subpoenas served by my client. Should you have any questions regarding this matter, please contact me at your earliest convenience.

933

O'MELVENY & MYERS LLP

Robert Harwood, Esq., January 5, 2007 – Page 2

Very truly yours,

/s K. Lee Blalack, II

K. Lee Blalack, II
of O'MELVENY & MYERS LLP

cc (via electronic delivery):    Jordan Lewis, Esq.
                                 Peter Overs, Esq.

# EXHIBIT 12

## WECHSLER HARWOOD LLP

488 MADISON AVENUE
NEW YORK, NEW YORK 10022

TELEPHONE: (212) 935-7400
TELECOPIER: (212) 753-3630

January 8, 2007

**By E-Mail**

K. Lee Blalack, II, Esq.
O'Melveny & Myers LLP
1625 Eye Street NW, Suite 10
Washington, DC 20006-4001

          Re:   <u>Third Party Subpoenas of Absent Class Members</u>

Dear Lee:

          I write in response to your letter of January 5, 2007,
which was emailed on January 7, 2007.

          I was equally pleased to learn of your agreement that the
depositions of Ms. LaRoche and Mr. Glidden are unnecessary given
that they simply chose not to proceed as representatives of the
proposed class of drivers in New Hampshire. As you acknowledged in
your letter of December 22, 2007, the reason you seek the
depositions of Messrs. Pinkham and Lester is to ascertain the
circumstances surrounding their similar decisions to cease being
class representatives. We can see no meaningful distinction
between the reasons you cited for deposing Ms. LaRoche and Mr.
Glidden and those for Messrs. Pinkham and Lester. We believe FedEx
Ground will be hard pressed to explain such a distinction to the
Court on a motion to quash the subpoenas and we urge you to
reconsider your intransigence on this issue.

          Please contact me at your earliest convenience to resolve
this matter.

                              Yours very truly,

                              Robert I. Harwood

RIH:ggc
cc:  Jordan Lewis, Esq. (By E-mail)

# EXHIBIT 13

## Robert Harwood

| | |
|---|---|
| **From:** | Blalack, K. Lee [LBlalack@OMM.com] |
| **Sent:** | Wednesday, January 10, 2007 3:13 PM |
| **To:** | Robert Harwood |
| **Cc:** | jordanlewis@sbgdf.com |
| **Subject:** | RE: FXG - Third Party Subpoenas |

Rob, I have now had the opportunity to confer with my client regarding your recent offer to submit affidavits from Messrs. Pinkham and Lester regarding the circumstances of their withdrawal as named plaintiffs in the MDL actions in lieu of the Rule 45 depositions that FedEx Ground is seeking from those third parties. We are not prepared to withdraw enforcement of our Rule 45 subpoenas as to those two individuals on this basis. Accordingly, if you are not prepared to accept my previous offer of compromise, your clients should promptly move to quash the Rule 45 subpoenas that we served last year. Thanks. Lee

**From:** Robert Harwood [mailto:rharwood@hfesq.com]
**Sent:** Monday, January 08, 2007 3:47 PM
**To:** Blalack, K. Lee
**Cc:** jordanlewis@sbgdf.com
**Subject:** RE: FXG – Third Party Subpoenas

OK. Let me know. Thank you.

RIH

**From:** Blalack, K. Lee [mailto:LBlalack@OMM.com]
**Sent:** Monday, January 08, 2007 3:08 PM
**To:** Robert Harwood
**Cc:** jordanlewis@sbgdf.com
**Subject:** RE: FXG - Third Party Subpoenas

Rob, I doubt that we will find affidavits acceptable but, in order to make sure that we have exhausted every possible option to avoid further motions practice, I will confer with my client and report back to you promptly on whether this proposal will be satisfactory to FedEx Ground. Thanks. Lee

**From:** Georgette Cupo [mailto:gcupo@hfesq.com] **On Behalf Of** Robert Harwood
**Sent:** Monday, January 08, 2007 2:44 PM
**To:** Blalack, K. Lee
**Cc:** jordanlewis@sbgdf.com
**Subject:** RE: FXG - Third Party Subpoenas

Dear Lee,

I fear that we are not thinking creatively enough to resolve this dispute short of motion practice.

Plaintiffs will agree unconditionally to allow you to conduct a four hour examination of Ms. Lindsay. In conjunction with that deposition, would your client be willing to accept an affidavit

from each of Messrs. Pinkham and Lester explaining the circumstances of their withdrawal as named plaintiffs?  If not, I confess to being out of ideas, creative or otherwise, and unless you can come up with a viable compromise, a motion to quash will be forthcoming.

RIH

---

**From:** Blalack, K. Lee [mailto:LBlalack@OMM.com]
**Sent:** Monday, January 08, 2007 1:54 PM
**To:** Robert Harwood
**Cc:** jordanlewis@sbgdf.com; Schroeder, Theodore B.
**Subject:** RE: FXG - Third Party Subpoenas

Rob, thanks for your letter.  I do not believe my client will reconsider our position with regard to seeking the testimony of the three former named plaintiffs who were identified in my most recent letter.  Accordingly, if you are unwilling to resolve our dispute over the Rule 45 subpoenas that we have served, you should proceed with the filing of your motion to quash at once.

Thanks,
Lee

---

**From:** Georgette Cupo [mailto:gcupo@hfesq.com] **On Behalf Of** Robert Harwood
**Sent:** Monday, January 08, 2007 1:50 PM
**To:** Blalack, K. Lee
**Cc:** jordanlewis@sbgdf.com
**Subject:** FXG - Third Party Subpoenas

Please see attached.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

|  |  |
|---|---|
| IN RE FEDEX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527 RM (MDL 1700) |
|  | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | **CERTIFICATE OF GOOD FAITH IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS** |

Pursuant to Federal Rules of Civil Procedure 26(c) and Local Rule 37.1(a) and (c), I, ROBERT I. HARWOOD, Co-Lead Counsel for Plaintiffs in the above-captioned action, hereby certify that counsel for Plaintiffs and Defendant have conferred in good faith in an effort to resolve, without court action, the dispute which is the subject of this Motion To Quash Subpoenas of Absent Class Members. I certify that such efforts have been unsuccessful and consequently it is necessary to file the instant Motion.

More specifically, I certify as follows:

1.     The relief requested by the instant Motion was the subject matter of many discussions between counsel for Plaintiffs and Defendant. In addition to a teleconference conducted on December 11, 2006, between myself and counsel for defendant FedEx Ground Package Systems, Inc. "FXG"), Mr. K. Lee Blalack, II, Esq., many detailed letters and emails were exchanged between Mr. Blalack and me to resolve this dispute. I respectfully refer the Court to my Declaration in Support of this motion and the exhibits annexed thereto which document counsels' discussions on this issue, including the citation to numerous legal authorities.

2.      Despite plaintiffs' attempt to reach a compromise through the submission of affidavits of the subpoenaed individuals, FXG remains intransigent in its position to enforce the subpoenas as served.  Accordingly, plaintiffs were forced to make this motion despite the undersigned's best effort to reach a mutually acceptable compromise.

I swear under penalty of perjury that the foregoing is true and correct.  Executed on January 16, 2007 at New York, New York.

Robert I. Harwood

2

## CERTIFICATE OF SERVICE

I, Virgilio Soler, Jr., hereby certify that I am not a party to the action, am over the age of eighteen years, am employed by the law firm of Harwood Feffer LLP, attorneys for plaintiffs, and that on January 16, 2007, I served the foregoing: **PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS, MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS, DECLARATION OF ROBERT I. HARWOOD IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS** and, **CERTIFICATE OF GOOD FAITH IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS** in the within action, by causing true and correct copies of same to be electronically mailed and by first class mail, postage pre-paid to counsel for defendant:

Evelyn L. Becker
K. Lee Blalack, II, Esq.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20007
E-mail: ebecker@omm.com
E-mail: lblalack@omm.com

Robert M. Schwartz, Esq.
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-6035
E-Mail: rschwartz@omm.com

          /s/ Virgilio Soler, Jr.
          Virgilio Soler, Jr.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF INDIANA

# SOUTH BEND DIVISION

_____

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION ) ) ) ) | Case No. 3:05-MD-527-RM (MDL 1700) |

_____)
)
THIS DOCUMENT RELATES TO:                    )
                                             )       CHIEF JUDGE MILLER
*All Coordinated Cases*                      )       MAGISTRATE JUDGE NUECHTERLEIN
                                             )
                                             )
..................................................................)

---

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DISCOVERY RELATED TO INTERNATIONAL BROTHERHOOD OF TEAMSTERS

---

### INTRODUCTION

Plaintiffs' arguments in opposition to FedEx Ground's motion reduce to the illogical

proposition that, because FedEx Ground does not *currently* possess evidence to establish that the

International Brotherhood of Teamsters the Teamsters is exerting undue influence over the

litigation (which would undermine the case for class certification), FedEx Ground should be

denied access to any discovery that might enable it to make such a showing.  Such an argument

would defeat the very purpose for permitting discovery.  The Court should reject it.

As explained in FedEx Ground's opening briefing, its entitlement to the discovery sought

is straightforward.  Plaintiffs' counsel in this litigation has sought, to the exclusion of alternative

litigation strategies, to pursue declaratory and injunctive relief that will have the effect of

converting FedEx Ground's package pickup and delivery drivers to employees of FedEx Ground.

If successful, this relief will radically reform the working relationship between FedEx Ground

and its drivers in a manner that is disfavored by the majority of the drivers currently performing

pickup and delivery services as independent contractors.  FedEx Ground merely seeks to

determine the motivation behind the adoption of a litigation strategy that is antagonistic to the

putative class members and which, if established, would undermine certification of the claims for

class treatment in the manner Plaintiffs' counsel intends to propose.

      Against this concise rationale justifying discovery, Plaintiffs offer three arguments.

*First*, they argue that they do not seek any change in the status of FedEx Ground's current

pickup and delivery drivers, notwithstanding the manifold changes to the working conditions and

rights of these drivers if Plaintiffs were to prevail.  *Second*, Plaintiffs rely on an inapposite series

of precedents in support of the proposition that the discovery sought by FedEx Ground is

irrelevant.  In fact, this authority supports FedEx Ground's position that, in order to present a

factual record sufficient for this Court to evaluate the adequacy of the proposed class

representatives, further discovery into the extent of the involvement of the Teamsters in this

litigation is necessary.  *Third*, Plaintiffs argue that the Court should decline to consider this

motion because it is untimely.  This argument is without merit, especially in light of the three

week extension of the discovery schedule that this Court recently granted to the Plaintiffs.

## ARGUMENT

**I.    PLAINTIFFS SEEK TO ALTER THE RELATIONSHIP BETWEEN FEDEX
     GROUND AND ITS INDEPENDENT CONTRACTORS**

      Plaintiffs allege that FedEx Ground's motion to compel rests on the "faulty premise" that

Plaintiffs seek to convert the status of active class members to that of employees.  (Pl.'s Mem. at

11.)  But Plaintiffs' own representations, both earlier in this litigation and to the public through

their own website, demonstrates this to be false.

First, Plaintiffs' responses to Interrogatory No. 9 (first set), demonstrate that Plaintiffs seek a "declaratory judgment that Plaintiffs and the plaintiff class are employees under [state and federal law] . . . [and] injunctive relief prohibiting Defendant from continuing to misclassify employees . . .." (*See* Def.'s Mem. Ex. C.)  Plaintiffs allege that FedEx Ground already treats its drivers as employees and that, therefore, Plaintiffs seek only a recognition of the status quo. This argument should be rejected.

The classification of a worker as an employee or independent contractor is not simply a switch that this Court, FedEx Ground, or Plaintiffs can merely flip from one setting to another without also fundamentally altering the working relationship between FedEx Ground and its contractors.  This is because, whatever 'controls' Plaintiffs allege FedEx Ground exerts over its drivers, these 'controls' are the result of business practices, which were agreed to by both FedEx Ground and its contractors, and which seek to recognize and govern the independent contractor status that was mutually sought by all parties at the inception of the working relationships.

If a court were to invalidate FedEx Ground's business model and enjoin further treatment of FedEx Ground's drivers as independent contractors, the justification for much of the independence enjoyed by Plaintiffs in the performance of their duties would no longer exist. There is no reason to believe, as Plaintiffs seem to suggest, that pickup and delivery drivers would merely enjoy all of the legal protections of employees without also having to conform to more rigidly structured working conditions.  Additionally, Plaintiffs would most certainly lose the equity they currently enjoy in their routes and the ability to substitute the personal services of another qualified driver at any time of their choosing.

Plaintiffs' press statements confirm this understanding.  As noted in FedEx Ground's opening briefing, www.fedexdriverlawsuit.com, a website maintained by Plaintiffs' counsel for

3

purposes of these lawsuits, promises myriad changes in working conditions if Plaintiffs prevail.

Plaintiffs' website also makes numerous references to the *Estrada* case (the plaintiffs in which

case were also represented by Co-Lead Counsel Lynn Faris) to support these claims.  (*See* Def.'s

Mem. at 4-6.)

Plaintiffs also cite to the injunctive relief recently overturned in the *Estrada* case as

evidence that their decision to seek injunctive relief is not "remarkable."  (Pl.'s Mem. at 3.)

Whether the relief sought by Plaintiffs is legally "remarkable" is irrelevant, however.  What is

relevant is that Plaintiffs have chosen to pursue injunctive relief that will fundamentally alter the

working relationship between FedEx Ground and its network of independent contractors in ways

that are disfavored by those same individuals.  Antagonism between the relief sought by the lead

plaintiff and that favored by the putative class members renders class certification inappropriate.

*Chicago v. Gen. Motors Corp.*, 332 F. Supp 285, 288 (N.D. Ill. 1973).

## II.    PLAINTIFFS' CITATION TO AUTHORITY ONLY UNDERSCORES THE NEED FOR THE REQUESTED DISCOVERY

### A.    The Requested Discovery is Relevant

Plaintiffs' next argument posits that FedEx Ground should not be entitled to the

Teamsters-related discovery because it cannot, at present, conclusively establish a conflict of

interest between Plaintiffs' counsel and the putative class members.  (Pl.'s Mem at 9.)  As stated

above, this argument is misguided because it fails to recognize that the civil discovery process is

designed to build a record upon which to evaluate the claims and defenses of the parties.  27

C.J.S. Discovery § 2 (2006).

Each of the authorities relied upon by Plaintiffs, (Pl.'s Mem. at 7), to rebut the relevancy

of the requested discovery is inapposite because it either considers a speculative conflict at the

time of class certification or because it rejects an inappropriate discovery request for reasons

wholly unrelated to relevance.  During the extensive meet and confers over this issue, FedEx

Ground has already demonstrated the inapplicability of these cases:

> The authority cited by Plaintiffs to rebut the relevancy of this information simply does not support your position.  In fact, *Shaffer v. Farm Fresh* affirmed that a potential conflict of interest -- like the employment status conflict that exists in this case -- is relevant to class certification.  966 F.2d at 146.  After discovery concluded, the trial court determined that a conflict exists; the appellate court disagreed on the facts.  But *Farm Fresh* supports the discoverability of the requested information so that the Court in this case can assess whether putative class counsel has a conflict.

> Your citation to *Wang v. Chinese Daily News* also fails to support your position.  That case stands only for the proposition that union support on the part of individual named plaintiffs, without more, does not render them inadequate representatives.  231 F.R.D. at 610.  Again, it is not union activity as such on the part of the named plaintiffs that FedEx Ground seeks to demonstrate, but rather union activity that has operated to shape the goals of the lawsuits in a way that is antagonistic to the putative class.

> *Trull v. Dayco Prods., McLendon v. Continental Group, Inc.* and *Coffin v. Bowater Corp.* are unavailing for similar reasons.  In *Trull* and *McLendon*, there was no conflict between the union and the putative class, and on this basis the union's funding of the lawsuit did not bar class certification.  *Trull*, 241 F.R.D. at 404, *McLendon*, 113 F.R.D. at 43.  *Coffin* doesn't hold that union support of litigation is irrelevant, as you claim, but rather that the defendant must make a showing of demonstrable conflict between the union and the purported class in order to defeat adequacy.  228 F.R.D. at 405.

> *Sayre v. Abraham Lincoln Fed'l Savings & Loan Ass'n.* also held that simultaneous representation of a labor union would not preclude plaintiffs' attorneys from being certified as class counsel in a context where no conflict of interest was alleged by defendant, and is therefore not applicable to the present situation.  You also cite this case for the proposition that FedEx Ground's discovery requests are irrelevant and not reasonably calculated to lead to admissible evidence.  However, the *Sayre* court expressly held that the discovery sought be defendant, which was designed to ascertain the capacity of plaintiffs to support the lawsuit financially, was relevant to the adequacy of plaintiffs as class representatives and manageability of the action.  65 F.R.D. at 383, 85.  The court disallowed an intrusive examination into plaintiffs' finances on burden grounds, not relevancy as you claim in your letter.

> Finally, you cite to *Brown v. Dunbar & Sullivan Dredging Co.*, for the proposition that courts have rejected challenges to class certification based on a union's solicitation activities.  The *Brown* case was brought under the FLSA and

therefore is inapposite to the Rule 23 adequacy of representation inquiries that
will be dispositive of the vast majority of Plaintiffs' claims.

(*See* Correspondence from Evelyn Becker to Susan Ellingstad dated October 13, 2006 (attached

as Exhibit 1 to Becker Aff. in support of Def.'s Mem.).)

The assessment of conflict necessarily requires a fact-specific inquiry, and so Plaintiffs'

citation to cases in which union activity did not raise a conflict of interest on one set of facts is

not persuasive as to whether *this* union's involvement in *this* litigation does raise such a conflict.

FedEx Ground's motion seeks to develop the facts necessary to determine whether a conflict

exists.  If Plaintiffs' communications with the Teamsters indicate that the Teamsters are exerting

influence over the litigation strategy in these proceedings, such information is plainly relevant

(and potentially dispositive) as to the adequacy of Plaintiffs to adequately represent the putative

class members.  *See Kamean v. Local 363 Int'l Bhd. of Teamsters, etc.,* 109 F.R.D. 391, 396

(S.D.N.Y. 1986).

Plaintiffs' attempt to distinguish *Kamean* is not persuasive.  Their primary argument is

that "[u]nlike in *Kamean*, there is no evidence to suggest that the Teamsters might have exerted

improper influence over the litigation."  (Pl.'s Mem. at 9.)  First, and most importantly, this

argument misapprehends the purpose of civil discovery.  *Kamean* did not concern a discovery

motion but rather denied class certification on the basis of a conflict between the named plaintiff

and the putative class on the grounds of a conflict that had already been established, presumably

through discovery.  *Kamean*, 109 F.R.D. at 395 ("The record before me shows that two of the

three named plaintiffs . . . presently belong to a rival union. . ..")  FedEx Ground seeks the

disputed discovery precisely so that it can make such a showing to this Court.  Secondly,

Plaintiffs' factual contention that there is no evidence to even *suggest* improper collusive activity

is incorrect.  FedEx Ground has already demonstrated that the Teamsters are engaged in

distributing leaflets advertising the lawsuits at FedEx Ground terminals and that the Teamsters

and Plaintiffs' websites cross reference each other.  (Def.'s Mem. at 5-6.) Moreover, the

Teamsters purport to be engaged in the maintenance of a "clearinghouse of information that

workers need in administrative hearings and court proceedings." (*Id.* at 5.)

Discovery is necessary in this case to establish a conflict exists that bears on the

adequacy of Plaintiffs to represent the putative classes.

### B.    This Discovery is not Sought for Improper Purpose

Plaintiffs also allege, without substantiation, that FedEx Ground seeks the disputed

discovery for an improper purpose.  Plaintiffs state that they are concerned that FedEx Ground

seeks this discovery "to further its anti-union campaign, or to target current Plaintiffs whose

counsel may have had contact of any kind with Teamster employees." (Pl.'s Mem. at 15.)  These

allegations are unsupported by the record.  If Plaintiffs are concerned about the privacy of named

Plaintiffs – each of whom has already chosen to bring suit against FedEx Ground and thereby

noticed his or her antagonism to Defendant for all the world to see – FedEx Ground is willing to

accept privacy-based redactions of any responsive communications that identify specific

contractors.

Because Plaintiffs have given no indication as to how these documents might be abused

in FedEx Ground's collateral interactions with the Teamsters, Defendant is unable to address

Plaintiffs' concerns with any specificity.  FedEx Ground does note, however, that the Protective

Order in this case exists in part for the purpose of preventing sensitive discovery materials from

being used for purposes external to this litigation.

## III.    THIS MOTION IS NOT UNTIMELY

Plaintiffs' final contention (actually first in their brief), is that this Court should decline to even *consider* FedEx Ground's motion because it is untimely.  Like Plaintiffs' other arguments, however, this one is also without merit.

First, Plaintiffs misstate the record to create the impression that FedEx Ground has delayed the filing of this motion.  Plaintiffs' claim that the meet and confer process concluded four months ago, (Pl.'s Mem. at 4), is simply untrue.  On October 13, 2006, FedEx Ground counsel Evelyn Becker sent Plaintiffs' counsel Susan Ellingstad a detailed meet and confer letter, quoted above, in an attempt to resolve this dispute without the involvement of this Court. (Exhibit 1 to Becker Aff. in support of Def.'s Mem.).)  Ms. Ellingstad responded eighteen days later, on October 31, 2006, that Plaintiffs would not reconsider their position.  (*Id.*)  This motion followed a little more than six weeks later, on December 14, 2006.

Plaintiffs next attempt to bring these facts within the ambit of *In re Sulfuric Acid Litigation*, 213 F.R.D. 331 (N.D. Ill. 2005), by claiming that FedEx Ground has waited until the "eleventh hour" to bring this motion.  (Pl.'s Mem. at 5.)  Unlike *Sulfuric Acid*, however, which concerned a motion to compel brought literally on the eve of the close of discovery, 213 F.R.D. at 332, this motion was brought seventeen days prior to the close of discovery under the schedule that was then in force.  Further, any delay in this matter has not been due to dilatory tactics by Defendant.  Quite to the contrary, a review of the exhaustive meet and confer letters exchanged over this dispute demonstrates that the parties were still engaged in good faith negotiations as of October 31.  (Exhibit 1 to Becker Aff. in support of Def.'s Mem.).)  Therefore, this situation is not similar to *Sulfuric Acid*, where the delaying party "could not possibly have been under any misapprehension that continued negotiations might moot the controversy."   231 F.R.D. at 339.

Also unlike the situation in *Sulfuric Acid*, Plaintiffs' subsequent actions in this case have mooted any concern that FedEx Ground's motion was untimely.   Since FedEx Ground filed its motion, Plaintiffs have obtained a three-week extension in this discovery schedule.  In any event, the discovery sought has little possibility of causing further delay in this litigation.  FedEx Ground seeks only documents reflecting communications between Teamsters and Plaintiffs' counsel *related to these lawsuits* and a description of all other communications *related to these lawsuits* that may not exist in documentary format.

## CONCLUSION

The discovery sought by FedEx Ground in this motion is critical to assessing the existence and extent of influence that the Teamsters have exerted over the litigation strategy pursued by Plaintiffs in this litigation.  Plaintiffs are unable to dispute the relevancy of this discovery to class certification and further can demonstrate no applicable privilege.  For these reasons, along with the other reasons cited above and in Defendant's initial memorandum, FedEx Ground respectfully requests that this Court GRANT its motion to compel production of documents and information responsive to Request for Production No. 1 (second set) Interrogatory No. 11 (third set) within fourteen (14) days after the entry of the Court's Order.

Dated:  January 16, 2007              Respectfully submitted,


                                      By:  ___s/ Thomas J. Brunner_____
                                            Thomas J. Brunner

                                      John H. Beisner
                                      Robert M. Schwartz
                                      Evelyn L. Becker
                                      O'MELVENY & MYERS LLP
                                      1625 Eye Street, NW
                                      Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN  46601

*Defendant's Liaison and Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of January, 2007, I filed the foregoing Reply Memorandum in Support of Defendant's Motion to Compel Production of Discovery Related to International Brotherhood of Teamsters with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By:_____s/ Thomas J. Brunner_____

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

------------------------------------------------------- )
                                                        )
In re FEDEX GROUND PACKAGE            )          Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT               )          (MDL 1700)
PRACTICES LITIGATION                        )
------------------------------------------------------- )
THIS DOCUMENT RELATES TO           )
ALL ACTIONS                                       )
-------------------------------------------------------)

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO**
**AMEND SCHEDULING ORDER, OR, IN THE ALTERNATIVE,**
**PRECLUDE DEFENDANT'S EXPERT REPORTS**

During the last twelve months, FedEx Ground Package System, Inc. ("FedEx Ground" or "Defendant") and its counsel have invested staggering amounts of time and expense to complete the discovery phase of the MDL proceedings within the Court-established time limits and in reliance on the Court's considered briefing and expert discovery structures.

Now that this work has been completed, Plaintiffs seek to undo the Court's structure and add provisions that run counter to the foundation upon which the Court has managed these cases since September 2005. Plaintiffs make several extraordinary requests. First, they seek to delay the class certification briefing schedule by nearly *three months*, by requesting an *additional* two-month delay on top of the three-week extension they received on December 20, 2006. Second, they ask that some or all of Defendant's expert reports be stricken, and that this Court allow an unorthodox and prejudicial round of "rebuttal" experts that was never contemplated by the Court or the parties. And finally, Plaintiffs seek to unfairly refashion the class certification briefing structure through the addition of an "omnibus fact brief," which risks confusion and the creation

of an oversimplified and imprecise record upon which the Court will be asked to judge their motions.

Such a significant reworking of the framework this Court has established would give Plaintiffs unfair last-minute advantages at Defendant's expense and would undermine the Court's ability to properly adjudicate these cases. FedEx Ground asks the Court to reject Plaintiffs' requests and deny their motion.

## ARGUMENT

## I.    PLAINTIFFS' INACCURATE DESCRIPTION OF THE RECORD

As an initial matter, the record needs to be corrected. Plaintiffs' representations about what happened before this Court on December 20, 2006 are untrue. Plaintiffs allege that "Defendant's counsel stood silent while Plaintiffs' counsel represented that Plaintiffs expected to receive the majority of Defendant's expert reports that very day," and describe this alleged incident as "shocking." (Pls. Mem. in Supp. of Mot. to Am. ("Pls. Mem.") at 2; *see also id.* at 3, 4, & 5 (repeating the allegation).)

A review of the transcript shows that not once did Plaintiffs say that any of Defendant's expert reports would be served on December 20 or on any date before January 8, 2007. (*See* Reporter's Transcript ("Tr.") at 98-112, excerpt attached as Ex. 1 to the Declaration of Robert M. Schwartz ("Schwartz Decl.").) In fact, the timing of the receipt of the reports was never raised. Thus, there was no statement for FedEx Ground to address or correct. The only mention of materials FedEx Ground expected to have produced to Plaintiffs on that date were additional documents Plaintiffs asked FedEx Ground to produce from the files located at its various terminals around the country. (*See id.* at 102-04.) Their accusation -- stoked with hyperbole and repeated throughout their brief -- that FedEx Ground counsel did not correct the record, is unfounded and erroneous.

954

The facts concerning this matter are explained in the attached declaration of FedEx Ground counsel Robert M. Schwartz: (1) on November 28, 2006, in the context of *Plaintiffs'* request for what became a twelve-day extension for the service of their expert reports, Plaintiffs' co-lead counsel agreed that FedEx Ground could serve all of its expert reports by January 8, 2007 (*see* Schwartz Decl. ¶¶ 2-5); (2) this was confirmed in an e-mail that day, to which Plaintiffs' counsel responded the next day without any disagreement over the revised January 8, 2007 deadline (*see id.* ¶ 6; *see also* email correspondence, attached as Ex. 2 to Schwartz Decl.); (3) this extension was reflected in FedEx Ground's December 18, 2006 filing with the Court concerning the impromptu scheduling conference Plaintiffs had requested (*see* FedEx Ground Statement, Docket Entry #450 at 3 n.3.); and (4) the deadline for expert reports was not the subject of any discussion or dispute at the December 20, 2006 hearing (*see* Tr. at 98-112). In short, the events and improper conduct Plaintiffs allege simply did not happen. Plaintiffs should have been more careful before leveling such accusations of impropriety.

II.    **THERE IS NO JUSTIFICATION FOR PLAINTIFFS' REQUEST TO EXTEND THE CLASS CERTIFICATION BRIEFING SCHEDULE BY CLOSE TO THREE MONTHS**

One week after Plaintiffs requested a two-month extension at a hearing before this Court, they returned requesting that the class certification briefing schedule be extended an *additional* two months *beyond* the three-week extension this Court granted them at that hearing.[1] None of

---

[1]    At the hearing, the Court noted that if it granted a three-week extension it would not be inclined to grant additional extensions. (*See* Tr. at 107-08.) Defendant notes that the Court's recent ruling on Plaintiffs' motions to compel does not justify any further delays. Plaintiffs' request for the Luntz survey materials was denied, and Defendant anticipates producing the revised set of "headcount" documents, prepared consistent with the Court's ruling (removing redactions to pickup and delivery contractor names), by the end of this week. With regard to the "redactions" motion, last Thursday, January 11, counsel for Plaintiffs and FedEx Ground met and conferred on the redactions. After reviewing an agreed-to set of documents, the parties agreed that FedEx Ground would reproduce two documents that contain redacted Scarlett survey information without redaction, and Plaintiffs' counsel agreed that should they

Plaintiffs' arguments justifies an extension beyond that which they have already received, let alone the extensive one they are requesting. Nor do any justify Plaintiffs' alternative request that Defendant's expert reports be stricken.

Plaintiffs point to the document production schedule as one reason the case should be put on hold for two additional months. They cite to "one half million documents belatedly produced by Defendant through December 31, 2006," in support of this contention. (*See* Pls. Mem. at 4.) That statement, however, is inaccurate. First, as of December 31, 2006, Defendant had produced a ***total*** of slightly over one-half million documents, amounting to over 1.8 million pages, the overwhelming majority of which -- over 75 percent -- had been in Plaintiffs' possession for over three months. (*See* Decl. of Guy Brenner ¶ 2.) Moreover, a significant amount of the recently produced documents are those that concern new plaintiffs that *Plaintiffs* elected to add to these cases in only the last few months.[2] Thus, the timing of their own litigation strategies cannot justify *any* of the delay they wish to impose. Furthermore, Plaintiffs can choose which cases they submit for class certification first, and accordingly can grant themselves briefing delays for those cases they feel they need more time to prepare. There is no justification for delaying the entire schedule for all cases.

---

need any other documents produced in unredacted format, they would contact Defendant's counsel. (*See* Decl. of Guy Brenner ¶ 3.) The parties have also opened discussions on the best way to meet and confer over privilege issues, and agreed to discuss the matter this week. (*Id.* ¶ 4.)

[2]    FedEx Ground has agreed to produce Department of Transportation files, vehicle maintenance files (known as "unit history files"), and business discussion files, as well as daily and weekly settlement records for all named plaintiffs in these cases. Accordingly, when Plaintiffs add a named plaintiff to their complaints, that action triggers a significant document collection, review and production effort. Since late September 2006, Plaintiffs have added eighteen named plaintiffs to their complaints, which has led to the production of over 126,000 pages of documents.

BDDB01 4639550v1

Plaintiffs, as a basis for delay, also cite to the fact that several depositions are to be conducted in January 2007. Again, Plaintiffs knew about the scheduling of most of these depositions months ago, and the timing of these depositions is largely the result of their actions. First, Defendant made available on dates in 2006 every FedEx Ground witness Plaintiffs have sought to depose in these cases. One of these witnesses was deposed in January (the deposition was held and completed on January 10). This witness had originally been scheduled for a deposition in October, but due to the sudden and unexpected death of a friend and fellow FedEx Ground executive mere days before the deposition, the parties agreed to postpone the deposition. FedEx Ground offered a deposition date in December, but in order to accommodate *Plaintiffs' counsel's* personal needs and vacation plans agreed to a date in January 2007. Second, four of the depositions are of third parties that *Plaintiffs* scheduled after subpoenaing those non-parties in the last weeks of the discovery period. Finally, with the exception of Defendant's experts, the remaining depositions are of named plaintiffs, the majority of which were added in recent months by *Plaintiffs*, presumably to bolster their cases. In short, if any party should be protesting the number and effect of conducting depositions in January 2007, it is Defendant and not Plaintiffs. Plaintiffs should not be permitted to use their own deferred planning as a basis for delay.

Plaintiffs also point to the production of Defendant's expert reports as a reason why this Court should significantly delay briefing. They claim that their receipt of the reports in early January, rather than in late December, justifies the additional time they seek. This argument is surprising and runs contrary to agreements the parties reached on the subject. FedEx Ground produced its expert reports in a manner and at a time fully consistent with the agreements reached between the parties.

BDDB01 4639550v1

In order to understand the parties' agreement on the production of expert reports, some background is necessary. First, the change in service dates of expert reports was the result of *Plaintiffs'* request for an extension for *their* expert's report. FedEx Ground agreed to Plaintiffs' request as long as it received a similar extension, and that the extensions would not delay the onset of class certification briefing. (*See* Schwartz Decl. ¶¶ 2-3.) Unfortunately, the extension resulted in FedEx Ground's deadline falling during the Christmas holidays.[3] Accordingly, counsel for FedEx Ground represented that it would do its best to produce a few of the reports by December 20, 2006 if it could, but that given the holiday season all would be produced by January 8, 2007. (*See* Schwartz Decl. Ex. 2.) Plaintiffs' counsel did not object to that in her response. (*Id*.) In fact, Plaintiffs' counsel told counsel for FedEx Ground that, because she would be on vacation from December 15 through January 2 and was not planning on working on the case, the January 8, 2007 date for all reports was acceptable. (*See* Schwartz Decl. ¶ 5.)

Plaintiffs received all of FedEx Ground's expert reports by the date agreed to by their counsel, and FedEx Ground is obtaining dates for Plaintiffs to depose FedEx Ground's experts. Accordingly, the expert report production date is no basis for extending the briefing schedule.

Plaintiffs' alternative proposal, namely to keep the current schedule but strike *all* of Defendant's expert reports, should also be rejected. Plaintiffs' justifications for this

---

[3]   Although the parties' email correspondence on the subject discussed December 20 as a possible production date, that date represented a misstatement of the date to which the parties agreed. After adding in 20 days to reflect the delay in Plaintiffs' expert report production and providing Defendant with a reciprocal period of time, the revised date for production was December 28. (*See* Ex. A to Cert. of Good Faith in Support of Pls.' Mot. to Am.) In reality, even that date was erroneous, as Plaintiffs' delayed production of their expert report twelve days past the deadline, resulting in a FedEx Ground expert deadline of New Year's Day. The next business day was Tuesday, January 2, 2007. As a result, FedEx Ground obtained what amounts to only a six-day extension of time. (*See* Schwartz Decl. ¶ 5.)

BDDB01 4639550v1

extraordinary and disparate remedy have been shown to be erroneous. Defendant made no misrepresentations to this Court, and Defendant has not breached any agreement with Plaintiffs.

Accordingly, the Court should deny Plaintiffs' request for a major delay in the class certification briefing schedule, and its extreme alternative proposal to strike all of Defendant's expert reports.[4]

## III.    THERE IS NO BASIS FOR BARRING DEFENDANT'S USE OF ITS EXPERT REPORTS, OR FOR PERMITTING PLAINTIFFS TO SUBMIT EXPERT REBUTTAL REPORTS

Plaintiffs have also requested that this Court strike the reports of what they call "undisclosed" experts, or permit Plaintiffs to generate a second round of expert reports, which they refer to as "rebuttal" expert reports. Since there have been no "undisclosed" experts, Plaintiffs' requests should be rejected.

Plaintiffs claim that they were not given notice of two of the experts or topics Defendant intends to use in this litigation.[5] This is inaccurate. Plaintiffs have known for months about the work of FedEx Ground's fourth expert, E. Deborah Jay of Field Research Corporation. In fact, in September, Plaintiffs sent a letter to FedEx Ground, asking about the Field Research work. (*See* Sept. 1, 2006 correspondence from Lynn Faris, attached as Ex. 3 to Schwartz Decl.) In addition, during the deposition of Plaintiffs' expert, David Lewin, it was suggested that Plaintiffs

---

[4]    As stated at the December 20, 2006 hearing, FedEx Ground believes that if the Court were to determine that an extension beyond the current three weeks is warranted, then the Court should also consider whether, in fairness, FedEx Ground should be afforded additional and proportional time to file its opposition and meet the arguments and presentation for which Plaintiffs have been given a more generous running head start to prepare. FedEx Ground realizes that doing so would add additional time to the schedule, and for that reason believes the three-week extension Plaintiffs already received should not be extended any further.

[5]    As Plaintiffs note, a year ago in its initial disclosures, FedEx Ground disclosed the names of three potential experts. FedEx Ground has provided Plaintiffs with expert reports from two of those disclosed experts. For the third, James C. Hardman, an expert in vehicle leasing regulations, Defendant produced Jeremy Kahn's expert report which covers the same topic.

discussed the survey activity of which they were aware with Mr. Lewin.  (*See* Draft Tr. of Lewin

Deposition at 50-51 ("I recall hearing that some survey work had been done or there was a

survey floating around in this matter.  I was given to believe there were other experts."), excerpt

attached as Ex. 4 to Schwartz Decl.)  Accordingly, it is hard to understand how Plaintiffs would

be prejudiced by a report from an expert they have been anticipating for several months.  As for

Defendant's fifth expert, P. Richard Jeanneret, FedEx Ground did not consider retaining an

expert on that subject (the skill and initiative of the independent contractors) until mid-

November, based on deposition testimony that had been given in the case, and did not decide to

retain him until December.  FedEx Ground supplemented its expert disclosures to include both

Dr. Jay (Field Research) and Prof. Jeanneret, shortly thereafter.  (*See* FedEx Ground Supplement

to Initial Disclosures, attached to Schwartz Decl. at Ex. 5.)  Given that Plaintiffs have known

about the topics and/or names of four of Defendants' experts for four-to-twelve months, and

learned of the identity of the fifth a few weeks after he was retained, there are no "undisclosed"

experts, no prejudice to Plaintiffs, and accordingly no basis to strike any of the reports.

Nor is there any justification for granting Plaintiffs' request to supplement their prima

facie presentation, and *substantially* delay the case schedule, with the production of an

undisclosed number of "rebuttal experts."  Plaintiffs argue that because they have the burden of

demonstrating that class treatment is appropriate, and because they believe that Defendant's

expert reports will provide them with information about where the deficiencies in their case

reside, they should be permitted to provide rebuttal expert opinions and testimony "to provide

the Court with a complete record upon which a ruling on class certification can be based."  (Pls.

Mem. at 6.)  That argument should be rejected.

First, as Plaintiffs note, they have always borne the burden of proof and that burden is the same regardless of what arguments Defendant decides to make in opposition.  They had more than a year since the Case Scheduling Orders on this subject were issued, nearly a year after receiving FedEx Ground's initial expert disclosures, and more than three months after writing to FedEx Ground about the company's survey expert (Field Research), to present expert testimony on these or any other subjects.  They chose not to.  They served the expert report (on the subject of the FedEx Ground corporate structure) they felt was appropriate and necessary to support their motions for class certification.  Plaintiffs are not entitled to see what expert presentation a defendant offers, and then present new expert testimony as "rebuttal."  That would stand the process and basic fairness on its head.  This is not unlike a proposal Plaintiffs made in the fall of 2005.  As the Court may recall, Plaintiffs' scheduling proposal recommended that they file only a barebones opening presentation in support of class certification, followed by a massive reply (to which FedEx Ground would have no express right to respond).  (*See* Proposed Case Management Order, Docket Entry #36 at 32 (proposing 35 page opening briefs, 50 page opposition briefs, and 75 page reply briefs).)  The Court should not allow Plaintiffs to have a last-minute "second bite" at the apple to support their class certification motions.

Second, adopting Plaintiffs' proposal is likely to lead to even more extensive delays than those which Plaintiffs already seek.  Were the Court to grant this request, Defendant should also be given the opportunity to provide rebuttal reports, and both sets of rebuttal experts would be subject to further depositions.  This proposal would lead to substantial, additional delays in the class briefing schedule.

Accordingly, Plaintiffs' requests to strike FedEx Ground's expert reports and to file "rebuttal" expert reports, should be denied.

IV.    **PLAINTIFFS' REQUEST FOR "OMNIBUS" FACT BRIEFING IN SUPPORT OF CLASS CERTIFICATION IS INAPPROPRIATE**

The class certification briefing ordered in this case, both in terms of order and timing, reflects considerable input from the parties and thought by the Court to ensure that no party is given an unfair advantage and that the process does not undermine the outcome.  Plaintiffs now seek a significant departure from the Case Scheduling Order to permit them to file a 30-page "omnibus fact memorandum" in support of all of their class certification motions.  As noted in Defendant's statement filed with the Court on December 18, 2006, this approach is impractical, inappropriate, and is an attempt to reopen this Court's ruling on page limits for class certification briefing.

In November 2005, the parties had a dispute over class certification briefing.  Defendant proposed that each side should get seventy-five pages, whereas Plaintiffs proposed that Defendant should receive fifty pages and that they should have seventy pages. (*See* Second Proposed Case Management Order, Docket Entry #45 at 18.)[6]  In the end, this Court rejected the prospect of high-volume briefs, and limited Plaintiffs to twenty-page opening and reply briefs, and gave Defendant thirty pages for each opposition.  Now, more than a year later, Plaintiffs wish to reopen this matter and reverse this Court's decision.

This additional briefing is also improper because it will interfere with the Court's individual consideration of the merits of granting or denying class certification with respect to each case.  Currently, this Court is scheduled to review twenty-nine class certification briefs, and will have to determine whether class treatment is appropriate for any of those cases, based on facts that are applicable *to each of those cases*.  While Plaintiffs claim that an omnibus brief is an attractive option in order to "avoid redundancy," each case has its own claims, class definitions,

---

[6]    In October 2005, Plaintiffs proposed that they receive 110 pages in total briefing, and that Defendant receive 50 pages.  (*See* Docket Entry #36 at 32.)

962

timeframes, and factual backgrounds that makes class certification *a distinct question for each of the cases*. To claim that all twenty-nine cases will share the same set of facts is untenable, and Plaintiffs' proposal will subject the Court to reviewing two sets of facts: one "omnibus" set that will apply to different cases to different degrees, and one that applies to the case for which class treatment is sought. The simpler, more sensible, and fair approach is to have a clear record for the Court to review for each class it is asked to certify. There is no basis for Plaintiffs' request, and it should be rejected.

Dated:  January 16, 2007                          Respectfully submitted,


                                                  By:  ___s/ Thomas J. Brunner_____
                                                         Thomas J. Brunner

                                                  John H. Beisner
                                                  Robert M. Schwartz
                                                  Evelyn L. Becker
                                                  O'MELVENY & MYERS LLP
                                                  1625 Eye Street, NW
                                                  Washington, DC 20006-4001

                                                  Thomas J. Brunner
                                                  Alison G. Fox
                                                  BAKER & DANIELS LLP
                                                  205 West Jefferson Blvd., Suite 250
                                                  South Bend, IN  46601

                                                  *Defendant's Liaison and Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of January, 2007, I filed the foregoing Defendant FedEx Ground Package System, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion to Amend Scheduling Order, Or, In the Alternative, Preclude Defendant's Expert Reports with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By:_____s/ Thomas J. Brunner_____

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

```
-------------------------------------------------- )
                                                   )
In re FEDEX GROUND PACKAGE               )            Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                 )            (MDL 1700)
PRACTICES LITIGATION                     )
-------------------------------------------------- )
THIS DOCUMENT RELATES TO                 )
ALL ACTIONS                              )
-------------------------------------------------- )
```

---

**DECLARATION OF ROBERT M. SCHWARTZ IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO AMEND
SCHEDULING ORDER, OR IN THE ALTERNATIVE, PRECLUDE
DEFENDANT'S EXPERT REPORTS**

---

I, Robert M. Schwartz, declare

1.      I am an attorney licensed to practice in California and a partner in the law firm of

O'Melveny & Myers LLP, located 1999 Avenue of the Stars, Los Angeles, California 90067-

6035.  I represent Defendant FedEx Ground Package System, Inc. ("FedEx Ground") in the

above-captioned matter.  I have been admitted *pro hac vice* to the United States District Court

for the Northern District of Indiana for these proceedings.  I have personal knowledge of the

facts set forth in this declaration and, if called to testify as a witness, could and would do so

under oath.

2.      On October 25, 2006, Co-Lead Counsel for Plaintiffs (Ms. Lynn Faris) e-mailed

me and my partner, Michael McGuinness, to ask for a two-week extension of time to serve

Plaintiffs' expert report (then due on November 1, 2006), and said she was willing "to extend the

deadlines that depend on this report accordingly." A true and correct copy of this email is

attached as Exhibit 6 to this declaration.

       3.     The next day, Mr. McGuinness e-mailed Ms. Faris to tell her that: (a) we would

give her a ten-day extension of time; (b) if she needed a two-week extension, she should let us

know; and (3) in either case, we were concerned that this would cause our deadline to fall during

the Christmas holiday. We asked that she discuss that with us so that would not happen. A true

and correct copy of this email is attached as Exhibit 7 to this declaration. Ms. Faris was traveling

that day to Pittsburgh to take the depositions of FedEx Ground witness Scott Ray. She likely did

not see the message, because, the next day, on October 27, 2006, during a break at Mr. Ray's

deposition, Ms. Faris asked me whether we would be willing to grant that extension. I said we

were, and that we had agreed to a ten-day extension via e-mail. I said that we were concerned

that, because any extension would involve a reciprocal amount of additional time for FedEx

Ground, the deadline would interfere with the holiday, and that we did not want to do anything

that would impact the class certification briefing schedule that the Court had established. Ms.

Faris said that she would "work with" us to see that our deadline did not fall during the

upcoming holidays and that it was not her desire to have any extension on expert reports affect

the class briefing schedule.

       4.     That did not occur. Instead, on November 13, 2006, twelve days after Plaintiffs'

expert report deadline, Plaintiffs served us with their expert report.

       5.     Over the next two weeks, Ms. Faris and I discussed a number of topics concerning

the class certification phase of the case, including evidentiary foundation issues and our expert

report deadline in view of the November 13 service of Plaintiffs' report. We spoke on

November 28, 2006 about these matters and I explained to Ms. Faris that, by reason of the

extension Plaintiffs received, our deadline fell on December 20, 2006.  (That was an erroneous calculation.  Had Plaintiffs' adhered to the original schedule, our reports would have been due on December 8.  The twelve day extension they received pushed that to December 20, but that afforded no reciprocal additional time to FedEx Ground, which had been a part of the extension.  That additional time moved the deadline to New Year's day, or the next business day, January 2, 2007.)  I told her that this was exactly what we didn't want to have happen as a result of the extension we granted to Plaintiffs, and that I wanted to be able to serve our reports on January 8, 2007.  I said that we were attempting to serve some of them by December 20, 2006, but that was only a goal, and that we needed the January 8, 2007 date as a firm deadline because of the holidays and conflicts in people's schedules.  Ms. Faris said she wouldn't be around to read them even if they came in on December 20, and that she was therefore indifferent as to whether they arrived on January 8, 2007, because she was going to be on vacation with her family and out of the office (and specifically *not* working on this case, as she emphasized) starting on December 15, and because her first day back in the office would not be until January 2, 2007.  She accepted my request for the January 8, 2007 deadline extension.

6.      After the call, I sent Ms. Faris a confirming e-mail to reflect our agreement that FedEx Ground's expert reports would be due on January 8, 2007, and I included our goal of attempting to serve some of them by December 20, if we could.  The next day, Ms. Faris responded to my an e-mail with regard to the need to also address the other class certification issues we had been discussing, but did not dispute the agreement to extend our deadline to January 8, 2007.  A true and correct copy of this correspondence is attached as Exhibit 2 to this declaration.

7.     The materials attached as Exhibit 1 to this declaration are a true and correct copy of excerpts from the reporter's transcript of the hearing held in the above-captioned matter on December 20, 2006.

8.     The materials attached as Exhibit 3 to this declaration are a true and correct copy of correspondence sent by Lynn Faris to Michael McGuinness, partner at O'Melveny & Myers, and an attorney representing FedEx Ground in this above-captioned matter, on September 11, 2006.

9.     The materials attached as Exhibit 4 to this declaration are a true and correct copy of an excerpt from the draft transcript of the deposition of Plaintiffs' expert David Lewin, which took place on December 19, 2006.

10.     The materials attached as Exhibit 5 to this declaration are a true and correct copy of FedEx Ground's Supplement to its Initial Disclosures, dated December 27, 2006.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 16th day of January, 2007

Robert M. Schwartz

4

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 152 of 1363
Case 3:05-md-00527-RLM-CAN    Document 477-2    Filed 01/16/07    Page 5 of 31

1

1                   IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF INDIANA

3                      SOUTH BEND DIVISION

4

5

6    IN RE:                      Cause Number:

     FEDEX GROUND PACKAGE         03:05-MD-527 RM

7    SYSTEM, INC., EMPLOYMENT     (MDL)-1700

     PRACTICES LITIGATION

8

                                  South Bend, Indiana

9                                 December 20, 2006

10                                THIS DOCUMENT APPLIES

                                      TO ALL CASES

11

12

13                  TRANSCRIPT OF PROCEEDINGS

14                          BEFORE

15     THE HONORABLE MAGISTRATE JUDGE CHRISTOPHER NUECHTERLEIN

16

17                    MOTIONS CONFERENCE

18

19

20   Court Reporter:        DEBRA J. BONK, RMR

                            United States District Court

21                          204 South Main Street - Room 323

                            South Bend, Indiana 46601

22

23   Proceedings reported in machine shorthand and transcript

     produced by Computer-Aided Transcription - ECLIPSE

24

25

Exhibit 1

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 153 of 1363
Case 3:05-md-00527-RLM-CAN    Document 477-2    Filed 01/16/07    Page 6 of 31

98

1    for that reason the motion should be denied.  There is no

2    reason to invoke a special master to delay this case or put

3    that financial burden on us.  We did what we were supposed

4    to do in reviewing these documents, Your Honor, and we did

5    all we could do in responding to a motion that was vague and

6    amorphous and a result of no proper meet-and-confer process.

7             THE COURT:  Okay.  So I have from plaintiffs that

8    the court should find that the waiver -- or that there was a

9    waiver because you failed to develop your argument or the

10   points to support the privilege, and I hear from the

11   defendant that the court should deny the plaintiffs' request

12   because of their failure to develop the issue in a

13   procedural posture, that is, Rule 37, meet-and-confer.  So

14   both of you are urging the court to take wholesale action,

15   one way or the other, either to grant or to deny, and we'll

16   have to see what's appropriate.

17             All right.  Time is running.  I need to move on to

18   other areas.

19             I appreciate counsel's argument.  It's been helpful,

20   but I want to switch argument now from the motions to the

21   timetable.  What effect will these motions -- and it is not

22   likely that I will be getting a decision out this week or

23   next on these motions.  It's going to take some time to

24   address that, and discovery closes this month, and the class

25   motions are coming on next.

1        Will the pendency of these motions and my ruling

2    necessarily require a modification of that schedule or only

3    if the court grants the plaintiffs' request and they get all

4    kinds of new information that previously was withheld or

5    redacted, that would then require that, well, now that we've

6    got it we need more time to digest it and use it?

7        So either one may speak.  You're to your feet first,

8    so you get the podium.

9        MS. ELLINGSTAD:  Thank you.

10       THE COURT:  Just advise me now what, if anything, we

11   should be thinking about with respect to the schedule

12   previously imposed in light of these motions.

13       MS. ELLINGSTAD:  Your Honor, we have separately made

14   a proposal to the court to extend only the class

15   certification briefing deadlines, not an overall extension

16   of the schedule for a lot of separate reasons.  I think,

17   obviously, the motions tie into that.  And if additional

18   documents are forthcoming as a result of these motions, the

19   current schedule would not work to accommodate any review of

20   that.  But plaintiffs have every motivation, just as

21   defendant, to keep this moving along, and we don't want to

22   delay anymore than is absolutely necessary to do.

23       I think that, with the other reasons that I outlined

24   in my letter, submission to the court, between the expert

25   discovery that is going to be ongoing and very busy through

1    the month of January, given not only some mutual extensions

2    that were granted by the parties but the fact that we

3    learned defendant is planning to submit five expert reports,

4    and that's subject to another request of plaintiffs, but

5    that will -- if those reports are allowed to stand and

6    discovery is held, expert discovery, that's going to be very

7    busy and run into that class certification deadline.

8         Another huge issue is the document production, and

9    I agree completely with defendant that both sides have

10   worked very hard, and I'm not faulting the delay in the

11   production, but we are seriously off schedule in what we had

12   anticipated in May when we approached the court as far as

13   document production, and that was to be completed

14   substantially by June 30th.

15        Now, as I mentioned, I received a production of

16   60,000 pages of documents yesterday.  On December 12th,

17   65,000 pages of documents were produced.  And because of a

18   negotiation on another category of documents, we could get

19   tens of thousands more documents at the end of the month, so

20   the documents after June 30th have been very voluminous and

21   coming in at a pace which has made it very difficult to

22   maintain the prior schedule which was set for the first

23   briefing waive to start on January 22nd.

24        So for those reasons, Your Honor, we have requested

25   a two-month extension just to the class certification

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 156 of 1363
Case 3:05-md-00527-RLM-CAN    Document 477-2    Filed 01/16/07    Page 9 of 31

101

1    briefing deadline so that each of the waives of briefs and

2    their response and reply briefs would be moved back by two

3    months, and plaintiffs believe we can accomplish that

4    without touching the deadlines for summary adjudication

5    which are existing in the schedule.

6            So to your first point, I think with the -- if this

7    request were granted, we could use that additional time to

8    review any documents that might be forthcoming as a result

9    of the motions.

10            THE COURT:  All right.  So did I hear you correctly,

11    you're suggesting we move the class certification motions by

12    two months, extend them by 60 days?

13            MS. ELLINGSTAD:  Yes.

14            THE COURT:  But not touch the discovery close at the

15    end of this month?

16            MS. ELLINGSTAD:  The parties actually were able to

17    reach an agreement on that, Your Honor, and we don't want to

18    overall extend the discovery cutoff deadline to open it up

19    to new discovery, but both parties agree that due to the

20    volume of depositions in discovery -- and both parties have

21    been working very, very hard to complete it -- that there

22    were a number of depositions that were unable to be

23    completed, non-expert depositions, and so with respect to

24    the depositions pending, we have agreed to extend that

25    deadline to January 31st, so that gives January month to

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 157 of 1363
Case 3:05-md-00527-RLM-CAN   Document 477-2   Filed 01/16/07   Page 10 of 31
102

1   wrap up the rest of these depositions.  We've got new cases

2   that have transferred in and a lot of plaintiffs'

3   depositions as well as a few third-party and defendant

4   depositions to clean up.  And so, again, that would provide

5   the parties a chance to complete that discovery as well as

6   the expert discovery without running into the briefing

7   deadline.

8            THE COURT:  Okay.  Mr. Schwartz.

9            MR. SCHWARTZ:  Yes, Your Honor.

10           I think in terms of how this affects the schedule,

11  without knowing where the court's going to come out in the

12  motions, it's a little difficult to say at this point.  And

13  maybe what ought to happen is, after the court rules, it

14  should -- or as part of its ruling -- schedule a telephonic

15  conference of counsel to discuss the time within which, if

16  there are to be any additional documents -- and, of course,

17  we don't think there ought to be -- how that would then

18  affect the schedule so maybe we could have a bit more

19  focused and informed conversation about that.

20           But in the meantime, Your Honor, since most of

21  the -- if you go back, sort of tick through the motions,

22  what's at stake there, trying to think how that would affect

23  the schedule, there's not -- putting aside the privilege

24  issue, there's not a lot when you talk about the specific

25  categories of documents that are involved.  The Luntz work

1    is a few documents.  The Scarlett material they're going to

2    have this week, anyway.  The head count redactions they

3    already have, the revised version.  So a lot of the issues

4    that were in dispute before have been already produced and

5    shouldn't really delay the schedule.

6          But in terms of the overall progress of the case, I

7    think I'm far more optimistic in being able to report to you

8    that we are not seriously behind schedule in the case.

9          About 85 five percent of the documents that we

10   needed to produce to the plaintiffs in response to their

11   first and second sets of production were, in fact, produced

12   by the end of June.  The documents that have been produced

13   from July 1st through the end date that counsel put forth in

14   their letter are comprised predominantly of documents that

15   concern plaintiffs that they added to the case more recently

16   and the terminal level productions that the parties agreed

17   and understood would go beyond the June 30th date.

18         And in conversations with Ms. Faris, in working

19   things out, she's acknowledged that this is the schedule for

20   the production of those documents that the parties

21   understood and agreed to.  And that is to say, by the end of

22   December, I think we are going to be, today, producing

23   pretty much the last set of those documents.  There will be

24   some trickling out.  We will be substantially if not

25   completed with the terminal documents by 12/31/06 as the

1     parties contemplated.

2            So what the parties thought would happen when we had

3     this schedule extension in May has, in fact, happened.

4     We're not on that schedule seriously behind, and I don't

5     think the volume of information that's been produced for

6     newly-added plaintiffs that they chose to add should delay

7     the progress of the case, so I hope that's some information

8     for the court.

9            We would not want to see a two-month wholesale

10    extension of the class certification briefing.  If there had

11    to be some extension, we would certainly want it to be more

12    modest, because once you go beyond a week, two, or three

13    weeks of additional time for them, Your Honor, you have to

14    ask whether we should be given additional time in filing

15    responses to their moving papers since they got this

16    additional running head start.  And once you do that, that

17    adds even more time, so we would like to not ask for that

18    and just keep their request for additional time to a pretty

19    small amount of time, if at all.  And, frankly, our view is

20    there is no need for additional time, but --

21            THE COURT:  Well, I certainly understand your

22    position, that the court is to simply deny all the

23    plaintiffs' motions and adhere to the schedule previously

24    imposed and move on?

25            MR. SCHWARTZ:  That's right.

 1              THE COURT:  That's your best scenario.

 2              But as I understood the plaintiffs' argument, it's

 3      to slide everything 60 days down?

 4              MR. SCHWARTZ:  That's their proposal.

 5              THE COURT:  That just pushes it 60 days down, but I

 6      wasn't hearing, you know:  We need six months or this is

 7      going to be more than that.

 8              But I think your first suggestion is the best, and

 9      that is to say let me digest what I have on my plate and

10      then, depending upon how I come out on the rulings, have a

11      telephonic to say:  All right.  Now, here's where we are.

12      Does this seriously and substantially change the game plan

13      and the case management deadlines and, if so, by what

14      amount?  And then view the train at that point.  I think

15      that makes sense rather than to just anticipate.

16              Mr. Harwood, I see a look on your face that suggests

17      you'd like to offer a comment.

18              MR. HARWOOD:  Please.

19              A conference sometime in the near future is fine.

20              But Mr. Schwartz grudgingly agreed to three weeks as

21      a more measured approach.  I think that was the term he used

22      in his papers.

23              Do you think, Your Honor, the plaintiffs could walk

24      away today knowing that there's going to be at least a

25      three-week extension?  It might salvage some of the holiday,

Case 4:06-cv-00175-KGB   Document 10-9   Filed 04/06/15   Page 161 of 1363
Case 3:05-md-00527-RLM-CAN   Document 477-2   Filed 01/16/07   Page 14 of 31
106

1    to be candid.

2            THE COURT:  Well, as I've said to others, you know,

3    we don't want to create the impression that this court is

4    hostile to the holidays.  We should be a family-friendly

5    court.

6            MR. HARWOOD:  And I think Your Honor knows that

7    everybody has been working hard on this case.

8            THE COURT:  Did I hear or did I wish to hear and

9    did not hear that the parties had agreed on a three-week

10   extension?

11           MR. HARWOOD:  No.  We had asked for two months in

12   our papers.

13           THE COURT:  Right.

14           MR. HARWOOD:  Mr. Schwartz's paper made reference to

15   no extension, but, if the court's going to grant some

16   extension, three weeks would be a more measured approach,

17   and all I'm asking is -- I wouldn't call that a concession.

18   But with that acknowledgement, three weeks is a more

19   measured approach.

20           THE COURT:  And we're talking about what deadline,

21   the discovery deadline or the --

22           MR. HARWOOD:  The date -- pushing the class

23   certification motions at least three weeks ahead, you know.

24           THE COURT:  Just on the status of what has

25   transpired today, irrespective of how I might rule is what

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 162 of 1363
Case 3:05-md-00527-RLM-CAN   Document 477-2   Filed 01/16/07   Page 15 of 31

107

1    you're suggesting?

2              MR. HARWOOD:  Yes.

3              THE COURT:  Mr. Schwartz.

4              MR. SCHWARTZ:  Well, I don't want to be the Grinch

5    who stole Christmas, but I at least -- yes, we did say, in

6    our view, if the court were inclined, three weeks would be

7    the right -- and "measured" sounds like I word I would use,

8    so I probably did use that term in our brief.

9              But I don't want to be in a position of negotiating

10   against myself when they come back and say:  Well, we really

11   want two months.  And so the baseline is three weeks versus

12   two months.  But I don't want to ruin anyone's Christmas.

13   Nobody here does.  And maybe that ought to be the decision

14   of the court.  Unfortunately, it's not fully informed yet

15   since the court has all this other motion practice to rule

16   on.  But, you know, so as long as it's understood that it's

17   not three weeks versus two months.  It's zero versus two

18   months.  But, you know, three weeks is what we were willing

19   to do.  I just don't want to be viewed as giving away such a

20   tremendous extension of this case's schedule because, you

21   know, we want to get this case resolved.  We've invested a

22   huge amount to meet the existing schedule, and --

23             THE COURT:  Well, the way I would view it is, if I

24   grant three weeks now on the current terrain, I'm going to

25   be less inclined to grant a two-months' extension depending

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 163 of 1363
Case 3:05-md-00527-RLM-CAN   Document 477-2   Filed 01/16/07   Page 16 of 31

108

1    on how I rule, so, you know, we're not going to just keep

2    pushing this out three weeks now, and then, perhaps, after I

3    rule, then have another two months, another 60 days on it.

4    That I'm not inclined to do.

5          MR. SCHWARTZ:  One other thing, Your Honor.

6          MR. HARWOOD:  Your Honor -- I'm sorry.  Go ahead.

7          MR. SCHWARTZ:  Thank you.

8          We said three weeks because we felt, look, if that's

9    what it is, fine, and we won't ask for more time to respond

10   because it's only three weeks.  But if there is a request

11   for additional time, we may very well come back and say:

12   Okay.  But since they're getting all this additional time to

13   put their opening set of papers together, the court should

14   give us some additional amount of time, not necessarily

15   three weeks but some additional amount of time, to respond

16   to it in view of the additional time it's given to them.

17   I'm not asking for that.  I'm just saying that's why we

18   limited it to three weeks.  And if they come back and ask

19   for more, you may very well hear from us asking for some

20   reasonable, additional amount of time.  I just wanted to put

21   that out there so everyone understands.

22         THE COURT:  Okay.  Let's make sure that I'm not

23   getting confused, and that's easily done.  What the

24   plaintiff is requesting is a three-week extension of filing

25   initial motions for the class certification motions, right?

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 164 of 1363
Case 3:05-md-00527-RLM-CAN   Document 477-2   Filed 01/16/07   Page 17 of 31

109

1      MR. HARWOOD:  No, Your Honor.

2      THE COURT:  All right.  Then I did misunderstand.

3      MR. HARWOOD:  We ask for a two-month extension.

4      THE COURT:  Correct.

5      MR. HARWOOD:  And we picked that date with some

6  degree of care.  We did not want to antagonize the court or

7  the defendants by asking for a longer period.  It's what we

8  think we reasonably need.

9          Your Honor heard today that the plaintiffs received

10  more than 100,000 pages of documents in the last two or

11  three business days with more coming.  And Your Honor knows

12  from litigation practice that frequently the best documents

13  are the last ones produced, so these have to be looked at

14  with some degree of care, so we would like two months, an

15  extension of two months, from January 27th of the schedule.

16          But we are asking for an indulgence today knowing

17  that we would have at least three weeks from January 27th

18  until the court has time to digest these motions and both

19  parties' requests and see what the appropriate time is.

20          THE COURT:  And if I grant that three weeks to the

21  plaintiff, the defendant is not necessarily asking for

22  additional time to respond --

23      MR. SCHWARTZ:  That's correct, Your Honor.

24      THE COURT:  -- or you are?

25      MR. SCHWARTZ:  No, we are not asking for additional

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 165 of 1363
Case 3:05-md-00527-RLM-CAN   Document 477-2   Filed 01/16/07   Page 18 of 31

110

1    time if their request is limited to three weeks.

2        THE COURT:  Okay.  Well, I'm inclined to, in light

3    of the arguments I've heard here and the information

4    provided recently, the documents that have come recently and

5    the holidays -- I'm always a sucker for the holidays -- to

6    extend those deadlines three weeks.  I don't think it will

7    adversely affect anyone.  And then, depending upon how I

8    rule, we'll see where we go with any further increases

9    necessary.  I think I'll just leave it at that.

10        MR. HARWOOD:  Thank you, Judge.

11        THE COURT:  So what that means is that the

12    plaintiffs' first class cert motions instead of -- what did

13    we say, 1/31?  Was it 1/31 or 1/27?

14        MS. ELLINGSTAD:  It was January 22nd.

15        THE COURT:  -- January 22nd would now be due three

16    weeks from that, and I don't have a calendar in front of me,

17    but you can figure that out, and that would not impact the

18    defendants in their response yet.

19        MR. SCHWARTZ:  That's fine.

20        One other thing, Your Honor, we had proposed -- but

21    I don't think it's within our authority.  We need the

22    court's approval on this -- the extension of the tail of the

23    discovery to January 31 so that the parties can complete

24    depositions that have already been noticed.  We're in

25    agreement that that makes sense from a housekeeping

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 166 of 1363
Case 3:05-md-00527-RLM-CAN    Document 477-2    Filed 01/16/07    Page 19 of 31

111

1    standpoint or otherwise.  Is that okay with the court?

2              THE COURT:  In light of what I just did and trying

3    to encourage agreement, yes.  So the discovery -- non-expert

4    discovery deadline would also now be extended to the end of

5    January.

6              MR. SCHWARTZ:  For the completion of --

7              THE COURT:  For the completion of previously-noticed

8    depositions.

9              MR. SCHWARTZ:  Right.  Thank you, Your Honor.

10             THE COURT:  All right.  Anything else?

11             MR. SCHWARTZ:  Merry Christmas.

12             MS. ELLINGSTAD:  Briefly.  Briefly, Your Honor.

13   Sorry.

14             THE COURT:  Well, I'll take the "Merry Christmas"

15   when I get it, so thank you.

16             MS. ELLINGSTAD:  I'm sorry, Your Honor.

17             THE COURT:  Yes.

18             MS. ELLINGSTAD:  Just what was included in our

19   submissions.  We also had an agreement with defendant to

20   push back the merits expert deadlines by four months, and

21   that was agreed with the parties, and that also would not

22   affect the summary adjudication deadlines in plaintiffs'

23   view.

24             The two requests that we made that were opposed that

25   were in our submission, Your Honor, was to be able to

1    prepare an omnibus fact brief and essentially borrow one

2    page from each of the opening briefs in the cases and use

3    those pages so as to not exceed the page limitations that

4    were set by the court, to present the facts in one brief,

5    which we think will be very efficient, and present the case

6    more clearly to the court.

7          And our second request, Your Honor, was, in light of

8    the fact that defendant has informed us that they intend to

9    introduce five expert reports, and on their initial

10   disclosures they've identified only three, we would either

11   ask to strike the other two that were not identified or to

12   be allowed to have rebuttal experts if we deem it necessary.

13         THE COURT:  Okay.  I'm going to address those later,

14   not today, okay.

15         MS. ELLINGSTAD:  Okay.

16         THE COURT:  Now, Merry Christmas.  Thank you all.

17         MR. SCHWARTZ:  Merry Christmas, Your Honor.

18         MRS. MACON:  All rise.

19         This court now stands adjourned.

20                       (Proceedings concluded.)

21

22

23

24

25

## Schwartz, Robert

| | |
|---|---|
| **From:** | Lynn Faris [lfaris@leonardcarder.com] |
| **Sent:** | Wednesday, November 29, 2006 3:58 AM |
| **To:** | Schwartz, Robert |
| **Subject:** | RE: FedEx MDL Proceeding |

Bobby: We need to memorialize our various other agreements about moving the scheduling of experts for summary adjudication and stipulating to authenticity, etc. as well. I hope that Mike can get me an update on the progress of document discovery soon --and thanks for passing on my request for that. I think Susan will be sending the letter we discussed to the magistrate asking for a status conference on 12/20 with status conference statements on 12/13.

I forgot to find out what is happening with Mr. Sullivan's deposition scheduling. As you know, we are not available to take his depo on Dec 15 - - the only date you have offered since we agreed to continue his deposition from Nov 23. We have been trying to arrange a mutually agreeable date for this final 30b1 deposition for more than a month now without any alternative date being suggested. As I previously told you, I am willing to depose Mr. Sullivan on a weekend or in January. Given that we have worked out all of our other scheduling challenges and disagreements about depositions and given the looming discovery cutoff -- we must reach agreement on this very soon. I really don't want to have to go to the Magistrate on this and I'm sure you don't either. Please let me know in the next 24-48 hours what alternate dates are available. Thanks. Lynn

---

From: Schwartz, Robert [mailto:RSchwartz@omm.com]
Sent: Tue 11/28/2006 7:40 PM
To: Lynn Faris
Subject: FedEx MDL Proceeding


Lynn--

I'm sending this note as to two of the items we discussed today with regard to the case schedule, experts, and the like, so that they don't get lost in the mix. In working out a revised expert report schedule for the parties, I had asked for additional time to serve FedEx's expert reports after the December 20 due date, namely, until January 8. You said today that plaintiffs are OK with our doing that. I appreciate that. As I mentioned before, our goal is to serve most of our reports by December 20, with one or two to follow by the later date. The other item concerns the class certification briefing schedule. FedEx is willing to extend that by one week, so that the first set of opening briefs from the plaintiffs would be due on January 29, with the succeeding dates to be extended by the same one week, as well. I know you said that this proposal is not sufficient, but it's still there in case you change your mind.

Thanks again, and best regards.

--Bobby

Reply information:
Telephone:    (310) 246-6835
Facsimile:    (310) 246-6779

* * * *

IMPORTANT NOTE: This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be privileged and/or confidential. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you for your assistance.

Exhibit 2

985

# LEONARD CARDER, LLP

VICTORIA CHIN
LYNN ROSSMAN FARIS
KATE R. HALLWARD
CHRISTINE S. HWANG
JENNIFER A. JAMBOR
ARTHUR A. KRANTZ
DANIELLE LUCIDO
PHILIP C. MONRAD
ELEANOR I. MORTON
ROBERT REMAR
MARGOT A. ROSENBERG
BETH A. ROSS
MATTHEW D. ROSS
PETER W. SALTZMAN
HINA B. SHAH
FRANCISCO UGARTE
RICHARD ZUCKERMAN

PLEASE REFER TO OUR FILE NO.

359-007

**ATTORNEYS**
1330 BROADWAY, SUITE 1450
OAKLAND, CALIFORNIA 94612

TELEPHONE: (510) 272-0169
FAX (510) 272-0174
www.leonardcarder.com

OF COUNSEL

WILLIAM H. CARDER
NORMAN LEONARD
SANFORD N. NATHAN
KIRSTEN L. ZERGER

SAN FRANCISCO OFFICE
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400
FAX: (415) 771-7010

September 11, 2006

*By email: mmcguinness@omm.com*
Mr. Michael McGuinness
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    Plaintiffs' Interrogatory Nos. 36 & 37 and Request for Production No. 22

Dear Mike:

It has come to our attention that FedEx Ground is once again conducting surveys of drivers who are members of the putative plaintiff class in this litigation. Specifically, we have learned that drivers have been contacted by "Field Research Corp." and questioned about their relationship with FedEx and their opinions about "independent contractor" versus "employee" status.

As you know, Plaintiffs have served discovery requests seeking information and material about any driver surveys or focus groups that have been conducted on behalf of FedEx. Specifically, I call your attention to the following requests (emphasis added):

Interrogatory #36. Identify *any vendor, marketing or public relations firm(s) employed by Defendant to conduct any survey or focus group* with any driver in any of the 50 states in the U.S.A. between 2000 and the present.

Interrogatory #37: Identify any document resulting from *any survey or focus group performed by any entity* identified in answer to Interrogatory #36.

Request For Production #22. *Any document(s) regarding surveys and/or focus groups conducted by Defendants or any of its agents, vendors, marketing or public relations firms, regarding satisfaction, attitudes or beliefs of driver(s) in any state regarding their work, the Estrada lawsuit, any case and/or their*

112250

Exhibit 3

LEONARD CARDER, LLP

*employment status.* This request includes but is not limited to the contract for such services, any reports generated by the entity performing the survey or focus group, any videotapes made of such focus groups and any survey forms filled out or used to compile the report, any form used by those conducting the survey or focus group and any document listing those who participated in such survey and/or focus groups and also includes but is not limited to surveys conducted by the Scarlett group, Global marketing Research *or any other company* with [which] Defendant contracted to perform surveys or focus groups.

Under Fed. R. Civ. P. 26(e), Defendant has a continuing duty supplement its discovery responses. I expect that Defendant will promptly supplement its responses to these requests with complete information and material pertaining to any driver surveys not previously identified in Defendant's responses, including but not limited to surveys by "Field Research Corp."

Sincerely yours,

LYNN ROSSMAN FARIS

cc: Robert Harwood, Susan E. Ellingstad

987

1219lew.txt

ROUGH DRAFT

07:28:12  1

        2          THIS TRANSCRIPT IS A ROUGH DRAFT

        3   TRANSCRIPT ONLY.  THIS REPORTER HAS NEITHER EDITED

        4   NOR PROOFREAD THIS TRANSCRIPT AND IT IS NOT A

        5   CITABLE DOCUMENT.

        6          SYLVIA P. SHEAR, RPR, CSR NO. 3010

        7            LOS ANGELES, CALIFORNIA

        8            TUESDAY, DECEMBER 19, 2006

        9            [!STARTTIME] ^ A.M. ^ P.M.

07:28:49 10

07:29:11 11      MR. JIH:

07:29:11 12      MR. GARRISON:

07:33:57 13      MS. BLOODGOOD:

07:33:58 14      MR. RUDD:

07:46:09 15      THE VIDEOGRAPHER:  Here begins volume 1

07:46:10 16   Videotape No. 1 in the deposition of David Lewin in

07:46:14 17   the matter of in re FedEx Ground Package Systems,

07:46:19 18   Inc. in the United States District Court, Tnorthern

07:46:21 19   District of Indiana, South Bend Division.  Case

07:46:24 20   number is 0305 MD 527 R MM DL 1700.  Today's date

07:46:36 21   is December 19, 2006.

07:46:38 22          The time on the video monitor is 7:46.

07:46:41 23   The video operator today is Stephen Smith a notary

07:46:46 24   public he public contracted by Meryl Legal

07:46:49 25   Solutions 20570 Ventura Boulevard Suite 205

                                                              1

ROUGH DRAFT

07:46:55  1   Woodland Hills 91364 this video deposition is

Exhibit 4

988

12191ew.txt

08:45:52 13    are marginal or not because I didn't engage in

08:45:54 14    primary research methods. And I understood your

08:45:57 15    question to be, would that be something one would

08:46:00 16    consider, I would consider and if that's not the

08:46:04 17    question I will come back.

08:46:05 18        Q. Actually that's an interesting answer.

08:46:08 19    Obviously at the end of the day you didn't conduct

08:46:12 20    certain primary research methods in terms of this

08:46:15 21    engagement and if you didn't reach an opinion as to

08:46:17 22    whether they are marginal or not, is it fair to say

08:46:19 23    you never made a decision yourself not to conduct

08:46:22 24    primary research?

08:46:23 25        MS. BLOODGOOD:  Object to counsel

                                                    50

ROUGH DRAFT

08:46:24 1    testifying and move to strike. Object to the form

08:46:27 2    of the question as vague and lacking foundation.

08:46:30 3        MR. JIH:  Let me rephrase it.

08:46:32 4        Q. Was it your -- I am trying to figure out

08:46:36 5    why primary research methods were not used in this

08:46:38 6    case and whether or not that was ultimately your

08:46:41 7    professional expert opinion that you didn't need to

08:46:43 8    or whether or not it was for some other reason why

08:46:46 9    it was not done.

08:46:51 10        So to simplify then the question would be,

08:46:53 11    why did you not use primary research methods?

08:47:00 12        A. Well, the direct answer, I wasn't asked

08:47:01 13    to.

08:47:02 14        Q. But you have a vague recollection, at

08:47:07 15    least of proposing primary research methods;

                        Page 45

1219lew.txt

```
08:47:11 16   correct?
08:47:11 17            MS. BLOODGOOD:  Object to the
08:47:12 18   mischaracterization of his testimony.
08:47:19 19            THE WITNESS:  I have a rough recollection
08:47:21 20   of talking about surveys of talking about
08:47:24 21   observations of talking about secondary data these
08:47:29 22   are the kind of things I talk about in almost all
08:47:31 23   cases that I work on and that's about it.
08:47:37 24   BY MR. JIH:
08:47:37 25      Q.  Do you remember what response you got when
```

                                                        51

                            ROUGH DRAFT

```
08:47:40  1   you suggested those possible methods?
08:47:41  2            MS. BLOODGOOD:  Objection to the
08:47:43  3   mischaracterization of his testimony.
08:47:48  4            THE WITNESS:  I don't know that I would
08:47:49  5   call them responses.  They were more discussion
08:47:51  6   items.  I recall hearing that some survey work had
08:47:56  7   been done or there was a survey floating around in
08:47:58  8   this matter.  I was given to believe there were
08:48:00  9   other experts.  It's not something I pursued in any
08:48:03 10   dimension.  It wasn't kind of a question/response.
08:48:06 11   That's not how I think about it in my memory.
08:48:09 12   BY MR. JIH:
08:48:09 13      Q.  Okay.  In terms of the secondary research
08:48:11 14   methods, did you use any published databases in
08:48:15 15   connection with in engagement?
08:48:18 16      A.  Published databases? I think the answer to
08:48:21 17   that question is no.
08:48:21 18      Q.  Okay.  And how about reference sources in
08:48:24 19   reaching your conclusions?
```
                            Page 46

1219lew.txt

08:48:28 20      A.  Reference sources would be yes.

08:48:31 21      Q.  And which reference sources? First of all

08:48:34 22  are these generally published reference sources or

08:48:36 23  are you using reference sources in a broader sense?

08:48:39 24  I am trying to think sit something you go to the

08:48:42 25  reference section of a library or what do you mean

                                                              52

                          ROUGH DRAFT

08:48:45 1   by reference sources?

08:48:46 2       A.  Well, I think the answer is yes to the

08:48:48 3   first -- I heard two questions there.  And I

08:48:53 4   referenced what I used in my report.  And there are

08:48:57 5   copies of those sources available so in that sense,

08:49:01 6   yes, specifically yes.

08:49:03 7       Q.  Okay.

08:49:04 8       A.  If you are asking the reference library

08:49:06 9   question about references, there's lots of other

08:49:09 10  things that are germane to my report that I do not

08:49:12 11  cite specifically and don't necessarily identify in

08:49:15 12  the body of the report.

08:49:16 13      Q.  Back to paragraph 4.  I think this is now

08:49:20 14  we are at the third semicolon or the third section

08:49:23 15  after the second semicolon.  It says you have

08:49:28 16  taught primary research methods courses --

08:49:30 17      A.  Yes.

08:49:30 18      Q.  -- at both Columbia Business School and

08:49:32 19  UCLA Anderson school.

08:49:34 20      A.  Yes.

08:49:36 21      Q.  In says you have sought primary research

08:49:38 22  method courses.  Have you ever taught any courses

                          Page 47

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

OUR FILE NUMBER
259075-3

December 27, 2006

WRITER'S DIRECT DIAL
(202) 383-5378

**VIA FEDEX AND ELECTRONIC DELIVERY**

WRITER'S E-MAIL ADDRESS
ebecker@omm.com

Susan Ellingstad, Esq.
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Re: _**Supplement to Initial Disclosures**_

Dear Susan:

This supplements our expert disclosures under Rule 26(a)(1) and 26(a)(2).

The following individuals may present expert testimony for purposes of class certification and/or merits:

1. James Scapellato--Mr. Scapellato was previously disclosed and will testify as to safety regulations.

    James E. Scapellato
    The Scapellato Group, Inc.
    1946 Saxon Valley Circle NE
    Atlanta, GA 30319
    Phone: (404) 327-8346

2. Jeremy Kahn--Mr. Kahn replaces Mr. Hardman who was previously disclosed. Mr. Kahn will testify as to vehicle leasing regulations.

    Jeremy Kahn
    Kahn and Kahn
    1730 Rhode Island Avenue, N.W.
    Suite 810
    Washington, DC 20036
    (202) 887-0037

Exhibit 5

992

O'MELVENY & MYERS LLP

Susan Ellingstad, Esq., December 27, 2006 - Page 2

3. Robert Crandall--Mr. Crandall was previously disclosed and will testify as to empirical, economic and statistical issues related to contractors and/or the independent contractor model.

   Robert Crandall, M.B.A.
   Resolution Economics
   9250 Wilshire Boulevard, Suite 400
   Beverly Hills, CA 90212
   Phone: (310) 275 9137

4. E. Deborah Jay--Dr. Jay will present evidence related to a survey of contractors, which you have been aware of since August/September 2006.

   E. Deborah Jay, Ph.D.
   Field Research Corporation
   222 Sutter Street
   San Francisco, CA 94108
   Phone:  (415) 392-5763

5. Richard Jeanneret--Dr. Jeanneret will opine about the type of skill and initiative required of the contractors, the existence of variations between contractors depending on how they choose to configure their businesses, and how contractors control their businesses.

   P. Richard Jeanneret, Ph.D.
   Valtera  Corp.
   601 Jefferson, Suite 3900
   Houston, TX 77002
   Phone: (713) 650-6535

Very truly yours,

Evelyn L. Becker
of O'MELVENY & MYERS LLP

cc:    Lynn Faris, Esq.
       Rob Harwood, Esq.

993

**Schwartz, Robert**

| | |
|---|---|
| **From:** | Lynn Faris [lfaris@leonardcarder.com] |
| **Sent:** | Wednesday, October 25, 2006 7:21 PM |
| **To:** | Schwartz, Robert; McGuinness, Mike |
| **Subject:** | Request for extension of time for expert report |

Bobby & Mike:  I wanted to follow up on my request (to Mike) for a two week extension of time for our expert report.  I have not heard back and we are anxious to know your position.  Obviously, we are willing to extend the deadlines that depend on this report accordingly.  Our concern is the lateness of so much of the document production and the production of the policy disks; we feel that our expert has been disadvantaged by these delays, however inadvertent.  Obviously, the expert will still be giving an opinion without the vast majority of the terminal document discovery, but we can live with that.  Please let me know whether you can accommodate this request.  Thank you.

*Lynn Rossman Faris*
*Leonard Carder, LLP*
*1330 Broadway, Suite 1450*
*Oakland, CA 94612*
*(510) 272-0169*

Exhibit 6

994

## Schwartz, Robert

| | |
|---|---|
| **From:** | McGuinness, Mike |
| **Sent:** | Thursday, October 26, 2006 11:17 AM |
| **To:** | 'lfaris@leonardcarder.com' |
| **Subject:** | Extension/Inspection |

Lynn -- I left you a voicemail extending your time to provide your expert report by 10 days.  If a 14-day extension is critical let me know and I will see what we can do.  Apparently 14-days backs us up pretty close to the holidays but we would like to be accommodating to your concerns.  Please let me know.

As I also stated in my voicemail, I would also like to talk about the designation of terminals for inspection.  My understanding of our agreement was that you would visit 25 terminals/facilities that were in the same location. A quick look at your list suggest to me that there are about 42 total terminal located in 38 different facilities. This is not what I was thinking, or, quite honestly, what I described to my client.  When you have a moment please call so we can talk this through.

Thanks.

Mike

Exhibit 7

995

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

```
------------------------------------------------ )
                                                  )
In re FEDEX GROUND PACKAGE                        )          Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                          )          (MDL 1700)
PRACTICES LITIGATION                              )
------------------------------------------------ )
THIS DOCUMENT RELATES TO                          )
ALL ACTIONS                                       )
------------------------------------------------ )
```

## DECLARATION OF GUY BRENNER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO AMEND SCHEDULING ORDER, OR IN THE ALTERNATIVE, PRECLUDE DEFENDANT'S EXPERT REPORTS

I, Guy Brenner, declare

1.      I am an attorney licensed to practice in Washington, D.C. and an associate in the law firm of O'Melveny & Myers LLP, located 1625 Eye Street, N.W., Washington, D.C. 20006. I represent Defendant FedEx Ground Package System, Inc. ("FedEx Ground") in the above-captioned matter. I have been admitted *pro hac vice* to the United States District Court for the Northern District of Indiana for these proceedings. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2.      As of December 31, 2006, FedEx Ground had produced to the opposing counsel in the above-captioned action approximately 566,809 documents, amounting to approximately 1,848,905 pages. Over 75 percent of these pages were produced to Plaintiffs before October 1, 2006.

3.    On January 11, 2007, I met and conferred with Peter Overs of the law firm of Harwood Feffer, L.L.P., at O'Melveny & Myers' Washington D.C. offices to discuss redactions made to documents produced by FedEx Ground in this litigation.  At the conclusion of the meeting, the parties agreed that FedEx Ground would reproduce two documents that contained redacted Scarlett survey information without redactions, and that should Plaintiffs want any additional documents produced without redactions, that they would contact Defendant's counsel.

4.    At the conclusion of the same meeting, Mr. Overs and Michael McGuinness, a partner at O'Melveny & Myers, and an attorney representing FedEx Ground in this litigation, discussed the need to meet and confer over Plaintiffs' objections to FedEx Ground's assertions of privilege and possible methods of proceeding with that task.  Messrs. Overs and McGuinness agreed to continue discussions this week.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.



Executed this 16th day of January, 2007

                                                    G. Brenner
                                                    _____
                                                    Guy Brenner



2

997

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

------------------------------------------------------ )
                                 )
In re FEDEX GROUND PACKAGE      )        Cause No.  3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT       )        (MDL 1700)
PRACTICES LITIGATION            )
                                 )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:       )
                                 )
ALL ACTIONS                          )
------------------------------------------------------ )

## JOINT MOTION FOR AMENDMENT OF SCHEDULING ORDER
## DATED MAY 26, 2006

As discussed at the status conference on December 20, 2006, Plaintiffs and Defendant FedEx Ground Package System, Inc. jointly request that the Court amend the Scheduling Order dated May 26, 2006 (Docket No. 261) to extend by four months the existing deadlines for summary judgment expert witnesses for all cases pending in MDL 1700.

Good cause exists for amending the schedule with regard to the summary judgment expert deadlines as fact discovery and class certification expert discovery are still ongoing and extending these expert dates will not affect the other deadlines in the May 26, 2006 Order.

Accordingly, the parties request the Pretrial Schedule to be modified as follows:

### III.     SUMMARY JUDGMENT/EXPERT WITNESSES

A.     Summary Judgment/Adjudication of Issues Relating to Independent
        Contractor/Employment Status

Movants shall serve any expert reports or affidavits upon which they rely on in that phase of proceedings no later than **June 5, 2007**.  Opponents have until **July 9, 2007** to depose such experts.  Opponents shall have until **July 9, 2007** to serve any expert reports or affidavits upon which they rely on in that phase of

proceedings.   Depositions of opponents' experts must take place no later than

**August 6, 2007**.

The Parties' joint request relates solely to the extension of expert deadlines and has no bearing

on Plaintiffs' pending motion to extend the class certification briefing deadlines.

WHEREFORE, the Parties respectfully move the Court to grant their joint Motion to

Amend the Scheduling Order to extend summary judgment expert deadlines by four months.

Dated:  January 17, 2007                    Respectfully submitted,


LOCKRIDGE GRINDAL NAUEN P.L.L.P.    O'MELVENY & MYERS LLP



By: **s/Susan E. Ellingstad**                By: **s/Robert M. Schwartz**
    Susan E. Ellingstad                         Robert M. Schwartz

Susan E. Ellingstad                         John H. Beisner
LOCKRIDGE GRINDAL NAUEN P.L.L.P.            Robert M. Schwartz
100 Washington Avenue South, Suite 2200    Evelyn L. Becker
Minneapolis, Minnesota  55401              O'MELVENY & MYERS LLP
                                           1625 Eye Street, NW
Lynn Rossman Faris                         Washington, DC 20006-4001
LEONARD CARDER, LLP
1330 Broadway Avenue, Suite 1450           Thomas J. Brunner
Oakland, California  94612                 Alison G. Fox
                                           BAKER & DANIELS LLP
Robert I. Harwood                          205 West Jefferson Blvd., Suite 250
WECHSLER HARWOOD LLP                       South Bend, IN  46601
488 Madison Avenue
New York, New York  10022                  *Defendant's Co-Lead and Liaison Counsel*

*Plaintiffs' Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I, Susan E. Ellingstad, hereby certify that on January 17, 2007, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David G. Caperton** | dcaperton@omm.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; efink@leonardcarder.com; kzerger@leonardcarder.com |
| **Eric M. Fink** | efink@leonardcarder.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |

| | |
|---|---|
| Robert I. Harwood | rharwood@whesq.com |
| Stacy J. Hauf | shauf@omm.com; swickliffe@omm.com |
| Dmitri Iglitzin | iglitzin@workerlaw.com |
| Dorothy Anne Jarrell | dajarrell@omm.com; prowen@omm.com; jdonovan@omm.com |
| Tom A. Jerman | tjerman@omm.com |
| Victor H. Jih | vjih@omm.com |
| Thomas P. Jirgal | tjirgal@omm.com; jbanks@omm.com |
| Aparna B. Joshi | ajoshi@omm.com; jdonovan@omm.com |
| Michael W. Kopp | mkopp@omm.com |
| Steve D. Larson | slarson@ssbls.com; dcerdas@ssbls.com; aardley@ssbls.com |
| Jordan M. Lewis | jordanlewis@sbgdf.com |
| Shannon Liss-Riordan | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| Anh-Nguyet Tran LyJordan | alyjordan@omm.com |
| Gary F. Lynch | glynch@carlsonlynch.com |
| Michael G. McGuinness | mmcguinness@omm.com |
| Matthew J. Merrick | mmerrick@omm.com |
| Jennifer Lee Merzon | jmerzon@omm.com |
| Raquel A. Millman | rmillman@omm.com |
| Daniel O. Myers | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| Peter W. Overs Jr. | povers@whesq.com |
| Richard T. Phillips | flip@smithphillips.com; tresahharden@smithphillips.com |
| D. Lucetta Pope | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| Nora M Puckett | npuckett@omm.com; dmeredith@omm.com |
| Charles Victor Pyle III | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| Anne T. Regan | atr@zimmreed.com; kmh@zimmreed.com |
| Robert G. Rikard | rrikard@attorneyssc.com |
| J. Gordon Rudd | jgr@zimmreed.com |
| Theodore B. Schroeder | tschroeder@omm.com |

| | |
|---|---|
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | matt@matthewtobinlaw.com |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Kirsten L. Zerger** | kzerger@leonardcarder.com |

I also certify that on January 17, 2007, I mailed by United States Postal Service the

foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
  CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Robert E McDaniel
THE MCDANIEL LAW OFFICES
4 Bicentennial Square
Concord, NH 03301
(New address:
755 North Main Street
Laconia, NH 03246)

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ 07960

365338-2

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

James R Mulroy II
William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Beth A Ross
LEONARD CARDER LLP
1330 Broadway, Suite 1450
Oakland, CA  94612

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
 AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI  02908

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN  55402

I further certify that I caused a copy of the Proposed Order, which was separately e-mailed to Magistrate Judge Christopher A. Nuechterlein pursuant to Section II.F of the CM/ECF Civil and Criminal User Manual for this District, to be delivered to all of the parties detailed above in the same manner as service of the documents filed with the Court.

Dated: January 17, 2007                    Respectfully submitted,

                                           LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                           __s/Susan E. Ellingstad_____
                                           Susan E. Ellingstad
                                           100 Washington Avenue South
                                           Suite 2200
                                           Minneapolis, MN  55401
                                           Tel:    (612) 339-6900
                                           Fax:    (612) 339-0981

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| ----------------------------------------------------- ) | |
| ) | |
| In re FEDEX GROUND PACKAGE ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL 1700) |
| PRACTICES LITIGATION ) | |
| ) | |
| ----------------------------------------------------- ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL ACTIONS ) | |
| ----------------------------------------------------- ) | |

---

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION**
**TO AMEND SCHEDULING ORDER OR, IN THE ALTERNATIVE,**
**PRECLUDE DEFENDANT'S EXPERT REPORTS**

---

**ARGUMENT**

**I.    PLAINTIFFS HAVE SHOWN GOOD CAUSE FOR A TWO-MONTH**
**EXTENSION OF THE CLASS CERTIFICATION BRIEFING**
**SCHEDULE**

In its memorandum in opposition to Plaintiffs' motion for a short extension of the

class certification briefing schedule, Defendant represents to the Court that "Plaintiffs'

co-lead counsel agreed that FedEx could serve all of its expert reports by January 8,

2007." This is false. Defendant granted Plaintiffs a twelve-day extension to serve their

expert reports. Plaintiffs then gave Defendant a corresponding extension of twelve days

– moving Defendant's deadline to serve expert reports from December 8 to December 20.

When Defendant asked for an additional extension until January 8 for all reports,

Plaintiffs responded that they would **only** agree to that extension if Defendant also agreed

to extend the class certification briefing deadlines, which Defendant would not.  Ex. 1 to

the Declaration of Susan E. Ellingstad ("Ellingstad Decl."), filed herewith.  Thereafter,

Plaintiffs' counsel, Ms. Faris, and Defendant's counsel, Mr. Schwartz, agreed that

Defendant would produce most if not all of the expert reports by December 20, 2006,

with one or two reports by January 8, 2007 if they could not be completed by December

20.  *Id.*; Ex. A attached to the Certificate of Good Faith of Robert I. Harwood ("Harwood

Cert."), Dkt. No. 456.

    Now, Defendant characterizes the December 20 deadline as merely "a goal."  As

the correspondence between counsel demonstrates, however, Defendant's counsel

represented "the goal" to be to get most if not all of the expert reports to Plaintiffs by

December 20 and, if that were not possible, **one or two** of the five reports would follow

on January 8, 2007.  *See* Ex. A. to Harwood Cert.  Indeed, this is precisely the agreement

that Plaintiffs described in their status conference submission:

> The reports of any experts upon whom Defendant intended to rely in
> opposing class certification were due on December 8.  Defendant asked for
> an extension to January 8, but refused to move the class certification
> briefing schedule.  Defendant informed Plaintiffs during these discussions
> that it intended to submit five expert reports.  **Defendant rejected**
> **Plaintiffs' proposal, but said it would produce three expert reports**
> **(and possibly more) on December 20 and the remaining reports on**
> **January 8, 2007.**

Ex. 2 to Ellingstad Decl., (emphasis added).

    Despite being fully aware of Plaintiffs' belief that Defendant would serve three or

more expert reports on December 20, Defendant argued against Plaintiffs' request for an

extension of the class certification briefing schedule at the status conference on

December 20, never disclosing that none of the expert reports would be submitted on that date. The next day when Ms. Faris wrote to Mr. Schwartz to inquire where the expert reports were, he simply stated: "we did not serve them yesterday. **We had hoped to have most of them done by then [December 20], with the remainder coming on the 8th**, as you and I discussed on November 28 … but that hasn't happened." See Ex. A to Harwood Cert. Counsel's own statements belie the claim that Plaintiffs agreed to all five reports being served on January 8, 2007.[1]

At the status conference on December 20, 2006, Plaintiffs requested a two-month extension in the briefing schedule based on the facts as they existed on that date: the expert reports were still forthcoming and expert discovery would likely not be completed in January; several non-expert depositions were left to complete in January on both sides; and hundreds of thousands of documents were still being produced by Defendant in December.

Those reasons and more now exist to grant Plaintiffs' request. Contrary to Plaintiffs' understanding of Defendant's agreement, Defendant served all five expert reports on January 8, with some, but not all, of the underlying data following on January 13. Depositions of Defendant's five experts have not even been scheduled. Thus, Plaintiffs will be spending the next several weeks digesting and analyzing these five reports, and then flying around the country for expert depositions – at the same time the class certification briefing is to commence.

_____

[1] Defendant's counsel's assertion that Ms. Faris said receiving all five expert reports on January 8 was acceptable as she was on vacation is also inaccurate. Plaintiffs' counsel indicated on December 27 when Mr. Schwartz informed her that Defendant's submission of most of the reports just "didn't happen" on the 20th that his response was a complete shock to her and she felt misled. Ex. 1 to Ellingstad Decl.

As expected, Plaintiffs received hundreds of thousands of documents throughout the end of December. *See* Ellingstad Decl. ¶ 4. Contrary to Defendant's assertions in its opposition brief, most of these documents related not to newly added Plaintiffs, but to preexisting document requests and productions of select terminal documents, such as business discussion notes from a wide sampling of terminals. *See id.* Plaintiffs are digesting this last-minute voluminous production in order to prepare their evidence on class certification, and thus require a brief extension to do so.

Also contrary to Defendant's representations in the brief, the depositions to be scheduled in January were not due to Plaintiffs' "timing of their own litigation strategies." Def. Br. at 4. Plaintiffs scheduled more than twenty-five named Plaintiffs' depositions in December and then sought to schedule twenty-five more which Defendant requested on Dec 5. All of those depositions simply could not be completed given the schedules of all involved as well as scheduling problems during the holiday. Similarly, the four non-party depositions Plaintiffs sought to take were delayed into January due to the third-party witnesses' own availability and scheduling issues.

Given the enormous amount of work and effort by both parties to complete discovery under the prior schedule, and given Defendant's agreement to extend the discovery deadline by one month to complete both parties' pending discovery, Defendant's accusation that Plaintiffs somehow caused a delay in the completion of discovery is unfounded. Likewise, in light of the massive amount of documents produced in the last weeks of discovery, as well as the unexpected submission of five expert reports just a few weeks before the briefing is to commence, Plaintiffs' request for

a short two-month extension in the class certification briefing schedule – which affects no other deadlines in the case -- is hardly an "extraordinary request." Plaintiffs simply seek time to sift through the evidence just produced in order to present it on class certification, and complete the flurry of expert depositions, prior to filing their first wave of class certification briefs.

Neither is this an *additional* request for an extension, as characterized by Defendant. As stated above, Plaintiffs initially requested this two-month extension at the status conference on December 20, 2006. Because of the holiday, the Court kindly assured the parties that it would grant a minimum of three weeks extension while considering Plaintiffs' request as well as the discovery motions. Plaintiffs' two-month request was not based on the outcome of the motions, however, but rather the document production, depositions and expert discovery, the completion of which bumped up against the class certification briefing deadlines. The relief provided by the Court's three-week extension was completely nullified by Defendant's self-granted extension of their expert report deadline. Despite Defendant's counsel's attempt to downplay the parties' agreement as merely a "goal," it is crystal clear that Plaintiffs understood at least three expert reports to be due on December 20 and relied on that date. Accordingly, Plaintiffs respectfully request, at a minimum, the two-month extension of the class certification briefing deadlines requested on December 20, 2006.

## II.  DEFENDANT'S OBJECTION TO AN OMNIBUS FACT BRIEF IS UNFOUNDED.

Puzzlingly, Defendant opposes Plaintiffs' request for an omnibus fact brief on the

basis that it will "reverse the Court's decision" in the scheduling order setting page limits for the class certification briefs. To the contrary, as Plaintiffs explained in their motion, in order to remain within the page limits set by the Court in its scheduling order, their request is to use one page of each opening brief for the fact brief, thus **not** exceeding the page limitations set by the Court.

Defendant's only other argument is that the Court might be confused by an omnibus fact brief because each case has its own individualized facts and claims. Indeed, the Court will have the opportunity to consider a separate brief for every case seeking class certification in this MDL proceeding and can certainly consider the claims and issues specific to each case. Contrary to Defendant's argument, Plaintiffs' position is that every single one of these cases shares a common set of facts and that Defendant's conduct relative to all of the Plaintiffs in all of the cases was centralized, standardized and uniform. Because common facts about Defendant's company-wide operation apply across the board to all cases, allowing Plaintiffs to submit an omnibus fact brief will avoid significant redundancy and duplication. Plaintiffs have the burden on class certification. Their proposal does not run afoul of the page limitations set by the Court. They request the Court to allow them to present their evidence in the way they believe is most clear and appropriate for the Court's consideration.

III.     **DEFENDANT'S UNDISCLOSED EXPERTS SHOULD BE BARRED OR, ALTERNATIVELY, PLAINTIFFS SHOULD BE ALLOWED TO REBUT DEFENDANT'S UNDISCLOSED EXPERTS.**

In accordance with Rule 26(a), the Supplemental Scheduling Order of this Court dated November 29, 2005 required Defendant to identify "all experts and witnesses upon

whom they will rely for the motions for class certification by January 8, 2006." Dkt. 12.

Defendant failed to disclose two of its experts in its initial disclosures, and never sought

an extension of that deadline. Nonetheless, Defendant argues that the experts should not

be stricken because Plaintiffs should have known about them anyway. Specifically,

Defendant argues that Plaintiffs "have known for months" about one of their experts, E.

Deborah Jay, of Field Research Corporation. The only thing Plaintiffs knew from reports

of a couple of putative class members, is that a group called Field Research Corporation

was contacting putative class members to conduct a survey. Upon learning that surveys

were once again being surreptitiously conducted by FedEx, Plaintiffs requested

information related to this survey be produced in discovery. *See* Ex. 3 to Schwartz Aff.

As with the Luntz survey, this survey was never disclosed to Plaintiffs in response

to their discovery requests, despite constituting factual data relied upon by Defendant's

expert. Neither did Defendant disclose the identity of Ms. Jay in response to Plaintiffs'

inquiry about the survey. Thus, it is inaccurate to allege that Plaintiffs have known about

this expert for months. Defendant shielded the existence of the survey from Plaintiffs,

failed to disclose it pursuant to the Court's Scheduling Order and Rule 26(a), and failed

to respond to discovery about the survey. This report should be stricken. *See Bazini v.

Advanced Adhesive Tech.,* 1996 WL 662447, *3-4 (N.D. Ind. 1996).

Similarly, Defendant did not supplement its initial disclosures to identify Dr.

Jeanneret until after Plaintiffs noted in their status conference submission on December

18, 2006 that two experts had never been disclosed. Defendant never sought from the

Court an extension of the expert disclosure deadline under the Scheduling Order. And

yet, Defendant argues that Dr. Jeanneret was not "undisclosed" because Defendant supplemented its initial disclosures with his name at the end of December – just a couple of weeks before Plaintiffs received Dr. Jeanneret's expert report.  This report should also be stricken.  *See id.*

Defendant's failure to identify its experts for class certification, as it was required to do well in advance of Plaintiffs' expert submissions, hampered Plaintiffs' ability to anticipate those experts and plan their class certification strategy accordingly.  Therefore, the reports of the two undisclosed experts, Jay and Jeanneret, should be stricken.  Alternatively, Plaintiffs should be allowed to submit rebuttal expert reports to these undisclosed expert reports.

## <u>CONCLUSION</u>

For all of the reasons set forth herein, Plaintiffs request a two-month extension of the class certification briefing schedule; that Defendant's two experts undisclosed in their initial disclosures be stricken or, alternatively, that Plaintiffs be allowed rebuttal exerts; and that the Court allow Plaintiffs to use one page from each opening brief to submit an omnibus fact brief in support of class certification.

Dated: January 18, 2007                 Respectfully submitted,

                                        LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                        _____s/Susan E. Ellingstad_____
                                        Susan E. Ellingstad
                                        100 Washington Avenue South, Suite 2200
                                        Minneapolis, MN  55401
                                        Tel:    (612) 339-6900
                                        Fax:    (612) 339-0981


Lynn Rossman Faris                 Robert I. Harwood
LEONARD CARDER, LLP                HARWOOD FEFFER LLP
1330 Broadway, Suite 1450          488 Madison Avenue, 8th Floor
Oakland, CA  94612                 New York, NY  10022
Tel:   (510) 272-0169              Tel:    (212) 935-7400
Fax:   (510) 272-0174              Fax:    (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| ---------------------------------------------------- ) | |
| ) | |
| In re FEDEX GROUND PACKAGE ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT ) | (MDL 1700) |
| PRACTICES LITIGATION ) | |
| ) | |
| ---------------------------------------------------- ) | |
| THIS DOCUMENT RELATES TO: ) | |
| ) | |
| ALL ACTIONS ) | |
| ---------------------------------------------------- ) | |

---

**DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS'**
**REPLY MEMORANDUM IN SUPPORT OF MOTION**
**TO AMEND SCHEDULING ORDER, OR, IN THE ALTERNATIVE,**
**PRECLUDE DEFENDANT'S EXPERT REPORTS**

---

I, SUSAN E. ELLINGSTAD, state:

1.      I am a partner with the law firm of Lockridge Grindal Nauen P.L.L.P., one of the firms named Co-Lead Counsel for Plaintiffs in this matter.  I submit this declaration in support of Plaintiffs' Reply Memorandum in Support of Motion to Amend Scheduling Order or, in the Alternative, Preclude Defendant's Expert Reports.

2.      Attached as Exhibit 1 is a true and correct copy of email correspondence from Lynn Faris to Robert Schwartz dated December 27, 2006.

3.      Attached as Exhibit 2 is a true and correct copy of page 4 of Plaintiffs' Statement Regarding Scheduling filed with the Court and served upon Defendant on December 18, 2006.

4.    Defendant produced over **233,000** pages of documents between December 11 and December 28, 2006.  In December, Defendant produced thousands of documents on each of the following dates:  December 5, 12, 14, 15, 19, 20, 21, 22, 27 and 28. Contrary to Defendant's assertion that most of these documents related specifically to Plaintiffs who were newly added to the lawsuit, the majority of documents produced by Defendant were responsive to Plaintiffs' prior discovery requests and were not Plaintiff-specific, including almost 40,000 pages of Scarlett Survey data, over 30,500 pages of Business Discussion Notes, tens of thousands of terminal specific documents, as well as training materials, terminal reviews, and policies and procedures.

I swear under penalty of perjury under the laws of the State of Minnesota and the United States that the foregoing is true and correct.  Executed on January 18, 2007 at Minneapolis, Minnesota.

_____**s/Susan E. Ellingstad**_____
Susan E. Ellingstad

Subscribed and sworn to before me
this 18th day of January, 2007.

 **s/Rachael M. Morton**_____
Notary Public - Minnesota
    My commission expires:  01-31-2010

# EXHIBIT 1

**Potteiger, Heather N.**

| | |
|---|---|
| **From:** | Lynn Faris [lfaris@leonardcarder.com] |
| **Sent:** | Wednesday, December 27, 2006 3:13 PM |
| **To:** | Schwartz, Robert |
| **Cc:** | Ellingstad, Susan E.; Robert Harwood; Jerald R. Cureton; Beth A. Ross; Bloodgood, Patricia A. |
| **Subject:** | FW: Expert Reports |

Bobby:  Your email response of 12/21 came as a complete shock to me, as well as a big disappointment in what I see as unexpected sharp practice. Not only were your reports (at least 3 of them) due on December 20 (not Dec 28), but you appear to have mislead not just me, but almost certainly, the court at the 12/20 hearing.

When we asked for an extra ten days for our expert report several weeks before it was due, we agreed to provide you with a similar extension and to make all good faith efforts to avoid holiday conflicts.  Our ten days wound up on a weekend and thus we actually provided our expert report on Monday, twelve days after the original due date -- that is why your reports were due on December 20th - - twelve days after the original due date of December 8th.  When you asked us to extend your time further to January 8th, I told you we would agree if your client agreed to an extension of our time to file class certification motions, as we could not possibly meet the motion deadline set for January 22nd, getting 5 expert reports on January 8th.  You rejected my proposal and insisted, instead, that you would provide us with at least 3 reports on December 20 and possibly four or all five reports on that date because, as you insisted, your client was opposed to any continuance of the class certification motion filing. If you were unable to provide all 5 on December 20th, you would provide either 1 or 2 reports on January 8th. That was our agreement, as you know full well. Our agreement that you would provide at least 3 of the 5 reports on December 20th was clearly stated in our status conference report on 12/18 and was quite obvious from my email to you asking where the reports were on December 21st.

Now, apparently taking advantage of the fact that (as you knew) I was out of town and unavailable, you have unilaterally extended your time to provide expert reports by 3 weeks without agreement and substantially disadvantaging plaintiffs by withholding not just the reports, but also the expert files, and making the completion of expert depositions directly conflicting with the class certification motion preparation. By your actions, you have forced Plaintiffs to seek court relief for your tardy submission of these experts in direct violation of our agreement and understanding.

Lynn Rossman Faris
Leonard Carder, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
(510) 272-0169

1

-----Original Message-----
From: Schwartz, Robert [mailto:RSchwartz@omm.com]
Sent: Thursday, December 21, 2006 10:35 AM
To: Lynn Faris
Cc: seellingstad@locklaw.com; rharwood@whesq.com
Subject: RE: Expert Reports

Lynn--

I wanted to respond to this live, as opposed to e-mail, so I just called Rob, since I didn't feel comfortable calling you on your cell phone while you are on vacation.

As I said to Rob, we have not completed the expert reports, so we did not serve them yesterday. We had hoped to have most of them done by then, with the remainder coming on the 8th, as you and I discussed on November 28 (see attached confirming e-mail), but that hasn't happened. I anticipate being able to serve some prior to the 8th, and will send around PDFs to you three on the day we send them out in hard copy.

You probably know that yesterday the Court extended the dates for class certification briefing three weeks, so that your first set is due February 12. Rob made a convincing request, at least so that your team would not need to spend the holidays on brief writing, and I agreed. That will also make dealing with experts a little easier.

(By the way, I realized yesterday afternoon that I miscounted in assuming that defendant's reports would be due on December 20 as a result of the additional time we extended to plaintiffs. Our reports were originally due on the 8th. The ten days plaintiffs had, plus extending our time by the same amount, put the date on December 28th, which is why I was concerned back in October that the extension would jam our side during the holidays. So I do appreciate your courtesy on that.)

Hope you are getting some time away from work. Best wishes for the holidays.

--Bobby

-----Original Message-----
From: Lynn Faris [mailto:lfaris@leonardcarder.com]
Sent: Thursday, December 21, 2006 8:22 AM
To: Schwartz, Robert
Cc: seellingstad@locklaw.com; rharwood@whesq.com
Subject: Expert Reports

Bobby: I've looked through my emails and see no expert reports. Have they been served some other way? Can you please pdf the reports themselves without the exhibits and files so that we may see them?

Lynn Faris

2

Leonard Carder, LLP

# EXHIBIT 2

case 3:05-md-00527-RLM-CAN     document 436     filed 12/18/2006    page 4 of 6

Magistrate Judge Christopher A. Nuechterlein
December 18, 2006
Page 4

In addition to the depositions already noticed for the existing named Plaintiffs, there are several newly transferred or soon-to-be transferred cases. Presumably Defendant will also seek to depose the named Plaintiffs in these newly transferred cases. Moreover, several Plaintiffs have been added to existing cases and their depositions have yet to be scheduled.

## SYNOPSIS OF EXPERT DISCOVERY TO DATE

Under the current scheduling Order, the deadline for any reports of experts upon which Plaintiffs intended to rely in support of its class certification motion was November 1, 2006. This date was extended by 10 days by agreement of the parties. Plaintiffs' expert is to be deposed on December 19.

The reports of any experts upon whom Defendant intended to rely in opposing class certification were due on December 8. Defendant asked for an extension to January 8, but refused to move the class certification briefing schedule. Defendant informed Plaintiffs during these discussions that it intended to submit five expert reports. Defendant rejected Plaintiffs' proposal, but said it would produce three expert reports (and possibly more) on December 20 and the remaining reports on January 8, 2007.

In light of the sheer number of experts and the late service of the expert reports, not to mention the fact that tens of thousands of pages of documents are yet to be produced by Defendant, Plaintiffs asked Defendant to stipulate to an extension in the class certification briefing schedule. Defendant refused. Defendant also refused to stipulate that Plaintiffs could designate rebuttal experts.

## RATIONALE FOR THE RELIEF SOUGHT ON MATTERS
## ON WHICH THE PARTIES AGREE

First, as indicated above, the parties agree that previously noticed depositions should be completed by January 31, 2007. There is good reason for the Court to grant this joint request. Defendant's stated intention of taking over 50 depositions in December is obviously untenable, particularly since 25 of these were attempted to be scheduled on December 5, 2006 after about 25 named plaintiff depositions were already scheduled.

Second, the parties also agree that the expert report date for summary judgment experts should be extended by four months, to June 5, 2007 for movants and July 5, 2007 for opponents, with depositions to take place by August 6, 2007. The parties agree that this will allow sufficient time before the September 21, 2007 deadline for summary judgment motions relating to employment status. It will give the parties and their summary judgment experts the time to digest the tens thousands of pages of documents still being produced and to digest the depositions which will take place throughout January 2007.

364585-4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| -------------------------------------------------- | ) | |
| | ) | |
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| | ) | |
| -------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| -------------------------------------------------- | ) | |

<u>CERTIFICATE OF SERVICE</u>

I, Susan E. Ellingstad, hereby certify that on January 18, 2007, I electronically filed the following documents:

1. **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO AMEND SCHEDULING ORDER OR, IN THE ALTERNATIVE, PRECLUDE DEFENDANT'S EXPERT REPORTS; AND**

2. **DECLARATION OF SUSAN E. ELLINGSTAD IN SUPPORT OF PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO AMEND SCHEDULING ORDER, OR, IN THE ALTERNATIVE, PRECLUDE DEFENDANT'S EXPERT REPORTS**

with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |

353064-1

| | |
|---|---|
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David G. Caperton** | dcaperton@omm.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; efink@leonardcarder.com; kzerger@leonardcarder.com |
| **Eric M. Fink** | efink@leonardcarder.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert I. Harwood** | rharwood@whesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |

| | |
|---|---|
| **Dorothy Anne Jarrell** | dajarrell@omm.com; prowen@omm.com; jdonovan@omm.com |
| **Tom A. Jerman** | tjerman@omm.com |
| **Victor H. Jih** | vjih@omm.com |
| **Thomas P. Jirgal** | tjirgal@omm.com; jbanks@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com; jdonovan@omm.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; aardley@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| **Anh-Nguyet Tran LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@whesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; |

ted.speth@ogletreedeakins.com;
Linda.lyday@ogletreedeakins.com

| | |
|---|---|
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |
| **Robert G. Rikard** | rrikard@attorneyssc.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | matt@matthewtobinlaw.com |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Kirsten L. Zerger** | kzerger@leonardcarder.com |

I also certify that on January 18, 2007, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI  53202-4108

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA  19004

Robert E McDaniel
THE MCDANIEL LAW OFFICES
4 Bicentennial Square
Concord, NH  03301
(New address:
755 North Main Street
Laconia, NH  03246)

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

James R Mulroy II
William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Beth A Ross
LEONARD CARDER LLP
1330 Broadway, Suite 1450
Oakland, CA  94612

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI  02908

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Patricia A Sullivan
EDWARDS ANGELL PALMER
  & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
  AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN  55402

Dated: January 18, 2007                  Respectfully submitted,

                                         LOCKRIDGE GRINDAL NAUEN P.L.L.P.

                                         **s/Susan E. Ellingstad**
                                         Susan E. Ellingstad
                                         100 Washington Avenue South
                                         Suite 2200
                                         Minneapolis, MN  55401
                                         Tel:    (612) 339-6900
                                         Fax:    (612) 339-0981

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| ----------------------------------------------------- | ) | |
| | ) | |
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| | ) | |
| ----------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| ----------------------------------------------------- | ) | |

## PLAINTIFFS' MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S RULING REGARDING DEFENDANT'S SURVEY/FOCUS GROUP DOCUMENTS

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, Plaintiffs hereby petition the Court to review and modify a portion of Magistrate Judge Nuechterlein's January 5, 2007 Order (Doc. No. 466). Specifically, Plaintiffs request that this Court review and modify that portion of the January 5, 2007 which denied Plaintiffs' motion to compel the production of certain survey and focus group research conducted on behalf of Defendant.

This motion is based upon the memorandum of law, and all of the files and records submitted herewith, as well as the memoranda of law, files and records submitted in connection with Plaintiffs' Motion to Compel Re: Headcount and Survey/Focus Group Documents. (Doc. No. 327).

Dated: January 22, 2007                        Respectfully submitted,

                                               LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                               __s/Susan E. Ellingstad_____
                                               Susan E. Ellingstad
                                               100 Washington Avenue South, Suite 2200
                                               Minneapolis, MN  55401
                                               Tel:    (612) 339-6900
                                               Fax:    (612) 339-0981


Lynn Rossman Faris                             Robert I. Harwood
LEONARD CARDER, LLP                            HARWOOD FEFFER LLP
1330 Broadway, Suite 1450                      488 Madison Avenue, 8th Floor
Oakland, CA  94612                             New York, NY  10022
Tel:    (510) 272-0169                         Tel:    (212) 935-7400
Fax:    (510) 272-0174                         Fax:    (212) 753-3630


                        **PLAINTIFFS' CO-LEAD COUNSEL**

DOCUMENT REMOVED PURSUANT TO

COURT'S ORDER #501

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

```
------------------------------------------------------ )
                                                       )
In re FEDEX GROUND PACKAGE      )          Cause No.  3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT        )          (MDL 1700)
PRACTICES LITIGATION            )
                                                       )
------------------------------------------------------ )
THIS DOCUMENT RELATES TO:       )
                                                       )
ALL ACTIONS                     )
------------------------------------------------------ )
```

## ORDER
## AMENDING SCHEDULING ORDER DATED MAY 26, 2006

The parties have filed a joint motion requesting this Court amend the Scheduling Order.

After considering the parties' motion, the Court now amends the May 26, 2006 Scheduling Order

as follows:

**III.    SUMMARY JUDGMENT/EXPERT WITNESSES**

      A.    <u>Summary Judgment/Adjudication of Issues Relating to Independent Contractor/Employment Status</u>

Movants shall serve any expert reports or affidavits upon which they rely on in that phase

of proceedings no later than **June 5, 2007**.  Opponents have until **July 9, 2007** to depose such

experts.  Opponents shall have until **July 9, 2007** to serve any expert reports or affidavits upon

which they rely on in that phase of proceedings.  Depositions of opponents' experts must take

place no later than **August 6, 2007**.

      **SO ORDERED**

Dated this 19th day of January, 2007.

                               <u>S/Christopher A. Nuechterlein</u>
                               Christopher A. Nuechterlein
                               United States Magistrate Judge

365344-2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700) THIS DOCUMENT RELATES TO ALL CASES |

## ORDER

On December 27, 2006, Plaintiffs filed a motion to extend the class certification briefing by two months, or in the alternative preclude Defendant Fedex Ground Package System, Inc., (Fedex) from submitting certain expert reports. Plaintiffs also seek to amend the class briefing by seeking leave to file one omnibus fact brief in relation to the nearly thirty probable class certification briefs. For the following reasons, Plaintiffs' motion is **GRANTED IN PART** [Doc. No. 454].

## I.    AMENDING THE BRIEFING SCHEDULE

Plaintiffs claim that Fedex unilaterally delayed submission of its expert reports, and as a result, seeks a two month extension of the class action certification briefing. Fedex denies these allegations and opposes an extension. Despite this factual dispute and without resolving it, this Court finds that an extension is warranted.

This Court recently entered an order on several motions to compel, and based on the representation of the parties, they appear to be working together in resolving some of those disputes as this Court has ordered. Consequently, Plaintiffs, and perhaps Fedex, may be obtaining more discovery materials at this time. Because the first phase of class certification

briefs is only three weeks away, this Court finds an extension of the class certification briefing schedule is warranted so that the parties can utilize the newly acquired discovery with class certification briefing.  However, this Court is also compelled to keep this litigation moving forward, and as a consequence, does not feel a full two month extension is warranted.  For these reasons, Plaintiffs' motion to amend the scheduling order is **GRANTED IN PART**.  This Court will extend the briefing schedule for class certification by one month.[1]

## II.    THE OMNIBUS FACT BRIEF

Plaintiffs also propose that one page be taken from each of their class certification briefs in order for them to file one omnibus fact brief that relates to all the class action briefs that will be filed.  Fedex contends that each class has inherently different facts, and as a result, this proposal is inappropriate.  Fedex also contends that this is an attempt by Plaintiffs to alter this Court's case scheduling order.

Despite Fedex's concerns, this Court agrees with Plaintiffs that an omnibus fact brief for all class certification would assist this Court in resolving all of the future motions for class certification.  Defendants are correct that some cases may have facts that are distinct to a particular case, but Plaintiffs choose to either address those facts in the separate briefs within the shortened limit or not at their own peril.  Consequently, Plaintiffs shall be allotted **one page** from each of their class certification briefs, and each of their class certification briefs shall be limited to **nineteen (19)** pages.

## III.    PLAINTIFFS' MOTION TO STRIKE

---

[1] Because this Court is extending the briefing schedule, as Plaintiffs primarily requested, Plaintiffs' alternative motion to preclude expert reports is **DENIED**.

2

Plaintiffs also appear to make a Fed. R. Civ. P. 12(f) motion to strike some of Fedex's experts because they were disclosed in an untimely fashion. However, this request for relief is a separate motion than a request to amend the scheduling order. Local Rule 7.1(b) provides, "[e]ach motion shall be separate." N.D.L.R. 7.1(b). Consequently, this Court **STRIKES** this request from Plaintiffs' motion. If Plaintiffs still seek to strike some of Fedex's experts after this Court's ruling, Plaintiffs' may file their motion to strike separately and brief appropriately in accordance with the local rules

## IV. CONCLUSION

The Plaintiffs' motion is **GRANTED IN PART** [Doc. No. 454]. The court rules as follows:

- The first phase of class certification briefs is due **March 12, 2007.**
- The second phase of class certification briefs is due **April 2, 2007.**
- The third phase of class certification briefs is due **April 23, 2007**.
- Defendants shall have **45 days** to respond, and Plaintiffs shall have **30 days** to file their reply.
- Plaintiffs may file an omnibus fact brief, and in turn, each class certification brief shall be limited to **19** pages.
- Plaintiffs' request to strike Fedex's experts is **STRICKEN**.

**SO ORDERED.**

Dated this 23rd Day of January, 2007.


S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

3

1034

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| ---------------------------------------------------- | ) | |
| | ) | |
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| | ) | |
| ---------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| ---------------------------------------------------- | ) | |

**PLAINTIFFS' MOTION TO REMOVE FROM THE PUBLIC DOCKET DOCUMENTS FILED IN CONNECTION WITH THEIR MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S RULING REGARDING DEFENDANT'S SURVEY/FOCUS GROUP DOCUMENTS**

Plaintiffs respectfully move this Court for removal from the public docket the Memorandum of Law and Exhibits A-D attached to the Declaration of Patricia A. Bloodgood in Support of Plaintiffs' Motion for Review of the Magistrate Judge's Ruling Regarding Defendant's Survey/Focus Group Documents. These documents were inadvertently electronically filed on January 22, 2007 [Docket No. 480].

Plaintiffs request that these documents be removed from the public docket as they should have been filed under seal pursuant to the Protective Order dated January 13, 2006 [Docket No. 101]. Plaintiffs are mailing these documents to the Clerk of Court today for filing under seal.

Dated: January 25, 2007                Respectfully submitted,

                                       LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                        s/Susan E. Ellingstad
                                       Susan E. Ellingstad
                                       100 Washington Avenue South, Suite 2200
                                       Minneapolis, MN  55401
                                       Tel:    (612) 339-6900
                                       Fax:    (612) 339-0981


Lynn Rossman Faris                     Robert I. Harwood
LEONARD CARDER, LLP                    HARWOOD FEFFER LLP
1330 Broadway, Suite 1450              488 Madison Avenue, 8th Floor
Oakland, CA  94612                     New York, NY  10022
Tel:    (510) 272-0169                 Tel:    (212) 935-7400
Fax:    (510) 272-0174                 Fax:    (212) 753-3630

**PLAINTIFFS' CO-LEAD COUNSEL**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| ---------------------------------------------------- | ) | |
| | ) | |
| In re FEDEX GROUND PACKAGE | ) | Cause No. 3:05-MD-527-RM |
| SYSTEM, INC., EMPLOYMENT | ) | (MDL 1700) |
| PRACTICES LITIGATION | ) | |
| | ) | |
| ---------------------------------------------------- | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL ACTIONS | ) | |
| ---------------------------------------------------- | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Susan E. Ellingstad, hereby certify that on January 25, 2007, I electronically filed the following documents:

1. **PLAINTIFFS' MOTION TO REMOVE FROM THE PUBLIC DOCKET DOCUMENTS FILED IN CONNECTION WITH THEIR MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S RULING REGARDING DEFENDANT'S SURVEY/FOCUS GROUP DOCUMENTS**

with the Clerk of Court using the CM/ECF system which sent notification of such filings to the following:

| | |
|---|---|
| **George A Barton** | gbarton@birch.net |
| **Evelyn L. Becker** | ebecker@omm.com |
| **Kenneth Lee Blalack II** | lblalack@omm.com |
| **Darcie R. Brault** | dbrault@dibandfagan.com |
| **Laura C. Bremer** | lbremer@omm.com |
| **Guy Brenner** | gbrenner@omm.com |
| **Thomas J. Brunner Jr** | Tom.Brunner@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |

| | |
|---|---|
| **Michael C. Camunez** | mcamunez@omm.com; cgreenberg@omm.com |
| **David G. Caperton** | dcaperton@omm.com |
| **Jerald R. Cureton** | jcureton@curetoncaplan.com |
| **Ginger A. DeGroff** | degrofflaw@yahoo.com |
| **Edward J Efkeman** | eefkeman@fedex.com |
| **Barry S. Fagan** | bfagan@dibandfagan.com |
| **Lynn R. Faris** | lfaris@leonardcarder.com; lbadar@leonardcarder.com; efink@leonardcarder.com; kzerger@leonardcarder.com |
| **Eric M. Fink** | efink@leonardcarder.com |
| **Lee K. Fink** | lfink@omm.com |
| **Robert K. Firsten** | rfirsten@firstenlaw.com |
| **Wood R. Foster Jr** | woodfoster@sbgdf.com; heidifurlong@sbgdf.com |
| **Alison G. Fox** | Alison.Fox@bakerd.com; alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Philip Stephen Fuoco** | pfuoco@msn.com |
| **Martin S. Garfinkel** | garfinkel@sgb-law.com; rwhite@sgb-law.com; bloch@sgb-law.com |
| **Michael W. Garrison, Jr.** | mgarrison@omm.com |
| **R. Christopher Gilreath** | chrisgil@sidgilreath.com |
| **John C. Hamilton** | jch@hamiltonfirm.com; hamiltonfirm@sbcglobal.net |
| **Robert I. Harwood** | rharwood@whesq.com |
| **Stacy J. Hauf** | shauf@omm.com; swickliffe@omm.com |
| **Dmitri Iglitzin** | iglitzin@workerlaw.com |
| **Dorothy Anne Jarrell** | dajarrell@omm.com; prowen@omm.com; jdonovan@omm.com |
| **Tom A. Jerman** | tjerman@omm.com |

| | |
|---|---|
| **Victor H. Jih** | vjih@omm.com |
| **Thomas P. Jirgal** | tjirgal@omm.com; jbanks@omm.com |
| **Aparna B. Joshi** | ajoshi@omm.com; jdonovan@omm.com |
| **Michael W. Kopp** | mkopp@omm.com |
| **Steve D. Larson** | slarson@ssbls.com; dcerdas@ssbls.com; aardley@ssbls.com |
| **Jordan M. Lewis** | jordanlewis@sbgdf.com |
| **Shannon Liss-Riordan** | sliss@prle.com; blarmier@prle.com; syoung@prle.com |
| **Anh-Nguyet Tran LyJordan** | alyjordan@omm.com |
| **Gary F. Lynch** | glynch@carlsonlynch.com |
| **Michael G. McGuinness** | mmcguinness@omm.com |
| **Matthew J. Merrick** | mmerrick@omm.com |
| **Jennifer Lee Merzon** | jmerzon@omm.com |
| **Raquel A. Millman** | rmillman@omm.com |
| **Daniel O. Myers** | dmyers@rpwb.com; wking@rpwb.com; sgiddens@rpwb.com; mbrown@rpwb.com |
| **Peter W. Overs Jr.** | povers@whesq.com |
| **Richard T. Phillips** | flip@smithphillips.com; tresahharden@smithphillips.com |
| **D. Lucetta Pope** | Lucetta.Pope@bakerd.com; Alicia.cummins@bakerd.com; Melissa.bozzuto@bakerd.com; amy.ricks@bakerd.com |
| **Nora M Puckett** | npuckett@omm.com; dmeredith@omm.com |
| **Charles Victor Pyle III** | victor.pyle@ogletreedeakins.com; Meredith.smith@ogletreedeakins.com; ted.speth@ogletreedeakins.com; Linda.lyday@ogletreedeakins.com |
| **Anne T. Regan** | atr@zimmreed.com; kmh@zimmreed.com |

| | |
|---|---|
| **Robert G. Rikard** | rrikard@attorneyssc.com |
| **J. Gordon Rudd** | jgr@zimmreed.com |
| **Theodore B. Schroeder** | tschroeder@omm.com |
| **Robert M. Schwartz** | rschwartz@omm.com |
| **James A. Staack** | jims@staack-firm.com |
| **R. Jay Taylor Jr.** | jtaylor@scopelitis.com; lnewton@scopelitis.com |
| **Matthew T. Tobin** | matt@matthewtobinlaw.com |
| **Jeffrey A. Trimarchi** | jtrimarchi@omm.com |
| **Michael J Watton** | jdrewicz@Wattongroup.com |
| **Andrew M. Weiner** | aweiner@omm.com |
| **Kirsten L. Zerger** | kzerger@leonardcarder.com |

I also certify that on January 18, 2007, I mailed by United States Postal Service the foregoing document to the following non CM/ECF participants:

John H. Beisner
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006-4001

Joree Brownlow
LAW OFFICE OF JOREE G BROWNLOW
1444 Gillham Drive
Suite 200
Bartlett, TN 38134

R Bruce Carlson
CARLSON LYNCH LTD
231 Melville Lane
PO Box 367
Sewickley, PA 15143

Jack D Hilmes
Kevin J Driscoll
FINLEY ALT SMITH SCHARNBERT
 CRAIG HILMES & GAFFNEY PC
699 Walnut Street
1900 Hub Tower
Des Moines, IA 50309

Eric E Hobbs
Eric H Rumbaugh
MICHAEL BEST & FRIEDRICH LLP
100 E Wisconsin Ave
Suite 3300
Milwaukee, WI 53202-4108

Donald B Lewis
5 Cynwyd Road
Bala Cynwyd, PA 19004

Robert E McDaniel
THE MCDANIEL LAW OFFICES
4 Bicentennial Square
Concord, NH  03301
(New address:
755 North Main Street
Laconia, NH  03246)

Carla D Macaluso
JACKSON LEWIS LLP
220 Headquarters Plaza
7th Floor East Tower
Morristown, NJ  07960

Paula R Markowitz
MARKOWITZ & RICHMAN
1100 North American Building
121 S Broad St
Philadelphia, PA 19107

Kenneth E Milam
WATKINS & EAGER
PO Box 650
Jackson, MS 39205-0650

James R Mulroy II
William T Fiala
LEWIS FISHER HENDERSON
  CLAXTON & MULROY
6410 Poplar Ave
Suite 300
Memphis, TN 38119

Joseph A. Osefchen
LAW FIRM OF PHILIP STEPHEN FUOCO
24 Wilkins Place
Haddonfield, NJ  08033

Alan M Purdie
PURDIE & METZ
P.O. Box 2659
Ridgeland, MS  39158
INCORRECT ADDRESS
402 Legacy
Ridgeland, MS  39157

Aaron Roblan
Karen P Kruse
JACKSON LEWIS LLP
One Union Square
600 University Street, Suite 2900
Seattle, WA  98101

Michael R Reck
BELIN LAMSON MCCORMICK
  ZUMBACH FLYNN
666 Walnut Street
Suite 2000
Des Moines, IA  50309-3989

Beth A Ross
LEONARD CARDER LLP
1330 Broadway, Suite 1450
Oakland, CA  94612

Jennifer Rygiel Boyd
OGLETREE DEAKINS NASH
  SMOAK & STEWART PC
10 Madison Avenue
Suite 402
Morristown, NJ  07960

Dan S Smith
DAN SOLOMON SMITH LLC
339 Main Street Suite 2D
Orange, NJ  07050

Richard Tanenbaum
1131 McDonald Avenue
Brooklyn, NY 11230

Patricia A Sullivan
EDWARDS ANGELL PALMER
 & DODGE LLP
2800 Financial Plaza
Providence, RI  02903

Donald R. Taylor
TAYLOR DUNHAM AND BURGESS LLP
301 Congress Avenue, Suite 1050
Austin, TX  78701

Charles W Whetstone Jr.
Cheryl F Perkins
WHETSTONE MYERS PERKINS
 AND YOUNG LLC
PO Box 8086
Columbia, SC 29202

Peter N Wasylyk
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI  02908

Clayton D. Halunen
Joni M. Thome
HALUNEN & ASSOCIATES
220 South Sixth Street
Suite 2000
Minneapolis, MN  55402

I further certify that I caused a copy of the Proposed Order, which was separately e-mailed to Chief Judge Robert L. Miller, Jr. pursuant to Section II.F of the CM/ECF Civil and Criminal User Manual for this District, to be delivered to all of the parties detailed above in the same manner as service of the documents filed with the Court.

Dated: January 25, 2007              Respectfully submitted,

                                     LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                     **s/ Susan E. Ellingstad**
                                     Susan E. Ellingstad
                                     100 Washington Avenue South
                                     Suite 2200
                                     Minneapolis, MN  55401
                                     Tel:     (612) 339-6900
                                     Fax:     (612) 339-0981

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE | ) | |
| SYSTEM, INC., EMPLOYMENT | ) | |
| PRACTICES LITIGATION | ) | |
|  | ) | CAUSE NO. 3:05-MD-527 RM |
|  | ) | (MDL-1700) |
|  | ) | |
|  | ) | THIS DOCUMENT RELATES TO |
|  | ) | ALL CASES |

**ORDER**

On January 22, 2007, Plaintiffs filed a motion to review the magistrate judge's ruling. The motion, the supporting memorandum, and all exhibits were inadvertently filed electronically rather than under seal. On January 25, 2007, Plaintiffs' filed a motion to remove the supporting memorandum of law and supporting exhibits from the public docket.

Some times, protective orders will provide a means by which to resolve inadvertent disclosures. E.g. Markowitz v. Miller Brewing Co 2007 WL 162553 at 2, ¶ 11 (E.D. Wis. 2007). However, this Court's protective order dated January 13, 2006, in this case has no provision dealing with inadvertent disclosures. Instead, the protective order states at paragraph 14:

> If some of the same information or materials that have been designated as "CONFIDENTIAL" under the terms of this Stipulation and Protective Order appear or are found in a publicly available forum without violation of Paragraph Five (5) of this Stipulation and Protective Order on the part of the receiving party herein, then such information or materials shall no longer be subject to the restrictions of this Stipulation and Protective Order.

(Doc. No. 101, ¶ 14). Because the materials have appeared on electronic filing, the materials have now actually appeared in a public forum.[1] Furthermore, it appears that paragraph 5 of the

---

[1]Pursuant to N.D.L.R. 5.6 and General Order 2006-8, CM/ECF Civil and Criminal User Manual for the United States District Court for the Northern District of Indiana, IV, B (*available*

protective order has not been violated because the materials were disclosed to the Court pursuant to subsection (e).  As a result, the protective order may no longer apply to the materials Plaintiffs submitted and this Court may have no authority to remove it from the public docket.  Essentially, it may be too late.

However, Plaintiffs have not provided a memorandum of law with their motion as required by Local Rule 7.1(b).  N.D.L.R. 7.1(b).  In fact, the only reasoning Plaintiffs provide for why its motion should be granted is that they committed a mistake.  However, a mistake does not address this Court's concerns regarding its authority under the protective order and the public's right to the materials.

This Court is required to articulate its reasoning for limiting the public's access to the records of any action.  In re Associated Press, 162 F.3d 503, 509 (7th Cir. 1998); Grove Fresh Distributors, Inc. v. Everfresh Juice Co., 24 F.3d 893, 898-99 (7th Cir. 1994).  This Court is the primary representative of the public interest and has a duty to review any request to deprive the public of access to documents.  Citizens First National Bank of Princeton v. Cincinnati Insurance Co., 178 F.3d 943, 945 (7th Cir.1999).  As a consequence, this Court is forced to make, at least, a preliminary analysis of whether the requested documents should be removed, or if the protective order applies.  Further explanation by the Plaintiffs may allow this Court to make the articulation it is required to by In re Associated Press and Grove Fresh to remove the requested documents from public view.  As a result, Plaintiffs' motion to remove items from the public docket is **DENIED WITHOUT PREJUDICE** [Doc. No. 483].  Plaintiffs may re-file their

---

*at* http://www.innd.uscourts.gov/usermanual.shtml), the public has electronic access to civil and criminal documents filed in the system and to the system dockets, which suggests that electronic filing is a public forum.

motion with an appropriate memorandum of law that addresses the concerns outlined by this order.

**SO ORDERED.**

Dated this 31st Day of January, 2007.

<u>S/Christopher A. Nuechterlein</u>
Christopher A. Nuechterlein
United States Magistrate Judge

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700)  THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On January 31, 2007, Defendant filed two motions to compel. On February 1, 2007,

Plaintiffs filed three motions to amend. Currently, the first wave of class certification briefs is

due on March 12, 2007. This Court fears that the current discovery disputes may jeopardize the

class certification briefing deadlines if they are not quickly resolved. Consequently, in order to

preserve the current schedule, this Court feels compelled to accelerate the deadlines for briefing

the discovery issues. Furthermore, assuming the parties appropriately met and conferred before

seeking court action, the parties should already be prepared to provide their respective

arguments. Therefore, Plaintiffs shall file a response to both of Defendant's motions to compel

and Defendant shall file any response to Plaintiffs' motions to amend by **February 12, 2007**.

Defendant's and Plaintiffs' replies to the motions to compel and the motions to amend are due by

**February 16, 2007**.

    **SO ORDERED.**

Dated this 2nd Day of February, 2007.


                                    S/Christopher A. Nuechterlein
                                    Christopher A. Nuechterlein
                                    United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

|  |  |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| *All Coordinated Cases* | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

## DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF PUTATIVE CLASS MEMBERS

### INTRODUCTION

In the last year, Plaintiffs have liberally, and with little resistance from Defendant or this Court, added, subtracted and substituted named Plaintiffs in the majority of the thirty-two cases before the Court.  Plaintiffs have dismissed ***forty-seven*** of the named Plaintiffs (and in almost all cases have replaced each with a new plaintiff), representing ***one-third*** of all Plaintiffs who were originally named in these cases.  To explore the basis for any plaintiff preferences and their relationship to this case, Defendant carefully selected for deposition just five of these formerly named Plaintiffs in cases where Defendant believes some discovery is necessary prior to the Court's consideration of class certification motions.  Plaintiffs resisted each one.  Although the parties were able to resolve their disagreements on three of these subpoenas, Plaintiffs refuse to cooperate in response to those issued to former Michigan Plaintiff James Lester and former

Texas Plaintiff Niles Pinkham, and Defendant respectfully asks this Court to invoke its enforcement powers and compel attendance.[1]

As a threshold matter, Plaintiffs' motion should be rejected because they have not made the requisite factual showing under Rule 45 to quash these two subpoenas. In fact, there is no record evidence before the Court on which it could conclude that the subpoenas at issue impose any burden on Messrs. Lester and Pinkham, much less an undue burden as specified in Rule 45(c)(3)(A)(iv). Neither individual has served objections to these subpoenas as required by Rule 45(c)(2)(B). Indeed, Messrs. Lester and Pinkham have not even moved to quash the two subpoenas served upon them by Defendant. The instant Motion was filed by class counsel in the coordinated proceedings. It does not appear that class counsel represent Messrs. Lester and Pinkham individually.[2] This motion has been filed instead on behalf of a putative class that may one day include Messrs. Lester and Pinkham if this Court grants Plaintiffs' anticipated motions for class certification. However, at this juncture of the proceedings, the named Plaintiffs in this case and the lawyers who represent them do not have an attorney-client relationship with either Mr. Lester or Mr. Pinkham.

Turning to the substance of Plaintiffs Motion, as explained below, it is based on a flawed premise that Messrs. Lester and Pinkham are "pure" absent class members and on an erroneous application of the law governing discovery from those who legitimately are. Plaintiffs' authority supports the proposition that, after a class has been certified, a defendant may not depose absent class members without a showing of need. But neither those cases nor the principals on which

---

[1] Defendant originally issued subpoenas to two former New Hampshire Plaintiffs. Since this time, Plaintiffs have voluntarily added additional named Plaintiffs to that case, thereby attenuating Defendant's need to take these depositions. As Defendant previously indicated to Plaintiffs, Defendant no longer seeks the deposition testimony of these individuals. Plaintiffs have also agreed to permit the deposition of the fifth subpoenaed individual, former Tennessee Plaintiff Debbie Lindsey.

[2] Based on Defendant's inquiry during the meet and confer process, class counsel confirmed that they were objecting to these subpoenas only as legal counsel for the putative class. (*See* Decl. of K. Lee Blalack in support of Defendant's Opposition to Plaintiffs' Motion to Quash.)

they are based apply when no class has been certified.  In this context, discovery of unnamed

potential members of the putative class is necessary to evaluate whether class certification is

appropriate.  Defendant is certainly entitled to depose non-plaintiff, past and present contractors

to establish that the stories presented by Plaintiff contractors are atypical and uncommon.

Messrs. Pinkham and Lester are entitled to no greater protection from discovery by virtue of their

past involvement in these proceedings.  In fact, their past involvement supports the propriety of

the subpoenas; their history of antagonism to Defendant will accord their admissions great

evidentiary weight and the burden to them will be reduced by virtue of having already

undertaken, or prepared to undertake, the requested document production and provision of

deposition testimony.

　　　　Even if this Court were to require some preliminary showing of need, Defendant has

nonetheless met its burden to obtain the requested discovery.  The reasons for dropping certain

Plaintiffs from this lawsuit are relevant to the class certification briefing because they may reveal

changes intended to reduce variations among Plaintiffs.  Notably, Plaintiffs have served nearly

identical interrogatory responses for all named Plaintiffs in these proceedings who seek relief

primarily on the basis of Defendant's purported misclassification of them.  Defendant is entitled

to discover whether these individuals withdrew as named Plaintiffs due to the existence of

material differences that indicate a lack of commonality and/or adequacy across the putative

classes.  Additionally, Defendant is entitled to discover if their withdrawal was prompted by the

failure of counsel or the remaining putative class representatives to adequately represent their

interests and if they disagree with the relief currently sought in these cases.

　　　　To be clear, Defendant has not served subpoenas on all former named Plaintiffs who have

been dismissed from these cases, although that would have been appropriate.  Rather, Defendant

has carefully selected the individuals whom it served with subpoenas for two reasons: first, their dismissal has reduced the geographic and numerical diversity in their respective cases in a manner that will hinder Defendant's ability to contest Plaintiffs' anticipated class certification motions; second, the individuals who were selected can respond to the subpoenas with little additional burden.  Defendant does not seek this discovery for any improper purpose and, therefore, this Court should deny Plaintiffs' motion to quash the subpoenas issued to Messrs. Pinkham and Lester.

## ARGUMENT

## I.    MESSRS. LESTER AND PINKHAM HAVE NOT MADE ANY FACTUAL SHOWING TO SUPPORT THE MOTION TO QUASH.

Defendant is entitled to discovery regarding "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Chavez v. DaimlerChrysler Corp.,* 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978) (quotation marks omitted)).  Against this broad standard, a movant seeking a motion to quash must convince the court that the challenged discovery would result in an "undue burden."  Fed. R. Civ. P. 45(c)(3)(A)(iv); *WM High Yield v. O'Hanlon*, 460 F. Supp. 2d 891, 895 (S.D. Ind. 2006) (citing *Jones v. Hirschfeld*, 219 F.R.D. 71, 74-75 (S.D.N.Y. 2003)).  Neither Messrs. Lester and Pinkham, nor putative class counsel on their behalf, made *any* factual showing of burden to the subpoenaed individuals as part of their application for relief.[3]  This fact alone warrants the denial of Plaintiffs' motion.

---

[3] It is questionable whether Plaintiffs even have standing to object to third-party subpoenas on the grounds that they are unduly burdensome.  *See, e.g., Washington v. Thurgood Marshall Acad.,* 230 F.R.D. 18, 22 (D.D.C. 2005) ("absent a privilege, personal interest, or proprietary interest, defendant has no standing to seek to quash, under Federal Rule of Civil Procedure ("Rule") 45, a subpoena issued to a non-party").  This standing question is, however, irrelevant because Plaintiffs did not attempt to make a factual showing of burden as to the subpoenaed third parties.

In fact, Messrs. Lester and Pinkham have not lodged any objections at all to these subpoenas, either with Defendant or with this Court.  Even if they had, they would be unable to demonstrate any compelling basis to quash the subpoenas under Rule 45.  As discussed more fully below, Defendant selected these individuals for subpoenas for two reasons.  First, their testimony will be relevant to class certification issues in the two constituent actions in which they were formerly named Plaintiffs.  Secondly, Defendant only selected individuals for whom the requested deposition testimony would be likely to present minimal additional burdens.  As explained in greater detail below, each individual has already produced documents as a named Plaintiff in this litigation and, further, has likely already undertaken at least some efforts in preparation for the depositions they cancelled on short notice in 2006.

## II.    PLAINTIFFS APPLY THE INCORRECT STANDARD TO THIS ISSUE

Rule 45 governs the issuance of subpoenas to third parties in civil litigation.  Fed. R. Civ. P. 45.  Because no classes have been certified in this litigation, putative class members are not parties and have no formal connection with these lawsuits.  *See Daniels v. Bursey*, 430 F.3d 424, 426 (7th Cir. 2005).  Plaintiffs' motion, which begins by restating the provision set forth in Rule 45(c)(3)(A)(iv) that a court shall quash a subpoena if it subjects a party to "undue burden," (Pl.'s Mem. at 1), admits that Rule 45, and not the rules applicable to party discovery, governs this dispute.  For this reason, the vast majority of the authority cited by Plaintiffs to support a heightened standard to justify the two subpoenas at issue is wholly inapposite.

Plaintiffs, in reliance on *Clark v. Universal Builders, Inc.*, 501 F.2d 324 (7th Cir. 1974), urge this court to require that Defendant overcome a "severe" burden in order to establish its right to take the depositions of Messrs. Pinkham and Lester.  (Pl.'s Mem. at 6.)  Plaintiffs' argument is twice flawed.  First, the authority relied upon by Plaintiffs considers whether or not withdrawing or absent plaintiffs should, in a *post-certification* class action, be required to

5

participate in discovery.  Secondly, even if the Court deems that some heightened standard is

appropriate, Plaintiffs have overstated the standard applicable in the *post-certification* context.

>    A.    <u>Pre-Certification Deposition Discovery of Unnamed Putative Class Members
>          is Appropriate</u>

This Court is authorized to permit whatever pre-certification discovery is necessary to

develop a sufficient factual record upon which to evaluate the propriety of class certification.

*Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982).  Further, the discovery of

absent, putative class members to build such a record is unexceptional.  In *Davenport v. Gerber

Products Company*, the district court permitted the deposition testimony of thirty-five (35)

unnamed members of the putative class for just this purpose.  *Davenport v. Gerber Prods. Co.*,

Civ. A. No. 87-3198, 1988 WL 52098, at *2 (E.D. Pa. May 20, 1988).  In *Davenport*, the court

held that pre-certification discovery of putative class members was likely to be relevant to

commonality, typicality, and adequacy.  *Id*.  The court held that this relevance was underscored

by virtue of the small number of putative class representatives offered by Plaintiffs, *id.*, a factor

that holds true in this case where a handful of individuals purport to represent putative classes

numbering in the thousands.

Depositions of putative class members have been authorized in other contexts, as well.

*Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 185 (D. Md. 2003) (noting defendant took

depositions of "many potential class members" relevant to class certification issues); *Carroll v.

John Hancock Distrib's., Inc.,* Civ. A. No. 92-5097, 1993 WL 64590, at *1 (E.D. Pa. Mar. 8,

1993) (same); *see Mehl v. Canadian Pac. Ry.*, 216 F.R.D. 627, 631 (D.N.D. 2003) (stating that

"[a] number of other courts have recognized that discovery from absent and unnamed class

members may be justified given Rule 23's requirements concerning commonality, predominance,

and representative typicality," but finding the disputed discovery in that case unjustified because

it was wholly irrelevant (citing *Yaffe v. Powers*, 454 F.2d 1362 (1st Cir. 1972)); *Oil, Chem. and Atomic Workers Int'l Union Local Union No. 7-765 v. Stauffer Chem. Co.*, No. 88 C 2082, 1991 WL 38247, at *2 (N.D. Ill. Mar. 19, 1991) (costs incurred by defendant in taking depositions of putative class members were taxable to plaintiffs because they aided resolution of the case).

Plaintiffs cite to the large number of depositions taken by Defendant in these proceedings as evidence that the two depositions sought through the contested subpoenas are unnecessary. (Pl.'s Mem. at 4.)  But Plaintiffs ignore the reality that those depositions have been spread across thirty-six (36) cases from thirty-one (31) states.  While the gravamen of the allegations in each of these cases is similar, each state applies different substantive law and each putative class action will seek certification of one or more classes limited to persons who have performed package pick-up and delivery services within each state.  Moreover, the deposition testimony of the named Plaintiffs that Defendant has obtained thus far makes absolutely clear that the experiences of pick up and delivery contractors differ widely based on the terminal in which they operated and the management personnel with whom they interacted.[4]  Consequently, it is of no relevance to the two depositions at issue in this Motion that Defendant deposed a large number of pick up and delivery contractors in other terminals located in other states across the country.  When properly viewed as a single request for deposition testimony in two discreet cases, in which only three (*Lester*) or five (*Humphreys*) named Plaintiffs have been presented as potential class

---

[4] (*Compare, e.g.,* Alexander Dep. 141:10-142:8, Aug. 15, 2006 (attached as Exhibit A) (California FedEx Home Delivery Plaintiff testified that he worked collaboratively with management to configure work area), *and id.,* 144:24-145:11 (Plaintiff testified that he was able to opt-out of the Flex program), *and id.,* 230:18-23 (Plaintiff testified that terminal doors were never locked to prevent contractors from leaving), *and id.,* 248:21-249:18 (Plaintiff testified that he was able to set his schedule and earn extra money during periods of heavy volume), *and id.,* 280:16-19 (Plaintiff testified that he worked, on average, less than eight hours per day), *with* Henderson Dep. 46:13-17, Aug. 18, 2006 (attached as Exhibit B) (California FedEx Home Delivery Plaintiff testified that he had no choice with regard to the Flex program), *and id.,* 126:15-127:3 (Plaintiff testified that his route was reconfigured without his consent), *and id.,* 193:18-20 (Plaintiff testified that terminal doors were locked to prevent contractors from leaving), *and* Allen Dep. 178:19-179:18, Aug. 14, 2006 (attached as Exhibit C) (California FedEx Home Delivery Plaintiff testified that he had no choice but to work 10-12 hours per day).)

7

representatives, it is apparent that Defendant's subpoenas do not seek cumulative evidence that has already been obtained in other constituent actions consolidated in this litigation.

Plaintiffs rely primarily on *Clark* in support of their proposed heightened standard to obtain the requested discovery. However, *Clark* dealt with the rights of members of an already certified class. *Clark*, 501 F.2d at 340-41 (discussing Rule 30 depositions and Rule 33 interrogatories rather than Rule 45 subpoenas for documents and testimony). The vast bulk of the other cases cited by Plaintiffs share this flaw. *See On the House Syndication, Inc., v. Federal Express Corp.*, 203 F.R.D. 452, 452 (S.D. Cal. 2001) (denying request to reopen discovery to allow *post-certification* discovery of absent class members); *Adkins v. Mid-America Growers, Inc.*, 141 F.R.D. 466, 468-69 (N.D. Ill. 1992) (in post certification case in which 80 depositions had occurred of absent class members, sanctions were inappropriate where attorney failed to thoroughly search files of each class member for documents responsive to a Rule 34 request for production); *Organization of Minority Vendors, Inc. v. Illinois Cent.-Gulf R.R.*, No. 79C 1512, 1987 WL 8997, at *1 (N.D. Ill. Apr. 2, 1987) (dismissed plaintiffs in a *certified class action* not required to submit to discovery); *Vernardo Chaffee v. A&P Tea Co.,* Nos. 79 C2735, 79 C3625, 1987 WL 9308, at *1 (N.D. Ill. Apr. 6, 1987) (involving Rule 33); *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 260, 264 (N.D. Ill. 1979) (involving Rule 33); *Wainwright v. Kraftco Corp.*, 54 F.R.D. 532, 534 (N.D. Ga. 1972) (Rule 33 and 34 discovery requests invalidated because absent class members are not parties); *Fischer v. Wolfinbarger*, 55 F.R.D. 129, 131 (W.D. Ky. 1971) (involving Rule 33).

Plaintiffs cite to a single, unreported district court decision from the Southern District of New York in support of their application of a heightened standard for the deposition of withdrawing plaintiffs in a *putative* class action. *See In re Currency Conversion Fee Antitrust*

*Litig.*, MDL No. 1409, M 21-95, 2004 WL 2453927 (S.D.N.Y. Nov. 3, 2004). In that case, however, the defendant sought to depose the withdrawing plaintiffs solely for individual issues unrelated to the proposed class as a whole. *Id.*, at *2. Their testimony would have, therefore, been totally irrelevant to the remaining issues before the Court. As discussed more fully below, Defendant in this case seeks the deposition of the withdrawn individuals because they are likely to possess information directly relevant to the central class certification issues that will soon be before the Court.

### B.    Even Post-Certification Discovery of Absent Class Members Would Not Warrant Application of Plaintiffs' Proposed Standard

Plaintiffs' reliance on *Clark v. Universal Home Builders* is also inappropriate because of the specific factual circumstances of that case. *Clark* concerned a discrimination action brought by a group of homeowners against homebuilders for selling them homes on unfavorable terms and at exorbitant prices because they were African-American. *Clark*, 501 F.2d at 327. In the context of litigation surrounding racial housing segregation in the 1970s, the risk of vexation and oppression of absent class members through abuse of the discovery process was especially high. Moreover, *Clark* is distinguishable on procedural grounds. In *Clark*, the court invalidated the district court's dismissal of unnamed class members' claims for failure to respond to defendants' discovery requests because the defendants had failed to offer any justification whatsoever entitling them to such discovery. *Id.* at 340-41. While the court opined that the defendants would likely be unable to demonstrate necessity, the court did not actually rule that the discovery requests were improper and should have been invalidated. *Id*.

For these reasons, the appropriate authority in the Seventh Circuit as to the proper standard for post-certification discovery of absent class members remains *Brennan v. Midwestern United Life Ins. Co.*, 450 F.2d 999 (7th Cir. 1971). In that case, the Seventh Circuit

upheld the dismissal of the claims of absent class members who had failed to respond to

discovery requests under Rules 33 and 34. *Id.* at 1005-06. In so holding, the court stated that

"[w]e do not believe there is any real inconsistency between Rule 23's general policy of

permitting absent class members to remain outside the principal action and our holding that in

appropriate cases absent class members may be required to submit to discovery." *Id.* at 1004-05.

*Brennan* further announced that such discovery was appropriate when it is "necessary *or helpful*

to the proper presentation and correct adjudication of the principal suit," *id.* at 1005 (emphasis

added), and not employed to "take unfair advantage of 'absent' class members," *id.* at 1006.

    As noted above, Defendant disputes that even this standard is applicable to the issue now

before this Court because this Motion involves discovery sought from two members of a putative

class *prior to class certification* and the purpose of the discovery is directed to the central

questions pertaining to the certification decision. Nevertheless, for the reasons discussed below,

the two subpoenas in dispute easily meet the standard announced in *Brennan*.

**III.    THE REQUESTED DISCOVERY IS NECESSARY FOR THE COURT'S
          PROPER ADJUDICATION OF PLAINTIFFS' ANTICIPATED MOTIONS FOR
          CLASS CERTIFICATION IN *LESTER* AND *HUMPHREYS* AND THE
          DISCOVERY HAS NOT BEEN SOUGHT FOR VEXATIOUS PURPOSES.**

    **A.    <u>The Requested Subpoenas Are Not Vexatious or Burdensome</u>**

    This litigation currently encompasses thirty-seven (37) cases and 151 named Plaintiffs.

These cases come to this MDL from thirty-one (31) states, and Plaintiffs are expected to seek

class certification of at least one state-wide class from each state. Even these statistics do not

capture the full scope of this litigation. Since coordination, Plaintiffs have dismissed forty-seven

(47) additional Plaintiffs in addition to the 151 referenced above. Plaintiffs have offered no

reason for the vast majority of the dismissals, to which Defendant has not objected. Of this

group of forty-seven (47) former litigants, Defendant now seeks to obtain deposition testimony

of only three (3): Ms. Lindsey, a former Tennessee Plaintiff who is not subject to this Motion;

Mr. Lester, former lead Plaintiff and one of three Plaintiffs dismissed from the Michigan case;

and, Mr. Pinkham, a former Texas Plaintiff.

Defendant did not seek to depose every dropped Plaintiff without regard to relevant

circumstances.  Defendant's narrow tailoring of these requests further supports their proper

purpose.  Moreover, the specific factual circumstances of Messrs. Pinkham and Lester reveal that

these subpoenas are not meant to harass the specific individuals to whom they were issued.  Both

Messrs. Pinkham and Lester were dismissed from this case very late in these MDL proceedings

on December 1, 2006.  (*See* Mot. for Leave to File Am. Compl. filed Oct. 26, 2006, Doc. No.

387; Third Am. Compl. in *Currithers v. FedEx Ground*, filed Dec. 1, 2006, Doc. No. 419; Fourth

Am. Compl. in *Humphreys v. FedEx Ground*, filed Dec. 1, 2006, Doc. No. 416.)  Each of these

individuals has already responded to written discovery and each has already produced documents

consistent with their longtime involvement in this litigation.  Defendant's subpoenas *duces tucem*

request documents that are substantively identical to the Rule 34 document requests issued to all

named Plaintiffs.  Given that Messrs. Pinkam and Lester have already produced documents

responsive to the Rule 34 requests for documents, the identical subpoenas *duces tecum* should

present little or no additional burden.

The deposition testimony requested should also present limited additional burden on the

witnesses.  Plaintiffs indicated their intent to dismiss Mr. Pinkham from the litigation less than

48 hours before his scheduled deposition, after the attorney for Defendant had already

commenced his travel to the deposition site.  (*See* Decl. of Lee Fink (attached as Exhibit D);

Decl. of Guy Brenner (attached as Exhibit E).)  Plaintiffs indicated their intent to withdraw Mr.

Lester from the litigation prior to providing a specific schedule for his deposition, but only

eleven (11) days prior to the scheduled commencement of deposition testimony in the Michigan case.  (*See* Decl. of K. Lee Blalack ¶¶ 3-7.)   In either case, but especially in the case of Mr. Pinkham, actually providing the deposition testimony that the witness had planned to give should present a minimal burden.  Defendant is, of course, willing to schedule the depositions on dates and at locations convenient to the witnesses.

### B.        These Depositions Will Aid the Court's Adjudication of the Principal Suits.

Defendant seeks the deposition testimony of Messrs. Pinkham and Lester because such testimony will be directly relevant to the motions for class certifications in those cases that will soon be before this Court.  While Defendant has not objected to Plaintiffs' many motions adding and dropping Plaintiffs, Defendant has the right to seek discovery of these individuals as third parties in appropriate cases.

This discovery is warranted, in part, by Plaintiffs' written discovery under Rule 33.  In all cases in these proceedings, including the two from which the subpoenaed individuals were dismissed, Plaintiffs have provided nearly identical interrogatory responses for each named Plaintiff.[5]  Defendant is entitled to establish the differences between the potential members of the putative class and whether these individuals were dismissed because they could or would not assert the facts and allegations commonly put forth by the remaining named Plaintiffs. Defendant is further entitled to know if these Plaintiffs' withdrawal was due to disagreements with other named Plaintiffs or counsel over the litigation strategy that they have opted to pursue, which would bear on the adequacy of the remaining named Plaintiffs and/or counsel to represent the interests of the putative class.

---

[5] *See, e.g.,* Responses of Named Plaintiffs to Interrogatory No. 1 (first set) in *Humphreys v. FedEx Ground* (attached as exhibit F); Responses of Named Plaintiffs to Interrogatory No. 1 (first set) in *Lester/Currithers v. FedEx Ground*) (attached as exhibit G).

While the deposition testimony of any dismissed Plaintiff would be relevant to these proceedings, Defendant has further limited the issuance of subpoenas to those cases where additional deposition testimony of former named Plaintiffs is most likely to bear upon the issues of typicality, commonality and adequacy that will soon be presented to the Court by Plaintiffs' class certification motions. The selection of these specific individuals underscores that Defendant's need for this deposition testimony is legitimate and not part of any campaign to harass or intimidate the potential members of the putative classes.

####   1.    James Lester

In the most recent complaint filed prior to his dismissal, Mr. Lester was one of six named Plaintiffs in the *Lester* action. (*See* Second Am. Compl. in *Lester v. FedEx Ground*, filed Apr. 18, 2006, Doc. No. 238-1.) Importantly, Mr. Lester was one of three Plaintiffs who operated from a terminal located in upstate Gaylord, Michigan, while the other three Plaintiffs operated from a terminal in the Detroit, Michigan area. (*Id.* ¶¶ 5-10.) In Plaintiffs' December 1, 2006 amendment of this complaint, Plaintiffs dismissed each of the three individuals from the terminal located in the upstate area. (Third Am. Compl. in *Currithers v. FedEx Ground* ¶¶ 5-7.) In so doing, Plaintiffs reduced a group of six putative class representatives spread across the State of Michigan to just three putative class representatives located in the urban Detroit area. Regardless, Plaintiffs still seek to certify a class of all persons who contracted with Defendant to provide package pick-up and delivery services *anywhere* in Michigan. (*Id.* ¶ 37.) Plaintiffs attempt to represent all contractors throughout Michigan with three contractors, all of whom operated from a single terminal in Detroit, but Defendant is entitled to discovery concerning the commonality, typicality, and adequacy issues raised in these circumstances.

Defendant can, and will, provide declarations from non-Plaintiff contractors to rebut Plaintiffs' allegations of control. Plaintiffs will no doubt argue that Defendant "cherry picked"

these declarants.  One of the reasons that Defendant seeks this testimony from Mr. Lester is, in part, because it will be immune from such criticisms.  Mr. Lester's original involvement in this suit irrefutably demonstrates that he is antagonistic towards the Defendant.  Evidence that he will provide tending to show material differences between the operation of a rural terminal in one part of the state and an urban terminal located in another part of the state as well as the level of direction provided by the Company, and the Company's course of performance under the Operating Agreement will be entitled to strong evidentiary weight.

### 2.    Niles Pinkham

Niles Pinkham was originally one of six Texas Plaintiffs put forth to represent a class of over 1,000 individuals.  This is an exceedingly small percentage of putative representatives in proportion to the potential number of claimants.  *Davenport*, 1988 WL 52098, at **1-2 (finding three putative class representatives in a products liability action to be insufficient compared to "potentially thousands" of claimants).  Moreover, the fundamental issues in dispute here are inherently more complicated than those presented in a standard products liability action.  In these proceedings, the Court will have to determine, among other things: what levels of independence the various putative classes exercised in the performance of their duties: what misrepresentations, if any, Defendant made to these individuals; and, what opportunity for profit or loss these individuals had.  The Court will further have to determine if the putative class representatives adequately represent these thousands of putative class members and if their legal and factual circumstances are common and typical.  Five individuals is simply too small of a number to make this determination for the entire State of Texas.

As in Michigan, Defendant can and will provide contractor declarations to rebut Plaintiffs' allegations in Texas.  However, and for the same reasons, Mr. Pinkham's testimony in

14

opposition to class certification will be entitled to significant weight because of his demonstrated history of adversity to Defendant.

## CONCLUSION

In deciding which, if any, former named Plaintiffs to subpoena, Defendant carefully examined the circumstances in each case where Plaintiffs had been dropped to determine in which cases additional deposition testimony would be necessary to build a proper record for the Court to decide issues of class certification. In doing so, Defendant further considered the burdens to the witnesses and acted to minimize that burden to the greatest extent possible. While this issue is properly decided under Rule 45 and not under the heightened standards advanced by Plaintiffs in this Motion, the subpoenas of Messrs. Pinkham and Lester are nevertheless warranted because they are "necessary or helpful to the proper presentation and correct adjudication of the principal suit," *Brennan*, 450 F.2d at 1005, and not employed to "take unfair advantage of 'absent' class members," *id.* at 1006. Defendant therefore respectfully asks this Court to DENY Plaintiffs' motion to quash the subpoenas issued to Messrs. Lester and Pinkham.


Dated:  February 5, 2007            Respectfully submitted,


                                    By:_s/Thomas J. Brunner_____  _____
                                        Thomas J. Brunner

                                    John H. Beisner
                                    Robert M. Schwartz
                                    Evelyn L. Becker
                                    O'MELVENY & MYERS LLP
                                    1625 Eye Street, NW
                                    Washington, DC 20006-4001

                                    Thomas J. Brunner
                                    Alison G. Fox
                                    BAKER & DANIELS LLP
                                    205 West Jefferson Blvd., Suite 250

South Bend, IN  46601

Defendant's Liaison and Lead Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2007, I filed the foregoing *DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF PUTATIVE CLASS MEMBERS* with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By:_____s/Thomas J. Brunner_____

BDDB01 4659892v1

16

1062

**8/15/2006  Alexander, Dean**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

--oOo--


IN RE:  FEDEX GROUP PACKAGE          )

SYSTEM INC., EMPLOYMENT              )  No. 93:05-MD-527

PRACTICES LITIGATION                 )       RM

                                     )

_____)



DEPOSITION OF

DEAN ALEXANDER

_____

August 15, 2006











REPORTED BY:  ANGELA T. KOTT, CSR 7811


EXHIBIT A

**8/15/2006  Alexander, Dean**

I N D E X

INDEX OF EXAMINATIONS

BY MS. BREMER                              8

BY MS. ZERGER                            285

EXHIBITS MARKED FOR IDENTIFICATION

Exhibit No.            Description            Page

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 248 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-2   Filed 02/05/07   Page 3 of 300
**8/15/2006  Alexander, Dean**

Contractor/Driver Information          59

    13              Sheet for Dean Alexander, Bates

FXG_ALEXANDER0000073 - 74

    14

Prospective Independent Contractor      64

    15              Candidate Review Guide and Summary

Form, Bates FXG_ALEXANDER0000106 -

    16              116

    17      3     FedEx Home Delivery Standard          68

Contractor Operating Agreement,

    18              Bates PCA0002403 - 2456

    19      4     Section 1.10 with handwritten          74

Notations, Bates PCA0002278 -

    20              2279

    21      5     Publication 583 - "Starting a          83

Business and Keeping Records,"

    22              Bates PCA0002250 - 2273

    23      6     Document entitled, "Becoming          85

A QHD Pickup and Delivery

    24              Contractor," Bates PCA0002374 -

2402

    25  //

**8/15/2006  Alexander, Dean**

```
EXHIBITS CONTINUED:
     7      Document entitled, "Estimate        88
            of Income Potential (using a
            van <4 years old)," Bates
            PCA0002462 - 2464


     8      Handwritten notes, Bates          92
            PCA0002475 - 2476
     9      Document entitled, "Business      94
            Support Package Uniform Program,"
            Bates FXG_ALEXANDER0000259
    10      Attachment 3.1 to Addendum 3     103
            FHD Standard Contractor Operating
            Agreement Temporary Core Zone
            Density Settlement, Bates
            FXG_ALEXANDER0000124 - 179
    11      Various Contractor Business Plans, 137
            Various Bates ranges

            HD Supplement Vehicle Use Request, 163
            Bates FXG_ALEXANDER0000278 - 279
    13      New Contractor/Data Sheet, Bates   164
            FXG_ALEXANDER0000260

            Bates FXG_ALEXANDER0005128 -
            5145

            Vehicle Contracts," Bates
            PCA0002014 - 2041

            PCA0001740, PCA0001102
    17      QuickZoom Report 1/1/02           250
            Through 12/31/02, Bates
            PCA0001999 - 2013
    18      QuickZoom Report 1/1/03           250
            Through 12/31/03, Bates
            PCA0001603 - 1623
   //
```

**8/15/2006  Alexander, Dean**

EXHIBITS CONTINUED:

19    QuickZoom Report 1/1/04              251

      Through 12/31/04, Bates

      PCA0001332 - 1358

20    Bus Profit & Loss Statements,       252

      1/1/02 Through 12/31/04, Bates

      PCA0001995, PCA0001602, PCA0001331

21    Addendum Response of Dean           273

      Alexander to Defendant's First

      Set of Interrogatories

**8/15/2006  Alexander, Dean**

APPEARANCES

FOR THE PLAINTIFFS:

    LEONARD CARDER, LLP

    BY: KIRSTEN L. ZERGER, ESQ.

    1330 Broadway, Suite 1450

    Oakland, California 94612

    Telephone:  (620) 345-3275

    TAYLOR, DUNHAM AND BURGESS, LLP

    BY:  DAVID E. DUNHAM, ESQ.

    301 Congress, Suite 1050

    Austin, Texas 78731


FOR DEFENDANTS:

    O'MELVENY & MYERS LLP

    BY:  LAURA C. BREMER, ESQ.

    375 Battery Street

    San Francisco, California 94111-3305

    Telephone:  (415) 984-8700

ALSO PRESENT:  JENNIFER McKAY, Video Solutions

**8/15/2006  Alexander, Dean**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

--oOo--


IN RE:  FEDEX GROUP PACKAGE        )

SYSTEM INC., EMPLOYMENT            )   No. 93:05-MD-527

PRACTICES LITIGATION              )        RM

                                  )

_____)

--oOo--

       BE IT REMEMBERED that, pursuant to Notice,

and on Tuesday, August 15, 2006, commencing at 8:30

a.m. thereof, at 1215 K Street, Sacramento,

California, before me, ANGELA T. KOTT, a Certified

Shorthand Reporter, personally appeared


DEAN ALEXANDER

_____

Called as a witness by the Defendants, who, having

been first duly sworn, was examined and testified as

follows:

--oOo--

**8/15/2006  Alexander, Dean**

1          THE VIDEO OPERATOR:  Here begins Videotape

2     No. 1 in the deposition of Dean Alexander in the

3     matter of FedEx Group Package System, Inc.,

4     Employment Practices Litigation in U.S. District

5     Court, Northern District of Indiana, South Bend

6     Division, Case No. 93:05-MD-527 RM.

7          Today's date is August 15, 2006.  The time

8     on the video monitor is 8:31.  The video operator is

9     Jennifer McKay, a notary public, contracted by

10    LegaLink New York, New York, New York.

11         This video deposition is taking place at

12    1215 K Street, 16th Floor, Sacramento, California,

13    and was noticed by O'Melveny & Myers.

14         Counsel, please voice identify yourselves

15    and state whom you represent.

16         MS. BREMER:  My name is Laura Bremer from

17    O'Melveny & Myers, and I represent FedEx Ground.

18         MS. ZERGER:  My name is Kirsten Zerger,

19    Leonard Carder, and I represent the Plaintiff.

20         THE VIDEO OPERATOR:  The court reporter

21    today is Angela Kott of LegaLink.  Would the

22    reporter please swear in the witness.

23         (Witness sworn).

24         THE VIDEO OPERATOR:  Please begin.

25

**8/15/2006  Alexander, Dean**

```
1                    EXAMINATION

2    BY MS. BREMER:

3         Q.  Good morning, Mr. Alexander.

4         A.  Good morning.

5         Q.  My name is Laura Bremer.  Could you please

6    state your name for the record?

7         A.  Dean Alexander.

8         Q.  Have you ever used any other names?

9         A.  No.

10        Q.  Have you ever had your deposition taken

11   before?

12        A.  Yes.

13        Q.  When have you taken your deposition before?

14        A.  In sometime in the '80s.  I can't remember

15   the exact time or date.

16        Q.  And what type of case was involved?

17        A.  Workers' Comp.

18        Q.  Were you making a Workers' Comp claim?

19        A.  No.

20        Q.  Who was making a Workers' Comp claim?

21        A.  One of the employees.

22        Q.  One of your employees?

23        A.  No, one of the company's employees.

24        Q.  And what company was that?

25        A.  That was Lewis & Tibbitts.
```

**8/15/2006  Alexander, Dean**

1        Q.  Is that the only time you've had your

2    deposition taken?

3        A.  Yes.

4        Q.  Have you ever testified in any other legal

5    proceeding, like trial?

6        A.  No.

7        Q.  Let me go through some of the ground rules.

8        A.  Okay.

9        Q.  Since it's been a while since you've had

10   your deposition taken.  This deposition is part of a

11   judicial proceeding, so even though we're sitting in

12   a conference room today, you are under oath and it's

13   as if you're giving testimony before a court of law.

14           Do you understand that?

15       A.  Yes.

16       Q.  And your testimony is under oath and it's

17   subject to the penalty of perjury if you don't tell

18   the truth.

19           Do you understand that?

20       A.  Yes.

21       Q.  The court reporter will transcribe all of

22   my questions and all of your answers, so it's

23   important that you answer audibly.  That means yes

24   or no, or a verbal answer as opposed to just shaking

25   your head or nodding.

**8/15/2006  Alexander, Dean**

1              Do you understand that?

2         A.  Yes.

3         Q.  And to help the court reporter, we should

4    try not to talk over each other.  You should wait

5    until I finish my question before you answer, and

6    I'll wait until you finish your answer before I ask

7    the next question.

8              If you don't understand one of my questions,

9    please ask me to clarify and I'll rephrase.  And if you

10   don't ask me to rephrase a question or tell me that you

11   don't understand, then I'm going to assume that you

12   understand my questions.

13             Is that fair?

14        A.  Yes.

15        Q.  Please answer each question to the best of

16   your ability.  You shouldn't just guess or

17   speculate, but if you can make an estimate, you can

18   go ahead and do so.

19             Do you understand?

20        A.  Yes.

21        Q.  After the deposition, the court reporter

22   will produce a formal transcript and you'll have the

23   chance to review and correct that transcript.  But

24   if you do make any changes to your testimony, I'll

25   have the opportunity to comment on any changes that

**8/15/2006  Alexander, Dean**

1    you may make.

2          Do you understand that?

3     A.  Yes.

4     Q.  I understand that you are taking some

5    medication today.  Are you on any medication that

6    would hinder your ability to testify today?

7     A.  No.

8     Q.  When did you first learn that you were

9    going to testify today?

10          MS. ZERGER:  Before we go forward with the

11    questions, I would like to get on the record the

12    stipulation that you and I talked about earlier that

13    was entered into between Lee Blalach and Lynn Faris

14    and applicable to all of the depositions.

15          And that is, that whenever we have the use

16    of the word "contractor" here today, either in an

17    answer, a question or an answer, that that will not

18    be construed as an admission regarding the ultimate

19    issue of employee status.

20          MS. BREMER:  Okay.  And I do agree to abide

21    by the stipulation that's set forth in the letter

22    dated August 9th, 2006.

23          MS. ZERGER:  Okay.

24    BY MS. BREMER:

25     Q.  When did you first learn that you were

**8/15/2006  Alexander, Dean**

1    going to testify today?

2         A.   About two weeks ago.

3         Q.   And what did you do to prepare for today's

4    deposition?  And I'm not looking for the substance

5    of communications between you and your attorneys,

6    but if you -- did you meet with your attorneys?

7         A.   Yes.

8         Q.   And when did you meet with them?

9         A.   I met a week ago Sunday in Oakland, and I

10   met with Kirsten Sunday.

11        Q.   About how long did you meet with Kirsten on

12   Sunday?

13        A.   About two and a half hours.

14        Q.   And you said you also -- did you meet with

15   someone else a week ago Sunday?

16        A.   We met as a -- the group of drivers met up

17   in Oakland.

18        Q.   How many drivers were at that meeting?

19        A.   There was 12, and one on a conference call.

20        Q.   Were they all contractors or former

21   contractors in California?

22        A.   They were all -- they are all part of this

23   class action suit.

24        Q.   And that's the Alexander case?

25        A.   Yes.

**8/15/2006  Alexander, Dean**

1        Q.  Have you reviewed any documents to prepare

2    for today's deposition?

3        A.  No.  Well, I take that back.  Let me think.

4    I did look at a few with her, but not a lot.

5        Q.  And when you say, "with her," you're

6    pointing to your attorney?

7        A.  I'm sorry, Kirsten, I'm sorry.

8        Q.  Which documents did you look at?

9        A.  I looked at one paragraph on my answers.

10       Q.  Your interrogatory answers?

11       A.  My interrogatory, yeah.

12       Q.  And were those your first interrogatory

13   answers or your supplemental interrogatory answers?

14   The ones that you just prepared a few weeks ago?

15       A.  The ones that the attorney prepared.

16       Q.  Okay.  Was -- were those the ones the

17   attorney prepared some time ago or just recently?

18       A.  Some time ago.

19       Q.  Okay.  What else did you review?

20       A.  She gave me a copy of the complaint.

21       Q.  Anything else?

22       A.  No, that's all I can remember.

23       Q.  What have you done to collect documents for

24   this case?

25       A.  I went to my home office.  And my wife and

**8/15/2006  Alexander, Dean**

1        I looked for anything that pertained to FedEx.

2            Q.  Were all of those documents kept in one

3    place?

4            A.  In the home office.

5            Q.  And you gave everything that you found

6    related to FedEx to your attorneys?

7            A.  Yes.

8            Q.  Did you review any of those documents prior

9    to today's deposition?

10           A.  No.

11           Q.  Did you discuss this deposition with anyone

12   besides your attorneys?

13           A.  This deposition?

14           Q.  Yes.

15           A.  I talked to Pete last night just to ask him

16   how it went.  I talked to him just for a few

17   minutes.

18           Q.  And Pete is -- what's Pete's last name?

19           A.  Allen, A-l-l-e-n.

20           Q.  And he was a contractor that was deposed

21   yesterday?

22           A.  Yes.

23           Q.  And what did he tell you?

24           A.  It was brutal.  He was on his way home and

25   I just wanted to see how it went.  We really didn't

**8/15/2006  Alexander, Dean**

1    discuss much of anything.  Just I wanted to know how

2    it went.

3          Q.  How long did you talk to Pete Allen?

4          A.  Probably about three minutes.

5          Q.  Have you discussed this deposition with

6    anyone else besides Pete Allen?

7          A.  No.

8          Q.  Who paid for your expenses to be here

9    today?

10          A.  I did.

11          Q.  Do you know if you are being reimbursed by

12    anyone?

13          A.  No.

14          Q.  Are you being compensated for your time to

15    testify here today?

16          A.  No.

17          Q.  Are you experiencing any lost wages today?

18          A.  Yes.

19          Q.  Where do you work now?

20          A.  Folsom Lake Ford.

21          Q.  You were born on September 6, 1947; is that

22    correct?

23          A.  Yes.

24          Q.  And you're married to Kathy Alexander?

25          A.  It's actually Mary Katherine.  She goes by

**8/15/2006  Alexander, Dean**

1    Kathy.

2         Q.   How long have you been married to Mary

3    Katherine Alexander?

4         A.   27 years.

5         Q.   And she's an accountant?

6         A.   Yes.

7         Q.   How long has she been an accountant?

8         A.   Back that up.  She was an accountant for

9    about 20 years, and she's now a certified insurance

10   consultant.

11        Q.   When did your wife become an accountant?

12        A.   In the '70s.  Late '70s, early '80s.  I

13   can't remember.

14        Q.   How many children do you have?

15        A.   Two.  Back up, three.  I forget I have one

16   from another marriage.

17        Q.   Okay.

18        A.   I have two with Kathy.

19        Q.   Okay.  The one from your other marriage,

20   what is that person's name?

21        A.   Chad.

22        Q.   Is his last name Alexander?

23        A.   Yes.

24        Q.   How old is he?

25        A.   He would be -- he'll be 33.

**8/15/2006  Alexander, Dean**

1          Q.   And what does he do?

2          A.   He works for a handyman.   He contracts with

3     Home Depot and Lowes.

4          Q.   Okay.   And you have two other children?

5          A.   Yes.

6          Q.   What are their names?

7          A.   Justin and Richard Alexander.

8          Q.   How old is Justin?

9          A.   Justin will be 26 this month.

10         Q.   And what does Justin do?

11         A.   Justin is starting college, going back to

12    college next week.

13         Q.   Did he do something between high school and

14    starting college?

15         A.   Justin?

16         Q.   Yes.

17         A.   Yes.   He worked -- he worked at Round Table

18    Pizza.   And Justin worked for me as a supplemental

19    driver, I believe it was around three years, I'm

20    guessing.   I'm not sure.   And he went back to

21    Colorado and worked back there this last year and

22    came back home at a Sears subsidiary.

23         Q.   What did he do at the Sears subsidiary?

24         A.   He worked in the lighting department.

25         Q.   As a salesperson?

**8/15/2006  Alexander, Dean**

1          A.  No, as a back room person.

2          Q.  So stock room?

3          A.  Yeah.

4          Q.  Did Justin do anything else between

5     college -- between -- I'm sorry, let me start over.

6               Did Justin do anything else between high

7     school and starting college besides working at the

8     Round Table Pizza, working for you as a supplemental

9     driver and working at Sears in the back room?

10         A.  Yeah, he worked at Albertson's for a while.

11    Albertson's grocery store.

12         Q.  And what did he do at Albertson's?

13         A.  He was a courtesy clerk.

14         Q.  What's a courtesy clerk?

15         A.  A bagger.

16         Q.  And what does Richard do?

17         A.  Richard works for Raley's supermarket.

18         Q.  What does Richard do for Raley's?

19         A.  He's a senior clerk.

20         Q.  How old is Richard?

21         A.  Richard is 23 -- no, 24.

22         Q.  And has Richard gone to college?

23         A.  No.

24         Q.  Are you a high school graduate?

25         A.  Yes.

**8/15/2006  Alexander, Dean**

1          Q.  What year did you graduate?

2          A.  1966.

3          Q.  And then you went to San Jose City College?

4          A.  Yes.

5          Q.  You took business and marketing classes

6     there?

7          A.  Yes.

8          Q.  What was your goal in attending San Jose

9     City College?

10          A.  At the time it was to stay out of the

11     service.

12          Q.  Did it work?

13          A.  No.

14          Q.  So you were in the military.  You served

15     from 1969 to 1973; is that right?

16          A.  Yes.

17          Q.  Were you in Vietnam?

18          A.  No.

19          Q.  When you finished serving in the service in

20     1973, did you finish college?

21          A.  No.  I went back and took some more courses

22     at night, but I didn't graduate.  I had about 55

23     units total.

24          Q.  Were those business and marketing classes?

25          A.  The majority.

**8/15/2006  Alexander, Dean**

1           Q.   Why were you taking business and marketing

2    classes?

3           A.   Well, I was assuming some day I'd be in

4    business.

5           Q.   And that was your goal?

6           A.   Hm-hmm, yes.

7           Q.   Have you had any special classes in

8    employee benefits or wage and hours matters?

9           A.   What do you mean?

10          Q.   At City College, do you have -- did any of

11   your classes relate to employee benefits?

12          A.   No.

13          Q.   What about tax classes?

14          A.   No.

15          Q.   Do you have any professional licenses or

16   certifications?

17          A.   Yes.

18          Q.   And what are they?

19          A.   I have Class A, Class B, Class C and

20   motorcycle licenses with all the endorsements.

21          Q.   And when did you get your Class A, Class B

22   and Class C licenses?

23          A.   I'm guessing it was '74, '75.  I can't

24   remember exactly what year.

25          Q.   In your business and marketing classes, did

**8/15/2006  Alexander, Dean**

1    you have any particular emphasis?

2         A.  Meaning?

3         Q.  Were those classes grouped in a particular

4    area or were they just general business and

5    marketing classes?

6         A.  Well, yes, I took the generals first, like

7    general marketing, then 101 -- you know the routine

8    from there.  And there's, I think, three classes,

9    the general and then the 101 and 102, and in both

10   areas.

11        Q.  And then what happened after those classes?

12        A.  As to other classes I took?

13        Q.  Yes.

14        A.  I took accounting, insurance, there was one

15   class on business law.  I took introduction to law

16   enforcement as a general to see if that was an area

17   I might be interested in.  English classes, biology.

18        Q.  And any other business or --

19        A.  There was a lot of business classes.  I

20   can't remember all of them.

21        Q.  Right.

22        A.  That's 30 some-odd years ago.

23        Q.  Right.  Have you ever been convicted of a

24   felony?

25        A.  No.

**8/15/2006 Alexander, Dean**

1        Q.  What about a misdemeanor?

2        A.  No.

3        Q.  Have you ever filed or been involved with

4    any other lawsuits?

5        A.  No.

6        Q.  When did you first contract with FedEx

7    Ground?

8        A.  I've got to remember.  It was in the

9    beginning class.  I can't remember if that was 2000.

10   It was -- I was in the start-up group when FedEx

11   Home became up and running.

12       Q.  So you started -- you were one of the first

13   contractors when FedEx Home started?

14       A.  Yes.

15       Q.  Before coming to FedEx Home, what jobs did

16   you have?

17       A.  Do you mean name all the jobs, or what job

18   did I have before I started there?

19       Q.  All your jobs.

20       A.  All my jobs.  You know about the military.

21   After I got out of the military, my ex-wife's father

22   owned a construction company and I went to work for

23   him.

24       Q.  And how long did you work at the

25   construction company?

**8/15/2006  Alexander, Dean**

1          A.   I worked there from '73 I think until '82.

2     I'm not real clear on the dates.

3          Q.   And when did you divorce your first wife?

4          MS. ZERGER:  Objection.  Relevance.

5     BY MS. BREMER:

6          Q.   You can go ahead and answer.

7          A.   Can I answer that?

8          MS. ZERGER:  Hm-hmm.

9          THE WITNESS:  Okay.  I'm trying to think.

10    I think it was '77.

11    BY MS. BREMER:

12         Q.   Okay.  And then after the construction

13    company, where did you work next?

14         A.   After that, that company, they went out of

15    business -- well, they retired the company and just

16    shut it down.  After that I went to work for Lewis &

17    Tibbitts.

18         Q.   What's Lewis & Tibbitts?

19         A.   Lewis & Tibbitts is also a construction

20    company.

21         Q.   And what did you do for Lewis & Tibbitts?

22         A.   I was a truck driver.

23         Q.   And what did you drive in your truck?

24         MS. ZERGER:  Objection.  Vague.

25    BY MS. BREMER:

**8/15/2006  Alexander, Dean**

1        Q.  What were you driving at Lewis & Tibbitts?

2            MS. ZERGER:  Objection.  Vague and

3    ambiguous.  Asking for the kind of truck or what was

4    in the truck?

5            THE WITNESS:  I understand what she's

6    asking.

7            MS. ZERGER:  You need to wait for me to

8    make the objection and then for her to respond,

9    okay.

10    BY MS. BREMER:

11        Q.  Do you understand my question?

12        A.  I do.

13        Q.  Okay.

14        A.  Okay.  I hauled equipment and dirt in the

15    dump trucks.

16        Q.  And how long did you work for Lewis &

17    Tibbitts?

18        A.  Until '89, 1989.

19        Q.  Were you an employee or an independent

20    contractor for --

21        A.  An employee.

22        Q.  Did you develop any special skills or

23    training when you worked for Lewis & Tibbitts?

24        A.  I had all the skills when I started there

25    that I learned from Great Western Pipeline.

**8/15/2006  Alexander, Dean**

1        Q.  And is Great Western Pipeline the

2    construction company?

3        A.  Company.

4        Q.  That your ex-wife's father --

5        A.  Father-in-law owned.

6        Q.  And what were you doing for your ex-wife's

7    father-in-law's company?

8        A.  Driving truck.

9        Q.  Okay.  And were you also hauling equipment

10    and dirt?

11        A.  Yes.

12        Q.  What did you do after working for Lewis &

13    Tibbitts?

14        A.  I moved to Sacramento -- well, I moved to

15    Folsom and went to work out of the union hall.

16        Q.  What were you doing at the union hall?

17        A.  Trying to get a truck driving job.  I ended

18    up driving water truck for about two years and then

19    gave up on construction.

20        Q.  Were you a member of the union?

21        A.  Yes.

22        Q.  For how long?

23        A.  From 1973 until about '92 when I took a

24    withdrawal.

25        Q.  And what's a withdrawal?

**8/15/2006  Alexander, Dean**

1        A.  Withdrawal means that I freeze all my

2    pension stuff.

3        Q.  When you drove the water truck, were you an

4    employee or an independent contractor?

5        A.  An employee.

6        Q.  What did you do after working driving the

7    water truck?

8        A.  I started a small janitorial business.

9        Q.  And what year was that?

10       A.  I can't remember the exact year.

11       Q.  Did you have --

12       A.  Could have been '93, '94.  I just can't

13   remember.

14       Q.  Did you have employees?

15       A.  No.

16       Q.  You worked for yourself?

17       A.  Yes.

18       Q.  And who hired you?

19       A.  It was called Progressive.

20       Q.  What did Progressive do?

21       A.  They were a janitorial maintenance.

22       Q.  So were you --

23       A.  A sub.

24       Q.  You were a subcontractor?

25       A.  Right.

**8/15/2006  Alexander, Dean**

1          Q.  How much did you make as a subcontractor?

2          A.  It got up as high as $2,200 a month.

3          Q.  Were you paid by the hour?

4          A.  By the job.

5          Q.  Did you make any benefits?

6          A.  No.

7          Q.  What did you do after starting a janitorial

8     business?

9          A.  After the janitorial business?

10         Q.  Yes.

11         A.  I went to work for the City of Folsom.

12         Q.  Do you know what year that was?

13         A.  No, I can't remember the year.  Sometime in

14    the '90s.

15         Q.  About how many years did you work in your

16    janitorial business?

17         A.  I did it for probably less than a year.

18         Q.  Why did you stop doing that?

19         A.  Because it was too cut-throat.

20         Q.  What do you mean?

21         A.  Well, you couldn't compete.

22         Q.  There were too many --

23         A.  People coming in and underbidding for the

24    jobs.

25         Q.  And what did you do for the City of Folsom?

**8/15/2006  Alexander, Dean**

1        A.   I drove bus.

2        Q.   How long did you drive a bus?

3        A.   I'm guessing it was close to two years.

4        Q.   How were you paid by the City of Folsom?

5        A.   Hourly.

6        Q.   Were you an employee or an independent --

7        A.   An employee.  I was, yeah, an employee.

8        Q.   Okay.  I know you know what I'm going to

9    ask, but it would be helpful if you wait until I

10   finish my questions.  Thank you.

11       A.   Sorry.

12       Q.   Otherwise the record gets screwed up.

13            Was driving a bus the last job you had before

14   working with FedEx Home?

15       A.   No.

16       Q.   Okay.  What else did you do?

17       A.   I drove for a company called Water Sweeper.

18       Q.   And what was Water Sweeper?

19       A.   They cleaned new housing tracts at night,

20   cleaned the debris off the roads.

21       Q.   And did you drive the trucks that cleaned

22   the roads?

23       A.   Yes.

24       Q.   How were you paid in that job?

25       A.   Hourly.

1091

**8/15/2006  Alexander, Dean**

1          Q.   You were an employee?

2          A.   Yes.

3          Q.   How long did you work for Water Sweeper?

4          A.   About a year.

5          Q.   Why did you leave Water Sweeper?

6          A.   Because it was an all-night job.

7          Q.   So you just drove at night?

8          A.   Yes.

9          Q.   Did you have any other jobs before working

10    for FedEx Home?

11         A.   No.

12         Q.   Based on your work experience before

13    contracting with FedEx Home, were you adequately

14    prepared to be a FedEx Home contractor?

15             MS. ZERGER:  And I'm just going to

16    reference the stipulation that we have so that I

17    don't need to make it each time the term contractor

18    is used, but that the use of that term or responding

19    doesn't constitute an admission as to its legal

20    significance.

21    BY MS. BREMER:

22         Q.   That's fine.

23         A.   Answer the question?

24         Q.   Yes, please.

25         A.   Yes, I believe I was.  I'm a hard worker

**8/15/2006  Alexander, Dean**

1    and a quick learner.

2         Q.   In what ways do you believe that your prior

3    experience prepared you for working for FedEx Home?

4         A.   I need to back up on this one job that I

5    missed.

6         Q.   Okay.

7         A.   If you want to.

8         Q.   Sure.

9         A.   I just thought of something that would go

10   into this question.  I worked for -- in the early

11   '90s, I worked for the Press Tribune in Roseville.

12        Q.   And what did you do --

13        A.   I was a circulation manager.  District

14   manager was the title.

15        Q.   What did you do as a district manager?

16        A.   I hired all the route drivers.

17        Q.   And you managed them?

18        A.   And managed them, and unfortunately had to

19   fire them if it was need be.  I had forgotten about

20   that job.

21        Q.   How long did you work for the Press

22   Tribune?

23        A.   I would say about two years on that job.

24        Q.   Did that job --

25        A.   That fits in between --

**8/15/2006  Alexander, Dean**

1           MS. ZERGER:  You have to wait until she

2       finishes her question.

3           THE WITNESS:  I got ahead of myself.

4       BY MS. BREMER:

5           Q.  Did that job help you in becoming a FedEx

6       Home contractor?

7           A.  Yes, it gave me knowledge of looking for

8       addresses, streets.

9           Q.  And what about managing employees, was that

10      helpful to you?

11          A.  Yes.

12          Q.  Do you think that FedEx Home did a good job

13      of helping you get prepared for your work for them?

14          MS. ZERGER:  Objection.  Ambiguous.

15          THE WITNESS:  The training that they gave

16      us in the beginning.

17      BY MS. BREMER:

18          Q.  That was helpful?

19          A.  We had all the training with the videos,

20      the driving videos, and how to deliver your

21      packages, how to handle your packages, how to talk

22      to customers.

23          Q.  And were those training videos helpful in

24      working as a contractor for FedEx Home?

25          A.  Yes.

**8/15/2006  Alexander, Dean**

1        Q.   Prior to contracting with FedEx Home, you

2     had never delivered packages before; is that right?

3        A.   Not packages.

4        Q.   You're not currently under contract with

5     FedEx Home, correct?

6        A.   No.

7        Q.   What jobs have you held since your contract

8     with FedEx Home ended?

9        A.   When I left FedEx, I retired.  That lasted

10    three months.  I decided to go back to work.  I went

11    to work for -- I'm trying to think of the name of

12    that place -- University Retirement in Davis.

13       Q.   When you retired, did you plan for your

14    retirement to last longer than three months?

15       A.   I wasn't sure.  I just -- I'm -- I was

16    busy.  I needed to have something to do.  I went

17    back to work.

18       Q.   You said you had to go back to work.  Was

19    there any --

20       A.   I didn't have to go back to work.  I wanted

21    to go back to work because I was bored.

22       Q.   What did you do for University Retirement?

23       A.   I took elderly people to doctors'

24    appointments.

25       Q.   Were you paid by the hour?

**8/15/2006  Alexander, Dean**

1        A.   Paid by the hour.  I was an employee.

2        Q.   How long did that job last?

3        A.   The job lasted about three months.  I was

4    more bored doing that than being retired.

5        Q.   So then what did you do?

6        A.   I got a call from Folsom Lake Ford.  They

7    needed a driver to go up into El Dorado County and

8    deliver parts.  I told them I'd be there in twenty

9    minutes.

10        Q.   So you deliver parts for Folsom Lake Ford?

11        A.   Yes.

12        Q.   How long have you held that job?

13        A.   It's just a little over a year now.

14        Q.   How are you paid by Folsom Lake Ford?

15        A.   By the hour.

16        MS. ZERGER:  You need to let her finish her

17    question.

18        THE WITNESS:  I'm sorry.

19    BY MS. BREMER:

20        Q.   You're an employee?

21        A.   Yes.

22        Q.   Have you ever applied for unemployment

23    benefits?

24        A.   Yes.

25        Q.   When was that?

**8/15/2006  Alexander, Dean**

1          A.  When I worked construction during the rainy

2      seasons.

3          Q.  And what happened?

4          A.  It would be for -- the period would be for

5      as long as we were shut down.  Sometimes a week,

6      sometimes two weeks, but never continuously.

7          Q.  Is that the only time that you have applied

8      for unemployment benefits?

9          A.  Is when I was working construction.

10         Q.  So that's yes?

11         A.  Yes.

12         Q.  When you were under contract with FedEx

13     Home, did you have any other jobs?

14         A.  No.

15         Q.  Did you have any other sources of income?

16         A.  Meaning?

17         Q.  Social security, disability --

18         A.  Are you talking about myself, not the

19     family?

20         Q.  Yes, right.

21         A.  Okay, no.

22         Q.  Rental income?

23         A.  No.

24         Q.  Did you use your vehicle in connection with

25     any other work?

**8/15/2006  Alexander, Dean**

1            MS. ZERGER:  Objection.  Vague as to what

2    vehicle.

3            THE WITNESS:  No.

4    BY MS. BREMER:

5        Q.  And I'm talking about the time that you

6    worked for, worked with FedEx Home, did you

7    understand that?

8        A.  Yes.

9            MS. ZERGER:  And I'm going to remind the

10   witness to wait a minute after the question is asked

11   so that I can respond.

12           THE WITNESS:  All right.

13   BY MS. BREMER:

14       Q.  Did you ever have an online financial

15   business?

16       A.  No.

17       Q.  For your janitorial business, why did you

18   decide to start that business?

19       A.  I thought it might be an opportunity to

20   have my own business.

21       Q.  And why did that appeal to you?

22       A.  I think I liked the fact of the

23   independence.

24       Q.  You said that it was cut-throat.  Was --

25       A.  Sorry.

**8/15/2006  Alexander, Dean**

1          Q.  Did you consider that business to be

2     successful?

3          A.  No.

4          Q.  And that was because it was too

5     competitive?

6          A.  It was, yes, it was too competitive.

7          Q.  Did you get to take vacations when you had

8     your janitorial business?

9          A.  No.

10         Q.  What were the hours of that business?

11         A.  The hours were generally after 6:00 in the

12    evening until I finished.

13         Q.  And when did you typically finish?

14         A.  Anywhere from 10:00 in the evening until

15    midnight.

16         Q.  And why did you work those particular

17    hours?

18         A.  The type of janitorial was mainly banks.

19    You have to go in after hours in offices.

20         Q.  So it was -- you worked late hours into the

21    evening to satisfy the customers' demands?

22              MS. ZERGER:  Objection.  Misstates the

23    testimony.

24              THE WITNESS:  We had to do general

25    cleaning.  The vacuuming, dusting, empty the trash,

**8/15/2006  Alexander, Dean**

1    just general janitorial.

2    BY MS. BREMER:

3        Q.  Right.  But I'm wondering if the -- if you

4    worked starting at 6:00 until midnight in order to

5    satisfy the banks and other customers' demands as

6    opposed to you choosing to work at that time?

7            MS. ZERGER:  Leading.

8            THE WITNESS:  We had to work -- we couldn't

9    go in during business hours.  It was all after-hour

10   work.

11   BY MS. BREMER:

12       Q.  And that's because that's what the banks

13   demanded?

14       A.  Yes.

15       Q.  How did you first learn about the

16   possibility of working with FedEx Home?

17       A.  My wife saw it in the newspaper.

18       Q.  She saw an ad?

19       A.  Yes.

20       Q.  Did she show it to you?

21       A.  Yes.

22       Q.  And what did the ad say?

23       A.  It was about they were having recruiting

24   meetings looking for contractors.

25       Q.  Did the ad say that they were looking for

**8/15/2006  Alexander, Dean**

1     contractors as opposed to employees?

2          A.   I believe it said contractors.

3          Q.   Did that appeal to you?

4          A.   I thought it might be a business

5     opportunity.

6          Q.   And did you want a business opportunity?

7          A.   Yes.

8          Q.   Why?

9          A.   I was looking for some opportunity that I

10    could take up until retirement.

11         Q.   And why did business -- why did having a

12    business appeal to you?

13         A.   Being my own boss.

14         Q.   Anything else?

15         A.   I can't think of anything right now.

16         Q.   After you saw the ad, what did you do?

17         A.   We went to the orientation.

18         Q.   Did both you and your wife go?

19         A.   Yes.

20         Q.   What was the orientation that you attended?

21         A.   Explaining what the job consisted of and

22    the opportunities, that they were taking

23    applications for -- I believe they said start-up,

24    but I can't remember if that was the exact words, of

25    a new branch of FedEx.

**8/15/2006  Alexander, Dean**

1        Q.   And who explained what the job consisted

2    of?

3        A.   I believe it was Dave, I think his last

4    name was Windfield.  I'm not sure on the last name.

5    I think it was Windfield.

6        Q.   That wasn't Westbrooks, was it?

7        A.   Westbrooks.

8        Q.   How many people were there?

9        A.   I'd say maybe 20.

10       Q.   And what happened after you attended the

11   orientation meeting?

12       A.   I filled out an application.

13       Q.   Did they have the applications at the

14   orientation meeting?

15       A.   Hm-hmm, yes, they did.

16       Q.   Did you fill it out right there on the

17   spot?

18       A.   Yes.

19       Q.   And then what happened?

20       A.   What do you mean?

21       Q.   After you filled out the application, did

22   you turn it in at the orientation?

23       A.   Yes.

24       Q.   Did you set up an interview at that point

25   or did they contact you later?

**8/15/2006  Alexander, Dean**

1          A.   They contacted me.

2          Q.   About how long was it between filling out

3     the application and being contacted?

4          A.   I can't remember.   Maybe two weeks.   I'm

5     not sure.

6          Q.   What was the next step in the process after

7     they contacted you?

8          A.   An interview.

9          Q.   At that point, were you working at one of

10    your other jobs?

11         A.   Water Sweeper.

12         Q.   Did you look into working for any other

13    package pick-up and delivery companies, like DHL or

14    UPS?

15         A.   No.

16         Q.   Why not?

17         A.   I don't know.

18         Q.   You just didn't consider it?

19         A.   No, I didn't.

20         Q.   When did you first realize that you were

21    being offered the possibility to own your own route?

22              MS. ZERGER:   Objection.   Assumes facts not

23    in evidence.

24              THE WITNESS:   I'm sorry?

25              MS. ZERGER:   It assumes facts not in

**8/15/2006  Alexander, Dean**

1    evidence.

2         THE WITNESS:  I can't remember.  We had

3    meetings -- they contacted me and said they were --

4    that I was going to be accepted as a driver after I

5    passed background checks and whatever else they had

6    to do.

7    BY MS. BREMER:

8         Q.  So you learned that you would be owning

9    your own route prior to contracting with FedEx Home;

10   is that right?

11        MS. ZERGER:  Leading.  Assumes facts not in

12   evidence.

13        THE WITNESS:  Right.

14   BY MS. BREMER:

15        Q.  Who did you first speak to regarding owning

16   your own route?

17        MS. ZERGER:  I'm going to have a continuing

18   objection to the, you know, the form of the question

19   in terms of stating owning your own route.  It's a

20   legal issue and it is a fact not in evidence.

21        THE WITNESS:  Ask the question again,

22   please.

23   BY MS. BREMER:

24        Q.  Who did you first speak to regarding owning

25   your own route?

**8/15/2006  Alexander, Dean**

1          A.  You're looking for a name?

2          Q.  Yes.

3          A.  Dave Westbrooks.

4          Q.  And when was that?  I'm not looking for a

5    date, but orientation meeting, was that in an

6    interview, or --

7          A.  That was at the orientation.

8          Q.  And what did he say?

9          A.  I don't remember exactly what I said.  I

10   said I was interested and be willing to fill out an

11   application.

12         Q.  What did he tell you about owning your own

13   route?

14         A.  I can't remember.

15         Q.  Did he discuss how you would be paid?

16         A.  Not at the orientation.

17         Q.  When did he discuss how you'd be paid?

18         A.  I think that was during the training

19   period.

20         Q.  Was that prior to signing the operating

21   agreement?

22         A.  Yes.

23         Q.  So you engaged in training prior to signing

24   the operating agreement?

25         A.  I believe during the training is when we

**8/15/2006  Alexander, Dean**

1    signed our contract, sometime during -- I can't

2    remember.

3        Q.  But to the best of your recollection, you

4    attended some training and then signed a contract

5    thereafter?

6        A.  Sometime during the training.

7        Q.  Okay.

8        A.  When we signed.

9        Q.  Was there any discussion of the hours you'd

10   be working?

11       A.  No.

12       Q.  Was there any discussion of what it meant

13   to be an independent contractor?

14       A.  How do you mean that?

15       Q.  Did he tell you what your responsibilities

16   would be?

17       A.  As a driver.  The goal was always to get

18   all your packages delivered.

19       Q.  Was there any discussion of you being a

20   contractor as opposed to an employee?

21       A.  They like to use the word a lot, "You're

22   not an employee."

23       Q.  And how was that used, in what

24   circumstances?

25       A.  I can't remember, but I heard it a lot of

**8/15/2006  Alexander, Dean**

1    times.  They always used to say, "We don't want to

2    hear the word employee, ever."

3         Q.  Did they say why?

4         A.  Well, I'm assuming because they didn't want

5    the responsibility.

6         Q.  Did they ever tell you that?

7         A.  No, I'm guessing.

8         Q.  You said that during training they told you

9    how you'd be paid.  What did they tell you?

10        A.  At the time none of us understood it.

11        Q.  What did they tell you?

12        A.  Well, they tried to explain to us that we

13   were going to get paid by the stop, by the core

14   zone.  There would -- I can't remember.  There was

15   other things they told us.

16            But at the time none of us really under --

17   it was all Greek.  None of us really understood how

18   we would be paid until, you know, we got into it and

19   then we started to understand how we were getting

20   paid.

21        Q.  Did they tell you all of the factors that

22   would go into the payments that you would get?

23        A.  I believe they did.

24        Q.  Did you ask anyone to explain how you would

25   be paid prior to signing the contract?

8/15/2006  Alexander, Dean

1          A.  Yes.

2          Q.  And who did you ask?

3          A.  I asked Dave and Jan to explain it.

4          Q.  And Jan --

5          A.  Jan was Dave's, I guess, second in command

6     at the time.  I don't know her last name.

7          Q.  Was she a P&D manager?

8          A.  She was Dave's assistant.

9          Q.  An assistant.  Did they explain to you how

10    you'd be paid?

11         A.  Yes.  But again, it was confusing in the

12    beginning.

13         Q.  What was confusing about it?

14         A.  Well, none of us understood -- we

15    understood the stops.  We didn't understand what the

16    core zone was.  We didn't understand time in core

17    zones.  It was a learning process.

18         Q.  And when you say that we didn't understand,

19    who else are you talking about?

20         A.  The group.

21         Q.  Who else are you -- what group?

22         A.  It was the original seven drivers.  We all

23    trained together.

24         Q.  And how do you know whether or not they

25    understood?

**8/15/2006  Alexander, Dean**

1       A.  Because we all kept asking the same

2   questions.  We don't understand.

3       Q.  So is that based on comments that you, or

4   questions that you heard from them?

5       A.  Yes.

6       Q.  Do you have any other reason to believe

7   that they didn't understand how they'd be paid?

8       A.  No.

9       Q.  Was it important for you to understand how

10  you would be paid before you started working with

11  FedEx Home?

12      A.  It was important, and I figured I'd figure

13  it out as we got going in, it would become more

14  clear as we were getting paid.

15      Q.  Were you concerned about leaving a job

16  where you had a set payment schedule -- or let me

17  start over.

18          How much were you paid at your prior job?

19      A.  I think it was $10.50.

20      Q.  So you were paid $10.50 an hour at, was

21  that the Water Sweeper?

22      A.  Hm-hmm.

23      Q.  Were you concerned about leaving a job

24  where you were making $10.50 an hour to go to a job

25  when you didn't understand how much you would be

**8/15/2006  Alexander, Dean**

1    making?

2         A.   No.  I knew it would be a business

3    opportunity.  And in the orientation it was brought

4    out that this was a start-up business and it would

5    be slow in the beginning but would build over time.

6         Q.   Did you believe that you would be making

7    more money than you made when you worked at the

8    Water Sweeper?

9              MS. ZERGER:  Objection, leading.

10             THE WITNESS:  I believed I would in the

11   future.

12   BY MS. BREMER:

13        Q.   And you were willing to be paid less in the

14   beginning with the expectation that your business

15   would grow and that you would make more in the

16   future?

17        A.   Yes.

18        Q.   Did you discuss what your proprietary

19   interest would be?

20        A.   I don't understand.

21             MS. ZERGER:  And I'm going to object that

22   that's a legal term.  Calls for a legal conclusion.

23   BY MS. BREMER:

24        Q.   Did you have an understanding of the term

25   "proprietary interest"?

**8/15/2006  Alexander, Dean**

1        A.  I don't understand it.

2        Q.  Were DOT driver safety requirements

3   discussed at the orientation or in your meetings

4   with Dave Westbrooks before you signed the contract?

5        A.  Yes.

6        Q.  What was said?

7        A.  That we would fall under DOT.  We'd have to

8   have annual maintenance checks on our truck.

9        Q.  Had any of the trucks that you'd driven

10  before been subject to DOT requirements?

11       A.  No.

12       Q.  Before you decided to contract with FedEx

13  Home Delivery, were there any issues you wanted to

14  investigate or questions you wanted answered?

15       A.  Explain.

16       Q.  Did you have any concerns about contracting

17  with FedEx Home Delivery?

18       A.  I had never done anything like this, so I

19  didn't know what to ask.

20       Q.  Had your wife ever owned a business?

21       A.  No.

22       Q.  Did you consult with an attorney before

23  contracting with FedEx Home?

24       A.  No.

25       Q.  Why not?

**8/15/2006  Alexander, Dean**

1          A.  I don't know.

2          Q.  Your wife was an accountant at the time

3      that you became a contractor, right?

4          A.  I can't remember when she went from

5      accountant to insurance.  Sometime in that, or maybe

6      before that period.  I don't remember when.

7          Q.  Your wife at least had been an accountant?

8          A.  An accountant, yes.

9          Q.  Did you talk to her about the financial

10     aspects with your contract at FedEx Home?

11         A.  Yes.

12         Q.  Did you consult with any other accountants

13     before consulting with FedEx Home?

14         A.  No.

15         Q.  Did you or your wife research the likely

16     costs that you would incur by becoming a contractor?

17             MS. ZERGER:  Objection.  Lack of personal

18     knowledge.  Compound question.

19             THE WITNESS:  Yes.

20     BY MS. BREMER:

21         Q.  What was done?

22         A.  We looked at the cost of buying the vehicle

23     and the maintenance prospects of running that

24     vehicle.

25         Q.  And how did you go about looking into the

**8/15/2006  Alexander, Dean**

1    cost of buying and running the vehicle?

2         A.   When we had our training period, FedEx had

3    all the information there.  They had -- I remember

4    they had a paper with Mike Albert Leasing on it and

5    one other one, I can't remember who it was, to lease

6    Chevy vans.

7         Q.   And what did you do to investigate the

8    maintenance costs of running the vehicle?

9         A.   Well, at the time the maintenance costs

10   were uncertain due to -- would come with mileage and

11   fuel.

12        Q.   But what did you do to research the

13   maintenance costs?

14        A.   Well, we didn't really research it.  My

15   wife and I thought about what the cost is going to

16   be.

17        Q.   Okay.  And how did you come up with your

18   decision or determination of what you thought the

19   costs would be?

20        A.   I thought once I start running the route

21   then I'd be able to know how much fuel I'm going to

22   be using in a week's time and how long -- when the

23   first set of tires wore out, when the first set of

24   brakes wore out.  I would know better what kind of

25   maintenance I'd be doing on a regular basis.

**8/15/2006  Alexander, Dean**

1          Q.   And did you do anything else to look into

2     the maintenance costs?

3          A.   No.

4          Q.   Did you have a projection of what the

5     likely maintenance costs would be?

6          A.   No.

7          Q.   And you did lease a truck from Mike Albert

8     Leasing?

9          A.   Yes, I did.

10          Q.   Were the costs of leasing that vehicle

11     about what you thought they would be before you

12     contracted with FedEx Home?

13          A.   I can't remember what the cost was as far

14     as -- you're talking about payment?

15          Q.   Yes.

16          A.   I thought they'd be about where they would

17     be for leasing.

18          Q.   You mean they were about what you thought

19     they would be, or let me just -- are you saying that

20     the cost of leasing the vehicle was about what you

21     thought it would be before you contracted with FedEx

22     Home?

23          A.   They already had a -- FedEx already had a

24     paper with Mike Albert Leasing on it, how much it

25     would cost you to buy, or -- well, to lease a van

**8/15/2006  Alexander, Dean**

1    with a figure.  And I can't remember what that

2    figure was, at $300 a month, per se.  And that's

3    what you would lease.  You would go through Mike

4    Albert Leasing, fill out the paperwork, they shipped

5    the vans out from back East, and --

6        Q.  And so the cost when you actually leased

7    from Mike Albert Leasing was what you thought it was

8    going to be; is that right?

9        A.  It's what FedEx had on their paper that

10   they gave us with the pictures of the vans and the

11   leasing companies they had on it.

12       Q.  So that was accurate?

13       A.  It was accurate to what they had on their

14   papers.

15           MS. ZERGER:  Can we take that break we

16   talked about earlier?

17           MS. BREMER:  Sure.  Let's go off the

18   record.

19           THE VIDEO OPERATOR:  Let's go off the

20   record.  The time is 9:37.

21           (Recess taken)

22           THE VIDEO OPERATOR:  Back on the record.

23   The time is 9:44.

24   BY MS. BREMER:

25       Q.  Mr. Alexander, we were talking about

**8/15/2006  Alexander, Dean**

1    research that you did prior to contracting with

2    FedEx Home.

3            Did you or your wife make any calculations

4    or forecasts of what you might make working as an

5    independent contractor for FedEx Home?

6        A.  We figured the first year would be a loss,

7    and we prepared for that loss.

8        Q.  How did you prepare for the loss?

9        A.  I put aside $6,000 for running the

10   business.

11       Q.  And why did you believe that your first

12   year would be a loss?

13       A.  We were told in the beginning that it would

14   be slow, that they would have to build up -- FedEx

15   would have to build up carriers and it would take

16   some time -- it would take time, but they would be

17   working and having salesmen out trying to get new

18   accounts, which we were seeing new accounts come in.

19       Q.  Did they tell you how long that was likely

20   to last?

21       A.  They gave no guesstimate, but it was pretty

22   slow for the first, oh, I would say the first month

23   or two delivering.

24       Q.  Did you do anything to build up the

25   business?

8/15/2006  Alexander, Dean

1        A.   No.

2        Q.   Did they tell you that you could do

3    anything to build up the business?

4        A.   I believe they did.

5        Q.   What did they tell you that you could do?

6        A.   That we could give them names of people

7    that had business in shipping, and they would send

8    salespeople out to go talk to them.

9        Q.   Did they give you any other ideas of what

10   you could do?

11       A.   I didn't feel it was my business to build

12   accounts.

13       Q.   Did you believe that it would benefit you

14   if you did build accounts?

15       A.   The fact that we were home delivery, it was

16   pretty difficult to mingle with businesses.

17       Q.   And that's because you delivered from

18   businesses to homes?

19       A.   Yes.

20       Q.   Did you or your wife make any calculations

21   or forecasts of what you might make after your first

22   year contracting with FedEx Home?

23       A.   That was always an uncertain because the

24   package count was always changing.  You had no set

25   amount of packages from day-to-day.

**8/15/2006  Alexander, Dean**

1          Q.  Did you believe that you had the potential

2      to make more than you had at the Water Sweeper?

3          A.  Yes.

4          Q.  And what was that based on?

5          A.  That was based on the fact that we kept

6      getting new accounts and the package count kept

7      going up.  As the package count went up, we made

8      more money.

9          Q.  Did you have any understanding as to your

10     income potential prior to contracting with FedEx

11     Home?

12             MS. ZERGER:  Asked and answered.

13             THE WITNESS:  I really didn't have an idea

14     what the full potential may or may not be.

15     BY MS. BREMER:

16         Q.  But you believed it was a good opportunity?

17         A.  I believed it would grow.

18         Q.  Did your wife agree to help you with the

19     business as a contractor for FedEx Home?

20             MS. ZERGER:  Assumes facts not in evidence.

21             THE WITNESS:  How do you mean that?

22     BY MS. BREMER:

23         Q.  Did your wife agree to help you run your

24     business as an independent contractor?

25         A.  My wife did all the accounting and the

**8/15/2006  Alexander, Dean**

1    recordkeeping.

2         Q.   Did she also file your taxes?

3         A.   Yes.

4         Q.   Did she do anything else?

5         A.   No, not that I can think of.

6         Q.   Do you know which particular route you were

7    being offered?

8         A.   In the beginning?

9         Q.   Yes.

10        A.   In the beginning I started out -- I knew

11   that I was going to get one specific area, but I

12   started out with nine zip codes.

13        Q.   And did you know what those zip codes were,

14   prior to contracting?

15        A.   No.

16        Q.   Did you know -- did you know one zip code

17   before you contracted?

18        MS. ZERGER:  Vague and ambiguous.

19        THE WITNESS:  We were asked during the

20   training period what areas would we like.  And we

21   all submitted a paper with -- I believe they had

22   like a map and an area with zip codes in it.  And

23   you had to pick one primary out of that.

24        And when I first started, I thought I was

25   getting that one primary zip code that I asked for,

**8/15/2006  Alexander, Dean**

1    and it ended up being nine zip codes, which is kind

2    of scary.

3    BY MS. BREMER:

4         Q.  Was the one zip code that you picked part

5    of your -- was that your primary zip code?

6         A.  The one -- I picked one for my primary.

7         Q.  And did they give you that one?

8         A.  They gave me that with eight other zip

9    codes.

10        Q.  How many contractors started at FedEx Home

11   at the same time as you did?

12        A.  I believe it was seven, but I'm not sure

13   now.

14        Q.  How many zip codes were the seven

15   contractors handling?

16        A.  I have no clue, but it was a lot.

17        Q.  Did you know that you would be handling a

18   large area prior to the time that you contracted

19   with FedEx Home?

20        A.  No.

21        Q.  Was there any discussion of the area that

22   you would be driving prior to contracting?

23        A.  Meaning what?

24        Q.  Did -- when did you first learn that you

25   would have nine different zip codes that you would

**8/15/2006  Alexander, Dean**

1    be delivering packages to?

2        A.  During the training time.

3        Q.  And was that prior to the date that you

4    signed your operating agreement?

5        A.  I can't remember which time during the --

6    during the training period where we signed our

7    contract.  I can't remember that at all.

8        Q.  So you may have had that information before

9    you signed your contract, but you don't recall?

10        MS. ZERGER:  Asked and answered.  You can

11    answer.

12        THE WITNESS:  Okay.  Sometime before we

13    started our routes, probably I would guess it was

14    towards the end of the training days, I would

15    imagine it was probably either Thursday, Friday that

16    they told us what areas we would have, what our

17    route would be.

18    BY MS. BREMER:

19        Q.  And when did you sign the contract?

20        A.  I can't remember.

21        MS. ZERGER:  Asked and answered.

22    BY MS. BREMER:

23        Q.  So it's correct that you don't know whether

24    or not you had the information about your route

25    prior to contracting with FedEx Home?

**8/15/2006  Alexander, Dean**

1        A.  Yes, I can't remember which date I signed

2    it.

3        Q.  What was your understanding of the services

4    that you were expected to provide to FedEx Home?

5        A.  I'm sorry, would you repeat that?

6        Q.  What was your understanding of the services

7    that you were expected to provide to FedEx Home

8    prior to signing the contract?

9        A.  To deliver my packages.

10       Q.  Anything else?

11       A.  You're talking about services, right?

12       Q.  Yes.

13       A.  Deliver my packages.  I can't think of

14    anything else.

15       Q.  I'm going to hand you what's been marked as

16    Alexander Exhibit Number 1.

17           (Whereupon, Deposition Exhibit 1 was marked

18           for identification)

19    BY MS. BREMER:

20       Q.  Go ahead and take a look at that.

21       A.  I forgot my glasses.

22           MS. ZERGER:  Wait.  Can we go off the

23    record?

24           MS. BREMER:  Yes.

25           THE VIDEO OPERATOR:  Going off the record.

**8/15/2006  Alexander, Dean**

1    The time is 9:56.

2              (Discussion off the record)

3              THE VIDEO OPERATOR:  Back on the record.

4    The time is 10:02.

5    BY MS. BREMER:

6         Q.  So Mr. Alexander, you've borrowed some

7    glasses; is that right?

8         A.  That's correct.

9         Q.  Can you now read the Exhibit 1?

10        A.  Yes.

11        Q.  I'm going to ask you a few questions about

12   Exhibit Number 1, and if you can't read it, please,

13   let me know.

14             Do you recognize this document?

15        A.  Yes.

16        Q.  What is it?

17        A.  Contractor/Driver Information Sheet.  I

18   know I've seen it.  I can't remember when.

19        Q.  Is this your handwriting on the

20   Contractor/Driver Information Sheet?

21        A.  Doesn't look like it.  Could be.

22        Q.  Look at the second page and at the end

23   there's a signature.  It appears to be Dean

24   Alexander.

25             Is that your signature?

**8/15/2006  Alexander, Dean**

1          A.   Yes.

2          Q.   At the top of this -- on page 1, there's a

3     place for a date, and it says, January 13th, '00, I

4     assume that's 2000.

5          A.   Yeah.  I see that.

6          Q.   Was that about the date that you attended

7     the orientation for FedEx Home Delivery?

8          A.   I can't remember.

9          Q.   Does that sound about right?

10         A.   Yes, it could be.

11         Q.   On the second page, there's, by your

12    signature, it says, 1/13/98, and then below that

13    there's the signature of the senior manager which

14    also appears to be the year 2000.

15              Is the date by your signature, do you

16    believe that's a mistake, that you would not have

17    filled out a driver information sheet in 1998?

18         A.   I believe that's a mistake.

19         Q.   Do you believe that this is the application

20    you were referring to earlier that you said that you

21    filled out when you attended the orientation for

22    FedEx Home?

23         A.   I'm sorry?

24         Q.   Do you believe that this is the application

25    that you said that you filled out at the orientation

**8/15/2006  Alexander, Dean**

1    that you attended for FedEx Home?

2        A.  I can't remember what I filled out, but it

3    might be.  I can't remember back that far.

4        Q.  Is the information that appears on this

5    Exhibit Number 1 accurate besides the date next to

6    your signature?

7        A.  Yes, that looks like my signature.

8        Q.  Is the other information that's handwritten

9    onto this form correct other than the date next to

10   your signature?

11          For example, it lists your prior jobs and

12   other information about you.

13       A.  Yes, that all looks like it's all correct.

14       Q.  And this sheet indicates that you were

15   applying for a -- to be a pick-up and delivery

16   contractor; is that right?

17          MS. ZERGER:  Can you direct the witness to

18   what you're looking at?

19   BY MS. BREMER:

20       Q.  This is on the first page.  The second box

21   where it says, "Position Sought," and there's a

22   check by the box, "Pick-up and Delivery Contractor"?

23       A.  Yes.

24       Q.  And this sheet does not indicate that you

25   were applying for employment; is that right?

**8/15/2006  Alexander, Dean**

```
1              MS. ZERGER:  The document speaks for

2      itself.  You may answer.

3              I wonder if we might also note the Bates

4      numbers on each of the exhibits.  That's what we

5      were doing yesterday just to have the record clear.

6              MS. BREMER:  Sure.  I'll note those as soon

7      as he answers the question.

8              THE WITNESS:  I'm sorry, what was the

9      question?

10     BY MS. BREMER:

11         Q.  The question was, this Exhibit Number 1

12     does not indicate that you were applying for

13     employment; is that right?

14             MS. ZERGER:  Same objection.  You may

15     answer.  You may answer.

16             THE WITNESS:  No, I don't see that on

17     there.

18     BY MS. BREMER:

19         Q.  Just for the record, Exhibit Number 1 is

20     Bates stamped FXG_ALEXANDER 73 through 74.

21             I'm going to hand you what has been marked as

22     Exhibit Number 2 to the Alexander deposition.  It's

23     Bates stamped FXG_ALEXANDER 106 through 116.  And it's

24     entitled, "Prospective Independent Contractor Candidate

25     Review Guide and Summary Form."  And the prospective
```

**8/15/2006  Alexander, Dean**

1     contractor's name is written in as Dean Alexander.

2                  (Whereupon, Deposition Exhibit 2 was marked

3                  for identification)

4     BY MS. BREMER:

5          Q.   The date on this exhibit is January 28th,

6     2000.  And the name of the interviewers are listed

7     as David Westbrooks and Jan Foster.

8                  Did you interview with David Westbrooks and

9     Jan Foster on or about January 28, 2000?

10         A.   Yes.

11         Q.   Have you ever seen this document before?

12         A.   No.

13         Q.   On page 109, number 5, there's a question,

14    "Why do you want to go into business for yourself?"

15                 Did Dave Westbrooks ask you why you wanted

16    to go into business for yourself?

17         A.   I'm sorry, on page 109 on this form, or --

18         Q.   Yes.

19         A.   9.

20         Q.   Well, it's listed 2 of 9, and then the

21    Bates numbers FXG_ALEXANDER 109.  I think it's the

22    next page, right, 2 of 9.  It's the last question

23    here.

24         A.   I see that.

25         Q.   Did Westbrooks ask you why you wanted to go

**8/15/2006  Alexander, Dean**

1    into business for yourself?

2           MS. ZERGER:  Objection.  Vague as to time.

3    You can answer.

4           THE WITNESS:  I believe he did.  It's six

5    and a half years ago.  I believe he did.  I can't

6    remember.

7    BY MS. BREMER:

8           Q.  Did you tell Dave Westbrooks that going

9    into business for yourself was a great opportunity?

10          A.  Well, I was thinking it might be a great

11   opportunity.

12          Q.  And why did you think it might be a great

13   opportunity?

14          A.  At the time I thought it might be an

15   opportunity to get in something on ground floor that

16   might go somewhere.

17          Q.  Any other reasons?

18          A.  I can't think of any right now.

19          Q.  If you turn to what's marked as 5 of 9, so

20   that's three more pages in on Exhibit 2, there's the

21   question, "What was your most repetitive routine

22   (job or task) you've ever had?  What kinds of

23   problems have you had to overcome in order to

24   concentrate on the details of route tasks," and

25   there's writing that says, "Same job task daily."

**8/15/2006  Alexander, Dean**

1            MS. ZERGER:  I'm not sure the witness is

2      reading where you are yet.  Do you have --

3            THE WITNESS:  I might be on the wrong page.

4      5 of 9?

5      BY MS. BREMER:

6         Q.  Exactly.  It's at the very bottom.

7         A.  I was looking at 2.  I thought you said 2.

8         Q.  I'm sorry, 3.  And it's written there,

9      "Same job task daily and good ability to overcome

10     hours," and then in parentheses "long".

11           Did you tell Dave Westbrooks that you had a

12     good ability to overcome long hours?

13           MS. ZERGER:  Vague and ambiguous as to

14     time.

15           THE WITNESS:  Well, if he wrote it down, I

16     must have said it.  I can't remember.

17     BY MS. BREMER:

18        Q.  Did you believe that you had a good ability

19     to overcome long hours?

20        A.  At the time I did.

21        Q.  And what was that based on?

22        A.  My years in construction, driving long

23     hours to the job, eight hours on the job, and then

24     two hours back home.

25        Q.  So you were commuting two hours each way to

**8/15/2006  Alexander, Dean**

1    your construction job?

2          A.   Sometimes.

3          Q.   And then you worked a full eight-hour day?

4          A.   Or nine.  I had one construction job, but

5    we worked as many as 13, 14 hours all summer long.

6          Q.   And how long did that last, one summer?

7          A.   One summer.

8          Q.   And you were commuting two hours each way

9    on top of the 13 or 14 hours?

10          A.   Not on this particular job, an hour.

11          Q.   One hour each way commute?

12          A.   Approximately.

13          Q.   And how long did you have the two-hour

14    commute each way?

15          A.   That varied from job to job.  In

16    construction you go where the work is.

17          Q.   And you were willing to put in long hours?

18          A.   When I was younger.

19          Q.   When did that stop, if ever?

20          A.   I don't really know.

21          Q.   Were you willing to put in long hours when

22    you worked for FedEx Home Delivery?

23          A.   And did.

24          Q.   I'm going to mark -- actually, it's already

25    been marked.

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 314 of 1363
Case 3:05-md-00527-RLM-CAN    Document 497-2    Filed 02/05/07    Page 69 of 300
8/15/2006  Alexander, Dean

1          I'm going to hand you what's been marked as

2    Exhibit 3.  It's Bates labeled PCA 2403 through

3    2456.  It's the FedEx Home Delivery Standard

4    Contractor Operating Agreement.  It's handwritten in

5    the top left-hand corner, "Dean Copy."  There you

6    go.

7          (Whereupon, Deposition Exhibit 3 was marked

8          for identification)

9    BY MS. BREMER:

10        Q.  This is Bates number PCA -- this indicates

11   that it was produced by plaintiffs.  Was this -- was

12   a contract of this -- was a copy of this contract

13   from your files?

14        Did you give this to your attorneys to

15   produce?

16        A.  No.  This is the one that -- I'm not

17   understanding the question.

18        Q.  This number at the bottom indicates that

19   this was produced by plaintiffs in this case.  And

20   I'm wondering if this was the document that you got

21   from your files and gave it to your attorneys?

22        A.  This is my contract?

23        Q.  Yes.

24        A.  I don't know.

25        MS. ZERGER:  Do you need to review the

**8/15/2006  Alexander, Dean**

1    document to see if it looks familiar to you?  It's a

2    long document.

3              THE WITNESS:  I can't remember.  This is my

4    contract -- this is my contractor agreement that I

5    signed.

6    BY MS. BREMER:

7         Q.  Right.  And you had a copy of this in your

8    files, correct?

9         A.  At home.

10        Q.  Right.  In your home office?

11        A.  Right.

12        Q.  And you gave a copy of your contract to

13   your attorneys; is that correct?

14        A.  I believe so.  I really don't know.  My

15   wife gave everything.  I didn't review.

16        Q.  So your wife is the one that conducted the

17   search for the documents?

18        A.  Yes.  And I don't know if she sent a copy.

19   I'm assuming she did.  I don't know.

20        Q.  You indicated earlier that you believe that

21   everything related to FedEx Home was provided to

22   your attorneys.  Was that what you were requested to

23   provide to your attorneys?

24        A.  I provided what I found.

25        Q.  What your wife found or what you found?

**8/15/2006  Alexander, Dean**

1      A.  Well, I helped her, but she put it all

2   together, all the documents.  And I -- and boxed

3   them up.

4      Q.  Okay.  I'm just trying to understand what

5   your basis is for saying that you believe that

6   everything that you had related to FedEx Home in

7   your office was provided to your attorneys.

8      A.  My wife knew where everything was.

9      Q.  Right, but that's not my question.

10      How do you know that everything that was

11   related to FedEx Home that was in your home office

12   was given to your attorneys?

13      Is that because your wife told you that or

14   because that's what you asked her to do, or did you

15   look at the documents yourself?

16      A.  We went -- as we were looking, we would --

17   I helped her with some and we went through the

18   drawers.  And she said, "Do you need this?"  And I

19   said, "Yes".  And I can't remember as we pulled

20   documents out to give -- I'm assuming a copy of my

21   contract is in there, was in there.

22      Q.  Are you saying that there may be documents

23   related to FedEx Home that were not provided to your

24   attorney?

25      MS. ZERGER:  Mischaracterizes the

**8/15/2006  Alexander, Dean**

1    testimony.  You can answer.

2         THE WITNESS:  No, I think everything was

3    given to them that we had, everything.

4    BY MS. BREMER:

5         Q.  Okay.  Turn to PCA 2435?

6         A.  2435?

7         Q.  Yes.  Under the word "Contractor" there's a

8    signature.  It appears to be Dean Alexander.

9         Is that your signature?

10        A.  Yes.

11        Q.  Did you sign the FedEx Home Delivery

12   Standard Contractor Operating Agreement on or about

13   March 13th, 2000?

14        A.  Yes.

15        Q.  Can you turn to the next page, which is

16   Addendum 1.  This is the "Identification of Leased

17   Equipment."

18        Is this something that you wrote in or is

19   this someone else's handwriting?

20        A.  It looks like somebody else's handwriting.

21        Q.  It lists a GMC 1999 vehicle.  Is that the

22   vehicle that you were planning to use to service

23   your route?

24        A.  Yeah, but it wasn't a GMC.  I believe it

25   was a Chevrolet.

**8/15/2006  Alexander, Dean**

1        Q.  Was it a 1999?

2        A.  I believe so.  I can't remember.

3        Q.  Can you turn to page 2443 of Exhibit 2,

4    please.  There's a signature at the bottom and I

5    just wanted to verify that that was your signature?

6        A.  Yes.

7        Q.  Okay.  On the next page, 2444, there's also

8    a signature which appears to be Dean Alexander.

9             Is that your signature as well?

10       A.  Yes.

11       Q.  And you signed that, this page, attachment

12   3.2 to Addendum 3, on or about March 13th, 2000?

13       A.  Yes.

14       Q.  Okay.  And then the next page is 2445.  Is

15   that your signature at the bottom of Addendum number

16   4?

17       A.  Yes.

18       Q.  Did anyone force you to sign this contract?

19       A.  No.

20       Q.  You signed it voluntarily?

21       A.  Yes.

22       Q.  When did you first see this contractor

23   operating agreement?

24       A.  I can't remember the exact date we saw it.

25   Sometime during the training period.

**8/15/2006  Alexander, Dean**

1          Q.  How long was the training period?

2          A.  One week.

3          Q.  Did anyone give you a deadline as to when

4     the agreement needed to be signed?

5          A.  I can't remember.

6          Q.  Did you review this contract with anyone

7     prior to signing it?

8              MS. ZERGER:  Asked and answered.

9              THE WITNESS:  I can't believe -- I can't

10    remember if we reviewed it with anybody.

11    BY MS. BREMER:

12         Q.  Did you read it before signing it?

13         A.  Yes, I did.

14         Q.  Did you show it to your wife?

15         A.  Yes.

16         Q.  Before signing it?

17         A.  I believe I did.

18         Q.  Did you understand the contents of this

19    operating agreement?

20         A.  I believe I understood it to the best of my

21    ability.

22         Q.  I'm going to show you what's been marked as

23    Exhibit Number 4.  And this is a document Bates

24    stamped PCA 2278 through 2279.

25    //

**8/15/2006  Alexander, Dean**

```
 1              (Whereupon, Deposition Exhibit 4 was marked

 2              for identification)

 3      BY MS. BREMER:

 4          Q.  Have you seen Exhibit Number 4 before?

 5          A.  I believe I have seen this.

 6          Q.  What is this?

 7          A.  This was a time when we started growing a

 8      little bit and we were being flexed every day.  And

 9      they were flexing me out, way out of my area up into

10      the mountains.

11          Q.  And when was that occurring?

12          A.  I can't remember.  If he has a date on

13      here -- I don't remember the exact time, but I

14      believe it was sometime in the summer.

15          Q.  In the summer of --

16          A.  Of that first year.

17          Q.  So that would be the summer of 2000?

18          A.  Yes.  And I was being flexed way up into

19      the mountains, which at the time I thought I

20      shouldn't have to go that far out of my way.  Used a

21      lot more fuel, a lot more maintenance.  It was all

22      hills coming down.

23              And this is when he told me to call Tom

24      Herd, which he wrote the number down here.  And I

25      called Tom Herd and left a message.  And he called
```

**8/15/2006  Alexander, Dean**

1    me back, I think the next day, and I asked him about

2    this portion of the contract that said we would be

3    flexed occasionally, and that I was being flexed

4    every day.  And Tom Herd's answer was that

5    occasionally is every day.

6         Q.  And you say he told to call you -- I'm

7    sorry.  You said that he told you to call Tom Herd.

8    Who were you referring to?

9         A.  Tom Herd is the contract person.

10        Q.  He's in contractor relations?

11        A.  Yes.

12        Q.  But who told you to call Tom Herd?

13        A.  Dave.

14        Q.  Dave Westbrooks?

15        A.  Dave Westbrooks.

16        Q.  Is the writing at the top that says, "Dean:

17   Maybe this isn't for you.  Show your attorney this

18   part of the cont," I assume that means contract.

19            Is that Dave Westbrooks' writing?

20        A.  Yes.

21        Q.  Did you show this to your attorney?

22        A.  No.

23        Q.  Why not?

24        A.  I don't know.  I never did.

25            MS. BREMER:  Okay.  I have a note from the

**8/15/2006  Alexander, Dean**

1    videographer that we need to change the tape.  So

2    let's go off the record.

3           THE VIDEO OPERATOR:  This marks the end of

4    Tape No. 1 in the deposition of Dean Alexander.

5    Going off the record.  The time is 10:30.

6           (Recess taken)

7           THE VIDEO OPERATOR:  This marks the

8    beginning of Tape No. 2 in the deposition of Dean

9    Alexander.  Back on the record.  The time is 10:35.

10   BY MS. BREMER:

11      Q.  Mr. Alexander, we were just looking at

12   Exhibit 4 and this is a portion of your contractor

13   agreement; is that right?

14      A.  Yes.

15      Q.  What led Dave Westbrooks to give you this

16   portion of the contract?

17          MS. ZERGER:  Asked and answered.  You may

18   answer again.

19          THE WITNESS:  The fact that I was being

20   flexed so far out of my area, I was covering nine

21   zip codes and going into a tenth zip code using more

22   fuel for three to four stops and not making any

23   money.

24          That was my point to Dave is, I'm going way

25   out of my way, more maintenance, more brakes.  As

**8/15/2006  Alexander, Dean**

```
1    soon as I got up in there, my brakes, I had to

2    replace them within a week.

3    BY MS. BREMER:

4         Q.  Did you have to replace your brakes on a

5    weekly basis?

6         A.  No, but at that point, we hadn't -- the

7    trucks were only -- because there was so much

8    downhill coming out, I was using so much more brake

9    as it was in the mountains.  It used to be

10   brakewise, three months, four months on a set of

11   brakes, average.

12        Q.  And when was that?  Was that when you were

13   driving in the mountains?

14        A.  Yes.

15        Q.  How long would it be before you had to

16   replace your brakes when you were not driving in the

17   mountains?

18        A.  Flat lands would be probably six to seven

19   months.

20        Q.  If you were driving only on flat land?

21        A.  Right.

22        Q.  Did Dave Westbrooks give you this portion

23   of the contract because you had complained to him

24   about receiving flex packages?

25        A.  Every day.
```

**8/15/2006  Alexander, Dean**

1        Q.   You would complain to him every day?

2        A.   No, I complained because I was getting

3    flexed every day and the contract said occasionally.

4    And my point was that, you know, I don't mind being

5    flexed and helping, but I don't want to be flexed

6    every day.

7        Q.   How many times had you complained to Dave

8    Westbrooks before he handed you this portion of the

9    contract?

10        A.   I believe it was just a few times.

11        Q.   Were other contractors serving a large

12    geographic area during that time?

13        MS. ZERGER:  Objection.  Personal

14    knowledge.  You can answer.

15        THE WITNESS:  Okay.

16        MS. ZERGER:  If you know.

17        THE WITNESS:  Everybody was complaining at

18    that time about being flexed out of their areas, and

19    I believe that's why Dave was so frustrated.  He was

20    hearing it from all of us.

21    BY MS. BREMER:

22        Q.   You said that you, your area got larger

23    during the summer of 2000.  What led it to get

24    larger during that time?

25        A.   The reason it got a little larger at that

**8/15/2006  Alexander, Dean**

1    time was the one gal, I can't remember her name, was

2    stretched so far that they gave me a corner of her

3    area that touched a corner of my area, which was

4    another zip code farther up the hill, to ease her

5    burden.

6        Q.  How many stops was that extra corner that

7    had been part of her route?

8        A.  It could be anywhere from one to four

9    stops.

10       Q.  How much further did you have to drive to

11   make those one to four stops?

12       A.  Probably an extra 15 miles up the hill and

13   then probably another 15 to 20 just delivering

14   packages up there.

15       Q.  At some point did you stop servicing this

16   extra corner of her route?

17       A.  Yes.

18       Q.  And when was that?

19       A.  I believe that was around the first

20   Christmas when we all shrunk.

21       Q.  And why did you all shrink around Christmas

22   of 2000?

23       A.  The growth.  They brought in new

24   contractors.

25       Q.  How many new contractors were brought in in

**8/15/2006  Alexander, Dean**

1    the Christmas of 2000?

2         A.   I can't remember.  I want to say three or

3    four.  I can't remember the exact number.

4         Q.   So starting during the Christmas season of

5    2000, how many zip codes were you servicing?

6         A.   I was servicing five.

7         Q.   So you indicated that you called Tim Herd?

8         A.   Tom.

9         Q.   I'm sorry, Tom Herd.  And he indicated that

10   you could be flexed every day; is that right?

11        A.   His exact words was, "Occasionally is every

12   day."

13        Q.   And which portion of the contract were you

14   referring to?

15        A.   I was referring to the part of the contract

16   that says that we can be flexed occasionally.

17        Q.   And could you point that out to me?

18        A.   I can't remember where that's at now.  I

19   can't remember exactly.  I don't see it on here.

20   It says here, "and in such other areas as Contractor

21   may be from time to time be asked to service --"

22             I know there was another one.  I'm almost

23   positive somewhere it said occasionally.  But

24   anyway, whether it was time to time or occasionally,

25   his answer was every day.

**8/15/2006  Alexander, Dean**

1        Q.   And were you satisfied with Tom Herd's

2    response?

3        A.   No.

4        Q.   What did you do about it?

5        A.   Nothing.

6        Q.   Did you consider terminating your contract

7    with FedEx Home?

8        A.   No, I just moved on and kept doing my job.

9        Q.   And why did you do that?

10       A.   Because I still wanted to see where this

11   was going to go.  And things settled down -- as we

12   grew, things settled down.

13       Q.   Did anyone tell you that your, the

14   geographic area that you'd be expected to service

15   would likely shrink?

16       A.   I believe in the beginning they said we

17   would -- as we grew they would bring on other

18   contractors.

19       Q.   And you were willing to continue servicing

20   a large service area in order to see if in the

21   future that might be beneficial to you?

22       A.   Right.  But as we shrunk, we also lost, you

23   know, we also lost some packages, but the packages

24   also kept increasing.

25       Q.   So you had more stops but in a smaller

**8/15/2006  Alexander, Dean**

1    geographic area?

2         A.   Exactly.

3         Q.   And were you paid more for that?

4         A.   No.  And we weren't paid more.

5         Q.   You didn't receive more income in -- later?

6         A.   Later.  But as far as core zones, we

7    received nothing extra for going into a higher core

8    zone.  We were paid on that one, on my base core

9    zone.  I know it's over here.

10         We were based -- I remember it was 70

11    some-odd dollars, I believe when I started, 76 was

12    my base core.  And if I went into a higher core

13    zone, which I did, which was maybe 108 or 109, the

14    max I could ever get was that 77 or 76 dollars.

15         So I don't know -- that's one thing I never

16    did figure out, how FedEx could send us into a

17    higher core and not get paid any extra money for the

18    stops.  It's all based on that one core zone.

19         Q.   You were -- you did make more income after

20    your first year; is that right?

21         MS. ZERGER:  Objection.  Mischaracterizes

22    the testimony.

23         THE WITNESS:  After the first year, the

24    first year was a losing proposition.  The second

25    year I made more money.

**8/15/2006  Alexander, Dean**

1    BY MS. BREMER:

2        Q.  I'm going to hand you what's been marked as

3    Exhibit Number 5.  It's PCA 2250 through 2273.  It's

4    "Starting a Business and Keeping Records".

5            (Whereupon, Deposition Exhibit 5 was marked

6            for identification)

7    BY MS. BREMER:

8        Q.  Is this document from your files that you

9    kept related to FedEx Home?

10       A.  I'm sorry?

11       Q.  Is Exhibit 5 from your files relating to

12   FedEx Home?

13       A.  Sure looks like a document I've seen.

14       Q.  Did you get this document before you signed

15   the contractor's operating agreement?

16       A.  I can't remember when we got this document.

17       Q.  Do you recall if you considered this before

18   you signed the contractor's operating agreement?

19           MS. ZERGER:  Asked and answered.

20           THE WITNESS:  I gave it to my wife and she

21   looked it over.  I don't even think I looked at

22   this.  I brought it home.

23   BY MS. BREMER:

24       Q.  Where did you get it?

25       A.  I really don't know.  I can't remember.

**8/15/2006  Alexander, Dean**

1    They gave us a lot of documents in the very

2    beginning and I can't remember.  I believe that

3    somebody brought them in and handed them out.  I

4    just can't remember.

5             I remember this calculator, but that's all

6    I can remember about it.  I'm not sure if FedEx just

7    had them there because I see Internal Revenue

8    Service on it.

9        Q.  You see that it's an Internal Revenue

10   Service document?

11       A.  Yes.  They did bring in stuff like this

12   from time to time for tips.

13       Q.  Did you believe that this was relevant to

14   what you were doing, starting a business?

15           MS. ZERGER:  Object to the characterization

16   starting a business.  You may answer.

17           THE WITNESS:  I believe that they were

18   trying to help us, you know.  There was a lot of

19   people that had no business experience.  But with my

20   wife being an accountant and running business forms,

21   that was never going to be an issue for me.

22   BY MS. BREMER:

23       Q.  So you felt that your wife would know how

24   to run your business and keep your records?

25       A.  Absolutely.

**8/15/2006  Alexander, Dean**

1           Q.  I'm going to give you what's marked as

2     Exhibit Number 6, which is PCA 2374 through 2402.

3             (Whereupon, Deposition Exhibit 6 was marked

4             for identification)

5     BY MS. BREMER:

6           Q.  Exhibit 6 is entitled, "Becoming a QHD

7     Pickup and Delivery Contractor."  And it says, "RPS"

8     in the left-hand corner.

9             Have you seen this document before?

10          A.  Yes.

11          Q.  Is this from your files?

12          A.  Yes.  The home files?

13          Q.  Yes.

14          A.  Yes.

15          Q.  Do you have any other files besides in your

16    home that relates to FedEx Home?

17          A.  One office.

18          Q.  Okay.  Just wanted to make sure.  When did

19    you receive Exhibit 6?

20          A.  I believe, and I'm not sure, if it was

21    during the training period.

22          Q.  Do you know if you received this before

23    contracting with FedEx Home Delivery or after?

24          A.  I can't remember.

25          Q.  Did you rely on anything in this document

**8/15/2006  Alexander, Dean**

1    prior to becoming a contractor?

2        A.  I can't remember.

3        Q.  Do you believe that anything in this

4    document is false or misleading?

5        A.  I'm not really sure I read all --

6    everything in this thing, so I'm not really sure.

7        Q.   In this lawsuit do you understand that you

8    are contending that written information that was

9    provided to you was, by FedEx Home Delivery, was

10   false or misleading?

11       A.  Yes.

12       Q.  Are you referring to anything in this

13   particular document, Exhibit 6, as being false or

14   misleading or are you referring to something else?

15           MS. ZERGER:  I'm going to ask that time be

16   given for the witness to review the document.  It's

17   a fairly lengthy document.  He has indicated it's a

18   long time ago when he got it.

19           Do we have the time?

20           MS. BREMER:  Why don't we go off the record

21   and give you a chance to review it then.

22           THE WITNESS:  It's been a long time.  I

23   looked at so many documents.  I can't remember.

24           THE VIDEO OPERATOR:  Going off the record.

25   The time is 10:55.

**8/15/2006  Alexander, Dean**

1          (Discussion off the record)

2          THE VIDEO OPERATOR:  Back on the record.

3    The time is 11:01.

4    BY MS. BREMER:

5          Q.  Mr. Alexander, you've now had a chance to

6    review Exhibit 6; is that correct?

7          A.  Yes.

8          Q.  Does it refresh your recollection as to

9    whether or not you read this document prior to

10   contracting with FedEx Home Delivery?

11         A.  Yes.

12         Q.  And did you?

13         A.  Yes.  I couldn't remember much of it.

14         Q.  Are there any statements in here that you

15   relied upon prior to signing the operating

16   agreement?

17         A.  Statements meaning?

18         Q.  Anything that was said in here that you

19   relied on when you became a contractor?

20         Let me ask you --

21         A.  I'm confused.

22         Q.  Okay.  Are there any statements in Exhibit

23   6 that you believe were misleading or false?

24         A.  At the time I didn't.  But as I got further

25   into it, into working the job, then I felt that I

**8/15/2006  Alexander, Dean**

1    had been misled.

2         Q.  And which statements in Exhibit 6 do you

3    believe are misleading or false?

4         A.  Well, being my own individual contractor.

5         Q.  And how do you believe that is false or

6    misleading?

7         A.  Because I was told what to do, when to do

8    it, how to do it, what to wear, what not to wear,

9    and -- I never felt in the last, especially in the

10   last couple years, that it was my business.

11        Q.  Anything else from Exhibit 6 that you

12   believe was misleading or false?

13        A.  I can't think of anything right at the

14   moment.

15        Q.  I'm going to hand you what's been marked as

16   Exhibit 7, which is Bates stamped PCA 2462 through

17   2464.  It's an "Estimate of Income Potential," is

18   the title.

19             (Whereupon, Deposition Exhibit 7 was marked

20             for identification)

21   BY MS. BREMER:

22        Q.  This document is from your files; is that

23   correct?

24        A.  Yes.

25        Q.  When did you receive this document?

**8/15/2006  Alexander, Dean**

1        A.  I believe it was sometime during the

2    training period.

3        Q.  Do you know if you received this before or

4    after you signed the contractor's operating

5    agreement?

6        A.  I can't remember whether it was before.

7        Q.  With respect to the exhibit that we were

8    just looking at, the QHD pickup and delivery

9    contractor, I just want to make sure that I

10   understand your answer.

11        You said that you received that and

12   reviewed it during the training period.  Do you know

13   if you reviewed that before or after you signed the

14   contract?

15        A.  I can't remember.

16        Q.  So at this time you don't know?

17        A.  We signed the contract just before we

18   started, so I would imagine I probably had this

19   prior to.

20        Q.  But you're not sure?

21        A.  Not sure.

22        Q.  Exhibit 7 lists the annualized gross

23   business income between $38,651 and $53,373; is that

24   correct?

25        A.  I'm sorry, explain that again.  I'm looking

**8/15/2006  Alexander, Dean**

1    at this.  I'm not seeing what you're talking about.

2         Q.  I'm looking at the bottom where it says

3    "Annualized Gross Business Income."

4         A.  Okay.

5         Q.  And then there are some numbers.  And the

6    range is between $38,651 and $53,373.

7             Do you see that?

8         A.  Yes.

9         Q.  Did you understand this to represent the

10   amount of income that you could make on an annual

11   basis before expenses?

12            Do you remember the question?

13        A.  I thought you were looking at something.

14        Q.  No, I asked you about these numbers at the

15   bottom.

16        A.  Yes.

17        Q.  It says, "Annualized Gross Business

18   Income," between $38,651 and $53,373.

19        A.  Yes.

20        Q.  And I asked if you understood that to

21   represent the amount of income you could make on an

22   annual basis before expenses?

23            MS. ZERGER:  Objection.  The document

24   speaks for itself and it mischaracterizes the

25   document.

**8/15/2006  Alexander, Dean**

1              THE WITNESS:  Yes.

2      BY MS. BREMER:

3          Q.  Did you show this document to your wife?

4          A.  Yes.

5          Q.  Did you show this to your wife about the

6      same time that you received it?

7          A.  Yes.

8          Q.  And did you use this to discuss what your

9      income potential might be?

10         A.  Yes, but we knew the first year wouldn't

11     come close.

12         Q.  And how did you know that?

13         A.  Just by what I was making at the time.

14         Q.  When you say by what you were making at the

15     time, what time are you referring to?

16         A.  We get a settlement sheet every week, and

17     I'm sure you have one of those.  When we first

18     started, you could see what your income is, what

19     you've made, and you could pretty much guesstimate

20     what you're going to make, you know, down the road.

21         Q.  You're saying after you started servicing a

22     route?

23         A.  The first year.

24         Q.  Okay.  What about before you started

25     servicing a route, did you know that you wouldn't

**8/15/2006  Alexander, Dean**

1    make as much money as listed on this document?

2         A.  Yes, I knew it was start-up.

3         Q.  Okay.  I'm going to show you Exhibit Number

4    8, which is Bates stamped PCA 2475 through 2476.

5    And it's handwritten notes dated January 28th, 2000.

6              (Whereupon, Deposition Exhibit 8 was marked

7              for identification)

8    BY MS. BREMER:

9         Q.  Do you recognize the writing, the

10   handwriting on Exhibit 8?

11        A.  Not really.

12        Q.  Does that look like your handwriting or

13   your wife's handwriting?

14        A.  It could be my wife's handwriting.

15        Q.  But you're not sure?

16        A.  I'm not sure.

17        Q.  This is -- these notes are from your files;

18   is that right?

19        A.  Okay.  Then it's my wife's handwriting.  I

20   thought so.  I wasn't sure.

21        Q.  At the top right-hand corner it says,

22   "WWWRPS.net".

23             Do you know your wife or you looked at the

24   RPS website on or around January 28th, 2000?

25        A.  No, I don't.

**8/15/2006  Alexander, Dean**

1        Q.   You don't recall?

2        A.   No.

3        Q.   Do you know where the information on this

4    document came from?

5        A.   Not really.  I don't know.  I don't

6    remember seeing it.  I can't remember.

7        Q.   On the second page of this document,

8    there's mention of "Bus Pkg," and then lists,

9    "Uniform rental, printing --"

10            MS. ZERGER:  I think that's "painting".

11   BY MS. BREMER:

12       Q.   Painting, yes, "batteries, body repair,

13   bumper, group buying power, group rate on vehicle

14   insurance, and group accident."

15            Do you see that?

16       A.   Hm-hmm.

17       Q.   Did you learn about the business support

18   package on or about January 28th, 2000?

19       A.   I can't remember.  I know we talked about

20   it.  I can't remember.

21       Q.   Do you know if you or your wife conducted

22   any investigation or research regarding RPS or FedEx

23   Home Delivery besides the materials that you

24   received from FedEx?

25       A.   Not that I can recall.

**8/15/2006  Alexander, Dean**

1          Q.   Okay.   Exhibit 9 is Bates labeled

2     FXG_ALEXANDER 259 and it says, "Business Support

3     Package Uniform Program."

4               (Whereupon, Deposition Exhibit 9 was marked

5               for identification)

6     BY MS. BREMER:

7          Q.   Is this your signature at the bottom of the

8     page?

9          A.   Yes, it is.

10         Q.   And this is a description of the business

11    support uniform package.

12              Did you receive this?

13         A.   Yes, I remember this.

14         Q.   Did you receive this at the time that you

15    signed the operating agreement?

16         A.   Yes.

17         Q.   If you look back at your operating

18    agreement, which is Exhibit 3, and page 2447, it's

19    Addendum Number 6, which is, "Business Support

20    Package."

21         A.   I'm sorry, the number?

22         Q.   2447.  Did you check that you were electing

23    to accept the standard business support plan?

24              MS. ZERGER:  I'm going to object.  No

25    foundation as to what the check -- where the checks

8/15/2006  Alexander, Dean

1    are from.

2    BY MS. BREMER:

3        Q.  Mr. Alexander, do you see a checkmark next

4    to, "Accept Standard BSP"?

5        A.  Yes, I do.

6        Q.  Did you put that check there?

7        A.  I can't remember.

8        Q.  Did you indicate that you were agreeing to

9    accept the standard business support package?

10        A.  I didn't know there was any other way.

11        Q.  You see there's a box for accept or reject

12    standard business support package, right?

13        A.  Right, but I didn't -- at the time I don't

14    know that this was explained.  I knew we had to have

15    uniforms and I don't remember them explaining to

16    reject.  If I remember, and I can't recall with 100

17    percent guarantee, is that we had to accept that as

18    part of our being hired.

19        Q.  Did someone tell you that you had to accept

20    it?

21        A.  You know, I'm not certain, but I don't

22    remember anybody telling me I could reject it.

23        Q.  The form itself indicates --

24        A.  I see that.

25        Q.  -- reject as an option; is that correct?

8/15/2006  Alexander, Dean

1       A.   Yes, I see that.

2       Q.   Did you consider other alternatives to the

3   business support package?

4       A.   We, at the time we didn't know -- we knew

5   that they were going to give us turn-by-turns, give

6   us all our -- well, that was going to be part of our

7   clothing.  As far as we were all concerned, it was

8   just part of the job.  Nobody really knew their

9   routes.  We all needed the support package.

10      Q.   So you wanted the support package?

11      A.   I felt I had no choice.

12      Q.   Because you didn't know your route?

13      A.   None of us did.

14      Q.   And the turn-by-turns would be helpful to

15  you?

16      A.   In the beginning they would be, but once we

17  got going, I didn't know that we had -- we could

18  reject them and turn them down.  But that would mean

19  then we would probably get no manifest or we would

20  have to look at our boxes individually.

21      Q.   Some of the electronic services that were

22  offered to you were helpful to your business; is

23  that right?

24      A.   Well, we didn't get electronics until we

25  were -- I can't remember when we got the hand

**8/15/2006  Alexander, Dean**

1    scanners.  We were manually for -- in other words,

2    our manifests had to be signed.  We didn't have hand

3    scanners and we had to call in to Pittsburgh and

4    give them our numbers.

5         Q.  When did you get scanners?

6         A.  I can't remember the exact date when we got

7    scanners.  I know we were probably into it, I'm

8    guessing now, maybe a year and a half to two years.

9    But I'm not sure.  I'm guessing.  I can't remember.

10        Q.  Was there anything else that was given to

11   you as part of the business support package that was

12   helpful to you in servicing your route?

13        A.  After I learned my route, I really didn't

14   need the turn-by-turns, but there was nothing else.

15   And everything that they did add onto it was just

16   more expense, onto our support package.

17        Q.  When did you learn your route so that you

18   didn't need the turn-by-turns anymore?

19        A.  That's hard to say.  Within the first year.

20        Q.  The area you service did change, though,

21   over time, even after the first year; isn't that

22   right?

23        A.  After the first year it shrunk.

24        Q.  And so you were servicing part of the same

25   area that you had serviced previously?

**8/15/2006  Alexander, Dean**

1        A.   Yes.  All they did was take out of the

2    original nine zip codes.  They took some zip codes

3    away, but they were always original zip codes that I

4    had left.

5        Q.   And the actual addresses on a day-by-day

6    basis would change?

7        A.   The addresses would change, but not the

8    streets.

9        Q.   And the turn-by-turn that you're referring

10   to, that is information on the most efficient way to

11   deliver packages in a particular day; is that right?

12       A.   Not necessarily.

13       Q.   Could you describe what it was?

14       A.   The turn-by-turn was the way FedEx set it

15   up that they thought was the best way to deliver it,

16   which always was not the best way to deliver the

17   route or the most efficient way.

18       Q.   You're saying that it was never the best

19   way?

20       A.   Because -- no, at times it was good, at

21   other times they'd have you doubling back over your

22   route and crisscrossing your route, which is not

23   efficient.

24       Q.   So what would you do when you got your

25   turn-by-turns?  Did you follow the turn-by-turns

**8/15/2006  Alexander, Dean**

1    or --

2         A.   No.  I did in the beginning.  And as soon

3    as I learned my route, I only -- I only looked at it

4    for the addresses because they had the address at

5    the bottom when you got to your stop.  I didn't look

6    at any turn-by-turns.

7              They had dead end streets on them that

8    didn't go through.  These were all things you had to

9    learn.

10        Q.   So after you learned your route, how did

11   you decide the order in which you were going to

12   deliver your packages?

13        A.   The most efficient way.

14        Q.   And how did you decide that?

15        A.   Well, because I knew my route.  I knew

16   which area I wanted to do first to get out of the

17   way so I wasn't crisscrossing back over the route.

18   I wanted to go -- always be going forward in an

19   efficient way.

20        Q.   Did anyone at FedEx Home Delivery tell you

21   that you couldn't drive the route the way that you

22   wanted to?

23        A.   FedEx basically set our packaging up with

24   numbers.  And the way the numbers were set up was

25   like from 10, 20, 30, 40, and so on.  And that's the

8/15/2006  Alexander, Dean

1    way they would like you to load your truck and

2    that's the way they would like you to deliver the

3    route.

4        Q.  I don't think you answered my question,

5    though.  I asked, did anyone at FedEx Home Delivery

6    tell you that you couldn't deliver packages in the

7    order that you wanted to?

8        A.  No.  They never told me I could deliver

9    them any way I wanted, but they would prefer you do

10   it their way.

11       Q.  Your answer was a little confusing.  Are

12   you saying that they told you that you could deliver

13   the packages any way you wanted?

14       A.  They basically said it's up to you, but

15   their guidelines would suggest with their numbering

16   system that they would like you to deliver them in

17   the sequential order that they scan them in.

18       Q.  And did you deliver them in a different

19   order?

20       A.  Yes, I did.  There was times I would follow

21   it and it was set up -- some days was pretty good,

22   but most days it was not a good delivery route to

23   follow.  But again, that's because I knew my route.

24       Q.  Were you ever reprimanded for not

25   delivering your packages in the sequential order set

8/15/2006  Alexander, Dean

1    up by FedEx Home Delivery?

2         A.  I was never reprimanded for that.

3         Q.  After you learned your route, did you ever

4    indicate to anyone at FedEx Home Delivery that you

5    did not want to participate in the business support

6    package anymore?

7         A.  Again, I thought we never had a choice.

8         Q.  And what was the basis of thinking you

9    never had a choice?

10        A.  When we started the job, we were just -- we

11   were told that we would get all that help we needed

12   in the support package to start our routes.  And

13   none of us -- because we were getting our clothes in

14   the support package, that was part of our support

15   package, and the turn-by-turns, and the manifest, we

16   all -- I don't think there's anybody that in the

17   company that doesn't take the support package.  We

18   just don't know.

19            Nobody's ever told us that you can either

20   buy our own scanners.  I never even knew you could

21   do that until recently.

22        Q.  What's your basis for saying that no one in

23   the company ever didn't accept the business support

24   package?

25        A.  The other drivers.

**8/15/2006  Alexander, Dean**

1         Q.   Just people that you've talked to?

2         A.   Yes.

3         Q.   But you haven't talked to every driver in

4    the company, right?

5         A.   No, I have not -- not every driver in the

6    company, but everyone that had come through the

7    doors there all had it and all assumed they needed

8    it.

9         Q.   Why was it helpful for you to get the

10   manifests through the business support package?

11        A.   The manifest would give you your total

12   numbers for the day on -- in the beginning, it would

13   tell you how many stops you have, 100 stops.  And it

14   would give you the sequence on the manifest as well,

15   the 10, the 20, the 30, and so forth, the way they

16   have it delivered, your delivery.

17        Q.   The order?

18        A.   The order that -- yeah.  And later as we

19   got scanners, that same -- it would be -- it would

20   come up in your scanner that way.

21        Q.   Did the scanners help you do your job as a

22   contractor?

23        A.   Again, we never -- we were never -- it was

24   never an option.  We just showed up one day and they

25   said you were going to get scanners next week and

**8/15/2006  Alexander, Dean**

```
1    here's some forms to look at to familiar yourself

2    with the scanner.  And then we will give you -- on

3    our day off, we had to go in and learn how to

4    operate the scanner.

5         Q.  So you had a training session on the

6    scanner use?

7         A.  To operate the scanner.

8         Q.  How long was that training session?

9         A.  It was probably, I'm guessing, an hour to

10   two hours.

11        Q.  Was using the scanner more efficient than

12   what you had done before?

13        A.  It was more efficient in the fact that we

14   didn't have to turn in a piece of paper every day

15   with people's signatures on it.  They could sign the

16   scanner on a signature required.

17        Q.  Anything else?

18        A.  Not that I can think of right now.

19        Q.  I'm going to mark as Exhibit Number 10

20   various addenda.  The starting Bates number is

21   FXG_ALEXANDER 124.

22             (Whereupon, Deposition Exhibit 10 was

23             marked for identification)

24   BY MS. BREMER:

25        Q.  I'm not going to ask you a lot of questions
```

**8/15/2006  Alexander, Dean**

1     about these.  From time to time, did you sign

2     addenda to the operating agreement?

3          A.  Yes.

4          Q.  And I just would like you to identify your

5     signatures on the addenda.  The first one I see is

6     at FXG_ALEXANDER 126, is that your signature?

7          A.  Yes.

8          Q.  And the date is August 28th, 2004?

9          A.  Hm-hmm, yes.

10         Q.  Look at the next page, please.

11         A.  Yes.

12         Q.  Is that also your signature?

13         A.  Yes.

14         Q.  And you signed that on or about May 21st,

15    2004?

16         A.  Yes.

17         Q.  Take a look at FXG_ALEXANDER 132.  This is

18    Addendum 6.  It says the "Business Support Package"

19    again and it says, "By initialing the appropriate

20    space below, Contractor," and then there are two

21    spaces, either "elects" or "not elects" to

22    participate in the Business Support Package.

23    Contractor may change such election as provided in

24    the Agreement."

25              Are those your initials next to --

**8/15/2006  Alexander, Dean**

1          A.  Those are my initials.

2          Q.  And it's next to "elects," correct?

3          A.  Yes, it is.

4          Q.  And at that time are you saying you didn't

5    know that you could put your initials next to

6    "elects not"?

7          A.  I figured if I don't have the support

8    package I'm not going to get the things I need to do

9    my job, like the scanner.

10         Q.  And you never researched whether you could

11   get a scanner somewhere else, did you?

12         A.  No, I did not.

13         Q.  Okay.  Take a look at FXG_ALEXANDER 140.

14   Is that your signature at the bottom of the page?

15         A.  Yes.

16         Q.  And you signed that on or about November

17   20, 2003?

18         A.  Yes.

19         Q.  Turn to 143, please.  Is that your

20   signature at the bottom of the page?

21         A.  Yes.

22         Q.  There are lots of signatures here.

23   FXG_ALEXANDER 146.

24         A.  Yes.

25         Q.  That's your signature as well?

**8/15/2006  Alexander, Dean**

1          A.   Yes.

2          Q.   And the next page, is that your signature?

3          A.   Yes.

4          Q.   Maybe we can do these in a group.  Turn to

5     156, and there's one on 157 also.  Are those your

6     signatures?

7          A.   Yes.

8          Q.   And 158, again, this is another Addendum

9     Number 6.  Those are your initials next to "elects"

10    or electing the business support package; is that

11    right?

12         A.   Sorry, on which page was that?

13         Q.   158.

14         A.   Yes.

15         Q.   Okay.  And then we skipped some Bates to

16    Bates number 253.

17              This is a "Peak Performance Bonus" at the

18    top.  Is that your signature at the bottom?

19         A.   Yes.

20         Q.   And then on page 256 and -- 256, is that

21    your signature?

22         A.   Yes.

23         Q.   217?

24         A.   Yes.

25         Q.   I also see a signature on pages 160, 165?

**8/15/2006  Alexander, Dean**

1        A.  Yes.

2        Q.  That's your signature on both of those

3    pages?

4        A.  I'm still getting there, yes.

5        Q.  Okay.  168 and 169, are your signatures on

6    those pages?

7        A.  Yes.

8        Q.  And then on 170 and 173 and 174, are those

9    your --

10       A.  171, yes.  And yes.

11          MS. ZERGER:  I'm going to instruct the

12   witness to -- yes, as to which was the last yes?

13          THE WITNESS:  The last page was 174.

14   BY MS. BREMER:

15       Q.  And on page 179, is that your signature?

16       A.  Yes.

17       Q.  Okay.  How is being a driver for the Water

18   Sweeper different from owning your own route?

19       A.  I had an hourly wage plus overtime plus

20   medical benefits, sick leave, and I think I've

21   covered it all.

22       Q.  Okay.  And in what ways was working for the

23   Water Sweeper better than owning your own route?

24   Are those the things you just mentioned or not?

25       A.  Well, Water Sweeper, I don't know if that's

**8/15/2006  Alexander, Dean**

1    really a good example.  I much prefer that -- it was

2    better when I was driving truck.  Water Sweeper was

3    a nighttime job.

4         Q.  So you didn't like the hours of that job?

5         A.  I didn't like working all night long.  It

6    just wasn't -- but basically driving truck was

7    basically the same thing as far as an hourly wage,

8    benefits and weekends off, vacation, all the things

9    that we didn't get as a contractor.

10        Q.  Are you saying that you prefer driving a

11   truck for the construction companies to driving --

12        MS. ZERGER:  Objection.  Mischaracterizes

13   the testimony.  You need to give me a chance to get

14   my objection in.

15   BY MS. BREMER:

16        Q.  And also to ask the question.

17        Are you saying that you preferred driving a

18   truck for the construction companies to being a

19   contractor for FedEx Home Delivery?

20        A.  You asked me the difference, what was the

21   difference.  And I gave you what the difference was,

22   is the, was the benefits and --

23        Q.  Okay.  Which did you prefer?

24        A.  They both had their own advantages in

25   different ways.

**8/15/2006  Alexander, Dean**

1        Q.   What were the advantages of driving for the

2    construction companies?

3        A.   Again, it was all the benefits.   And being

4    a contractor probably was some sense of

5    independence, but not a lot.

6        Q.   And how did you feel independent when you

7    were working as a contractor for FedEx Home

8    Delivery?

9        A.   When I was on my own and out of the

10   terminal.

11       Q.   And so you felt independent in the way that

12   you drove your route?

13       A.   I felt --

14          MS. ZERGER:  Objection.  Mischaracterizes

15   the testimony.  You may answer.

16          THE WITNESS:  I felt independent when I was

17   on my own, delivering on my route because I was

18   truly on my own to do -- to get my job done.

19   BY MS. BREMER:

20       Q.   So you felt independent in the way you went

21   about delivering packages; is that correct?

22          MS. ZERGER:  Asked and answered.

23   Mischaracterizes the testimony.

24          THE WITNESS:  Yes.  I liked being out on my

25   own.

8/15/2006  Alexander, Dean

1    BY MS. BREMER:

2         Q.   Were there times when you worked as a

3    contractor for FedEx Home Delivery that you did not

4    feel independent?

5         A.   Yes, there were times, and especially

6    inside the terminal.

7         Q.   And what happened inside the terminal that

8    made you feel less independent?

9         A.   The fact that at that point we had to do

10   pretty much -- we had to get there when they opened

11   the door, not when we wanted to show up.  They

12   would -- it just was the environment was not -- it

13   felt more like a hostile environment with the people

14   they had running it.

15        The people -- there were contractors who

16   came in and for whatever reason didn't get all their

17   stops done.  They would chew them out at the back

18   door and yell at them.  And on one occasion, I saw

19   one contractor get fired at the back door for not

20   delivering his packages.

21        Q.   And who fired that contractor?

22        A.   I believe that was Scott Dolan.

23        Q.   Who were the terminal managers when you

24   worked at the -- you worked at the Sacramento

25   terminal, correct?

**8/15/2006  Alexander, Dean**

1        A.   Yes.

2        Q.   Who were the terminal managers?

3        A.   The original one was Dave Westbrooks, and

4    then they brought another guy in, I can't remember

5    his name but he didn't last very long.  And then I

6    believe they brought Scott Dolan in after that.

7             And then they brought -- oh, I don't

8    remember, Leonard, I can't remember his last name,

9    out of the Oakland terminal.  And that was it for me

10   as far as terminal managers.

11       Q.   Was that Leonard Levoir?

12       A.   Yes, I believe that was his last name.

13       Q.   You said that there was a hostile

14   environment there.  Was that -- was there one

15   particular terminal manager that you thought was

16   difficult to deal with?

17           MS. ZERGER:  Objection.  Mischaracterizes

18   the testimony.

19           THE WITNESS:  I believe every one of them

20   at one time or another was -- it was hostile.  Not

21   at all times, but at given times during my time

22   there.  Except for Leonard, I didn't deal much with

23   Leonard.

24   BY MS. BREMER:

25       Q.   Did you prefer working with one of the

**8/15/2006  Alexander, Dean**

1    terminal managers over the others?

2         A.   Not really.   They were all about the same.

3         Q.   Were you ever yelled at for not getting

4    your stops run?

5         A.   Absolutely not.

6         Q.   Is that because you made all your stops?

7         A.   I think if you look in my file you'll see

8    my delivery record was 100 percent.

9         Q.   How did you accomplish that?

10        A.   Hard work, doubling back on my route,

11   trying to get rid of signatures.

12        Q.   Do you think that you were better being a

13   contractor than some of the other contractors at the

14   Sacramento terminal?

15        A.   Yes.

16        Q.   And what do you think made you a better

17   contractor?

18        A.   My drive to get the job done.

19        Q.   So the hostile environment that you're

20   talking about is something that you didn't

21   experience personally?

22        MS. ZERGER:  Objection.  Mischaracterizes

23   the testimony.

24   BY MS. BREMER:

25        Q.   Did you experience any hostility

**8/15/2006  Alexander, Dean**

1     personally?

2            A.   I believe I did.

3            Q.   How?

4            A.   They would -- I'm going to have to think

5     how to word this.  The -- there was times they'd

6     come around with a negative attitude.  Oh, I

7     can't -- I'm trying to think of a good example.

8                 I can't think of a good example, but he

9     would be upset about something that my other driver

10    did.  He was -- we -- I don't know.  There was just

11    a lot of negativity.  And I think part of that was

12    they had bad days as well.

13           Q.   And when you say he would be upset at

14    something your other driver did, who are you

15    referring to?

16           A.   I'm referring to my son.

17           Q.   As the other driver?

18           A.   As the other driver.

19           Q.   And who was it that was upset about

20    something that your son had done?

21           A.   Scott Dolan.

22           Q.   Was the management style of Scott Dolan

23    different than Dave Westbrooks' style?

24           A.   I would say Dave was more laid back.  Once

25    you got to know him, he seemed to be better.

**8/15/2006  Alexander, Dean**

1          Q.  So did you ever experience any hostility

2     from Dave?

3          A.  The one incident, but -- that we discussed

4     earlier about that letter that Dave wrote or that

5     note he wrote me.  But once we got through that and

6     ironed that out, it was -- we had a good working

7     relationship.

8          Q.  And you're referring to?

9          A.  Dave Westbrooks.

10         Q.  Right, Dave Westbrooks and you having an

11     issue over flexing?

12         A.  Flexing.

13         Q.  And how did you iron that issue out?

14         A.  I just kept doing my job and we just kept

15     talking in the terminal.  Dave was always a guy that

16     would always come around and talk to the drivers

17     individually most every day.

18         Q.  And was that helpful in resolving issues as

19     they came up?

20         A.  Yes.

21         Q.  And was that something that Scott Dolan did

22     not do?

23         A.  Scott would -- by the time Scott came on

24     there was so many other drivers on board.  We were

25     probably up to probably 25, 30 drivers at that time.

**8/15/2006  Alexander, Dean**

1          Q.   When did Scott Dolan start working at the

2    Sacramento terminal?

3          A.   I'm guessing that it was probably a year

4    and a half to two years, maybe, into it.  I can't

5    remember exactly.  I don't think -- I can't remember

6    when he started.

7          Q.   That's 2001 or 2002?

8          A.   Could be 2002.  I'm guessing.  I don't know

9    exactly when he started.

10         Q.   What happened to Dave Westbrooks, by the

11   way?

12              MS. ZERGER:  Objection.  Personal

13   knowledge.

14   BY MS. BREMER:

15         Q.   If you know.

16         A.   He left.  They didn't really say.  He moved

17   on for whatever reason.  He left FedEx, I know --

18   that's all I know.

19         Q.   Did you ever see Dave Westbrooks yelling at

20   drivers or terminating them by the back door?

21         A.   Dave wasn't there long enough.  The

22   original -- Dave never fired anybody.

23         Q.   Did you ever see him yelling at other

24   contractors?

25         A.   No, but there was some discussions amongst

**8/15/2006  Alexander, Dean**

1    drivers, but I don't remember him getting -- they

2    were -- you know, they might get a little loud, but

3    not what I would call heated.

4         Q.  Did --

5         A.  Not argumentative.

6         Q.  Did Scott Dolan have more of a temper?

7         A.  I don't know that Scott had more of a

8    temper, but when he did show signs of a temper,

9    which was very often, he would get angry.  But I

10   don't know how -- you know, not being there but a

11   few, but an hour, hour and a half in the terminal.

12   But yes, I did see him get angry a time or two.

13        Q.  And you saw signs of him getting angry

14   often?

15        A.  Yes, not often, but a time or two that I

16   definitely seen him.  When he fired that one guy he

17   was real angry that day.  And then when he -- he

18   would get angry and he would leave the floor and go

19   off into his office, which like I say, again, was

20   not a frequent thing.  But he would normally leave

21   and go off by himself.

22        Q.  So the hostility you felt -- or let me

23   start over.

24             You indicated that there was some hostility

25   when you were actually at the terminal.  Is that

**8/15/2006  Alexander, Dean**

1    something that was just under the time that Scott Dolan

2    was terminal manager or all terminal managers?

3            MS. ZERGER:  Asked and answered and

4    mischaracterizes the previous testimony.

5            THE WITNESS:  That was -- it just -- it's

6    like an environment.  It's hard to explain.  You go

7    into and you just know in your heart that it's a

8    hostile environment.  The workers, you can feel it

9    from them, and the staff, or the -- that was there,

10   they would get upset a lot, too.

11           And part of that I think was the hours they

12   were working, but it just felt hostile in there.

13   BY MS. BREMER:

14       Q.  When did it first start seeming hostile to

15   you?

16       A.  I would say probably the year before I

17   left.

18       Q.  And what year was that?

19       A.  I would say that was -- I left in 2000, was

20   it three or four.  I can't remember when I left.

21       Q.  Was that one of the reasons you left?

22       A.  That was partially one of the reasons.

23       Q.  How long did Leonard Levoir work as

24   terminal manager before you left?

25       A.  He probably wasn't there, I'm guessing,

**8/15/2006  Alexander, Dean**

1    four to five months.

2         Q.  Did you have any problems with him?

3         A.  No.  I didn't have any problems.

4         Q.  Did you still feel that there was a hostile

5    environment while Leonard Levoir was terminal

6    manager?

7              MS. ZERGER:  Asked and answered.

8    Mischaracterizes the testimony.

9              THE WITNESS:  At that point in time when I

10   finally decided I was selling my route, the whole --

11   all the drivers were hostile.  I mean, everybody was

12   not hostile -- I mean, upset in one way or another.

13             I could see them talking to each other.

14   When you talked to them for a minute it was always,

15   you know, in a negative way about the terminal or

16   somebody.  At that point, I wasn't into getting into

17   any of that, you know, negativity from the other

18   drivers.

19             There was such a turnover there at that

20   terminal that it got to be like a war zone.  You

21   didn't make new friends.  When new drivers come on,

22   you didn't even want to know them.

23   BY MS. BREMER:

24        Q.  Had you already decided that you were going

25   to sell your route by the time Leonard Levoir

**8/15/2006  Alexander, Dean**

1    started as terminal manager?

2         A.   Yes.

3         Q.   So this -- I think we started with things

4    that you preferred about being a contractor for

5    FedEx Home Delivery over driving as an employee for

6    the construction companies.  And you indicated that

7    you had some sense of independence when you were

8    delivering your route.  Was there anything else that

9    you preferred?

10        A.   I think that's what I enjoyed the most, was

11   being on my own and doing my job.  That's where I

12   was the happiest.

13        Q.   Did you make more money as an independent

14   contractor than in your previous jobs?

15            MS. ZERGER:  Objection.  Vague and

16   ambiguous.

17            THE WITNESS:  Basically, no.

18   BY MS. BREMER:

19        Q.   And why do you say basically, no?

20        A.   By the time I did all my expenses, paid my

21   taxes, my disability, taxes, my fuel bills, my

22   maintenance, I was making probably less than what I

23   was making as a, driving construction, as a union

24   member.

25        Q.   When you drove construction as a union

**8/15/2006  Alexander, Dean**

1    member, was that the most you had made previous to

2    being a contractor for FedEx Home Delivery?

3        A.  Yes.

4        Q.  And how much did you make then?

5        A.  I think it was about $21 or $22 an hour.

6        Q.  And how much did you make on an annual

7    basis?

8        A.  It was in the 30,000s -- 38, $39,000.

9        Q.  That job was not listed on Exhibit 1, which

10   is your contractor driver information sheet; is that

11   right?

12           MS. ZERGER:  Do you want the witness to

13   look at the exhibit?

14   BY MS. BREMER:

15       Q.  Yes, go ahead and look at Exhibit 1.

16       A.  Yeah, this -- I'm assuming this was the

17   form I filled out at the interview.  But if you'll

18   see on below it says, "Reference to resume."

19           Do you see that?

20       Q.  Yes, I do.  So that job was on your resume?

21       A.  Yes, that was the construction job with

22   Lewis & Tibbitts and Great Western Pipeline.

23       Q.  Other than the weekends off, vacation and

24   benefits, was there anything else that you preferred

25   in being a driver for the construction companies

**8/15/2006  Alexander, Dean**

1    over being a contractor for FedEx Home Delivery?

2         A.  I was a lot happier being a driver for the

3    construction company.  I think that would be one

4    thing.

5         Q.  And why was that?

6         A.  Well, being a contractor, I'm responsible

7    for all my own maintenance, washing my truck,

8    anything that had to be done had to be done on my

9    days off, whether it was taking it into the shop for

10   new brakes or new tires or -- it just seemed like

11   there was always something you needed to do on them.

12        Q.  Did you ever take care of maintenance on

13   days that you were running your route?

14        A.  On days I was running my route, no, never.

15        Q.  Earlier you indicated that you thought that

16   becoming a contractor for FedEx Home Delivery was a

17   great opportunity.  Did you feel like that was borne

18   out?

19        A.  I'm not really sure.

20        Q.  Did you feel that you were able to make

21   your business grow through your hard work?

22        A.  Well, my business grew because FedEx kept

23   adding packages, and with the more packages, the

24   harder and longer it got.  And that's where the

25   contractor point was starting to get rough is you've

**8/15/2006  Alexander, Dean**

1    got to expand to keep up with your packages.  When

2    you start getting up to 200 stops a day, I mean,

3    that's too much.

4        Q.  But when you started with FedEx Home

5    Delivery, you hoped that the business would grow and

6    that you were starting in at the bottom and that it

7    would grow and there was benefit from that, correct?

8        A.  Exactly.  But it got to the point, though,

9    where there was no help from FedEx, period.  The one

10   time they liked to tell us we're contractors is when

11   it's Christmastime and you've got 300 packages to

12   deliver that you don't know how you're going to get

13   them done.  And that's when they love to tell you,

14   "It's your business, so you get it done."

15       You could never look for any help anywhere

16   in that place.  And it just got to the point where

17   it just -- I wanted to slow down eventually.  I'm

18   not getting younger.  And I had thought of all the

19   options of putting on drivers, growing the business,

20   but I just got to the point where I realized it's

21   not my business and I just need to get out and let

22   somebody find out for themselves it's not their

23   business either.

24       When the opportunity arose when they closed

25   all the routes and when the business was sellable, I

8/15/2006  Alexander, Dean

1    put it up for sale.

2          Q.  So at some point you decided that you

3    wanted to slow down because you were getting older;

4    is that right?

5          MS. ZERGER:  Mischaracterizes the

6    testimony.  Asked and answered.

7          THE WITNESS:  Slow down.  What I meant by

8    slow down was I, personally, didn't want to do 200

9    stops a day.  I can do 100, 125, and that's a long

10   day.  But a 200, that's a young man's job.

11         And we still cover so much ground even with

12   the -- even though the routes have tightened up,

13   it's gotten even better since I left with tighter

14   routes, but the guy who bought my route is having

15   the same problem now.  He's gotten to the point

16   where it's so big that he can't -- he almost can't

17   handle the route now.  He's working 14, 16 hours

18   every day.

19   BY MS. BREMER:

20         Q.  So I'd like to strike that last portion as

21   nonresponsive.

22         MS. ZERGER:  I think there's no striking in

23   a deposition.  You can get it on the record.  It

24   will be up to a judge later.

25   BY MS. BREMER:

**8/15/2006  Alexander, Dean**

1        Q.  So my question is, one of the reasons that

2     you wanted to sell your route was because you wanted

3     to slow down from delivering so many packages

4     because you were getting older, right?

5        A.  I never thought it was my business to begin

6     with.

7        Q.  You said you wanted -- or you indicated

8     that FedEx gave you no help.  What sort of help did

9     you want FedEx Home Delivery to give to you?

10       A.  Well, at Christmastime is when we could

11    really use some help.  But sometimes we would get so

12    much bulk, like 100 boxes, which takes up a lot of

13    room in a truck, and it's either take the 100 boxes

14    out and leave behind 100 stops -- somebody always

15    said somebody ought to be there to handle that bulk.

16            They ought to have -- on occasions they did

17    have people to handle the bulk stops because it's --

18    you know, when you're out 30, 40 miles and to drive

19    all the way back to pick up more load, to pick up

20    another load, doesn't make a lot of sense.

21       Q.  So you're saying that there would be 100

22    boxes for one stop?

23       A.  For one.

24       Q.  And that was in your route?

25       A.  Occasionally.

**8/15/2006  Alexander, Dean**

1        Q.  And you would have preferred if someone

2    else would have handled those stops on your route?

3        A.  The bulk.  I had many a times where they --

4    what they would do on occasions is they would flex

5    it off to somebody else who had room to take it out.

6    We had accounts with a lot of big boxes.

7        Q.  Did you ever make arrangements with other

8    contractors to have them deliver those bulk stops

9    for you?

10        MS. ZERGER:  Objection.  Ambiguous.

11        THE WITNESS:  On occasions I would if there

12    was one close.  The driver that would head up the

13    hill, if they had room, I would ask that they could

14    take the eight or nine big boxes I had and swap

15    them.

16    BY MS. BREMER:

17        Q.  When you say swap them, you mean you would

18    informally agree to give some of your stops to

19    another contractor to deliver?

20        A.  One stop.

21        Q.  Okay.

22        A.  One stop, a big bulk that I couldn't fit on

23    that they had room for that particular day.  We had

24    a lot of -- we had a lot of Southern Living

25    products, which is one of the ones that was a real

**8/15/2006  Alexander, Dean**

1    problem because those -- they would never come less

2    than ten, 15, sometimes 20 big boxes.  And that's a

3    lot of room in a truck.

4        Q.  When you informally agreed to give one of

5    your bulk stops to another contractor, did you

6    inform someone at FedEx Home Delivery?

7        A.  Yes, I informed the terminal manager.

8        Q.  Did they ever refuse to allow you to do

9    that?

10       A.  No, they never did because they knew it was

11   the only way they were going to get it out that day.

12       Q.  Did they tell you that?

13       A.  It was either that or one of the employees,

14   their employees would have to take it out, which

15   they did on rare occasions.

16       Q.  So they never -- no one at FedEx Home

17   Delivery ever told you that you couldn't informally

18   agree with another contractor to have him deliver

19   some of your packages?

20       MS. ZERGER:  Objection.  Leading.

21       THE WITNESS:  We would always check with

22   the terminal manager to see if it was all right.

23   BY MS. BREMER:

24       Q.  My question was not whether or not you

25   checked with him.  My question was whether or not

**8/15/2006  Alexander, Dean**

1    anyone at FedEx Home Delivery told you that you

2    could not informally have another contractor deliver

3    some of your packages?

4            MS. ZERGER:  Same objection.

5            THE WITNESS:  No, I can't remember being

6    told no.

7    BY MS. BREMER:

8        Q.  So you mentioned two situations in which

9    you wanted help from FedEx Home Delivery, one was at

10   Christmas, getting all the packages delivered.  And

11   the other is when you had bulk stops.

12           Was there any other help that you thought

13   that FedEx Home Delivery should give to you?

14       A.  No, I didn't -- another reason at

15   Christmastime was because we ended up having to work

16   seven days a week for at least two weeks.  So at

17   least 14 days straight every Christmas -- well,

18   maybe not the first, but every Christmas after that,

19   I worked at least 14 days straight to make sure all

20   my packages were out.

21           By the end of that 14 days, you're tired.

22   And that's the time I wish there was some help that

23   could help out.  Because they always said, "Can you

24   come in Sunday, finish up?"  Then you couldn't

25   finish up on Sunday, you had to come in on Monday

8/15/2006  Alexander, Dean

1    and do some more.

2         Q.  You had other alternatives for delivering

3    those packages, didn't you?

4              MS. ZERGER:  Objection.  Leading.

5              MS. BREMER:  Leading is allowed.

6              MS. ZERGER:  So is my objection.

7              MS. BREMER:  No, it's not a proper

8    objection in a deposition.

9              THE WITNESS:  I'm sorry, ask that again.

10   BY MS. BREMER:

11        Q.  Were there other alternatives you had for

12   delivering your packages at Christmas other than

13   doing it yourself?

14        A.  Not really.

15        Q.  Did you consider having someone else

16   deliver those packages for you?

17        A.  The ones who wanted to work and get their

18   job done, got it done.  Those who didn't, there was

19   very few of us that were willing to get in there and

20   give up both our weekends, both our days off.  There

21   just wasn't any spare bodies around.

22        Q.  So are you saying that you were one of the

23   few contractors that did work 14 days in a row

24   during the holiday season?

25             MS. ZERGER:  Objection.  Mischaracterizes

8/15/2006  Alexander, Dean

1    the testimony.

2            THE WITNESS:  I worked 14 days to make sure

3    that mine was always cleared up.  Because I knew if

4    I didn't get my packages cleared up on Saturday or,

5    I'm sorry, on Sunday and Monday, it would still be

6    there for me to do on Tuesday.  Just more on top of

7    what I already had left over.

8    BY MS. BREMER:

9        Q.  Right, but that wasn't my question.  It was

10   whether you were one of the few contractors that did

11   work 14 days in a row during the holiday season?

12           MS. ZERGER:  Objection.  Lacks personal

13   knowledge.

14           THE WITNESS:  I can't remember how many of

15   us actually came in.  There was a number of us that

16   would come in and keep our routes cleaned up.  And

17   the reason being is so we weren't hammered when we

18   started Tuesday.

19   BY MS. BREMER:

20       Q.  So when you came in during the holiday

21   season, you would see if there were other

22   contractors at the terminal, right?

23       A.  I would see some, yes, but they would come

24   in at all -- they would come in, Scott or somebody

25   would come in at that time.  And if you were going

**8/15/2006  Alexander, Dean**

1    to work, he'd say come in between 9:00 and 10:30 and

2    pick up your stuff if you're going to come in.

3        Q.  And why did he give you those times?

4        A.  So he didn't have to spend all day there.

5        Q.  So if you wanted to come in on a day that

6    contractors normally don't work, he permitted you to

7    do so, but only during a certain time frame?

8        MS. ZERGER:  Objection.  Mischaracterizes

9    the testimony.  Asked and answered.

10        THE WITNESS:  Scott wanted everybody to

11    come in and clean up their piles, but only those who

12    wanted to did.  But he wanted to do it in a time

13    frame where he could get in there and you could load

14    up and leave, and he could go do whatever he needed

15    to do.

16    BY MS. BREMER:

17        Q.  During the years that you worked on your

18    days off during the holiday season, about how many

19    other contractors would you see at the terminal

20    working those days?

21        A.  I really can't give you a fair

22    guesstimation, but there was always somebody coming

23    in, anywhere -- there was always one or two others

24    in there.

25        Q.  So it would just be one or two other

**8/15/2006  Alexander, Dean**

1    contractors?

2        A.   That were there when I was there.  But you

3    had that window of an hour and a half to two hours

4    to get in and load up.  So who came behind me, I

5    don't know.  I was always the first one there when

6    the door opened.

7        Q.   And how long did you spend at the terminal

8    during those days off during the Christmas season

9    before you actually started running your route?

10       A.   Well, the packages were already prescanned,

11   so -- sometimes they were, sometimes they weren't.

12   But if they were prescanned at that time, we were

13   allowed to leave our scanners open with the number

14   of packages that were left.

15           And any other time your scanner has to be

16   closed every day.  They'd make exceptions.  So we'd

17   get in there, all I had to do is go out and load up

18   whatever number of packages I had, 40, 50, and be

19   out of there probably within 25 -- 20, 25 minutes,

20   max.

21       Q.   It was your perception that very few

22   contractors at the Sacramento terminal would work 14

23   days straight during the holiday season; is that

24   right?

25           MS. ZERGER:  Objection.  Mischaracterizes

**8/15/2006  Alexander, Dean**

1    the testimony.  Asked and answered.

2         THE WITNESS:  I really don't know how many

3    how many would do it.  I always took care of my own

4    business.

5    BY MS. BREMER:

6         Q.  You stated before that there were few

7    contractors that were willing to give up their days

8    off; is that correct?

9         A.  A few -- I can't give you a number on a

10   few.  There was, I know, a few willing to work, but

11   I don't really -- I really didn't follow who was

12   working and who wasn't.  I always told them I would

13   come in.  As far as who else came in, I really

14   didn't know unless somebody was there at the

15   terminal.

16        Q.  You only saw one or two other people?

17        A.  When I was there at any given time.

18        Q.  When you first contracted with FedEx Home

19   Delivery, did you buy your route?

20        A.  No.

21        Q.  Was that because FedEx Home Delivery was a

22   new terminal when you started?

23        A.  It was a start-up, yes, brand-new.

24        Q.  So no one had to purchase their routes?

25        A.  No.

**8/15/2006  Alexander, Dean**

1      Q.  Did you believe that this was one of the

2    ways that contracting with FedEx Home Delivery would

3    be a great opportunity?

4      A.  Well, in the training period they said when

5    they close routes that you would be able to sell

6    your route, assuming that it was, that all the

7    routes were closed out.

8          They gave routes away up to 42 drivers, I

9    believe.  I'm not really sure.  And at that point

10   then it became a closed terminal and every route

11   then was saleable -- could be sold.

12     Q.  So you knew that if you stayed at the FedEx

13   Home Delivery terminal until they had 45 drivers

14   that you would be able to sell your route; is that

15   right?

16         MS. ZERGER:  That mischaracterizes the

17   testimony.  You may answer.

18         THE WITNESS:  Sorry.  I didn't know for

19   sure the exact number at what number they were going

20   to close routes out.  And at what number -- and I'm

21   still not sure how many it is.  It's 40-something

22   but I'm not sure.

23   BY MS. BREMER:

24     Q.  But you understood that at some point they

25   would close the routes out and then you would be

**8/15/2006  Alexander, Dean**

1    able to sell your route?

2         A.  Yes.

3         Q.  And was that one of the reasons you thought

4    that becoming a contractor for FedEx Home Delivery

5    in the beginning would be a great opportunity?

6         A.  Yes, to have a business you could sell,

7    that definitely was a plus.

8         Q.  What type of geographic area was covered by

9    your route?

10        A.  I had a lot of mountain -- well, low

11   mountain area.

12        Q.  And was that a suburban area, rural?

13        A.  No, I had rural to the suburbs.

14        Q.  Did that change over time?

15        A.  Yes.

16        Q.  How did it change?

17        A.  As we grew, it ended up I lost -- out of

18   the last five that we had discussed earlier, when I

19   got down to the last five zip codes, I lost -- I

20   think after, I can't remember, two, two and a half

21   years, I lost the mountain portion of it, or the

22   rural portion of it.  They finally got another

23   driver.  But I still had some -- still had some

24   rural in my area left.  And then my primary core

25   zone was all residential.

**8/15/2006  Alexander, Dean**

1          Q.  Were there routes serviced by other

2     contractors at your terminal that were more densely

3     populated than your route?

4          A.  Absolutely.

5          Q.  And how did that impact how you would

6     service your route, the fact that it's, that it was

7     more rural?

8          A.  As far as -- it was time that really -- in

9     a rural route.  Because sometimes you've got to

10    drive five, ten miles to your next stop.  And you

11    get a lot of dirt roads, wild animals running across

12    the road.  You really have to be -- when you're in a

13    rural area, you really have to stay focused for

14    anything that might jump out of the bushes, so to

15    speak.

16         Q.  Did you have pick-ups on your route?

17         A.  No.

18              MS. BREMER:  We need to change the tape,

19    I've been informed, so let's go off the record.

20              THE VIDEO OPERATOR:  This marks the end of

21    Tape No. 2 in the deposition of Dean Alexander.

22    Going off the record.  The time is 12:26.

23              (Lunch recess taken)

24              THE VIDEO OPERATOR:  This marks the

25    beginning of Tape No. 3 in the deposition of Dean

**8/15/2006  Alexander, Dean**

1    Alexander.  Back on the record.  The time is 1:06.

2    BY MS. BREMER:

3        Q.  Okay.  Mr. Alexander, you understand that

4    you're still under oath?

5        A.  Yes, I do.

6        Q.  Okay.  You mentioned off the record that

7    you remembered something?

8        A.  Yeah.  On page 2436 of Exhibit 3.

9        Q.  Hm-hmm.

10       A.  We all started out with rental vans until

11   our vans were received.  And this is the rental van.

12       Q.  I see.  How long did you drive the rental?

13       A.  I'm going to guess a month.  I can't

14   remember.  Until our van came from the factory.

15       Q.  And that was true, to your knowledge, for

16   all of the contractors that started when you

17   started?

18       A.  One or two had their own vans already.  But

19   everybody else was renting in lieu of our $25 a day

20   for the vehicle.

21       Q.  Okay.  And were there seven contractors

22   that started when you started?

23       A.  I believe it was seven.  I'm not really

24   sure, but I believe it was seven.

25       Q.  When we went to lunch we were talking about

**8/15/2006  Alexander, Dean**

1    your route.  And let me go ahead and mark as Exhibit

2    Number 11 a document entitled, "Contractor Business

3    Plan," and there are actually a series of these

4    contractor business plans.  The first date is or the

5    first Bates numbers FXG_ALEXANDER 5146.

6              (Whereupon, Deposition Exhibit 11 was

7              marked for identification)

8    BY MS. BREMER:

9         Q.  Do you know what contractor business plans

10   are?

11        A.  Well, we would discuss these every year

12   about what my plan might be per my business, to

13   either grow it or whatever I was going to do with

14   the business.

15        Q.  You had discussed your business plan with

16   the terminal manager; is that right?

17        A.  Yes.

18        Q.  And would he take notes during your

19   discussion?

20        A.  He would take -- I believe he was filling

21   this out as we talked.

22        Q.  He would be filling out the contractor

23   business plan form?

24        A.  This form, as we talked.

25        Q.  Did you ever see any of the contractor

**8/15/2006  Alexander, Dean**

1    business plans that were filled out, other than just

2    seeing him writing on the form?  Did he show them to

3    you?

4         A.  No.

5         Q.  Let's look at the one that's from July 7,

6    2000.  That's at the very end.  I guess they are

7    backwards.

8         A.  Running together.  I see.

9         Q.  It's page 270.  Do you know if you

10   discussed your business plan with the terminal

11   manager on or about July 5th, 2000?

12        MS. ZERGER:  I'm going to have a continuing

13   objection to the use of the term business and

14   business plan to the extent that that calls for a

15   legal conclusion.  And that the use of that term

16   does not constitute an admission that it is, in

17   fact, a business.

18   BY MS. BREMER:

19        Q.  You can go ahead.

20        MS. ZERGER:  You can go ahead and answer,

21   yeah.

22        THE WITNESS:  I'm sorry, the question

23   again?

24   BY MS. BREMER:

25        Q.  Do you know if you discussed the business

**8/15/2006  Alexander, Dean**

1    plan with the terminal manager on or about July 5th,

2    2000?

3          A.  I can't remember.

4          Q.  Does that sound about right, that that

5    would have been probably about four months after you

6    started?

7          A.  I guess so.  I really can't remember.

8          Q.  This under 1, it says, "Work Area

9    Changes/Modifications in past 12 months," and it

10   says, "Yes."  It indicates that there was a change

11   or a modification, and that -- is it saying that you

12   had one less zip code in the area?

13         A.  You're talking about details?

14         Q.  Yes.

15         A.  "Lost one zip in area."

16         Q.  So you started out with nine zip codes on

17   your route; is that right?

18         A.  I believe it was nine.  One I lost right

19   away.

20         Q.  And is that this one that's being discussed

21   here?

22         A.  Yeah, that could be the one, I lost Fair

23   Oaks right away.

24         Q.  How did you lose the first zip code?

25         A.  Because I was -- just had too much.  It was

**8/15/2006  Alexander, Dean**

1    kind of out of my way kind of an area.  There was

2    two parts to Fair Oaks and they gave it to the

3    driver out in that area, you know, that just ran

4    right up against it.  I was kind of going way over

5    and then coming back into another area.  It was just

6    out of my way and he managed to give it to another

7    driver.

8        Q.  Did you request that that zip code be given

9    to another driver?

10       A.  I think we discussed the fact that I really

11   needed to lose that, if there was a way we could

12   lose that one in particular because of its -- the

13   way it was set out way off to one corner, which was

14   causing me to, you know, put excess miles on, you

15   know, when it was out of my way.

16          When they designed these in the very

17   beginning, Jan and them, I guess, sat down with an

18   overall print of the areas that had to be covered.

19   And people, like I say, got their zip codes, their

20   primary one, and then they built you around that zip

21   code.

22          And for some reason or other, this one little

23   corner got stuck over on me, which really fit better

24   with the person who had the Fair Oaks area.  So he took

25   care of that.

**8/15/2006  Alexander, Dean**

1      Q.  And you told the terminal manager that you

2   wanted that zip code to go to another driver; is

3   that right?

4      A.  Yeah, he suggested it.  We had mentioned it

5   and then he came back and said that was a good idea.

6      Q.  And you were happy with that change?

7      A.  Yes, I was happy with that because that cut

8   my mileage down by ten miles a day.

9      Q.  How soon was that change made?

10      A.  I'm sorry?

11      Q.  How soon did you lose that first zip code?

12      A.  Well, I believe it was in that month.  The

13   date here, I'm assuming, it was at this time around

14   July.  I don't know exactly when.  I can't remember

15   what happened back that far.

16      Q.  Did you receive any compensation when you

17   lost that zip code?

18      A.  No.

19      Q.  Were there other improvements to your work

20   area over time?

21      A.  Yes.

22      Q.  Can you just go through how the work area

23   improved?

24      A.  By losing zip codes, is that what you're

25   getting at?

**8/15/2006  Alexander, Dean**

1        Q.   If that's how it improved, yes.

2        A.   It improved by getting less area to cover.

3    And that -- I believe it was around the first

4    Christmas that they broke off Citrus Heights and

5    Orangevale off of me, which covered quite a big

6    area, and part of Roseville, I believe I had as

7    well.  Which left me Orangevale, which was right up

8    against Folsom, El Dorado Hills, Cameron Park,

9    Shingle Springs and Rescue, the latter three being

10   the rural areas.

11       Q.   So by that first Christmas, how many zip

12   codes did you have?

13       A.   Five left.

14       Q.   And were your zip codes further reduced

15   later?

16       A.   Later, yes.  I'm not sure as to the timing,

17   what year it was.  Could have been 2000 sometime.

18   I'm not sure on days, so I won't even go there.  I

19   lost a big part of my rural.  I lost Rescue, Shingle

20   Springs and Cameron Park.

21       Q.   So by the time that you sold your route,

22   how many zip codes did you have left?

23       A.   I was down to just the one.

24       Q.   Your primary service area?

25       A.   Yes.

**8/15/2006  Alexander, Dean**

1        Q.   And how long had you been servicing just

2    your primary service area before you sold your

3    route?

4        A.   You're talking about just me doing it or

5    the whole area -- the longevity time?

6        Q.   I mean the longevity.

7        A.   Okay.  That was almost five full years,

8    close to five years.  And I still almost served El

9    Dorado Hills just as long.  I had given that up just

10   months before -- I didn't -- that wasn't -- I didn't

11   own that route, but I was supplementing it for

12   almost the entire time.  But I just gave it back to

13   FedEx and said you can put -- it was time for it to

14   become a route.

15       Q.   You had indicated before that when you

16   first started contracting with FedEx Home Delivery

17   that you had concerns about flexing and that, but

18   that those problems were ironed out.  When did those

19   problems become ironed out?

20       A.   They became ironed out probably maybe a

21   year, maybe two years later when I told them I

22   didn't want to be flexed anymore.  I didn't want to

23   do it.

24       Q.   And who did you tell that you didn't want

25   to be flexed anymore?

**8/15/2006  Alexander, Dean**

1        A.   I told it to Scott.

2        Q.   Scott Dolan?

3        A.   Hm-hmm.  And he basically told me that I

4    didn't want to be a team player anymore.  And he was

5    real sarcastic about the fact I put my foot down and

6    said I just don't want to be doing someone else's

7    area and not getting any real compensation in the

8    zip codes.

9        Q.   Did he force you to flex packages?

10       A.   No, they would ask on occasions, and

11   sometimes they would, once in a blue moon.

12       Q.   But he would ask you first?

13       A.   No.

14       Q.   Did you -- when you told him that you were

15   not going to flex packages anymore, did he

16   acknowledge that?

17       A.   Well, again, he was very negative that I

18   was not going to be a team player and help out.

19       Q.   Right.  He wanted you to continue flexing?

20       A.   He wanted to continue flexing and

21   occasionally, occasionally they would.  And it would

22   be in my, right next to my area and I did not mind

23   if it was occasionally.

24       Q.   But generally, he didn't force you to flex

25   packages after that point?

**8/15/2006  Alexander, Dean**

1          A.  No.

2          Q.  Have you heard the term "route

3    reconfiguration"?

4          A.  Yes.

5          Q.  What does it mean?

6          A.  I believe -- now, I'm not real sure if I

7    know the meaning.  But from what I think it is, is

8    when your route gets too big, they reconfigure it

9    into a different -- so they can either add a driver

10   on.  They reconfigure it so another person can get a

11   route.

12         Q.  Was your route reconfigured?

13         A.  Every time I lost zip codes it was

14   reconfigured.  And I would get a shorter route or a

15   tighter route, if you will.

16         Q.  And you were happy with those changes?

17             MS. ZERGER:  Leading question.

18             THE WITNESS:  Well, the growth was

19   compensating -- as we were growing package-wise, it

20   was compensating.

21   BY MS. BREMER:

22         Q.  So you were getting more packages?

23         A.  I was getting more packages in my own area

24   and they were adding new accounts and we'd get

25   another ten, 15 stops.

**8/15/2006  Alexander, Dean**

1            And every time they reconfigured it, it was

2       just because I was at pretty much the limit on, you

3       know -- well, it became a -- they have -- it has to

4       have a certain amount of packages to become a route.

5       And as these areas got the limits, they would put a

6       new contractor in that area, and then we would

7       shrink back closer into our primary core zone.

8            Q.  Were you involved in any of the decisions

9       to reconfigure your route?

10           A.  Other than my input saying it was time,

11      that that needs to be a route.  And at that point,

12      they would take a look and see if it was ready to

13      become a route.  And then they would tell me that

14      it's time that that area becomes a route.

15           Q.  So every time that you indicated to FedEx

16      Home Delivery that one of the zip codes that you had

17      been servicing needed to be its own route, would

18      they agree with you?

19           A.  Pretty much they knew.  They knew by the

20      sheer volume.  They would get -- they would get a

21      guesstimation of every time they got a new account

22      of how many packages that new account is going to

23      bring in.  And they could, by looking at that, and I

24      assume they have some formula, they know what the

25      increase in your route is going to be.  And they

**8/15/2006  Alexander, Dean**

1    always made the determination as to when an area

2    needed to become a route.

3        Q.   And did they always make that determination

4    and create a new route after you had told them that

5    you thought that it needed to be a new route?

6        A.   They would come and ask me from time to

7    time.  That was never a threatening issue.  It was

8    basically left up to me.

9            They would say, "If you want to keep it,

10   it's ready to be a route, if you want to keep the

11   area, you can, you know, hang on to it."  But I

12   wanted to shrink it because I knew, again, between

13   El Dorado Hills and Folsom it was more than enough

14   to handle.  That's what I ended up doing is keeping

15   those two zip codes.

16       Q.   So they would give you a choice as to

17   whether or not you would want to keep a zip code in

18   your route or not?

19       A.   They would -- if I wanted to keep it, but

20   they knew it was really not going to be -- it really

21   wasn't going to be feasible to keep it.

22       Q.   Were there times when they asked you

23   whether or not you wanted to keep a zip code and you

24   decided that you did want to keep a zip code?

25       A.   I kept El Dorado Hills for almost five

**8/15/2006  Alexander, Dean**

1    years.

2        Q.   And was that a zip code that they said that

3    they would make a separate route if you wanted it to

4    be a separate route?

5        A.   If I wanted it to be.  At the end, I just

6    didn't want it.  For some reason or other that

7    little area in El Dorado Hills just seemed to stay

8    forever right around 60 packages -- well, 60 to 70

9    stops, sometimes 80 a day for several years.

10       Q.   So even though that El Dorado Hills was

11   ready to be a route, you decided you wanted to keep

12   it until the end?

13       A.   It really never was going to be -- it

14   really, for most of that time it never met the

15   criteria.  It would have 65 stops one day and then

16   maybe 75 to 80 another day, but it stayed right in

17   that 65 to 70 stops.  And I told him I would just

18   hang on to that until it got to the point where --

19   because the building up there was, it was incredible

20   growth coming.  And when the growth really took off,

21   the last Christmas, I gave it up.  I wouldn't have

22   been able to handle it with the van that I had.

23       Q.   And so you gave it up when you decided you

24   wanted to give it up?

25       A.   Yes, when I wanted to give it up at that

**8/15/2006  Alexander, Dean**

1    point, knowing that I was trying to -- at that

2    point, I was trying to find a buyer for my route.

3        Q.  And prior to that time, FedEx Home had

4    given you the option of giving up that route, but

5    you had decided that you didn't want to?

6        A.  I had told them that I would -- when Jan

7    was still there, that I would just hang on to that

8    right up -- because what it did was, it backed up

9    right to Folsom.

10       Q.  So the answer to my question was yes?

11       A.  Yes, I would just hang on to it.

12       Q.  Did the reconfigurations of your route

13   reduce the number of stops?

14       A.  It might have for a short time, but it

15   generally would come right back up into within a

16   matter of time, short time back into where it was

17   with the -- it would probably never -- the other one

18   probably went up as well.  So if I went down, let's

19   say, to 100 stops a day, the other route would be up

20   to 100 as well.

21           And then we would be up to probably in a

22   matter of three to four months right back up to 120,

23   30 stops again because of the new accounts.

24       Q.  Because the business was growing so

25   quickly?

**8/15/2006  Alexander, Dean**

1           MS. ZERGER:  Object to mischaracterization

2     of the testimony.

3           THE WITNESS:  Because the --

4     BY MS. BREMER:

5           Q.  Is that right?

6           A.  I'm sorry?

7           Q.  The number of stops would increase because

8     the business was growing so quickly?

9           A.  Well, FedEx was getting new accounts at all

10    times.

11          Q.  Did the reconfigurations of your route make

12    it easier for you to service your customers each

13    day?

14          A.  Yes.

15          Q.  Did it lower your costs?

16          A.  Yes, it would lower the fuel cost a little

17    bit.

18          Q.  What about service costs?

19          A.  Maintenance on my second -- on my second

20    truck always took up more.  It still had hills.  The

21    other one, the maintenance went down to brakes maybe

22    every eight to nine months instead of running six

23    months.  Tires was still two sets a year.

24          Q.  Do you think that you were treated fairly

25    when your route was reconfigured?

**8/15/2006  Alexander, Dean**

1         A.  Well, you know, earlier you had mentioned

2    if I got paid for losing that area -- just to step

3    backwards just for a second.

4             I never really complained, but there were

5    people in there that really knew that contract area

6    and did make a real stink about being paid.  I never

7    did, but I thought I would go ahead and go backwards

8    a little bit on that one because I just happened to

9    remember that.

10        Q.  When do you recall people making a stink

11   about being paid when their routes were

12   reconfigured?

13        A.  Well, what I meant was, when they got into

14   their core zone, sometimes they'd send people into

15   their primary cores.  And when somebody goes into

16   your primary core without your permission, because

17   if there's any -- if there is a chance you want your

18   primary core and not somebody else doing it.

19            Do you understand what I'm saying?

20            And they would do that in the flexing thing

21   and take what I would consider -- we'll just use the

22   word like gravy, your easy stuff and give it to

23   somebody else.

24            And there were several people that really

25   went sideways on that with, you know, going into

**8/15/2006  Alexander, Dean**

1    their primary cores.  And that was with Dave

2    Westbrooks, but that didn't last long.  But they

3    were all wanting to be paid for people going into

4    their primary core.  It was three or four -- there

5    was three people, I know, that really went sideways

6    on that issue.

7         Q.  So the three people that -- were upset

8    because packages were flexed from their primary core

9    zone without their permission?

10        A.  Yes.

11        Q.  Did that occur in 2000?

12        A.  I really can't speculate.  It was during

13   the time Dave Westbrooks was there, and it was with

14   the original seven.  So I can't -- timewise I can't.

15   But I don't think Dave was there for more than a

16   year.  I don't know -- he wasn't there that long.

17        Q.  Right.  And you indicated that new

18   contractors were hired during Christmas of that

19   year; is that right?

20        A.  Well, what they did is they brought on subs

21   and the subs eventually -- they went in -- they took

22   over -- the one took over my Citrus Heights and

23   Orangevale area.  And then after Christmas he stayed

24   on and then eventually was contracted for that area

25   along with several other subs that were in.

**8/15/2006  Alexander, Dean**

1            In the beginning they were hiring subs to

2     come in.  And when the areas were starting to get a

3     little more for the contractors to handle, the subs

4     would start coming into an area and helping them

5     out.  And eventually that area would be contracted

6     to the sub meeting all criteria.

7            Q.  Were packages ever flexed out of your

8     primary core zone?

9            A.  A time or two, not a whole bunch.

10           Q.  And was that with your permission?

11           A.  Well, they did it with the fact that they

12    knew that I had so many up in the rural area that I

13    wouldn't have been able to get down and service it

14    before dark.  So basically, they said, "We're doing

15    you a favor by taking some of your packages away so

16    you can service this rural area up above."

17           Q.  Did you consider it a favor?

18           A.  I did.  Dave asked me to do him a favor at

19    that point.  He came and asked me for a couple of

20    weeks would I mind going into Diamond Springs

21    because they were really hurting in Diamond Springs.

22    And by that point we had built up a good rapport.

23    And I said, "Dave, I'm willing to do that if it's

24    less than ten packages."

25           Because you get out into that rural, it

**8/15/2006  Alexander, Dean**

1    gets really rural up there.  And ten packages can

2    take you two hours or more.  And you're not making

3    money when you're not -- in rural areas, ten bucks

4    in two hours is not much money.

5        Q.  So he asked you to deliver those packages

6    as a favor?

7        A.  If I would help out for a short time

8    because they were contemplating getting another --

9    making another route, but they were really hung up

10   in the middle of the upper route and the lower

11   route.  So I told him I would -- if it was for a

12   couple weeks, I'd be more than happy to do that, and

13   I did.  It lasted a month.

14       Q.  We talked previously about other

15   contractors agreeing to take some of your packages

16   and deliver them, some of the bulk packages or bulk

17   deliveries.

18           Did you ever take any stops from other

19   contractors?

20       A.  I never had the extra room in my truck.

21       Q.  You hired your son Justin to help you

22   service your route, correct?

23       A.  Yes.

24       Q.  Have you hired anyone else to help you?

25       A.  When I -- when that questionnaire was

**8/15/2006  Alexander, Dean**

1    filled out, I didn't -- misunderstood the question

2    of how -- I didn't -- I thought that that particular

3    question was asking me if -- I'm sure you're reading

4    that one.

5         Q.   You're talking about your interrogatories?

6         A.   Yes, is that the interrogatory or no?

7         Q.   This is not, no.

8         A.   There's one I was going to go back and

9    correct because there was something that was brought

10   up that I didn't put down on that particular thing.

11        I understood the one question to be if I

12   had a supplemental driver, and I put down as the

13   supplemental driver, but I didn't understand it to

14   mean that anybody that I had had on route.  And I

15   did hire a couple of other people for a day here and

16   a day there.

17        Q.   And who were those people?

18        A.   I can only remember two names.  I think I

19   only used three, and I can remember two names.

20   First name is Larry, still works at the terminal.

21   And Trevor, he still subs at the terminal.

22        And there was one other person, I can't

23   remember their name.  I used him for a weekend or

24   for a Saturday one time, and I can't remember his

25   name.  As far as I know, that's all I ever used.

**8/15/2006  Alexander, Dean**

1    But I wanted to clarify that up because I thought

2    about it later.

3        Q.  Okay.

4        A.  Okay.

5        Q.  When did you first hire your son Justin?

6        A.  I can't give you a specific date.  I know

7    it's written down somewhere, but I don't remember.

8    I think he worked for me -- I want to say 2003, but

9    I don't know.

10           I was getting to the point where the

11    route -- the Folsom route was starting to get real

12    big, and at that time I thought about keeping El

13    Dorado Hills and maybe contracting that in the

14    future.  But it was just going to be too difficult

15    for me to service both, so I asked him to work for

16    me and do Folsom.  And later on, I ended up buying a

17    bigger truck for Folsom since that route continued

18    to grow.

19        Q.  Let's look back at Exhibit Number 11.  And

20    we had looked previously at the business plan for

21    2000.

22           If you could turn to the business plan

23    that's dated September 18, 2001.  That's -- the

24    number at the bottom is 267.  And then where it

25    says, "Peak Planning," near the bottom, the

**8/15/2006  Alexander, Dean**

1    question, "What is the Contractor's plan to provide

2    service during the peak season?"  And it's written

3    in here, "Will have son as a helper."

4         Do you recall if you hired Justin as a helper

5    in 2001?

6         A.  I believe I did as just a -- not a driver,

7    just a helper.

8         Q.  Okay.  And what did he do as a helper?

9         A.  He took packages to the front door.

10        Q.  So you would drive the truck?

11        A.  And he would take packages.

12        Q.  How long did he do that?

13        A.  Through the Christmas -- just Christmas.

14   And then that wasn't every day either.

15        Q.  He did that during Christmas 2001?

16        A.  Yeah, probably.  He probably -- he probably

17   worked with me for maybe three to four days just

18   when we got into the peak-peak, the last three to

19   four peak days.

20        Q.  And there's another, a business plan that's

21   dated March 21st, 2001.  That's the one right before

22   this, the one we were just --

23        A.  Before or after?

24        Q.  It's before.  It's -- the number at the

25   bottom of the page is 265.  And --

**8/15/2006  Alexander, Dean**

1          MS. ZERGER:  I don't think he's found the

2     number yet.

3     BY MS. BREMER:

4          Q.  Okay?

5          A.  265.  One more page.

6          Q.  The peak planning here also talks about,

7     has his son as a helper.  Did you hire your son as a

8     helper before the Christmas season of 2001 or was

9     that the first time?

10         A.  I put that down as a business plan.  He

11    really only came on to help me during the peak.

12         Q.  Okay.

13         A.  This is a business plan.

14         Q.  Right.  Right.  Okay.  And then turn to the

15    one right before this, which is dated March 14th,

16    2002.  And the number at the bottom is 263.

17              And then for the peak, under "Peak

18    Planning" here it says, "Will run supplemental

19    route."

20              Did you start running a supplemental route

21    in 2002, or do you think it was later than that?

22         A.  I don't know.  Like I say, again, these are

23    just questions they ask you, what you're going to do

24    in the future.

25         Q.  Right.

**8/15/2006  Alexander, Dean**

1      A.  And I can't -- like I say, I know I have it

2    at home.  I don't know the exact dates as to when he

3    started.  But it could have been around that time.

4    I just don't remember without looking it up.

5          Q.  Could you describe what a supplemental is?

6          A.  A supplemental is another -- is a second

7    vehicle which supplements the first vehicle and

8    helps out.  They will get a portion of the route.

9          Q.  So you had two vehicles that were servicing

10   your route once you started with the supplemental?

11         A.  I had the main, my main truck was in my

12   primary and my smaller, my smaller van was in the --

13   was actually the supplemental route.  I was doing

14   the supplemental route.  Justin did the primary

15   core.

16         Q.  And what was the supplemental route?

17         A.  The supplemental route was El Dorado Hills,

18   was what I hung on to.

19         Q.  How old was your son when you first hired

20   him to run a supplemental truck?

21         A.  I'm not sure.  It was -- I know he was over

22   21 because you had to be 21 or older to work for

23   FedEx.

24         Q.  And he had graduated from high school?

25         A.  Yes.

**8/15/2006  Alexander, Dean**

1          Q.   Did he have any other educational history

2     when you hired him?

3          A.   He had been to some computer classes.

4          Q.   And he had a high school diploma?

5          A.   And a very high IQ, too, above average.

6          Q.   Was your son employed at the time that you

7     hired him?

8          A.   He was working as a bagger at Albertson's,

9     or courtesy clerk.

10         Q.   How much was your son making at the time

11    that you hired him?

12         A.   From Albertson's?

13             MS. ZERGER:  Vague and ambiguous.  Making

14    where?

15    BY MS. BREMER:

16         Q.   How much was he making at Albertson's when

17    you hired him?

18             MS. ZERGER:  Objection.  Personal

19    knowledge.

20             THE WITNESS:  Minimum wage.

21    BY MS. BREMER:

22         Q.   Why did you decide to hire your son?

23         A.   I hired my son because the area was growing

24    so much.  I had visions of building the routes up to

25    a point where I could have two trucks in Folsom or

**8/15/2006  Alexander, Dean**

1        contract the other route.

2                I wasn't sure what I was going to do, but

3        my plan at that time was to grow.  And finding good

4        drivers -- they are hard to find.

5            Q.  Did Justin have any experience driving a

6        truck prior to the time that you hired him?

7            A.  He drove his pickup every day.

8            Q.  Did he drive any larger trucks when you

9        hired him?

10           A.  I really couldn't tell you.  When he

11       started out, he was just in the van-van.

12           Q.  But he hadn't been employed as a driver

13       prior to the time that you hired him; is that right?

14           A.  He had been -- he also worked part time at

15       Round Table Pizza delivering pizzas.

16           Q.  Had Justin had any other work experience

17       either driving or delivering when you hired him?

18           A.  He had a paper route.

19           Q.  And when did he have a paper route?

20           A.  Now you got --

21           Q.  Was that something he serviced on his

22       bicycle or did he drive a car?

23           A.  He started out with that and as he got

24       older he did motor routes.

25           Q.  And that was in a car or a truck?

**8/15/2006  Alexander, Dean**

1          A.   In a truck delivering, covering quite an

2     area.

3          Q.   That was his pickup truck?

4          A.   Hm-hmm, yes.

5          Q.   When your son Justin worked for you as a

6     helper, did you need to get approval from FedEx Home

7     Delivery first?

8          A.   He had to fill out a job application.

9          Q.   Did he have to do anything else?

10         A.   Not as a helper.  I'm assuming that they

11    might have done some background check, I'm not sure.

12         Q.   So you informed them that -- you informed

13    FedEx Home Delivery that you were going to hire your

14    son as a helper?

15         A.   A lot of people did at Christmastime.  They

16    had helpers.

17         Q.   Did you tell anyone at FedEx Home Delivery

18    that Justin was your son?

19         A.   Everyone knew it.

20         Q.   But did you tell anyone?

21         A.   The point?  The point you're trying to

22    make?  I mean, I don't understand the point you want

23    me to get to.

24         Q.   I'm just wondering if you -- how everyone

25    knew that he was your son?

**8/15/2006  Alexander, Dean**

1        A.  I introduced him as my son to whoever came

2    by.

3        Q.  Okay.  Did anyone at FedEx Home Delivery

4    tell you that you could not hire a relative to work

5    for you?

6        A.  No.

7        Q.  I'd like to mark as Exhibit Number 12 an

8    "HD Supplemental Vehicle Use Request."  It's dated

9    October 20th, 2001 and it's Bates numbered

10   FXG_ALEXANDER 278 through 279.

11            (Whereupon, Deposition Exhibit 12 was

12            marked for identification)

13   BY MS. BREMER:

14       Q.  There's a signature at the bottom.  Is that

15   your signature?

16       A.  Yes.

17       Q.  Have you -- this document indicates, it

18   asks who will operate vehicle and it says Justin

19   Alexander.

20           Does this form refresh your recollection as

21   to when Justin started driving for you with the

22   supplemental vehicle?

23       A.  Yeah, probably, it does, yeah.  It probably

24   started then in -- oh, gosh, might have been August.

25   Dates and times are hard to remember.

8/15/2006  Alexander, Dean

1         Q.  Let me mark one other form, which is a "New

2    Contractor Data Sheet."  Let's mark this as Exhibit

3    Number 13.  It's Bates numbered FXG_ALEXANDER 260.

4              (Whereupon, Deposition Exhibit 13 was

5              marked for identification)

6    BY MS. BREMER:

7         Q.  Go ahead and take a look at this.  Over the

8    word "Contractor" there's a signature.  Is that your

9    name, your signature?

10        A.  Yes.

11        Q.  What is this document?

12        A.  This would be a document that was, I'm

13   assuming was in the very beginning.  I'm not even

14   sure what it is.

15        Q.  It indicates a start date as November 3rd,

16   2001.

17        A.  Oh --

18        Q.  Does that indicate the date that Justin

19   started driving for you?

20        A.  This might have been -- no, that's

21   November.  I really don't know what this is.  It

22   could be.  I don't -- it's not really clear what

23   this is.

24        Q.  Look back at Exhibit 12.  Exhibit 12 lists

25   information about a vehicle.  It says the make is a

**8/15/2006  Alexander, Dean**

1    Ford, the year is 2001, and appearance is brand-new.

2              Is that the supplemental vehicle?

3         A.   The one in the picture?

4         Q.   Yes, and it's described as a Ford, 2001

5    Ford.

6         A.   Okay, that's the supplemental.

7         Q.   Okay.  And your supplemental vehicle

8    request then was in October of 2001.  So was it

9    about that time, October or November of 2001 that

10   Justin started driving for you?

11        A.   I think -- I would think it was about that

12   time, yeah.  I would say somewhere in that area when

13   I bought the -- when I bought the truck.

14        Q.   And if you could look back at 13 again,

15   about halfway down the page, it says, "Bus Sup," and

16   then "Pkg," I assume that means business support

17   package.  And there's, it's filled in "No".  And

18   then "Mapping Software" is also filled in "No".

19             When Justin became a supplemental driver

20   for you, did you acquire a business support package

21   for him?

22        A.   We both had turn-by-turns and I think they

23   just added it on because I was charged the whole

24   five years for a business support package.

25        Q.   For one vehicle or for two?

**8/15/2006  Alexander, Dean**

1        A.  We both received manifests and

2    turn-by-turns and had scanners, which we paid extra

3    for the scanners in our business support.

4        Q.  Do you know if you paid for two complete

5    business support packages or just paid extra for the

6    scanner?

7        A.  I believe I just paid extra for the

8    scanner.

9        Q.  And did you get mapping software for both

10   of your trucks?

11       A.  Yes.

12       Q.  Justin was your employee, correct?

13       A.  Yes.

14       Q.  How much did you agree to pay Justin?

15       A.  I think we started him out -- I'm not sure

16   on the numbers.  We raised him up as we made more

17   money.  I think we started him out at $250 a week

18   until the stops got up.

19       Q.  And how did you determine how much to pay

20   him?

21       A.  As we grew, we would pay him more money.

22   We made more money -- we started paying him more

23   money until he'd tell me it's time that I need a

24   raise, I'm doing more.  So my wife would -- they'd

25   sit down and talk about it and give him a raise.

**8/15/2006  Alexander, Dean**

1          Q.   Initially, how did you come up with the

2      approximately 250 a week?

3          A.   Him and Mom worked that out.

4          Q.   So they negotiated that?

5          A.   They negotiated.

6          Q.   Was anyone from FedEx Home involved in

7      those negotiations?

8          A.   Just Mom.

9          Q.   At the time that your son started driving a

10     supplemental route, had you been providing financial

11     support to him?

12              MS. ZERGER:  Objection.  Relevance.

13              THE WITNESS:  Do I answer that?

14              MS. ZERGER:  Yes.

15              MS. BREMER:  Yes.

16              THE WITNESS:  He was living at home.

17     BY MS. BREMER:

18          Q.   Did you give him an allowance?

19              MS. ZERGER:  Same objection.

20              THE WITNESS:  No.

21     BY MS. BREMER:

22          Q.   Did you tell anyone at FedEx Home Delivery

23     what you were paying your son?

24          A.   I don't think I told anyone.

25          Q.   Why not?

**8/15/2006  Alexander, Dean**

1          A.   I don't think that's anybody's business.

2          Q.   Why wasn't it their business?

3          A.   He works for me.

4          Q.   And would you pay Justin out of your

5    settlement payment from FedEx Home Delivery?

6          A.   I paid that out of our bank account.

7          Q.   When did Justin receive his first raise?

8          A.   I can't remember.  Him and Mom worked money

9    out.

10         Q.   And those were the only two people that

11   were ever involved in negotiations over his pay?

12         A.   Yes.

13         Q.   How did you teach your son to service your

14   route?

15         A.   He learned when he was -- prior to taking

16   over the route, I trained him.  I told Dave and Jan

17   that I would train him how to do everything prior to

18   his starting.

19         Q.   And what did you do to train your son prior

20   to him starting?

21         A.   There wasn't much to train.  He knew Folsom

22   better than I did.  How to put the package on the

23   door, to hide it if it need be.  How to do the

24   service crosses.  How to code it with whatever code

25   you needed to code it with, if you had to bring it

**8/15/2006  Alexander, Dean**

1    back.

2         Q.  Did Dave Westbrooks or Jan object that you

3    would be training Justin instead of them?

4         A.  At that point they weren't as rigorous as

5    they are now for the supplemental drivers.  Now

6    everybody has to be trained, even a supplemental.

7              At that point they were letting -- in the

8    beginning, with a day of training, in-house

9    training, some videos, he had to go down and watch

10   videos.  I can't remember how many it might have

11   been, two days, I'm not sure.  But he was in-house

12   for a couple of days and then I trained him out on

13   the road.

14        Q.  So one or two days he watched videos.  And

15   was he watching videos all day or how many hours do

16   you think he did that?

17        A.  No, I'm not sure how many hours he was

18   there.

19        Q.  Was it all day?

20        A.  I would imagine it was.  I just don't

21   remember how many he was there.

22        Q.  Okay.  And then how long did Justin go out

23   on the route with you to be trained on the road

24   prior to starting?

25        A.  I think it was just -- I can't remember for

**8/15/2006  Alexander, Dean**

1    sure.  It was probably less than a week.

2        Q.  So several days?

3        A.  Several days.

4        Q.  Once Justin started working for you.  Did

5    you continue to train him and tell him how to

6    operate?

7        A.  No.

8        Q.  How would he figure out which stops to go

9    to in which order?

10       MS. ZERGER:  Objection.  Calls for

11   speculation.  Lack of personal knowledge.

12   BY MS. BREMER:

13       Q.  Were you involved in decisions about the

14   order of stops that he was to make?

15       A.  He had the same set of turn-by -- he had

16   turn-by-turns and he had the manifest.

17       Q.  Right.  And you had indicated before that

18   in your experience the turn-by-turns weren't the

19   most efficient way to service the route.

20       A.  No, but --

21       Q.  So did you teach him how to service the

22   route efficiently?

23       A.  I didn't have to.  He knew Folsom better

24   than I did.  By the time he was into the second

25   week, he wasn't even using the turn-by-turns.  He

**8/15/2006  Alexander, Dean**

1    was doing the route the way it was the most

2    efficient.

3         Q.   Did you have any service issues with your

4    son?

5         A.   Service issues?

6         Q.   Like did he have -- you had indicated, I

7    think, that your service was 100 percent.  Was

8    that --

9         A.   Including both of them.

10        Q.   That was for both of you?

11        A.   That's combined.  So he was doing 100

12   percent as well.

13        Q.   Were there any issues of him leaving

14   packages behind without following procedures?

15        A.   I'm assuming there was something like that.

16   That's when I was on vacation, one time something

17   happened.  Scott would snivel over it.  It was just

18   too much stuff.  It only happened once or twice

19   while I was on vacation and he was doing both

20   routes.

21        Q.   And how did you find out that there was

22   some sort of problem when you were on vacation?

23        A.   He'd call me.

24        Q.   Justin would call you or Scott?

25        A.   No, Scott would call me, which was very

**8/15/2006  Alexander, Dean**

1    rude.

2        Q.  Because he was calling you on your

3    vacation?

4        A.  Yes.  I wouldn't want to be bothered on my

5    vacation.

6        Q.  Did he tell you why he was calling you as

7    opposed to handling the situation himself?

8        A.  Well, I don't think -- he, personally, was,

9    at that point, was at a stage in his career there

10   that he was starting to get overburdened, if you

11   will.

12            At that point was when he was really

13   just -- that's when he was getting into his blowup

14   stages at that time.  And every little problem --

15   and I believe at that time we had a lot of DNAs.

16   And DNAs does not make a terminal manager look good.

17   So he had a short fuse, and that's when some people

18   got let go during that period.

19       Q.  And what are DNAs?

20       A.  Did not attempt.

21       Q.  And did you or Justin have any of the did

22   not attempts?

23       A.  No.  He didn't write that up as that.  It

24   was a bulk stop that he didn't have the room in to

25   take, and he told Scott that he would get it

**8/15/2006  Alexander, Dean**

1    tomorrow when he had room.  He was -- he would go

2    out of there packed top to bottom.

3        Q.  When you were on vacation?

4        A.  Yes.  And he would -- Scott wanted him to

5    come back and get the bulk stop.  So you got a

6    50-plus mile turn-around, doesn't make sense when

7    you've got 175 stops.  But he --

8        Q.  So when Scott called you on your vacation

9    concerning that problem, did you then talk to your

10   son?

11           MS. ZERGER:  Objection.  Leading.

12           THE WITNESS:  I called him, but I'm not

13   worried about it.  I know that Scott, for lack of

14   better words -- I'd like to say something but I

15   can't.  But Scott was just at that point where --

16   the terminal was not making its numbers.  And in

17   FedEx land, you make your numbers.  The package is

18   more important than anybody else, any driver in that

19   company getting that delivery.  They don't care

20   about anything else but the package.

21   BY MS. BREMER:

22       Q.  So did you give any instructions to Justin

23   as to whether or not he needed to go back and pick

24   up the packages and deliver them that day or whether

25   he could wait until --

**8/15/2006  Alexander, Dean**

1        A.  He didn't have the time to do it.

2        Q.  So you told him he could wait until

3    tomorrow?

4        A.  They didn't write it up much.  If they said

5    anything, he just made more of a fuss over it.  He

6    knew he couldn't do it.  Like I say, he just wanted

7    to be irritating because their numbers were way

8    down.

9            Nobody -- we weren't getting our bonuses at

10    that time because our bonuses were depending on

11    every driver in that terminal to do a 97 percent

12    delivery record, every driver.  And some drivers

13    were -- well, obviously we weren't making 97 percent

14    in order to get our bonuses.  And that means he's

15    not getting his bonus either.

16            So bonuses were way down, nobody was

17    getting bonuses, our smaller bonuses, monthly

18    bonuses.

19        Q.  So was it your understanding that Scott

20    called you when you were on vacation and there was a

21    problem that he perceived with Justin because Justin

22    was your employee?

23        A.  I believe so, but I believe he called just

24    to be irritating.  To me, there was no sense to make

25    that call to begin with.

8/15/2006  Alexander, Dean

1      When you've got a driver that does 100

2   percent, a small issue like that should be nothing.

3   But because of the numbers being down in the

4   terminal and they know what didn't get delivered.

5      Q.  Did Justin have a temper?

6      MS. ZERGER:  Vague and ambiguous.

7      THE WITNESS:  I'd say he doesn't have a

8   temper.  I think like anybody who gets into a

9   corner, with stupidity, you can get a temper.

10  BY MS. BREMER:

11     Q.  Did you say Justin is a hot head?

12     A.  No, he's not.  I didn't say that.

13     Q.  Have you ever heard the term "business

14  discussions"?

15     A.  I believe I've heard that.

16     Q.  Do you know what those are?

17     A.  You'd have to refresh my memory.

18     Q.  Have you ever heard the term "contractor

19  discussion notes"?

20     A.  I believe so.

21     Q.  Well, let me mark as Exhibit 14 something

22  labeled, "Contractor Discussion Notes."  It's Bates

23  labeled FXG_ALEXANDER 5128 through 5145.

24         (Whereupon, Deposition Exhibit 14 was

25         marked for identification)

**8/15/2006  Alexander, Dean**

1    BY MS. BREMER:

2        Q.   I'm not going to go through every single

3    one of these, but why don't you turn to the

4    discussion on 5134.

5        A.   5134.

6        Q.   This is dated January 8th, 2004.  And it

7    says, "Dolan:  Dean, I need you to speak with Justin

8    about deleting packages with his scanner.  I've told

9    him, and we've talked about this before.  He has no

10   authority to delete packages.  He needs to get a

11   hold of someone in management.  He deleted a bunch

12   of El Dorado packages and left them lying in a

13   pile."

14           Do you recall having a discussion with Scott

15   Dolan about Justin deleting packages?

16       A.   Yeah, I remember him doing that.  At that

17   particular time we were just -- that was -- what was

18   the date on that?

19       Q.   January 8th, 2004.

20           MS. ZERGER:  Do you see the date on there?

21           THE WITNESS:  Oh.  Yeah, I remember him

22   having it.  I don't remember why he did it right

23   now.  I believe because he was too heavy in Folsom.

24   And Scott basically dumped part of my route back on

25   him.

**8/15/2006  Alexander, Dean**

1          And I think what happened -- I was real

2    heavy that day and Justin was heavy that day.  And

3    there was nobody around, again, to pick the slack up

4    to be flexed into that area.  And he just didn't

5    have the room nor the time.

6          And we told Scott before he did that,

7    "Justin's heavy today, Scott."  Trouble is, you get

8    one side of what they say.  They always put down

9    what they said but not what the real story is.

10          And we told him, "He's too heavy today,

11    Scott, you need to take that off," and so Justin

12    deleted them and left them behind.  It was only

13    about five or six.  I believe that particular day I

14    came back and got them.

15    BY MS. BREMER:

16       Q.  Was part of the problem that he was -- he

17    wasn't using the proper procedures to delete the

18    packages?

19       A.  Well --

20          MS. ZERGER:  I'm going to object.  It

21    mischaracterizes the testimony.  And it's been asked

22    and answered.

23          THE WITNESS:  I can't -- I really don't

24    remember much about this situation.  But Scott was

25    always in his face for some reason.

**8/15/2006 Alexander, Dean**

1    BY MS. BREMER:

2        Q.  He was always in Justin's face?

3        A.  Yeah.

4        Q.  Did he also talk to you asking you to talk

5    to Justin?

6        A.  Hm-hmm.

7        Q.  If you look at the second line of what

8    Dolan, or the second, I guess, paragraph that's

9    under, "Dolan," it says, "We set that route up just

10   like you told us to do."

11           Did you tell Scott how you wanted the route set

12   up?

13       A.  Yes, to get -- so he could get -- Justin

14   could get the back end of the route.

15       Q.  So you told -- am I understanding it

16   correctly that you told FedEx Home which portion of

17   the route you wanted to go to Justin and which

18   portion to go to you?

19       A.  Right.  Because that part of the route was

20   closer to Folsom.

21       Q.  Look at 5138.  This is a contractor

22   discussion note dated January 9th, 2003.

23       A.  I'm sorry, what page was that?

24       Q.  5138.  Take a moment to look at it.

25   Apparently the issue here is Justin yelling and

**8/15/2006  Alexander, Dean**

```
1     cussing at management staff in front of other
2     people.
3          A.  He wasn't.
4          MS. ZERGER:  The document speaks for
5     itself.  As to the truth of it, we don't have the
6     person who wrote this document here.
7          THE WITNESS:  That's not true.
8     BY MS. BREMER:
9          Q.  Do you recall an issue with Justin yelling
10    at terminal staff?
11         A.  I don't really remember this, but it
12    doesn't really matter.  I mean, I see here it says,
13    "Tish, but once again she did not cross the line."
14    She crossed the line quite often.
15         Q.  How did Tish cross the line?
16         A.  With her attitude.  She was -- she had a
17    real attitude.  She would be slow getting our
18    scanners back to us.  When she was checking at the
19    back door, she would be another one who would be,
20    you know, "Why did you bring this package back?"
21    What's your excuse this time?"  Loud enough so
22    everybody could hear it.
23         Q.  So did Justin talk back to her?
24         A.  I'm sure she talked to him first.  Knowing
25    her, she was quite the disturber.
```

**8/15/2006  Alexander, Dean**

1        Q.  Do you have any knowledge of Justin talking

2    back to her or yelling at her?

3        A.  I can't remember.  And this was 1/9/03.

4    Who knows.  You know, like I say, these people could

5    be very irritating.  And a lot of times Tish herself

6    could be very unprofessional in her treatment of the

7    drivers.

8        Q.  This document says, indicates that you

9    said, "Justin is just a hot head.  Tish pushed his

10   buttons and he went off.  She deserves it I'm

11   telling you, the way she talks to people."

12           Do you recall saying that?

13       A.  Who, me?

14       Q.  Yeah.

15       A.  No, I don't remember calling -- saying

16   Justin was a hot head.  I don't remember that at

17   all.  Besides, I wouldn't have said that about my

18   son.

19       Q.  Did you ever talk to Justin about how to

20   handle Tish?

21       A.  Yes, I did.

22       Q.  Did you give him any advice?

23       A.  Yeah.  Don't talk to her.  Don't -- these

24   people would get literally under your skin.

25       Q.  How long did Justin work for you?

**8/15/2006  Alexander, Dean**

1       A.  He worked up until the day I sold the

2    route.  He finished out the last of the route.  So

3    about whenever I sold my route.

4       Q.  Do you know if your wife prepared a 1099 or

5    a W-2 for Justin?

6       A.  1099.

7       Q.  You mentioned that you had gone on

8    vacation.  What would you do -- how would you make

9    sure that your route got serviced while you were on

10   vacation?

11      A.  I had Justin do it.

12      Q.  So Justin would --

13      A.  He did both routes, when it wasn't too big.

14      Q.  How much vacation did you take?

15      A.  A week.

16      Q.  A week a year?

17      A.  Some years, no.  When I did, it was a week.

18      Q.  And how many times did you take a week

19   vacation?

20      A.  I can't remember.  Maybe three.  Maybe.

21   I'm not sure.  Maybe two.

22      Q.  What would you do if you or Justin got

23   sick?

24          MS. ZERGER:  Vague and ambiguous.

25          THE WITNESS:  That wasn't an option.  We'd

8/15/2006  Alexander, Dean

1    work.

2    BY MS. BREMER:

3        Q.  Were you ever sick enough that you weren't

4    able to work?

5        A.  I was sick a few times with a bad cold, but

6    I kept working.

7        Q.  Did you ever -- were you ever sick with

8    anything worse than a cold when you were contracting

9    for FedEx Home?

10       A.  Just bad colds.

11       Q.  What about Justin, was he -- did he ever

12   get sick?

13       A.  He had a cold or two along the line, but

14   both of us just -- whenever we were sick, we worked.

15       Q.  Did you participate in the time-off

16   program?

17       A.  No, I wouldn't pay somebody to be on a list

18   to -- and not get nothing for it.  That was a bad

19   plan.  Just another way FedEx takes advantage of

20   drivers.

21       Q.  But you had an option whether or not to

22   participate, correct?

23       A.  It just was a bad plan.  Whoever did that

24   didn't have the drivers in mind.  To have to pay to

25   get on a list to get a vacation and get nothing for

**8/15/2006  Alexander, Dean**

1    that money, you're just paying, whatever, ten bucks

2    a week for a week off for nothing, just to be on

3    that list, and then lose your whole check because

4    your whole check goes to that person who's doing

5    your route.

6        Q.  So you decided not to sign up for the

7    time-off program because you felt it was a bad deal?

8        A.  I thought it was a very bad deal.  So did a

9    lot of other people.

10       Q.  After you signed the operating agreement

11   and owned your own route, what did you do to prepare

12   for your first day of delivering packages?

13       A.  What did I do to prepare?

14       Q.  Yes.  Sounds like you went to training

15   first, and then was anything else done?

16       A.  The week -- you're talking about the day I

17   started or the week of training?

18       Q.  I guess before you started driving your

19   route.

20       A.  Well, FedEx told us anything and everything

21   to do that had to do with delivery.  The one thing

22   they did not do is physically take us out and drive.

23       Q.  So no one rode with you when you first

24   started servicing your route?

25       A.  No.  I didn't have any packages my first

8/15/2006  Alexander, Dean

1    day.

2         Q.  Really?

3         A.  Not a one.

4         Q.  When did you have your first packages?

5         A.  The next day.

6         Q.  So what did you do your first day?

7         A.  Went home.

8         Q.  So you showed up at the terminal and there

9    were no packages so you went home?

10        A.  I went out -- well, actually, I went out

11   with -- I can't remember.  There was some gal, she

12   had four stops and she goes, "Why don't you ride

13   along with me," and I rode along with her to do the

14   four stops, which took about, you know 45, 50

15   minutes, and then went home.

16        Q.  What type of vehicle did you use to service

17   your route?

18        A.  On the Folsom route, I upgraded --

19        Q.  Why don't we start with what vehicle you

20   first had.

21        A.  I started out with the one that the

22   terminal recommended.  It was a three-quarter ton

23   Chevy van.

24        Q.  And how long did you drive the Chevy van?

25        A.  Until I upgraded to the Workhorse.  I can't

**8/15/2006  Alexander, Dean**

```
1    remember the date I got the Workhorse, but it was

2    probably -- probably that spring after I bought the

3    supplemental, and that was, what, 2002.

4         Q.  Why did you decide to upgrade to the

5    Workhorse?

6         A.  Because it was a bigger van and we were

7    getting to the point where packages were getting

8    bigger and bigger, and they offered $1,000 for an

9    upgrade.

10        Q.  And how did you decide to go with the

11   Workhorse as opposed to some other van?

12        A.  That's the one FedEx had on their poster

13   board.

14        Q.  Did you consider other vans?

15        A.  There really -- I didn't really know where

16   to go.  No, I didn't.  That's what they had up

17   there.  Later on a few other companies came around

18   after I bought that one with vans, but that's --

19   they recommended that one through Bush Leasing, I

20   believe it was.

21        Q.  So you started with a Chevy van and you

22   later upgraded to a Workhorse.  Did the other

23   contractors in the terminal in the beginning own

24   different types of vehicles?

25             MS. ZERGER:  Objection.  Lack of personal
```

8/15/2006  Alexander, Dean

1    knowledge.  Speculation.

2              You can answer, if you know.

3              THE WITNESS:  Okay.  When we started we all

4    started out with -- out of the seven drivers, five

5    had the leases from the same company and two of them

6    had bought smaller vans, which at the time was okay.

7              But every time -- after the first year, as

8    they started adding new contractors, they would go

9    to a 250 -- I'll just use the Ford because that's

10   easier -- the 250, which is a one-ton.  And then

11   they'd go -- then the next crowd would come in and

12   they'd have to have at least a 350 box van.  And

13   then up to the 450, and then up to as big as the 550

14   in a box van or buy a bigger, like a Workhorse, like

15   a UPS-type van.

16   BY MS. BREMER:

17        Q.  So the five contractors that had leases

18   from the same company as you, did they all lease the

19   exact same vehicle or did they have different

20   vehicles?

21        A.  That was the exact same vehicle they had in

22   all the videos they showed us.

23        Q.  And the other two had different vans?

24        A.  They had smaller vans.  They had the

25   half-ton, which at the time was all right, but they

**8/15/2006  Alexander, Dean**

1    would have found out real soon that those weren't

2    going to work, but they didn't last that long.

3        Q.  Let me mark a file, "FedEx Vehicle

4    Contracts."  It's labeled PCA 2014 through 2041.

5            (Whereupon, Deposition Exhibit 15 was

6            marked for identification)

7    BY MS. BREMER:

8        Q.  Do you recognize this as your file on FedEx

9    vehicle contracts?

10       A.  Yes.

11       Q.  Looks like the more recent documents are on

12   top so I'm going to ask you about documents at the

13   end first.  If you could turn to page 2039.  It's

14   near the end.

15           This is a letter dated September 5th, 2000 from

16   Mike Albert Leasing to Mr. Dean Alexander and Ms. Mary

17   Alexander.  And it says, "Enclosed is the paperwork for

18   your lease of 2000 Chevy 2500 Express."

19       A.  2500 Express.

20       Q.  2500 Express.  And then behind that there's

21   Schedule A from Mike Albert Leasing and an

22   individual leasing form also dated September 5th,

23   2000.

24           Do you see that?

25           MS. ZERGER:  I don't think the witness

**8/15/2006  Alexander, Dean**

```
1     answered that he saw where you -- you need to say

2     audibly.

3             THE WITNESS:  I'm sorry, I didn't realize

4     you were talking to me, I'm sorry.

5             Yes, I see that.

6     BY MS. BREMER:

7         Q.  Do you recognize this as the paperwork that

8     was filled out for the lease of the Chevy?

9         A.  Yes.

10        Q.  Okay.  On Schedule A, there are two

11    signatures -- it's signed by, it appears, both Dean

12    Alexander -- is that your signature?

13        A.  Yes.

14        Q.  And then Mary Alexander.  Is that your

15    wife's signature?

16        A.  Yes.

17        Q.  Why did Mary Alexander sign this leasing

18    form?

19        A.  Because her name is, was on the title, was

20    going to be on the title.

21        Q.  And why did you decide that her name was

22    going to be on the title?

23        A.  Community property.

24        Q.  By the way, did you pay her at all for her

25    accounting services?
```

**8/15/2006  Alexander, Dean**

1        A.   No.

2        Q.   Did you consider purchasing a vehicle as

3    opposed to leasing?

4             MS. ZERGER:  Vague and ambiguous as to

5    time.

6    BY MS. BREMER:

7        Q.   When you first started driving your route

8    for FedEx Home Delivery.

9        A.   Again, I'll go back to the very beginning.

10   Everything they had was lease.  Every piece of paper

11   we got was lease.  And I thought that was the way

12   they wanted us to go.  You lease the vehicle, you

13   wear it out and you get a new one, and they wore out

14   a lot quicker.

15            But that's always -- it was always what

16   FedEx had at our first week.  None of us really knew

17   what was really happening in this thing.  We thought

18   that is the way FedEx wants it done.  We were all

19   under that same impression, so they -- I'm sorry.

20       Q.   Go ahead and finish your answer if you

21   aren't done.

22       A.   Like I say, we had all this Mike Albert

23   Leasing material.  And there was another one, I

24   can't remember the other leasing company, that they

25   had two that we could deal with.  And I asked -- I

**8/15/2006  Alexander, Dean**

1    can't remember if it was Jan or it was Dave, "Which

2    one do you recommend?"  And they recommended Mike

3    Alberts was the better of the two, so that's why I

4    chose Mike Albert.

5        Q.   Did they say why Mike Albert was better?

6        A.   I didn't ask them.  I figured they knew.

7        Q.   Did you consider the other leasing company?

8        A.   I figured they knew what they were talking

9    about.

10       Q.   And you knew that this was going to be a

11   significant investment; is that correct?

12       A.   Yes.

13       Q.   How much did you pay to lease your Chevy?

14       A.   I made, I don't remember -- I think I put a

15   thousand dollars down and then whatever the -- I

16   can't remember what the payments were on it.

17   $479.82 a month.

18       Q.   For how long?

19       A.   I can't remember how long I leased this

20   one.  I don't remember.  I'd have to really look at

21   it and see the -- it didn't last a little over a

22   year and then I upgraded.  They let -- I don't

23   remember the terms for how long.

24       Q.   Before you decided to lease a vehicle to

25   service your FedEx Home Delivery route, did you know

**8/15/2006  Alexander, Dean**

1    that other potential contractors owned their own

2    vans and were going to use those vans?

3           MS. ZERGER:  Assumes a fact not in

4    evidence.  You can answer.

5           THE WITNESS:  I don't understand "others,"

6    who do you mean "others"?

7    BY MS. BREMER:

8       Q.  You indicated that there were seven

9    contractors that started at the same time as you and

10   that two of them owned their vans and used those

11   vans to service their routes; is that correct?

12      A.  They bought smaller vans.

13      Q.  Right.

14      A.  And I figured that was going to be a big

15   mistake.

16      Q.  Did you know that they had purchased those

17   vans prior to deciding to lease a van?

18      A.  Yeah, I did.  I knew that the one gal was

19   buying one, and I don't know why she leased --

20   didn't lease.  She paid almost as much for that.  I

21   don't know that she could qualify, maybe, for this.

22   I don't remember the circumstances why she bought a

23   smaller van when FedEx was clearly recommending the

24   three-quarter-ton long -- the little bit longer van.

25      Q.  And why do you think that it was a mistake

**8/15/2006  Alexander, Dean**

1    for those two contractors who purchased their

2    vehicles to do that?

3        A.  Because they were smaller, a lot smaller.

4    And we were told growth.  We were told growth.  And

5    the first one that's going to grow out is the

6    smaller vans.  Ours had an extra, I don't know how

7    many square feet, but it had probably an extra ten,

8    20 square feet more loading capacity.

9        Q.  So you believed that it would be better for

10   your business in the long run to lease the larger

11   van as opposed to purchasing a smaller van?

12       A.  The one that FedEx was recommending.

13       Q.  And that's why you decided to go ahead and

14   lease that van?

15       A.  The bigger van.

16       Q.  And that was a yes?

17       A.  That was a yes.

18       Q.  Okay.  If you look at the, this individual

19   leasing document, which is dated September 5th,

20   2000, that's the last page, Bates labeled 2041.  It

21   says, "Said vehicle described above is being leased

22   by an individual," and then it has an "s" in

23   parentheses, "primarily for, "and I guess three

24   choices, "business, agricultural, personal."  And

25   someone has circled "business".  Is that -- did you

8/15/2006  Alexander, Dean

1    circle "business"?

2          A.  I'm assuming I did.

3          Q.  And you understood that the vehicle was

4    going to be used in your business as opposed to

5    personal purposes?

6          MS. ZERGER:  I'm going to object to the

7    characterization use of the word "business" as I had

8    before.

9          THE WITNESS:  Yes.

10   BY MS. BREMER:

11         Q.  Did the Chevy come with FedEx Home Delivery

12   logos?

13         A.  No.

14         Q.  Did you get logos on the van?

15         A.  No.

16         Q.  You never had logos?

17         A.  I had magnets.

18         Q.  Magnets.  And how did you get those?

19         A.  The terminal bought them.  They had them

20   when we started up.  They had magnets for the vans.

21         Q.  And so the logos were magnets that you

22   could put on the van and then remove?

23         A.  Yes, they were.  They knew this would be a

24   temporary thing.  We didn't.  But it didn't take

25   long to figure out that it was going to be

**8/15/2006  Alexander, Dean**

1    temporary, that's why the magnets.

2        Q.  What do you mean?

3        A.  They needed to keep going bigger and bigger

4    vans.  And as the bigger ones came in, one of the

5    requirements was to come with the logo.

6        Q.  As they got bigger?

7        A.  As they got to the one-tons, at that point

8    they were required to physically have a permanent

9    FedEx logo on the truck, nonremovable.

10       Q.  So you're saying that you think the reason

11   that they used magnets at first was because you

12   believed that they would have -- that they knew that

13   they would need larger trucks later?

14       A.  Yes.

15       Q.  Then why -- why would they later require

16   that the trucks have attached logos if --

17       A.  Well, I don't know.  That's one of FedEx's

18   rules.  You go down there to the terminal right

19   today, any FedEx Ground terminal and you'll see

20   every one is permanent as the trucks got bigger.

21   Over a one-ton.

22       Q.  Did anyone tell you why they required

23   magnets at first and permanent logos later?

24       A.  I'm assuming because they were so small and

25   that people would be upgrading as the volume went,

**8/15/2006  Alexander, Dean**

1    as they realized, because they kept asking people to

2    upgrade.  Because people were leaving packages

3    behind already, the ones that had the Chevy 2500

4    van.  By the time you got -- after your first year,

5    a lot of people were having problems because they

6    got big accounts with big boxes, and they kept

7    asking people to upgrade.  Some did, some didn't and

8    some left.

9        Q.  Okay.  I don't think I got an answer to my

10   question which was did anyone tell you why they

11   required magnets at first and permanent logos later?

12       A.  No.

13       Q.  So you're just assuming?

14       A.  Assuming that is why.

15       Q.  Okay.  Did you ever remove the logos from

16   your van when they were magnets?

17       A.  Yes.

18       Q.  And why did you remove them?

19       A.  To wash it.

20       Q.  Any other reason?

21       A.  If I went down to the store and I didn't

22   want anybody to know I was working for FedEx, I

23   would take them off.

24       Q.  So sometimes you used your Chevy for

25   personal use?

**8/15/2006  Alexander, Dean**

1        A.  Yes, but not very much.  But to go to -- if

2    I needed to go to the garden store and pick up some

3    fertilizer or some garden supplies, I would take the

4    van down there.

5        Q.  Was that the only van that you owned at

6    that time?

7        A.  At that time.

8        Q.  Let's look at page 2021 in the last exhibit

9    we were looking at.

10       A.  15?

11       Q.  15, right.  This is a letter from Bush

12   Leasing, 2021.  It's a letter from Bush Leasing

13   dated May 28, 2002.

14           MS. ZERGER:  Objection.  The document

15   speaks for itself.

16   BY MS. BREMER:

17       Q.  Did you sell the 2000 Chevy in 2002 to buy

18   a 2002 Workhorse?

19       A.  I traded it in.  Bush Leasing found a buyer

20   and sold it.

21       Q.  And were you required to replace your

22   vehicle?

23       A.  This is -- we're talking about the

24   Workhorse here?

25       Q.  Yes.

**8/15/2006  Alexander, Dean**

1          A.   I just -- I decided to take advantage of

2      the $1,000 that they offered to upgrade, after you

3      worked it for 90 days, to get a bigger van because

4      we were getting bigger and bigger and bigger boxes,

5      so I decided to upgrade to a bigger van.

6          Q.   Okay.  And then did you purchase a second

7      vehicle for Justin?

8          A.   The Workhorse?

9          Q.   Did Justin drive the Workhorse?

10          A.   Justin drove the Workhorse.

11          Q.   And then did you purchase another vehicle

12      for yourself at some point?

13          A.   The 2001 Ford F150.

14          Q.   You indicated that you used your Chevy

15      occasionally for personal purposes.  Did you ever

16      use either of your other vans for personal reasons?

17          A.   The Workhorse, I never did.

18          Q.   What about the Ford?

19          A.   The Ford had -- on occasions I would go

20      down, again same scenario, would go down and use it

21      for yard supplies.  I didn't want to put any

22      unnecessary miles on them.

23          Q.   Did Justin ever use the Workhorse for any

24      purposes other than driving your route?

25              MS. ZERGER:  Objection.  Lack of personal

**8/15/2006  Alexander, Dean**

1    knowledge.

2             You can answer if you have knowledge.

3             THE WITNESS:  I really don't know if he did

4    or not.  He brought it home every night after work.

5    BY MS. BREMER:

6        Q.  How long did Justin live with you?

7        A.  I'm not sure when he moved out.  It was

8    maybe 2003 or two.  I'm not really sure when he

9    moved out.

10       Q.  When he was living with you, did you ever

11   see him driving the Workhorse for personal reasons?

12       A.  No, he had his own vehicle.

13       Q.  Did anyone from FedEx Home Delivery tell

14   you that you couldn't use your vehicles for personal

15   purposes?

16       A.  I had heard they didn't like the fact that,

17   for you to ride around and use your vehicle with the

18   FedEx logos on them.

19       Q.  Did they ever tell you that directly?

20       A.  I can't remember, but I know I heard it.

21       Q.  And you think you heard that from other

22   contractors?

23       A.  Yes.

24             MS. BREMER:  Okay.  Sorry, we need to

25   change the tape.

**8/15/2006  Alexander, Dean**

1           THE WITNESS:  Okay.  Perfect timing.

2           THE VIDEO OPERATOR:  This marks the end of

3    Tape No. 3 in the deposition of Dean Alexander.

4    Going off the record.  The time is 2:52.

5           (Recess taken)

6           THE VIDEO OPERATOR:  This marks the

7    beginning of Tape No. 4 in the deposition of Dean

8    Alexander.  Back on the record.  The time is 3:04.

9    BY MS. BREMER:

10       Q.  Mr. Alexander, before we went on a break we

11   were looking at Exhibit 15.  Could you turn to page

12   2016 through 17, please?

13           What is this document?

14       A.  This document was the supplemental vehicle.

15   This was the 2001 Ford Econoline van.

16       Q.  And you purchased that in 2001; is that

17   correct?

18       A.  Yeah, I think so.  I don't see the date,

19   but --

20       Q.  And I see on pages 2016 and 17, looks like

21   there's a signature, Kathy Alexander, numerous

22   signatures by Kathy Alexander.  Are those your

23   wife's signatures?

24       A.  Yep.  Yes, those are my wife's signatures.

25   I was so busy she went down and bought it.

**8/15/2006  Alexander, Dean**

1          Q.   And if you look up at the top for the

2    second box, there's a box that says, "Primary use

3    for which purchased," and there are three choices.

4    One is, "Personal, family or household," one is,

5    "business," and one is "agricultural."  Do you see

6    that?

7          A.   Yes.

8          Q.   And there are checkmarks next to "personal,

9    family or household."

10         Do you know why that box was checked as

11   opposed to business?

12         A.   I'm not really sure.  My wife bought it.

13   And why she did that --

14         Q.   Did you discuss with your wife in advance

15   whether you were going to characterize this purchase

16   as a personal vehicle versus a business vehicle?

17         A.   It was purchased to use as a business

18   vehicle.

19         Q.   Did you discuss with your wife how it would

20   be characterized on this form?

21         MS. ZERGER:  Asked and answered.

22   BY MS. BREMER:

23         Q.   It was asked.  It wasn't answered.

24         A.   Now, this form here is the purchase form;

25   is that correct?  This was the form that I purchased

**8/15/2006  Alexander, Dean**

1    the vehicle or she purchased the vehicle.  I'm

2    assuming it's a copy of it.

3            I'm assuming when she went down to buy this

4    that they automatically assumed when they were

5    filling out the paperwork that it was for personal

6    use.  So I don't really think that really matters, I

7    wouldn't think.

8        Q.  And that's just an assumption that you're

9    making?

10       A.  Yeah, I'm making an assumption because

11   obviously FedEx had all the information that they

12   needed to know that it was a work vehicle.

13       Q.  If you look at page 2018, there's a

14   handwritten note which says, "VS," I assume that

15   means vehicle sold, as route sold January 2005; is

16   that right?

17       A.  I'm assuming that's what this is.  I don't

18   know.

19       Q.  Did you sell one of your vehicles when you

20   sold your route?

21       A.  What year, 1/05.  Yes, I sold the Workhorse

22   with the route.

23       Q.  And did you sell the Workhorse with the

24   route in January of 2005?

25       A.  Yes.

**8/15/2006  Alexander, Dean**

1        Q.  Who did you sell your route to?

2        A.  I knew you were going to ask me.  I hope

3    his name was Dan, I think it was Brinkie, was the

4    last name.

5        Q.  Was it Blinkie?

6        A.  Blinkie, Blinkie or Brinkie.  Yes.

7        Q.  How did you go about finding Mr. Blinkie to

8    purchase your route?

9        A.  He came to me in the terminal.  He was

10   working as a Ground driver and doing a route for

11   somebody in our terminal and had heard that my route

12   was for sale.  And -- back up.

13        Dan took over the El Dorado Hills route.  I

14   had almost forgotten.  And he knew -- he had found

15   out that I was selling my primary and came over and

16   asked me about it, what I wanted for the route.  And

17   said he was -- told me he was interested.

18        Prior to that I put it in the paper a

19   couple times and got a couple of bites, but nobody

20   could qualify.  So eventually he wanted the route.

21   This was before Christmas sometime.

22        Q.  Before Christmas 2004?

23        A.  Yeah.  I'm thinking it might be.  It was

24   around -- might have been in November or early -- I

25   think it was in late November sometime he came and

**8/15/2006  Alexander, Dean**

1    asked about the route, and then we started shortly

2    after that, or I can't even remember if it was -- I

3    think it was before Christmas we started working on

4    the sale and getting prepared for what needed to be

5    done as far as inspections on the truck prior to

6    sale, and he bought the route.

7        Q.  You indicated that you put it in the paper

8    a few times.  Did you put advertisements in the

9    paper that you were selling your route?

10       A.  I put, "FedEx Home Delivery route for

11   sale."  Not many people had luck out of the paper.

12       Q.  When did you first put an ad in the paper

13   that you were selling your FedEx Home Delivery

14   route?

15       A.  I'm guessing it was in the summer of 2005,

16   later summer.

17       Q.  The summer of 2004, would that have been?

18       A.  Oh, I'm sorry, 2004, that's right.  2005 I

19   got rid of it.  I gained six months.

20           And I actually tried around July to sell

21   it, I'm thinking.  And I got one interested person

22   in it and that person couldn't qualify, later on

23   finding out he had a felony after I told him there

24   better be not anything in your closet because

25   they'll find it.  And he lied to me and lied to them

8/15/2006  Alexander, Dean

1     and they found it.

2           The next guy wanted to buy the route for an

3     investment and FedEx told him that he could not buy

4     the route and put a driver on it.

5           Q.   And how did you find out that that was the

6     problem?

7           A.   He told me.

8           Q.   Did anyone from FedEx Home tell you that

9     that was an issue?

10          A.   No, they didn't tell me, or I don't

11    remember if they did.  But the fact that they wanted

12    a person in the truck that owned the route, they did

13    tell me that.  But other than that --

14          Q.   So they did tell you that?

15          A.   They did tell me they wanted, yes, somebody

16    to be in the truck that owned the route.  They

17    didn't want anybody buying it for an investment.

18    That happened to several people in the terminal

19    where they wouldn't let people buy the routes

20    because they wanted to buy it for investments and

21    put drivers.

22          Q.   Did you talk about how much you wanted for

23    the route with the first two people who were

24    interested?

25          A.   Yes.

**8/15/2006  Alexander, Dean**

1        Q.  And how much did you tell them?

2        A.  I told them $50,000.

3        Q.  And you requested that amount from each of

4    them?

5        A.  Yes, and they both had agreed that they

6    would pay that if they got the route.

7        Q.  When did the person who wanted to buy the

8    route for an investment approach you?

9        A.  That was probably, I'm guessing, I don't

10   know the time frame, but it was probably in

11   September, I reran it again in the paper.

12       Q.  Were there any other problems with the

13   person who wanted to buy the route as an investment

14   other than he wanted it as an investment?

15       A.  There was no problem with as far as his

16   background.  It's just that Scott said they didn't

17   want somebody who was not be an owner and not

18   physically be on route.  Why, I don't know.

19       Q.  Did you do anything to try and get Scott to

20   change his mind about that?

21       A.  He was very adamant about it.

22       Q.  Did anyone else express interest in the

23   route?

24       A.  Just Dan after that.  And I wasn't going to

25   run it again until after the first of the year.

**8/15/2006  Alexander, Dean**

1    Christmastime is not the time to sell a route.

2        Q.  You weren't going to run the ad again until

3    after the first of the year?

4        A.  After the first of the year.

5        Q.  Did you do anything besides running ads?

6    Did you post it on bulletin boards or --

7        A.  No.

8        Q.  Tell people at the terminal to look out for

9    someone to purchase your route?

10       A.  Yes, they were all -- there was a lot of

11   them looking for buyers at that time.

12       Q.  You indicated previously that you would not

13   be able to sell your route until all of the routes

14   were closed out; is that right?

15       A.  Yes.

16       Q.  When did that happen?

17       A.  I believe that happened around March of

18   2004 when the district manager came down for our

19   annual -- going over the new incentive packages for

20   the next contract season.  Told us that the -- that

21   they finally closed out the routes and now anybody

22   that wants to sell a route can.

23       Q.  And when did you decide you wanted to sell

24   your route?

25       A.  I wanted to sell -- after that I thought

**8/15/2006  Alexander, Dean**

1    about it for a while and by June I had made up my

2    mind that it was time to sell the route.  I'd had

3    enough.

4         Q.  Did the first two people who were

5    interested in purchasing your route negotiate with

6    you over the price?

7         A.  No.

8         Q.  And Dan Blinkie ultimately purchased your

9    route; is that correct?

10        A.  Yes.  But he bought it for, I believe it

11   was $47,500.

12        Q.  So he did negotiate with you?

13        A.  He said that's all he could get on a loan,

14   so at that time it was close enough.

15        Q.  That was $2,500 less?

16        A.  Yeah, $2,500.

17        Q.  Did you know of other contractors that had

18   sold their routes before you?

19        A.  There was a lot of them trying, but a lot

20   of times Scott would get in the way.  Don't ask me

21   why.  I don't know why Scott would get in the way of

22   sales.

23        Q.  You're saying you don't know the facts?

24        A.  I don't know the facts.  I didn't talk, but

25   they said, "Scott wouldn't let me sell it to Joe."

**8/15/2006  Alexander, Dean**

1      Q.  And you're just talking about other

2    contractors?

3      A.  Other contractors who had found people to

4    buy their routes.

5      Q.  And they would tell you that Scott had

6    gotten in the way?

7      A.  Scott got in the way and wouldn't let them

8    sell, I'm assuming because Scott didn't think that

9    they might not do the job as they were doing.  The

10   terminal, like I say, was in semi-chaos with DNAs.

11   So he was looking out for his best interest.

12     Q.  You were ultimately able to sell your

13   route; is that right?

14     A.  Yes.

15     Q.  Were there any problems with Dan Blinkie

16   buying your route?

17     A.  No.  He had already been -- he had already

18   been working for Ground.  He was known.  I can't

19   remember with his brother or his cousin or somebody

20   he had been helping out for quite a while.  And when

21   I gave up El Dorado Hills, he got that for free.

22     Q.  How did you decide how much to sell your

23   route for?

24     A.  I looked at what I was making, the growth

25   potential and where this was headed and made a

**8/15/2006  Alexander, Dean**

1    determination it would be worth that.

2        Q.  Was your wife involved in calculating how

3    much it was worth?

4        A.  I think we were both in agreement when we

5    looked at the numbers.  We looked at every year's

6    gross and you could see the steady growth through

7    the four years.  And that's how we determined that

8    the growth was going up at a certain percentage

9    every year.

10       Q.  And that was the growth in your income?

11       A.  Yes.

12       Q.  How much do you think your route was worth

13   when you first started working for FedEx Home

14   Delivery?

15       MS. ZERGER:  Objection.  Calls for

16   speculation.  No personal knowledge.

17       THE WITNESS:  When I first started, it was

18   worth nothing.

19   BY MS. BREMER:

20       Q.  And why do you believe it was worth

21   nothing?

22       A.  You can't sell something that's not making

23   money.

24       Q.  How did the income improve from the time

25   that you were, you first started servicing the route

**8/15/2006  Alexander, Dean**

1    to the time that you sold it?  What factors entered

2    into the improvement?

3          A.  The new accounts, the more stops.  We had a

4    penny or two more raise every year.  Bottom line,

5    that goes along ways.  FedEx was very generous in

6    that area.

7               Basically, it was the -- it was the volume,

8    the sheer volume of making -- maxing out your --

9    when you had your core, maxing your core out and

10   getting your max core money every day along with the

11   stops.

12         Q.  Do you think your work had anything to do

13   with the improvement of the income of the route?

14         A.  I didn't lose any customers, if that's what

15   you mean.

16         Q.  You serviced your customers in that area

17   well?

18         A.  Well, yes.  And had conversations with many

19   of them.

20         Q.  What do you mean you had conversations with

21   many of them?

22         A.  Well, as I got to know -- there was always

23   those customers where we delivered quite often to

24   and actually got to know.  They got to know me

25   personally, by my name, not just the FedEx guy.

**8/15/2006  Alexander, Dean**

1          But these were primarily customers that

2     were repeat, and especially my drug customers who --

3     you always have face-to-face meeting with drug

4     customers because they are drugs.  They have to be

5     signed for.

6          Q.  You're talking about prescription drugs, I

7     take it?

8          A.  Prescription drugs, yes.  Who knows, we'll

9     never know if people shipped illegals, but these

10    were prescriptions -- these were people who worked

11    for pharmacies that went to doctors' offices and

12    dispensed drugs to the doctors.

13         Q.  And because you did a good job servicing

14    your customers, you believe that they would come

15    back again?

16         A.  Well, FedEx -- it's making a good

17    impression for the FedEx name, not -- they know me

18    personally, but, you know, on a first-name basis,

19    but it's a conversation that may last four or five

20    minutes while you're unloading.  "Mrs. Jones, how

21    are you doing today?  How's everything going?"  You

22    know something about their dog or cat, or "How's

23    your kids doing?"  "Jimmy broke his arm."  "How's he

24    doing?"

25         You hear these things so you ask when you

**8/15/2006 Alexander, Dean**

1    see them.

2        Q.  And they know when FedEx Home delivers a

3    package to them that you're going to be the one that

4    will be delivering?

5        A.  Yes, I would -- yes, especially those ones

6    that were the repeat customers that I seen a lot.

7            We had customers we would see a lot on a

8    weekly, sometimes daily basis, some people.  I think

9    they lived out of catalogs or the Internet, but yes.

10       Q.  And if they -- if you did a good job, they

11   would continue to use you and use FedEx Home

12   Delivery?

13           MS. ZERGER:  Objection.  Speculation.  Lack

14   of personal knowledge.

15           THE WITNESS:  Yeah, I really can't say that

16   I had anything to do -- my job was always

17   professional and friendly and courteous.  That was

18   my job.  That's the way I am.  That's the way I'll

19   always be.

20   BY MS. BREMER:

21       Q.  And did you believe that some of those

22   customers would use FedEx Home Delivery and you

23   because they felt like you were servicing the route

24   well?

25       A.  I believe they would use FedEx.  I don't --

**8/15/2006  Alexander, Dean**

1    we didn't pick up.  So on -- there towards the end

2    we were starting to do a little home pick-up.  It

3    was just starting to happen.

4           I don't know where that's gone today, but

5    we were doing some little home-based business stuff,

6    which just, like I say, in the last, oh, four or

7    five months before I left.  It was on a small scale.

8           And again, those were the people that

9    did -- when I did pick up, you'd get to know them

10   because they were home shipping their home-based

11   whatever they had.

12       Q.  You indicated that FedEx Home would give

13   you a raise of a penny or two every year.  What were

14   you referring to?

15       A.  We had a -- I don't know where that

16   information is right now.  I know I've seen it.  But

17   we would have a new -- every March, we'd have, when

18   the fiscal year was coming, we could get an

19   incentive.  I think it was called your new incentive

20   package for the year.  In other words, that would be

21   like what you're going to get for a raise.

22          Well, in some years, we actually didn't get

23   a raise.  It was the one form we had with all the

24   numbers in the core zones.  Do you remember that?

25   You don't have to get it out.

**8/15/2006  Alexander, Dean**

1          Q.   Yes.

2          A.   Our core zones, sometimes they would give

3    us a nickel raise and then drop the core zone $2 or

4    $5.

5               One year they gave us like a two-cent raise

6    and dropped the other one five cents.  So anyway,

7    some years we really didn't get a raise.  They

8    always made it sound like they was really giving us

9    a lot.

10         Q.   And the raise that you were referring to,

11   that was on the incentive package?

12         A.   That was on the stop, on the delivery.

13         Q.   The number of stops?

14         A.   Well, if -- like when I first started, it

15   was a dollar, let's say it was $1.07 for the -- or

16   $1.02 and 20 cents for the stop -- for the package,

17   I mean.  That would be $1.25 you got for that stop.

18              The next year they would increase the stop

19   two cents and then you would be making $1 -- let's

20   call it a $1.25 or 7.  That was your incentive, two

21   more cents per stop.

22         Q.   And you're saying if you had a lot of stops

23   that that could add up?

24         A.   Yes.  But the thing that was always, what I

25   always called haywire was the fact that when we did

8/15/2006  Alexander, Dean

1    bulk stops, that was -- I always thought that FedEx

2    was sticking it to us.  We would have 100 packages,

3    we'd get paid a dollar for -- call it a $1.05 for

4    the stop and then 22 cents for every package beyond

5    that for the stop.  I always thought that was really

6    unreasonable.

7        Q.  Why?

8        A.  Because FedEx is making a lot of money on

9    every box.  More than 22 on each of those -- and

10   most of those were the drug boxes.  And some of them

11   were quite heavy.  Some of them were liquids.

12           So I know that they don't charge -- they

13   charge by the pound.  And them liquid gallon ones,

14   there were generally sometimes two to four gallons

15   in one box of the liquid whatever, the medicine.

16   I'm not sure what it was.  I didn't ask.  All I

17   knew, it was sure heavy.

18       Q.  How frequently did you have bulk stops?

19       A.  I would say weekly, weekly, two to three.

20   And that would be anywhere from 16 or 17 with big

21   boxes.  And then probably weekly on the drugs, we

22   had GlaxoSmithKline was one of their big accounts

23   and they always came in 20 to 100.  Whatever the

24   drugs were, I had no clue.

25       Q.  So that would be one of your bulk stops

**8/15/2006  Alexander, Dean**

1    during a week?

2         A.  It would be -- I had several of the -- of

3    my customers had -- were reps for GlaxoSmithKline,

4    and my son had a bunch of them.

5         Q.  When you say two to three bulk stops

6    weekly, is that for your route and Justin's or just

7    for you?

8         A.  Just my route.  Justin would have a lot

9    more than I did.  GlaxoSmithKline had a new policy

10   that they had to be in an environment where the

11   temperature couldn't drop below 70 degrees, so they

12   had to be in climatized storage sheds.  And Justin

13   had it in Folsom.  And he would be in the storage

14   and most of them had to go in the storage shed,

15   probably three to four times a week with hundreds,

16   you know, altogether.

17        Q.  Do you know how much your Workhorse van was

18   worth when you sold it in 2005?

19        A.  It was worth about -- I'm not sure.  The

20   payoff on it was almost $25,000 and it was worth

21   more than that.  Not much, but a little more.

22        Q.  So when you sold your route, you made a

23   profit of $22,500; is that right?

24        A.  No.

25        Q.  Why?

**8/15/2006  Alexander, Dean**

1        A.   Why, I still had to pay off the Ford.

2        Q.   Which you said was $25,000?

3        A.   No, the Workhorse was 25.  The Ford was

4    still owed over about $6,500.  And my original

5    investment, which I went through during that period

6    of $6,000.  So the difference being, what I made,

7    eight or $9,000 profit for five years.

8        Q.   And what happened to the Ford that you

9    owned when you sold your route?

10       A.   I sold it.

11       Q.   And how much did you make on that?

12       A.   I owed -- I took a loss on it.  I took a

13   loss of -- I sold it for $6,250 and I owed 65 or

14   $6,600 on it.

15       Q.   So that was about?

16       A.   I believe it was $6,800 I owed on it.

17       Q.   So that was about $650?

18       A.   Sounds about right.  I can't remember.

19       Q.   And then you said your original investment

20   was $6,000.  What was your original investment?

21   What did you use that for?

22       A.   Well, in the first year we didn't make much

23   money.  I think my first check was -- I don't think

24   I made about -- I can't remember, about $15,000 that

25   first year, or from March to January.  I can't

**8/15/2006  Alexander, Dean**

1    remember.  It wasn't much.  And we knew that was

2    coming and that money was set aside to supplement

3    the household income.

4        Q.  So that $6,000 -- the investment that

5    you're talking about is just money that you were

6    using to run your household?

7        A.  Well, money to make up the difference.

8    That was money that I set aside to make up the

9    difference in the income that we needed to run the

10   household.  It was my start-up money.

11       Q.  And your contract with FedEx Home Delivery

12   was not terminated, correct?

13       A.  No.

14       Q.  What happened -- when you sold your route,

15   what happened to the computer that you had for your

16   business?

17       A.  I turned it in.  One went with the truck

18   and one I turned in with -- and I made them sign for

19   it.  I turned all my clothes back in, my scanner.  I

20   think that's about it.  And all the upload devices

21   that I had at home.

22       Q.  And what about your cell phone?

23       A.  My cell phone was mine.

24       Q.  Were you ever told that FedEx Home Delivery

25   would terminate your contract?

**8/15/2006  Alexander, Dean**

1        A.   You mean had I been threatened?

2        Q.   Yes.

3        A.   Not so much with that, not because of my

4    delivery service.  But I was threatened a lot of

5    times with DNA on the flex time.  And I was also

6    threatened when -- in the contract there's a policy

7    that you make three attempts on a signature

8    required.  You can't leave a package without a

9    signature.

10           And after three attempts, they would say,

11   "Oh, take it out just one more time."  And I used to

12   say, "Okay, I'll do that."

13           But as we got bigger and bigger, and more

14   time was out on the route, we started getting a lot

15   of wine products, and all alcohol is signature

16   required.

17           And they had an account, I can't think of

18   the name, Beverages and More.  And once a week or

19   once a month they would have a big shipment come out

20   and we'd get as many as -- I would get as many as 26

21   of the wines.  That means there's 26 signatures

22   you've got to take out, and, you know, and try to

23   get rid of.

24           You don't get paid if you don't lose them.

25   That's what I used to call it, losing them, and get

**8/15/2006  Alexander, Dean**

1    your signatures.  So we would take out, sometimes

2    we'd come back with 15, 16, nobody's home.  So we

3    did 24 stops and got paid for nothing on half of

4    those stops.

5            And anyway, long story short, we'd do the three

6    times, we'd have all the service crosses on them with

7    the 07s, means that we couldn't driver-release it,

8    that's what that means, and they would come back and

9    say, "Do it one more time."  Then it would go, "Well,

10   just one more time," you know, five times.  And I

11   finally, you know, told them -- and then they started

12   in with the threatening thing.  "Well, if you don't

13   take it out, we'll just DNA you."  That affects the

14   little monthly bonus they gave you on your service

15   record.

16       Q.  What's the DNA again?

17       A.  Did not attempt.

18       Q.  So you were never threatened with contract

19   termination, but you were threatened with DNAs?

20       A.  With DNAs.  And they knew that I had --

21   they knew that I knew that I had the 100 percent

22   delivery record and was proud of it.

23       Q.  For maintenance on your vehicles, did you

24   use the FedEx Home delivery suggested vendors?

25       A.  No.

**8/15/2006  Alexander, Dean**

1        Q.   Why not?

2        A.   I did on a couple of times for the tires

3    towards the end.  I used the one Goodyear they had,

4    but that was right at the end.  Other than that,

5    they didn't really get that started until I think

6    half way for two years or whatever before they

7    really got anything out there for us home delivery

8    drivers.

9        Q.   So in about 2002, you think --

10       A.   Yes, I'm guessing they finally came out

11   with a few of different vendors you could use for

12   tires and --

13       Q.   And why did you decide not to use those

14   vendors?

15       A.   Because I was using, for my brakes I was

16   using Midas because once you buy your brakes you

17   only pay for -- you don't pay for the installation.

18   You never buy brakes again, just the installation.

19   Tires, I shopped around for the best value I could

20   get.

21       Q.   And no one from FedEx Home Delivery told

22   you you had to use their suggested vendors, did

23   they?

24       A.   No, no.  Like I say, we didn't really have

25   until towards the end any options for vendors that

**8/15/2006  Alexander, Dean**

1    was FedEx-approved or recommended.

2         Q.   And in the end, once they did have

3    suggested vendors, they didn't require that you use

4    them?

5         A.   No, but their prices were hard to beat.

6    They had pretty good prices on tires.

7         Q.   The FedEx prices were good, the FedEx

8    suggested vendors' prices were good?

9         A.   Yeah, that was a pretty good deal.

10        Q.   Do you know what the term "deadlined"

11   means?

12        A.   Like get it done by tomorrow?

13        Q.   I think in reference to a vehicle.

14        A.   Deadline or deadhead?

15        Q.   Deadlined.

16        A.   I don't.

17        Q.   You've never heard that term?

18        A.   I've heard of deadhead.

19        Q.   Was your vehicle ever removed from service?

20        A.   Oh, okay.  Now I understand, you're talking

21   redlined?

22        Q.   Is that the term that you've heard?

23        A.   Yes.

24        Q.   Okay.  Was your -- were any of your

25   vehicles ever removed from service or redlined?

**8/15/2006  Alexander, Dean**

1        A.   Yes.

2        Q.   Can you tell me what happened?

3        A.   Somebody broke out the back window and --

4    of the Chevy van.  And I made a police report and

5    everything.  And I went off to work and Dave saw the

6    broken window and told me I could not use that truck

7    for the day.

8             I had told him that I had made arrangements

9    to have that window fixed at the end of the day.

10   And he said, no.  I said, "Dave, I'm never going to

11   be more than, you know, 15 yards away from that

12   truck at any given time."

13            And he basically said, "No, you can't drive

14   it until you get the window fixed."  So I ended up

15   having to get a rental.

16       Q.   Where was your window broken?

17       A.   The rear back window.

18       Q.   I guess geographically, did that occur

19   during -- while you were servicing your route or

20   some other place?

21       A.   That happened overnight at my house.

22       Q.   And so your truck was -- your Chevy was

23   parked at your house, the window was broken when you

24   came out in the morning?

25       A.   Yeah, somebody broke it.

**8/15/2006  Alexander, Dean**

1      Q.  Did Dave Westbrooks indicate what his

2    concern was with the broken window?

3      A.  Somebody might reach in and steal the

4    packages.

5      Q.  Was -- were any of your vehicles removed

6    from service any other time besides this one?

7      A.  No.

8      Q.  And this one time, was that just for a day?

9      A.  Yes.

10      Q.  We had talked about some of the equipment

11   you use for your work with FedEx Home Delivery.  And

12   you had talked about a computer or computers that

13   you turned in.  What were those computers used for?

14      A.  The computers were, what was it called,

15   they were terminals to send the -- our uploads back

16   to Pittsburgh, modems.

17      Q.  And this was to upload information from

18   your scanners?

19      A.  To Pittsburgh.

20      Q.  Did you use any other computers in your

21   business?

22      A.  I know my wife used -- for tax purposes.

23      Q.  She had a computer that she used for taxes

24   and keeping records?

25      A.  Yes.

**8/15/2006  Alexander, Dean**

1          Q.  You indicated that you had a cell phone.

2      Did you have separate cell phones for personal and

3      business use?

4          A.  No, I had the one cell phone.

5          Q.  Did you ever use your cell phone for

6      personal use?

7          A.  On occasions, yes.

8          Q.  Did you have any other equipment that you

9      used when you contracted for, with FedEx Home

10     Delivery?

11         A.  No, nothing I can think of.

12         Q.  Once your son started working for you, can

13     you walk me through what a typical day would be like

14     as an independent contractor?

15         A.  We would arrive at 6:00 in the morning at

16     the terminal.

17         Q.  And both you and Justin would arrive at the

18     same time?

19         A.  Right.  We would generally be -- I'd

20     normally be first and he'd either be third or

21     fourth.  A lot of people wanted to get there early

22     and get on the road and get the job done.

23             We would pull in.  They would scan any

24     packages we brought back, rescan them back into the

25     system.  And after that was done, we would drive --

**8/15/2006  Alexander, Dean**

1    we each had an area where we loaded our own packages

2    up.  Basically it was three pallets that they took

3    and put all our packages on.

4            And we would go and upload our scanners.

5    And then they would reput in the packages that were

6    there -- well, when they were done, obviously, with

7    all the sort, we would go and get our scanners

8    uploaded with how many packages we had.

9            But later on, when we got the new scanners,

10   it would automatically upload itself within the

11   terminal.  It had the antenna and everything.  And

12   we'd know right when we get in.

13           And we'd pull over and we'd start scanning

14   our own packages for the day's delivery.  And they

15   had to be scanned in.  We'd load them as we scanned

16   them.  And that could take anywhere from, depending

17   on the sort, 45 minutes to -- we've been there as

18   long as three hours, but average I'd say 45 minutes

19   to an hour.

20           And then when we were done, we would take

21   our scanners in and they would eliminate any

22   packages that we could not find.  If you couldn't

23   zero your scanner, you couldn't go in and upload

24   right away.  I know this is confusing.

25           But we would -- if we couldn't find a

**8/15/2006  Alexander, Dean**

1    package, first they would make us go out and look

2    around on other people's pallets, which was

3    impossible.  Going through 42 different pallets

4    looking for a missing package that somebody -- the

5    package handlers weren't that great.  That happened

6    quite often.

7         Q.  Let me stop you for a second.  How often

8    did you have to eliminate packages that you couldn't

9    find?

10        A.  It was quite often.  Not -- it was

11   wonderful to zero out.

12        Q.  Was it monthly that this was an issue or

13   more frequently?

14        A.  It was more frequently.  It was to the

15   point where the only one that was zeroing out was

16   the last person in the building.

17        Q.  Was this a problem with particular package

18   handlers?

19        A.  Where the problem was was 21, 27.

20        Q.  Contractors?

21        A.  Yeah, that's contractors' numbers, and

22   they'll put 27 as, you know, the contractor's number

23   is 27, box number 10, 20, 30, 40, but they always

24   marked it with our number, that was our space.

25             But the numbers would get messed up on 21,

**8/15/2006  Alexander, Dean**

1    27 -- depends on who was writing, how good they

2    would write different numbers.  43 -- there was

3    always -- and the package handlers, you know, they

4    didn't care.  They are working for three hours a day

5    and they look at it real quick.  And if it's

6    upside-down, a 12 is a 21.

7         Q.  So it sounds like this wasn't an issue when

8    there were seven contractors?

9         A.  No.

10        Q.  But it became an issue sometime later?

11        A.  As we grew.

12        Q.  Can you tell me about when this started

13   becoming an issue?

14        A.  The bigger -- well, the bigger they got it

15   was always -- the ones who would have the problems

16   with missing packages -- because my route was 12.

17   So the first place I'd go is look on 21.

18            And but, you know, you can't go through,

19   you know, 175 packages to look for one number 12.

20   But it became an issue after that, after -- the

21   bigger we got, it became an issue of one or two.

22   And the early people would always have the problems.

23   There was always at least ten of us that wanted to

24   be in and out of there.

25        Q.  But generally you would be able to get it

**8/15/2006  Alexander, Dean**

1    all sorted out and get out of the terminal in 45

2    minutes to an hour?

3         A.  They would delete the missing package.  And

4    they would find it and we'd deliver it the next day.

5         Q.  And so was that a yes?  I wasn't sure.

6         A.  Yes.

7         Q.  Okay.  You indicated that you wanted to be

8    one of the first people to start.  Did anyone tell

9    you what time you needed to start in the morning?

10        A.  Nobody told us, but you wanted to get

11   there, especially in the wintertime.  The more

12   daylight you can have -- it's easier to work in the

13   daytime than it is the nighttime.

14        Q.  You decided that it would be better to

15   start your day at 6:00 rather than later?

16        A.  I would have started at 5:00 if they'd open

17   the door.  I'm a morning person.

18        Q.  Were the gates ever locked to prevent you

19   or others from leaving when you wanted to?

20        A.  I can't -- they closed the doors after the

21   sort, but they would open them to let us out.  I

22   can't remember a time where they physically locked

23   us in, not to get out.

24        Q.  Were your scanners ever held to prevent you

25   from leaving when you wanted?

**8/15/2006  Alexander, Dean**

1          A.  Yes.

2          Q.  And how often would that occur?

3          A.  Not too often.  When they felt there was a

4    meeting that everybody should be to, they wouldn't

5    give you your scanner until -- they would try to

6    break it up, since we were so big, into an 8:00

7    meeting and a 9:00 meeting, but they wouldn't give

8    you your scanner until it was time for you to go.

9              That was getting to be an issue towards the

10   last year, more so than any other time.

11         Q.  Did that ever occur in the first few years

12   that you were working?

13         A.  No.  It became an issue, like I say, after

14   about the last year I was there, the '04 year.

15         Q.  So the first time that your scanners were

16   held to prevent you from leaving the terminal was in

17   2004?

18             MS. ZERGER:  Objection.  Mischaracterizes

19   the testimony.

20             THE WITNESS:  I really can't remember.

21   BY MS. BREMER:

22         Q.  But that's your best estimate?

23         A.  That's a guesstimate.  I just can't

24   remember.

25         Q.  Was anything else done to prevent you from

**8/15/2006  Alexander, Dean**

1    leaving the terminal when you wanted to?

2          A.  Nothing that I can think of offhand.

3          Q.  Were you ever pushed out of the terminal

4    before you were ready?

5          A.  No.

6          Q.  So if I understand what you said, did you

7    typically leave the terminal around 6:45 or 7:00 in

8    the morning?

9          A.  It was always after 7:00, 7:30.  By the

10   time you got your packages loaded and your scanners

11   reissued back to you to get out on the day's work,

12   it was -- it could be anywhere, on average, from an

13   hour and a half to two hours every -- it was in or

14   around the terminal.

15         Q.  Okay.  I guess I'm confused because earlier

16   you said the average was 45 minutes to an hour.

17         A.  Well, to load.

18         Q.  Okay.  So that would be the load.

19         A.  And then the down time there would be --

20   and that wouldn't -- that's not a ballpark figure.

21   Like I say, it could vary.  And the more packages I

22   had, the longer it took.

23             So it could take you two hours to load if

24   you had a lot of bulk.  It's just trying to use an

25   average.  I like to be out of there, if possible, by

**8/15/2006  Alexander, Dean**

1    7:00 and making my first stop by 8:00, was my goal

2    every day.

3        Q.  So your goal was to get out of there by

4    7:00 but sometimes --

5        A.  -- it didn't pan out.

6        Q.  Did you and Justin both drive your trucks

7    to the terminal every morning or did you ever leave

8    your trucks there overnight?

9            MS. ZERGER:  Compound question.

10           THE WITNESS:  We took our trucks home

11   daily.

12   BY MS. BREMER:

13       Q.  How did you decide how to load your

14   vehicle?

15       A.  Our vehicles were loaded pretty much the

16   way they wanted them loaded.  Everybody loaded their

17   small numbers, which should be their first stops,

18   their second stop, and accordingly, in, like I say,

19   the 10, 20, up to how many packages they had up to

20   number 2,000.

21       Q.  So when you went to the terminal in the

22   morning, would you get a list of what all your stops

23   were?

24       A.  I wouldn't get a physical list until

25   afterwards.  What we would have is the number of

8/15/2006  Alexander, Dean

1    packages on our scanner.  And as we scanned the bar

2    code, if it was a good bar code, we'd go down by one

3    until we zeroed out.

4        Q.  And how did you determine which packages to

5    put on the van first?

6        A.  Well, it was always the low numbers went to

7    the front.  That's the way the turn-by-turns went,

8    10, 20 -- just went the same way on the

9    turn-by-turns.

10       Q.  Now, you indicated that after you were

11   running your route for a while you didn't follow the

12   turn-by-turns.  So in those circumstances, how would

13   you figure out how to load your vehicle?

14       A.  I'd spot the packages that was in an area

15   that I wanted to get out of the way early in the

16   morning and I would set those aside.  And I would

17   note the number sequence and load it in a place

18   where I could find it when I got there.

19       Q.  And did you teach Justin how to load his

20   vehicle?

21       A.  By the time Justin started, he already knew

22   what to do.  A couple of days -- like I say, he's

23   very intelligent.  He's above IQ.  You don't have to

24   tell him twice.

25       Q.  And he learned that from helping you

**8/15/2006  Alexander, Dean**

1    previously?

2         A.  He's got a great memory.  He kept all his

3    gate codes in his head.  I couldn't do that.

4         Q.  During the day, did you ever take breaks or

5    eat lunch?

6         A.  I didn't stop until I finished.

7         Q.  And when did you typically finish?

8         A.   It varied from day to day to day depending

9    on the amount of packages I had.  You figure I

10   started at -- my workday started at 6:00 when I

11   entered that terminal and I'd finish anywhere from,

12   could be as early as 2:30 or as late as 7:00,

13   depending on the volume.  And Justin would work,

14   again, from 6:00 until -- he averaged most days

15   about anywhere from 4:00 to 6:30.

16        Q.  So you said that you'd start at 6:00 a.m.

17   and finish between 2:30 p.m. and 7:00 p.m.?

18        A.  As early as 2:30.  Depending on how the

19   packages were.

20        Q.  Right.

21        A.  We never had a set number of packages from

22   day to day.  Some days we were heavy, some days we

23   were light.  We never knew.  We didn't have a set

24   amount, in other words, so we could have a specific

25   time to end every day.  It was different.  There was

**8/15/2006  Alexander, Dean**

1    no two days alike, ending time.

2         Q.  Do you know what the average ending time

3    was?

4         A.  I don't have a clue.

5         Q.  Just because it varied so much?

6         A.  It just varies every day.  I mean, when you

7    get those 2:30 days it's like, yeah, but my son then

8    didn't turn around and finish until 6:00 that day.

9         Q.  So are you saying on the days that you

10   worked from 6:00 a.m. to 7:00 p.m. that you didn't

11   take a break all day?

12        A.  Normally on those days I never stopped

13   until I was done, except for restroom breaks.

14        Q.  Would you ever pick up anything to eat?

15        A.  Rare occasions, I would.  Not very often.

16        Q.  Did you ever carry food with you?

17        A.  No.

18        Q.  Did anyone tell you that you couldn't take

19   breaks or eat lunch?

20        A.  Nobody ever told me.

21        Q.  Why did you decide not to take breaks?

22        A.  I worked until the job is done.

23        Q.  Is that because you wanted to get done with

24   your job sooner?

25             MS. ZERGER:  Objection.  Leading.

**8/15/2006  Alexander, Dean**

```
1              THE WITNESS:  I always wanted to get done

2     before dark.

3     BY MS. BREMER:

4         Q.  Did you ever conduct any personal business

5     during the workday?

6         A.  No.

7         Q.  What would you do if you needed to go to

8     the doctor?

9         A.  I'd make my appointments on Mondays, my day

10    off.

11        Q.  Did you ever run any errands while you were

12    servicing your route?

13             MS. ZERGER:  Asked and answered.

14             THE WITNESS:  No.

15    BY MS. BREMER:

16        Q.  You never stopped at the bank?

17        A.  No.

18        Q.  Would you return back to the terminal each

19    day after driving your route?

20        A.  Did I?

21        Q.  Yes.

22        A.  No.

23        Q.  What would you do then after you finished

24    delivering packages?

25        A.  I'd go home and upload my scanner.
```

**8/15/2006  Alexander, Dean**

1          Q.   And you could do that from home?

2          A.   Yes, that's why we had the modems.

3          Q.   Would there be anything else that you would

4     do in connection with servicing your route after you

5     got home?

6          A.   Just -- and sometimes I'd get home and I'd

7     have a late evening delivery that I'd have to go

8     back out and do.

9          Q.   So sometimes you'd eat dinner and then go

10    out again?

11         A.   Yes.

12         Q.   What would determine whether you had a late

13    delivery or not?

14         A.   FedEx.

15         Q.   Was that because of some customer service

16    window or what would be the reasons?

17         A.   Either the customer or the shipper

18    requested an evening delivery and they would state a

19    time between -- it could be anywhere from 5:00 to

20    7:30.  Those were called appointment deliveries.

21         Q.   So if you had an appointment delivery where

22    a customer or a shipper requested a delivery between

23    5:00 and 7:30 p.m., you would, on those days, finish

24    your route, go home, do whatever you wanted to do

25    and then you would go back out between 5:00 and 7:30

**8/15/2006  Alexander, Dean**

1    and deliver those packages?

2        A.  Yes.

3        Q.  Other than when a customer or a shipper

4    requested an evening delivery, were you ever told

5    what time you had to complete your route?

6        A.  At our route -- clarify that question,

7    please.

8        Q.  Other than when a customer or shipper

9    requested an evening delivery, were you ever told

10   what time you needed to deliver packages?

11       A.  Other than appointment deliveries, no.

12   Only appointment deliveries.  And then if you -- if

13   you delivered -- one time I went by one of my drug

14   people, as I called them, and I had an evening

15   delivery for her for some drugs and she was home.

16           I just happened to drive by and see the

17   garage opened, so I stopped.  And this was like 4:30

18   in the afternoon.  And I went ahead and dropped them

19   off and got a signature from her, and basically got

20   chewed out for doing that.  They wanted me to go

21   back at -- they wanted me to deliver at the

22   appointed time, even if she was home.

23       Q.  And what was the appointed time for that

24   customer?

25       A.  I think it was 6:00.  But I told Scott, I

**8/15/2006  Alexander, Dean**

1    said, it doesn't make sense if I happen to drive

2    by -- I mean, I just happened to drive by and seen

3    the garage open on my -- I was in that area

4    delivering.  And I thought, "Whoa, she's home.  I

5    might as well do it now, then I won't have to come

6    back out."

7        Q.  Is that the only time that you made a

8    delivery outside the appointment window that you

9    were given?

10       A.  Yeah, after -- because Scott basically said

11   the shipper doesn't like that if they make an

12   appointment.  I guess they can check on -- the

13   scanner gives a time when something was scanned.

14       Q.  So did you decide not to do that again

15   partially because you were concerned that the

16   customer might be upset that you had done that?

17           MS. ZERGER:  Objection.  Misstates the

18   testimony.  Leading.

19           THE WITNESS:  The customer didn't mind at

20   all.  She said, "Any time I'm home and the garage

21   door is open, please stop."

22   BY MS. BREMER:

23       Q.  Actually, what I meant to say was, did you

24   have any concern that the shipper would be unhappy

25   that you delivered it outside of the appointment

**8/15/2006  Alexander, Dean**

1    time that was set?

2        A.  That's the point that Scott had made, but

3    nothing ever came of it.  I mean, as far as the

4    shipper saying, "Why did they deliver this at 4:30

5    when the appointment was 6:00?"  Nothing ever came

6    of it.

7        I think the shipper is happy that the

8    customer gets the drugs and they are put in a safe

9    and secure place.

10       Q.  Did you ever have any communications with

11   the shipper, one way or the other, regarding the

12   appointment time?

13       A.  No.  We would get our manifest and if we

14   had an appointment, what they would do is they would

15   totally mess your route up.  Then they would make

16   the appointment the last stop.  It might fall

17   somewhere in the middle of your route, but it messes

18   your whole route up.

19       Q.  Did you keep records of how many hours you

20   worked each day?

21       A.  Those were on the, on our settlement.

22       Q.  And where did that information on the

23   settlement come from?

24       A.  It comes from the scanner only.

25       Q.  And that's information that you enter onto

8/15/2006  Alexander, Dean

1       the scanner?

2           A.  It puts a start time in there -- when you

3       make your first stop, all that information is there

4       inside the scanner so they know when you made your

5       first stop and what time you made your last stop.

6           Q.  And is that automatic or is that something

7       that you input into the scanner?

8           A.  That was automatic.

9           Q.  So if you wanted to put down a later start

10      date -- let me start over.

11              If you wanted to put down a later start

12      time in your scanner, you wouldn't be able to do

13      that?

14          A.  Your scanner has a built-in clock that --

15      basically it's like a stamp every time you scan a

16      package.  It's going to put the time that you

17      scanned that package back to Pittsburgh.  And the

18      information they get out of your scanner, they are

19      going to know every stop you made, how much time it

20      took you in between stops.  They are going to know

21      everything you did when you started scanning.

22              Now, towards the end before, just as I was

23      leaving, it used to be our -- we could enter our -- we

24      had to enter our time in our scanner when we left the

25      terminal in the morning, we'd enter our start time from

**8/15/2006  Alexander, Dean**

1    the terminal.  And we would enter our ID number and

2    then basically hit "Go" and it would say, okay, go

3    deliver your packages.

4           Towards the end, they started making -- they

5    changed the, reprogrammed the scanner so our start

6    time -- we couldn't enter our start time until we

7    arrived at our first stop.

8           So in other words, it took me 35 minutes to

9    drive to my first stop.  Now that's when our time is

10   officially starting for FedEx instead of the 35-minute

11   drive time.  They don't count that anymore as part of

12   your hours.

13       Q.  And that change was made when, in 2004?

14       A.  Before I just --

15       Q.  Or 2004?

16       A.  The end of -- somewhere around the end of

17   2 -- I can't remember the exact time when they

18   started doing it.

19       Q.  But you think it was around the end of

20   2004?

21       A.  Yeah, maybe October.  I can't remember

22   officially when they started doing that.

23       Q.  So up until approximately October 2004 when

24   you left the terminal in the morning, you would

25   enter into your scanner the time that you were

**8/15/2006  Alexander, Dean**

1    leaving the terminal?

2       A.  Yes, and my ID number.  There were several

3    things we just had to enter in that had to do with

4    the terminal.

5       Q.  Did anyone ever tell you to falsify your

6    hours in service for DOT purposes?

7       A.  You mean -- it's hard to falsify when it's

8    in the scanner.

9       Q.  But you input the time into the scanner up

10   until the end of 2004, right?

11      A.  The time I start.  No, we don't input.  The

12   time is automatically -- we have a built-in clock.

13   It's just like punching a time clock.  Every time I

14   punch a bar code, it physically stamps that time for

15   that package delivery inside the computer.

16      Q.  Right.  So that would be for each package

17   delivered?

18      A.  Right.  And that way FedEx knows how long

19   it's taking you to get from stop to stop.  And

20   they'll tell you your average time per stop is four

21   minutes.  You should be four minutes or three

22   minutes and 54 seconds, you know.  They didn't

23   physically tell us that, but they can tell us via

24   the scanner and our times that are entered via the

25   scan what our -- I seen it somewhere in one of these

**8/15/2006  Alexander, Dean**

1    papers, what our delivery time is per stop.

2         Q.   Okay.  And then as far as the time that you

3    left the terminal, did you ever put an incorrect

4    time into your scanner?

5         A.   It won't let you do it.  It tells you right

6    on there the time is 7:35, and you hit okay.

7         Q.   But could you have waited another twenty

8    minutes before you said "I'm leaving the terminal"

9    to your scanner?

10        A.   Why would I want to do that?  I want to get

11   out and get done.

12        Q.   I'm just wondering if you ever did that?

13        A.   No, there's no way to cheat it.

14        Q.   Did anyone tell you that you should be

15   entering times that were different than the actual

16   times into the scanner?

17             MS. ZERGER:  Objection.  Asked and

18   answered.

19             THE WITNESS:  Again, I think I've made

20   myself clear.  Again, it's automatically done when

21   you scan a package.  There's no way of hiding it

22   from anybody or entering something that's wrong.

23   BY MS. BREMER:

24        Q.   On an average day, how many times would you

25   speak to a FedEx Home Delivery employee?

**8/15/2006  Alexander, Dean**

1          A.  At the terminal?

2          Q.  So you'd speak to them at the terminal

3     before you left for your day?

4          A.  Are you talking about talking to employees

5     or drivers?

6          Q.  I'm talking about employees who are working

7     at the terminal?

8          A.  I tried to talk to them as little as

9     possible.

10         Q.  So some days did you not talk to any of

11    them at all?

12         A.  There was a lot of those days.  If there

13    was -- I never needed to stop at the front door.

14         Q.  So you'd just load your packages and get

15    out of there?

16         A.  Grab my scanner and leave.  There was no

17    sense having a conversation.

18         Q.  Would they call you while you were

19    servicing your route?

20         A.  They called several times on my route to --

21    one time to tell me that I had made a delivery out

22    into the country of -- it was basically like a

23    barrel.  And we delivered a lot of these barrels.  I

24    hadn't a clue what were in them, but we delivered

25    them to primarily the country.  And I figured some

**8/15/2006  Alexander, Dean**

1      kind of horse, whatever, some kind of stuff, I would

2      drop the barrel off.

3            I went into this one driveway, and out

4      there in the country there's nobody out there.  I

5      dropped it at the garage door when -- so they could

6      see it when they got home and move it.

7            And the next day I got a call saying that I

8      had a complaint because I left it at the garage

9      door.  And I said, "Well, what's wrong with that?"

10            I mean -- and she goes, "Well, the guy is

11      handicapped and he wants it up at his front door."

12      And she called me twice probably within about 30

13      minutes as to when I was going to get out there.  It

14      was way at the other end of my route.

15            I said, "I will get there as quick as I

16      can."  I really didn't, you know, see anything

17      wrong.  There's a lot of those I dropped at the

18      garage door just because they were a barrel.

19      Q.   So you waited and serviced other stops

20      during your route before going back there?

21      A.   I skipped some as I got closer and then I

22      made it there within an hour to take the barrel up

23      to the garage door or up to the front door.

24      Q.   Right.  But you decided to service some

25      stops in between before you went back?

**8/15/2006  Alexander, Dean**

1        A.   If I wasn't wasting a lot of time.

2        Q.   Were there other occasions where FedEx Home

3    Delivery employees would call you while you were out

4    on your route?

5        A.   There were several times, but I can't -- I

6    can't remember why.

7        Q.   Right.

8        A.   That was the one that really stuck out into

9    my head.  Maybe to ask me questions about when I was

10   going to make it to a certain stop.  Somebody was

11   calling, those kinds of reasons.

12       Q.   So when you say they talked to you several

13   times, you're talking about several times over the

14   approximately four years that you were working with

15   FedEx Home Delivery?

16       A.   I can't tell you how many times.  It was

17   probably more than five.  I can't really give you --

18   that's a guesstimate.  That's the best I can do.

19       Q.   But it was pretty rare?

20       A.   It was rare, but it did happen.

21       Q.   Why were you willing to work seven days in

22   a row or 14 days in a row during the holiday season?

23       A.   To service my area and keep it so we didn't

24   fall behind.

25       Q.   And so what was the benefit to you in doing

**8/15/2006  Alexander, Dean**

1    that?

2        A.  Because on Tuesday with the volume coming

3    in, we would just be more behind.  So at least if we

4    got caught up with our deliveries that we couldn't

5    do on -- we just couldn't fit them all in.  That was

6    the problem, was on the weekends.  That's why I

7    think I explained they let us keep our scanners open

8    and not close them.  That was somewhat of a little

9    bit of benefit to us, but because they were paying a

10   little extra money for stops over a certain point.

11          And that was kind of a little incentive, if

12   you wanted to come in and earn that extra money at

13   peak time.  And some people just didn't want to do

14   it, but I just didn't want to be more behind on

15   Monday.  I know how Christmas is.  That was -- you

16   know, when Justin came on board, we always worked at

17   least two weeks and one occasion three weeks

18   straight.

19       Q.  And so they -- you would be paid more when

20   you worked on Sundays and Mondays?

21       A.  Sometimes, sometimes not.  There was, I

22   think, one or two occasions where they allowed the

23   scanner to be open and not closed, so what was

24   left -- if there was 50 stops left in that scanner,

25   that would be 50 more that would be added to your

**8/15/2006  Alexander, Dean**

1    peak bonus time.

2              If you hit a certain amount of stops, you

3    would get two dollars a stop, and after another peak

4    you would get three dollars a stop.  So it would

5    allow you to make extra money.

6         Q.  You've already indicated that your wife was

7    an accountant, correct?

8         A.  She was.

9         Q.  And she helped you keep track of your

10   business records?

11             MS. ZERGER:  Asked and answered.

12             THE WITNESS:  Yes.

13   BY MS. BREMER:

14        Q.  Did she keep track of the money that you

15   earned?

16        A.  She did.

17        Q.  And did she also keep track of your

18   business expenses?

19        A.  And the business expenses were paid out of

20   the household expense.

21        Q.  Did your wife file a Schedule C, profit or

22   loss from business when she filed your taxes?

23        A.  If there was a form that needed filing, she

24   filed it.

25        Q.  And you don't know which particular tax

8/15/2006  Alexander, Dean

1    form she filed?

2         A.  She did everything on Quickens.  Every --

3    we had --

4              MS. ZERGER:  There's not a question

5    pending.

6              MS. BREMER:  I'd like to mark a few

7    exhibits.  Exhibit 16 is a document that says at the

8    top, "2000 Business Expenses," starting Bates number

9    is PCA 1740.

10             (Whereupon, Deposition Exhibit 16 was

11             marked for identification)

12             MS. BREMER:  Exhibit Number 17 is a

13   QuickZoom Report, indicates it's for the period

14   January 1st, 2002 through December 31st, 2002.  And

15   the starting Bates number is PCA 1999.

16             (Whereupon, Deposition Exhibit 17 was

17             marked for identification)

18             MS. BREMER:  Exhibit 18 is a QuickZoom

19   Report.  It indicates it's for the period January

20   1st, 2003 through December 31st, 2003, and the

21   beginning Bates number is PCA 1603.

22             (Whereupon, Deposition Exhibit 18 was

23             marked for identification)

24             MS. BREMER:  And finally, Exhibit 19 is a

25   QuickZoom Report for the period January 1st, 2004

**8/15/2006  Alexander, Dean**

```
 1     through December 31, 2004.  The starting Bates

 2     numbers PCA 1332.

 3             (Whereupon, Deposition Exhibit 19 was

 4             marked for identification)

 5     BY MS. BREMER:

 6         Q.  Do you recognize the handwriting on Exhibit

 7     16?

 8         A.  Yeah, that's my wife's handwriting, I

 9     believe.

10         Q.  And this document is from your files; is

11     that right?

12         A.  I'm sorry?

13         Q.  This document is from your files?

14         A.  Yes.

15         Q.  Look at the first two pages anyway.  Were

16     these documents prepared for purposes of filing

17     taxes?

18         A.  I think this -- I would imagine.  I don't

19     do any of the accounting.  I think this was one

20     time -- if Scott had this stuff, I showed him one

21     time, I believe, what my expenses were.  And I

22     believe that's why we ran the -- I ran this to show

23     him.

24         Q.  Actually, let me -- I think I -- let's --

25     the first two pages of this Exhibit 16, the
```

**8/15/2006  Alexander, Dean**

1    handwritten pages that I marked as Exhibit 16, let's

2    leave that as 16.  Will you take the next three

3    pages off?

4        MS. ZERGER:  I only have two.  Do you want

5    to see the one you gave me?  I have these two.

6        MS. BREMER:  Okay.  Well, there's three.

7    So I'd like to mark the pages that are Bates

8    numbered PCA 1995, PCA 1602 and PCA 1331 as Exhibit

9    Number 20.

10        (Whereupon, Deposition Exhibit 20 was

11            marked for identification)

12        MS. ZERGER:  You've got four pages here.

13        MS. BREMER:  He must have your other page.

14    Okay.  There you go.

15    Q.  Okay.  So back to 16.  Was the gross income

16    that you made in 2000 approximately $27,000?

17        MS. ZERGER:  Objection.  It misstates the

18    document.  The document doesn't talk about gross.

19        THE WITNESS:  I would imagine.  I really

20    don't know.  I didn't do any of the accounting.

21    BY MS. BREMER:

22    Q.  These are records that your wife kept?

23        Were these prepared to help you with your

24    business as a contractor for FedEx Home Delivery?

25    A.  I don't know why we wrote this down.  I

**8/15/2006  Alexander, Dean**

1    would imagine it was part -- it was, all our income

2    taxes was done on Quickens.  She did our Quickens or

3    QuickBooks -- our TurboTax, so everything was on

4    file in the TurboTax.

5         Q.  And when did she start using TurboTax?

6         A.  I think right from the very beginning.

7         Q.  So in 2000 she would have been using that?

8         A.  I would imagine.

9         Q.  Does this look about right, that you

10   made -- that your income was about $27,000 the first

11   nine months or so that you worked as a driver for

12   FedEx Home Delivery?

13        A.  I'm not sure.  I can't remember without

14   looking at the tax returns.  If my wife wrote it

15   down, then that must be it.

16        Q.  Do you still have your tax returns?

17        A.  Yes.

18        Q.  Take a look at now what's been marked as

19   Exhibit Number 20.  You were telling me before that

20   you thought that you prepared these documents or

21   printed these documents out?

22        A.  I'm sorry?

23        Q.  Did you print out these business profit and

24   loss statements?

25        A.  Yeah, my wife had them on the computer.

**8/15/2006  Alexander, Dean**

1          Q.   And were you indicating that you printed

2     them out to show to Justin?

3          A.   To show Justin?

4          Q.   Maybe I misunderstood your testimony.

5     Whose writing -- whose handwriting is on Exhibit 20?

6          A.   That's got to be my wife.

7          Q.   Okay.  Do you believe that these documents

8     accurately reflect the income that you made while

9     you were working as a contractor for FedEx Home

10    Delivery?

11         A.   I would say they look like the amounts, but

12    I haven't seen the W-2s or the other paperwork in a

13    while.  I can't remember.

14         Q.   When you say not having seen the other

15    paperwork, are you talking about your tax filings?

16         A.   My tax returns.

17         Q.   Were your business expenses in 2002

18    approximately $53,000?

19         A.   My expenses in what year?

20         Q.   2002.

21              MS. ZERGER:  The witness has already

22    testified that he can't confirm these figures.

23              THE WITNESS:  I can't confirm them, but

24    there's a lot of expenses there that I know we had.

25    The vans, the health insurance, the Cingular.

**8/15/2006  Alexander, Dean**

1    BY MS. BREMER:

2        Q.  On the last page of Exhibit 20, it shows

3    the business expenses as around $77,000, which is

4    about $25,000 more than the business expenses listed

5    on the first page, which is 2002.

6            Does that sound about right, that you, that

7    your expenses were about $25,000 more between 2002

8    and 2004?

9        A.  Well, we were putting on more miles.  We

10   were putting on a lot of miles.

11       Q.  So that sounds right to you?

12       A.  That could be right.

13       Q.  On 2003, which is the second page, and

14   2004, it lists an expense for an office.  Do you

15   know what that refers to?

16       A.  We have a home office that we take off on

17   the tax form.

18       Q.  Where is your home office in your house?

19   Is it a separate room?

20       A.  It's a separate room all by itself.  It's

21   an office by itself.

22       Q.  Was that office used for any purpose other

23   than for working on your FedEx business?

24           MS. ZERGER:  Objection.  Relevance.

25           THE WITNESS:  I'm sure my wife used her

**8/15/2006  Alexander, Dean**

1    computer for other things.

2    BY MS. BREMER:

3        Q.  That was where you had a computer?

4        A.  I had a computer, kept all the records, all

5    the filings in there, all the pay statements.

6    Anything that pertained to the business was in there

7    and filed in there.

8        Q.  Did you have any other filings for any

9    anything else that were in your home office?

10       A.  Meaning?

11       Q.  Mortgage, you know, personal files.

12       A.  Yes, we had personal files in there.

13          MS. ZERGER:  Same objection.  Relevance to

14   the previous question.

15   BY MS. BREMER:

16       Q.  Did you just have one computer at your

17   house?

18       A.  We had --

19          MS. ZERGER:  And objection relevance.  You

20   need to wait just a minute to let me get the

21   objection in.

22          THE WITNESS:  Sorry.  We had -- my son had

23   a computer in his room.

24   BY MS. BREMER:

25       Q.  Did you ever use the computer in the

**8/15/2006  Alexander, Dean**

1    office?

2         A.  Did I?

3         Q.  Yes.

4              MS. ZERGER:  Again, same objection.

5              THE WITNESS:  No, I didn't.

6    BY MS. BREMER:

7         Q.  And was your office deducted as a business

8    expense on your taxes?

9              MS. ZERGER:  Objection.  There's a taxpayer

10   privacy privilege in California that we've already

11   claimed in this case.

12             MS. BREMER:  Are you instructing him not to

13   answer?

14             MS. ZERGER:  Yes.  In terms of what he

15   filed on his taxes, it's a privileged matter.

16             MS. BREMER:  Are you refusing to answer

17   based on your counsel's objection?

18             MS. ZERGER:  I'm directing you not to

19   answer.

20             THE WITNESS:  Yes.

21   BY MS. BREMER:

22        Q.  Do you believe that exhibits -- well, first

23   of all, who prepared the documents that are Exhibits

24   17, 18, and 19?

25        A.  I'm not sure.  Maybe my wife.  I don't

**8/15/2006  Alexander, Dean**

1    know.  I really don't know.  I don't think I've ever

2    seen these.  Not that I know of.

3         Q.  Do you know if your wife kept spreadsheets

4    like this of expenses that you spent on your

5    business?

6         MS. ZERGER:  Asked and answered.  He's

7    already answered he doesn't know.

8         THE WITNESS:  I don't know.  She ran -- she

9    took care of all the books.  I don't know what she

10   did.

11   BY MS. BREMER:

12        Q.  Do you know if you are able to deduct wages

13   that you paid to your son as a business expense on

14   your tax filings?

15        MS. ZERGER:  Objection.  Asks for a legal

16   conclusion.

17   BY MS. BREMER:

18        Q.  Do you know if you did deduct the wages

19   that you paid to your son as a business expense on

20   your tax filings?

21        MS. ZERGER:  Again, I'm going to claim the

22   taxpayer privilege in terms of what he did on his

23   taxes, and I direct you not to answer.

24        MS. BREMER:  And are you refusing to

25   answer?

**8/15/2006  Alexander, Dean**

1              THE WITNESS:  Yes.

2     BY MS. BREMER:

3          Q.  Do you know how wage payments were made to

4     Justin?

5          A.  How wage payments were made?

6          Q.  Right.  Was the same amount given to him

7     every, on a weekly basis or --

8          A.  That -- him and Mom.  That was their deal.

9     I don't know how she paid him.  I'm assuming it was

10    weekly, but that was a deal that they had going with

11    each other.  When he needed more money, he would

12    come and ask her for more.

13         Q.  Do you know if you or your wife ever

14    purchased anything for Justin that was then

15    considered part of his wages?

16         A.  No, I didn't purchase anything.  I did give

17    him a gift for bonus time, but I didn't consider it

18    a part of his wages.  It was just a gift for working

19    hard at Christmastime.

20         Q.  And when was that?

21         A.  One year we had our, one of our good years

22    at Christmastime and made quite a bit of money.  I

23    got him a gift at Christmas.

24         Q.  And what was --

25         A.  I can't remember which year it was.

**8/15/2006  Alexander, Dean**

1          Q.   What was the gift?

2          A.   The gift was a laptop.

3          Q.   Were you ever audited by the IRS?

4          A.   No.

5               MS. BREMER:  Okay.  The tape is about to

6     run out, so let's go ahead and go off the record.

7               THE VIDEO OPERATOR:  This marks the end of

8     Tape No. 4 in the deposition of Dean Alexander.

9     Going off the record.  The time is 4:49.

10              (Recess taken)

11              THE VIDEO OPERATOR:  This marks the

12    beginning of Tape No. 5 in the deposition of Dean

13    Alexander.  Back on the record.  The time is 4:56.

14    BY MS. BREMER:

15         Q.  Mr. Alexander, do you believe that you did

16    an average, below average or better than average job

17    servicing your FedEx Home Delivery route?

18         A.   Better than average.

19         Q.   And why is that?

20         A.   Delivery record speaks for itself.

21         Q.   And what was your delivery record?

22         A.   100 percent.

23         Q.   And that's 100 percent of what?

24         A.   Of deliveries.

25         Q.   So you made all your deliveries?

**8/15/2006  Alexander, Dean**

1          A.   Yes.

2          Q.   What makes certain contractors better than

3    others?

4          A.   Work ethics.

5          Q.   And what was your work ethic?

6          A.   Very high.

7          Q.   And did you observe that some of the other

8    contractors did not have as high of a work ethic

9    than you or as you?

10         MS. ZERGER:  Objection.  Personal knowledge

11    about someone's work ethic.

12         THE WITNESS:  I would assume so.

13    BY MS. BREMER:

14         Q.   Did you observe actions of other

15    contractors that led you to believe that their work

16    ethic was not as high as yours?

17         A.   Everybody has their own ability and their

18    own speed.  I can't speak for -- mine was to get

19    everything done every day all the time.

20         Q.   And some people didn't do that?

21         MS. ZERGER:  Objection.  Personal

22    knowledge.

23    BY MS. BREMER:

24         Q.   Let's go back to Exhibit 3, the standard

25    contractor operating agreement.

**8/15/2006  Alexander, Dean**

```
 1              If you look at the first page, full page of
 2        the agreement, which is PCA 2406.  This is the first
 3        page after the Table of Contents.  About the last
 4        full sentence up from the bottom it says, "Both FHD
 5        and Contractor intend that Contractor will provide
 6        these services strictly as an independent contractor
 7        and not as an employee of FHD for any purpose?"
 8              Do you see that?
 9        A.  I must be on the wrong page, I'm sorry.
10        Q.  That's all right.  It's near the bottom.
11        A.  2406.  The last sentence you're talking
12   about?
13        Q.  The last full sentence.
14        A.  Contractor --
15              MS. ZERGER:  You want to count the number
16   of lines maybe from the bottom?
17   BY MS. BREMER:
18        Q.  Yeah, six lines from the bottom.
19        A.  It's still not right.
20        Q.  You had your finger right on it.  Let me
21   point it out.  Starting right there.
22        A.  Okay.  I was too far up.
23        Q.  So when you signed this operating
24   agreement, did you understand and agree that you
25   would provide services strictly as an independent
```

**8/15/2006  Alexander, Dean**

1    contractor and not as an employee of FedEx Home

2    Delivery?

3              MS. ZERGER:  Again, I'm going to object in

4    terms of calling for a legal conclusion as well as

5    reminding or indicating, again, our prior

6    stipulation on the use of the term independent

7    contractor.  You may answer.

8              THE WITNESS:  At the time, that's the way I

9    understood it.

10   BY MS. BREMER:

11        Q.  And it was your intention to be an

12   independent contractor when you signed this

13   contract; is that right?

14             MS. ZERGER:  Calls for a legal conclusion.

15             THE WITNESS:  Yes, at the time.

16   BY MS. BREMER:

17        Q.  Could you look at Addendum 5, which is page

18   2446.  And this Addendum 5 is labeled, "FHD Standard

19   Contractor Operating Agreement Proprietary

20   Interest."

21        A.  Sorry, which line was that?

22        Q.  That's the title at the top.

23        A.  Oh, okay.

24        Q.  What was your understanding of proprietary

25   interest?

**8/15/2006  Alexander, Dean**

1          A.   Proprietary, I think I'd be the sole owner.

2          Q.   And did you understand that you would own

3    your route?

4          A.   Yes, I understood I would own my route.

5          Q.   Did you understand that there would be no

6    base pay before you signed the operating agreement?

7          A.   At the time I understood it.

8          Q.   And you understood that there would be no

9    guaranteed minimum?

10          A.   Yes, I understood that.

11          Q.   You understood that you had to pay your own

12    expenses?

13          A.   I understood that.

14          Q.   Did you receive a fuel supplement?

15          A.   Yes.  It was very, very small.

16          Q.   How much was it?

17          A.   It was anywhere from a penny to five cents,

18    depending on the cost of fuel at any given week.

19          Q.   And a penny or five cents for what?

20          A.   Per mile.

21          Q.   But when you contracted you believed if you

22    worked hard and managed your expenses closely that

23    your settlement would be enough for you to make a

24    profit?

25          A.   The cost of gas going up was a big adder to

**8/15/2006  Alexander, Dean**

1    the bottom line.

2        Q.  You're saying -- I'm talking about before

3    you signed the contract with FedEx Home Delivery.

4        A.  Yes.  Yes, if you managed it.

5        Q.  You believed that you'd be able to make a

6    profit?

7        A.  Yes.  I believed that given any unforeseen

8    costs, like fuel going out of sight.  That really

9    adds to your bottom line when you're only getting

10   six miles, five and six miles to the gallon.

11       Q.  Other than the first year that you drove,

12   which you indicated was a loss, did you make a

13   profit every year?

14       A.  That first -- I don't know until I look

15   at -- I really don't know.  Like I say, I never

16   looked at the paperwork.  I signed it at the end of

17   the year.  My wife did occasionally show me

18   something, but that was her field of expertise.

19       Q.  Right.  Was it your understanding that you

20   were profiting?

21       A.  I believe I saw one here that we made a

22   profit after expenses.

23       Q.  And was it your understanding that you were

24   making a profit every year after 2000?

25           MS. ZERGER:  Asked and answered.

**8/15/2006  Alexander, Dean**

1            THE WITNESS:  I'm sorry?

2            MS. ZERGER:  It's been asked and answered.

3    You can answer again.

4            THE WITNESS:  Ask me that question again,

5    please.

6    BY MS. BREMER:

7        Q.  Is it your understanding that you were

8    making a profit every year after 2000?

9        A.  Yes, every year, I made more money gross.

10       Q.  And the last full year that you contracted

11   with FedEx Home Delivery, 2004, did you make an

12   income of over $100,000?

13       A.  Yes.

14       Q.  The first full year that you contracted

15   with FedEx Home Delivery, 2001, did you make

16   approximately $55,000 income?

17       A.  My second year?

18       Q.  Yes, the first full year that you drove.

19       A.  I believe so.  I really don't know without

20   having facts and figures in front of me.  I think I

21   saw on one of these was that year.

22       Q.  If you look back at Exhibit 20, that's the

23   one that is the profit and loss statement.

24       A.  Hm-hmm.

25       Q.  For various years.  And actually that one

**8/15/2006  Alexander, Dean**

1    doesn't have a 2001.  This one is, it says it's

2    2000 -- January 2002 to December of 2002.

3          Do you believe in 2002 that your income was

4    close to $88,000?

5          A.  2002, how come I'm missing that?  That was

6    on 20, you said?

7          Q.  Yes, isn't that the first one?

8          A.  I see it now, $88,000.  Yes, that was

9    gross.  But also missing on this profit and loss is

10   all the taxes we had to pay, the social security we

11   had to pay, the state disability we had to pay.

12   That's not on here as far as -- yes, I grossed that,

13   but missing on the bottom line is what we paid in

14   taxes.

15         Q.  And you were able to deduct business

16   expenses, correct?

17         A.  Yes.

18         Q.  Turn back to Exhibit 3, and page 2412.

19   It's paragraph 1.10, "Agreed Standard of Service."

20   And it states that, "FHD has represented to shippers

21   and consignees that, in arranging transportation of

22   packages within the FHD system, it will provide a

23   standard of service that's fully competitive with

24   that offered by other national participants in the

25   industry.  Contractor acknowledges the benefits of

**8/15/2006  Alexander, Dean**

1      his or her business of participation in the FHD

2      national system, and agrees to conduct activities

3      under the terms of this Agreement to achieve the

4      results represented to shippers and consignees."

5              Do you see that?

6          A.  Yes.

7          Q.  So when you signed the operating agreement,

8      you agreed to provide a standard of service to your

9      customers and to FedEx Home Delivery customers,

10     right?

11             MS. ZERGER:  Calls for a legal conclusion.

12             THE WITNESS:  Yes.

13     BY MS. BREMER:

14         Q.  And you understood that the standard to

15     which you had agreed was based on the market

16     requirements set by other national participants in

17     the small package delivery industry, correct?

18             MS. ZERGER:  The document speaks for

19     itself.

20             THE WITNESS:  I don't remember them telling

21     us that -- I mean, going over it with us.

22     BY MS. BREMER:

23         Q.  And you did review this document prior to

24     signing it, correct?

25         A.  Yes.  Almost six years ago.  I can't

**8/15/2006  Alexander, Dean**

1    remember.

2        Q.  If you look at paragraph (a) it says,

3    "Contractor agrees to provide daily delivery and

4    pick-up service to consignees and shippers on days

5    and at times which are compatible with their

6    schedules and requirements within Contractor's

7    Primary Service Area."

8        Do you see that?

9    A.  Yes.

10       MS. ZERGER:  The document speaks for

11   itself.  And I'm just going to direct you, again,

12   give me a minute to get my objection out.

13       THE WITNESS:  Sorry.

14   BY MS. BREMER:

15       Q.  When you signed the operating agreement,

16   you understood that customers could require you to

17   pick up and deliver packages at times that were

18   compatible with their schedules, not your own; is

19   that right?

20       A.  This primarily complies with Ground.  With

21   Home Delivery, we were always under the assumption

22   and trained under the assumption that we would not

23   be picking up packages.

24       Q.  Right.  But as far as the delivery of

25   packages, that could be based on customer demands;

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 516 of 1363
Case 3:05-md-00527-RLM-CAN  Document 497-2   Filed 02/05/07   Page 271 of 300
8/15/2006  Alexander, Dean

1   is that right?

2        A.  That's -- I'm assuming that's why they had

3   appointment deliveries.

4        Q.  And you understood that that could be a

5   requirement when you signed the operating agreement,

6   correct?

7        A.  Yes, I knew we could have appointment

8   deliveries.

9        Q.  In subparagraph (b), "Contractor agrees to

10  make reasonable efforts to retain and increase the

11  base of shippers and consignees served and the

12  number of packages handled per shipper within

13  Contractor's Primary Service Area."

14          Did you do anything to retain and increase

15  the base of customers in your service area?

16          MS. ZERGER:  Asked and answered.

17          THE WITNESS:  Can I read my answer back on

18  that one?

19  BY MS. BREMER:

20       Q.  I don't think you've answered that yet.

21          MS. ZERGER:  Very early.

22          THE WITNESS:  Very early on it was asked.

23  You can answer it again to the best of your

24  recollection.  I don't know if you can go back and

25  find it or not.

**8/15/2006  Alexander, Dean**

1            THE REPORTER:  I don't know what answer

2      he's talking about.  Just recently or --

3            THE WITNESS:  No, it was in the morning.

4      My answer will stand the same as that answer I gave

5      this morning.  And I believe my answer was to do a

6      good and reasonable job or facsimile thereof.

7      BY MS. BREMER:

8            Q.  And when you signed the operating

9      agreement, you understood that you were obligated to

10     make some effort to grow the customer base of your

11     work area; is that right?

12           A.  No.  We were told -- I remember my answer

13     was that FedEx sent out salesmen to shippers and

14     tried to acquire contracts.  If we saw somebody --

15     but we only did home deliveries, we didn't do

16     businesses.  So there was not an opportunity for me

17     to visit shippers.  I was doing homes, never

18     businesses.

19           Q.  Did you ask anybody about this provision

20     prior to signing the contract?

21           A.  When we -- Dave said, if I remember right,

22     and I'm trying to -- I'll speculate on this, and I

23     remember him saying that part of this contract would

24     not apply to you because a lot of it has to do with

25     Ground -- some of it has to do with Ground.  That we

**8/15/2006  Alexander, Dean**

1    don't do pick-ups and we don't do -- it might even

2    be the same contract Ground has.

3         Q.  Did you -- are you specifically remembering

4    that he told you that part of this contract would

5    not be applicable to you?

6         A.  Some of the areas, like the picking up from

7    shippers, I remember them saying somewhere, somebody

8    along the line, I can't totally remember for sure,

9    but some of it -- we wouldn't be picking up packages

10   from shippers.  Ground does that.

11        Q.  Did they -- did you ask anyone which

12   portions of the contract wouldn't apply to you?

13        A.  No.  They basically said picking up from

14   shippers would not be one of the jobs we would be

15   doing.  And I can't remember who said it or where I

16   heard it.

17        Q.  We talked earlier about the flex program.

18   How did you learn about the flex program?

19        A.  That would be in the vacation time.

20        Q.  What do you mean?

21        A.  Is that the flex or flexing?

22        Q.  Flexing.  You were talking about someone

23   then giving extra packages to you, and I believe you

24   called that as flexing.

25        A.  That was something that wasn't in place

**8/15/2006  Alexander, Dean**

1     when I left.

2          Q.   The flex program was not in place?

3          A.   No.   That's where you can get extra money

4     to be flexed.

5          Q.   How do you find out about the flex program?

6          A.   I talked to some Ground drivers and they

7     had talked about, you know, some people being in

8     that flex program.   That's really all -- I don't

9     know much about it other than people would get extra

10    money just to be on the list.

11         Q.   Okay.

12              MS. ZERGER:   Can we go off the record for a

13    minute just to check time?

14              MS. BREMER:   Sure.

15              THE VIDEO OPERATOR:   Going off the record.

16    The time is 5:18.

17              (Discussion off the record)

18              THE VIDEO OPERATOR:   Back on the record.

19    The time is 5:20.

20    BY MS. BREMER:

21         Q.   You've just been handed Exhibit Number 21,

22    which is an Addendum Response of Dean Alexander to

23    Defendant's First Set of Interrogatories.

24              (Whereupon, Deposition Exhibit 21 was

25              marked for identification)

8/15/2006  Alexander, Dean

1      BY MS. BREMER:

2           Q.   Do you recognize this document?

3           A.   Yes, I've seen this.

4           Q.   The last page, page 11, is a verification.

5      Is that your signature?

6           A.   Yes.

7           Q.   And did you declare under penalty of

8      perjury that the responses to the interrogatories

9      were correct?

10          A.   Yes.

11          Q.   Did you review the interrogatories in

12     preparation for your deposition?

13          A.   Not all of it.

14          Q.   But you reviewed some of it?

15          A.   Some of it.

16          Q.   When you signed the interrogatory

17     responses, you did so knowing that giving

18     statements -- that you were giving statements true

19     to the best of your knowledge; is that correct?

20          A.   Yes.

21          Q.   And you took it seriously?

22          A.   Yes.

23          Q.   Did you think about the answers --

24          A.   Yes.

25          Q.   -- before you signed?

**8/15/2006  Alexander, Dean**

1            And did you believe that they were true to

2      the best of your knowledge?

3            A.   Yes.

4            Q.   You mentioned one thing that you believed

5      was inaccurate; is that right?

6            A.   Right.

7            Q.   And what is that again?

8            A.   That was the area that had to do with the

9      supplemental drivers.

10           Q.   That there were additional people that you

11     hired for a short period of time?

12           A.   Right.  When I read the question I

13     understood it to be a driver, not more than one

14     driver.

15           Q.   Okay.  So there were three people that you

16     left out of that response?

17           A.   Right.  That I had -- like I say, I

18     interpreted as being just a supplemental, but that

19     was brought to my attention that it included people

20     that might have filled in a day here and day there.

21           Q.   And are you referring to your response to

22     Interrogatory No. 4?

23           A.   Page 4?

24           Q.   No, Interrogatory No. 4?

25           A.   Okay.  What page is that on?

**8/15/2006  Alexander, Dean**

1        Q.   Nine.

2        A.   Okay, no wonder.  I thought it read

3    differently, but that's -- I thought there was

4    another one that asked about --

5        Q.   Number 4 asks if anyone assisted you in the

6    performance of your duties, and please state the

7    identities of those individuals, including their

8    name, last known address, telephone number, etc.

9        A.   Yeah, I don't know any of that.  Their

10   phone numbers are --

11       Q.   Right, but the only person you identified

12   was Justin Alexander.

13       A.   Justin.

14       Q.   And what you're telling me now is that

15   there were three other people --

16       A.   That did a day here and a day there.

17       Q.   And how much were those people paid?

18       A.   $100, and one of them got $125, but I can't

19   remember which one that was.

20       Q.   And for how long was that?

21       A.   I think just the day.  I can't remember.  I

22   can't remember how I used them and when I used them.

23       Q.   It indicates here that Justin's pay rate

24   was $250 per week in 2001, and by 2005 it was $500

25   per week.

**8/15/2006  Alexander, Dean**

1         A.   Yes.

2         Q.   So basically in those four years his

3    salary, his wages had doubled?

4         A.   Yes.

5         Q.   What justified the doubling of his wages?

6         A.   More responsibility.

7         Q.   And what more responsibility did he take

8    on?

9         A.   More stops, a lot more stops.

10        Q.   Were you working less by 2005?

11        A.   No, I was probably working more up in El

12   Dorado Hills.

13        Q.   So both of you were working more?

14        A.   I didn't give up El Dorado Hills until I

15   think it was October or November of 2005.

16        Q.   When you reviewed your interrogatory

17   responses, did you notice anything else that was

18   incorrect?

19        A.   No, that's the only thing that I caught.

20        Q.   Could you look at page 4, please.  The last

21   sentence in the paragraph in the middle of the page

22   says, "Even when I was ill or injured I was forced

23   to work because I did not have a readily available

24   replacement driver."

25        A.   That's page 4?  I see.  Okay, it's up

**8/15/2006  Alexander, Dean**

1    above.

2        Q.   Were you ever forced to work when you were

3    ill or injured?

4        A.   I wasn't forced, but I had to do it or lose

5    the route, not having anybody else to do the route.

6        Q.   And those were the occasional colds that

7    you had?

8        A.   Sometimes I got pretty sick.

9        Q.   You had -- I believe you testified earlier

10   that you could only recall having a few colds.

11       A.   But colds can get real nasty.

12       Q.   And were you ever sick with anything more

13   than a cold?

14       A.   No.

15       Q.   Were you ever forced to work when you were

16   injured?

17       A.   I was never injured.

18       Q.   So you were never forced to work when you

19   were injured?

20           Was there an answer?

21       A.   I'm sorry, where was that at again?

22       Q.   I'm just asking if you were ever forced to

23   work when you were injured?

24       A.   I was never injured.

25       Q.   So you were never forced to work when you

8/15/2006  Alexander, Dean

1    were injured?

2         A.  No.  I can't remember at the moment.  I

3    don't remember putting that down.

4         Q.  Did you, on average, work 12 hours a day?

5         A.  I had -- if you combine my two trucks, I

6    did.  When I was by myself there's, I think, some

7    statements that shows the hours that I worked when I

8    was by myself.

9              And then when Justin came in -- if he

10   hadn't have come in I would have been working

11   probably -- between the two trucks we were working,

12   mine running about seven and a half hours and him

13   running another eight, eight and a half hours, would

14   have been a fifteen-hour-plus day if I hadn't of put

15   him on.

16        Q.  So you, personally, worked an average of

17   about seven and a half hours a day?

18        A.  Seven and a half to eight and a half, but

19   not when I was by myself.

20        Q.  And you were by yourself prior to

21   approximately October or November of 2001?

22        A.  Yes.

23        Q.  And how many hours were you working prior

24   to that time?

25        A.  I can't remember without looking.

**8/15/2006  Alexander, Dean**

1       Q.  Did you ever work on average more than 12

2   hours per day?

3       A.  At Christmastime always.

4       Q.  And so that was during --

5       A.  Peak.

6       Q.  A two-week period?

7       A.  18, 19, 20 days.  And then like I say, I

8   can't remember.  I was looking at some of my

9   statements and hours.  It's hard for me to remember

10   all the hours that I worked and when.

11       Q.  Did FedEx Home Delivery deduct any money

12   from your pay for cargo claims?

13       A.  Yes.

14       Q.  So you had cargo claims?

15       A.  Yes.

16       Q.  How many?

17       A.  I can't remember.  And I think it was

18   about -- I can't remember, but it was probably under

19   $2,000 worth of claims in five years.

20       Q.  Were you provided with information about

21   the claims before a deduction was made?

22       A.  And that's a good point.  Because I have --

23   everyone that I got I took care of.  And but I know

24   there was some -- I'd get claims and I'd go, "I

25   never seen this tracer, but I'm getting charged."

**8/15/2006  Alexander, Dean**

1    And the standard answer was always, "We gave you a

2    tracer."

3        Q.  So is it your understanding that when you

4    got a tracer you had to explain what had happened?

5        A.  I had to physically go and call the person

6    or visit them and take time out to go out of your

7    way to go see them and ask them if they received

8    their package on such and such a day from Sears and

9    Roebuck.  You know, and we knew the contents of the

10   package and we'd say it was a jacket.

11           And they would either say yes, we received

12   that package or no, we didn't.  And then they had to

13   sign that they received the package and I had to

14   sign off on it and give it to the terminal manager.

15       Q.  And if you did that, did they clear your

16   cargo claims?

17       A.  They did.

18       Q.  And could you look at your response to

19   Interrogatory No. 5, which is on page 10, please.

20       A.  On page what?

21       Q.  Ten.

22       A.  Ten, sorry.

23       Q.  And the interrogatory is, "If you contend

24   you worked in excess of 40 hours in any given week,

25   please state the dates and hours worked and the

**8/15/2006  Alexander, Dean**

```
 1    circumstances surrounding your need to work."

 2            And the response is that, "FedEx determined

 3    the number of packages assigned to me on a daily

 4    basis and required me to deliver every package

 5    assigned to me on the day it was assigned.  This

 6    caused me to have to work in excess of eight hours a

 7    day and 40 hours a week consistently.  On average, I

 8    estimated that I worked approximately 12 hours in a

 9    day and far more than 40 hours each week.  During

10    peak season I estimate that I worked 12 to 14 hours

11    a day because of the increased number of packages."

12            Is it incorrect that you worked approximately

13    12 hours a day and far more than 40 hours each week on

14    average?

15        A.  I counted the -- my time that I arrived at

16    the terminal and the time I arrived back home as

17    working time.

18        Q.  And are you saying now that you estimate

19    that between the time that you left home --

20        A.  Not home.  The time I arrived at the

21    terminal.

22        Q.  Arrived at the terminal and then went home

23    at the end of the day, that that was, on average,

24    more than 12 hours?

25        A.  I don't know if it was every single day,
```

**8/15/2006  Alexander, Dean**

1    but the eight hours was pretty much every single

2    day.  And the -- you know, it might have been ten to

3    12.  I mean, I can't remember all the hours, but I

4    know it was a lot of hours I was working.

5         Q.  So sitting here today, you don't believe

6    that, on average, you worked approximately 12 hours

7    a day yourself?

8         MS. ZERGER:  I'm going to object.  It

9    mischaracterizes the testimony.  The witness was

10   talking about the eight-hour figure.  I think

11   there's some miscommunication going on.

12        THE WITNESS:  Yeah.  Do you want to --

13   BY MS. BREMER:

14        Q.  You previously testified that you believed,

15   on average, you worked about seven and a half hours

16   per day.  Was that -- did that include the time that

17   you were at the terminal?

18        A.  No.

19        Q.  And you were at the terminal approximately

20   45 minutes to an hour in the morning?

21        A.  Not every day.  My ideal goal was to get

22   out of there in 45.  But 45 -- if we were lucky --

23   if we get in there at 6:00, 45 was really good.  An

24   hour and 15 really -- legitimate time was hour 15 to

25   an hour and a half to an hour 45.  It varied every

**8/15/2006  Alexander, Dean**

1    day.

2         Q.  Right.  So on average, it was more like

3    eight and a half, possibly nine hours a day; is that

4    right?

5         A.  On the job?

6         Q.  From the time you got to the terminal until

7    the time that you got home at the end of the day.

8         A.  No, it was more hours than that.

9         Q.  Was it 12 hours on average?

10        A.  You know, I just can't -- I'm thinking.  I

11   don't know that it was maybe 12, more maybe like ten

12   to 12 every day when I filled it out.  And I would

13   like to change that to ten to 12, now that I think

14   about it.  I was combining it.

15            What I was doing was combining -- I think I

16   was combining some of Justin's time into this when I

17   was filling it out.

18        Q.  So the 12 hours -- the on average

19   approximately 12 hours would include both your time

20   and Justin's time; is that right?

21        A.  When you add in the two trucks, it would

22   be -- on average, it was over 15 hours a day with

23   the two trucks.  And I was thinking the two trucks

24   timewise because I'm only getting paid for the one

25   route, any bonuses or anything.  The other route was

8/15/2006  Alexander, Dean

1    a flex route.

2         Q.  Right.  So just to confirm, when you say --

3    when you said that, "On average I estimated I worked

4    approximately 12 hours in a day and far more than 40

5    hours a week," what you meant was that you and

6    Justin together were working that amount; is that

7    correct?

8         A.  More, or more.

9         MS. BREMER:  Okay.  Thank you, Mr.

10   Alexander.

11        MS. ZERGER:  Can we go off the record for a

12   quick break while I get ready for my redirect?

13        MS. BREMER:  Yes.

14        THE VIDEO OPERATOR:  Going off the record.

15   The time is 5:39.

16        (Discussion off the record)

17        THE VIDEO OPERATOR:  Back on the record.

18   The time is 5:42.

19

20                     EXAMINATION

21   BY MS. ZERGER:

22        Q.  Mr. Alexander, I have a few questions

23   before we finish up today.  If you could look at

24   Exhibit Number 21.  You have that?

25        And there's Response No. 1, the second

**8/15/2006  Alexander, Dean**

1    paragraph, about the -- starting the third line of

2    the second paragraph you see, "After I began

3    working," do you see that?  At the end of the third

4    sentence, second paragraph.  Right here.

5        A.  Okay.

6        Q.  "FedEx required me to purchase or lease a

7    bigger truck over my objection."

8        Did that ever happen?

9        A.  No.  They asked me to get a bigger vehicle

10   and that it would be helpful.

11       Q.  Okay.  So the more accurate statement would

12   be that they asked you to get a bigger vehicle?

13       MS. BREMER:  Object as to form.

14       THE WITNESS:  Yes.

15   BY MS. ZERGER:

16       Q.  Okay.  Mr. Alexander, we've looked at this

17   sentence in Response No. 1 on page 4.  We looked at

18   the sentence about whether you were required to work

19   when you were injured.  You indicated that you were

20   not injured.  We look at your response to No. 4 on

21   page 9 regarding drivers who assisted you.  And you

22   indicated that there were three additional

23   individuals.  You testified earlier you knew the

24   names of two and couldn't remember the third one.

25   And then on the response to No. 5, page 10, you have

**8/15/2006  Alexander, Dean**

1    given a revised estimate of your hours and explained

2    what you were thinking when you wrote -- when you

3    verified this complaint.

4            Do you recall all that?

5        A.  Yeah.

6        Q.  What I'm going to ask you is, when did you

7    recall these facts which modify your answer, the

8    answers that we've pointed out?

9        A.  When I was asked about my, my personal

10   hours.  I'm always combining my two trucks as one

11   hour.

12       Q.  Okay.  My question is, when did you recall

13   and understand that these needed to be corrected?

14           When did you realize these needed to be

15   corrected?

16       A.  The --

17       Q.  The ones that I've pointed out?

18       A.  During this deposition.

19       Q.  Okay.  Did you deliberately omit or

20   misrepresent that information?

21           MS. BREMER:  Object as to form.

22           THE WITNESS:  No, I didn't do it on

23   purpose.

24   BY MS. ZERGER:

25       Q.  Okay.  You're a named plaintiff in this

**8/15/2006  Alexander, Dean**

1    case and a complaint was filed on your behalf in

2    this lawsuit, correct?

3         A.  Yes.

4         Q.  And you have seen that complaint, have you

5    not?

6         A.  Yes.

7         Q.  Does that list all of the legal claims you

8    have asserted against the company?

9         A.  Yes.

10        Q.  Okay.  Did you think at the time -- did you

11   think at any time after you signed the operating

12   agreement that you actually were in business for

13   yourself?

14            MS. BREMER:  Object as to form.

15            THE WITNESS:  I thought I was in business

16   for myself, but after all the experiences and the,

17   everything I went through with FedEx, I would

18   just -- I felt I was not treated fairly as a -- I

19   was disappointed that I felt I wasn't a contractor.

20   BY MS. ZERGER:

21        Q.  You were not a contractor, is that what you

22   said?

23        A.  I was not a contractor.

24        Q.  Okay.  All right.  Over the course of the

25   years you worked for FedEx, how many different

**8/15/2006  Alexander, Dean**

1    managers and service -- terminal managers and

2    service managers did you work for -- under, an

3    estimate?

4         A.  Four.

5         Q.  Okay.  And is it accurate to say that with

6    all of those managers the rules, policies and

7    procedures were uniform --

8              MS. BREMER:  Object as to form.

9    BY MS. ZERGER:

10        Q.  -- that you worked under?

11        A.  I would say each one had their own style.

12        Q.  Their own style.  What I'm asking is about

13   the rules, the policies and the procedures, were

14   those the same?

15        A.  Yes.

16             MS. BREMER:  Same objection.

17   BY MS. ZERGER:

18        Q.  And under each manager, did you have some

19   sort of a driver bulletin board with directives and

20   notices to drivers under each manager?

21        A.  Yes.

22        Q.  And under each manager were there grief

23   boards or some posting upon which they wrote the

24   service percentage on a daily basis of each of the

25   drivers in those terminals?

**8/15/2006  Alexander, Dean**

1              MS. BREMER:  Object as to form.

2              THE WITNESS:  Yes.

3      BY MS. ZERGER:

4          Q.  And under each of those managers, did you

5      ever lose pay because the people in your terminal

6      did not meet the service percentages set up by the

7      company, even though you did meet your service

8      percentage?

9          A.  Yes.

10             MS. BREMER:  That was object as to form as

11     well.

12             MS. ZERGER:  And you need to wait and allow

13     her to make her objections.

14             THE WITNESS:  I'm sorry.

15     BY MS. ZERGER:

16         Q.  Under each of those managers, were there

17     some kind of boards or places for posting entries

18     that showed the number of complaints and the number

19     of accidents that drivers in the terminal had

20     experienced?

21             MS. BREMER:  Object as to form.

22             THE WITNESS:  Yes.

23     BY MS. ZERGER:

24         Q.  And under each of the managers, did you

25     have to go through the same check-in and check-out

**8/15/2006  Alexander, Dean**

1    procedures?

2              MS. BREMER:  Object as to form.

3              THE WITNESS:  Yes.

4    BY MS. ZERGER:

5        Q.  And under each of those managers, did you

6    have the same experience of managers conducting

7    meetings with you in which they told you what they

8    wanted you to do or objected to things that they

9    thought you hadn't done?

10             MS. BREMER:  Object as to form.

11             THE WITNESS:  Yes.

12   BY MS. ZERGER:

13       Q.  And did each manager use the same driving

14   system in training drivers, as far as you know?

15             MS. BREMER:  Object as to form.

16             THE WITNESS:  Yes, they all used the Smith

17   system.

18   BY MS. ZERGER:

19       Q.  Okay.  And under each manager, did you

20   receive manuals and other written directives about

21   how to pick up and deliver packages?

22             MS. BREMER:  Object as to form.

23             THE WITNESS:  Yes.

24   BY MS. ZERGER:

25       Q.  And under each manager, the forms that you

**8/15/2006  Alexander, Dean**

1    used when delivering packages, like the door

2    knocker, all used FedEx Home Delivery logos?

3             MS. BREMER:  Object as to form.

4             THE WITNESS:  Yes.

5    BY MS. ZERGER:

6        Q.  And under each of those managers, were you

7    ever permitted to leave the terminal when you were

8    ready if the sort was not completed for everyone?

9             MS. BREMER:  Object as to form.

10            THE WITNESS:  Repeat that again, please.

11   BY MS. ZERGER:

12       Q.  Under each of these managers, were you ever

13   permitted to leave the terminal when your van was

14   loaded but the sort and loading was not complete for

15   all the other drivers?

16       A.  Yes.

17       Q.  You were permitted to?

18       A.  Oh, no, I'm sorry, no.  I misunderstood

19   that.  Now I understand.

20       Q.  Okay.  You testified earlier that you

21   enjoyed -- the happiest time when was you were out

22   on your route and you could deliver your packages.

23            Were you able to deliver packages any way

24   that you wished?

25            MS. BREMER:  Object as to form.

**8/15/2006  Alexander, Dean**

1              THE WITNESS:  Yes.

2      BY MS. ZERGER:

3          Q.  Okay.  So you could choose to throw the

4      packages over a balcony?

5          A.  No.

6          Q.  Okay.  So could you just -- was there a set

7      system for delivering packages, how you were to

8      handle and deliver packages?

9          A.  Yes.

10         Q.  Okay.  And could you choose to ignore the

11     service cross on a package?

12         A.  No.

13         Q.  Okay.  Could you choose not to put the

14     package into the scanner once the scanners were in

15     use?

16         A.  No.

17         Q.  You said that you had to -- that Justin had

18     to fill out an application when you wanted him to be

19     brought on as a supplemental driver.

20             Do you recall that testimony?

21         A.  Yes.

22         Q.  Was that a FedEx application?

23         A.  Yes.

24         Q.  You said that Justin had to watch videos

25     for several days prior to going out on the route

8/15/2006  Alexander, Dean

1    with you.

2              Were those FedEx videos?

3              MS. BREMER:  Object as to form.

4              THE WITNESS:  Yes.

5    BY MS. ZERGER:

6        Q.  You said in your earlier testimony that you

7    had put an ad in the paper to sell your route and

8    that you got, in your words, several bites but no

9    one could qualify.

10             Who did they have to qualify with?

11       A.  FedEx.

12       Q.  You said in your testimony that -- you were

13   asked, "How did you decide to load the vehicle?"

14   And your answer was, "The way they wanted the

15   vehicle loaded."

16             Who is "they"?

17       A.  FedEx.

18       Q.  You testified earlier in answer to a

19   question, the question was, "Were you told when to

20   deliver packages?"  And you testified that you were

21   not -- you said, "No."

22             And my question to you is, could you have

23   chosen to do all your deliveries between 9:00 and

24   11:00 p.m.?

25             MS. BREMER:  Object as to form.

**8/15/2006  Alexander, Dean**

1              THE WITNESS:  Yes.

2      BY MS. ZERGER:

3          Q.  You could have?

4          A.  Assuming I could have.  You mean 11:00 in

5      the morning to --

6          Q.  No, 9:00 in the evening to 11:00 in the

7      evening.

8          A.  Oh, no.

9          Q.  Okay.

10         A.  I'm sorry, I misunderstood that date.

11         Q.  You couldn't have chosen that, why?

12         A.  No, it's just too late.  They don't want

13     deliveries after 8:00.

14         Q.  And "they" being?

15         A.  FedEx.

16         Q.  Okay.  The hours that are recorded on the

17     settlement sheet, do those include the time of

18     the -- that you're at the terminal doing your

19     loading?

20              You testified earlier that the settlement

21     sheet records the hours from the scanner.  Do you

22     recall that?

23         A.  Yes, it only records the time that you're

24     on route, not any time loading or -- anything at the

25     terminal, any hours or time at the terminal.

**8/15/2006  Alexander, Dean**

1        Q.  Okay.  And you were asked how often you

2    spoke to a FedEx employee at the terminal.  And you

3    said that you did it as little as you could.

4            What was the amount of contact you had with

5    the terminal manager or the service manager in an

6    average week?

7        A.  "Hi, how are you?"  "How are you doing?"

8    "You're doing a great job."

9        Q.  In terms of how often would you have

10   contact with them or talk, or whether it be a

11   greeting or about a problem?  Did you see them every

12   day?

13       A.  I would see them every day.  Most days he

14   would at least say hello, and some days no

15   conversation at all.

16       Q.  Okay.  Is that true for the service manager

17   as well?

18       A.  The service manager was always at the back

19   door as we checked our packages in, so there was --

20   if you had packages, there was some smalltalk.

21       Q.  Okay.  And you took your scanner after you

22   had loaded your packages -- you testified you took

23   your scanner to someone at FedEx where it was

24   uploaded.  Was that also a FedEx employee?

25           MS. BREMER:  Object as to form.

**8/15/2006  Alexander, Dean**

1           THE WITNESS:  Yes.

2    BY MS. ZERGER:

3         Q.  Okay.  So you saw that person every day?

4         A.  It wasn't always the same person, but they

5    did the same job.

6         Q.  But there was a FedEx person you had

7    contact with?

8         A.  An employee, yes.

9           MS. ZERGER:  Okay.  I have no further

10   questions.

11          MS. BREMER:  Thank you.

12          THE WITNESS:  Thank you.

13          THE VIDEO OPERATOR:  This marks the end of

14   Tape No. 5 in the deposition of Dean Alexander.  The

15   original videotapes will be held by LegaLink New

16   York, 420 Lexington Avenue, Number 2108 and 2112,

17   New York, New York.  Going off the record.  The time

18   is 5:56.

19

20          (Whereupon, the deposition was

21          adjourned at 5:56 p.m.)

22

23

24                    --oOo--

25

**8/15/2006  Alexander, Dean**

```
1

2                    CERTIFICATE OF WITNESS

3

4            I, the undersigned, declare under penalty

5      of perjury that I have read the foregoing

6      transcript, and I have made any corrections,

7      additions, or deletions that I was desirous of

8      making, that the foregoing is a true and correct

9      transcript of my testimony contained therein.

10

11

12

13

14

15           EXECUTED THIS_____day of_____,

16      2006, at _____, _____

17

18

19

20

21

22           _____

23                    Signature of Witness

24

25
```

**8/15/2006  Alexander, Dean**

```
1                    CERTIFICATE OF REPORTER

2

3           I, ANGELA T. KOTT, a Certified Shorthand

4      Reporter, hereby certify that the witness in the

5      foregoing deposition was by me duly sworn to tell

6      the truth, the whole truth and nothing but the truth

7      in the within-entitled cause;

8           That said deposition was taken down in

9      shorthand by me, a disinterested person, at the time

10     and place therein stated, and that the testimony of

11     the said witness was thereafter reduced to

12     typewriting, by computer, under my direction and

13     supervision;

14          I further certify that I am not of counsel

15     or attorney for either or any of the parties to the

16     said deposition, nor in any way interested in the

17     event of this cause, and that I am not related to

18     any of the parties thereto.

19

20          DATED                        , 2006.

21

22

23

24          ANGELA T. KOTT, CSR 7811

25
```

**8/18/2006  Henderson, Jerrett**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION



In re FEDEX GROUND PACKAGE SYSTEM, INC.

EMPLOYMENT PRACTICES LITIGATION


DEAN ALEXANDER, et al.,          )

         Plaintiffs,      )

      vs.                      )  Case 3-05-MD-527-RM

FEDEX GROUND PACKAGE SYSTEM, )

INC.,                            )

         Defendant.       )

_____)


EXHIBIT B

**8/18/2006  Henderson, Jerrett**

INDEX OF EXAMINATIONS


EXAMINATION BY MR. JIH......................................6

EXAMINATION BY MS. ZERGER................................292


EXHIBITS MARKED FOR IDENTIFICATION


PLAINTIFF HENDERSON'S EXHIBIT NO.:

1       FedEx Home Delivery Standard Contractor

        Operating Agreement, Bates No. FXG_ALEXANDER

        0003205-3260.......................................55


2       Incentive document to purchase vehicle on

        behalf of Stearns Bank, Bates No. PCA0004439......227


3       Document entitled "Contract Discussion Notes,"

        Bates No. FXG_ALEXANDER0004945-4946...............260


4       Document entitled "Addendum Response of Jerrett

        Henderson to Defendant's First Set of

        Interrogatories," 14 pages........................286


--oOo--

**8/18/2006  Henderson, Jerrett**

```
1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF INDIANA

3                       SOUTH BEND DIVISION

4

5

6    In re FEDEX GROUND PACKAGE SYSTEM, INC.

7    EMPLOYMENT PRACTICES LITIGATION

8

9    DEAN ALEXANDER, et al.,        )

10                   Plaintiffs,    )

11        vs.                       )  Case 3-05-MD-527-RM

12   FEDEX GROUND PACKAGE SYSTEM, )

13   INC.,                          )

14                   Defendant.     )

15   _____)

16

17        BE IT REMEMBERED that, pursuant to Notice, and on

18   Friday, August 18, 2006, commencing at 8:32 a.m. thereof, at

19   the Marriott Residence Inn, 2485 Carmichael Drive, Chico,

20   California, before me, LISA R. OLLAR, a Certified Shorthand

21   Reporter, personally appears

22                    JERRETT HENDERSON,

23   called as a witness by the Defendant, who, having been first

24   duly sworn, was examined and testified as follows:

25   ///

26   ///
```

**8/18/2006  Henderson, Jerrett**

1                         --oOo--

2           LEONARD CARDER, 1330 Broadway, Suite 1450, Oakland,

3    California, 94612, represented by KIRSTEN ZERGER, Attorney At

4    Law, appeared as counsel on behalf of the Plaintiffs.

5           O'MELVENY & MYERS, LLP, 1999 Avenue of the Stars,

6    Suite 700, Los Angeles, California, 90067-6035, represented

7    by VICTOR H. JIH, Attorney At Law, appeared as counsel on

8    behalf of the Defendant.

9           O'MELVENY & MYERS, LLP, 1999 Avenue of the Stars,

10   Suite 700, Los Angeles, California, 90067-6035, represented

11   by LEE K. FINK, Attorney At Law, appeared as counsel on

12   behalf of the Defendant.

13          ALSO PRESENT:  Scott George, videographer.

14                        --oOo--

15

16

17

18

19

20

21

22

23

24

25

**8/18/2006  Henderson, Jerrett**

```
 1                   P R O C E E D I N G S

 2           THE VIDEOGRAPHER:  My name is Scott George.  I'm the

 3    videographer.  I'll be videotaping this proceeding on behalf

 4    of Legalink Manhattan at 420 Lexington Avenue, Suite 2108, in

 5    New York, New York.

 6           Today's date is August 18th, 2006.  And the time is

 7    8:32 a.m.  Our location today is 2485 Carmichael Drive in

 8    Chico, California.  We're here in the matter of Dean

 9    Alexander, et al., versus FedEx Ground Package Systems, Inc.

10    This is Case No. 3-05-MD-527-RM.

11           This is the deposition of Jerrett Henderson.

12           The noticing attorney is Victor Jih of O'Melveny &

13    Myers, LLP.  And the court reporter is Lisa Ollar of M.O.A.

14    Deposition Reporters.

15           This is a single-track recording, and overlapping

16    voices cannot be separated, and private discussions while

17    we're on the record will also be recorded.

18           Will counsel please identify yourselves, your firm,

19    and those you represent.

20           MS. ZERGER:  Kirsten Zerger with Leonard Carder for

21    the Plaintiff.

22           MR. JIH:  Victor Jih with O'Melveny & Myers for

23    FedEx Ground.

24           MR. FINK:  Lee Fink, also from the O'Melveny &

25    Myers.
```

**8/18/2006  Henderson, Jerrett**

1             THE VIDEOGRAPHER:  Go ahead and swear the witness

2    in, please.

3             (Whereupon the witness was sworn)

4                      EXAMINATION BY MR. JIH

5    Q.     Good morning, Mr. Henderson.  Could you state your

6    full name for the record.

7    A.     Jerrett Weston Henderson.

8    Q.     Have you ever used any other names?

9    A.     No.

10   Q.     My name is Victor Jih, and I represent FedEx Ground.

11          Have you ever had your deposition taken before?

12   A.     No.

13   Q.     Let me explain some ground rules just to make sure

14   we're on the same page.

15          Your deposition is part of a judicial proceeding.

16   That means it's part of a formal proceeding, even though

17   there is no judge here and we're not in a courtroom.  Do you

18   understand that?

19   A.     Yeah.

20   Q.     And you'll be asked a series of questions, and you

21   should answer them with the same formality and sanctity as

22   you would if you were sitting in a courtroom.  Do you

23   understand that?

24   A.     Okay, yeah.

25   Q.     And that means your testimony is given under oath,

**8/18/2006  Henderson, Jerrett**

1    which means it's subject to the penalty of perjury if you

2    don't tell the truth.  Do you understand that?

3    A.    Yes.

4    Q.    And what do you understand the penalty of perjury to

5    mean?

6    A.    I understand that that's lying under oath, I guess,

7    and I guess you can go to jail for that, as far as I

8    understand.

9    Q.    Pretty good understanding.  I just wanted to make sure

10   you understand that means, you know, that you have to do the

11   best you can to answer my questions.

12   A.    Right, right.

13   Q.    You have to tell me the complete truth.  You know,

14   it's just not like part of the truth, but to give me the full

15   truth.  Does that make sense?

16   A.    Yes.

17   Q.    And you understand that you have to tell me the truth

18   whether you think it helps your case or doesn't help your

19   case. Do you understand that?

20   A.    Right, yeah.

21   Q.    The court reporter, as you'll see right there, is

22   transcribing all of your answers and all of my questions, and

23   at the end of the proceeding, whenever she finishes the

24   transcript, you'll get a copy of the transcript to look at

25   and to review.

**8/18/2006  Henderson, Jerrett**

1     A.     Okay.

2     Q.     And that's your opportunity to make sure if there are

3     any changes you want to make or if you think, you know, you

4     want to make a correction to the testimony, or if you think

5     something was written down wrong.

6     A.     Okay.

7     Q.     You have a chance to make those changes.  Do you

8     understand that?

9     A.     Yes.

10    Q.     If you do make a change, though, I or any other

11    attorney has the right to comment on any changes.  So, for

12    example, if you change a "no" to a "yes," or if you change a

13    "yes" to an "I don't know," you know, depending on the

14    circumstances, people may or may not argue that you shouldn't

15    be believed or that your memory is not that reliable.  We may

16    or may not make arguments based on any changes.  Do you

17    understand that?

18    A.     Yes.

19    Q.     So it's very important that you do your best today to

20    give me the best testimony that you can.

21    A.     Okay.

22    Q.     Okay.  To help the court reporter and to help all of

23    us, actually it would be useful for you to answer and to

24    pause before you answer any question.

25    A.     Okay.

**8/18/2006  Henderson, Jerrett**

1    Q.    And that way your attorney will have a chance to

2    object if she wants to, and it will keep us from talking over

3    each other.

4    A.    Okay.

5    Q.    I'll try to do my best on that.  I tend to have a

6    tendency to jump the gun a little bit, so I'll try to hold

7    back.

8    A.    Okay.

9    Q.    Answer audibly.  You're doing that fantastic right

10   now, but sometimes we have a tendency to answer "uh-huh" or

11   give a nod of the head or shake our head.

12   A.    Okay.

13   Q.    That doesn't transcribe very well on paper, so it's

14   important that we answer "yes" or "no."

15   A.    All right.

16   Q.    Or whatever else the answer is.

17   A.    Right.

18   Q.    If you don't understand one of my questions, please

19   let me know.

20   A.    Okay.

21   Q.    Because if you do answer the question, I'm going to

22   proceed on the assumption that you understood it.

23   A.    Okay.

24   Q.    Do you understand?

25   A.    Okay, okay.

**8/18/2006  Henderson, Jerrett**

1    Q.    We're going to be talking about some things that have

2    happened, you know, a couple of years ago --

3    A.    Uh-huh.

4    Q.    -- and so your memory may or may not be, you know,

5    crystal clear on certain subjects.

6    A.    Right.

7    Q.    I'm entitled to your best recollection or your best

8    testimony.  I don't want you to completely guess if you have

9    no idea whatsoever.

10    A.    Right.

11    Q.    But if you even have sort of some recollection or a

12    vague recollection, I'm entitled to that.  So on the one hand

13    I don't want you to guess, but if you have any information

14    whatsoever, you know, I do want you to share that information

15    with me.

16    A.    Okay.

17    Q.    Do you have any questions about the procedure?

18    A.    No, not so far.

19    Q.    And you're represented by counsel today, correct?

20    A.    Yes.

21    Q.    Are you on any medication that might hinder your

22    ability to testify today?

23    A.    No.

24    Q.    And can you think of any reason why we can't proceed

25    with your deposition at this time?

**8/18/2006  Henderson, Jerrett**

1    A.      No, I can't.

2    Q.      What did you do to prepare for today's deposition?

3    A.      I discussed the deposition with my attorney.

4    Q.      Okay.

5            MS. ZERGER:  And at this point, I'm going to just

6    remind the witness that any conversations between your

7    attorney and yourself are privileged and not to be revealed.

8            THE WITNESS:  Okay.

9            BY MR. JIH:  Q.  Did you do anything else?

10   A.      No.

11   Q.      How many times did you meet with your attorney to

12   prepare for today's deposition?

13   A.      I think -- I think two, maybe three.

14   Q.      And when did those meetings take place?

15   A.      I believe there was one last Sunday -- I think it was

16   last Sunday -- a phone meeting.

17   Q.      Okay.

18   A.      And there might have been another one a previous week,

19   so...

20   Q.      Phone or in person?

21   A.      I believe phone.

22   Q.      Okay.  So other than -- you said maybe three.  You've

23   given me two phone calls.  Did you have any other meetings to

24   prepare for this deposition?

25   A.      Umm, there was a meeting yesterday.

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 557 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-3   Filed 02/05/07   Page 12 of 305
**8/18/2006  Henderson, Jerrett**

1    Q.    And that was in person?

2    A.    That was in person, yeah.

3    Q.    Any other meetings?

4    A.    No, not that I can recall.

5    Q.    The phone call -- well, let's start with the meeting

6    yesterday.  How long did that last?

7    A.    A couple hours.

8    Q.    Did it take two hours?  Three hours?

9    A.    Yeah, I think two.

10   Q.    And who else was -- who was present at that meeting?

11   A.    Myself and counsel.

12   Q.    And no one else?

13   A.    No one else.

14   Q.    And the phone call last Sunday --

15   A.    Yes.

16   Q.    -- who was that with?

17   A.    That was with myself and I believe the other

18   plaintiffs in the case, and I think Lynn and a few of the

19   attorneys.  I don't know specifically all the names, so --

20   Q.    Okay.

21   A.    It was a phone conference, so...

22   Q.    Oh, a conference call?

23   A.    Yeah.

24   Q.    How long did that call last?

25   A.    I believe approximately two and a half to three hours.

2/5/2007  10:34 AM                                                        12
                                                                          1374

**8/18/2006  Henderson, Jerrett**

1    Q.    And you had mentioned there may have been a phone call

2    before that.  Do you remember when that might have been?

3    A.    Not specifically, no.

4    Q.    Was it immediately before the Sunday phone call or a

5    while before?

6    A.    I would say a few days to a week maybe.

7    Q.    And who was on that phone call?

8    A.    I believe -- I believe Lynn.

9    Q.    And by "Lynn," you mean Lynn Faris?

10   A.    Yes, Lynn.

11   Q.    Anyone else?

12   A.    Not that I can recall.  I don't know if there was

13   anyone else present.

14   Q.    And how long was the phone call with Ms. Faris?

15   A.    Not very long.  Less than a half an hour.

16   Q.    Okay.  Going back to the Sunday conference call --

17   A.    Uh-huh --

18   Q.    -- you said some of the other plaintiffs were on the

19   conference call as well, correct?

20   A.    Yeah.

21   Q.    Which -- who else was on the conference call, as far

22   as you know?

23   A.    I -- the only person that I heard named that I

24   recognized was Peter, and the rest of the names I don't -- I

25   didn't know.  I mean, I just heard them, and I don't remember

**8/18/2006  Henderson, Jerrett**

1    who they are, so...

2    Q.    Okay.  And who is Peter?  Last name?

3    A.    Last name, I think it's Allen.

4    Q.    And how do you know Mr. Allen?

5    A.    I know Peter from being a temporary driver in the

6    terminal I was in at one point.

7          THE VIDEOGRAPHER:  Excuse me, Jerrett.  Could you

8    raise the microphone a little bit, just above the next

9    button.  There we go.

10         THE WITNESS:  Okay.

11         THE VIDEOGRAPHER:  Thank you.

12         BY MR. JIH:  Q.  Did you review any documents to

13   prepare for today's deposition?

14   A.    I discussed -- I discussed the -- I can't remember the

15   name of it.  I discussed the documents with my attorney.

16   Q.    Okay.  And did any -- but did you review any

17   documents?  In other words, did you have the documents in

18   front of you?  Take a look at them?

19   A.    I reviewed the -- and, again, the name of the document

20   is -- it is the document that has the reason for the case and

21   the points -- I'm sorry.  I can't remember the --

22   allegations.

23   Q.    So the Complaint, or was it a different document?

24   A.    You'd have to show me it for me to be -- to confirm.

25   Q.    But did it look like something that was formally filed

**8/18/2006  Henderson, Jerrett**

1    with the Court or --

2    A.      It appeared to be, yeah.

3    Q.      Okay.  Any other documents?

4    A.      No.

5    Q.      Did you discuss this deposition with anyone before

6    coming here today besides your attorneys who were on the

7    conference call?

8    A.      No.

9    Q.      Is anyone paying for your expenses to be here today?

10   A.      No.

11   Q.      And are you being compensated in any way for your time

12   to testify?

13   A.      No, huh-uh.  I took time off work today and that's at

14   my own expense and --

15           (Reporter interrupts and asks for repeat)

16           THE WITNESS:  I took time off work today and that was

17   out of my own pocket.  I'm losing that money today that I'm

18   here.

19           BY MR. JIH:  Q.  Now, I asked you earlier about other

20   depositions, so I'm going to ask you something different.

21           Have you testified in any court or administrative

22   hearings before?

23   A.      Yes, I have.

24   Q.      How many times?

25   A.      I think three, and again I'm not positive.

**8/18/2006  Henderson, Jerrett**

1    Q.    Okay.  That's a lot.  Which three, that you remember?

2    A.    Well, I believe I'm referring to the EDD or the

3    unemployment case where I testified, I think it was three

4    times there.

5    Q.    And was one of them for your own benefits?

6    A.    Yes.

7    Q.    And were all three related to that, or were they

8    separate proceedings?

9    A.    No, I think all three were related to that.

10   Q.    Any other hearings or administrative hearings?

11   A.    No, not that I can recall.

12   Q.    What is your current home address?

13   A.    1180 East Lassen, No. 66, in Chico.

14   Q.    How long have you lived there?

15   A.    I believe four years.

16   Q.    And before that?

17   A.    Before that I was -- it was in town, not very far.  I

18   don't recall the street name.  It was a roommate situation,

19   so I...

20   Q.    Okay.  You mentioned roommates.  Are you married?

21   A.    No.

22   Q.    Any children?

23   A.    No.

24   Q.    Now, if I understand right, you graduated from

25   Paradise High School, correct?

**8/18/2006  Henderson, Jerrett**

1    A.    Yes.

2    Q.    And then you went to Hi-Tech Institute in Arizona?

3    A.    Yes, I did.

4    Q.    And so is the Hi-Tech Institute a -- what is that?

5    What program is that?

6    A.    It's just a technical school for electronics.

7    Q.    And any school or educational program after that?

8    A.    No.

9    Q.    No trade school beyond that?

10    A.    No, huh-uh.

11    Q.    Do you have any professional licenses or

12    certifications?

13    A.    No.

14    Q.    Have you ever served in the military?

15    A.    No, I have not.

16    Q.    Are you a member of any professional associations or

17    clubs?

18    A.    No.

19    Q.    Have you ever -- beyond this lawsuit and I guess the

20    claim for benefits, unemployment benefits, have you ever

21    filed or been involved in any other lawsuits?

22    A.    No.

23    Q.    Have you ever been convicted of a felony?

24    A.    No.

25    Q.    How about a misdemeanor?

2/5/2007  10:34 AM

**8/18/2006  Henderson, Jerrett**

1        MS. ZERGER:  I'm going to just object as irrelevant.

2    The conviction of a misdemeanor is not admissible.

3        You may go ahead and answer.

4        BY MR. JIH:  Q.  Unless she instructs you not to

5    answer -- there will be objections on the record, and it's

6    for purposes of the Court.  But after the objections, you can

7    still answer the question unless your attorney tells you not

8    to.

9    A.    Okay.  No.

10   Q.    When did you first enter into your contract with FedEx

11   Ground?

12   A.    I think it was February of '01.

13   Q.    And before -- so I think you ended -- so you graduated

14   from Hi-Tech Institute in 1988?

15   A.    Okay.

16   Q.    And then FedEx Ground, I guess the contract was in

17   February '01.  What did you do in between there in terms of

18   work?

19   A.    I had different positions with different companies.

20   Q.    Okay.

21   A.    I did waiting tables for a few years.  I worked at a

22   bank for a few years, and I also worked in retail, Office

23   Depot.  I think that was the one before FedEx.  That wasn't

24   for very long.

25   Q.    Now, in terms of waiting tables, is that the Olive

**8/18/2006  Henderson, Jerrett**

1    Garden?

2    A.    Yes, that would be the Olive Garden.

3    Q.    And did you have any sort of supervisory

4    responsibilities or management responsibilities at the Olive

5    Garden?

6    A.    No, huh-uh.

7    Q.    So you were just -- you were a waiter?

8    A.    Yeah, just a waiter.

9    Q.    And how long were you there for?

10   A.    Five years.

11   Q.    And at the bank, what was your position -- is that

12   Tri-Counties Bank?

13   A.    Yes.

14   Q.    And what was your position at the bank?

15   A.    I -- ending position was loan processor.

16   Q.    And at Tri-Counties Bank did you have any managerial

17   or supervisory responsibilities?

18   A.    No, huh-uh.

19   Q.    So you were an employee at Tri-Counties Bank?

20   A.    Yes.

21   Q.    And at Office Depot, you said you weren't there for

22   very long.  How long were you there?

23   A.    I think two to three months.  I had just recently

24   started there, so...

25   Q.    What was your position there?

**8/18/2006 Henderson, Jerrett**

1    A.    Floor sales, I guess.

2    Q.    You weren't a manager?

3    A.    No.

4    Q.    And why did you decide to leave Office Depot?

5    A.    Because I was looking for another job that would pay

6    more, and, you know, I knew that the Office Depot job was a

7    temporary thing while I looked for other work, so...

8    Q.    Why did you -- why did you leave Tri-Counties Bank?

9    A.    I was fired from Tri-Counties Bank.

10    Q.    Did the bank give a reason for termination?

11    A.    They -- I think they did.  It was a -- I'm trying to

12    remember because it was a while back.  It was an incorrect

13    entry on one of the loans that I had made and that was a

14    disagreement that I had between my supervisor and myself.

15    Q.    So the bank took issue with something that had been

16    entered in one of the loans that you had made?

17    A.    Yeah, it was just an error, and it was something that

18    I had just started learning.  It was a new -- it was a new

19    type and a new section that I hadn't done before, and I had

20    only been doing it for a few days at that point, and that was

21    my contention or argument that I had a supervisor sitting

22    next to me training me, and it wasn't my, you know -- it

23    wasn't my fault; I was just learning it.  And, yes, there was

24    an error made, I did agree with that, but I didn't feel that

25    it was my fault because I was, you know, being trained on

**8/18/2006  Henderson, Jerrett**

1    something new, so...

2    Q.      And the bank managers disagreed?

3    A.      The managers disagreed, yeah.

4    Q.      What did they -- what did they disagree with?

5    A.      That the responsibility was mine and not the

6    supervisor's who was training me, so...

7    Q.      What was the error?

8    A.      I don't specifically remember.  I don't remember

9    specifically what it was.

10   Q.      Did the bank believe that the error -- so...I just

11   want to make sure I understand.  So there was an error

12   made on -- was it a loan application or --

13   A.      No, it wasn't a loan application.  We processed the

14   files that were already compiled from the other branches.

15   Q.      Okay.

16   A.      And there was something -- like I said, this was a new

17   thing, so I mean if it was something that I had been doing on

18   my normal loan procedures and normal loans, I could probably

19   tell you exactly what, you know, or as close to exactly what

20   happened.  But since this was a new section and a new thing

21   that I hadn't done before, I can't remember all the specifics

22   on it and what, you know, what the error was exactly, and I'm

23   sorry.

24   Q.      So the bank -- so there was a mistake basically on one

25   of the pieces of paper associated with the loan?

**8/18/2006  Henderson, Jerrett**

1    A.    Associated, yeah, with this loan or this...

2    Q.    And was it the bank's -- in your view, it was a just a

3    mistake, it was an error, it was something new that you were

4    learning, correct?

5    A.    Correct, yes.

6    Q.    And did the bank agree it was a mistake, just thought

7    you should have caught it or did the bank think that it

8    wasn't a mistake, it was done on purpose?  I'm trying to

9    figure out what the issue was.

10   A.    I think that -- yeah, I think that their position was

11   that it was something that should have been caught and wasn't

12   caught and I think that's what it was.

13   Q.    So it was sort of one mistake and you're out?

14   A.    Yeah, I guess on that, yeah.

15   Q.    Why did you leave or stop waiting tables at the Olive

16   Garden?

17   A.    I think that -- I think that I was looking for work

18   out of the area, and so I had thought I had found something

19   and it turned out -- so I had left there to do that.

20   Q.    But you made the decision to leave?

21   A.    Yeah, yeah.  That was something where I left.  I

22   wasn't fired, yeah.

23   Q.    Now, did you ever work for a place called Sorcery

24   Computer?

25   A.    Yeah, a long time ago.

**8/18/2006  Henderson, Jerrett**

1    Q.    And that position -- you were an employee there?

2    A.    Yes.

3    Q.    Did that involve any managerial or supervisory

4    responsibilities?

5    A.    No, no.

6    Q.    Why did you leave Sorcery?

7    A.    Sorcery went out of business and all the employees

8    left.

9    Q.    How about TFI Corp?

10   A.    TFI Corp?  Yes, I worked there.

11   Q.    What was your position?

12   A.    It was sanding the mouldings.

13   Q.    Employee there?

14   A.    Uh-huh, yes.

15   Q.    No management or supervisory responsibilities?

16   A.    No, no.

17   Q.    Why did you leave TFI Corp?

18   A.    That, if I remember right, was a seasonal position,

19   so...

20   Q.    So it just ended?

21   A.    Yeah, it just ended.

22   Q.    And how about KHSL TV?

23   A.    KHSL, right, yes.  I worked there.

24   Q.    What did you do there?

25   A.    I did some of the internet hookup for customers.  They

**8/18/2006 Henderson, Jerrett**

```
 1    had a small division in the company that provided internet

 2    service to people, so...

 3    Q.    Did you manage anyone there or have any --

 4    A.    No.

 5    Q.    Why did you leave KHSL?

 6    A.    They were phasing the internet portion out.  They

 7    didn't like it and it wasn't working for them, and so they

 8    were phasing it out of the company.

 9    Q.    Okay.  Can you think of any other jobs you had before

10    contracting with FedEx Ground?

11    A.    No, not off the top of my head, no.

12    Q.    Just to follow up on KHSL for a moment --

13    A.    Uh-huh, yeah.

14    Q.    -- in the, I guess they call it the Contractor Driver

15    Information Sheet that you filled out for FedEx Ground, it

16    indicated that the reason you left was a family matter.  Do

17    you know what that refers to?

18    A.    I know that -- I know that around that time, that my

19    parents were -- I believe that they were in Paradise, and my

20    mom at that time was really sick or -- she was diagnosed with

21    cancer, and they were leaving their house and there was some

22    family problems there, so that was again one of the reasons

23    why -- I think that was right around the time I left Olive

24    Garden, too, and both of those were -- I was going to be

25    looking for work elsewhere.  I wasn't sure of my family
```

8/18/2006  Henderson, Jerrett

1    situation up there, so...

2    Q.     Got it.

3    A.     But, yeah, it all contributed with them saying that

4    they were phasing me -- the internet portion of the company

5    out anyway, so there really wasn't going to be anything solid

6    for me there.  And I know that there was a couple other

7    people in that same section of the company that I worked at

8    that also moved on because of that same reason, so...

9    Q.     Okay.  Before contracting with FedEx Ground, I think

10   you said February 2001 --

11          MS. ZERGER:  At this point I would like to go on the

12   record regarding the stipulation that has been entered into

13   between Lee Blalock and Lynn Faris regarding the use of the

14   term "contractor" or "independent contractor," and that if

15   that's used here today in the questions or the answers, that

16   that does not constitute an admission as to the legal status

17   of -- on the legal issue of employee status.

18          MR. JIH:  I don't know what was agreed to, but

19   whatever it is, it is.

20   Q.     But you did enter into a contract with FedEx Ground,

21   correct?

22          MS. ZERGER:  Well, the reason I'm entering it now is

23   it's a continuing objection.  Obviously, the stipulation is

24   so that I don't have to say it every time you use the word

25   "contractor" or the deponent uses the word "contractor."

**8/18/2006  Henderson, Jerrett**

1              MR. JIH:  Understood.

2              THE WITNESS:  Okay.

3              BY MR. JIH:  Q.  You did enter into a contract with

4      FedEx Ground in February 2001, correct?

5      A.      Yeah, I did.

6      Q.      And before you entered into that contract, did you

7      have any experience sort of with driving or delivery in a

8      professional capacity?

9      A.      No, no, huh-uh.

10     Q.      Did you have any experience managing or supervising

11     other people?

12     A.      Not that I can recall, no.

13     Q.      Did you have any experience, for example, managing

14     expenses or keeping track of costs?

15     A.      No, you know, other than if you're going to, you know,

16     give it to the bank as an example, but other than that, no.

17     Q.      Did you have any experience running your own business?

18     A.      No, not that can I recall.

19     Q.      And before contracting with FedEx Ground, all of the

20     job positions we talked about you were an employee, correct?

21     A.      I'm sorry --

22             MS. ZERGER:  I'm going to object in terms of it

23     calls for a legal conclusion.

24             You may answer.

25             BY MR. JIH:  Q.  When you were at Sorcery Computer,

**8/18/2006  Henderson, Jerrett**

1    TFI, Olive Garden, Tri-Counties Bank, KHSL, Office Depot,

2    that was all as an employee, as far as you understood?

3    A.    As far as I understood, all as an employee.

4    Q.    Do you have any experience being an independent

5    contractor before contracting with FedEx Ground?

6    A.    No, not that I know of, no.

7    Q.    Based on your work experience before contracting with

8    FedEx Ground, do you believe you were adequately prepared to

9    be a FedEx Ground contractor?

10   A.    I think I was.

11   Q.    Why do you say that?

12   A.    I think that I had -- that I had, you know,

13   responsible positions, and I think that I did, you know,

14   well, and could, you know -- I was a responsible person and,

15   you know, showed up for work every day, and you know, I knew

16   that, you know, I had those traits and, you know, no criminal

17   background or anything like that.  And so I was, yeah,

18   confident that I could do it.  I knew I had a good driving

19   record, so I mean...

20   Q.    Now, your contract with FedEx Ground, I believe was

21   terminated in November of 2004, correct?

22   A.    Yes.

23   Q.    Since the contract was terminated, what jobs have you

24   held?

25   A.    I have held -- I had a couple of temporary positions

**8/18/2006  Henderson, Jerrett**

1    through an agency a few days to a week, and recently I have a

2    job with Builders Supply.

3    Q.     What is Builders Supply, what do they do?

4    A.     They do lumber sales and hardware.

5    Q.     What do you do for Builders Supply?

6    A.     I assist the accountant, AP department.

7           THE REPORTER:  The accountant --

8           THE WITNESS:  Yeah, the accountant, the accounts

9    payable department.

10          BY MR. JIH:  Q.  When did you start at Builders

11   Supply?

12   A.     Approximately two months ago.

13   Q.     And how much do you make at Builders Supply?

14   A.     $10 an hour.

15   Q.     I want to make sure I understand.  So before Builders

16   Supply about two months ago, it was just basically temporary

17   positions, or did you have other non-temporary positions

18   before Builders Supply?

19   A.     Just temporary positions.

20   Q.     So you worked -- which temp -- did you work with one

21   temp agency or many different ones?

22   A.     I think I worked with two.

23   Q.     Which two?

24   A.     Anderson & Associates and Express.

25   Q.     Did Builders Supply start as a temp position or was

**8/18/2006  Henderson, Jerrett**

1    that just completely outside?

2    A.    Completely outside.  Not related.

3    Q.    So from the end of November 2004 -- I think the record

4    shows the contract was terminated November 23rd, so the end

5    of November to about two months ago, the only positions

6    you've held were through those two temp agencies?

7    A.    Yeah, I think so.

8    Q.    Was there a period where you were unemployed?  In

9    other words, did you immediately start with a temp agency as

10   soon as you left FedEx Ground, or was there a period where

11   you didn't work?

12   A.    There was -- well, there was a period all through that

13   time where I didn't work, but I did have them -- have my

14   information with them and was checking back with them for

15   work, but...

16   Q.    While you were under contract with FedEx Ground, did

17   you have any other jobs, part-time jobs or anything like

18   that?

19   A.    No.

20   Q.    Did you have any other sources of income?

21   A.    No.

22   Q.    How did you first learn about FedEx Ground?

23        MS. ZERGER:  Objection.  Vague and ambiguous.

24        You may answer if you understand.

25        THE WITNESS:  Umm, could you rephrase it?

**8/18/2006  Henderson, Jerrett**

1              BY MR. JIH:  Q.  Yeah, how did you first learn about

2     the possibility of working with FedEx Ground?

3     A.      I'm pretty sure that I saw an ad in the paper.

4     Q.      This would be while you were working at Office Depot?

5     A.      Yeah, that's correct.

6     Q.      What paper did you see the ad in?

7     A.      Enterprise Record.

8     Q.      Enterprise Record?

9     A.      Yeah.

10    Q.      What did the ad say?

11    A.      I don't recall the specific wording of the ad.

12    Q.      Do you recall generally what you remember about the

13    ad?

14    A.      Generally, that FedEx Home Delivery was on there.  I

15    don't know for sure if it said opening a new warehouse, but I

16    thought it was something to that effect, and looking for

17    drivers, and that's about the best I can remember of the

18    wording.

19    Q.      Did the advertisement say FedEx Home Delivery was

20    looking for "contractors," or "temp drivers," or was it

21    specific in any way in terms of that?

22              MS. ZERGER:  Asked and answered.

23              You can answer if you remember.

24              THE WITNESS:  The only thing that I can probably

25    recall for sure is that I don't remember it saying "temp" --

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 576 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-3   Filed 02/05/07   Page 31 of 305
8/18/2006  Henderson, Jerrett

1          BY MR. JIH:  Q.  Okay.

2    A.      -- anywhere in the ad.

3    Q.      Do you remember it saying "contractor" anywhere in the

4    ad?

5          MS. ZERGER:  Asked and answered.

6          THE WITNESS:  Yeah, I don't.  Like I said, I don't

7    recall.

8          BY MR. JIH:  Q.  What did you do after you saw the

9    advertisement?

10   A.      I went to the address indicated in the ad and, you

11   know, applied for the job.

12   Q.      What was the address -- I mean, where was it?  I don't

13   expect you to remember the address.

14   A.      Oh, I think the address is 311 Otterson or 301.

15   Q.      And what's located there?

16   A.      I'm sorry.  I don't understand what you're asking.

17   Q.      In other words, where did you go?  What is that the

18   address of?  Is it the terminal?

19   A.      Yeah, the terminal where -- right.

20   Q.      The Home Delivery terminal?

21   A.      The Home Delivery terminal, right.

22   Q.      Who did you contact when you went to the Home Delivery

23   terminal?

24   A.      I believe both James Cumberland and Pete Van Buskirk,

25   if I got the name right, were both there when I went in.

**8/18/2006  Henderson, Jerrett**

1    Q.    So you met with them.  Was it just you or was it a

2    group of people with those two?

3    A.    Again, I don't know for sure, but I think there was at

4    least one other person, and I think it was an applicant was

5    there in the office, so...

6    Q.    When you met with Mr. Cumberland and Mr. Van Buskirk,

7    what did you discuss with them?  Was it an interview?  Was

8    it --

9    A.    Well, I discussed my application with them and talked

10   about the position briefly.

11   Q.    What did they say about the position you were applying

12   for?

13   A.    Again, you know, nothing specific that, you know -- it

14   was a little while ago.

15   Q.    Okay.

16   A.    And -- but I, you know, I think just discussed being,

17   you know, a delivery driver.  They may have discussed whether

18   or not -- you know, my driving record.  You know, just kind

19   of an overview of the different questions that they, I guess,

20   were concerned about for, you know, a general applicant

21   position.  You know, I think they might have asked if I had

22   any conditions that would prevent me from, you know, working

23   or, you know, any health conditions or anything like that.

24   Q.    So other than driving record, any conditions like

25   health conditions, do you remember anything else they may

**8/18/2006  Henderson, Jerrett**

1    have asked you about at that meeting?

2    A.    Not anything that stands out, anything specific that I

3    can...

4    Q.    When you were meeting with Mr. Cumberland and Mr. Van

5    Buskirk, was this -- did they tell you what the position was

6    for?  Was this for a contractor position, or was it a temp

7    driver position, or was it not clear?

8    A.    I'm sure it wasn't for a temp position.  Yeah, you

9    know, they did mention that they had several routes, you

10   know, five, six, whatever the number was.  They mentioned

11   that they had, you know, filled one route already and so

12   that -- yeah, it was my understanding that it was not a temp

13   position.  It was a full-time driver position, so...

14   Q.    You mentioned earlier today that you were employed as

15   a temp driver at one point for someone named Peter Allen?

16   A.    That I was an --

17   Q.    Yeah --

18       MS. ZERGER:  Objection.  Mischaracterizes the

19   testimony.

20       BY MR. JIH:  Q.  Maybe I just misunderstood.  How

21   did you know Peter Allen again?

22   A.    I know Peter Allen from working in the -- he worked in

23   the terminal.

24   Q.    Oh, he was a temp driver for the terminal?

25   A.    For the terminal, yeah.

**8/18/2006  Henderson, Jerrett**

1    Q.      Got it.  My mistake.

2    A.      Okay.

3    Q.      After this initial meeting at the terminal with

4    Mr. Cumberland and Mr. Van Buskirk and maybe one other

5    applicant or two, you said, what happened next?  Did they

6    give you the contract on the spot or what happened next?

7    A.      If I remember correctly, I believe that they did

8    present the operating agreement and the contract, and they

9    did give me a short period to look it over.  I did skim

10   through it, and then they -- like I said, you know, they

11   looked at the applicant -- or the application.  They talked

12   about that with me, and they said that -- you know, they said

13   that I appeared to be, you know, a good applicant for the

14   position, as far as I remember.

15   Q.      So your best recollection is that you were given the

16   operating agreement in that very first meeting at the Home

17   Delivery terminal?

18   A.      I think so, yes.

19   Q.      And did you sign it during that first meeting?

20   A.      I believe I did, yes.

21   Q.      How long did that meeting take?

22   A.      I don't recall exactly.  It was possibly an hour, hour

23   and a half.

24   Q.      Other than talking to Mr. Cumberland and Mr. Van

25   Buskirk, were any other written materials given to you or any

**8/18/2006 Henderson, Jerrett**

1    presentations made to you during that meeting?

2    A.    I don't remember if there were.

3    Q.    So you just remember sort of an in-person meeting, no

4    formal presentation, no slide show or videotape or something

5    like that during the first meeting?

6    A.    During the first meeting, I don't remember -- I don't

7    remember that.

8    Q.    So you don't remember any video or anything like that

9    before you signed up to be a contractor?

10   A.    I don't -- I don't think so before that.

11   Q.    Any written materials other than the operating

12   agreement itself before you signed up to be a contractor?

13   A.    I can't recall that.

14   Q.    Tell me everything you remember either Mr. Cumberland

15   or Mr. Van Buskirk told you about the position before you

16   signed the contract.

17          MS. ZERGER:  Asked and answered.

18          You can answer if you have additional...

19          THE WITNESS:  I don't have anything additional for

20   that unless there's a specific question.

21          BY MR. JIH:  Q.  Well, did Mr. Cumberland or

22   Mr. Van Buskirk tell you what it would mean in terms of your

23   responsibilities to be a contractor with FedEx Ground or

24   FedEx Home Delivery?

25   A.    That -- in my opinion, that's a little vague.

**8/18/2006  Henderson, Jerrett**

1          Again, they went over the position and talked about,

2    you know, like I said -- you know, the position was a

3    delivery driver for FedEx and, you know, I'm sure they went

4    over a little bit of it, but it was -- like I said, it was an

5    overview of the whole application process, so there was a lot

6    of things talked about.

7    Q.    And if that's all you remember, that's great.  I just

8    want to make sure because you said "if there's something

9    specific," so I just want to follow up to make sure I have

10   all the things you remember.

11         Do you remember them saying anything in terms of what

12   you would have to do as a Home Delivery contractor?

13   A.    At that point, you know, other than -- you know, other

14   than general ideas of the position, I don't think that they

15   went into any details or specifics at that point.  There

16   were, you know, like I said a general overview of the

17   position at that time I was there.  That's what I...

18   Q.    And I understand that they didn't get into the

19   specifics, but it was a general idea or general overview.  I

20   don't know what that means.  So can you just tell me what you

21   remember in terms of what they did communicate about the

22   general idea or general overview.

23         MS. ZERGER:  Asked and answered.

24         You can answer.

25         THE WITNESS:  No.

**8/18/2006  Henderson, Jerrett**

1          BY MR. JIH:  Q.  Well, "general," that just

2     describes it.  I don't know what exactly was said.  So do you

3     -- it was a driving position.  Do you remember anything else

4     that was said beyond that?

5     A.     No.  Again, I can't, you know, think of anything

6     beyond that right now.

7     Q.     So you can't think of anything that was discussed

8     about what it would mean to be a contractor for FedEx Home

9     Delivery other than the fact that it would involve driving?

10    A.     I don't recall anything specific that they went into

11    at that time.

12    Q.     Do you remember if there were -- if they told you how

13    you would be paid?

14    A.     I do think that they mentioned how I would be paid,

15    yes.

16    Q.     Do you remember what they said about that subject

17    during that meeting?

18    A.     I remember that they mentioned that there was a

19    per-package compensation, and I remember that they said there

20    was a compensation that, now I understand that might have

21    been core zone that they were talking about, but at that time

22    I think that those were the two things that they mentioned

23    for compensation, and I really don't think that there was

24    anything beyond that in the compensation part that they went

25    into.

**8/18/2006  Henderson, Jerrett**

1    Q.    Did they tell you how much you should expect to make

2    in that meeting?

3    A.    I believe that they gave me a general figure of what

4    the average contractor makes, but...

5    Q.    What did they give you as the general figure?

6    A.    I think again, if I remember right, that general

7    figure was right around 800 to 850 in a week, I think, so...

8          But, again, like I said, I don't remember that they

9    broke those down into where all those came from.  It was

10   mainly just those two things that I think they threw out

11   there.

12   Q.    Why did -- why was it a general figure as opposed to

13   exactly what you would make?  Like you said it was more of an

14   average.

15         MS. ZERGER:  Objection.  Lack of personal knowledge.

16         BY MR. JIH:  Q.  In other words, why were you

17   talking about averages and general figures as opposed to this

18   is what you're going to take home on a weekly basis?

19   A.    At that time I don't -- you know, all I know was that

20   they were giving me an idea of some sort of, you know, figure

21   of what a person could make doing it.

22         So, like I said, I don't know the details of where

23   they got those numbers, and at that time I had no idea of the

24   breakdowns, you know, of core zone and van availability and

25   all that stuff that, so...

**8/18/2006  Henderson, Jerrett**

1    Q.     So you understood that you could make anywhere between

2    800 to 850 in a week, but there was no guarantee that you

3    would make that as a contractor?

4          MS. ZERGER:  Objection.  Mischaracterizes the

5    testimony.

6          THE WITNESS:  That's what I understood was just an

7    idea, an average.

8          BY MR. JIH:  Q.  So you understood that it was

9    possible to make less than 800 to 850?

10   A.     At that time I didn't know.

11   Q.     Did you understand that you could make more than 800

12   to 850 a week?

13   A.     Again, I didn't know.  I wasn't sure.

14   Q.     Did you ask?

15   A.     No, I don't think at that time I did.

16   Q.     Why not?

17   A.     Again, it was just an application and interview

18   process and -- you know, I didn't get into it that far.

19   Q.     So at some point during this meeting, you were given

20   the operating agreement, correct?

21   A.     I think so.

22   Q.     And you testified that you skimmed through it?

23   A.     Uh-huh.

24   Q.     Why do you say "skimmed"?

25   A.     Well, because, you know, I looked at it, and it looked

**8/18/2006 Henderson, Jerrett**

1    to be, you know, a lot of, you know, legal speak and talk and

2    so I looked through it and was kind of trusting, you know,

3    their presentation and, you know, discussion with me on it to

4    give me an idea of, you know, what the position was.  So, you

5    know, I looked over it and tried to understand what I was

6    looking at.

7    Q.    Were you -- well, you said you were given a short

8    period of time to review it.  Was that because Mr. Cumberland

9    or Mr. Van Buskirk said you had to sign it on the spot?  Or

10   what do you mean by you were only given a short time?

11   A.    Well, they had a short time that I was going through

12   this, you know, that they were discussing the application

13   with me and discussing the position.  Like I said, I believe

14   that there was, you know, another applicant in the room and

15   they had said that I could, you know, sign this and that they

16   liked the application, liked what they saw.

17         I felt that if I left the building for, you know, any

18   period of time and came back at a later date, that I might

19   lose the opportunity to, you know, be hired, so...

20   Q.    So you signed it on the spot because you were worried

21   that another applicant might take the opportunity instead?

22   A.    Might get the job or that, you know -- possibly not

23   him, but someone else; that they had stated that they had,

24   you know, a limited number available, and so...

25   Q.    Did either Mr. Cumberland or Mr. Van Buskirk tell you

**8/18/2006  Henderson, Jerrett**

1    you had to sign the operating agreement on the spot?

2    A.    I don't remember that.

3    Q.    During this meeting, did you have any discussions

4    concerning -- well, first of all, let me back up.  Do you

5    understand what I mean when I say "proprietary interest"?

6          MS. ZERGER:  Objection.  Calls for a legal

7    conclusion.

8          BY MR. JIH:  Q.  Have you heard that term before?

9    A.    I have heard it.

10   Q.    What does that mean to you?  What's your understanding

11   of that term?

12         MS. ZERGER:  Same objection.

13         You may answer.

14         THE WITNESS:  As far as I understand, I thought that

15   it was -- it was -- proprietary would be that I had the

16   ability to either get money from whatever was there or that

17   it was mine; that, you know, I had either the opportunity to

18   sell or get money from it.

19         BY MR. JIH:  Q.  Did you have any discussions with

20   either Mr. Cumberland or Mr. Van Buskirk before you signed

21   the contract about what your proprietary interest would be?

22   A.    I don't remember that.  That doesn't sound familiar.

23   I don't remember that.

24   Q.    When you signed the contract to become a FedEx Home

25   Delivery contractor, was it important to your decision at all

**8/18/2006 Henderson, Jerrett**

1    that you would be an independent contractor as opposed to an

2    employee?

3           MS. ZERGER:  Again, I'm going to just object to the

4    extent that it calls for a legal conclusion.

5           You may answer.

6           THE WITNESS:  Could you restate it again.

7           BY MR. JIH:  Q.  Well, when you signed the contract

8    with FedEx Ground, and when I say that, I think it's with

9    FedEx Ground, but it's for FedEx Home Delivery.

10   A.      Home Delivery.

11   Q.      Is that your understanding?

12   A.      Yeah, I understand what you mean.

13   Q.      So when you signed the contract, did you understand

14   that it was, at least on its face, to be an independent

15   contractor?

16   A.      That's -- that was my understanding, although

17   eventually it didn't work out that way, but that was what

18   I -- that was what the intent, I guess, and the original

19   understanding that I thought was presented.

20   Q.      And was it important to your -- you made the decision

21   to sign the contract.  So I'm just trying to think through or

22   ask you, when you made that decision, was it important to you

23   at all that it was to be an independent contractor as opposed

24   to an employee?

25   A.      The idea of it was interesting.  At that time I don't

**8/18/2006  Henderson, Jerrett**

1    know whether I could say that that, you know, was an

2    overriding decision for me accepting it.

3    Q.    Well, was it part of your decision-making at all?  I

4    understand it wasn't an overriding factor in the decision,

5    but was it a part of the decision at all?

6    A.    Probably.  Like I said, it was interesting.

7    Q.    Well, would you have signed up with FedEx Ground if it

8    was as an employee?

9    A.    Possibly.  If you're going to, you know, compare that

10   example to, say, a UPS driver.  If I was to have gone in to

11   UPS and asked to sign on with them as an employee driver,

12   again, to me, that's a good position.  Same with the post

13   office.  I mean, that's what, you know, hear about, you know,

14   really good position, good money, you know, long-term.  All

15   those things come to mind, you know, a good company name.

16   So, sure, I probably would still have been interested.

17   Q.    So at this meeting in February 2001, what was your

18   understanding of the difference between an independent

19   contractor and an employee?

20        MS. ZERGER:  Objection.  Calls for a legal

21   conclusion.

22        You may answer.

23        THE WITNESS:  At that time -- at that time I really,

24   you know -- like I said, I wasn't positive of it, of what

25   the, you know, major differences were.  I could only go by,

**8/18/2006  Henderson, Jerrett**

1    you know, what the managers were, you know, explaining in

2    their overview and their talk with it.  I thought, you

3    know -- I can remember thinking that maybe I would have the

4    say of whether or not to accept delivery for a certain

5    customer, accept delivery for a certain area, and that, you

6    know, also -- you know, that might mean taking on more, too.

7    That would be, you know, something that I would be able to

8    decide, the amount that I took on.  But I don't know that I

9    went any further than that with differentiating, if that's a

10   word.  Did I get that word right?  So, yeah.  I mean, those

11   were the things that I can remember possibly thinking about

12   having some sort of input on.

13        BY MR. JIH:  Q.  Now, you said you weren't positive

14   of what the major differences are, but you could only go by

15   what the managers were explaining in their overview.  So tell

16   me everything you remember the managers explained to you in

17   terms of the difference between an independent contractor and

18   an employee.

19   A.    You know, again, it was --

20        MS. ZERGER:  I'm just going to object.  I think it

21   assumes -- mischaracterizes the testimony and assumes a fact

22   not in evidence.  There was no testimony that the managers

23   explained the difference between independent contractor and

24   employee in that meeting.

25        MR. JIH:  That's a fair question.

**8/18/2006  Henderson, Jerrett**

1    Q.      I took that from your prior answer, but let me just

2    ask you straight up.  Do you remember the managers explaining

3    to you the difference between being an independent contractor

4    and an employee before you signed the contract with FedEx

5    Ground?

6    A.      Not in, you know, so much of a breakdown.  Like I say,

7    I remember that they, you know, threw that term out there,

8    and I don't remember them going into great detail about it,

9    and, you know, that's why I mentioned the couple things that,

10   you know, went through my head as far as, you know, maybe

11   deciding what customers I could deliver to, what areas I

12   could deliver to and things of that nature, but it wasn't

13   really anything beyond that because it just wasn't into that

14   much detail at that time.

15   Q.      Well, do you remember any of the managers telling you,

16   before you signed the contract, that you would be able to

17   decide which customers you would deliver packages to?

18   A.      I don't remember that specifically.

19   Q.      So that may have just been your impression, but not

20   necessarily something they told you, correct?

21   A.      It could have been, yeah.

22   Q.      And do you remember them telling you that you could

23   decide how much work you wanted to do?

24   A.      I don't specifically remember that.

25   Q.      So that again could have just been something that you

**8/18/2006  Henderson, Jerrett**

1    thought but not something they told you?

2    A.      Yeah, it could have been.

3    Q.      We've been focusing on that meeting where you signed

4    the operating agreement.

5    A.      Okay.

6    Q.      I just want to ask you now, as you're sitting here

7    today, what is your understanding, if it's at all different,

8    of what it means to be an independent contractor as opposed

9    to an employee?

10          MS. ZERGER:  And, again, I'm going to object that it

11    calls for a legal conclusion.

12          You may answer.

13          THE WITNESS:  Well, I still, you know, feel, you

14    know, now today that there, you know, should be things like

15    flexing packages, you know, onto me from other routes that I

16    should have the decision of whether or not to be able to

17    accept those type of deals.  The decisions for me as far as

18    the amount of packages that are assigned to the route that

19    I'm delivering, again should be something that, you know, I

20    would have input and, you know, independent contractor would

21    have input on and say whether or not it could be, you know --

22    when that amount is enough.

23          And also, you know, as far as upgrading a vehicle to a

24    larger vehicle should be the decision of an independent

25    contractor and, you know, cosmetic maintenance.

**8/18/2006  Henderson, Jerrett**

1    I would also say that the hiring of someone to fill in

2    should be, you know, a decision for the independent

3    contractor and not something that the company has to be --

4    you know, has to be approved through the company.

5         Those are just some examples.

6         BY MR. JIH:  Q.  When you said "cosmetic maintenance,"

7    what do you mean by that?

8    A.    Everything from tinted windows to, you know, small

9    paint cover-up, you know -- you know, paint chips and things

10   like that.

11   Q.    Tinted windows, you're saying you think an independent

12   contractor should have the ability to have tinted windows; is

13   that --

14   A.    Should have the decision of whether or not to.  The

15   frequency of the -- the frequency of oil changes; any, you

16   know, any small dents that doesn't, you know, hinder your

17   ability to do your job, but may just be, you know, small

18   cosmetic things that, you know...

19   Q.    Before you decided to sign the contract with FedEx

20   Ground, were there any issues you wanted to investigate or

21   questions answered?

22   A.    I don't believe so at that time.

23   Q.    Did you ever think about consulting an attorney to

24   review the language of the contract before signing it?

25        MS. ZERGER:  Objection.  Vague and ambiguous.

**8/18/2006  Henderson, Jerrett**

1          THE WITNESS:  Could you rephrase that.

2          BY MR. JIH:  Q.  Well, I'll use a synonym.  Did you

3    ever consider consulting an attorney to review the language

4    of the contract before signing it?

5    A.     It wasn't -- it wasn't something that I thought that I

6    needed to do, you know.

7    Q.     Did you ever consider consulting an accountant or

8    financial advisor before entering into the contract with

9    FedEx Ground?

10   A.     Again, at that time it wasn't something that I thought

11   was something that I needed to be doing.  I was there for a

12   job.

13   Q.     Well, did you feel like you had a clear understanding

14   of what the contract required when you signed it?

15   A.     At that time I thought that I understood what -- the

16   idea that the managers were trying to get across to me.  I

17   thought that, you know, I understood the idea of it and

18   that's about as far as I knew.

19   Q.     It didn't bother you that you weren't -- well, I'll

20   take that back.

21          Were you at all concerned that you were entering into

22   a, you know, a legal document and assuming obligations that

23   you didn't fully understand?

24          MS. ZERGER:  Objection.  Mischaracterizes the

25   testimony.

**8/18/2006  Henderson, Jerrett**

1            THE WITNESS:  Umm, again I was there, you know,

2     looking for a job with a company that, you know, was a known

3     name, and those things didn't cross my mind, didn't -- I just

4     didn't think about that I needed to be concerned with, you

5     know, something like that.  Like I said, I had to take what

6     was presented to me at face value and...

7            BY MR. JIH:  Q.  The operating agreement is rather

8     long.  Do you remember how many pages it is.

9     A.    I don't remember how many pages it is.

10    Q.    It's like over 50 pages long, right?

11    A.    Okay.

12    Q.    I mean is that your recollection?  We'll get to it in

13    a bit.

14    A.    I remember it was long.

15    Q.    It's not like a one- or two-page document; it's a

16    pretty long document?

17    A.    Yeah, it's long, yeah.

18    Q.    In all of your prior jobs, you know, with the bank or

19    with Office Depot, et cetera, did any of those jobs require

20    you to sign an agreement?

21    A.    Not that I remember, no.

22    Q.    And certainly none of them required you to sign an

23    agreement that was as long as the FedEx Ground agreement,

24    correct?

25    A.    Yeah, not...

**8/18/2006 Henderson, Jerrett**

1    Q.      In fact, you understood when you were signing the

2    agreement that there may be something different about this

3    because they threw out the term "independent contractor,"

4    that you at least found interesting, correct?

5            MS. ZERGER:  Objection.  Mischaracterizes the

6    testimony and is getting argumentative.

7            THE WITNESS:  Yeah, could you restate the question

8    again.

9            BY MR. JIH:  Q.  Well, what I'm getting at is did

10   you understand that there might be something different about

11   this particular position since they were -- since the

12   managers were talking about it in terms of being an

13   independent contractor as opposed to an employee?

14   A.      Again, I understood that there was, you know, a slight

15   difference, but it wasn't -- you know, I could only go by

16   what was being told, and I didn't know anything beyond that.

17   Q.      Well, we talked about what you understood in terms of

18   the difference between an independent contractor and an

19   employee at the time.  You talked about, you know, a

20   contractor being able to make certain decisions about the

21   amount of work or what customers.  Do you remember that?

22   A.      (Nodding) -- correct.

23   Q.      Did you have any understanding as to what different --

24   or what obligations you might have as an independent

25   contractor?

**8/18/2006  Henderson, Jerrett**

1          MS. ZERGER:  Objection.  Asked and answered.

2          BY MR. JIH:  Q.  Again those are all things that you

3     think an independent contractor should have some say over.

4     My question is did you have any understanding in terms of

5     what an independent contractor might be obligated to do?

6          MS. ZERGER:  Objection.  Asked and answered.

7          THE WITNESS:  Yeah, I've answered that.

8          BY MR. JIH:  Q.  What did you answer it as?  Yes?

9     Did you have any understanding of what an independent

10    contractor would be obligated to do, if they had any

11    additional responsibilities or obligations?

12         MS. ZERGER:  Vague and ambiguous.  Additional as to

13    what?  Compared to what?

14         THE WITNESS:  Yeah, that's -- that was my only

15    understanding at the time, is what I have previously stated.

16         BY MR. JIH:  Q.  Okay.  So then, just to be fair to

17    you, because I don't want to misinterpret your testimony, so

18    is it fair to say that when you entered into the contract

19    with FedEx Ground, you didn't have any understanding of what

20    your obligations might be as an independent contractor as

21    opposed to an employee?

22    A.    I've stated that they talked about delivering the

23    packages and, you know, being part of the FedEx company, but

24    again, like I said, they didn't get into great detail at that

25    time and there were only basic things talked about, so I

**8/18/2006  Henderson, Jerrett**

1    don't know, you know, how more to answer that question.

2    Q.     Well, for example, you mentioned earlier, you know,

3    being an employee for UPS or being an employee for the post

4    office.  I mean those people have to deliver packages, too,

5    correct?

6    A.     I assume so.

7    Q.     So did you have any understanding that as an

8    independent contractor you might have obligations that an

9    employee doesn't?

10   A.     I don't know, at that time.

11   Q.     When you made the decision to enter into the contract

12   with FedEx Ground, had you considered working with any other

13   package -- pickup and delivery companies like UPS, or the

14   postal service or DHL?

15   A.     I don't recall any specific -- any specific times.  I

16   may have also applied at one time, but whether it was a year

17   previous, two years previous, or longer, I don't remember.

18   You know, I applied everywhere for jobs, so...

19   Q.     You do remember applying to another package pickup and

20   delivery company?

21   A.     I don't specifically.  I could have.  Either the post

22   office or UPS.  You know, again, like I say, both of those

23   are jobs that everybody finds appealing, you know, the

24   average person, so it's quite possible I could have applied

25   to those two companies previously, but I don't know how long

**8/18/2006  Henderson, Jerrett**

1    versus my, you know, applying with FedEx, or how close.  I

2    don't know.  But if I did, you know --

3    Q.    So you don't even know if you did?

4    A.    I don't remember any specific time or date that I

5    would have applied, but I could say -- you know, if you're

6    asking me if I would have, yeah, I probably would have

7    applied at one point.  I just don't know.  I applied to

8    hundreds of places.

9    Q.    Okay.

10         MR. JIH:  We have five minutes left on the tape.

11         What did you guys do, just go until it runs out?

12         MS. ZERGER:  Uh-huh.

13         MR. JIH:  Okay.  We'll go until it runs out.

14   Q.    Before you decided to sign the contract with FedEx

15   Ground, did you talk to any other contractors?

16   A.    No.

17   Q.    Before you signed the contract, did you know which

18   particular work area or route you were being offered?

19   A.    Yeah, they did mention that it would be the Yuba City

20   area, and that was about as far as I could remember them

21   describing.

22   Q.    And that was the only route that you were being

23   offered?

24   A.    They said that there were -- there were other routes,

25   and that the Chico area route was taken, and so I happened to

**8/18/2006  Henderson, Jerrett**

1    have lived in Yuba City at one point in my life and I knew

2    that area, so that was one we agreed on.

3    Q.     So there were other routes as well that were open, but

4    you were interested in the Yuba City one given your -- the

5    fact that you had lived there before?

6    A.     Yeah.

7    Q.     Do you remember the other routes that were open?

8    A.     I remember -- I think there was one in the Oroville

9    area and one in some mountain areas, and that's about as far

10   as I remember.

11   Q.     And you weren't interested in either of those routes?

12   A.     Well, versus the Yuba City one, I just felt that was a

13   better fit for me.

14   Q.     Did they offer you those other two routes to see if

15   you were interested in them?

16   A.     There wasn't really, you know -- I mean it wasn't

17   really offered.  They just, you know, said that there were

18   four of them, and like I just told you, I told them that I

19   lived in Yuba City, and so we both agreed that that would

20   probably be a good fit.

21   Q.     Did you do anything to -- well, actually I'll take

22   that back.  I know the answer to that.

23          Do you believe you had a good understanding of how

24   FedEx Home Delivery operated before deciding to enter into

25   the contract?

**8/18/2006  Henderson, Jerrett**

1    A.      Sorry.  One more time, please.

2    Q.      Do you believe you had a good understanding of how

3    FedEx Home Delivery operated before deciding to enter into

4    the contract?

5    A.      I don't know what you would call a good understanding.

6    You know, I had a basic idea of, you know, the warehouse and,

7    you know, you pull your van in, you load up your packages,

8    you deliver.  The basic idea.

9           MR. JIH:  I think I'll forfeit the remainder of this

10   30 seconds.  So why don't we go ahead and go off the record.

11          THE VIDEOGRAPHER:  That's the end of Tape 1.  We're

12   off the record at 9:51 a.m.

13          (9:51 a.m., off the record)

14          (10:00 a.m., back on the record)

15          THE VIDEOGRAPHER:  This is the beginning of Tape 2.

16   We're back on the record at 10:00 a.m. in the matter of

17   Alexander, et al, versus FedEx Ground Package System, Inc.,

18   Case No. 3-05-MD-527-RM.

19          MR. JIH:  I'm going to mark as Henderson Exhibit 1.

20          (Exhibit 1 was marked for identification)

21          BY MR. JIH:  Q.  On the first page it says "FedEx

22   Home Delivery Standard Contractor Operating Agreement."

23   A.      Uh-huh.

24   Q.      In the bottom right says "September 2000."  Do you see

25   that?

**8/18/2006  Henderson, Jerrett**

1    A.      Right.

2    Q.      And if you could just flip through the document real

3    quick, just to take a look at it.  I'm just going to ask if

4    you recognize this document.  You should take a look at it.

5    A.      Okay.

6    Q.      Do you recognize this document?

7    A.      Yes.

8    Q.      What is it?

9    A.      It's the operating agreement document.

10   Q.      Now, in the middle of it, I think it has Page 30 on

11   it --

12   A.      Okay.

13   Q.      -- in the middle of the document --

14           MS. ZERGER:  Are we going to identify the Bates

15   numbers on this, for the record?

16           MR. JIH:  Sure.  It says FXG Alexander and the

17   document starts at 3205 going all the way to 3260, and the

18   page I'm referring to right now has the Bates No. 3237.

19   Q.      Do you see that?

20   A.      Uh-huh, yes.

21   Q.      And is that your signature?

22   A.      Yes, it is.

23   Q.      Where it says contractor Jerrett Henderson?

24   A.      Yes.

25   Q.      And it's dated February 28th, 2001.  Do you see that?

**8/18/2006  Henderson, Jerrett**

1    A.    Yes, I do.

2    Q.    Is that the day you recall signing this document?

3    A.    Yeah, to the best of my knowledge.

4    Q.    And to the best of your knowledge, that's the day you

5    first went to the Home Delivery terminal and met with Mr. Van

6    Buskirk and Mr. Cumberland?

7    A.    I think so, yes.

8    Q.    And there were no meetings before February 28th with

9    anyone at Home Delivery, correct?

10   A.    I don't think so.

11   Q.    And do you see at the top of that page it says,

12   "Contractor acknowledges and represents."  Do you see that

13   paragraph in bold?

14   A.    I do, yes.

15   Q.    And it's all caps, right?

16   A.    Yes.

17   Q.    Did you read that before you signed it?

18   A.    I don't recall.  I figure that I probably did.

19   Q.    Okay.  And so it says, "Contractor has read and fully

20   understands the provisions of this agreement."  Do you see

21   that?

22   A.    I do see that.

23   Q.    So was that true when you were signing it?

24   A.    Again, as I've stated, you know, I did have, you know,

25   a basic overview of this.  I skimmed through it.  I thought

**8/18/2006  Henderson, Jerrett**

1    at the time that I had an idea of what they were trying to

2    do.  So I, you know...

3    Q.      Now, there's a difference between "had an idea" and

4    "fully understands."  So was it true that you fully

5    understood the provisions of this agreement when you signed

6    it?

7    A.      And I can only say that I thought at the time that I

8    had an understanding of it.  I know, you know, that...

9    Q.      You thought at the time you had "an" understanding of

10   it or a "full" understanding of it?

11   A.      Again, "an" understanding of it, a basic idea of it.

12   Q.      So not a full understanding?

13   A.      You know, I'm not a lawyer, I don't, you know -- I

14   don't know all the terms in here.  I can only -- like I said,

15   I can only go by what they were presenting and the idea that

16   they were talking about, and, you know, taking a look at it,

17   I had thought that I had a basic idea of it.

18   Q.      And that was good enough for you to sign the

19   agreement?

20   A.      I thought so, yes, at the time.

21   Q.      And it says you -- well, it says here, "Contractor

22   acknowledges and represents that," and then it continues, had

23   an "opportunity to consult with personal financial, tax and

24   legal advisors."  Do you see that?

25   A.      I do see it, yes.

**8/18/2006  Henderson, Jerrett**

1   Q.      Now, is it fair to say that you did have that

2   opportunity, you just chose to sign it on the spot; is that

3   true?

4   A.      They didn't talk about that to me.  They didn't talk

5   about me, you know, going to consult with anybody, any

6   financial advisors.

7           Again, like I said, I -- at the time I felt that if I

8   left the building, that I would, you know, a possibility that

9   I would lose out on this job opportunity, this job position,

10  and you know, especially having, you know, another applicant

11  in the room, so...

12  Q.      But no one told you that you couldn't consult any

13  personal financial, tax or legal advisors, correct?

14  A.      They did not talk about that.

15  Q.      Did you sign the operating agreement voluntarily?

16  A.      I wasn't forced to sign it.

17  Q.      Do you remember who the other applicant was that was

18  in the room?

19  A.      No, I have no idea.

20  Q.      So that applicant never became a contractor?

21  A.      I don't know who it was.  I have no idea.  I just

22  remember there being another applicant in the room.

23  Q.      But since you worked at the terminal, you never saw

24  that applicant again?

25  A.      Well, if I could identify that person for you right

**8/18/2006  Henderson, Jerrett**

1    now, I could probably tell you whether or not he was employed

2    there or if I ever saw him as a temporary driver.  I can only

3    picture a figure in my mind filling out an application at a

4    table.  I have no idea who that face is.

5    Q.    It could be --

6    A.    I don't know.

7    Q.    It could be someone who actually did become a

8    contractor; you just don't remember if that was the person?

9    A.    I have no idea who it was.  I just remember seeing an

10   applicant there.

11   Q.    Do you remember if the other applicant signed the

12   operating agreement on the spot?

13        MS. ZERGER:  Objection.  Lacks personal knowledge.

14        THE WITNESS:  Yeah, I'm sorry.  I don't know

15   anything about what went on with him.

16        BY MR. JIH:  Q.  Oh, he wasn't in the same room with

17   you?

18   A.    He was -- they had a room when you first enter and

19   then they had an office, I would assume a manager's office.

20   So, yes, there was a table there where we filled out the

21   application, and then, you know, any further discussion of

22   the application or whatever was in this room with -- away

23   from that.  So, yeah, I don't know anything that went on with

24   him.  I just saw him there at the table filling out an

25   application, so...

**8/18/2006  Henderson, Jerrett**

1    Q.      So your meeting with Mr. Van Buskirk and

2    Mr. Cumberland was just with -- you know, it was those two

3    and you and that was it?

4    A.      Yeah, from what I remember, yes.  It was just us.

5    Q.      And if you see at the -- you know, we were looking at

6    Page 30 in the middle of the document where you signed.  And

7    then after that there are all these addendum.  Do you see

8    that?

9    A.      Let me get back to the page.  Okay, after that --

10   okay.

11   Q.      And then, you know, there's an Addendum 1 -- I think

12   there are two pages of Addendum 1 because one is typewritten

13   and one is handwritten.

14   A.      Okay.

15   Q.      And then there's an Addendum 2, and again it looks

16   like there are two of those.

17   A.      Okay.

18   Q.      And if you go on like -- go a couple more, I think the

19   end of Addendum 3.

20          MS. ZERGER:  Do you have a Bates number?

21          MR. JIH:  Yeah.  The Bates number is 3245.

22   Q.      It has your -- or what looks to be your signature on

23   it.

24   A.      Okay.

25   Q.      Is that your signature?

**8/18/2006  Henderson, Jerrett**

1    A.    It looks like it, yes.

2    Q.    Okay.  And this particular addendum was signed

3    November 29th, 2001, correct?

4    A.    Okay, yes.

5    Q.    Is that your recollection?

6    A.    Yes.

7    Q.    And I guess some of these addendum have different

8    signatures and different dates.  Is that because the addendum

9    were modified?

10    A.    I don't know.

11    Q.    Like the one that I just showed you on 3245 --

12    A.    Okay.

13    Q.    -- it says "Attachment 3.1 to Addendum 3."  Do you see

14    that at the top?

15    A.    Yes, I do.

16    Q.    And then the third line down it says, "Effective

17    November 3rd, 2001"?

18    A.    Okay, yes.

19    Q.    And then I guess at the bottom there's a signature,

20    November 29th, 2001.  Do you see that?

21    A.    Yes, I do.

22    Q.    Did that refresh your recollection that, you know,

23    that at least this page changed and so that's why you signed

24    it again, or do you recall?

25    A.    I have -- I don't recall, I'm sorry.

**8/18/2006  Henderson, Jerrett**

1    Q.    Okay.  And then the next page Addendum 4, Bates No.

2    3246, do you see that says "Primary Service Area"?

3    A.    Okay, yes.

4    Q.    And then at the bottom that's your signature under

5    "Contractor" or above "Contractor"?

6    A.    Yes.

7    Q.    And that one was signed February 28th, 2001, right?

8    A.    Okay, right.

9    Q.    So a different addendum -- and if you look at the very

10   last page of the document, Bates No. 3260 --

11   A.    Okay.

12   Q.    -- and you signed this page as well, right?

13   A.    Yes.

14   Q.    But this time on June 2nd, correct?

15   A.    Yes.

16   Q.    2001?

17   A.    Okay, yes.

18   Q.    So does this refresh your recollection that sometimes

19   the addenda changed, and then you signed them at different

20   times?

21        MS. ZERGER:  Objection.  Mischaracterized the

22   testimony.

23        THE WITNESS:  Yeah, I mean you're asking me if I

24   know the reasons for the addendum changes.

25        BY MR. JIH:  Q.  Uh-huh.

**8/18/2006  Henderson, Jerrett**

1    A.    I don't -- yeah, I don't know the reason that the, you

2    know, the addendums are brought to us, you know.  If it's

3    because they've changed them, then I have to, you know, take

4    your word or the company's word for it as that's why they're

5    bringing them to us.  So, yeah, I mean that's all -- all I

6    can tell you.  I don't personally know why they're bringing

7    the addendums to us, but if it's because they're changing,

8    then that's the reason.

9    Q.    When you were reviewing the operating agreement before

10   signing it, were there addenda attached to the operating

11   agreement?

12   A.    I don't remember addenda other than -- other than this

13   page here, this Page 3246 does look familiar to me, but --

14   Q.    So you at least looked at Addendum 4 because you

15   signed that on the same day, right?

16   A.    Well, yeah, and I assume this is -- you know, I figure

17   this is talking about the zip code, which is Yuba City, which

18   is the area that I discussed with the managers about

19   delivering in.  So, yes, this document does look familiar to

20   me, but I don't know if the other addendums, you know, were

21   attached to this or any part of this when I signed the

22   operating agreement itself, you know, on that day.  I only

23   recognize the -- remember talking about the Yuba City

24   portion, and so yeah, I recognize that one for that

25   particular day.

**8/18/2006  Henderson, Jerrett**

1    Q.    So the other addendum or versions of the other

2    addendum could have been there, you just don't remember?

3    A.    Yeah, I don't remember specifically.  They don't stand

4    out.

5    Q.    Okay.  Now, the Addendum 4, this is the zip code

6    95993.  That's what you said was Yuba City?

7    A.    That was a Yuba City zip code, yes.

8    Q.    And you understood that you were contracting or that

9    you had agreed with FedEx Ground that Yuba City would be your

10   Primary Service Area?

11   A.    Yeah, that's the primary area that we discussed, yes.

12   Q.    And was that -- I mean did you consider that an

13   important part of your agreement with FedEx Ground that you

14   would be given Yuba City?

15   A.    I don't know.  I mean if you're emphasizing important

16   part of the agreement, at that time it was the place I was

17   most familiar with, so that, you know, seemed like a logical

18   thing to agree on and, you know, that would be -- that would

19   be the biggest reason for that area over any of the other

20   areas, so I don't know other than -- other than that, I don't

21   know how to answer your question.

22   Q.    Well, did you consider the Addendum 4, identifying

23   Yuba City as the Primary Service Area, to be part of your

24   agreement with FedEx Ground?

25   A.    Again, I'm not sure what you're asking me.  Yes, we

**8/18/2006 Henderson, Jerrett**

1    discussed Yuba City, and that was, like you said, the primary

2    area that we discussed, so -- yeah, I'm not exactly sure I

3    fully understand what you're asking me.

4    Q.    Well, for example, you could have discussed Yuba City,

5    but if there was no agreement about it, FedEx Ground could

6    have just changed it.  My question is did you understand the

7    Yuba City designation as your Primary Service Area to be part

8    of your contract with FedEx Ground?

9    A.    Okay.  Yeah, sure, that's -- yes.

10   Q.    And that was an important part of the contract, right,

11   because that was the area that you wanted to have as your

12   Primary Service Area, correct?

13        MS. ZERGER:  Objection.  Asked and answered and

14   mischaracterizes the testimony.

15        THE WITNESS:  Yeah, I've already -- I mean I've

16   already answered that question.  I mean -- again, I don't

17   know how else to answer it, except to say that it was

18   logical, and I don't know how important your emphasis on

19   that -- on "important" is.  It was logical.  It was a right

20   fit.  That's all I know how to say.

21        BY MR. JIH:  Q.  Did you ask FedEx to make any

22   changes to any of the language in the operating agreement,

23   including the addenda, before signing it?

24   A.    I don't recall asking them to make changes in it, no.

25   Q.    Do you remember wanting FedEx to make any changes?

**8/18/2006  Henderson, Jerrett**

1    A.      No.  At that time, again, it was -- I was, you know,

2    going by just the, you know, what we were discussing and

3    talking about.  I didn't know that that was a concern.

4    Q.      Did anyone tell you that you couldn't request any

5    changes?

6    A.      No, no one told me that.  No one said that I could.  I

7    mean either/or.  It didn't come up.

8    Q.      So you just didn't have any changes in mind that you

9    wanted to make so just the issue never came up?

10   A.      Yeah, the issue didn't come up.

11   Q.      If you'd look on -- let's see.  What page is this?

12   It's Page 3 of the agreement, Bates No. 3210.  And at the

13   bottom there's a section entitled 1.4.  Do you see that?

14   A.      Yes.

15   Q.      And it's -- the section heading is "Operation of the

16   Equipment."

17   A.      Okay.

18   Q.      And the first sentence reads, "Contractor agrees to

19   direct the operation of the Equipment and to determine the

20   methods, manner and means of performing the obligations

21   specified in this Agreement."

22           Do you see that?

23   A.      I do.

24   Q.      Do you remember reading that when you signed the

25   agreement?

**8/18/2006  Henderson, Jerrett**

1    A.    I don't specifically remember reading it.  You know,

2    I've read the operating agreement, you know, since then.

3    That phrase looks familiar, I just can't tell you for sure if

4    that's what I read that day.

5    Q.    Did you understand when you signed your contract with

6    FedEx Ground that you were agreeing to determine the methods,

7    manners -- manner and means of performing your obligations in

8    the agreement?

9         MS. ZERGER:  Objection.  Calls for a legal

10    conclusion.

11         You may answer.

12         THE WITNESS:  You know, again, at that time, I've

13    stated before, that I had a basic understanding, and that

14    there were a few things that I thought that, you know, their

15    term of "independent contractor," that I would have, you

16    know, input or say over, and so that -- that could apply to

17    this paragraph, in thinking that I had, you know, method and

18    manner and means and input on there, but I can't, you know,

19    again...

20         BY MR. JIH:  Q.  Well, I'm just focusing on your

21    understanding of the agreement generally, so not necessarily

22    at the time you signed it, but just your understanding of

23    your obligations under the agreement.

24         Would you agree that it was your obligation to deliver

25    packages in your Primary Service Area?

**8/18/2006  Henderson, Jerrett**

1    A.    Okay.

2    Q.    Was that your understanding?

3    A.    Sure, yeah.

4    Q.    And you agreed to that, right?  You agreed to deliver

5    the packages for your Primary Service Area, correct?

6    A.    Correct, okay.

7    Q.    And would you agree that it was your obligation to

8    figure out the best method, manner and means of getting that

9    done?

10            MS. ZERGER:  Objection.  That calls for a legal

11   conclusion.

12            BY MR. JIH:  Q.  Well, in other words --

13            MS. ZERGER:  You may answer.

14            MR. JIH:  I'll rephrase.

15   Q.    Let's say on a given day there are a hundred packages

16   to deliver in Yuba City.

17   A.    Uh-huh.

18   Q.    Would you agree that under the agreement it was your

19   obligation to figure out how those hundred packages would

20   actually get delivered that day?

21   A.    You're going to have to -- you're going to have to

22   define better what "obligation," what you mean by

23   "obligation."  You know, the packages were put on my pallet,

24   and I didn't have a choice of whether or not to take those

25   packages or refuse them.  So, based on that, those packages

**8/18/2006  Henderson, Jerrett**

1   had to be delivered by me.  I didn't have a choice.

2        So with that in mind, you know, of -- any contractor

3   would deliver the packages the best that he could, do the

4   best job that he could.  I did the best job that I could

5   delivering the packages.  So if you're -- I mean, I'm not

6   sure, you know, I was obligated to do that.  That was my job.

7   Q.    Well, by "obligation," I mean sort of what you were

8   agreeing to do under the contract.  So I mean it seems like

9   choices -- choice seems like it was an important thing for

10  you.  So my question is did you understand that you had an

11  obligation to deliver any packages at all, or was it

12  completely up to your choice, based on the contract that you

13  signed?

14  A.    Well, yeah, I mean there's -- like I say, there's a

15  difference between doing your job and, you know, not having

16  the choice of whether or not to, you know, accept more work.

17  I mean, yeah, I -- like I said, you know, the packages were

18  there, they were on my route and on my pallet, and logically

19  you do the best job that you can do, the most efficient job

20  that you can do, and to try and get those all delivered.

21  Q.    Well, did you -- I'm trying to get a sense of what you

22  understood -- and if the answer is you don't know what the

23  contract requires you to do, that's okay.  But what I want to

24  ask is what you understood the contract that you signed

25  required you to do.  And is it your understanding that under

**8/18/2006  Henderson, Jerrett**

1    the contract you could choose on any given day whether or not

2    you wanted to deliver packages, or did you promise under the

3    contract to actually deliver, you know, a certain number or

4    certain types of packages?

5    A.    Under the contract, going back to the, you know,

6    independent part of it, it was, you know, the thought --

7    going back to what I said, that I could accept certain areas

8    or decline certain areas, was what I understood my obligation

9    or that the contract was saying, is that I had that input

10   into, you know, the route that I was driving, but it didn't

11   happen that way, and so, you know, to say that I -- to say

12   that I understood the obligation to it was -- well, I thought

13   that I understood that I had this, you know, input into it,

14   but it turned out that I didn't, so I did the best that I

15   could with what they were putting onto me.

16   Q.    Well, let's start with just your Primary Service

17   Area --

18   A.    Okay.

19   Q.    -- at the beginning which is Yuba City.

20   A.    Okay.

21   Q.    You had input into selecting that area, correct?

22         MS. ZERGER:  Objection.  Mischaracterized the

23   testimony.

24         You can answer.

25         THE WITNESS:  I had a discussion with the manager

**8/18/2006  Henderson, Jerrett**

1    about that area.

2              BY MR. JIH:  Q.  Yeah, and you wanted to do Yuba

3    City instead of Oroville or the mountain areas, right?

4              MS. ZERGER:  Objection.  Mischaracterized the

5    testimony.

6              You can answer.

7              THE WITNESS:  We agreed that that was the most

8    logical place, both of us.

9              BY MR. JIH:  Q.  Okay.  And so you at the very least

10   agreed to assume responsibility for the Yuba City area,

11   correct?

12   A.    I agreed to take that route.

13   Q.    Okay.  And once you agreed to take that route, you

14   know, presumably by signing, you know, the Addendum 4 --

15   A.    Okay.

16   Q.    -- at that point at least you would agree you were

17   under an obligation to actually deliver the packages for Yuba

18   City, correct?

19   A.    That's what I was -- yeah, thinking is that I was --

20   yeah, I would be delivering the packages for the Yuba City

21   area.

22   Q.    And so it was your understanding, at least as of

23   February 28th, 2001, when you signed the agreement for Yuba

24   City --

25   A.    Uh-huh.

**8/18/2006 Henderson, Jerrett**

1    Q.      -- you didn't believe you still had the choice on any

2    given day to say "I don't feel like delivering packages to

3    Yuba City today," did you, or is that something you still

4    believed you had the choice to do?

5    A.      Not for Yuba City area.  That was right, that was what

6    you were talking about the primary area being.

7    Q.      And that's because you agreed to accept responsibility

8    for Yuba City, correct?

9          MS. ZERGER:  Objection.  I'll withdraw that.

10          It's leading, but you can answer.

11          THE WITNESS:  I agreed that that was going to be the

12    route I was driving, yeah, and delivering packages in, yes.

13          BY MR. JIH:  Q.  And not just that you would be

14    driving in that route, but you understood that under your

15    contract with FedEx Ground, that you were accepting

16    responsibility to make sure that the packages in Yuba City

17    were delivered on a daily basis, correct?

18          MS. ZERGER:  Objection.  Asked and answered and

19    getting argumentative.

20          THE WITNESS:  Yeah, I've tried to answer that the

21    best way I could.

22          BY MR. JIH:  Q.  Well, I mean you either understood

23    it was your responsibility to make sure the packages in Yuba

24    City were delivered or you didn't.  My question is was it

25    your understanding that you had an obligation to make sure

**8/18/2006  Henderson, Jerrett**

1    all of the packages in Yuba City for a particular day were at

2    least attempted to be delivered.

3    A.    It was my understanding that that was a primary area

4    and that I was, you know, delivering packages in that area

5    and I couldn't, you know, necessarily refuse packages for

6    that area --

7    Q.    But beyond --

8    A.    And I'd do the best possible job delivering packages

9    in that area.

10   Q.    Okay, but -- I understand that it was agreed that that

11   was your primary area.  My question goes beyond that.

12         Because it was your primary area, did you understand

13   that it was your obligation or your responsibility to at

14   least make sure that all packages for that area were

15   attempted to be delivered on any given day?

16         MS. ZERGER:  Asked and answered.

17         THE WITNESS:  Yeah.

18         BY MR. JIH:  Q.  Yes or no?

19   A.    I've already -- I mean I already felt that I've

20   answered that.  I mean --

21   Q.    I don't think you have, but I may have missed it.  So

22   if you could just tell me what your answer was.

23   A.    Well, my answer was that I attempted to deliver all

24   the packages in that area and do the best that I could in

25   that area.

**8/18/2006  Henderson, Jerrett**

1    Q.      And we were looking at Section 1.4 on Page 3, that's

2    Bates No. 3210.

3    A.      3210, okay.

4    Q.      And it says, "Contractor," like I said, "agrees to

5    direct the operation of the Equipment and to determine the

6    methods, manner and means of performing the obligations

7    specified in this Agreement."

8    A.      Okay.

9    Q.      And the question I asked you earlier, and we -- you

10   had some questions about it, so we've been dealing with it --

11   A.      Okay.

12   Q.      -- if, for example, on a given day you had a hundred

13   packages to attempt to deliver in Yuba City, which you had

14   agreed to assume responsibility for, did you understand it

15   was your obligation or your responsibility to figure out the

16   method, manner and means of actually getting that

17   accomplished?

18          MS. ZERGER:  Objection.  Calls for a legal

19   conclusion.

20          You can answer.

21          THE WITNESS:  Again, to the amount of packages, I

22   would say that I had to do the best that I could because that

23   was not my choice.  But, again, Yuba City was my primary

24   area, and I knew that the packages for that area, that I

25   would do the best I could do to deliver those and attempt

**8/18/2006 Henderson, Jerrett**

```
 1    them all every day.  But to the amount, you're asking if I

 2    was obligated to deliver them all.  And, you know, for the

 3    amount I had no choice, so...

 4         BY MR. JIH:  Q.  And by "amount," you're saying on

 5    any given day there could be too many packages for Yuba City

 6    for you to get done by yourself; is that your understanding?

 7    A.    Yeah.  I mean, you know, I think that now we're moving

 8    into a lot of, you know, speculation, you know, on whether or

 9    not, you know, Yuba City -- if we want to talk

10    generalization, then, yeah, it's possible that on any given

11    day that there could be too many packages there to deliver,

12    you know, overloaded, and I didn't have the choice of whether

13    or not to accept those or decline them, and so that could

14    definitely impact, you know, any obligation that you're

15    talking about to deliver all these packages and make attempts

16    on them all.

17         So, you know, if you want -- you know, if you want to

18    specifically look at Yuba City and talk about specific

19    circumstances, then that's a different story.  But if you're

20    generalizing, then I can make that generalizing statement

21    also about the number of packages.

22    Q.    My question, though, wasn't focused on whether or not

23    you had any choice over the amount of packages.  Whatever the

24    amount is for that particular day, whose job was it or whose

25    responsibility was it to figure out how to get all of those
```

**8/18/2006  Henderson, Jerrett**

1    packages delivered on that particular day?

2    A.    Well, I would -- I would have to say that the -- you

3    know, the terminal manager had, you know, a big role in that,

4    you know, and again it goes back, you know, to the amount of

5    packages and the choice that I had.

6         You know, the terminal manager determined the amount

7    of packages that went on that thing, so he also, in a sense,

8    determined the ability to deliver all those packages and

9    attempt them.  So, you know, I was the driver and did the

10   best that I could, but he also had a big role in that

11   obligation because that was his decision for those packages

12   being there.

13   Q.    So if the manager at the terminal gives you a certain

14   number of packages, and it sounds like, in your view,

15   sometimes it was too many packages --

16        MS. ZERGER:  Objection.  Mischaracterized his

17   testimony.

18        BY MR. JIH:  Q.  Is that true?

19   A.    In some cases I felt that there were too many

20   packages.

21   Q.    And that's because you didn't feel like you could get

22   all of them delivered on a particular day, correct?

23   A.    Yeah.

24   Q.    Now, let's say you were given a certain number of

25   packages, it could be just right or too much, whatever, who

**8/18/2006 Henderson, Jerrett**

1    figured out, you know, how best to get those packages

2    delivered?

3    A.      Well, after they were all assigned to me, then again I

4    tried to figure out the best way that I could deliver those

5    packages.

6    Q.      And how did you go about making those decisions?

7    Let's say there were, you know, 300 packages assigned to you.

8    What would you do to figure out what the best way was to get

9    them delivered?

10   A.      Every -- I, you know, looked at the size of the

11   packages, and you know, tried to fit as many as I could into

12   the van to get the most delivered.  You know, I used, you

13   know, the turn-by-turn mapping sheets to try, you know, and

14   for the most part, those a lot of times were correct and

15   efficient, but there were times that they weren't, but you

16   know, using both of those, I tried to deliver as many as I

17   could on those days that were, I felt there were too many.

18   Q.      Did you do anything else to try to deliver?

19   A.      Those were, you know, pretty much the two large

20   factors in determining, you know, the route direction and how

21   many I could fit in there.

22   Q.      Let me make sure I understand each of them.  First of

23   all, you said you would put as many as you could into the van

24   to get the most delivered on that day, correct?

25   A.      That's correct.

**8/18/2006  Henderson, Jerrett**

1    Q.      So how do you go about making that decision?  How does

2    that impact how many you get delivered in a day?  What kinds

3    of things were you looking at?

4    A.      Mainly, like -- I think I said the size, you know, is

5    one of the things I would look at and, you know, where one

6    large box could fit with one delivery, maybe five or six

7    smaller ones could fit and get that many more delivered to

8    the customer.

9    Q.      So you would make the decision maybe to leave the

10   large box because that's only one delivery and instead put a

11   lot of smaller packages in the van?

12   A.      That was the only thing that I could do.  There

13   wasn't, you know, really any other, you know, choice to that.

14   I mean, you know, the manager, you know, also had a little

15   bit of input on that, but you know, for the most part it was

16   logical to do that and try and get the most delivered as

17   opposed to, you know, just one.

18   Q.      Well, did anyone tell you to leave the larger boxes

19   and to fill the van with the smaller boxes?

20   A.      On certain occasions, yeah.  I mean, like I said,

21   managers did have input on that, and you know, of course, you

22   know, any time any boxes were left behind, it wasn't that I

23   drove the van out of there as quickly as possible without

24   telling anyone or no one knowing.  You know, the managers

25   would always come over and I would explain, you know, what

**8/18/2006  Henderson, Jerrett**

1    was going on and, you know, they knew about them and there

2    were times when they did say that, yes, you know, I should be

3    leaving, you know, a larger one behind to take four or five

4    smaller ones.

5    Q.    So when you say "had a little bit of input on that,"

6    you mean you told them what you were doing and there were

7    occasions where they said fine, go ahead and leave the larger

8    box?

9    A.    They had to come out and approve of anything that I

10   did is what I'm saying.  They had to have their input on it,

11   and no matter which way I decided, one box or four, that had

12   to be okayed and approved through them, and -- you were

13   asking me if there were ever times where they told me to

14   leave one box.  Yes, there were times when they said, you

15   know, to leave one box and take four or five instead, so...

16   Q.    So I want to make sure.  There's a difference between

17   -- I just want to be very clear on this.  There's a

18   difference between someone saying -- telling you, you know,

19   leave the large box, go ahead and take the four or five

20   smaller ones, and you just following that direction versus

21   you making a decision, okay, this is what I'm going to do

22   today, is that okay, and then they say fine, go ahead and do

23   that.  Which one was it?  Do you understand the difference

24   between those two?

25        MS. ZERGER:  Asked and answered.

**8/18/2006 Henderson, Jerrett**

1          You may answer.

2          THE WITNESS:  I do understand what you're getting

3    across, and I'm saying that both circumstances happened at

4    various times, so there were circumstances where they did

5    say, you know, "I don't agree with this box that you're

6    taking, you should be taking this one, and I want you to take

7    this one instead."  And so, yeah, they were both -- it

8    happened both ways.

9          BY MR. JIH:  Q.  Now, you used the word "input," and

10   I want to make sure I understand what you mean by that.

11         Was it your understanding that you were required to

12   follow their instructions as to which boxes to leave and

13   which ones to take?

14   A.    Well, it was my understanding both that and there

15   were -- like I said, there were occasions where they said

16   absolutely that I had to, I didn't have a choice, so...

17   Q.    So there were instances where you felt like you had a

18   choice and then instances where you felt like you didn't have

19   a choice?

20   A.    There were instances where your example of them

21   agreeing with the package that I put in there or the package

22   that was left behind, or whatever was done, there were

23   instances where they agreed and said, okay, that's fine.

24   There were instances where they said that it wasn't fine and

25   I didn't have a choice, and I had to take certain things,

**8/18/2006  Henderson, Jerrett**

1    so...

2    Q.    So if you arrive on a day and you see too many

3    packages for you to fit into the van --

4    A.    Okay.

5    Q.    -- do you talk to the management before or after you

6    start loading the van in terms of deciding which ones to

7    load?

8         MS. ZERGER:  Objection.  Compound question.

9         THE WITNESS:  For that question, I believe that in

10   most cases I attempted to load the van fully because it's

11   hard to -- it's hard to judge sometimes, and you, you know,

12   you don't want to, you know, go over something like that

13   leaving anything behind without actually, you know, doing

14   your best to get everything inside.

15        So for most cases I did attempt to fit everything

16   inside first, and in the event that there wasn't any room

17   left, then I would go to the manager after that.

18        BY MR. JIH:  Q.  You said "most instances."  Why

19   would you ever not attempt to fully load the van first?

20   A.    Well, because there were certain times where it was

21   obvious that there were too many to be able to fit in the van

22   when you first pulled in, so...

23   Q.    And in those instances, what would you do?

24   A.    In those instances I generally went to the manager

25   first and told him that I felt that it was obvious that there

**8/18/2006  Henderson, Jerrett**

1    were too many.

2    Q.      How often would that occur?

3    A.      Not very often in the first few years of working

4    there.  Fairly often towards the last year.

5    Q.      Now, when you -- so when you couldn't fill all of the

6    packages -- fit all of the packages into your van, did

7    management say -- well, let me rephrase that.

8          On those instances where you couldn't deliver all of

9    the packages, what happened to the packages that you left?

10   A.      They were either marked as "Did Not Attempt," DNAs, or

11   in some circumstances I could give those packages to a second

12   van driver if he had room, and the managers would move those

13   packages over to his route.

14   Q.      And the second van driver you're referring to -- that

15   was your second van driver or --

16   A.      That was the second route I had.

17   Q.      The second route you had, okay.

18         Who would make the decision to move certain packages

19   over to the second van driver?

20   A.      A lot of times it was the manager.

21   Q.      Why was the manager making those decisions?

22         MS. ZERGER:  Calls for personal --

23         THE WITNESS:  I don't know.

24         MS. ZERGER:  Lack of personal knowledge.

25         BY MR. JIH:  Q.  Well, why weren't you making those

8/18/2006  Henderson, Jerrett

1    decisions?

2    A.    In some cases I remember wanting to and asking to, and

3    the manager refusing.

4    Q.    Tell me about those occasions.  What's the first one

5    you remember?

6    A.    The specific occasions, it's hard to remember specific

7    days and specific, you know, goings-on.  I mean, I delivered

8    packages every day for four years.  It's hard, you know -- I

9    just remember that there were, you know, occasions where I

10   couldn't fit everything in my van and wanted to, you know,

11   give these left-over packages to the other route, and the

12   manager saying that he put those on my route and my pallet

13   and I had to deliver them, nobody else, so...

14   Q.    And for every package that was left, your

15   understanding generally is if it wasn't delivered that day,

16   it would count as a DNA.  What is a DNA?

17   A.    Did Not Attempt.

18   Q.    And it would count as a Did Not Attempt?

19   A.    Yes.

20   Q.    And that would be considered a service failure?

21   A.    Yes.

22   Q.    What do you understand -- what does the word "Service

23   Failure" mean?

24         MS. ZERGER:  Objection.  Vague.  To whom?

25         THE WITNESS:  Service failure, I guess for myself is

**8/18/2006  Henderson, Jerrett**

1    that I didn't take the package and attempt to deliver it.

2           BY MR. JIH:  Q.  Did you understand that a service

3    failure constituted a breach of the operating agreement?

4           MS. ZERGER:  Objection.  Calls for a legal

5    conclusion.

6           THE WITNESS:  I really wasn't sure how that, you

7    know, related to the operating agreement.  I, you know, was

8    told by the managers that, you know, if I continued to have

9    service failures, I could lose my job or my contract, so...

10   Q.    How were you paid under your contract with FedEx Home

11   Delivery?

12   A.    I received, you know, a check in an envelope with

13   FedEx paper and the managers brought that out, I believe on a

14   weekly basis and handed it to us.

15   Q.    And how was your -- the amount you were paid

16   calculated?

17   A.    I think I said before nobody knows the answer to that.

18   You know, I don't know how they calculate it all.  Again, I

19   recognize certain things, like van availability and core

20   zone, you know, and the per-package piece, those things I

21   recognize, but how they come up with those numbers or

22   calculate them, I have no idea.

23   Q.    But you understood that you did get paid for making

24   your van available, correct?

25   A.    That was, I guess one of the terms they used.  We had

**8/18/2006  Henderson, Jerrett**

1    to have the, you know, the van there ready to work and that's

2    what the $25 was for every day.

3    Q.    And you also understood that -- how much you were paid

4    was based in part on how many packages you delivered in a

5    day, correct?

6    A.    Yeah, per-package amount.

7    Q.    And how many stops you made?

8    A.    And per-package or per-stop amount, yeah, that was one

9    of the breakdowns.

10   Q.    And you understood there was no guaranteed minimum

11   pay, correct?  If you didn't make your van available on a

12   given day and delivered no packages and made no stops, you

13   didn't still receive a minimum amount of payment each day,

14   did you?

15   A.    Not to my knowledge.

16   Q.    Did you understand that you were responsible for

17   paying your own expenses?

18   A.    Yeah, the maintenance and then the gas, right, that

19   was something that -- repairs.

20   Q.    Before signing the contract, did you ever consider

21   creating a corporation?

22   A.    No, I didn't know about that at the time.

23   Q.    Okay.  I want to ask you some questions about the

24   Chico Home Delivery terminal.  That's what it's called,

25   right, the Chico Home Delivery terminal?

**8/18/2006  Henderson, Jerrett**

1    A.    I guess.

2    Q.    That's how you refer to it?

3    A.    I guess.

4    Q.    When you started, how many contractors were at the

5    terminal, the Home Delivery terminal?

6    A.    I don't --

7         MS. ZERGER:  I'm going to object.  Calls for -- lack

8    of personal knowledge, speculation.

9         Answer, if you know.

10        THE WITNESS:  Yeah, I mean a rough figure, five, six

11   maybe.

12        BY MR. JIH:  Q.  And when you left the Chico Home

13   Delivery terminal in 2004, how many contractors were there?

14        MS. ZERGER:  Same objections.

15        You may answer.

16        THE WITNESS:  Same.  Vague.  I think maybe seven to

17   eight.

18        BY MR. JIH:  Q.  Okay.  Well, when you started, who

19   were the other contractors?

20   A.    I can try and remember the names.  I believe Jerry

21   Ferguson started when I did, and I believe there was someone

22   named Gerald and someone named Gary -- and I think that is

23   all I can remember on names.

24   Q.    How about in 2004 when you left the terminal, who were

25   the other contractors?

**8/18/2006 Henderson, Jerrett**

1    A.      Again, Jerry Ferguson I believe was there; there was

2    another person named Jared there; Travis, a person named

3    Travis, and I don't recall his last name; and I remember that

4    there was another person that recently started, but I never

5    knew his name.  And right now that's all I can remember on

6    names.

7    Q.      So at some point while you were there, Gerald and Gary

8    left the terminal?

9    A.      Yeah, right, right.

10   Q.      Do you remember when Gerald left?

11   A.      Not exactly, no.

12   Q.      How about Gary?

13   A.      Yeah, no.

14   Q.      And when you started, the senior manager was Van

15   Buskirk; is that right?

16   A.      I believe so, yes.

17   Q.      And at some point was there a new senior manager?

18   A.      Uh-huh.

19   Q.      Who was that?

20   A.      I think the next one that was -- Darrell, Darrell

21   Henderson, I think.

22   Q.      And was there anyone else after that?

23   A.      Yes, Pat McDonald after that.

24   Q.      Okay.  And after that?

25   A.      Keep going?

**8/18/2006  Henderson, Jerrett**

1    Q.    Yeah.

2    A.    I think Eric Smith was the last one for the time

3    period I was employed.

4    Q.    How long was Van Buskirk the senior manager before it

5    became Darrell?

6    A.    It was somewhere near a year, I believe.  Right in

7    that neighborhood.

8    Q.    Okay.  And then you recall Darrell Henderson being a

9    senior manager, like the terminal manager?

10   A.    Yeah, the senior, yeah, right.

11   Q.    So not just a P&D Manager, but an actual -- the

12   terminal manager?

13   A.    I thought so, yes.

14   Q.    And how long was Darrell the senior manager?

15   A.    I'm going to say probably close to the same time

16   period.  Probably ten months to a year, I think.

17   Q.    And then how about Pat McDonald?

18   A.    I'm pretty sure Pat McDonald was there for a year, a

19   good year, maybe a year and a month.  It seemed like a little

20   bit longer than the last two managers.

21   Q.    Okay.  And then how about Eric Smith?

22   A.    Eric Smith was there when I left, so I don't know how

23   much longer he's been there or if he's still there.

24   Q.    How long was he there before you left, as senior

25   manager?

**8/18/2006  Henderson, Jerrett**

1    A.    I don't know.  Nine months?  Right around in that

2    neighborhood.  Maybe a little less.

3    Q.    Well, when you started in 2001, Cumberland was the P&D

4    Manager?

5    A.    Yeah, I guess, the service or the -- service manager,

6    I guess you want to call them.

7    Q.    They're called service managers?

8    A.    Yeah, yeah.  They were called a lot of different --

9    P&D, Service, you know.

10    Q.    Were there any other managers?

11    A.    I don't remember any other ones, no.

12    Q.    Now, was Cumberland the service manager the entire

13    time you were there or did that change as well?

14    A.    I believe he was the entire time I was there.

15    Q.    Okay.

16    A.    I believe he had held the same position throughout the

17    whole...

18    Q.    So then other than Cumberland, Van Buskirk, Henderson,

19    McDonald and Smith, were there any other managers while you

20    were there?

21    A.    I don't remember any other ones offhand.

22    Q.    You started with the -- well, if you look at Page 7 of

23    the operating agreement that you have in front of you.  The

24    Bates number is 3214.

25    A.    Okay.

**8/18/2006  Henderson, Jerrett**

1    Q.    And it's Section 1.10, "Agreed Standard of Service."

2    Do you see that?

3    A.    Okay, yes.

4    Q.    And under Subsection (a) it says, "Provide daily

5    delivery and pick-up service to consignees and shippers on

6    days and at times which are compatible with their schedules

7    and requirements within Contractor's Primary Service Area."

8    Do you see that?

9    A.    Okay.

10    Q.    "...as that term is defined in this Agreement, and in

11    such other areas as Contractor may from time-to-time be asked

12    to service."  Do you see that?

13    A.    Okay, yes.

14    Q.    And by "Primary Service Area," when you signed this

15    agreement in 2001, you understood that to be Yuba City,

16    correct?

17    A.    Yeah, that was always discussed "Primary Service Area"

18    was Yuba City.

19    Q.    And in this Section 1.10 you were agreeing to provide

20    daily delivery and pickup service to Yuba City as well as

21    other areas as you may from time to time be asked to service,

22    correct?

23         MS. ZERGER:  Objection.  Calls for a legal

24    conclusion.

25            You can answer.

8/18/2006 Henderson, Jerrett

1    THE WITNESS:  Yeah.  I mean that was -- that was

2    what was in the agreement.  Like I said, I had, you know, a

3    basic understanding of the whole thing, so...

4    BY MR. JIH:  Q.  So you understood that you were

5    agreeing to provide daily service to Yuba City and any other

6    areas that you were asked from time to time to service.

7    A.    It was, you know, talked about later that it was --

8    "from time to time" was, you know, rare, and the impression

9    that they gave everybody in the terminal and that they got

10   across to us was that it was very rare and would not be for

11   any length of time.  For example, a few days at the most.

12   So, again, you're asking for, you know, an

13   understanding of -- you know, a more in-depth and more

14   specific understanding of this at the time that I signed it.

15   And again I'm saying I had a basic understanding, and later

16   on it was a little bit more, you know, explained a little bit

17   more or went into a little bit more in-depth, you know, as I

18   was there working.

19   You know, we all still felt that the managers still

20   explained it to us incorrectly and misrepresented this as

21   being, you know, very rare that happened and not for a very

22   long length of time if it did happen.  And when, in fact, it

23   happened a lot and it was a considerable amount of time that

24   these areas outside were asked to be serviced, and that was a

25   major disagreement.

**8/18/2006 Henderson, Jerrett**

1    Q.    Okay.  And you said "'we' all felt."  Who are you

2    speaking on behalf of?

3    A.    Well, I know that, you know, when -- I'm speaking of

4    the other, you know, drivers or, you know, contractors, if

5    you want to say, that were in the warehouse since we all

6    loaded the vehicles next to each other, and this happened on,

7    like I said, a more often and for a longer period of time

8    than was originally stated to us; that we addressed this and

9    brought this up, you know.  It wasn't just a one-on-one type

10   of thing.  It was, you know, everybody standing there

11   bringing this up to the managers that they disagreed with

12   this.  So that's how I know that the rest of them felt the

13   same way.

14   Q.    Who at the terminal do you believe misrepresented that

15   the time-to-time reference would be rare?

16   A.    Both the managers, service and senior.

17   Q.    So that would be Cumberland?

18   A.    Right, Cumberland and Van Buskirk.

19   Q.    How about Darrell, Pat or Eric?

20   A.    Darrell, yes, and by that time that Pat came around it

21   was, you know -- it was almost -- didn't matter anymore to

22   bring the subject up, so...

23   Q.    Now, when you say that Van Buskirk and Cumberland

24   misrepresented how often you'd be asked to service other

25   areas in addition to Yuba City, that was after you entered

**8/18/2006  Henderson, Jerrett**

1    into the agreement, correct?

2    A.    Uh-huh.

3    Q.    When was the first time you believed they even talked

4    about when you would be asked to service other areas?

5    A.    Again, that's really specific and, you know, I can

6    only -- I can guess that it might have been within the first

7    three weeks to a month.  The terminal was new.  There weren't

8    very many packages to start out with in the first place.

9    There was a little bit of time before that came up.

10   Q.    But it was certainly within the first month?

11   A.    Possibly, yeah.

12   Q.    Do you remember which one of them said it or did both

13   of them say it?

14   A.    I remember that both of them said it, you know.  Did

15   they both say it the first time?  I can't say that

16   absolutely.  Did they both say it many times after that?

17   Sure, yeah.

18   Q.    What did they exactly say, to the best of your

19   recollection?

20   A.    The best of my knowledge, that they could give us any

21   packages from any route and, you know, in any amount, and we

22   couldn't refuse them.  You know, they were, I guess, saying

23   that they had the right to distribute the packages throughout

24   the terminal any way that they saw fit to do, and that if

25   they were assigned to our route, then we had to deliver it

**8/18/2006  Henderson, Jerrett**

1    and couldn't refuse it, so that was basically what they said,

2    what their stance was.

3    Q.    So your best recollection is they started taking that

4    position with you in 2001?

5    A.    Yeah, some point in 2001, yeah.

6    Q.    And is that what you meant earlier by saying that you

7    started feeling like you were being treated as an employee?

8    A.    I don't remember if I said that specifically.

9         MS. ZERGER:  Yeah, I'm going to object to the

10    mischaracterization of the testimony.

11        BY MR. JIH:  Q.  Well, when you heard from Mr. Van

12    Buskirk and Mr. Cumberland that they could give you packages

13    from any route and in any amount, did you believe that was

14    consistent with you being an independent contractor at the

15    time?

16    A.    I didn't believe that that was what -- yeah, was part

17    of the job description or contract.

18    Q.    Did you tell them that?

19    A.    I did, yeah.

20    Q.    Did you believe -- you didn't believe that was part of

21    the job description or contract, but did you believe it was

22    inconsistent with you being a contractor as opposed to an

23    employee?

24    A.    I don't know if at that time I made that distinction.

25        MS. ZERGER:  Objection.  Calls for a legal

**8/18/2006  Henderson, Jerrett**

1    conclusion.

2            THE WITNESS:  I don't know if I had enough

3    information to make that distinction.  I just wasn't...

4            BY MR. JIH:  Q.  When was the first time you

5    remember thinking that you were being treated as an employee

6    as opposed to an independent contractor?

7            MS. ZERGER:  Objection.  Calls for a legal

8    conclusion.

9            You may answer.

10           THE WITNESS:  Being treated, you know, unfairly, I

11   would have to say that time that I just stated, I mean would

12   be the most recent from when I started the position there.

13   And that, you know, if I remember correctly, was the first

14   instance where I felt it was unfair that they were, you know,

15   expressing that they could put any packages that they wanted

16   to onto this route and I had no choice in it and I had to

17   deliver it and for any length of time until, you know, they

18   chose otherwise.  So that would be the first time that I can

19   think of that I felt that it was unfair, being treated

20   unfairly.

21           BY MR. JIH:  Q.  That wasn't my question.  I didn't

22   ask you the first time you thought you were being treated

23   unfairly.  My question was when is the first time you

24   remember thinking that you were being treated as an employee

25   as opposed to an independent contractor?

8/18/2006  Henderson, Jerrett

1        MS. ZERGER:  I object.  Calls for a legal

2    conclusion.

3        You can answer.

4        THE WITNESS:  Yeah, and, you know again, I don't

5    know that in that time period I was making that distinction

6    yet, that, you know, it seems to me that I would have to be

7    thinking in much more technical and legal terms to be, you

8    know -- you're making a specific distinction of an employee

9    and independent contractor, and at that time I just don't

10   think that I was that sophisticated in thinking to, you know,

11   be talking about those two terms.  I thought that it was

12   unfair, and I didn't think that they had the right to do

13   that, to make those decisions on me.

14       BY MR. JIH:  Q.  Well, in 2001, did -- when that

15   first instance arose, I guess within the three weeks to a

16   month that we talked about --

17   A.      Okay.

18   Q.      -- did either Mr. Van Buskirk or Mr. Cumberland point

19   you to provision 1.10(a) where there's the language that says

20   "such other areas as Contractor may from time-to-time be

21   asked to service"?

22   A.      I don't believe they did, no.

23   Q.      But you -- when you signed the agreement, though, that

24   was the language you were agreeing to, correct?

25   A.      That was the language that was in the contract, and I

**8/18/2006  Henderson, Jerrett**

1    signed it.  I mean, again, like I said, I guess you're

2    implying that I understood that and all the, you know,

3    specifics and details that went into it, and I've already

4    stated I had a basic understanding of it.  So they did not,

5    to my knowledge at that time point out these things in the

6    contract when we brought that up to them.

7    Q.    Did you have any discussions with Mr. Van Buskirk or

8    Mr. Cumberland about the "time-to-time" language before you

9    signed the contract?

10   A.    I don't believe, no -- I don't believe that that came

11   up.  It just wasn't...

12   Q.    Did you have any discussions with Mr. Van Buskirk or

13   Mr. Cumberland before you signed the contract about your

14   obligation to service areas other than Yuba City?

15   A.    I think again in the, you know, the short discussion

16   that we had, that it was -- it was brought up that there were

17   surrounding areas, and for example, he might have mentioned

18   Live Oak and he might have mentioned Gridley or, you know,

19   even Marysville that was near, near those areas, but that

20   would be as far as the proximity around that primary area

21   that was discussed or brought up.  Nothing more outside that

22   that I can remember them bringing up at that time.

23   Q.    Was there any discussion about the fact that you would

24   be asked to deliver or pick up packages in those areas?

25   A.    Yes, that -- that's what I'm saying.  There's areas

**8/18/2006  Henderson, Jerrett**

1     immediately surrounding that Primary Service Area where he

2     did say there could be packages to deliver in those areas,

3     and especially, like I said, since there weren't very many

4     and it was a new terminal, you know.

5     Q.     So starting then in 2001 -- okay, wait.  I'm getting

6     confused then.  You mentioned earlier that you felt that they

7     had misrepresented what the "time-to-time" would mean, that

8     you thought it would be -- they represented it would be rare;

9     correct?

10    A.     Okay.

11    Q.     Is that what you said?

12    A.     Yeah.

13    Q.     Okay.  Yet in 2001, within a month you said Mr. Van

14    Buskirk and Mr. Cumberland said that they had the right to

15    give you any package from any route in any amount, correct?

16    A.     Uh-huh.

17    Q.     Okay.  So what would the misrepresentation -- where

18    did they say it was rare?  Was it during that conversation

19    that they wouldn't do it that often or -- where did the

20    "rare" come in?  That's what I'm having trouble

21    understanding.

22    A.     Yeah, it was -- it was one of the first times or

23    whatever that that came up, he had that -- you know, when I

24    said that, you know, and the other contractor said that it

25    was -- you know, "Why is this being put here?  Why?  You

**8/18/2006  Henderson, Jerrett**

1    know, this isn't part of this area that I've been servicing

2    for the last month," you know.

3         And then, yeah, that's when they would -- went into

4    the fact that they had a right to do this and that they, you

5    know, were telling us that, you know, this, you know, was

6    rare and, you know, it doesn't happen a lot, and it's not,

7    you know -- in other words, they were -- they were trying to,

8    at least in our mind, you know, tell us that it wasn't very

9    often it happened and, you know, "Could you just do it, you

10   know, this once," or "today and tomorrow," or whatever, "This

11   won't be happening a lot."

12        So, you know, as it went on and, you know, happened

13   later and continued to happen, then that's where we felt that

14   it was unfair and they were misrepresenting.

15   Q.    But at the time when they first said it, was it rare

16   or was it already happening all the time?

17   A.    I don't understand how it could --

18        MS. ZERGER:  I'm going to say vague and ambiguous as

19   to the question.

20        THE WITNESS:  I don't understand how it could happen

21   all the time if it was the first time.

22        MS. ZERGER:  My objection was vague and ambiguous.

23        You may answer, if you understand.

24        And then you said...

25        THE WITNESS:  I said I don't understand how it can

**8/18/2006  Henderson, Jerrett**

1    happen all -- you know, all the time if it was the first

2    time.  He asked a contradicting question.

3            BY MR. JIH:  Q.  So the first time this came up

4    because people were being given packages outside of their

5    ordinary areas, correct?

6    A.      Yes.

7    Q.      And there was a meeting.  Was this a meeting between

8    the contractors and Mr. Van Buskirk and Mr. Cumberland?

9    A.      No, I just remember that there were a couple of us

10   maybe the first time that, you know, asked the managers right

11   there in the terminal about it.

12   Q.      Okay.

13   A.      And, like I said, they said, "It didn't happen that

14   often, and could you do it for this once," or "for a few

15   days," you know, "It won't be on there continuously on your

16   route."

17   Q.      And that's what you -- and your recollection is you

18   met with them the very first day you started receiving

19   packages for a different area?

20   A.      I -- the very first time it happened I asked them

21   about it, too, yes.

22           Are you asking me did we go into the office separately

23   away from everybody and have a short meeting about it?  Is

24   that what you're asking me?

25   Q.      No.  I'm just asking, in other words, when you say it

**8/18/2006 Henderson, Jerrett**

```
 1    was the first time, I just want to be clear.  Did you mean --
 2    I know it was the first time you talked to management about
 3    it.  Was it also the first time you had received packages
 4    outside of your normal area?
 5    A.    Oh, okay.  Yes, then that was the same, yeah, the same
 6    occurrence, yeah.  The first time that that did happen I did,
 7    myself, and, you know, like I said, maybe one or two of the
 8    other contractors, it happened to us the same day, and we
 9    asked management about it that day, just like I said.
10    Q.    Now, as of that day it was rare, right, because it had
11    never happened before?
12    A.    Right.  We were, you know, taking what they told us,
13    that it was rare and didn't happen that often and could you
14    please just do it, at face value.  We said okay.
15    Q.    When was the next time you received packages outside
16    of your area?
17    A.    Again, really -- you know, really specific on it.
18    Q.    Was it the next day or was it a while after?
19    A.    It probably -- it probably was again -- again we're
20    talking about the very beginnings of this, so again I can't
21    say for certain because it was a long time ago, and you don't
22    think anything of it too much at the time when it happens, so
23    it could have been maybe three weeks to a month before it
24    happened again, you know, that early on in that opening of
25    the warehouse, so...
```

**8/18/2006 Henderson, Jerrett**

1    Q.    So in the very beginning would it be fair to say it

2    was rare that packages were given to you outside of your

3    area?

4    A.    It was, yeah.

5    Q.    When did it stop?  When did it become more frequent?

6    A.    When -- I would say, you know, maybe after three

7    months it became more frequent, especially with some of the

8    mountain areas and some of the drivers there, you know, were

9    not able to get their deliveries off.

10   Q.    And when you say packages outside of your area, you're

11   referring to your Primary Service Area, Yuba City?

12   A.    No, sir.

13   Q.    What are you referring to?

14   A.    I'm referring to the normal delivery route area.  And

15   if you want to -- again, just for a generic example's sake,

16   if you want to say that Live Oak, Gridley and Marysville were

17   part of the normal service route area, including the primary

18   area that I delivered, then they would be packages outside of

19   that area where, you know, 99 percent of my day every day in

20   the week would be in the specific areas, and then these

21   packages would come from an area outside of there where I

22   normally didn't deliver.

23   Q.    When you -- well, when you started, do you recall how

24   many routes there were?  I think you said four or five

25   contractors, but was it four to five routes, basically?

**8/18/2006  Henderson, Jerrett**

1    A.    I think so, yeah.  Four to five routes, yeah.

2    Q.    And then when you left, I know you said about six to

3    seven contractors, but do you remember how many routes there

4    were when you left the Chico terminal?

5    A.    I'd say maybe eight.

6    Q.    Are you familiar with the -- any of the other routes

7    at your terminal?

8    A.    Not very familiar.  I mean I know like the

9    primary-type areas that they were delivering in.  For

10   example, I know a guy who delivered in Chico, a guy who

11   delivered in Oroville, you know.  I would say the same thing

12   about myself, a guy who delivered in Yuba City, you know,

13   essentially.  So I mean that's probably about the extent.  I

14   don't know too much more about any specific route.

15   Q.    How would you describe your -- and I'm talking about

16   your first route area, the Yuba City, I think you said Live

17   Oak, Gridley, Marysville --

18   A.    Yeah.

19   Q.    -- how would you describe that geographic area?  What

20   kind of work area is it?  Is it densely populated?  Is it

21   mountainous?  What's the area like?

22   A.    Well, the Yuba City area would be a city area, I guess

23   you could describe, and the other areas would be more rural,

24   you know, some farmland, I guess you would say, ranches.

25   Q.    Are all of the different routes that come out of the

**8/18/2006 Henderson, Jerrett**

1    Chico terminal about the same kind of routes or are there

2    differences between the different geographies?

3         MS. ZERGER:  Objection.  Vague and ambiguous,

4    although I think you clarified it at the end, and then I

5    would go to lack of personal knowledge.

6         You can answer if you know.

7         THE WITNESS:  You know, I lived in Paradise, so I

8    know that that area, you know, is somewhat mountainous.  But,

9    you know, I don't know that route and I don't know where they

10   go on that route, and then I know that there are some, you

11   know, mountain routes that I mentioned beforehand that are,

12   you know, more mountainous or whatever than Paradise.  But

13   again, you know, I, myself, didn't actually go up there so I

14   don't know too much about that.

15        BY MR. JIH:  Q.  But based on your discussions or

16   just your experience talking to the other contractors, et

17   cetera, did you have an understanding that certain routes

18   were, you know, more challenging than other routes, or some

19   routes easier than other routes?

20        MS. ZERGER:  Objection.  Calls for speculation.

21        You can answer if you know.

22        THE WITNESS:  The only thing that I knew is that

23   because, you know, of the mountainous terrain or whatever,

24   that those drivers got a few less packages.  I mean,

25   obviously, if it's not a city with houses on every block type

**8/18/2006  Henderson, Jerrett**

1    of thing, you are not going to be delivering as many as a

2    city person does deliver, but you know, I don't -- like I

3    said, I didn't drive their route so I don't know their

4    circumstances or, you know, if they had a hard time reading

5    the map or if they had -- I don't know.

6         MR. JIH:  We can go ahead and change tapes.

7         THE VIDEOGRAPHER:  That's the end of Tape 2.  We're

8    off the record at 11:19 a.m.

9         (11:19 a.m., off the record)

10        (11:22 a.m., back on the record)

11        THE VIDEOGRAPHER:  This is the beginning of Tape 3.

12   We're back on the record at 11:22 a.m. in the matter of

13   Alexander, et al., versus FedEx Ground Package System, Inc.,

14   Case No. 3-05-MD-527-RM.

15        BY MR. JIH:  Q.  At some point you acquired a second

16   route, correct?

17   A.    Yes.

18   Q.    When did that happen?

19   A.    I probably, you know, should know exactly, but I'm

20   sorry, I don't.  I think it was right around December/January

21   of '02.  Somewhere in that time frame.

22   Q.    And what was that route?

23   A.    I'm sorry, I don't --

24   Q.    Which route was that?  Did you acquire the second --

25   A.    Yeah, yeah.  The area that it serviced was the

**8/18/2006 Henderson, Jerrett**

1    Marysville area, Wheatland, Beale Air Force Base, that --

2            THE VIDEOGRAPHER:  Excuse me.  Could you raise your

3    microphone a little higher because you're soft-spoken.

4            THE WITNESS:  All right.  Sorry.

5            BY MR. JIH:  Q.  What motivated you to acquire the

6    second route?

7    A.     At that time the -- I had more packages than would fit

8    in the van, and that started to, you know -- I started to see

9    that that, you know, could become a problem and so -- and

10   then the other part of that was that I, you know, still at

11   that point was thinking that, you know, having a second route

12   and, you know, more income was, you know, interesting and

13   something I was wanting to look at.

14   Q.     Any other reason?

15   A.     I felt that if -- you know, if I didn't get that

16   second route, that the, you know, packages that I had that

17   were accumulating, you know, could possibly not get serviced

18   and I could lose my job for that.  So, you know, there were a

19   couple of determining factors, but it was -- you know, a

20   large part of that was the -- that the packages were

21   accumulating and building up, and I was looking at, you know,

22   failing to deliver those packages and losing the job, so...

23   Q.     How does acquiring the second route help you with the

24   buildup of packages?  How did that help solve that?

25   A.     Well, my understanding is that they call -- they split

**8/18/2006 Henderson, Jerrett**

1    the route is what they call it, so those packages are divided

2    between two vans, and that, you know, would be a large factor

3    in helping to, you know, be able to deliver those packages

4    and not have failures.

5    Q.    Well, did you consider not splitting the route and

6    just hiring someone to drive a second van?

7    A.    That seemed to me like it would cost a lot of money

8    and I would lose a lot of money on that.

9    Q.    So the benefit of splitting the route into two and

10   getting FedEx Ground or Home Delivery's agreement to do that

11   is you get paid a second van availability and things like

12   that because the payment is different?

13   A.    Well, that would be -- that would be one benefit of

14   it.

15   Q.    What other benefits would there be?

16   A.    Well, I just stated that, you know, I would be able to

17   deliver the packages, you know.  I wouldn't have, you know,

18   failure, failure to deliver them and wouldn't be in danger of

19   losing the job.

20   Q.    Okay.  We may have been miscommunicating.  My question

21   was why would you -- let me rephrase that.

22        You could have also just delivered the packages though

23   by keeping the route as one route and just hiring someone to

24   drive a supplemental van, correct?

25        MS. ZERGER:  Objection.  Argumentative and

**8/18/2006  Henderson, Jerrett**

1    speculative.

2            You may answer.

3            THE WITNESS:  It was possible to do it that way,

4    but, again, like I said, the cost to do that I would have

5    lost money to deliver the route that way.  I would have also

6    had to have whatever person was hired to do this, you know,

7    go, you know, be approved from the managers and go through

8    their training system and the whole, you know, the whole

9    deal.  So, you know, with that in mind and the loss of, you

10   know, running just a second vehicle for an indefinite period

11   of time, I would have reduced the money that I had -- my pay

12   considerably.

13           THE REPORTER:  Reduced the money?

14           THE WITNESS:  The pay considerably.

15           BY MR. JIH:  Q.  So -- but do you actually recall at

16   the time thinking through these factors and making that

17   decision, or is this something that -- I just want to make

18   sure if you actually -- everything you just testified to, was

19   that something you considered and decided not to do when you

20   were considering to acquire a second route?

21   A.    Well, not -- I did look at that, but it was because

22   the easier way and the way that I felt was better for

23   everyone involved was to split the route.  I was told no on

24   several occasions by the terminal manager, that they would

25   not split the route, and that I would have to continue to

**8/18/2006  Henderson, Jerrett**

1    deliver the packages or to, like you said, hire a

2    supplemental driver, another driver, even at the loss of

3    money.

4         And so when they stated that to me, that they would

5    not split the route for me, then, of course, I had to look at

6    that option, and I had to look to see that it was, you know,

7    going to lose me a lot of money that way and, you know, all I

8    could do at that point was, you know, continue to try and

9    deliver the route the best that I could and try and deliver

10   all the packages that they gave me, and continued to ask them

11   to split the route for me so that I wouldn't start losing

12   money.

13   Q.    Whose idea was it originally to split the route?

14   A.    That was something that I asked them to do, myself.

15   And I asked them to do that because that was part of this,

16   you know, initial, you know, presentation and some of the

17   training that they did, that it was kind of a selling point

18   with the videos that they showed and the way that they said

19   that, you know, contractors picked up second routes and, you

20   know, "grew" a business, that, you know, they talked about

21   and the whole, you know, the whole deal.

22        So that was my first thought was, well, this route has

23   piled up, and it's at the point where it looks like it needs

24   to be done as opposed to failing to deliver packages to

25   customers, and so I asked them to split it.

**8/18/2006  Henderson, Jerrett**

1    Q.      These videos and presentations that you just referred

2    to, when did you see those?

3    A.      I saw that in the first week, maybe the first couple

4    days after being accepted.

5    Q.      But by then you had already signed the operating

6    agreement?

7    A.      I think so, yeah.

8    Q.      If you had already signed up to be a contractor, what

9    was the point of the videos and presentations?

10   A.      It was training, as far as I -- job training, as far

11   as I could see it.

12   Q.      Did you -- going back to the issue:  The packages were

13   accumulating from your first route --

14   A.      Uh-huh.

15   Q.      -- and you were trying to figure out how -- at that

16   point did you already have service failures or were you just

17   foreseeing that you might have service failures?

18   A.      Again, that might be too specific.  It's possible I

19   could've had one or two and, like I said, it could've

20   appeared that they were, you know, going in that -- it was

21   going in that direction and starting to get more and more

22   every day instead of being, you know, just here and there.

23   Q.      But to the best of your recollection, was it a big

24   issue then already or was -- it was just sort of just

25   starting to emerge?

**8/18/2006  Henderson, Jerrett**

1    A.    It was a big enough issue that the managers were, you

2    know, pointing out that I had, you know, maybe a failure here

3    or there and pointing out that I had a lot of packages, and

4    they were asking, you know, if I could fit them all in and

5    what I was going to do, and so I guess it was that big enough

6    of an issue.

7    Q.    When you say they were asking you what you were going

8    to do, what were they asking you?

9    A.    They were asking me if I was going to, you know, like

10   you mentioned, get another driver to help deliver any of

11   these that were overflowed.  One time I think I can remember

12   that they even asked if I was going to cut the top of the van

13   and put a shell up there to fit more in there.  So they were,

14   you know, they were saying that, you know, I had to be

15   looking and, you know, doing these things and, you know...

16   Q.    So they were trying to figure out what plan you had in

17   mind to get all the packages delivered?

18   A.    They were telling me, you know, different, you know,

19   different things that they want -- you know, they wanted me

20   to do to get them serviced.  And, you know, like I said, my

21   first thought was splitting and they refused to do that.  So

22   they were telling me that, you know, it was either hiring on

23   another driver or getting, you know, this shell put on the

24   roof, to cut out, you know.  Those are the two that stick out

25   in my mind that they were telling me to do.

**8/18/2006  Henderson, Jerrett**

```
1    Q.     Okay.  We have to be very careful with words like

2    "telling you to do," so I want to follow up on that.  Do you

3    understand the difference between sort of a requirement and a

4    suggestion?

5    A.     I think I do.

6    Q.     What's your understanding of the difference between

7    the two?

8    A.     Well, I would say that, you know, a suggestion is

9    something that, you know, wouldn't have -- necessarily

10   wouldn't have consequences to it and that you could, you

11   know, decide if you didn't want to do or not.

12          And I felt that, in this case, they weren't -- it

13   wasn't a suggestion because there was consequences to it.  If

14   I didn't deliver the packages, then I could be fired and lose

15   my job, whatever you want to say.  And so, you know, I was

16   essentially forced into doing, you know, one of these two

17   things.  And, obviously, you know, the camper thing would be

18   almost a waste of time, you know.  The shell might allow for,

19   you know, three or four or five more packages at the most,

20   but that might be a temporary fix for three weeks, who knows,

21   you know, and then we'd be right back in the same position.

22   So, you know, really I was looking at one option which is

23   hiring a supplemental driver and losing money until they felt

24   that they would agree to split the route or if ever, like I

25   said, an indefinite amount of time.  And so that really
```

**8/18/2006 Henderson, Jerrett**

1    wasn't a suggestion or a choice.  It was, you know, I either

2    do this or lose my job.

3    Q.    But the managers, were they telling you -- let's put

4    it this way.  They were telling you that you had to service

5    your area, correct?

6    A.    That was one of the things they were telling me.

7    Q.    Okay.  And they were saying if you didn't service your

8    area and you had, you know, too many failures to deliver,

9    that that would cause problems under the contract, correct?

10         MS. ZERGER:  Objection.  Mischaracterizes the

11    testimony.

12         THE WITNESS:  Yeah, they were telling me that if I

13    had service failures and didn't deliver these packages, that

14    I could lose my job or my contract.  Same thing.

15         BY MR. JIH:  Q.  Is that consistent with your

16    understanding of the contract at the time as well?

17    A.    I guess, you know, with a basic understanding of it at

18    the time.  I believed what they were telling me, that if I

19    didn't, you know, if I didn't deliver these packages, that

20    the contract could be terminated and I could lose the job.

21    Q.    Do you believe, and I'm talking about -- this is the

22    time before you acquired the second route.

23    A.    Okay.

24    Q.    And I think you said maybe the December or January

25    period, January 2002, or something like that.

8/18/2006  Henderson, Jerrett

1    A.      Okay.

2    Q.      Do you believe that the FedEx management did enough to

3    help you figure out how those packages would be delivered, or

4    do you feel like they just sort of said you have to figure it

5    out, get the packages delivered?

6    A.      I think that -- no, I guess I don't feel that they

7    were doing enough to help me get those packages delivered.

8    You know, it was -- again, you know, I guess I could bring up

9    that -- another disagreement that both myself and I heard

10   other contractors also bring this position up, was that, you

11   know, something else that they communicated to us early on,

12   and I don't remember specific, you know, days or dates, but

13   they did communicate to us that if there were times where we

14   were overloaded or couldn't fit all these things in, that

15   they would have temporary drivers available, and that those

16   packages that were not able to be fit in would be given to

17   the temporary drivers so that they could get serviced and so

18   that nobody would lose out and nobody would be in harm's way,

19   you know, for losing their job, and that didn't happen.

20        If it did happen, it was once in a great while, and

21   again that was a choice that the managers made.  It wasn't

22   something that we could request of them and say, "We can't

23   fit all this in, would you give this to a temporary driver?"

24        There were a lot of times that we brought the subject

25   up, but they refused and said, "There are no temporary

8/18/2006  Henderson, Jerrett

1    drivers here to do this," or "We don't have any."

2         And so, again, we're back to the subject of, you know,

3    either I hire someone at a pay loss or I fail and lose my

4    job.  So there wasn't a lot of choice there.

5    Q.    Well, do you -- what do you think FedEx -- the FedEx

6    manager should have done to help you get all of the packages

7    delivered?

8    A.    Well, I think that there were two things that they

9    could have done, and one was to actually have a temporary

10   driver available, and give those packages to him because I

11   don't think that it was just one driver.  I think there were

12   probably, you know, a couple drivers that had a few packages

13   at that time that were starting to build up, and so I think

14   that -- you know, when it was originally communicated to us

15   by the managers and presented to us, I thought, okay, that

16   sounds like a reasonable idea and if it gets to that point,

17   then we can tell the managers that we have packages that we

18   just can't fit in and don't have, you know, the ability to

19   deliver and give them to the temp driver.  And that would be

20   one solution that all of us, I think, didn't have a problem

21   with.  The other would be to split the route.

22        And, you know, again, that was something else that was

23   presented to us in the videos and presented to us as a great

24   idea, but was refused when we asked for it -- or when I asked

25   for it.  Refused several times, so...

**8/18/2006 Henderson, Jerrett**

1    Q.    So before FedEx agreed to split the route, you did

2    have discussions with management about different options or

3    you brainstormed different things you could do to try to

4    service the route, correct?  I think you said cut off the --

5    what did you say, cut off the shell of the van?

6    A.    That was one thing that the manager brought up.

7    Q.    As a possibility?

8    A.    As either doing that or hiring a supplemental, were

9    the two things that he said that I could do.

10   Q.    He said those were things you could do as potential

11   ways to service the route, or did he say you have to do one

12   of these things because I said so?

13   A.    He said that he wasn't going to split the route, the

14   route wasn't going to be split, and that he -- he told me

15   that I should be getting a temporary -- or a supplemental

16   driver to help deliver the packages, and the shell again was

17   just another thing that, you know, he may have seen somebody

18   else do, but he was telling me about the shell and it was

19   really, like I said, there aren't very many things that, you

20   know, you can do, and I can't recall him giving any other --

21   you know, telling me to do any other things than those two

22   things because the other choice was to lose the job.

23         So we weren't talking about, you know, great ideas and

24   brainstorming fantastic things that we could do to help each

25   other out.  He came over and said that I needed to get this

**8/18/2006  Henderson, Jerrett**

1    serviced and to get a supplemental driver or to get a shell

2    on the vehicle or I was going to lose my job.

3    Q.    And you would lose your job because otherwise the area

4    wouldn't be serviced?

5    A.    Because the packages were not being delivered.

6    Q.    Okay.  But did anyone ever say, "I want you to hire a

7    supplemental, and you'll lose your job if you don't hire the

8    supplemental because you're disobeying my instruction," or

9    was it always in the context of servicing the route?

10        MS. ZERGER:  Objection.  Asked and answered and

11   argumentative.  Compound.

12        THE WITNESS:  Yeah, I already stated that that's the

13   way that it was put to me was that I get a supplemental

14   driver or if I continue to have those -- failed to service

15   those, I'd lose my job, so...

16        BY MR. JIH:  Q.  Did you come up with any ideas as

17   to how you could service your route other than hiring a

18   supplemental or splitting the route or cutting off the top?

19   I mean did you come up with any ideas as to how to service

20   the route?

21   A.    I was only asking what was presented to us as, you

22   know -- like I said, these were things that were already

23   presented to us and talked about, you know, in the beginning

24   of, you know, temporary drivers that would take the packages

25   from us and splitting the route.  Those were the two things

**8/18/2006 Henderson, Jerrett**

```
 1    that were ideas, you know, presented to us.  That's what they

 2    do.  That's how FedEx handles the situation.

 3         And when that problem came up, that those two items

 4    that they presented to us were refused.  So there really

 5    wasn't anything else that we could do.  I can service it

 6    myself, which I couldn't fit them all in.  I could hire a

 7    second guy to service it at my loss, so...

 8    Q.    Okay.  Now, I understand that.  But is the answer then

 9    that you didn't come up with any other ideas as to how to

10    service the route?

11    A.    Other than, like I said, other than requesting what we

12    thought, you know, was presented to us as how it was handled.

13    That's, you know, just trying to go by what we thought the,

14    you know, procedure was, and...

15    Q.    Did anyone at FedEx ever tell you that you couldn't

16    come up with other solutions to servicing your route?

17    A.    It never really came up in that way, but I guess I'd

18    have to answer no to that, you know.

19    Q.    Well, did you ever consider, for example, before your

20    route was split, getting a larger van?

21    A.    That van was in the very first year.  No.

22    Q.    You didn't even think about it, or you did and

23    rejected it because it was so new?

24    A.    No, I didn't even think about it.  That was the van

25    that was approved by FedEx to be used.  It was on a five-year
```

**8/18/2006 Henderson, Jerrett**

1    loan like most vehicles are, and it was in the first year of

2    use.  So, no, I didn't think about that.  I didn't think I

3    would ever have to think about that.

4    Q.    Who was the loan with for the first vehicle?

5    A.    I think it was Sierra Central, a credit union bank.

6    Q.    And who suggested Sierra Central?

7    A.    It was just the first one that I went to, to try to

8    get a loan.

9    Q.    So you found that bank?

10   A.    It was a bank I already had.

11   Q.    Okay.  So you didn't think it was a real -- I guess

12   you didn't think about it at the time.  Did anyone at FedEx

13   tell you you couldn't upgrade the van?

14        MS. ZERGER:  Objection.  Vague as to time.

15        THE WITNESS:  At the time I don't think that it was

16   brought up even.

17        BY MR. JIH:  Q.  Well, at the time, and again this

18   was before your route was split, so I think it was before --

19   or about January 2002, I think is what you said.

20   A.    Yeah.

21   Q.    Did you ever come up with any ideas or solutions as to

22   how you could service your area that anyone at FedEx said no

23   to other than splitting the route?

24        MS. ZERGER:  Objection.  Asked and answered.

25        THE WITNESS:  Yeah, I already stated that we didn't

**8/18/2006  Henderson, Jerrett**

1    come up with ideas because we were following and trying to

2    follow the procedure that was presented to us.  We were, you

3    know -- we thought that that was what -- how it got resolved.

4            BY MR. JIH:  Q.  So at some point the FedEx managers

5    said that you could split your route, correct?

6    A.    At some point they did, yes.

7    Q.    What changed, do you know?

8    A.    I don't know.

9    Q.    And before it was actually split, did you hire a

10   supplemental, or what did you do about servicing your route?

11   A.    I don't recall exactly what I did at that time before

12   that happened.

13   Q.    So you could have hired someone; you just don't

14   remember?

15   A.    I'm pretty sure that, if anything, it was -- it was

16   once or twice that I hired a, I guess you'd call a

17   supplemental or temp driver is what I was thinking.  So I

18   guess it's possible, you know, but I just don't remember me

19   doing that at that point.

20   Q.    Now, at some point did you request a third route?

21   A.    Yes, I did.

22   Q.    When was that?

23   A.    Let me think.  Okay.  Again, my best guess is that it

24   was probably somewhere near the fall, October-November of

25   '03.  Right in that area.

**8/18/2006  Henderson, Jerrett**

1   Q.    Why did you want a third route?

2   A.    For the same reason, that the two routes that I had

3   had accumulated packages and was not able to fit in the van,

4   and I didn't want a service failure and I wanted to, you

5   know, keep the job.

6   Q.    So you wanted to split the routes or reconfigure the

7   routes again, just sort of the same area, but just split them

8   into three routes?

9   A.    I wanted to split them into three routes, right.

10  Q.    But you weren't looking to add geography; you were

11  just -- it would be existing area, you just wanted to split

12  them into three?

13  A.    Yeah, the existing area had enough packages to warrant

14  three routes.  It had, you know -- where the third route, we

15  weren't talking about five packages on the third route.  We

16  were talking about 60 plus, you know.  So, yeah, between the

17  same service area, between the two routes, yeah, the third

18  one, and there was enough for a third one.

19  Q.    Do you remember how many packages those two areas --

20  you said there were enough packages to warrant a third route.

21  How many packages did you have at that time for those two

22  routes?

23  A.    You know, again, best guess, you know, I know there

24  was a point where I was over 100 for each route, you know,

25  110, something like that.

**8/18/2006  Henderson, Jerrett**

1    Q.      Has anyone ever approached you to buy -- had anyone

2    ever approached you to buy any of your routes?

3    A.      To my knowledge, no.

4    Q.      I know you didn't sell the routes, but I just didn't

5    know if anyone had ever even talked to you about potentially

6    selling the routes?

7    A.      I don't think so, no.

8    Q.      Okay.  And had you ever talked to anyone about

9    potentially buying their routes?

10   A.      No.

11   Q.      But you're aware that -- well, are you aware of any

12   contractors who have sold their routes?

13   A.      Only just through casual conversation.  I don't know

14   offhand anybody specifically personally, just have heard that

15   it happens, have heard of people doing it.

16   Q.      In the Chico terminal or just in general?

17   A.      In general, maybe even in general in the area, you

18   know, as far down as Sacramento.  But no, I don't believe so

19   in Chico, that I can recall, anybody selling in Chico,

20   selling their route.

21   Q.      You understood, though, that until the contract was

22   terminated, that you could sell your route as well, correct?

23   A.      That's what I had thought, that at any point if I

24   decided to quit or something, I could sell my route to

25   another person.  That's what I thought, but I never got the

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 669 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-3   Filed 02/05/07   Page 124 of 305
**8/18/2006  Henderson, Jerrett**

1    opportunity to do that, and...

2    Q.    And that's because of the termination?

3    A.    From what I understand, yeah.

4    Q.    Well, before the termination, did you understand if

5    there were any restrictions on your ability to sell the

6    route?

7    A.    To my knowledge, I didn't think that there were any

8    restrictions, no.

9    Q.    Before you were terminated, you thought you could sell

10   your route, correct?

11   A.    I did.

12   Q.    Were you trying to sell your route?

13   A.    No, I was trying to keep my route and do the best that

14   I could.

15   Q.    You were trying to actually keep both routes, right?

16   You had two at the time.

17   A.    Yeah, right.  I mean keep my job, keep my routes.  I

18   mean I was trying the best I could.

19   Q.    Do you have an opinion of how much you believe your

20   routes were worth when you were terminated?

21   A.    I have no idea.

22         MS. ZERGER:  Objection.  Speculative.

23         You need to give me a chance to get my objections

24   in.

25         THE WITNESS:  I'm sorry.

**8/18/2006  Henderson, Jerrett**

1          BY MR. JIH:  Q.  So for all you know, they could

2     have been worth nothing?

3          MS. ZERGER:  Objection.  Speculative.

4          THE WITNESS:  Yeah, I'm sorry.  I don't know what

5     they were worth.

6          BY MR. JIH:  Q.  But do you believe that they were

7     worth something?

8     A.     Sure, I believe that they were worth something.

9     Q.     Why would you say that?

10    A.     Well, just based on the amount of deliveries that they

11    did, and possibly the area that I delivered being, you know,

12    more city than rural.

13    Q.     Have you ever heard the term "route reconfiguration"?

14    A.     I think I have, yes.

15    Q.     And what's your understanding of what that means?

16    A.     Well, I think -- now I think that it means that FedEx

17    takes the area that you're driving, your route area, and

18    moves it around, switches it around, however, whatever term

19    you want to use, can portion it to whoever.  It could be a

20    totally different route, I guess.

21    Q.     Was your route ever reconfigured?

22    A.     Yes, it was.

23    Q.     And when did that happen?

24    A.     I believe that that happened in June or July of '04.

25    Q.     How was the -- which route was reconfigured?

**8/18/2006  Henderson, Jerrett**

1    A.    I believe it was the Yuba City route.

2    Q.    So your original route?

3    A.    The original route, yeah.

4    Q.    How was it reconfigured?

5    A.    Essentially, from my view, or I guess if you looked on

6    a map, it seemed to be split right down the center of Yuba

7    City and, you know, one-half portion, if you will, and to me,

8    I think I remember looking at the amount of packages and it

9    was somewhere near 70 to 80 deliveries were taken from the

10   route and given to another driver.

11   Q.    And before that -- so was that the only time that your

12   route was reconfigured?

13   A.    Yeah, if that's the definition of "reconfigured," yes,

14   if that's the correct...

15   Q.    So when it was reconfigured in June or July of 2004,

16   how did that happen?  Did you talk to someone about it or how

17   did that actually happen?

18   A.    I was called in to the office.  The two managers were

19   in the office and they had a chart on the wall that showed

20   the areas, the map areas, and they informed me that that

21   section was to be given to this other driver whose name I

22   can't remember, and that I now had the other area that was

23   left over, and that was -- there was no talk about it or

24   discussion about it.  They just brought me in there to inform

25   me that that's how it was.

**8/18/2006  Henderson, Jerrett**

1    Q.    So they didn't ask you if it was okay; they just told

2    you they were doing it?

3    A.    Right.

4    Q.    Do you remember who it was?

5    A.    Well, Eric and James were the two managers at that

6    time.

7    Q.    Now, when you say they took away half of it -- well,

8    let's look at Addendum 4 again on that document.  It's --

9    A.    Which page, sir?

10   Q.    3246.

11   A.    Okay.  I see that.

12   Q.    Now, the 95993, that's the Primary Service Area for

13   your first route, correct?

14   A.    Yes.

15   Q.    Okay.  If you go to the second page right after that,

16   3247 --

17   A.    Okay.

18   Q.    -- there's a different Addendum 4 that says 95901 for

19   Marysville.  Do you see that?

20   A.    I see that.

21   Q.    That's the Primary Service Area for your second route,

22   correct?

23   A.    Right.

24   Q.    So when you first contracted with FedEx Ground, this

25   second addendum didn't exist, right?  This was added later

**8/18/2006  Henderson, Jerrett**

1    on?

2    A.      That was, yeah, added for the second -- yeah.

3    Q.      Okay.  Now, the Addendum -- so when you were talking

4    about the reconfiguration, you're not talking about 95901;

5    you're talking about your first route, correct?

6    A.      Well, right, yeah, the Yuba City route, the original

7    route is what I...

8    Q.      Now, when it was reconfigured in 2004, did they take

9    away zip code 95993?

10   A.      No --

11          MS. ZERGER:  Objection.  Vague and ambiguous.  He

12   was talking about a reconfiguration at a different time, I

13   understand.

14          MR. JIH:  It was 2004, right?

15          THE WITNESS:  2004, yeah, July.

16          MS. ZERGER:  My error.

17          BY MR. JIH:  Q.  So when it was reconfigured in

18   2004, you're talking about the route that you were used to

19   driving on a daily basis, correct?

20   A.      Yeah, the daily route that I was driving.

21   Q.      But they didn't take away your Primary Service Area,

22   95993, correct?

23   A.      They didn't take away that one specific zip code, no,

24   they did not.

25   Q.      Okay.  So they took away other zip codes that were not

**8/18/2006  Henderson, Jerrett**

1    your Primary Service Area?

2    A.      They were not that zip code, yes.

3    Q.      Well, did you understand that you had a contractual

4    right to other Primary Service Areas of different zip codes?

5    A.      They talked about -- the managers talked about Primary

6    Service Area, both as the route that I was driving and the

7    zip code that you have there on the addendum.  So they used

8    the term for both cases on a regular basis.

9    Q.      Okay.  But in terms of the contract, they weren't

10   taking away what Addendum 4 defines as your Primary Service

11   Area, correct?

12   A.      Yeah, they were not taking away that particular zip

13   code, but I do feel that they were taking away the service

14   route that I had been servicing for four years, and I felt

15   that I had a proprietary interest in that entire route, not

16   just the one zip code.

17          So -- we spoke about proprietary interest before and,

18   you know, I feel that that was one of the contentions is

19   that, you know, I serviced that route for four years.  If I

20   were to sell the route, the route would be sold to another

21   person as an entire route that was built up and serviced for

22   four years and had all those packages and had the area, like

23   I described, you know, of mostly city area and the whole

24   thing.  So, you know, I can't sell my route as a zip code to

25   somebody.  I sell it as the route, and that's why I had a

**8/18/2006 Henderson, Jerrett**

 1    proprietary interest in that, was my understanding of it.

 2    And like I said, the managers talked about a Primary Service

 3    Area in both cases and they referenced both of those as that

 4    same description.  So, you know...

 5    Q.    So what zip codes did they take away?

 6    A.    They took away 95991, and they took away Gridley,

 7    which I don't know the zip code to Gridley, California, and

 8    Live Oak, California.  I don't know the zip code to that

 9    either.

10    Q.    Okay.

11    A.    So I think those are the three they took away that I

12    can remember off the top of my head.  I don't know if there

13    was one other one.  Might have been.

14    Q.    Well, you said that -- you referenced something about

15    how you felt that that area, even though it wasn't 95993, was

16    something that you had serviced for four years and built up.

17    What did you mean by that?  Like what did you do to build up

18    those areas, or why do you believe you had a proprietary

19    interest in Gridley, Live Oak or 95991?

20    A.    Well, you know, I don't know if I did say built up in

21    a sense, but if I did, the context I was using is to be

22    servicing that area and I felt that I, you know, did a good

23    job, that the people that I did deliver to liked me.  I

24    wasn't, you know, not showing up.  I was delivering every

25    day, and I felt that I had a good delivery record.

**8/18/2006  Henderson, Jerrett**

1          So there was, you know, a good amount of packages,

2     like I said, that was on that route that if I was to sell

3     that to someone, that that would be appealing and have, you

4     know, a large customer base in there.

5     Q.     Well, I understand that it would be appealing, but why

6     did you feel that you were entitled to that area?

7     A.     Like I said before, that I felt that that was part of

8     the Primary Service Area and that I had a proprietary

9     interest in that.

10    Q.     I understand that you feel like you had a proprietary

11    interest in it.  I'm trying to get at -- and if there's

12    nothing more, that's okay.  I'm trying to get on the record

13    today exactly every reason why you believe you had a

14    proprietary interest in 95991, Gridley or Live Oak.

15    A.     I don't think that -- I don't think that I can come up

16    with anything more than, you know, having, you know, a four-

17    -- you know, a four-year, three-and-a-half-year, however you

18    want to call it, delivery record for that area that was, you

19    know, good service and people, you know, recognize you and,

20    you know, the packages for the most part, like I said, were,

21    you know, delivered, had a good service, you know, record on

22    there, and...

23    Q.     Was it a surprise when FedEx took away 95991, Gridley

24    and Live Oak?

25    A.     I felt it was, yeah.

**8/18/2006 Henderson, Jerrett**

1    Q.    Did they ever tell you that they might -- they were

2    thinking about that?

3    A.    I don't remember them saying that they would be taking

4    away that or they were thinking about taking away that.    I

5    just remember them talking about, you know, losing the job,

6    having my contract terminated if I didn't deliver the boxes

7    that were, you know, overflowing, like I said, so...

8    Q.    Did they tell you why your route was being

9    reconfigured?

10   A.    Because I didn't deliver the boxes and that I

11   didn't -- and that I also didn't purchase a larger vehicle

12   because they did tell me to purchase a larger vehicle to fit

13   the boxes and, you know, again I couldn't afford to do that

14   without any -- without another route, without any additional

15   income to support an additional van, especially the larger

16   ones that they were asking me to buy, and so I just couldn't

17   do that.

18   Q.    And so -- and then -- without a larger vehicle then,

19   would you agree that you were having difficulty servicing the

20   route before it was reconfigured?

21   A.    I was having some difficulty servicing it, but I did,

22   in fact, hire a supplemental and tried, again -- you know,

23   tried my best to service the route with that supplemental.

24   It was getting serviced.    You know, between the three vans we

25   were delivering all the packages, and I was taking a loss on

**8/18/2006 Henderson, Jerrett**

1    the money for it.

2            At that time I felt that was the only choice that I

3    had other than losing my job, and -- because I had requested

4    for a third route and was denied several times.  I even did

5    talk to the manager, Pat McDonald, about getting a larger

6    vehicle, and -- which is one of the reasons that I hired the

7    supplemental driver.  We discussed getting a larger vehicle,

8    and I told him that I would do that in January after the

9    season, and that I would keep the supplemental on through the

10   peak season if they agreed to split the route for me, and I

11   felt that that was, you know, that was a good compromise, it

12   was a good agreement, and Pat said that that sounded good to

13   him and that he agreed to that.

14           So, you know, again, I was doing everything that I

15   could to service the area and going as far as to hire a

16   supplemental and lose money in trying to get it done, but the

17   route was still configured and taken away from me.

18   Q.      Did the reconfiguration make it easier for you to

19   service the remaining portion of the route?

20   A.      The reconfiguration left me with considerably less

21   packages so I was able to deliver the packages, but of

22   course, you know, loss of the area and loss of money was

23   considerable also.

24   Q.      How much money would you say you lost as a result of

25   the reconfiguration?

**8/18/2006  Henderson, Jerrett**

1    A.    I don't have a figure for that.

2    Q.    Ball park?

3         MS. ZERGER:  Calls for speculation.

4         You can answer if you know.

5         THE WITNESS:  I don't know ball park.  My best

6    guess, I guess, is 600, 600 a week.

7         BY MR. JIH:  Q.  Now, you mentioned that -- we'll

8    get into more supplementals a little bit later, but you said

9    that at that time you were servicing your two routes with a

10   supplemental, correct?

11   A.    Right, with a supplemental that I hired, right.

12   Q.    But you said that you lost money on the supplemental?

13   A.    Right.

14   Q.    How much money were you losing on the supplemental?

15   A.    Again, best guess -- I can't remember the exact

16   figures -- possibly 400 a week, maybe -- I'm not positive.

17   I'd have to look at.

18   Q.    So I'm just trying to get a sense, though, because I

19   don't know.  I want to make sure I'm comparing apples to

20   apples.  Was it worse for you financially to have your route

21   configured or would it have been worse -- was it worse to

22   have the route reconfigured or is that at least better than

23   losing the 400 a week with the supplemental?  How did those

24   two compare financially for you?

25        MS. ZERGER:  Objection.  Compound.

**8/18/2006  Henderson, Jerrett**

1        You can answer if you understand.

2        THE WITNESS:  There were two situations.  One was

3    permanent.  One was temporary.  You know, the temporary pay

4    loss for the supplemental to get through the few months there

5    and the, you know, the agreement from Pat to split the route

6    afterwards was, you know, was better if you want to ask which

7    is better.  Obviously, I would get to keep my area, I would

8    have another route, you know, wouldn't have to worry about

9    not failing to service the routes.  That would be better.

10        BY MR. JIH:  Q.  Did Pat -- well, when Pat McDonald

11    told you that your compromise solution made sense to him, did

12    he promise that he would be able to get you a third route, or

13    did he make that promise?

14    A.    He didn't use the word "promise."

15    Q.    Okay.  Well, did you understand that it was his

16    decision, or did you understand that he would also have to

17    get approval from elsewhere?

18    A.    I understood that he -- that he thought that he could

19    get that approved.

20    Q.    But you understood that he had to get it approved,

21    though, correct?

22    A.    I guess I understood that it wasn't his decision

23    alone, but that he essentially was saying that they could do

24    that, that that was -- that was a good solution to the

25    problem, and that he could get that approved come January,

8/18/2006  Henderson, Jerrett

1    you know.

2    Q.    Okay.  So at the very least you understood that --

3            THE VIDEOGRAPHER:  Sorry to interrupt, but his

4    microphone --

5            MR. JIH:  Oh, it's flopping over.

6            THE VIDEOGRAPHER:  Yeah, it's rubbing and it makes a

7    bunch of noise.

8            THE WITNESS:  Oh, I'm sorry.  Okay.  I moved it.

9            THE VIDEOGRAPHER:  No problem.  Go ahead and

10   proceed.

11           BY MR. JIH:  Q.  So you understood that Pat thought

12   he could get it approved, but he would still have to get it

13   approved?

14   A.    I would guess.

15   Q.    But that was your best understanding?

16   A.    To my best knowledge, yeah.

17   Q.    Do you know exactly what words he told you, what he

18   exactly said to you about getting a third route?

19   A.    I don't remember the exact words he used.

20   Q.    And the compromise that you were talking about, you

21   know, running a supplemental and then getting a third route,

22   whose idea -- who came up with the compromise?

23   A.    He suggested getting a supplemental.  Again, we were

24   back to the same problem of a supplemental being -- costing a

25   lot of money.  They wanted me and asked several times for me

**8/18/2006  Henderson, Jerrett**

1    to get a larger truck, and told me that if I didn't get a

2    larger truck that I would lose the contract, be terminated.

3    So that was the agreement is that I would agree to get a

4    larger truck, and in addition, I would also hire a

5    supplemental driver through those last few months.

6    Q.    Whose idea was the compromise?

7    A.    It was both of our ideas.  It was his suggestion to do

8    the supplemental for an indefinite period, and it was my want

9    to get a split route.  So it was both of our ideas.

10   Q.    Why did he have to get your agreement to get a larger

11   truck?

12   A.    I don't understand what you're asking.

13   Q.    In other words, he was saying -- you said they wanted

14   you to get a larger truck.  You were talking about the

15   management at the terminal?

16   A.    Uh-huh.

17   Q.    And they wanted you to get a larger truck because that

18   was the way they thought you could service your route,

19   correct?

20   A.    That would fit all the packages into the truck.

21   Q.    That was the way they could see -- I mean that was the

22   solution they could think of to get all of the packages

23   delivered on a daily basis, correct?

24   A.    I don't know what they were thinking about getting all

25   the packages delivered.  I know that the packages -- the

**8/18/2006  Henderson, Jerrett**

```
1    amount of packages that I had were at the point where it

2    wouldn't matter the size of the truck, if I had an

3    18-wheeler.  Could I get them all done, you know, without

4    going for 14, 15 hours?  I mean there was a lot of packages

5    there.  It was at that point.

6         So the size of the truck wasn't, you know -- I don't

7    know what they were thinking as far as requesting that, but

8    that's what they said, that I needed to get a larger truck.

9    Q.    Now, did you ever hear back from Pat in terms of your

10   request for a third route?

11   A.    No, because at that time he was, I guess, in the

12   process of his transfer to another terminal or whatever.  So,

13   no, I never heard back and no one ever agreed that that was

14   ever said, so...

15   Q.    So you brought up the issue of a third route with the

16   next manager?

17   A.    Yeah, I did.

18   Q.    Who was that?

19   A.    Eric.

20   Q.    Eric.  And what did Eric say in response to that?

21   A.    That he would -- he would either have to get in touch

22   with Pat or -- you know, he just wasn't sure.

23   Q.    Did he follow up on the third route request?

24        MS. ZERGER:  Objection.  Calls for personal

25   knowledge.
```

**8/18/2006  Henderson, Jerrett**

1         THE WITNESS:  I don't know.

2         BY MR. JIH:  Q.  So he never talked to you about it

3    again?

4    A.    I don't remember if he did or not.  There was a lot of

5    things that went on in those last few months.  I don't know

6    if he did or not, so...

7    Q.    Have you ever heard of the term "flexing"?

8    A.    I have heard of that term, yes.

9    Q.    What does that term mean to you?

10   A.    I think that that goes back to I think what I was

11   talking about as taking packages from an area that you don't

12   normally deliver in and assigning them to your route.

13   Q.    And were packages ever flexed -- well, let's start

14   with the first route, the Yuba City route.  And in this case

15   let's talk specifically about 95993.

16   A.    Okay.

17   Q.    Were packages ever flexed off of 95993 by FedEx?

18   A.    I don't remember if there were.  I would have to say

19   no.  And if it was, maybe it might have been once.

20   Q.    Like accidentally or something?

21   A.    I don't know if it was accidental.  I can't remember

22   any instances really myself.

23   Q.    And when you acquired the second route, the 95901,

24   were there any instances where packages were flexed off of

25   95901 by FedEx?

**8/18/2006  Henderson, Jerrett**

1    A.    I don't remember.  I don't remember that either, that

2    happening.

3    Q.    So at least with respect to the two sort of, at least

4    put in the contract as the two Primary Service Areas, you

5    don't recall any instance where packages were flexed away

6    from you?

7    A.    No, I don't remember that ever happening.

8    Q.    Now, in terms of the other zip codes that may -- you

9    know, that in your discussions with FedEx Ground you acquired

10   or worked on in your daily route, and those would be things

11   like -- I think we just said like 95991?

12   A.    Uh-huh.

13   Q.    Were there situations where those packages got flexed?

14        MS. ZERGER:  Objection.  Vague.  Flexed on or off?

15        MR. JIH:  Flexed off.

16        THE WITNESS:  Flexed off?  Again, there may have

17   been one or two occasions that I just don't remember.  I

18   don't remember that they were flexed off.

19        BY MR. JIH:  Q.  Let me just state it more

20   generally, then.  Other than the reconfiguration, and with

21   the reconfiguration certain zip codes were taken away from

22   you, but before then do you recall any instance where

23   packages were flexed off of your route by FedEx Ground or

24   Home Delivery?

25   A.    Well, I can recall a few instances where some packages

**8/18/2006  Henderson, Jerrett**

1    were flexed off of the route, but that -- I can recall more

2    instances where packages were flexed onto the route.

3           Generally that goes back to -- you know, flexing off

4    the route goes back to what I spoke to before where there

5    were too many packages, and we had asked if some of the

6    packages could be given, or if you want to call the term

7    "flexed," if you want to call it that, to a temporary driver

8    or, you know, however they wanted to try and do it.  Those

9    were always met with -- you know, I'd say 90 percent, 95

10   percent of the time, "No, we're not going to do that," "We

11   can't do that," "There's no one here to take it," "We don't

12   have any -- we can't do that."

13          So, you know, most of the time I can't recall them

14   being flexed off of the route, but lots of times there were

15   more added and flexed onto the route.

16   Q.    So when you said a moment ago that there were a few

17   instances you recall where packages were flexed off, you were

18   talking about those instances where you would ask if someone

19   else could handle them.  Like you said 95 percent of the time

20   they said no, but sometimes they would say yes; is that what

21   you were referring to?

22   A.    Yeah, yeah.  Again, like I said, we were overflowed or

23   had too many, and so the intent was to get those delivered

24   and the best way to do that would be to give them to a

25   temporary driver, someone else to deliver them.

**8/18/2006  Henderson, Jerrett**

1    Q.    Was there ever a situation where management flexed off

2    packages against your -- over your objection?

3    A.    Again I can't remember any specific situations where

4    they were flexed off --

5    Q.    Okay.

6    A.    -- over our objection.

7    Q.    Did you and the other contractors ever just between

8    yourselves flex packages between each other?

9    A.    Again, I might have -- I might have observed something

10   in the terminal, but I can't speak for other drivers.  I

11   don't know what their situations were.  There were occasions

12   where I took mine off one route and moved them to the second

13   route, to the other driver, but I don't -- I can't speak for

14   what other drivers did with their packages and who they gave

15   them to.  I just don't know the situation.

16   Q.    So you would sometimes move packages from one of your

17   routes to the other one of your routes, but you didn't have

18   any kind of flexing discussions or move packages between you

19   and other contractors, correct, that weren't one of your

20   routes?

21   A.    Yeah, not that I can remember.  I mean if it did

22   happen, maybe it happened once or twice, and you know, I just

23   can't recall that specific event.

24   Q.    Well, did anyone ever say you couldn't talk to the

25   other contractors to see if they could take some of your

**8/18/2006  Henderson, Jerrett**

1    packages on a given day?

2    A.    Yeah, there was a few times, yes, I remember where the

3    managers said that we can't -- you know, they didn't want us

4    giving any packages to any other drivers, they were put on

5    our pallet and our route and we had to deliver them, couldn't

6    give them to anybody else, even if they agreed to it.

7    Q.    Who said that?

8    A.    James, I know for sure, and it's possible at one point

9    one of the other managers did too, maybe Darrell, but I'm

10   pretty sure James I could say for certain.

11   Q.    When did they say that?

12   A.    You're asking for specific times and I'm not positive.

13   We had, you know, situations like that come up all throughout

14   the time I was working there, so...

15   Q.    Did they tell you why they didn't want any other

16   drivers to take the packages?

17   A.    I don't recall any explanation or why.

18   Q.    Now, how often would you take packages from one of

19   your routes and move them to the other route?

20   A.    Generally only when my route was overflowed and I felt

21   that I didn't have enough -- and I think I've already said

22   that or talked about that where, you know, I would try and

23   give those to the second route if there was enough room.

24   Q.    In the second route?

25   A.    Yeah, in the second route, to try and get them

**8/18/2006  Henderson, Jerrett**

1    delivered.

2    Q.    Do you have a sense, though, of how often that

3    happened?

4    A.    I would say that in the latter part of my employment

5    there, maybe twice a week, you know, at an average.  It was

6    happening, like I was saying, when the route was starting to

7    fill up and got overflowed on a regular basis, so...

8    Q.    Did you have to ask for anyone's permission before you

9    could do that?

10   A.    I had to -- yeah, I had to ask the manager every time.

11   Q.    Why did you believe you had to ask the manager?

12   A.    Because the manager -- James told me all the time that

13   if there was any -- you know, for one thing, they wanted the

14   package -- excuse me.  They wanted the package scanned on the

15   route that it was on, but he, you know, said that he wanted

16   to know about any, you know, any movement between the

17   packages between routes, you know, whenever there was --

18   whenever that was going to happen he wanted to know.

19   Q.    So he wanted to know basically where the package was,

20   which route it was on?

21   A.    He didn't really explain in detail why he, you know --

22   the only thing, like I said, the only thing that I could say

23   for certain was about the package being scanned onto the

24   route that it was on.  Anything past that I just don't

25   remember him going into detail as to why he wanted that.

**8/18/2006  Henderson, Jerrett**

1            THE WITNESS:  I'm going to have to use the rest

2      room.

3            MR. JIH:  No problem.

4            THE VIDEOGRAPHER:  We're off the record at 12:31

5      p.m.

6            (12:31 p.m., lunch break taken)

7            (1:11 p.m., back on the record)

8            THE VIDEOGRAPHER:  We're back on the record at 1:11

9      p.m.

10            BY MR. JIH:  Q.  Do you believe it is FedEx Home

11      Delivery's job to help you prevent service failures?

12      A.    I don't know what their -- I mean I don't know what

13      their job is.  I'm not, you know -- again, going back to what

14      I said previously, I think that -- or I did think, at least

15      at the time, that that was what they were -- you know, they

16      were saying to me and to the other contractors is that --

17            THE VIDEOGRAPHER:  Excuse me.  I'm sorry.  My deck

18      just shut off.  I have to do that last question over again.

19      It's been doing weird things.  It just shut off and started

20      fast forwarding.

21            MR. JIH:  Do you want to go off the record?

22            THE VIDEOGRAPHER:  Yeah, we have to.  It just

23      stopped recording.

24            (Off the record momentarily)

25            (1:14 p.m., back on the record)

**8/18/2006  Henderson, Jerrett**

1              THE VIDEOGRAPHER:  We're back on the record at 1:14

2     p.m.

3              This is Scott George, the videographer.

4              Would you please reask the question.

5              BY MR. JIH:  Q.  Do you believe it was FedEx Home

6     Delivery's job to help you prevent service failures?

7     A.     I think that at the time that I started there, that

8     that's what I thought that they were presenting to us, is

9     that -- is that, you know, and going along with the temporary

10    drivers that they told us that they would have available and

11    the split routes that they were talking to us about, that

12    these were things that I felt that they were, you know, doing

13    to help prevent and that was their responsibility.  I thought

14    that that was their job to help as much as they could and

15    that -- because that's what they were telling us, and you

16    know, that's what they were presenting to us.  So, again,

17    I -- at that time I thought that that was what was going on.

18    Q.     When did they present the idea of temp drivers or

19    splitting routes to you?

20    A.     Well, again the splitting routes was part of the video

21    that they showed us for the training procedures, and they

22    also talked about it.  And the temporary drivers again were

23    around the same period that they talked about, you know,

24    having those available for times that there were too many

25    packages to deliver, so...

**8/18/2006 Henderson, Jerrett**

1    Q.    And "they" would be the first senior manager Van

2    Buskirk and then Cumberland?

3    A.    James Cumberland, right, right.

4    Q.    And all of this was after you signed the agreement?

5    A.    I believe so, yeah.

6    Q.    Did Mr. Cumberland or Mr. Van Buskirk ever say or

7    promise that FedEx Ground would always have a temp driver

8    available to help prevent service failures?

9    A.    I don't believe that they used those words "always."

10   You know, again, specific words like that that you're asking

11   me if they said that long ago, I can't tell you positively,

12   but I don't think they used the word "always."  It was,

13   again, this is what they were presenting to us as the normal

14   thing, and...

15   Q.    I want to make sure I understand because I understand

16   you said they were presenting to you that, you know, it was

17   very normal to have temp drivers help out, or that it was

18   normal for routes to end up being split, but did they ever

19   promise that they would do those things for you?

20   A.    Yeah, I guess if you're going to use the word

21   "promise," then I can't recall them using that term,

22   "promise."

23   Q.    Well, but did you recall them -- maybe they didn't use

24   that word, but do you ever remember them, whatever words they

25   used, promising to you that they would give you temp drivers

**8/18/2006 Henderson, Jerrett**

1    or promise you that they would split your route when you

2    wanted to?

3    A.     You know, again they weren't necessarily talking to

4    any one specific driver.  This was, you know, part of the

5    training that they showed us in the videos.  This is

6    something that, you know, they talked about to all the

7    drivers because we were all present there at the same time,

8    and again, it's a terminology and reference that you're using

9    that just wasn't coming up.

10   Q.     The "promise" terminology?

11   A.     They were presenting to us that this is the way and

12   the impression they gave us, is the way it's handled and the

13   way it's done, is that the temporary drivers are there to

14   help get them delivered and are available, and that they

15   would have them available, and that split routes is what

16   happens when it gets to the point when you're not being able

17   to deliver and it's a normal thing that happens, it's...

18   Q.     Other than splitting routes and providing temporary

19   drivers, do you have any other basis to believe that FedEx

20   Home Delivery had any responsibility to help prevent service

21   failures?

22          MS. ZERGER:  Let me just object to the extent that

23   it calls for a legal conclusion.

24          You can answer.

25          THE WITNESS:  Well, in observing, you know,

**8/18/2006 Henderson, Jerrett**

1      everything on a day-to-day basis of, you know, them tracking

2      the customers' packages, them updating the software, them

3      doing all these different things, it seemed like they had

4      some responsibility for that.

5              You know, again, like I say, I'm not -- I'm not an

6      attorney or, you know, anybody legal.  I can just tell you

7      what I saw and what was presented to us and the way we

8      thought that it was supposed to go.

9              BY MR. JIH:  Q.  Well, on a day-to-day basis do you

10     feel like the management at the Home Delivery terminal was

11     sort of putting the pressure on you to make sure that the

12     packages assigned to you were delivered?

13             MS. ZERGER:  Objection.  Mischaracterizes the

14     testimony.

15             THE WITNESS:  Let me think if that sounds right.

16             Okay.  Could you ask it again, please?

17             BY MR. JIH:  Q.  Yeah.  On a day-to-day basis do you

18     feel like the management of the Home Delivery terminal was

19     putting the pressure on you to make sure the packages

20     assigned to you were delivered?

21     A.     Okay.  Yeah, I guess I don't see a problem with that.

22     That sounds somewhat true.

23     Q.     Somewhat true or true?

24     A.     Well, that they were -- you know, there was definitely

25     a lot of pressure and, you know, like I said, they gave us

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 695 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-3   Filed 02/05/07   Page 150 of 305
8/18/2006  Henderson, Jerrett

1    the packages, put them on the pallet, and you know, were

2    pretty much, you know, they either are delivered or are

3    failed and you can lose your job for it, so that's -- I

4    mean...

5    Q.    I mean did they ever say, "Don't worry about it, just

6    do your best," or did they hold you accountable for every

7    single package assigned to you?

8    A.    It seemed like they were, you know, concerned about

9    every single package.  And no, I don't recall them ever

10   saying "Don't worry about it, just do whatever"...

11   Q.    Did they ever say, you know, "Hey, if you can't get

12   all the packages delivered" -- no, I take that back.

13         Can you point to any provision in the operating

14   agreement where FedEx Home Delivery promised to provide you

15   temporary drivers?

16   A.    No, not to my knowledge.

17   Q.    Can you point to any provision in the operating

18   agreement where FedEx Home Delivery promised to split your

19   routes or give you additional routes?

20         MS. ZERGER:  And I'm going to start to object here

21   in terms of calling for a legal conclusion.

22         You can answer.

23         THE WITNESS:  No, not to my knowledge.

24         BY MR. JIH:  Q.  But at least to your knowledge,

25   you're not aware of any provision in the operating agreement

**8/18/2006  Henderson, Jerrett**

1    that does that, correct?

2              MS. ZERGER:  Same objection.

3              You can answer.

4              THE WITNESS:  Yeah, same.

5              MR. JIH:  Okay.  Why don't we switch tapes.

6              THE VIDEOGRAPHER:  That's the end of Tape 3.  We're

7    off the record at 1:23 p.m.

8              (1:23 p.m., off the record)

9              (1:25 p.m., back on the record)

10             THE VIDEOGRAPHER:  This is the beginning of Tape 4.

11   We're back on the record at 1:25 p.m. in the matter of

12   Alexander, et al., versus FedEx Ground Package System, Inc.,

13   Case No. 3-05-MD-527-RM.

14             BY MR. JIH:  Q.  Who was responsible if any packages

15   assigned to you were stolen, lost or damaged?

16   A.     For the most part, I think it's me.

17   Q.     Tell me everything you did to make sure your packages

18   were not stolen, lost or damaged.

19   A.     Well, everything -- you know, damaged, you know, we

20   would bag them, you know, to keep them from, you know, water

21   damage if there happened to be that, trying to put them in a

22   safe place as much as you could away from public eye, and

23   that's about -- you know, that's about the best two ways to

24   do it.

25             Yeah, trying to use your best judgment for a safe

**8/18/2006  Henderson, Jerrett**

1    place as far as, you know, neighborhood or whatever you want

2    to say.

3    Q.    Well, how did you decide -- when you say use your best

4    judgment, I mean how did you go about deciding what a safe

5    place would be to leave a package?

6    A.    Are you referring to like a neighborhood or maybe a

7    high-crime area?

8    Q.    I'm just saying in terms of your experience with your

9    route.  Did you have different types of neighborhoods in your

10   area?

11   A.    Well, yeah.  I mean that kind of goes without saying.

12   Everybody has different types of neighborhoods so, yeah.

13   Q.    Would you do something different depending on the

14   neighborhood?

15   A.    Well, you just may not, you know, release the package

16   if it appears to be a high-crime area.  There might be

17   Neighborhood Watch or, you know -- anything that might look

18   rundown or just, you know, like I said a guess or a best

19   judgment.

20   Q.    So if you're in a particular situation where, based on

21   your best judgment, the neighborhood looks -- the potential

22   for crime is too high, for example, you would make a decision

23   not to leave the package?

24   A.    It might help to prevent a lost or stolen package by

25   doing that, yeah.

**8/18/2006  Henderson, Jerrett**

1    Q.    Did you make the decision whether or not to leave a

2    package in a given instance or would someone tell you whether

3    or not to leave the package?

4    A.    There was both cases.  I would say, you know, most of

5    the time that -- the driver decides whether or not to leave

6    it, but there are times when I did call terminal management

7    and they instructed me whether or not to leave the package.

8    Q.    On the instances where you did call terminal

9    management, why did you call them on those instances?

10    A.    To see if they would leave the package or not.

11    Q.    Okay.  I think I'm not understanding.  You said most

12    of -- you said most of the time, you know, you as the driver

13    would decide whether or not to leave the package, but there's

14    some instances where you called terminal management.

15    A.    Well, if -- the managers did tell us -- James told us

16    several times if you're unsure of whether or not to leave a

17    package, then call the terminal, and they will tell you

18    whether or not to leave a package.

19    Q.    So you called in those instances where you weren't

20    sure what the best thing to do would be?

21    A.    On some of them, yeah.  I can't recall every instance,

22    but...

23    Q.    But most of the time you would make the decision?

24    A.    Most of the time it would be me, yeah, or the driver.

25    Q.    You say you and the driver.  Are you referring to --

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 699 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-3   Filed 02/05/07   Page 154 of 305
8/18/2006  Henderson, Jerrett

1    A.    You or the driver is what I said, yeah.

2    Q.    But in your experience, that would be your second

3    driver or whatever --

4    A.    Yeah, whatever, yeah, right.

5    Q.    And would they sometimes call you to decide whether or

6    not to leave a package?

7    A.    Yes and/or sometimes call the manager, and ask.

8    Q.    You started in 2001 and were there until 2004.  Do you

9    believe you got better at providing daily pickup and delivery

10   service over that time?

11   A.    Yeah, I guess so.

12   Q.    And how would you say you got better at providing

13   daily pickup and delivery service?

14   A.    Just I would say maybe most -- more familiar with the

15   area I was delivering in, and maybe more familiar with

16   loading the van.  That would be...

17   Q.    Anything else?

18   A.    Huh-uh.  No.

19   Q.    Now, why would becoming more familiar with the area

20   help you provide daily pickup and delivery service?

21   A.    Maybe -- well, knowing where a certain address was

22   instead of, you know, not knowing helps you not have to

23   backtrack or not have to drive past it and, you know, not

24   realize what side of the street it's on.  You know, whatever.

25   That type of thing.

**8/18/2006  Henderson, Jerrett**

1    Q.    How did you become more familiar with the area?

2    A.    Just by driving it more.  Doing it more.

3    Q.    So this isn't something that someone taught you; it

4    was more from your experience?

5    A.    I guess just the day-to-day experience, yeah.  I

6    mean...

7    Q.    How does more familiarity with loading help you better

8    provide daily pickup and delivery service?

9    A.    Just what works better to fit inside the van.  What

10   works better to start loading with and end loading with, that

11   type of thing.

12   Q.    And how did you -- how did you learn or how did you go

13   about becoming more familiar with loading?

14   A.    I mean it's just a day-to-day experience.  It just

15   happens over time.

16   Q.    Sort of trial and error and through the passage of

17   time you discover there's certain better ways to do it than

18   others?

19   A.    Yeah, possibly.

20   Q.    Who's responsible for loading your van?

21   A.    Myself.  The drivers.

22   Q.    Did you consider yourself an average, below-average,

23   or above-average contractor in the Chico terminal?

24   A.    Well, like -- you know, comparing myself to other

25   drivers, I mean, you know, I have to know a lot about what

**8/18/2006 Henderson, Jerrett**

1    they did and, you know, what they didn't do, to know -- I

2    mean I can just say that I thought I was a good driver

3    myself, you know.  I think I stated before that I thought I

4    did, you know, a good job and showed up to work every day.

5    Q.    Well, did some contractors -- in your experience, did

6    some contractors service their routes better than others, or

7    would you say pretty much everyone did about the same?

8    A.    Again, you know, I didn't really keep track of the

9    other drivers personally myself.  I didn't keep track of

10   them.  I mean, I really don't know for sure how to answer

11   that.

12   Q.    So you don't know if other contractors were having the

13   same kinds of service issues or to the same degree as you

14   were?

15           MS. ZERGER:  Objection.  Misstates the testimony.

16           You can answer.

17           THE WITNESS:  The only thing that I know is the, you

18   know, service charts that were posted by the management.

19   That, you know, obviously showed a percentage and a service

20   percentage and a terminal percentage and, you know, I can see

21   in that light, but the specific affairs of the driver and

22   what they didn't deliver and their routes and stuff, you

23   know, wasn't my business to be into, so...

24           BY MR. JIH:  Q.  What did those charts show?

25   A.    The percentage of service that you did for, I believe

**8/18/2006 Henderson, Jerrett**

1    it was each day in the week.

2    Q.    Did your percentage of service tend to stay the same

3    through your, I guess four years, or did it go up?  Down?

4    Did it vary a lot by day?

5         MS. ZERGER:  Compound question.

6         BY MR. JIH:  Q.  Just trying to get a sense of how

7    much it changed.

8    A.    It didn't change very much.

9    Q.    What was your typical percentage of service?

10   A.    I'm not positive, a vague idea of maybe in the middle

11   90s.  You know, a lot of it is based on how many packages you

12   have that day and, you know, one not making service one day

13   and one not making service another day could be, you know, a

14   small percent or a few percent so, you know.

15   Q.    Do you remember just looking at the chart what the

16   range was in terms of what other people's percentage of

17   service numbers were?

18   A.    Not now.  I can't remember those figures.

19   Q.    Was middle 90s considered good, or was it considered

20   not good enough?

21   A.    As far as I know, according to what the managers told

22   us, it wasn't good enough, that 98 and 99 percent was what

23   was acceptable.

24   Q.    And do you recall on the service charts if there were

25   other contractors who were meeting the 98 or 99 percent?

**8/18/2006  Henderson, Jerrett**

1          MS. ZERGER:  Asked and answered.

2          THE WITNESS:  Yeah, I don't recall the exact

3    numbers, so I mean I couldn't tell you whether it was 98 or

4    99 or whether it was 96 and 95.  I just don't remember the

5    exact figures.

6          BY MR. JIH:  Q.  Oh, I'm not asking for exact

7    figures so -- that's a long time ago.  I was getting more a

8    sense of -- your understanding was that 98 or 99 percent was

9    sort of the target.  Do you have any recollection, looking at

10   that list, was everyone below it, or were you the only one

11   below it, or was it half, half?  I just want to get your

12   general impression if you have a recollection.

13   A.     Yeah.  You know, I may have remembered -- I may have

14   remembered one person, but like I said, the numbers

15   fluctuated so much within a small amount of percentages that

16   you know, I can't be sure of, you know, one person being

17   above that and one person not, and on average how often they

18   were just because, like I said, it was such a fine -- I just

19   can't be sure.

20   Q.     And when you're saying middle 90s, we're talking about

21   95, 96 or are you also including like 93, 94?  I just want to

22   know what you mean by that.

23   A.     I'm thinking, I guess, 95 and above, in that range.

24   Q.     Now, the number of packages you were responsible for,

25   that increased over time, correct?

8/18/2006  Henderson, Jerrett

1    A.    Uh-huh.  Yeah, correct.

2    Q.    In the beginning, approximately how many packages did

3    you get a day on your route?

4    A.    I would say between 18 and 20 to 35 to 40, somewhere

5    in that range.  It just depends on what time of the beginning

6    you're talking about.

7    Q.    Packages, right; we're not talking stops?

8    A.    Yeah, okay, yeah.  It was pretty close to the same.

9    Q.    And we talked earlier about the number of packages

10   were increasing.  So, for example, when you were in

11   discussions to split your first route, what was your package

12   volume at that time?

13   A.    Again, I can't be certain of exact numbers.  I believe

14   that at that time it was probably in the 80s to 100 range.

15   Q.    And then after it split, what was the average package

16   volume for your route, at that point each of your routes?

17   A.    Again, to my knowledge, probably around 50s, 45 to 50s

18   for each, right in that area, I think.

19   Q.    And in 2004 right before your route was reconfigured,

20   the Yuba City route --

21   A.    Uh-huh.

22   Q.    -- what was your package volume in each of the routes

23   then?

24   A.    Somewhere in the neighborhood of 135 to 140, right in

25   that --

8/18/2006 Henderson, Jerrett

1    Q.    For the Yuba City or for both?

2    A.    Well, for the Yuba City and you might take, you know,

3    20 for the second route so, you know, we're talking 110 to

4    120, right in that range on the second route.

5    Q.    So each of the routes had over 100?

6    A.    Oh, yeah, yeah.

7    Q.    With the benefit of hindsight and all of your years of

8    experience at FedEx Home Delivery, do you have any opinion as

9    to what makes a successful contractor in terms of servicing

10   the route, or what it takes to be a successful contractor?

11   A.    I'm really not sure, and I'm not sure how to answer

12   that because I feel that there was so many things that the

13   terminal managers at FedEx did to prevent me from being, you

14   know, as successful as I felt I could be or, you know, as

15   good, do as good of a job as I could be.  And it's hard to

16   say, you know -- you know, you could even say basic things

17   like showing up to work every day is obviously -- goes

18   towards being successful and, you know -- being, you know,

19   being pleasant and nice to customers and, you know, basic

20   things like that, but anything beyond that, you know, getting

21   into the work environment, you know, obviously, I don't feel

22   that, you know, they did everything, you know, to help make

23   me succeed and put a lot of roadblocks in the way too, so I

24   don't know how to answer that any more than that.

25   Q.    Okay.  Let me follow up on that a little bit.  I think

**8/18/2006 Henderson, Jerrett**

1    you mentioned there's certain things you felt like management

2    did to prevent you from becoming successful, and then you

3    also felt they didn't do everything they could to help you

4    become successful, so I'm going to split those up.

5            What things did you believe management did to

6    prevent you from becoming successful as a contractor?

7    A.    Things like adding packages to the route that weren't

8    in my normal service area, not having -- you know, both

9    adding packages to the, you know, the volume of the route and

10   then not -- you know, not taking those packages for temp

11   delivery when, you know, by their own addition was too much

12   and overflowing; not splitting the route to, you know, again

13   help make those, you know, deliveries serviced instead of not

14   serviced; you know, adding requirements like, you know, like

15   door tags and, you know, certain driving procedures on, you

16   know, the right side of the road always, and right turns not

17   left turns.  You know, a lot of these rules implemenca --

18   implemenca --

19   Q.    Implementations?

20   A.    Implementations, I kept saying "c" for "cations," it's

21   "tations."  You know, it just seemed to be more of a

22   hindrance than towards being, you know, successful.

23   Q.    Anything else?

24   A.    For right now, no.  That's off the top of my head.

25   Q.    Now, I don't know if you were sort of answering both

**8/18/2006  Henderson, Jerrett**

1    parts of my question, but I was going to follow up with what

2    did you think management failed to do to help you succeed.

3    Would your answer be different?  Do you have other things in

4    mind for that?

5    A.    They're both fairly similar.  I, you know, really

6    wasn't separating the two myself.  You're the one that

7    separated them.  So yeah, they were fairly...

8    Q.    So I want to follow up with the driving procedures

9    that you just mentioned.  You mentioned something about right

10   side and right turns.  Why don't you tell me everything you

11   had in mind in terms of driving procedures.

12   A.    Well, the training video that they showed and, you

13   know, the discussions that they had about, you know, driving

14   on the right side of the road and, you know, always making

15   right turns and, you know, the procedures for entering and

16   exiting the vehicle, and putting door tags on the door, how

17   to fill out the door tags, just all -- you know, they were,

18   like you said, all wrapped up in, you know, the rules and the

19   training that they were presenting us.

20   Q.    Anything else?

21   A.    Smith System is part of the driving, you know, again

22   part of the same thing they were presenting us.  You know,

23   backing cameras are another thing, all part of the driving,

24   so -- right now that's all I can, you know, think of.

25   Q.    And all of these things you just discussed you were

**8/18/2006  Henderson, Jerrett**

1    tying to the -- were you tying -- were you saying these came

2    from the training video and the discussions that happened

3    when you first started as a contractor?

4    A.    Most -- yeah, most of it was, yes, in the training

5    period.

6    Q.    Was any of it after the training period?

7    A.    Door tags, backing camera, things like that were,

8    yeah.  There were a few things that were after.

9    Q.    But the others were during the training?

10   A.    Yeah, the best I can recall, yeah.

11   Q.    I'll come back to training.  Actually, why don't we do

12   the training right now.  That will help.

13         So at the beginning, when you signed up to be a

14   contractor, I guess did you show up for work the next day, or

15   -- was it that immediate, or was there a period of time

16   before you started?

17   A.    Well, I think that I showed up for work for, I think,

18   you know, paperwork and videos.  So, yeah, that was -- I

19   believe it was the next day for that.

20   Q.    And the videos, was it just you or was it for a group

21   of people?

22   A.    They were both.  I experienced both.

23   Q.    Okay.  So how much of each were -- describe for me

24   what the training was.

25   A.    Yeah, as best as I can recall from that long ago,

**8/18/2006  Henderson, Jerrett**

1    there were, you know, a large set of videotapes that they

2    said I had to watch before I could start.  There was some

3    question sheets, I think, that were there that related to the

4    videos that I had to answer.  They, you know, had me do --

5    had me lift a box that was 50 pounds and lift -- you know,

6    stand up with it and put it back down.  And they also did a

7    drive with me, I guess a driver evaluation and the manager

8    went with me for, I don't know the amount of miles it was,

9    but it was, you know -- we'll just say half a mile or a mile

10   or something like that and then back to evaluate driving

11   skills is what they said.

12           And for -- yeah, for the first portion that's what

13   comes to mind initially.  And the 50-pound thing was

14   something I remember because I do remember the managers, you

15   know, saying that, you know, there would never be anything

16   over 70 pounds that we would have to deliver or lift and, of

17   course, that was not true, and eventually we were told that

18   we had to lift up to 150 and there were even times that James

19   said there was no weight limit, that we had to lift and take

20   whatever came in, so...

21   Q.    You said that was the first part of the training.  Was

22   there another part to the training?

23   A.    No, I said that that was the training I remember when

24   I first started in the first week or two.

25   Q.    Okay.

**8/18/2006  Henderson, Jerrett**

1    A.      You know, any other, you know, driver meetings that

2    they had with more of us than just, you know, the videos and

3    stuff like that.  I remember there were a few of those in the

4    beginning, but I can't remember exactly what they related to

5    or --

6    Q.      Those could have been like safety issues or -- you

7    just don't remember what those meetings were for?

8    A.      I just don't remember, yeah.

9    Q.      So the only training then that you remember is during

10   sort of this initial training on how to drive, or how to

11   deliver packages?

12          MS. ZERGER:  Objection.  It mischaracterizes the

13   testimony.

14          You can answer.

15          THE WITNESS:  The initial training.  As far as I'm

16   concerned, there was training all throughout the job there.

17   I mean, you know, when we got scanners, they trained us on

18   scanners and showed us videos and paperwork on scanners, you

19   know.  There were all sorts of different things that would

20   come up that you can describe as training, so...

21          BY MR. JIH:  Q.  Well, was there more training on,

22   after that initial period, on how to deliver packages or

23   driving?

24   A.      I don't recall exactly if there was anything specific

25   on training for package release or, you know.  Like I said,

**8/18/2006 Henderson, Jerrett**

1      it could have been part of some of those meetings that they

2      would have periodically, but I just don't remember anything,

3      you know, specific to what you're asking for training.

4      Q.      Okay.  Or in terms of how to drive and how to park or

5      things like that?

6      A.      Yeah.  Again, you know, there were always, you know,

7      little updates here and there to various things in these

8      periodic meetings, and the meetings could cover -- they could

9      cover, you know, a driving habit, they could cover something

10     in the meeting.  So, you know, yes, I do remember that there

11     were certain times during these periodic meetings where they

12     would talk about things like that, but...

13     Q.      But those are more like -- I mean because I

14     understand -- I don't want to put words in your mouth, but I

15     understand that at times sometimes there might be voluntary

16     safety meetings where there may be discussions about how to

17     drive safely.

18             Is that what you have in mind or do you actually

19     recall additional training on how to literally drive?

20             MS. ZERGER:  Objection.  Mischaracterizes the

21     testimony and assumes facts not in evidence.

22             THE WITNESS:  Yeah, I don't know how to answer your

23     question any more than I've already done.

24             BY MR. JIH:  Q.  You just don't remember?

25     A.      There -- yeah, I mean there could be training, more

8/18/2006 Henderson, Jerrett

1    training in those meetings, but I just don't remember the

2    specifics of each and every meeting, so...

3    Q.    This initial training period, how many days did it

4    last?

5    A.    The best of my knowledge, two to three.

6    Q.    And then after that period did you immediately start

7    work on the route or was there sort of a time in between?

8    A.    I think, again, you know, the best of my knowledge, I

9    remember that there was a short period, I don't remember how

10   many days it was, but again this was a new terminal and it

11   was opening, so I don't believe that there were packages

12   there immediately following training, but it was fairly soon

13   after.

14   Q.    So you were -- for the Chico terminal Home Delivery,

15   you were like a day-one contractor, right?  You were there

16   when it opened?

17   A.    Yeah, I was there when it opened, yes.

18   Q.    Now, in terms of this initial period, I just want to

19   see how strong you are in your memory.  Are you positive this

20   is before you signed the agreement to be a contractor?  I

21   mean -- sorry.  Your testimony was after.  Are you positive

22   that this initial training period, as you called it, was

23   after you had already signed the operating agreement?

24        MS. ZERGER:  Asked and answered.

25        You can answer.

**8/18/2006 Henderson, Jerrett**

1          THE WITNESS:  I'm pretty sure it was.

2          BY MR. JIH:  Q.  So that's clear in your memory, as

3    clear in your memory as anything else you've testified to

4    today?

5          MS. ZERGER:  Objection.  Mischaracterizes the

6    testimony.  Argumentative.

7          THE WITNESS:  To the best of my knowledge it was

8    before.

9          BY MR. JIH:  Q.  The reason I ask is what if during

10   the driver -- you said there was a driver evaluation.  What

11   if it turns out you just didn't even know how to drive?  It

12   seems weird to me that you would have already signed the

13   operating agreement before they even evaluated your driving.

14         MS. ZERGER:  Objection.  Argumentative.

15         BY MR. JIH:  Q.  But that's your recollection?

16   A.     That's my recollection, yes.

17   Q.     And like what if you couldn't lift a 50-pound box?

18         MS. ZERGER:  Objection.  Argumentative.

19         THE WITNESS:  Again, I don't know what the managers'

20   procedures were and what they were instructed on to do in

21   cases like that.  I don't know what would happen.  I just --

22   that's what I recall happening.

23         BY MR. JIH:  Q.  Now, the videotapes that you had to

24   watch, because earlier you had said some of these you did by

25   yourself, some of them may have been with other people there.

**8/18/2006 Henderson, Jerrett**

1    Were these just the different videos, some you'd watch by

2    yourself and some with others?

3    A.    I think it was -- it may have just been the time of

4    day possibly I was watching videos and possibly another

5    applicant had, you know, came in and -- I think, like I was

6    saying, the training was over a couple of days, so possibly

7    the next day there were more people there at the table to

8    watch them and the first day there wasn't, I just -- to the

9    best of my knowledge that's what I remember, is part of the

10   time it was just me, and part of the time it was more than

11   me.

12   Q.    How many videotapes did you have to watch?

13   A.    I think it was 20 some odd videotapes.

14   Q.    Do you remember the titles of any of them?

15   A.    No way.

16   Q.    Do you remember what the videotapes were about, what

17   subjects they covered?

18        MS. ZERGER:  Objection.  Asked and answered.

19        You can answer.

20        THE WITNESS:  Certain ones come to mind, but I can't

21   remember all 20 plus of them.  I remember, you know, the

22   driver release part of it; I remember, you know, videos where

23   it showed people exiting the vehicle and going up to the

24   door; I remember the Smith System video; and I think I also

25   remember at that time safety videos with, you know, possibly

**8/18/2006  Henderson, Jerrett**

```
1    the belt and lifting packages and things of that nature, off

2    of your pallet and things.  Those are the ones that I can

3    picture and remember.

4            BY MR. JIH:  Q.  Well, actually you had indicated a

5    list of driving procedures that you believe you learned or

6    were told about during the training videos.  I just want to

7    go through those.

8            The first one you said something about on the right

9    side of the road.  I wasn't sure what you meant by that.  Was

10   that just literally driving on the right side of the road?

11   A.      Well, yeah, I mean, you know -- from what I remember,

12   that was presented both in the video and the managers also,

13   you know, stressed to us and told us that they wanted us to

14   drive -- in other words, if a location of a home was across

15   the street, they didn't want us to walk across the street,

16   you know.  And I may be getting too literal with my

17   explanation here, but the idea is the same.  They wanted us

18   to drive around and park at that location on the right side

19   instead of walking across the street.

20   Q.      Oh, okay.

21   A.      So they were, you know -- and, you know, I remember

22   also later on that, you know, these things came up in, you

23   know, driver evaluations and things that they would tell us

24   about.  Well, you know, driving on the right side was

25   something that they were, you know, looking and watching to
```

**8/18/2006  Henderson, Jerrett**

1    see if we did.

2    Q.    So why didn't they want you to walk across the street?

3    A.    I'm not sure.

4         MS. ZERGER:  Speculation.

5         BY MR. JIH:  Q.  And then always making a right

6    turn, what was that?

7    A.    Again, I don't know exactly the reasons for it, but

8    they were, you know, saying making right turns on your route

9    would, you know, help either -- I guess either remind you or

10   help get into the practice of, you know, parking at these

11   locations on the right side of the street.  Anything further

12   I just don't remember or I don't know what the reasoning was

13   behind the right turns.

14   Q.    Now, the right turning, that was something you saw in

15   the training video?

16   A.    I know driving -- or parking at the locations on the

17   right was something I am pretty sure I remember seeing in the

18   video.

19   Q.    And how about the right turns?

20   A.    The right turns I don't know for sure on the video, if

21   that was part of the video.

22   Q.    Now, did anyone tell you that you were -- we talked

23   earlier about suggestions versus requirements, right?

24   A.    Uh-huh.

25   Q.    Was it your understanding that driving on the right

**8/18/2006  Henderson, Jerrett**

1    side of the road was a requirement or a suggestion?

2    A.    It was always -- it was always presented to us that if

3    we didn't follow the instructions that the management was

4    giving us at any time, that we could be written up for not

5    doing these things.

6         So my answer to that would be that they, you know,

7    didn't say that we had to do it, but they did say that if we

8    didn't do it and there was a problem, that we could be

9    written up.  So if there was ever any problems that occurred

10   from not following their instructions, that we could be

11   written up.

12   Q.    So, in other words, it's not so much that -- well,

13   what do you mean by if there was ever any problems that

14   occurred from not following their instructions?

15   A.    Well, from, you know -- I would have to know the

16   reasoning behind, more the reasoning behind the right-turn

17   stuff and the left turn to give you an example on that.

18        We could take the door tag for an example and say that

19   we were always told that we had to do a door tag no matter

20   what.  We didn't have a choice on that.  If we didn't do a

21   door tag, we would be written up for that, and again that

22   could go towards losing -- the contract could be terminated.

23        So, with that part in mind, you know, if anything ever

24   happened, if a package came up missing, lost, if anything --

25   you know, if a customer couldn't find it -- maybe a package

**8/18/2006  Henderson, Jerrett**

1    was right there, but they couldn't find it just because they

2    were dumb -- you know, whatever reason, and then they called

3    the terminal and complained that they couldn't find their

4    package, was there a door tag on the door?  If there wasn't a

5    door tag on the door, then that would be something that would

6    happen because the driver didn't follow the manager's

7    instruction to put a door tag on the door, so he could be

8    written up for that, and that could lead to being terminated.

9    Q.    Because in that instance there would have been a

10   customer complaint, or a lost package or something like that?

11   A.    Or even, like I said, even if there wasn't a lost

12   package, even if the customer did not officially complain,

13   the fact was that there was no door tag there and the

14   customer couldn't find the package.  It was not indicated

15   "left by door," "left by back door," "left by garage," so the

16   customer couldn't find it and called in.

17         And so they would say, "Was there a door tag there?"

18         "No."

19         Okay.  You can be written up for that.

20   Q.    Well, I understand the door tag then.  But do you

21   recall anyone ever saying, you know, if you don't drive on

22   the, you know, right side of the road and you cross the

23   street, that you would be written up and your contract would

24   be in jeopardy?

25   A.    Again, like I stated before, they did not say that

**8/18/2006  Henderson, Jerrett**

1    sentence or those words, but they did say if anything ever

2    came up, I guess negative, if you want to say, it's similar

3    in example to the door tag, and we were not following those

4    instructions, then we could be written up.

5    Q.    And by "if anything negative came up," that would be

6    something like customer having an issue or, you know, a

7    safety violation or a service problem, or anything else?

8    A.    Yeah, I don't know.  Like I said, I'd have to know

9    more about their reasoning for the right turn other than just

10   parking on that side of the road, you know.  That's why I

11   used the example of the door tag because I had more knowledge

12   of the reasoning of why they wanted that.

13   Q.    So you don't remember, though, anyone saying to you

14   that you were required to drive on the right side of the road

15   or else your contract was going to be terminated?

16   A.    Again, I already, you know, answered that question,

17   but, yeah, again they did not use those words and did not say

18   that, but they did say --

19   Q.    If a problem came up --

20   A.    -- if a problem came up, and I was not doing that,

21   didn't follow those instructions --

22   Q.    Did anyone at Home Delivery ever tell you that you

23   were required to always make a right turn, and if you didn't

24   your contract would be terminated, or you'd be disciplined in

25   any way?

**8/18/2006  Henderson, Jerrett**

1    A.      The same answer goes for the right turn also.  No,

2    they didn't use that terminology, but they did say that --

3    Q.      If a problem --

4    A.      -- if a problem came up, then...

5    Q.      Earlier you said you learned -- or there were driving

6    procedures about entering and exiting the vehicle, right?

7    A.      Uh-huh.

8    Q.      What did you mean by that?

9    A.      The training video that I remember seeing, you know,

10   said -- you know, again showed the parking on the right side,

11   and besides that parking brake, exit the driver's side, go

12   around, you know, shut the doors, open the side door, take

13   the package out.  I mean, you know, pretty much step-by-step

14   instructions for taking the package and delivering it to the

15   customer.

16   Q.      Did anyone ever -- from Home Delivery ever tell you

17   that you were required to follow this entry-and-exit

18   procedure or else your contract would be terminated or you'd

19   be disciplined?

20   A.      No.  Again same sort of deal.  And really with the

21   entering and exiting, again, you know, it was the whole idea

22   of the training and the whole package of the training thing

23   is it was presented as this is how we were supposed to do it,

24   this is how FedEx wanted us to do it.  And so picking out any

25   one specific thing that they, you know, had this dialogue

**8/18/2006  Henderson, Jerrett**

1    with us about -- some things, yes, some things, no, they

2    didn't have this dialogue with us about.

3    Q.    Well, I understand this is sort of what they presented

4    as training sort of as the way you should do it, but what I'm

5    focusing on is but no one ever told you that you had to do it

6    that way or else your contract would be terminated, right?

7            MS. ZERGER:  Objection.  Asked and answered.

8            You can answer.

9            THE WITNESS:  Yeah, you know, again you're picking

10   out specific things.  You're picking out right and left turns

11   and entering and exiting the vehicle and this and that.  And

12   my answer to that is in some cases they had this dialogue

13   with us that you are not required to, but if a problem arises

14   and you are found to not be doing it this way, you can be

15   written up or terminated.

16           So that's -- that's the answer for the entire

17   training process.  Yes to some things, no to some things.

18   This dialogue was not communicated.

19           BY MR. JIH:  Q.  Does that also apply to the backing

20   cameras?

21   A.    Yes, absolutely would.  Yes, absolutely with backing

22   cameras.

23   Q.    And the same answer applies to the Smith System?

24   A.    The Smith System, yes, but I don't think that that

25   dialogue was -- because that's not something that I think

**8/18/2006  Henderson, Jerrett**

1    they can actually, you know, observe and follow up on, and I

2    mean that just -- you know, that's an eyes forward and, you

3    know, distance and rearview mirror thing.  I mean you can't

4    really so -- I don't think that dialogue was used with the

5    Smith System.

6    Q.    So did anyone -- just so I'm clear, so no one at FedEx

7    Home Delivery ever told you you have to follow the Smith

8    System when you were driving?

9    A.    No, they didn't use that terminology, no.  They said

10   that -- they emphasized the Smith System and said that they

11   wanted us to use it, but yes, they didn't use that dialogue

12   of that we had to use it.

13   Q.    And you didn't understand that you had to use it,

14   right?

15   A.    Right.  I mean -- I think for most of us it was

16   logical and part of the training and we understood that

17   that's what they wanted us to -- procedures they wanted us to

18   follow, so...

19   Q.    Did you in all of your time at FedEx Home Delivery

20   always drive on the quote/unquote right side of the road?

21   A.    Well, I would have to say no to that.  It's

22   impossible, so...

23   Q.    And did you always only make right turns?

24   A.    Probably no on that, too.

25   Q.    And did you ever have any problems arise as a result

**8/18/2006 Henderson, Jerrett**

1    of not always making right turns?

2    A.    I don't recall any, no.

3    Q.    And so you never had a discussion with any management

4    as a result of not always making right turns?

5    A.    Right, yeah, not --

6    Q.    It just didn't come up because there was no problem?

7    A.    Right, right.

8    Q.    Did you always enter and exit the vehicle the way it

9    was shown on the training video?

10   A.    No, I did not.

11   Q.    Did you feel like you were required to do it that way?

12   A.    No, no, not required to.

13   Q.    Did you feel like you were required to always make a

14   right turn?

15   A.    No, not required to again, but like I said before, I

16   did feel that, you know, this is what they wanted us to

17   follow and part of the training program, and that was the

18   impression that I got and I know some of the other guys got

19   too, is that these are the procedures they wanted us to

20   follow.

21   Q.    Okay.  What is a backing camera?

22   A.    A backing camera, as far as what I used in my personal

23   experience is a camera that's mounted on the rear of the

24   vehicle, and I had mine above the window, above the door

25   windows on the very top of the rear of the vehicle, and then

**8/18/2006  Henderson, Jerrett**

1       it has a monitoring -- a monitor, video monitor up front near

2       your steering wheel so that you can see what's going on

3       behind the vehicle.

4       Q.     So it's just to make sure you don't run over somebody

5       as you're backing up?

6       A.     Just for whatever reason.  To see behind you.

7       Q.     Were you required to get a backing camera?

8       A.     No, I was not required to get a backing camera.  I was

9       repeatedly told to get a backing camera on a weekly basis, if

10      not more than a weekly basis.

11      Q.     So you understood you weren't required to, but they

12      kept sort of saying "Come on, get a backing camera"?

13             MS. ZERGER:  Objection.  It mischaracterizes the

14      testimony.

15             THE WITNESS:  They told me not only to get a backing

16      camera repeatedly, but that if I was involved in any

17      incident, accident or anything, that I could lose my contract

18      for not having one on the vehicle.

19             BY MR. JIH:  Q.  Okay.  Well, did you agree with

20      them that it was a good idea to get the backing camera?

21      A.      I did not agree with them that I should be forced to

22      get a backing camera under those circumstances.  I argued

23      that it should be my choice to get a backing camera, whether

24      or not I had an incident, accident, or a bump or anything.

25      It should be up to me to get a backing camera and they

**8/18/2006  Henderson, Jerrett**

1    disagreed with that, both managers at that time, and said

2    repeatedly that I needed to get one or if that did occur,

3    that the contract could be terminated.

4    Q.    I guess those are -- I want to make sure I understand

5    because at least in my mind I think you've said two different

6    things, and maybe it was both, I don't know.

7          On the one hand you said they repeatedly said, look,

8    if you don't get a backing camera and you get into an

9    accident, your contract could be terminated.  And on the

10   other hand you said that you were forced to get a backing

11   camera.  I'm trying to figure out was by "forced," was it

12   simply their threat that if you got into an accident your

13   contract would be terminated, or did they go beyond that and

14   say you have to get a backing camera, we don't care?

15   A.    It was -- I felt it was under force of threat of

16   losing my job.

17   Q.    Okay.

18   A.    And I did get a backing camera because of that.

19   Q.    When you said you felt forced, you're referring to

20   their -- basically what they kept saying in terms of, look,

21   if you get in an accident and you don't have one, there goes

22   your contract?

23   A.    Yeah, an accident, incident, anything.  And they

24   clarified that it wouldn't make any difference if it was, you

25   know, an accident, ding, bump, dent, whatever it was.

**8/18/2006  Henderson, Jerrett**

1    Q.    Do you remember any training on how to load the

2    vehicle?

3    A.    I remember -- the only thing that I can remember off

4    the top of my head about loading vehicle training would be

5    picking it from off the ground and turning and placing it in

6    the vehicle.  There was something that referenced twisting

7    your back in a manner to put the box into the vehicle.

8          So as far as loading goes, it's the only training that

9    I can recall, you know, other than, you know, scanning

10   training or whatever as far as, you know, scanning all the

11   boxes that you loaded onto your vehicle, so...

12   Q.    Did anyone at Home Delivery ever tell you that you're

13   required to pick up boxes in a certain way or else your

14   contract would be terminated?

15   A.    No, they did not use that terminology.  That was part

16   of the safety and -- their safety meetings and instruction,

17   so...

18   Q.    So it was more sort of like a safety suggestion, or

19   this is how to avoid hurting your back, or something like

20   that?

21   A.    Yeah.  Again, it was a normal safety thing.  I figured

22   that it was a normal thing that every job does, is give you

23   safety training and...

24   Q.    Well, did you always pick up packages and turn the way

25   that that training illustrated?

**8/18/2006 Henderson, Jerrett**

1    A.    I never picked up packages and turned before that,

2    so...

3    Q.    That's the way you did it then?

4    A.    That's the way I did it is the way that they said.

5    Q.    Okay.  Hopefully it worked and you didn't hurt your

6    back?

7    A.    That's true.

8    Q.    Good.  So at some point you start driving the Yuba

9    City route, and you drove the route yourself, correct?

10   A.    Uh-huh, yes.  I'm sorry.

11   Q.    What days of the week did you work?

12   A.    Normally Tuesday through Saturday.

13   Q.    You said normally.  Did that ever change?

14   A.    Yes, it did.

15   Q.    When would it change?

16   A.    It changed -- on occasion there were holidays that

17   FedEx changed that -- and I can't remember specific details

18   on it.  One holiday was on one day one year, and it changed

19   the next day and so we were required to work a Monday, and

20   again I don't recall the specific circumstance.

21         There were also times where the managers told us that

22   we had to come in and work an additional day if we weren't --

23   didn't get all of our packages delivered by the end of the

24   week.  If there were any left over, that we had to come in

25   and deliver them, you know, however many hours, even if it

**8/18/2006 Henderson, Jerrett**

1    was two hours or whatever.  We had to come in that day and

2    deliver them and get out of there.

3    Q.    Just to avoid service failure?

4    A.    I would assume so, yeah.

5    Q.    And that was because they couldn't have been -- they

6    weren't completed during the regular week?

7    A.    Right, right.

8    Q.    But in that instance you could have chosen not to come

9    in and just taken the service failure, right?

10         MS. ZERGER:  Objection.  Mischaracterizes the

11   testimony.

12         THE WITNESS:  Again, in those circumstances, I felt

13   like I didn't have a choice in the matter.  The managers did

14   say that I could take a service failure if I did not show up,

15   but that that would reflect and be written up for that and I

16   could lose my job for it, so...

17         BY MR. JIH:  Q.  Okay.  So a typical day then

18   working your route, what time did your day start?

19   A.    Generally, on average, I would show up at 6:15, 6:30

20   and start my day there, loading the vehicle.  Scanning and

21   loading.

22   Q.    As far as you can tell, did all of the contractors

23   show up at the same time?

24   A.    Most did.  Some didn't.

25   Q.    Did some show up earlier or later?

8/18/2006  Henderson, Jerrett

1    A.      Both.

2    Q.      Well, why did you show up at 6:15, 6:30 each day as

3    opposed to earlier or later?

4    A.      It was my understanding that that was the average time

5    that the packages were finished unloading from the 18-wheeler

6    and were actually on the pallet ready to be scanned or fairly

7    close to that point.

8    Q.      Did anyone ever tell you that you have to show up at

9    6:15 or 6:30 every day?

10   A.      No, they did not.  They did tell us that we had to

11   have all of our packages scanned and loaded and ready for

12   departure by 9:00 o'clock in the morning.

13   Q.      And did they tell you that from the beginning or is

14   that something they said later on, the 9:00 a.m. thing?

15   A.      I don't believe it was in the beginning because the

16   terminal was so new and that just wasn't something that was

17   in place yet and came up yet, so, yeah, I mean...

18   Q.      When did that come up, the 9:00 a.m.?

19   A.      Well, I believe it came up when they started to get a

20   regular 18-wheeler delivery vehicle in there, but I can't be

21   certain on the specific, you know, time of -- what time of

22   year when it exactly came up.  I think that's what the

23   difference was.

24   Q.      But do you remember if this was, for example, when you

25   only had one route or two routes?  Was it later?  Closer to

**8/18/2006  Henderson, Jerrett**

1    2004?  Any ball-park estimate of when that happened?

2    A.    No.  I think it was in the first year, sometime the

3    first year.

4    Q.    And before the sort of 9:00 a.m. instruction, was

5    there -- did anyone ever tell you what time you had to leave

6    the terminal?

7    A.    No, not that I can recall.  Just like I said, it

8    didn't came up -- it didn't come up because the terminal was

9    so new.  There just wasn't that many packages to deliver in

10   the first place, so...

11   Q.    Now, when your day starts, you drove a van, right, not

12   a truck?  I don't even know if there's a difference.

13   A.    I drive a van, right.

14   Q.    Was your van already at the terminal or did you bring

15   your van to the terminal?

16   A.    I brought the van to the terminal.

17   Q.    Okay.  And so you would bring your van to the

18   terminal.  Did you bring anything else with you to the

19   terminal?

20   A.    Not to my knowledge, no, except I mean -- I mean if

21   you want to ask a specific time frame of when I was doing

22   this,, I bought the scanner -- you know, after the scanners

23   were introduced, I brought the scanner, a jacket if it was

24   winter.  I mean, I don't know what...

25   Q.    So at the beginning of the day your van would show up.

8/18/2006 Henderson, Jerrett

1   Then what would you do?

2        MS. ZERGER:  Objection.  Mischaracterized the

3   testimony.  The van didn't just show up.

4        BY MR. JIH:  Q.  I mean when you drove your van to

5   the terminal, what would you do next?

6   A.    I would -- I pulled up to the route pallet, and I

7   began to, you know, scan the pallet and load the packages in

8   the van.

9   Q.    Did you have to check in with anyone at the terminal

10  before you started doing that?

11  A.    Yes.  When -- at any time that we brought packages

12  back from the previous day, yes, the managers were -- you

13  know, we had to stop outside the terminal, the managers had

14  to scan the packages, and we had to provide an explanation

15  for the packages that weren't delivered.

16  Q.    All right.  So before you go into the terminal the

17  managers had to determine which packages from the prior day

18  had not been successfully delivered, right?

19  A.    And an explanation of why.

20  Q.    Okay.  So they could say whether or not the customer

21  just wasn't there or it was just a no attempt?

22  A.    I guess so, yeah.

23  Q.    What were the -- I mean, my understanding is there's

24  some kind of code that was attached to each package, right?

25  A.    Right.

**8/18/2006 Henderson, Jerrett**

1    Q.    What was your understanding of the different codes or

2    the different explanations?

3    A.    Everything from street or address not being able to be

4    found, to place -- maybe it was closed, customer wasn't home.

5    All those different codes.

6    Q.    Was it your understanding that some of those,

7    depending on how it was coded, would count as service

8    failures and some of them would not?

9    A.    For the most part, yeah, it was very confusing a lot

10   of times because the managers would, you know, tell us one

11   week that a certain code was a service failure and another

12   week they would change their mind and say it wasn't a service

13   failure, and it was okay, not to worry about it.  It seemed

14   like it changed a lot from week to week, or month to month on

15   what was a service failure and what wasn't, so...

16   Q.    Well, what codes do you have in mind when you're

17   saying one week it was a failure and one week it was not?

18   A.    "Street not found."  I mean all of those that I

19   mentioned, really.  Street not found, a business was closed,

20   customer that wasn't home for a signature, all of those

21   examples just off the top of my head.  Those all got, you

22   know, description redefined several times from the managers.

23   Q.    Okay.  So other than getting the packages that weren't

24   delivered from the prior day scanned, would you have to check

25   in with the managers when you got to the terminal?

**8/18/2006  Henderson, Jerrett**

1    A.    I don't think so.  There might have been a time at the

2    very beginning when the scanners were first introduced that

3    the managers may have had you, you know, sign in with the

4    scanner.  That's something they might have done.

5    Q.    You don't remember?

6    A.    I don't recall specifically if we had to do that or

7    not, but that would be the only other thing I could think of

8    right now that they would be involved in.

9    Q.    So after the packages are scanned you drive to the

10   pallet of packages that were assigned to you?

11   A.    Right.

12   Q.    And you would start scanning and loading the van?

13   A.    Yes.

14   Q.    How long did it typically take you to scan and load

15   the van?

16   A.    I guess on average probably an hour, but since

17   packages were different every day, I mean it just depends on

18   how many we got.  It could take longer or shorter, it just...

19   Q.    And was there anyone from the terminal on a typical

20   day that would sit there and load your van with you or is

21   that something you were responsible to do?

22   A.    We were -- it was always just the driver, myself, as

23   far as I know.  There was no one helping me.

24   Q.    And if you didn't have any problems getting all of the

25   packages into the van, would you have to talk to anyone from

**8/18/2006  Henderson, Jerrett**

1    management?

2    A.    Yeah.  I mean even if the van was loaded normally and

3    ready to go, we still would have to, you know, close that out

4    and give the scanner to the manager and he, you know,

5    transferred that information or did something on the computer

6    and printed out paperwork for us, and that was it.

7    Q.    Oh, so basically they needed that information to

8    transmit it into some computer?

9    A.    I think so.

10   Q.    Did you get paid for loading your van?

11   A.    I think so, yeah.  I think we get a small amount.

12   Q.    As part of your settlement?

13   A.    Yeah, I think so.

14   Q.    So after -- so once you're done with the scanner, you

15   give the scanner to someone at the terminal to transmit it

16   into the computer system.  Then what happens -- or what

17   happened?

18   A.    Then we get the scanner back, and then we get the

19   paperwork back and we get in the van and drive out and start

20   on the way -- on our way to the first delivery stop.

21   Q.    What paperwork are you referring to?

22   A.    Paperwork would be turn-by-turn paperwork and mapping.

23   Q.    Anything else?

24   A.    A manifest that showed all the stops.

25   Q.    Were you required to take maps from Home Delivery?

**8/18/2006  Henderson, Jerrett**

1    A.    No, we were not required to take maps.

2    Q.    Were you required to take the turn-by-turns from Home

3    Delivery?

4    A.    No, we were not required to take that.  That was --

5    you know, if -- again, it still goes back to if -- you know,

6    the managers did say and always said that there was the

7    mapping stuff here as part of the business package.  We

8    didn't have to buy the business package, but again, if we

9    were not getting our packages delivered and we were not using

10   this, then that was a problem, could be written up for that.

11   Q.    But, in all fairness, if you had a problem delivering

12   the packages, the fact that you got the turn-by-turns

13   wouldn't help you in that instance, would it?

14         MS. ZERGER:  Objection.  Argumentative.

15         BY MR. JIH:  Q.  In other words, if you failed to

16   deliver all of your packages, the fact that you may have

17   elected to get the turn-by-turns wouldn't save you from the

18   service failure, would it?

19         MS. ZERGER:  Objection.  Argumentative.

20         THE WITNESS:  I would have to disagree with you

21   there, absolutely.

22         BY MR. JIH:  Q.  Really?  Why do you disagree?

23   A.    Well, I would say in certain cases that the mapping

24   software did help and the maps did help, and the person --

25   you know, whoever it may be, if you're talking about me

**8/18/2006  Henderson, Jerrett**

1    specifically, it's possible I might have been able to do the

2    route without them, but it's most likely that it would have

3    been a slower process.  And so I, in fact, did use them and I

4    did reference them from time to time on the route, and I

5    think it made the route go a little bit faster for me.  I

6    can't speak for other people.  But I would say that, you

7    know -- in my case, you know, you can't say that electing not

8    to take it would completely save me or using them would

9    completely save me.  I mean...

10   Q.    I actually meant something different with my question.

11   A.    Okay.

12   Q.    What I meant was, you know, let's say you did take the

13   turn-by-turn and you did use the turn-by-turn, but you still

14   had a service failure.

15   A.    Okay.

16   Q.    The management wasn't going to give you a break from

17   the service failure just because you paid for the

18   turn-by-turn, right?

19   A.    Right.  Yeah.  Oh, I see what you mean.  Yeah, that

20   was not related to that.

21   Q.    Because the management was just, look, if there's a

22   service failure, there's a service failure.  That's a

23   problem.

24   A.    I guess so, yeah.

25   Q.    Now, the turn-by-turns, you didn't always follow them,

**8/18/2006 Henderson, Jerrett**

1    right?  You sometimes referenced them, but you sometimes

2    chose your own way?

3    A.    I referenced them a lot unless they were incorrect and

4    I saw that they were incorrect.  Obviously, if, you know,

5    they told me to turn left and go two blocks, and I knew that

6    the place was to the right two blocks, no, I didn't follow

7    that and then went there.  If I knew the street dead-ended

8    into a levee, I wouldn't follow them.  I would go around,

9    but...

10    Q.    Did that ever happen, by the way?

11    A.    Yes, it did.

12    Q.    How often?

13    A.    Often enough to be annoying.

14    Q.    So even though you got the turn-by-turns you still had

15    to use your own judgment and experience with your work area

16    to figure out how best to service the route?

17    A.    I used my knowledge of, you know, the work area, over

18    time.  But because I was in a city route, then the mapping

19    stuff benefitted me, so I used it.

20    Q.    So you'd get the paperwork -- oh, the manifest.  Did

21    you have to have the manifest, have to take the manifest?

22    A.    To my knowledge, it was all part of the same -- it all

23    printed out so, I mean...

24    Q.    Were you required to do anything with the manifest?

25    A.    Well, before we had scanners, yeah, I think we used

**8/18/2006  Henderson, Jerrett**

1    the manifest for various things, signature or whatever it

2    was, but after -- I don't remember for sure if we had to

3    actually do anything with it.

4    Q.    Okay.

5    A.    I don't think so.  It just printed out with the other

6    turn-by-turns and stuff, so...

7    Q.    In general, what time did you typically leave the

8    terminal?

9    A.    Are you asking for time of day?

10   Q.    Yeah.

11   A.    Generally between 8:00, 8:30.  Between there.  Most of

12   the time it was by 8:00.

13   Q.    So when the 9:00 instruction came out, that didn't

14   really impact your day?

15   A.    Not so much, but there were days when the trailer was

16   late, you know.  There were other factors that impacted it,

17   you know.

18   Q.    Were the gates ever locked at the terminal to prevent

19   you from leaving when you wanted?

20   A.    Yes.

21   Q.    When did that happen?

22   A.    Specific dates I don't remember, but I do remember

23   that happened when Darrell was in the management position so

24   that's the best I can recall on that.

25   Q.    Do you remember how often it happened?

**8/18/2006  Henderson, Jerrett**

1    A.    I remember that there was a period of time that it

2    happened for a few weeks, maybe a little longer than that, so

3    it was more than just, you know, a day or two days.  It was

4    for a longer period of time than that consecutively, so...

5    Q.    Was that because Darrell and the team that Darrell had

6    was just having trouble with the sorts, or do you know why he

7    was doing that?

8    A.    I don't remember exactly why they did that.

9    Q.    Okay.  But on the days where the gates were locked,

10   do you remember if there were issues with the sorts?

11   A.    I don't remember if that's what it was.

12   Q.    So you have no recollection as to why Darrell would've

13   locked the gates?

14   A.    Yeah, I can't remember specifically why.

15   Q.    Did -- is it Peter Van Buskirk, or is his first name

16   Peter?

17   A.    I think that's right.

18   Q.    Okay.  Did he ever lock the gates when he was the

19   senior manager?

20   A.    I don't remember that happening when he was manager.

21   Q.    How about Pat McDonald?

22   A.    I don't remember that happening with him either.

23   Q.    Okay.  And how about Eric Smith?

24   A.    No.

25   Q.    So it was sort -- more of a Darrell thing?

**8/18/2006 Henderson, Jerrett**

1    A.    That was -- it happened when he was manager there.

2    Q.    And did Home Delivery management ever do anything

3    else, like holding scanners or things like that to prevent

4    you or others from leaving the terminal when you wanted?

5         MS. ZERGER:  Vague and ambiguous.

6         You can answer.

7         THE WITNESS:  I recall -- I recall a few different

8    circumstances where that happened where the manager, James in

9    particular, held scanners and wouldn't close the scanners out

10   or return the scanners to allow us to proceed on until --

11   anything from -- I think from a certain package that was

12   missing -- it didn't even have to be ours, or if we disagreed

13   with, you know, a package that was assigned to our route and

14   didn't have it on the vehicle, he wouldn't give us a

15   close-out until the package was put on the vehicle.

16         BY MR. JIH:  Q.  How often -- did that happen to

17   you?

18   A.    I think it -- I don't know if the missing package

19   thing happened to me.  I believe that the package being

20   assigned and not put on the van happened, yeah, a couple

21   times with me.

22   Q.    Okay.  And that with James Cumberland?

23   A.    Yeah, with James, right.

24   Q.    Did that ever happen with any of the other managers at

25   the terminal?

**8/18/2006 Henderson, Jerrett**

1    A.    Well, like I say, it happened a couple of times with

2    James and I don't remember if it was just one manager that

3    was there, senior manager, or if there was another senior

4    manager also.  I mean two different time periods with

5    different senior managers.  I don't recall.

6    Q.    Was there anything else -- was anything else ever done

7    to prevent you from leaving the terminal when you wanted?

8    A.    Right now I can't think of anything else to answer

9    that.

10   Q.    Did anyone at Home Delivery ever make you leave the

11   terminal before you wanted to?

12   A.    No, I don't remember that happening, no.

13   Q.    Did the management in Home Delivery ever -- did they

14   tell you what order to do your stops in?

15   A.    They -- again, going back to the same thing I've

16   stated before, is that they did say on more than one occasion

17   that if I couldn't get the packages delivered in any single

18   day, that if I wasn't following the manifest that they

19   provided, that I could be written up for that.

20   Q.    But if you didn't get all the packages delivered in a

21   certain day, and you were following the manifest, you would

22   still get written up, right?

23   A.    Sorry?

24        MS. ZERGER:  Argumentative.

25        BY MR. JIH:  Q.  Well, my question is -- you brought

**8/18/2006 Henderson, Jerrett**

1    in the fact if you weren't following the manifest.  My

2    question is if you didn't get all your packages delivered in

3    a day, you would get written up regardless of whether you

4    followed the manifest, right?

5    A.     Yeah, that for -- right, right.

6    Q.     So the focus is not so much on the manifest, but just

7    on getting all the packages delivered?

8          MS. ZERGER:  Objection.  Argumentative,

9    mischaracterizes the testimony.

10          THE WITNESS:  You asked if I was ever required to

11    follow the order of the manifest, and that goes back to the

12    same thing was I ever required to do stuff on the training

13    video and those instructions.

14          Well, they did not say, and they didn't use that

15    terminology that I was required to do it.  But, again, if I

16    failed and I was not using -- or not following the order

17    provided on the manifest, then I would be written up for

18    that.  So they -- that was something that they communicated

19    to me, something that they said on several occasions, that,

20    you know, we have this here for you to follow, you should be

21    following this, and if you don't follow it, then...

22          BY MR. JIH:  Q.  You may have a service failure.

23    A.     Whatever, you know.  Anything that comes up like a

24    service failure, or it could have been anything like not

25    being able to find the place or, you know, whatever.  It

**8/18/2006  Henderson, Jerrett**

1    didn't necessarily have to be a service failure; it could

2    have been whatever problem arised from it.  They would ask

3    that, were you following this?  And if you were not, then at

4    their discretion they could write you up for that.

5         MR. JIH:  I think we're about to switch tapes, so

6    why don't we do that.

7         THE VIDEOGRAPHER:  That's the end of Tape 4.  We're

8    off the record at 2:44 p.m.

9         (2:44 p.m., off the record)

10        (2:54 p.m., back on the record)

11        THE VIDEOGRAPHER:  This is the beginning of Tape 5.

12   We're back on the record at 2:54 p.m. in the matter of

13   Alexander, et al, versus FedEx Ground Package System, Inc.,

14   Case No. 3-05-MD-527-RM.

15        BY MR. JIH:  Q.  So during the day what would you do

16   if you could not find an address?

17        MS. ZERGER:  Objection.  Vague and ambiguous.

18        Are we talking about when he's driving?  Are we back

19   at some particular time?

20        MR. JIH:  I think we're still on a typical day.

21        MS. ZERGER:  Okay.

22        THE WITNESS:  Typical day, okay.

23        BY MR. JIH:  Q.  At FedEx Home Delivery.

24   A.   Usually I would look to see in there was a packing

25   slip to see if there's a difference in the address and also

**8/18/2006 Henderson, Jerrett**

```
 1      if there's a phone number on there.  Those two things.  If

 2      that turned up nothing, then I would check the phone book to

 3      see if that had a different address for the person, but other

 4      than that -- on an average day that's what I would do.

 5      Q.      Now, was that something you figured out on your own or

 6      did someone tell you to do that?

 7      A.      Managers told me to do that.  They actually told us

 8      that they wanted us to do more than that, but that was what,

 9      you know, I felt I could do in enough time versus what they

10      were, you know, telling us.

11      Q.      All right.  So the managers told you even more than

12      those three things on what you could do to find a wrong

13      address, but you just -- you weren't required to do those

14      things, right?

15      A.      They told us that they wanted us to not only do those

16      things, but to go to a neighbor on each side of the residence

17      and ask them, and -- you know, and if -- again, going back to

18      that same thing, they told us that if there was a problem of

19      you couldn't deliver and the customer called and we had not

20      done these things, we could be written up for them, so...

21      Q.      So they weren't checking to see if you were following

22      all of these procedures.  It was more if an issue came up,

23      they might ask you if you followed these procedures?

24      A.      If an issue came up, yes, they would ask if we

25      followed the instructions that they gave.
```

**8/18/2006 Henderson, Jerrett**

```
1     Q.     But if the package was delivered and there were no
2     issues, no one ever checked to see if you did these things,
3     right?
4     A.     Right.
5     Q.     What would you -- during the day -- did your van ever
6     break down during the day?
7     A.     On occasion it did, yes.
8     Q.     What would you do if your van broke down?
9     A.     Well, if the van broke down -- in my cases I would --
10    if there was an opportunity to rent another van and transfer
11    the packages and continue delivering that day, I would do
12    that.  If there wasn't an opportunity to do that, then I
13    would attempt to get the packages back home or back to the
14    Chico warehouse and rent a vehicle the next day if the van
15    was still out of service the next day.
16    Q.     How many times during your tenure at Home Delivery did
17    your van break down?
18    A.     I can't say for certain.  I recall at least twice,
19    maybe three times.
20    Q.     And when your van broke down, did anyone -- did the
21    Home Delivery -- anyone at the terminal help you with your
22    packages or help you with the rental, or just help you take
23    care of the problem?
24    A.     On one occasion I can remember that there wasn't an
25    opportunity, it was either late in the day or there were no
```

**8/18/2006  Henderson, Jerrett**

1    rentals available, so I believe one of the managers, James,

2    came down came and picked up the packages to take back to the

3    warehouse, but as far as helping to deliver them, no.

4    Q.      And did that count as a service failure that day?

5    A.      I believe it did, yes.

6    Q.      But on the times when your van broke down, did anyone

7    from the terminal help you get another vehicle or help you --

8    you know, pick you up or do anything like that to help you

9    with the van?

10   A.      Yeah, I don't recall that that ever happened and that

11   they picked me up or anything like that.

12   Q.      So if your van broke down, then, it was sort of -- it

13   was just something you had to figure out in terms of what to

14   do?

15   A.      Well, I mean renting the vehicle and delivering the

16   packages is what the managers told us they wanted us to do,

17   and every situation is to do that.  You know, circumstances,

18   like I said, late in the day, there being no vehicle

19   available to rent, you know, no way to get to the rental

20   place to sign for it, you know -- but as far as what we were

21   supposed to do, that's what managers told us we were supposed

22   to do if our vehicle broke down.

23   Q.      But how to get it done, though, was sort of up to you

24   to figure out?

25   A.      I guess, sure.

**8/18/2006  Henderson, Jerrett**

1    Q.      During the day, during a typical day, did you ever

2    take breaks or eat lunch?

3    A.      Normally, no.

4    Q.      Did anyone say you could not take a break or eat

5    lunch?

6    A.      They did not, no, but the amount of packages that were

7    assigned to us, most of the time, we were not able to take a

8    lunch or break.

9    Q.      Just because of the volume of packages?

10   A.      Right.

11   Q.      Well, how about at the beginning when there weren't as

12   many packages; did you ever take breaks or eat lunch?

13   A.      I believe so, yeah.

14   Q.      And did anyone tell you how many breaks you could take

15   or how long you could take for lunch?

16   A.      I don't recall specifically them talking about that.

17   Q.      So it was sort of up to you in terms of how you

18   managed your day when there were fewer packages?

19   A.      Fewer packages, I think at that time they were just

20   telling us to deliver the packages for that day and, you

21   know, that was all that was communicated to us.

22   Q.      So as long as you got the packages delivered, that's

23   all they cared about?

24   A.      At that time, as far as I know.

25   Q.      At what point in time -- I'll take that back.

**8/18/2006  Henderson, Jerrett**

```
1            Well, I guess at the beginning when there were fewer

2       packages you were able to take lunch and take breaks.  Do you

3       remember at what point in time it became -- the volume became

4       so great that you weren't able to take breaks anymore, when

5       that happened?

6       A.    No, I can't pinpoint that time.  There were so many

7       variations to the route and areas that were, you know, both

8       flexed on and, you know, added in, that I just can't pinpoint

9       when that occurred.

10      Q.    Well, do you remember how many -- was there sort of

11      like a magic number in the sense of once you had over this

12      number of packages it became very difficult for you to take

13      breaks and have lunch?

14      A.    No.  Like I said, a lot of it had to do with the route

15      itself and the packages combined and the amount that came in.

16      It was a day-to-day thing and so it was hard for me to

17      pinpoint when that happened.

18      Q.    At any time you were a contractor with FedEx Home

19      Delivery, did you ever conduct any personal business like

20      errands or going to the doctor during the workday?

21      A.    I don't recall anything specific like that.  There

22      were -- you know, on the occasions that there were days that

23      I, you know, did stop for, you know, lunch or for, you know,

24      drive-thru, a burger or whatever, there was a store there, I

25      might have gotten a few things, you know.
```

**8/18/2006 Henderson, Jerrett**

1    Q.    So is it fair to say though that at the beginning when

2    the package volume was smaller, there was more time during

3    the day for you to run errands or do things, personal

4    business if you had to?

5    A.    There was just -- I mean you could say that because

6    there was less packages, the day was -- I mean the route was

7    finished earlier, earlier in the day than normal.

8    Q.    But the route could either be finished earlier or you

9    could also run -- conduct some personal business during the

10   day as well, right?  You had that choice?

11        MS. ZERGER:  Objection.  Mischaracterizes the

12   testimony.  Argumentative.

13        THE WITNESS:  That was something that didn't occur

14   to me, didn't -- I didn't do.  I mean, I -- you know, I

15   generally tried to deliver the route until it was done and

16   then...

17        BY MR. JIH:  Q.  Did anyone ever tell you that you

18   couldn't conduct any personal business during the day?

19   A.    I don't recall that they told me that I couldn't

20   conduct personal business other than they didn't -- they

21   didn't want you to drive around doing things with the FedEx

22   van and the logo and in the uniform, so you'd have to be --

23   you'd have to define more than just, like I said, stopping

24   for lunch and running into the store to grab a couple items

25   that you might be missing at home versus doing personal

**8/18/2006  Henderson, Jerrett**

1    errands and business throughout the day in uniform and in the

2    vehicle.

3    Q.    Sort of as a FedEx Home Delivery person?

4    A.    Right, because that absolutely we were told that they

5    didn't want us to do.

6    Q.    So basically when you were in uniform and sort of

7    driving around with a logo vehicle, you were told that that

8    was supposed to be when you were doing FedEx Home Delivery

9    business, right?

10    A.    Right, and we were told to cover up any logos for any

11    time that was personal, not in uniform.

12    Q.    But it was your understanding that you could use the

13    vehicle for other purposes as long as you covered up the

14    logo?

15    A.    As long as -- yeah, as long as we were able to cover

16    up the logo and were not in uniform doing it.

17    Q.    Did you ever do that?  Did you ever use the vehicle

18    and cover up the logo?

19    A.    At one point for a while we had magnets, and the

20    magnets were fairly easy to take off the side and to use the

21    vehicle, but there was a point where they required us to put

22    decals, FedEx decals across the vehicle that you couldn't

23    remove or cover up.  I don't think there's anything that big

24    to cover up those magnets, so -- or the decals, so I didn't

25    use it after that.

**8/18/2006  Henderson, Jerrett**

1    Q.    When were the magnets replaced with decals?

2    A.    The best I can remember was sometime in '03, I think.

3    Q.    So before 2003 did you ever use the vehicle and just

4    take the magnets off of them for other purposes?

5    A.    I did on occasion, yes, take the magnets off.

6    Q.    And what would you use the vehicle for?

7    A.    I don't recall specifically.  It could be, you know,

8    anything just from going to the store, going to get gas,

9    obviously, you know.

10   Q.    Transport things or --

11   A.    No, I don't think I transported stuff in them.

12   Q.    But you did use the vehicles for other purposes but

13   you just took the magnets off?

14   A.    Right.

15   Q.    Now, after it was changed to decals, did anyone at the

16   terminal ever explain how people could cover up the decals?

17   A.    No one ever talked about that.

18   Q.    So you don't know if they had magnets that could cover

19   up the decals?

20   A.    I don't know, like I said, of anything that size that

21   could cover up decals that, I mean, you'd want to, you know,

22   spend all that time doing that, but...

23   Q.    Well, did you ever ask anyone how you could cover up

24   the decal?

25   A.    No.

**8/18/2006  Henderson, Jerrett**

1    Q.    So you just didn't --

2    A.    I just didn't drive it.

3    Q.    So there wasn't an instance where you wanted to drive

4    it, went and talked to someone at the terminal, and they just

5    said no, we're not going to tell you how to cover up the

6    decal?

7          MS. ZERGER:  Objection.  Mischaracterization of the

8    testimony.

9          BY MR. JIH:  Q.  Just didn't come up?

10   A.    That example didn't happen.

11   Q.    At the end of the day -- well, when did your day

12   typically end?  Well, that might depend on the time.  So why

13   don't we start at the beginning before the route got busier.

14   What time did your day usually end?

15   A.    Okay.  Are you talking a time period in years?  What

16   time period?  Because you made the statement "before the

17   route got busy," so...

18   Q.    Okay.  Let's start within the first year.

19   A.    Within the first year, okay.

20   Q.    What time did you typically end each day?

21   A.    Again, the best I can remember, I would guess maybe

22   around 3:00 o'clock.  Maybe a little earlier.  I don't know.

23   Q.    Oh, so maybe even earlier than three?

24   A.    Possibly, yeah.  Like I say, it depends really -- I

25   mean we started out with, like I said, 20 to 30 packages, you

**8/18/2006  Henderson, Jerrett**

1     know.  In a short time that grew to more.  And, you know,

2     just depending on the stops and where they were, I mean -- I

3     was in both Yuba City and Marysville and Beale Air Force Base

4     area myself at that time, so just the miles itself could

5     extend the day.

6     Q.     So at that period of time -- well, I guess at some

7     point in time though then the volume got greater and so you

8     had to work longer days?

9     A.     Right.

10    Q.     And -- you know, so towards 2003-2004, when did your

11    day typically end?

12    A.     Average, I'd say 5:30, 6:00 o'clock.

13    Q.     What was the latest you would work?

14    A.     The latest I remember working is nine I think at one

15    time.

16    Q.     Did anyone at FedEx Home Delivery ever tell you you

17    had to stop working at a certain time?

18    A.     I had to stop working?

19    Q.     Correct.

20    A.     No, I don't recall them saying I had to stop working

21    at any time.

22    Q.     So you could have worked past 6:00 o'clock if you

23    wanted to?

24    A.     I guess so.

25    Q.     Now, in the earlier period when it was just 20 or 30

**8/18/2006 Henderson, Jerrett**

1    packages and there wasn't the issue with the package volume,

2    during that period -- how long would you say that period

3    lasted?  From 2001 to...

4    A.    Where I had a shortened day?

5    Q.    Or just -- yeah, before there were package volume

6    issues.

7    A.    Well, obviously, there was package volume issues

8    towards the end of that first year and into the beginning of

9    the second because that's when I brought up the issue about

10   the second route and splitting them, so it would be near that

11   time frame.

12   Q.    In the early period then before package volume became

13   an issue, do you believe that the FedEx Home Delivery

14   management treated you unfairly in any way?

15   A.    Well, I think I've said that there were, you know,

16   flex issues that I didn't agree with and that I felt were

17   misrepresented, and I -- like I said, I wasn't the only

18   person who felt that way.  There were other drivers that

19   expressed that right there, you know, in the warehouse in

20   front of me.  So I think in the beginning that was probably

21   one of the main issues.

22   Q.    Anything else in the early period?

23   A.    I'm trying to think in the early period.  I just don't

24   remember any of the other issues coming up at that time.

25   Q.    At the end of a typical day would you go back to the

**8/18/2006 Henderson, Jerrett**

1    Home Delivery terminal or what would you do?

2    A.     At the end of the day I would go to my house, and then

3    we had the upload system there.

4    Q.     For the scanner?

5    A.     For the scanner.  You plug the scanner in and uploaded

6    the information through the phone line, so...

7    Q.     Okay.  So you weren't required to go back to the

8    terminal at the end of the day?

9    A.     No, huh-uh.

10   Q.     So after you left -- typically I think you said you

11   left the terminal by 8:00 or 8:30 in the morning, right?

12   A.     Right.

13   Q.     Would you ever return to the terminal after 8:00 or

14   8:30 in the morning, after you left?

15   A.     Generally, no.  I mean my route was approximately,

16   what, 45 miles away from the terminal, and generally my first

17   stop was somewhere in that area, within 10 miles.  So no, I

18   generally didn't come all the way back to the terminal

19   throughout the day.

20   Q.     And no one asked you to?

21   A.     Let's see.  There were a few occasions where the

22   managers did ask me to come back to the terminal if there

23   were packages that they had found that they wanted -- in

24   other words, there may have been a package that was put

25   somewhere, and they didn't know about it, but they discovered

**8/18/2006  Henderson, Jerrett**

1    it and wanted it delivered, said that it had to be delivered

2    that day or whatever.  So, yeah, then they would call and

3    want me to come back to get it and deliver it.

4    Q.    And would you always come back?

5    A.    I did -- I think I did once or twice, but not every

6    time, no.

7    Q.    Were you required to come back, or was it sort of up

8    to you if you wanted to come back?

9    A.    They said that if I didn't come back and get it that

10   it would be counted as a service failure.

11   Q.    Would it be counted as your service failure or the

12   terminal's service failure?

13   A.    Mine.

14   Q.    Your service failure?

15   A.    Yes.

16   Q.    Did they say why?

17   A.    Because I refused.

18   Q.    Who said that?

19   A.    James.

20   Q.    When did he say that?

21   A.    I can't give you specific dates.

22   Q.    How often did he say that, or how often did this

23   happen?

24   A.    It probably happened maybe, I don't know, six or seven

25   times, right in that area.

**8/18/2006  Henderson, Jerrett**

1    Q.     Over four years?

2    A.     Yeah, probably over the four years, yeah.

3    Q.     In Home Delivery are you responsible for any pickups?

4    A.     On occasion.  That doesn't happen very often.

5    Q.     Okay.  How often?

6    A.     It was more often towards the end of '03 and into '04,

7    but I would say on average maybe once a month.

8    Q.     Oh, okay.  And would those pickups be sort of like

9    call-tag pickups?

10   A.     Call-tag pickups, yes.

11   Q.     And would they usually be for a certain time or was it

12   just that day?

13   A.     Most of the time it was just that day.

14   Q.     So it didn't matter if you went early in the day or

15   later in the day?

16   A.     Most of the time, no, it didn't.

17   Q.     Did it ever matter?  I mean were there any call tags

18   that were for a specific time?

19   A.     It seems like there might have been one or two, but,

20   like I say, generally with the call tags it wasn't specific

21   to a time, and the only example I could give for that would

22   maybe be a business that had a call tag.  Obviously, if they

23   closed at a certain time, that would be a time frame.

24   Q.     Oh, just before they closed shop?

25   A.     Right, right.

**8/18/2006  Henderson, Jerrett**

1    Q.      But there wasn't anything like you have to pick this

2    up at 2:00 o'clock?

3    A.      For our call tags, I don't remember there being a time

4    frame on the call tags.

5    Q.      So just basically during the business hours of that

6    day at best?

7    A.      I think so.

8    Q.      So you said when you were done with the day, you

9    returned home, you had to just upload information from the

10   scanner to the computer system, right?

11   A.      Right.

12   Q.      What did that involve?  What did you have to do?

13   A.      I think it -- I can't remember all the things we had

14   to put in there.  I think you just put in the ending day and

15   miles and if there were any packages that were -- in other

16   words, made sure all the packages were scanned so that, I

17   guess, you know, it came up with a small list if there were

18   any packages that needed to be scanned and coded with

19   whatever code, you know, and then that was it.  And then you,

20   you know, selected the upload option and it went through the

21   phone system, so...

22   Q.      Okay.  And was there just a cradle or something; you

23   just put it in there?

24   A.      Yeah, a cradle I think so, yeah -- or a cable.

25   Q.      A cable.  And after you did that, was there anything

**8/18/2006  Henderson, Jerrett**

1    else you had to do on a daily basis?

2    A.    I don't think so, no.

3    Q.    On an average day, how many times -- and so at some

4    point you leave the terminal and then you're on the road.  On

5    an average day how many times do you speak to a Home Delivery

6    employee while you're on the road?

7    A.    On an average, I guess I might -- it really depends.

8    On average, maybe twice, and it would be most -- most of the

9    time it would be the managers, but some days there wouldn't

10    be any -- you know, I wouldn't speak to them at all and other

11    days I would speak to them five or six times throughout the

12    day.  It just -- it varied by day so it's hard to say.

13    Q.    Now, would they usually -- would someone from the Home

14    Delivery terminal call you usually, or was it something --

15    you're calling them for something?

16    A.    A lot of times it was the manager from the Home

17    Delivery calling me.

18    Q.    All right.

19    A.    But there were occasions, like I gave an example

20    before, as far as maybe delivering a package and calling a

21    manager to describe the area to deliver that package to and

22    driver release.

23    Q.    Typically, why would you receive calls from the

24    terminal?

25    A.    A lot of times it was for a customer that I had made

8/18/2006  Henderson, Jerrett

1    an attempt earlier in the day and they were not home and they

2    wanted me to make another attempt, and so the manager would

3    call me and tell me to make another attempt because the

4    customer called.

5    Q.    Any other reason?

6    A.    You know, getting out, you know, and maybe not

7    necessarily all the way down to my delivery area, but a good

8    portion of the way and calling me to have me come back to get

9    a package that they found that they discovered was hidden

10   somewhere.

11   Q.    Or was missed for some reason?

12   A.    Missed for some reason, yeah, that they just didn't

13   get.  And those were the two big ones that I can remember off

14   the top of my head, big reasons.

15   Q.    How would they reach you?  They would call you on your

16   phone or something?

17   A.    Cell phone, yes.

18   Q.    Were you required to have a cell phone?

19   A.    No, I was not required.  That's another thing that

20   they brought up to us and told us that they wanted us to have

21   a cell phone to get in contact.  Again, they described a

22   situation like I just described where if a customer called in

23   and wanted something, you know, another attempt or a

24   neighbor's house and they didn't have any way to contact us,

25   if we didn't do that delivery, then it would be considered a

**8/18/2006  Henderson, Jerrett**

1    failure because we didn't have the cell phone for them to

2    contact us.

3    Q.     So they explained that having a cell phone might help

4    avoid either issues with customers or service failures?

5    A.     And would -- well, yeah, would also result in a

6    service failure if they weren't able to contact me.

7    Q.     But even if they did contact you and you didn't

8    deliver the package, there could still be a service failure,

9    right?

10   A.     That's true too, yes.

11   Q.     So it was just the cell phone was a way to help avoid

12   or deal with potential service failures?

13   A.     That was what they said they wanted us to have to be

14   able to...

15   Q.     Who had to pay for the cell phone?

16   A.     I did.

17   Q.     Did anyone tell you what cell phone you had to get?

18   A.     No.

19   Q.     Did anyone tell you what service plan or tell you

20   anything about what kind of cell phone?

21   A.     No, they didn't.

22   Q.     Did you already have a cell phone?

23   A.     No, I didn't.

24   Q.     So you just went out and selected a cell phone?

25   A.     I went out and got one, yeah, after they told us to.

**8/18/2006  Henderson, Jerrett**

1    Q.      And you made the decision of which one to get and what

2    plan to get?

3    A.      Yeah, I just went out and got a cell phone.

4    Q.      When you first contracted with FedEx Home Delivery,

5    you had to make the decision as to what vehicle to use,

6    right?

7    A.      Not necessarily, no.

8    Q.      Well, you needed a vehicle?

9    A.      Right.

10   Q.      And you were required to furnish the vehicle?

11   A.      Right.

12   Q.      What vehicle did you get?

13   A.      I got a Chevy cargo van, white, and it was -- I think

14   it's a 1500.  Again, this was the van that I was told to get.

15   They needed it to be within certain specifications and

16   they -- I did originally ask to get a Ford van and had one

17   picked out, and they said that they wanted me to get a Chevy

18   instead because that's what they normally work with, so

19   that's what I got.

20   Q.      Well, did they say that the Ford van was not within

21   specifications?

22   A.      They said that the Ford van would not be approved.

23   Q.      Did they say why?

24   A.      They didn't -- no, they didn't go into it, other than

25   the fact that I just said, that they said they normally

**8/18/2006 Henderson, Jerrett**

1    worked with Chevys and they want all of their vans to be

2    Chevys, so that's what they told me to go get.

3    Q.    Do you know what other vans or trucks other

4    contractors in the terminal drove?

5         MS. ZERGER:  Objection.  Calls for speculation, lack

6    of personal knowledge.

7         BY MR. JIH:  Q.  I mean you could see other trucks

8    and vans, right?

9    A.    At the time that we started I believe that they were

10   all similar to the Chevy that I drove with, you know -- might

11   have been a 2500 instead of a 1500, but they all looked

12   similar.

13   Q.    But do you remember if they were all Chevys?

14   A.    Yeah.

15   Q.    And as time went on did people start using different

16   kinds of trucks or vans?

17   A.    No.  To my knowledge, no.

18   Q.    So when you left, it was still all Chevys?

19   A.    Yeah, as far as I know.

20   Q.    You said that there were certain specifications that

21   the van had to fall within.  Do you remember what those

22   specifications were when you started?

23   A.    No, I remember that the -- whoever it was, I guess it

24   was Pete or whatever, pointed out a sheet that had a picture

25   of a van on it and, you know, a lot of the specs on there.

**8/18/2006  Henderson, Jerrett**

1    The point really was to say, when they were saying they

2    didn't want the Ford van, and it was kind of like we need

3    these specifications, and we're used to using Chevy.  So it

4    wasn't like they handed it to me or gave it to me to look

5    over, but that was -- so, no, I don't know what those exact

6    specifications were, but...

7    Q.    So you don't know if there were other -- first of all,

8    do you know if the Ford van met the specifications?

9    A.    I don't know for sure specifically what they were.  I

10   just remember them, you know, pointing out that sheet and

11   telling me to get Chevy.

12   Q.    And do you remember -- do you remember considering any

13   other vans that -- or proposing other vans beyond the Ford

14   van that they said no to?

15   A.    No, that was just the first van that I went out and

16   found, and that was the first thing that they said, and so I

17   went with what they told me to go get and that was the one

18   that I ended up driving, so...

19   Q.    Now, you said some of the contractors had a 2500 and

20   some had a 1500?

21   A.    I think so, yeah.

22   Q.    Why did you choose a 1500 instead of a 2500?

23   A.    It was just the -- at that time I really didn't make

24   the distinction or, you know, go looking for a difference.  I

25   just, you know, "that white Chevy cargo van there," you know.

**8/18/2006  Henderson, Jerrett**

1    Q.    Well, did anyone tell you you had to get a 1500 as

2    opposed to a 2500?

3    A.    No, I don't think that they made that remark and,

4    obviously, you know, like I said, it looked to me like there

5    was, you know, a slight difference in size, but for the most

6    part they were the same van so I didn't imagine they would be

7    approved if there was some sort of problem with it.

8    Q.    But did you -- at that time did you know what the

9    difference was between the 2500 and the 1500?

10   A.    I didn't really think about it.  No, I mean -- you

11   know, I assumed it was just the weight, the tonage, I guess,

12   or the quarter-ton, I don't even know, because I'm not a car

13   person so I, you know -- it didn't look like it was that much

14   of a difference between the two, so...

15   Q.    I'm not a car person either, but is it your

16   understanding that a 2500 is a larger van than a 1500?

17   A.    Like I said, it didn't look larger.

18   Q.    So you don't know?

19   A.    I don't know for sure.

20   Q.    So even as of today, you don't know what the

21   differences are between a 2500 and a 1500?

22   A.    As of today I think it's probably the amount of weight

23   it can -- it's supposed to carry, but that's what I think as

24   of today.

25   Q.    Now, I've seen references to something called a 350

**8/18/2006  Henderson, Jerrett**

1    van.  Do you know what that is?

2    A.      I think that those were referring to the vans that had

3    a box on the back of it for carrying space.

4    Q.      Uh-huh.

5    A.      So, yeah, the terms of 350, 450, 550, it just, you

6    know, again same type of appearance with the box on the back

7    of the truck and the big doors that open in the back, but

8    whether or not it means that they're bigger inside or just

9    more weight that they can hold, I'm not positive on that,

10   but...

11   Q.      But did you ever consider purchasing a 350, 450 or a

12   550 van?

13   A.      Only at the very end when I had the discussion with

14   Pat about it.

15   Q.      Why didn't you consider those options at the

16   beginning?

17   A.      Because those were the vans that they were talking

18   about to us.  And, like I said, you know, the Chevy that they

19   were talking to us about, that's what I went and got, is what

20   was described to me, and so that's what they, you know -- and

21   the other contractors again got the same type of vehicle

22   because that's what was described to them, so I didn't even

23   think about getting these other ones.

24   Q.      Now, were the 350, 450 and 550 vans Chevys also?

25   A.      I'm pretty sure they were, yes.

**8/18/2006  Henderson, Jerrett**

1    Q.    And no one ever told you you couldn't get a 350, 450

2    or 550 van, right?

3    A.    No, I don't think that that came up, again because it

4    just wasn't brought to our attention so I wasn't even sure

5    about those -- didn't even think -- you know, come up.

6    Didn't even think about it.

7    Q.    But did anyone ever say you can't look at other Chevy

8    models or other types of vans that might meet specifications?

9         MS. ZERGER:  Asked and answered.

10        THE WITNESS:  Yeah, I mean I'm just going back to --

11   I mean, you know, the answer to that, no, they did not say

12   that, but again this is the van that they pointed out and

13   suggested and that's the van we all showed up with.

14        BY MR. JIH:  Q.  So they had made a suggestion as to

15   this van might be a good idea, and after they said you

16   couldn't get the Ford you just went with that suggestion?

17        MS. ZERGER:  Objection.  Mischaracterization of the

18   testimony.

19        THE WITNESS:  Yeah.  You know, again, what I'm

20   saying is this is what -- you know, they declined the Ford

21   van.  They said that this is the van that they would approve,

22   and that's the ones that we went to get.

23        BY MR. JIH:  Q.  But they never said they wouldn't

24   approve other vans other than the Ford one you had brought to

25   their attention?

**8/18/2006  Henderson, Jerrett**

1    A.    That didn't come up in the conversation.

2    Q.    What's a P-500 step van?

3    A.    Again, I believe that it's the ones that are -- you

4    normally associate with the really long insides and the

5    sliding door to the side, and I don't know how else to

6    describe it.  They're really big trucks.

7    Q.    Who told you that you -- that the Ford van would not

8    be approved that you had proposed?

9    A.    I'm going to say it was Pete Van Buskirk.

10   Q.    And do you recall -- do you recall specifically what

11   Pete said about why it would not be approved?

12   A.    No, other than the fact that they had, like I said,

13   certain specifications that he pointed out on the sheet and

14   that they wanted us to get Chevys.  That's really as far into

15   it as they went, and I didn't stand there and argue with him

16   about it, so..

17   Q.    But did Pete ever say they would not approve anything

18   that wasn't a Chevy?

19   A.    I think you've already asked that question, and the

20   answer was no because we didn't get into the discussion any

21   further.  It was -- I didn't argue with him about what he

22   said to me, so...

23   Q.    Did you ever think about changing, upgrading or

24   replacing your vehicle?

25   A.    Only at that time that I had the discussion with Pat.

**8/18/2006  Henderson, Jerrett**

1    Q.    And that was in what year?

2    A.    '03.

3    Q.    Why didn't you think about changing or upgrading the

4    vehicle before then?

5            MS. ZERGER:  Objection.  Speculation.

6            You can answer.

7            THE WITNESS:  I think I had talked about this

8    before, that at the time I had just recently got a brand new

9    vehicle, and it was still in the early part of the loan.  It

10   was still a new vehicle.  I could not afford to get a second

11   vehicle with no additional income to support that, and there

12   was -- I just didn't even think about it.

13           BY MR. JIH:  Q.  So at some point you got your

14   second route, the route was split.

15   A.    Right.

16   Q.    And then you needed to get a van for the second route,

17   correct?

18   A.    Correct.

19   Q.    And what type of van did you get for the second route?

20   A.    I got the same exact van for the second route.

21   Q.    And at that point the package volume was starting to

22   go up, right?  In fact, that was the reason you split the

23   route?

24   A.    Right.

25   Q.    Why didn't you get a larger vehicle for the second

**8/18/2006  Henderson, Jerrett**

1    route?

2    A.    Because this is the van that was still being discussed

3    with managers, the vans that they were, you know, telling

4    people to get, and the Chevy vans just like this one is the

5    ones that they would approve, and so that hadn't changed at

6    that time.  That's the one that I went out and got.

7    Q.    Do you remember actual discussions on that issue when

8    you got the second van or you just assumed things hadn't

9    changed?

10   A.    At the time I remember when they said, "Okay, you're

11   approved for a second route," and I believe that I said

12   something to the effect that, you know, "I'll just go get

13   another one just like this and it will be approved," and he

14   said, "Yes, that's the ones that we," you know, "don't have a

15   problem with.  It meets all of our specifications and

16   requirements."  So that really -- again, there was no

17   discussion further than that.

18          It was, "Is this okay with you?"

19          "Yes, this is what we will approve."

20          "I'll go out and get another one as soon as possible."

21   Q.    But they never said that was the only vehicle they

22   would approve?

23   A.    Again, same answer as before.  It didn't come up in

24   the discussion because there was no need to further discuss

25   or argue about.

8/18/2006  Henderson, Jerrett

1   Q.    So is it fair to say then you didn't consider, even

2   think about getting a larger van or vehicle?

3        MS. ZERGER:  Objection.  Mischaracterization of the

4   testimony.

5        You can answer.

6        THE WITNESS:  That was the only one that I thought

7   was necessary.  I mean I just -- it was the exact same one,

8   so I knew that it would be approved and that there wouldn't

9   be any problems, so...

10       BY MR. JIH:  Q.  But that answer doesn't actually

11  answer my question, which as I understand that's the only one

12  that you thought was necessary.  My question is did you even

13  think about potentially going with a larger vehicle?  You may

14  have thought it was unnecessary, but my question is did you

15  even think about it.

16  A.    No.  I said at that time it didn't come up in my mind

17  just like previously before, because that was again the one

18  that they, you know, presented and talked about with us so,

19  you know...

20  Q.    Did you ever purchase a third vehicle or is it just

21  the two?

22  A.    Just the two.

23  Q.    Just the two, okay.  So when you had a supplemental,

24  then, who got that vehicle, or was it the supplemental's

25  vehicle?

**8/18/2006  Henderson, Jerrett**

1    A.        That was a -- it was a rental, so -- yeah.

2              MR. JIH:  I want to show you another document.  I'm

3    going to mark it as Henderson Exhibit 2.

4              (Exhibit No. 2 was marked for identification)

5              BY MR. JIH:  Q.  And this is Bates numbered

6    PCA0004439.

7    A.        Uh-huh.

8    Q.        Do you recognize this document?

9    A.        Yeah, it looks a little familiar.

10   Q.        I mean is this a document that came from you or do you

11   just sort of -- was this a document that came from you, your

12   files?

13   A.        It's possible.  I don't remember all -- every document

14   that came from my files, but it's possible.

15   Q.        Okay.  And what is this document?

16   A.        It looks to be -- yeah, it was an incentive to

17   purchase one of these vehicles.

18   Q.        And is this an incentive from Stearns Bank or was it

19   an incentive from Home Delivery?

20   A.        I think it was -- it looks like it was probably from

21   Stearns Bank.  Home Delivery posted it up on the boards for

22   us to see.

23   Q.        So sometimes Home Delivery might get offers from banks

24   or certain other vendors and just post them up so people

25   would know about it?

**8/18/2006  Henderson, Jerrett**

1    A.    Yeah, I think so, and I think Stearns is one that they

2    worked with a lot, so probably saw a few of the Stearns ads.

3    Q.    Do you remember how you got this particular document?

4    A.    No, I really don't.

5    Q.    Do you know whose handwriting this is on the document?

6    A.    No, I don't.  You know, at that time I think in that

7    second year was when Darrell worked there.  It's possible

8    that's his writing, handwriting, but it certainly doesn't

9    look like mine.

10   Q.    Is it possible that it's also -- someone from Stearns

11   Bank wrote on it, too?

12   A.    I guess so.  I have no idea.

13   Q.    So do you remember any discussions with anyone from

14   Home Delivery about this document?

15   A.    You know, it's vaguely familiar because, like I said,

16   there was a few of these documents that came through that

17   they put up on the bulletin boards.  So, I mean yeah, it

18   looks vaguely familiar.

19   Q.    But do you remember any discussions about it with

20   anyone from Home Delivery?

21   A.    Not specifically.

22   Q.    And you recall that there were many different things

23   that might come along, some from Stearns Bank, some from

24   other people?

25   A.    I can't personally recall anything from other people,

**8/18/2006  Henderson, Jerrett**

1    but I do remember, like I said, that Stearns Bank was one

2    that they talked about on more than one occasion and put

3    these things up on more than one occasion, so...

4    Q.     Okay.  Did you ever finance a vehicle through Stearns

5    Bank?

6    A.     No, I didn't.

7    Q.     So you weren't required to finance vehicles through

8    Stearns Bank, right?

9    A.     No, huh-uh.

10   Q.     So you didn't understand a document like this to be an

11   instruction that you had to do; it was more like an offer if

12   you were interested?

13   A.     Yeah, I think so.  I don't think that it was ever, at

14   least pressed on me to go with Stearns Bank, but...

15   Q.     How did you finance your first vehicle?

16   A.     That was the Sierra Central Bank that I got a loan

17   through them.

18   Q.     How did you finance your second vehicle?

19   A.     I believe the same thing.

20   Q.     Did Home Delivery management ever recommend other

21   companies that could help finance vehicles?

22   A.     Yes, they did.  Stearns Bank.

23   Q.     Okay.  And that was the only recommendation?

24   A.     The only one off the top of my head.  There may have

25   been others, but -- yeah.  This is, I guess, the one that

**8/18/2006  Henderson, Jerrett**

1    stands out.

2    Q.    Okay.  Now, we talked about your supplemental and how

3    you had to rent a vehicle.  How many vehicles -- well, let me

4    break it up.  How long did you have to rent the vehicle for

5    for the supplemental?

6    A.    They didn't have -- the rental company didn't have any

7    sort of requirement or anything like that, but in this

8    conversation that I had, when I told Pat McDonald that I

9    would be willing to run this supplemental through the end of

10   the year, well, I in turn, also told the rental agency that I

11   would need this van through the end of the year, so that I

12   wouldn't, you know -- if I was returning it, it would be only

13   on a weekend or something to that effect.

14   Q.    So you told the rental agency that it would be a

15   longer term rental?

16   A.    Yeah, it would be a longer period of time, right.

17   Q.    And which rental agency was that?

18   A.    Enterprise.

19   Q.    Did you consider any other rental agencies?

20   A.    Not really.  That was the one that we had always been

21   using throughout the time that I worked there so I didn't see

22   any reason.

23   Q.    You were happy with what they were doing and you just

24   went with them?

25   A.    Yeah, that was pretty much...

**8/18/2006 Henderson, Jerrett**

1    Q.    No one said you couldn't consider another rental

2    agency, right?

3    A.    No -- no, they didn't say that.

4    Q.    And no one said you had to go with Enterprise?

5    A.    No, they didn't say that.

6    Q.    And when you -- and you dealt with Enterprise

7    directly, right?  That didn't go through someone at the

8    terminal?

9    A.    Some and some not.

10   Q.    What do you mean?  Well, first, let's start with the

11   supplemental one, the longer term rental.  Is that something

12   you dealt with Enterprise directly?

13   A.    Well, that was -- yes, that particular time, yes, I

14   did.

15   Q.    And what other times did you have to rent vehicles

16   from Enterprise?

17   A.    There were just other times, like we said before, with

18   breakdowns, things like that where I would rent from them.

19   Q.    And it was always Enterprise?

20   A.    Not always.  It was also Budget was another one that

21   was, you know, working with Home Delivery.  So, yeah, both of

22   those, but mostly Enterprise.

23   Q.    So Enterprise and Budget, they both had just worked

24   with Home Delivery people before so they sort of had vans

25   ready or they knew what kinds of vans to use?

**8/18/2006  Henderson, Jerrett**

1            MS. ZERGER:  Objection.  Speculation, lack of

2    personal knowledge.

3            THE WITNESS:  Yeah, I mean...

4            BY MR. JIH:  Q.  That was your understanding?

5    A.    That was my understanding, yeah, that it was...

6    Q.    And then you said sometimes you would go through the

7    terminal to rent the vehicle.  What did you mean by that?

8    A.    Well, there were occasions when, you know, James would

9    call over to Enterprise and -- because I guess the -- there

10   was supposed to be a driver rate that they had there, so...

11   Q.    Okay.  So just sort of he would call over to make sure

12   that you would get the driver rate?

13   A.    I think that's what a lot of it was, yeah.

14   Q.    So it wasn't like you were required to go through

15   James?

16   A.    No, it was not for that, yeah.

17   Q.    It was just so you could get the right rate?

18   A.    Right.

19   Q.    The preferred rate?

20   A.    Right.

21   Q.    Have you ever heard of Bush Leasing?

22   A.    That kind of sounds familiar in the same way that

23   Stearns sounds familiar.

24   Q.    Okay.  Do you remember anyone ever saying you have to

25   use Bush Leasing or anything like that?

**8/18/2006 Henderson, Jerrett**

1   A.      I don't know for sure.  If I knew, you know, a little

2   bit more in detail about Bush or what it was exactly, I might

3   be able to answer that better.

4   Q.      But sitting here today you don't remember anything

5   like that happening?

6   A.      I don't recall, yeah.

7   Q.      In fact, you didn't use Bush Leasing so...

8   A.      Right, so I don't really know.

9   Q.      Who was responsible for making sure that your two

10  vehicles were maintained properly?

11  A.      Well, I was mostly responsible for doing that.

12  Q.      And what did you do to make sure that your vehicles

13  were maintained properly?

14  A.      I usually did, you know, an oil change.  Once a month

15  is as much as I could remember to do it.  They, you know,

16  told us to make sure we checked the tire treads and so I did

17  do that.  You know, I tried to make sure the vehicle was

18  clean and -- for the most part, I took it in for checkups.

19  You know, when there was an oil change or whatever or

20  maintenance on it, made sure that they did a full checkup on

21  it, things like that.

22  Q.      Anything else that you remember?

23  A.      Not off the top of my head.  I mean we were required

24  to do a yearly vehicle audit, so we had that that we did, and

25  that was something that FedEx set up and we did through them,

**8/18/2006  Henderson, Jerrett**

1    and then we were required to fill out the monthly maintenance

2    reports.  It may -- I guess you might say that helped us

3    remember, but it was something that, you know, management had

4    us do and that they checked monthly.

5    Q.    You said you would make sure that the vehicle was

6    clean.  What would you do to make sure -- this is visually

7    inspect it or things like that?

8    A.    Well, yeah.  I mean washed and swept out and just

9    things of that nature.

10   Q.    How often would you wash your vehicle?

11   A.    I tried once a week.

12   Q.    And how about sweeping out your vehicle?

13   A.    Same.

14   Q.    Now, in terms of the oil change, you said you tried to

15   do it once a month?

16   A.    I tried to do it once a month, yes.

17   Q.    Why did you decide to do it -- try to do it once a

18   month?

19   A.    Well, two reasons.  That just -- it seemed to me that

20   that was a good, you know, pace to do it, at least once a

21   month, but it was also the managers that instructed that,

22   too.

23   Q.    Instructed in the sense of suggestion or in terms of

24   requirement?

25   A.    The same type of deal.  I mean, again it fell back to

8/18/2006 Henderson, Jerrett

1    if there was any breakdowns or any things, any problems that

2    arose, they, you know, had said that they would -- indicated

3    they wanted me to do a once-a-month oil change, and again if

4    any problems arose from that and I hadn't done a once-a-month

5    oil change, then...

6    Q.    But if a problem didn't arise, then they didn't say

7    anything about it?

8    A.    You know, they would remind and, you know, maybe say

9    it again on the monthly maintenance when they were looking

10   over it if they didn't see one.

11   Q.    But they would not take your vehicle out of service

12   for not doing an oil change once a month, did they?

13   A.    Not doing an oil change, no.

14   Q.    How often would you check the tire treads?

15   A.    Usually once or twice a week.

16   Q.    And why did you decide to do it once or twice a week?

17   A.    No reason.

18   Q.    Did anyone ever tell you to do it once or twice a

19   week?

20   A.    No.

21   Q.    How about washing your vehicle once a week, how did

22   you decide to do it once a week?

23   A.    No reason for that either, just...

24   Q.    It's what you did?

25   A.    Yeah.  Just at the end of the week, you know, the

**8/18/2006  Henderson, Jerrett**

1    accumulated dust and bugs and wash it off and go the next

2    week again.

3    Q.    And how about sweeping it out once a week, why did you

4    do that once a week?

5    A.    Same type of reason, just of the accumulation of stuff

6    from delivering inside there.

7    Q.    And so you just sort of decided to do it once a week?

8    A.    Uh-huh.

9    Q.    And then taking it in for checkups, how often did you

10   take it in for a checkup?

11   A.    Again, generally, like I said, when -- they obviously

12   do that when they do an oil change.  They usually do the

13   inspection on oil changes, and then if there was any, you

14   know, maintenance or repair that needed to be done, then I

15   usually had them check.

16   Q.    Who's the "they"?

17   A.    Whatever place that I had the maintenance and repair

18   done on it.

19   Q.    And that would differ depending on when you did it or

20   was it always the same place or did it change?

21   A.    A lot of the times it was the same place, yes.

22   Q.    But sometimes it wasn't?

23   A.    No, sometimes it wasn't.

24   Q.    Who decided where to take the vehicle?

25   A.    I did.

8/18/2006  Henderson, Jerrett

1    Q.    Do you remember where you typically took it?

2    A.    Local place.  Mike's Auto.

3    Q.    And how did you learn about Mike's Auto?

4    A.    It was near to my house.

5    Q.    Oh, okay.  Did anyone from Home Delivery ever say you

6    have to use Mike's Auto?

7    A.    No, they didn't.

8    Q.    So that was your -- you made that decision?

9    A.    Yeah, I just saw it and decided to go there.

10           MR. JIH:  I think we are about to run out of tape.

11           THE VIDEOGRAPHER:  That's the end of Tape 5.  We're

12    off the record at 3:52 p.m.

13           (3:52 p.m., off the record)

14           (3:54 p.m., back on the record)

15           THE VIDEOGRAPHER:  It's the beginning of Tape 6.

16    We're  back on the record at 3:54 p.m. in the matter of

17    Alexander, et al, versus FedEx Ground Package System, Inc.,

18    Case No.  3-05-MD-527-RM.

19           BY MR. JIH:  Q.  Did you ever have to paint your

20    vehicle?

21    A.    No.

22    Q.    No?  Now, when you got the second vehicle with the

23    second driver, did you do all the maintenance on that vehicle

24    as well or did the other driver do it?

25    A.    I did all the maintenance on that vehicle, too.

**8/18/2006  Henderson, Jerrett**

1    Q.    So you're responsible for both vehicles?

2    A.    Yes, I was.

3    Q.    And that's because you were the contractor on that

4    second route?  You owned the vehicle?

5    A.    It's because I own the vehicles, yes.

6    Q.    And that second vehicle, when your driver would drive

7    it, did he take that van home with him at night or did they

8    leave it at your house?

9    A.    He took the van home.

10   Q.    And that was just because you said he could or -- why

11   did he take it home?

12   A.    Because that was the best course.  He lived in another

13   town, and that was the best...

14   Q.    And you were okay with that?

15   A.    That was okay with me.

16   Q.    I want to talk about some other vendors that you might

17   have used to maintain your vehicles.  So like Bob's Tire

18   Center, are you familiar with them?

19   A.    Right.

20   Q.    And how did you end up at Bob's Tire Center?

21   A.    Again, just it was near to my house.

22   Q.    So your decision?

23   A.    Yeah, my decision.

24   Q.    Anyone at FedEx Home Delivery suggest Bob's Tire

25   Center?

8/18/2006 Henderson, Jerrett

1    A.    No.

2    Q.    How about Perkins Mobile Auto Glass?

3    A.    Right.

4    Q.    How did you end up there?

5    A.    It was -- it's again just one that I found in the

6    phone book.

7    Q.    How about Noe's Automotive Service?

8    A.    That was the one that they used for the annual truck

9    inspections.  That's FedEx's deal.

10   Q.    How about RT's Auto Body Service?

11   A.    Yeah, I'm going to go -- I mean I don't recognize that

12   name.  I'm going to go with the same answer, though.

13   Q.    Same answer being that you came up with it in the

14   phone book or --

15   A.    Either, yeah, found in the phone book or -- yeah, or

16   saw it.

17   Q.    In general, when your vehicle had maintenance issues,

18   did the people at the terminal help you find the right

19   vendors for it or help you in any way in terms of maintaining

20   the vehicle?

21        MS. ZERGER:  Objection.  Vague and ambiguous.

22   Compound.

23        THE WITNESS:  Could you ask it a different way?

24        BY MR. JIH:  Q.  Well, in other words, I know it was

25   your responsibility to maintain the vehicles.  I'm wondering

**8/18/2006  Henderson, Jerrett**

1    did the people at Home Delivery help you with that, or were

2    you sort of on your own to try to find the right vendors,

3    good places to go?

4    A.    They didn't have any input in that, as far as I know.

5    It wasn't a concern.

6    Q.    What insurance company did you use to insure your

7    first vehicle?

8    A.    State Farm Insurance.

9    Q.    And why did you use State Farm?

10   A.    Because I already had a personal vehicle on their

11   plan.

12   Q.    And how about the second vehicle?

13   A.    The second vehicle, I used State Farm Insurance and

14   also had Protective forced -- placed on the van.

15   Q.    Why is that?

16   A.    Because for some reason that I can't explain and that

17   they couldn't explain either they continually said that the

18   policy for the second van was not identical to the first van.

19   Q.    So they took the position that the second vehicle's

20   insurance policy wasn't adequate?

21   A.    Right, was not identical to the first van because the

22   first van's insurance policy was adequate.

23   Q.    And who did you have these discussions with at Home

24   Delivery about the adequacy of the State Farm Insurance for

25   the second vehicle?

**8/18/2006  Henderson, Jerrett**

1    A.    Both James and I think it was Darrell at that time, if

2    I remember right.

3    Q.    And were there a lot of discussions on this, or did

4    you just say "I'll do the protective also"?

5    A.    No, there were discussions about this at least every

6    week.

7    Q.    For how long?

8    A.    For almost a year.

9    Q.    So it was a year before you decided to add the

10   protective insurance?

11   A.    No, sir.

12         MS. ZERGER:  Objection.  Mischaracterized the

13   testimony.

14         BY MR. JIH:  Q.  So when did you decide to put on

15   the protective insurance.

16   A.    I'm sorry, I didn't decide to put on the protective

17   insurance.  Protective insurance was force placed on the

18   vehicle in addition to the State Farm Insurance.

19   Q.    What do you mean by force placed?

20   A.    It was without my agreeing to it, being attached to my

21   wages.

22   Q.    Okay.  So they just attached it onto there and you

23   disagreed with it, but you had no choice, it just got

24   deducted from your settlement?

25   A.    From my settlement check, right.

**8/18/2006  Henderson, Jerrett**

1    Q.    Do you know what it means to deadline a vehicle?

2    A.    The term sounds familiar.  I don't remember the

3    definition at this time.  I don't recall the definition.

4    Q.    Did the protective insurance that you said was force

5    placed, did that ever come off, or did it always stay on the

6    second vehicle?

7    A.    It came off after a year, yeah.

8    Q.    Why did it come off?

9    A.    The only answer I can give to that is that the

10   corporate in FedEx agreed to take it off.

11   Q.    Did you -- when you had disputes with management in

12   terms of issues like the protective insurance, would you go

13   to people at Contractor Relations?

14   A.    I did go to people at Contractor Relations, Tom Hurd,

15   and I did also go to the person who specifically handled

16   insurance, and I think his name was Jerry, but I can't be

17   positive.  All these people I talked with.  And, you know, my

18   argument was that the people at State Farm would have to be

19   the most inept, stupid people in the world to take an entire

20   year to match one insurance policy to be the same as the

21   original insurance policy, second vehicle.  So I couldn't

22   possibly see how that could be a mistake for an entire year

23   or something that they couldn't understand for an entire

24   year.

25   Q.    Did Tom Hurd try to figure out the issue for you?

**8/18/2006  Henderson, Jerrett**

1    A.      Tom Hurd said a few times that he would look into it

2    and work on it, and that was the same response from the

3    insurance person that was also at FedEx, but again nothing

4    ever happened and it never got resolved for a year, which

5    just seems amazing to me.

6    Q.      But at some point it did just get resolved?

7    A.      At some point.

8    Q.      And do you know if Tom Hurd had anything to do with

9    that?

10   A.      I don't.

11   Q.      So it could have been, you just don't know who

12   actually ultimately got the issue resolved?

13           MS. ZERGER:  Asked and answered.

14           THE WITNESS:  I don't know who resolved the issue.

15           BY MR. JIH:  Q.  Have you ever talked to anyone else

16   at Contract -- or anyone at Contractor Relations about any

17   other issue?

18   A.      Yes, I have.

19   Q.      What issues?

20   A.      Ones that come to mind, I talked to Tom Hurd again

21   about the flexing issues and assigning packages.  I talked to

22   him about the volume and the amount of packages that were

23   assigned to the vehicle and also talked to him about

24   continuously, you know, asking me to get a larger vehicle or,

25   you know, and/or threatening my, you know, job and

**8/18/2006  Henderson, Jerrett**

1    termination if I didn't get a larger vehicle.  So, yeah, I

2    talked to him about these things.

3    Q.    Now, we were talking a moment ago about deadlining it.

4    We don't have to use that term.  Do you know what it means

5    sort of to take a vehicle out of service?

6    A.    Okay.  Yes, if that's the definition of deadline,

7    okay, that sounds familiar.

8    Q.    I don't know that it is, so why don't we just say

9    "take a vehicle out of service."

10    A.    Take a vehicle out of service.

11    Q.    Has your vehicle ever been taken out of service by

12    anyone at the terminal?

13    A.    I don't remember it being taken out of service, but I

14    do remember a day where James did say it would be taken out

15    of service if I didn't go and purchase new tires --

16    Q.    Oh, okay.

17    A.    -- that morning.

18    Q.    Because there was an issue with the tires?

19    A.    He felt that the tread was too low.  I disagreed with

20    him on it, but he made that statement that it would be taken

21    out of service if I didn't go do it that morning.

22    Q.    Did you sign up for the Business Support Package?

23    A.    I did do the Business Support Package.

24    Q.    You did?

25    A.    Right.

**8/18/2006  Henderson, Jerrett**

1    Q.    Were you required to do the Business Support Package?

2    A.    No, I was not required to do it.  I don't believe that

3    I could have successfully done the job without the Business

4    Support Package, the scanner, uniforms.

5    Q.    So you thought it was the best option for you?

6          MS. ZERGER:  Objection.  Mischaracterized the

7    testimony.

8          THE WITNESS:  I felt that I could not do the job

9    without the support package.

10         BY MR. JIH:  Q.  Okay.  I want to talk about the

11   people you've hired to help service your two routes.  So

12   let's start before it became two routes, when it was only one

13   route.

14   A.    Okay.

15   Q.    Did you ever hire any helpers, temp drivers,

16   supplemental -- did you ever hire anybody to help you service

17   your route when it was only one route?

18   A.    I can't recall a specific time where I helped someone

19   with just my own route.

20   Q.    Or hired someone, you say?

21   A.    Yeah, right.  A helper, anybody.  I think for that

22   first route it was, you know -- at that initial time in that

23   year it was just me.

24   Q.    But you understood that you had -- it was your choice

25   whether or not -- you could hire a helper or supplemental,

**8/18/2006 Henderson, Jerrett**

1    you could certainly consider hiring someone, right?  You had

2    that option?

3    A.    I think so.  I don't know if -- I don't know if that

4    was something that came up in that first initial period.

5    Again, like I say, just because the volume was just starting

6    and -- but, yeah, I don't think that there -- that I thought

7    there was any issue with that, I just --

8    Q.    It didn't come up?

9    A.    It didn't come up.  I mean I wouldn't have made any

10   money if I was giving it all to the guy who was driving.  I

11   mean there would be no point.  I might as well not have been

12   working, right?  Same outcome.

13   Q.    Got it.  And after your route was split, so you had

14   two routes.

15   A.    Uh-huh.  After the split.

16   Q.    Tell me all the people you hired to help you with your

17   routes after they split?

18   A.    Well, I remember -- the very beginning, I don't know

19   that I had anybody specific or set in mind, you know, like

20   Ray Valverde that I was using for an extended period of time.

21   So I think there was one guy before him.  His name was Kyle,

22   but he was only there for a small -- a little while.  And

23   then I had Ray, and he ran the second route.  The only other

24   time I used anybody was just for a day off or a sick if, you

25   know, Ray was sick or something like that.

**8/18/2006  Henderson, Jerrett**

```
1            I think I may have used one of the temporary drivers
2     that was there at that time.  There was hardly any there
3     ever, but I know I used -- once or twice I used a temporary
4     driver that was there, a few times.
5     Q.    How about -- who was the supplemental?
6     A.    Which time period are you talking about now?
7     Q.    I'm just talking about at any point in time after you
8     had two routes.  You hired a supplemental at some point,
9     right, towards the end?
10    A.    Oh, right, right, yeah, and that person I believe was
11    Sam, Sam Dibble, but as far as -- I was trying to name
12    everybody I could think of, like you said, that either helped
13    me or substituted in, and yeah, those are -- Kyle and Ray had
14    been there until the end, and really the only other people
15    that I remember using was the temporary ones on, you know, a
16    day or so that they, you know...
17    Q.    So Kyle, was Kyle a helper or was he a driver?
18    A.    What do you mean, definition of helper or driver?
19    Q.    Well, I'm looking at your interrogatory responses, and
20    I'll just represent it has -- your answer was, "In March 2002
21    I used a helper for approximately one to three days and paid
22    that helper $10 per hour."
23           Is that Kyle or is that someone else or did that not
24    even happen?
25    A.    March of 2002?
```

**8/18/2006  Henderson, Jerrett**

1    Q.    Yeah, that's what it says in your --

2    A.    No, that wouldn't have been Kyle.  That would have

3    probably been -- I think I might have been referring to the

4    helper as one of the temporary helpers that they had there.

5    I used one of those guys for a day or two, like I said, to

6    substitute for sick or whatever reason I think Ray had a

7    wedding or --

8    Q.    Then was Kyle just a -- who was Kyle?

9    A.    Well, like I said, before Ray became a permanent

10   driver for that second route, Kyle was driving that second

11   route just for a short period of time.

12   Q.    How did you find Kyle?

13   A.    I think that he had originally came in for a temp job

14   or a belt job, one of the two, and I had known him from the

15   Olive Garden, but not -- I'm pretty sure he came in for one

16   of those jobs, a temp job.

17   Q.    Did anyone at Home Delivery tell you to hire Kyle?

18   A.    No.

19   Q.    Did anyone at -- did you want to hire other people,

20   but Home Delivery said no?

21   A.    Yes, absolutely.

22   Q.    Who was that?

23   A.    Well, I wanted to use one of my relatives' sons, and

24   they refused to hire him, and I also at the time that Sam

25   came on for supplemental, I had also brought them another

**8/18/2006 Henderson, Jerrett**

1    person who was very good, in my opinion.  I even took him out

2    on a few rides with me and tried to, you know, explain and

3    give him a little bit of training to see if that was

4    something that he wanted to do and, you know, could do, and

5    he did great and, you know, I thought that he would make a

6    good person to be a supplemental driver in addition to Sam if

7    there was ever any problems, but they never -- they told me

8    that he would have to go through the training and the

9    driver's school and all this other stuff and that I couldn't

10   bring him on to help me until he was approved from them, and

11   two weeks passed by, three weeks passed by, and the guy asked

12   me all the time, you know, can I come and help and work, you

13   know, there, and I told him, "No, you're not approved yet."

14        Called the terminal and they just kept putting him

15   off, putting him off and would never approve him.

16   Q.    And that's because he wouldn't go through the

17   requisite training?

18        MS. ZERGER:  Objection.  Mischaracterization of the

19   testimony.

20        THE WITNESS:  No.  He was there and ready for

21   anything that they wanted to train him on and put him through

22   driver whatever.  They didn't have anyone down there to give

23   him driver training, and they didn't provide him or they

24   didn't do any training with him.  He -- like I said, he

25   showed up and checked in constantly throughout the week and

8/18/2006 Henderson, Jerrett

1    they just refused to help him.

2            BY MR. JIH:  Q.  And the reason he needed training,

3    was that because he didn't have sufficient driving experience

4    on his own?

5            MS. ZERGER:  Objection.  Calls for speculation.

6            BY MR. JIH:  Q.  Do you know?

7    A.    I don't know for sure.  I know that they had stated a

8    few times that everybody had to go through the driver -- this

9    driver school course or whatever, that someone had to come

10   down and instruct and train them on.

11   Q.    Why did you believe it was Home Delivery's

12   responsibility to train this person?

13           MS. ZERGER:  Objection.  Mischaracterized his

14   testimony.

15           BY MR. JIH:  Q.  Well, do you believe it was Home

16   Delivery's responsibility to train this person if he wasn't

17   previously trained?

18   A.    I can only say that I believed what they were telling

19   me, that they would not approve him until he went through

20   their training.  So I'm not really sure how to answer your

21   question.  I did believe him when he told me that.

22   Unfortunately, I couldn't override his decision -- or FedEx's

23   decision to not approve this person.  I wanted him.

24   Q.    Who told you that he was not approved?

25   A.    Both James and the senior manager that were there,

**8/18/2006  Henderson, Jerrett**

1    which -- I don't know if Eric was there at that point or not,

2    but he might have been.  Like I said, there was -- Pat was

3    leaving and Eric was coming in, so...

4    Q.    What's the name of this person you wanted to bring in?

5    A.    God.  I don't remember.

6    Q.    What was the name of the relative's son that you

7    wanted to hire?

8    A.    Ben.

9    Q.    Last name?

10   A.    Henderson.

11   Q.    Henderson.  Do you know why Ben Henderson was not

12   approved?

13   A.    I don't know the reason.  I do know that at that time

14   I believe it was Darrell who was there, and James.  I

15   remember that they said that they didn't feel that he was a

16   good candidate.  That was about as far as an explanation that

17   I got from them.

18   Q.    But you do remember them saying that?

19   A.    I do remember them saying that.

20   Q.    So in terms of Kyle, you found Kyle, you knew Kyle

21   from Olive Garden, and you knew him from coming into the Home

22   Delivery terminal, right?

23   A.    Yeah, I knew who he was.  I knew him, but, again, I

24   don't believe that -- I believe that he came in there for one

25   of those temporary positions, and since I had that available

**8/18/2006  Henderson, Jerrett**

1    at that time --

2    Q.      You offered it to him?

3    A.      Yeah.

4    Q.      How much did you pay him?

5    A.      I believe $10 an hour.

6    Q.      And who told you to pay him $10 an hour?

7    A.      That was something that I had just asked some other

8    drivers what they normally pay.

9    Q.      So -- but did anyone at Home Delivery tell you to pay

10   Kyle $10 an hour?

11   A.      No.

12   Q.      Did they even know you were paying him $10 an hour?

13   A.      I don't know.

14   Q.      But you didn't have to get their approval to pay him

15   $10 an hour?

16   A.      No, they didn't need any approval for that.

17   Q.      And did you hire Kyle as an employee or an independent

18   contractor?

19          MS. ZERGER:  Object to the extent that it calls for

20   a legal conclusion.

21          You may answer.

22          THE WITNESS:  I didn't really classify him in my

23   mind.  I mean I just hired him to deliver packages and I paid

24   him.

25          BY MR. JIH:  Q.  How did you find Ray?

**8/18/2006 Henderson, Jerrett**

1   A.      I believe that Ray actually did work there on the

2   belt, so I believe he was already employed through FedEx

3   there, taking packages off the belt.

4   Q.      And so you just offered him a job, a different job so

5   he started working for you instead of FedEx?

6   A.      Well, the manager, James, actually came over and

7   suggested that I use Ray for that position, and so I did.

8   Q.      He told you Ray was interested?

9           MS. ZERGER:  Objection.  Mischaracterized his

10  testimony.

11          THE WITNESS:  Yeah, exactly what I said.  He came

12  over and suggested that I go with Ray.

13          BY MR. JIH:  Q.  Did he say you had to hire Ray?

14  A.      No, he didn't.

15  Q.      So did you feel pressured to hire Ray, or was it just

16  an option that was being given to you and you agreed that Ray

17  would be good?

18  A.      No, I don't think that he was pressuring me.  I think

19  it was that Ray was there and already working in the system

20  so...

21  Q.      So he understood how it worked?

22  A.      Yeah, he understood how it worked.

23  Q.      How much did you pay Ray?

24  A.      I believe I also paid him $10 an hour.

25  Q.      And like Kyle, that was something that you just

**8/18/2006  Henderson, Jerrett**

1    decided based on asking other contractors what would be

2    reasonable?

3    A.      Yeah, same reason as Kyle's.

4    Q.      Now, how about Sam Dibble, how did you find Sam

5    Dibble?

6    A.      Sam Dibble, I did an ad in the Enterprise Record for

7    help.

8    Q.      And he answered the ad?

9    A.      Yes.

10   Q.      Why did you -- whose idea was it to place an ad?

11   A.      Well, mostly it was the manager's.

12   Q.      So you were looking for somebody and they suggested

13   you place an ad?

14          MS. ZERGER:  Objection.  Mischaracterized the

15   testimony.

16          THE WITNESS:  Well, again, at that point they

17   weren't -- we were still on the position that there were no

18   temporary drivers, there were -- there was no one that we

19   could even, you know, offer to be a supplemental.  So the

20   manager said that we should go and place an ad and look for

21   people that way, and so that's what I did.

22          BY MR. JIH:  Q.  And so they weren't willing -- they

23   weren't looking for temporary drivers or they didn't have

24   temporary drivers that you guys could use, so they said,

25   look, you have to go out and find them yourself, go place an

**8/18/2006  Henderson, Jerrett**

1    ad?

2    A.    Go place an ad.

3    Q.    Did they tell you what the ad should say?

4    A.    Not necessarily, no.

5    Q.    Did they tell you where to place the ad?

6    A.    No.

7    Q.    Did they review the ad before you posted it?

8    A.    No, they didn't.

9    Q.    So what was in the ad, that was up to you?

10   A.    Right.

11   Q.    How much did you pay Sam?

12   A.    I believe I also paid him $10 an hour.

13   Q.    And same thing, that was just something you decided?

14   A.    Right, same reason.

15   Q.    Now, why did you stop using Kyle, or was he only for a

16   temporary situation?

17   A.    It was something that he wasn't interested in after a

18   short period of time that he did it.

19   Q.    And then did Ray drive for you all the way until the

20   routes were terminated?

21   A.    Yes, he did.

22   Q.    And do you know what happened to Ray after the routes

23   were terminated?

24   A.    I'm not sure.  I think I might have heard that he had

25   a position in a school system somewhere.

**8/18/2006 Henderson, Jerrett**

1    Q.      Okay.  And then how about Sam?  Did he just -- did you

2    have a supplemental all the way until the routes were

3    terminated?

4    A.      No, I didn't.

5    Q.      When did Sam stop driving for you as a supplemental?

6    A.      Sam stopped driving, I believe, sometime in August --

7    no, I'm sorry.  Is it August?  September?  No, I think it was

8    October, sometime in October.

9    Q.      Of 2000' --

10   A.       '4.

11   Q.      -- '4.  Why did he stop driving for you?

12   A.      He stopped driving for me because James, the service

13   manager, was verbally harassing him every day and yelling at

14   him and swearing at him, and he asked Eric Smith if he could

15   instruct James to not do this to him every morning, and Eric

16   Smith said that James was a valuable employee and that he

17   would not instruct James how to act on the job, and so Sam

18   came to me then and said that I -- that he didn't want to

19   work under those conditions, and so he quit.

20   Q.      Do you know why James was harassing Sam or what he was

21   saying?

22   A.      I really don't know -- don't know why.  A lot of it

23   happened away from earshot, but you know, I had heard Sam say

24   a few things to me about -- for example, checking in in the

25   morning, as I had mentioned before, you have to wait and have

**8/18/2006  Henderson, Jerrett**

1    the manager check in, and he would tell me that James would

2    walk past him more than once in the morning and wouldn't stop

3    to check his boxes so that he could start the day, and would

4    also ignore him when he called his name and asked him to come

5    check the boxes over -- or come check the boxes out.  So he

6    felt that -- he didn't know why James was treating him that

7    way, and when he went to talk to him about it and ask him

8    about it, then he would be yelled at and harassed, so...

9    Q.    So at least your understanding was -- or was it your

10   understanding that for some reason James and Sam sort of had

11   a personal issue going on, and Sam was being unfairly

12   targeted by James?

13   A.    That's what I got, that Sam was being unfairly

14   targeted, and I mean I definitely observed the yelling and

15   the cursing at him.  So, you know, I knew that what he was

16   saying was correct as far as the yelling and harassment went,

17   so...

18   Q.    You just didn't know why it was happening or what the

19   issue was?

20   A.    I didn't know why that James was targeting him and

21   treating him that way.

22   Q.    Okay.  Did you train Ray on how to run the route?

23   A.    I think that both James and I did some training.

24   Q.    And what training did you do?

25   A.    I'm a little vague on remembering exactly what

**8/18/2006 Henderson, Jerrett**

1    training I did.  I think in the beginning parts he rode with

2    me on the route to see the general idea and areas of where we

3    went, and then I also think he rode with James for the

4    training portion of how to deliver and how to, you know, how

5    they wanted him to, you know, interact with the customers and

6    that part of it.

7    Q.    You think that happened or do you remember that

8    happening?

9    A.    I remember that happening, that he went out with

10   James.

11   Q.    But you weren't there when they went out together?

12   A.    No, I wasn't there.

13   Q.    Who was responsible if your supplemental driver or

14   your second van driver failed to deliver all of their

15   packages?

16   A.    Well, I don't know if I would call it responsible.  I

17   would say I would -- myself would suffer the consequences for

18   it.

19   Q.    Okay.  And what would you -- well, tell me everything

20   you did to make sure that either Ray or anyone working for

21   you provided the daily service that Home Delivery expected?

22   A.    Well, I tried to look at his manifest, I tried to help

23   with any deliveries that maybe he was unfamiliar with, I

24   tried to, you know, help -- if he felt overloaded and maybe

25   take a few packages from him to, you know, help him be able

**8/18/2006 Henderson, Jerrett**

1    to make the service, and then you know, talked with him in

2    the middle of the day for any questions as far as, you know,

3    maybe delivery locations like, you know, again if he had

4    trouble finding some place or if he had a breakdown, you

5    know.  There were times where he had a breakdown and I came

6    to take those deliveries into my vehicle and take him home,

7    so...

8    Q.    Do you think the management at Home Delivery did

9    enough to help you with your supplementals and second van

10   drivers?

11         MS. ZERGER:  Objection.  Vague and ambiguous.

12         You can answer it, if you understand.

13         THE WITNESS:  The answer is similar to what I stated

14   before, that I think that, you know, the fact that, you know,

15   the example with Sam and the harassment, and the example with

16   the other person that I brought in that they wouldn't

17   approve, and the relative that they wouldn't approve, it

18   seemed like they not only didn't do enough, but did some

19   things that were a hindrance to being able to do these

20   things.

21         BY MR. JIH:  Q.  Well, did the -- did the management

22   at Home Delivery help you supervise your supplementals or

23   second van drivers?

24   A.    Well, they -- they came over and had discussions with

25   them without me being involved.  They instructed them without

**8/18/2006  Henderson, Jerrett**

1    me being involved, so, you know -- you're using two different

2    terms in "help" and "supervise," you know, so I think there

3    were cases where they supervised and provided instruction.

4    In those certain cases, I don't think that was a help.

5    Q.    Were those situations that involved service failures

6    or customer issues?

7    A.    Some of them.

8    Q.    I'm going to mark as Exhibit 3 -- and this is Bates

9    No. FXG Alexander 4945.

10   A.    Okay.

11         (Exhibit No. 3 was marked for identification)

12         BY MR. JIH:  Q.  And I'm assuming you haven't seen

13   this document before, correct?

14   A.    I'm sorry?  You're assuming that what?

15   Q.    Have you seen this document before?

16   A.    Let me look at it.  Okay.

17   Q.    Do you remember at some point in June of 2003 your

18   second van driver, Ray, having an accident in an apartment

19   complex?

20   A.    I remember this situation.  I personally don't think

21   he was at fault.

22   Q.    That's fine.  But do you remember Patrick McDonald,

23   the senior manager, talking to you about that on or about

24   June 21st, 2003?

25   A.    Yeah, vaguely.  I mean I do remember him coming out to

**8/18/2006  Henderson, Jerrett**

1    talk about it because obviously it was an accident.  I mean

2    it would be strange for management not to come out.

3    Q.    And do you remember Patrick McDonald asking you if it

4    was okay for James to do a post-accident ride with Ray?

5    A.    I think I remember that.

6    Q.    You remember him asking you if you were okay with

7    that?

8    A.    Right, right.

9    Q.    And then do you remember him ever asking you if you

10   wanted Ray to take the two-day safety course to review safe

11   driving?

12   A.    That part I don't remember, that being discussed.

13   That doesn't sound familiar.

14   Q.    Well, in this document it says he asked you that, and

15   it says you responded, "Not at this time.  I will review

16   safe driving tips with him."

17   A.    Right.

18   Q.    You don't recall that conversation?

19   A.    That part doesn't sound familiar to me.

20   Q.    Do you have any reason to believe it didn't happen?

21   A.    I don't -- not really.  It doesn't sound like

22   something that I would respond with, and it doesn't sound

23   like something that -- I mean after the length of time that

24   Ray had been there, it just doesn't sound like it was

25   necessary or something that he would suggest, especially with

**8/18/2006  Henderson, Jerrett**

1    it not being, you know, really his fault.  I mean I knew the

2    details of that accident and the way he described it.

3    Q.    Did Patrick typically ask you whether -- to get your

4    approval before doing anything with Ray?

5    A.    I can't remember too many times that, you know, he was

6    discussing things with Ray.

7    Q.    Oh, okay.  But you do recall at least certain

8    instances he would ask you first?

9    A.    No, I really don't.  I mean I don't know.

10   Q.    Did Ray have a cell phone?

11   A.    Yes, Ray had a cell phone.

12   Q.    Who bought him the cell phone?

13   A.    I think he had already had it.

14   Q.    Did you buy any equipment for any of the people you

15   hired?

16   A.    No, I mean I bought equipment for the van itself, but

17   I -- and I may have -- like the uniforms, I think may have

18   been charged to me, but I don't recall buying anything

19   specific for Ray, personally, you know.

20   Q.    Now, when you paid people like Ray or anyone else that

21   you hired, how did you handle like the payroll issues or tax

22   issues?

23         MS. ZERGER:  Compound question.

24         MR. JIH:  Fair enough.

25   Q.    How did you handle payroll issues?

**8/18/2006  Henderson, Jerrett**

1    A.     I told him -- I told him that I would be declaring

2    what I paid him, and that he, in turn, would need to report

3    that himself.

4    Q.     Okay.  Did you do any withholdings for him or any of

5    your employees?

6    A.     I did not do any withholdings.

7    Q.     So did you prepare a 1099 for him or W-2 for any of

8    them?

9    A.     I think I did have a 1099 form.

10   Q.     So your recollection is you prepared 1099s for the

11   people you hired?

12   A.     I think so.

13   Q.     Why did you prepare 1099s instead of W-2s, if you

14   recall?

15   A.     Well, because that's what was given to me by FedEx,

16   and so...

17   Q.     Because you got a 1099 from FedEx?

18   A.     Yeah, I got a 1099 from FedEx, and so that's what I

19   felt I would give to him.

20   Q.     So just do the same thing?

21   A.     Type of thing, yeah, right.

22   Q.     Did you have an accountant or anyone to help you with

23   those issues?

24   A.     I did have an accountant, yeah.

25   Q.     And the accountant -- did the accountant prepare the

**8/18/2006  Henderson, Jerrett**

1    1099s or did you prepare them?

2    A.    I think the accountant did.

3    Q.    And did you keep files of, you know, records of the

4    people who worked for you, like you know, how long they

5    worked, their hours, payroll stubs, checks, anything like

6    that?

7    A.    I -- yeah, I did.

8    Q.    And so you have a file or documents about each of the

9    people you hired?

10   A.    I think so, yeah.

11   Q.    Do you know if you've given those over to your lawyer

12   to produce in this case?

13   A.    Oh, yeah.  Yes, I've given everything to the lawyer,

14   yes.

15   Q.    Okay.  So we should have then documents dealing with

16   all of your -- the people you hired?

17   A.    Yes, absolutely.

18   Q.    Okay.  We'll check on that.  I'm not sure we've seen

19   that, but we'll check on that.

20         So what happens -- you're a contractor.  What happens

21   if you want a day off -- or what happened if you wanted a day

22   off?  Could you get one?

23   A.    Only if there was someone to cover the route.

24   Q.    Whose responsibility was it to find someone to cover

25   the route?

**8/18/2006  Henderson, Jerrett**

1    A.    They told us that it was our responsibility to find

2    someone.

3    Q.    So the people at Home Delivery wouldn't find someone

4    for you?

5    A.    No.

6    Q.    So you couldn't just go in and say, "Hey, I need to

7    take next Tuesday off," and they covered for you?  They

8    didn't do that?

9    A.    No.  They -- again, they had originally said to us

10   with that whole talk about temp drivers and things, that

11   there would be temps there in case we wanted to take a day

12   off or in case we had a sick day, whatever, but in fact, you

13   know, the temps were, you know, hardly ever around and

14   available, so...

15   Q.    You said there were a few instances where you did

16   bring in someone on a temp basis to cover either you or your

17   second driver, if someone got sick?

18   A.    Right.

19   Q.    Or for a day off?

20   A.    Right.

21   Q.    Now, were those FedEx temp drivers or were those temp

22   drivers that you found?

23   A.    Those were FedEx temp drivers.

24   Q.    Okay.  So in those instances occasionally they had

25   temp drivers around that you could then hire?

**8/18/2006  Henderson, Jerrett**

1   A.      Yeah, in those instances they happened to have them

2   there and so I was able to use them.

3   Q.      Now, if you used them, how much would you pay those

4   temp drivers?

5   A.      Well, I paid everybody the $10 an hour.  Anybody who

6   had worked for me I paid.

7   Q.      So if you used a FedEx Home Delivery temp driver, that

8   just means them having people there.  It was still up to you

9   to sort of say, "Hey, I will pay you this amount," and they

10  could either agree or not agree?

11  A.      Yeah, I believe, yeah.

12  Q.      So you still had to personally go hire them for that

13  day or whatnot, correct?

14  A.      Go ask them to work for that day, yes.

15  Q.      Okay.

16  A.      And the management had to, you know, say whether or

17  not they were available that day or whether FedEx was using

18  them.

19  Q.      Okay.  Because if Home Delivery was using them for

20  some other purpose, then they weren't available for you to

21  hire for a day?

22  A.      They weren't.

23  Q.      Did anyone at Home Delivery get involved in how much

24  you would pay these temp drivers?

25  A.      No, not to my knowledge.

**8/18/2006  Henderson, Jerrett**

1    Q.    How did you keep track -- well, sort of as the

2    contractor on these two routes, did you do anything to keep

3    track of your expenses?

4    A.    Other than, you know, your normal account that you try

5    and keep track of, yeah, that's just a basic --

6    Q.    But you did try to keep track of your expenses?

7    A.    Yeah.  Oh sure.

8    Q.    Would it be fair to say that you then sort of kept

9    your own books for your routes?

10          MS. ZERGER:  Objection.  Mischaracterized the

11   testimony.

12          You can answer.

13          THE WITNESS:  I tried to keep track of my expenses,

14   yeah.

15          BY MR. JIH:  Q.  So you did it, though; you didn't

16   hire someone to do it for you?

17   A.    No, the only person I had was an accountant for the

18   end of the tax period or whatever.

19   Q.    Just to prepare the taxes?

20   A.    Right.

21   Q.    But on a sort of day-to-day basis keeping track of how

22   much money you've spent, et cetera, that's something you took

23   care of yourself?

24   A.    That's something I took care of, right.

25   Q.    Did anyone at Home Delivery sort of track your

8/18/2006 Henderson, Jerrett

1    expenses for you?

2    A.      No, they didn't.

3    Q.      Did you have to report -- did you have to tell anyone

4    at Home Delivery what your expenses were on an ongoing basis

5    or anything like that?

6    A.      Along with the -- along with the monthly maintenance

7    report we had to provide copies with any -- of any repairs,

8    and then, of course, we declared the mileage for the gas so

9    there was that portion of our expenses that we did have to

10   report.

11   Q.      But other than that?

12   A.      That's all that I can think of.

13   Q.      Do you remember in your first year approximately how

14   much money you took home from FedEx Ground -- I'm sorry,

15   FedEx Home Delivery, your gross income, basically?

16   A.      Yeah, my gross income?  I can't for sure remember.  I

17   mean it would be a guess if I said -- if I answered.  I can't

18   remember.

19   Q.      Well, I think, based on the information we have, I

20   mean does 40,000 seem about right that you took in in 2001?

21   A.      It seems -- it seems right, but I can't be sure.

22   Q.      And I'm taking these from just the information that

23   FedEx Home Delivery has, what they reported basically.

24   A.      Right.

25   Q.      And what I have is that you made or took home, gross,

**8/18/2006  Henderson, Jerrett**

1    over 100,000 in 2002.  Is that consistent with your

2    recollection?

3    A.      Probably, yeah.

4    Q.      And then that was because I guess you had two routes

5    then?

6    A.      Right, right.

7    Q.      And then in 2003, 119,000?

8    A.      Right.

9    Q.      And then in 2004 -- you were terminated in November,

10   right, of 2004?

11   A.      Right.

12   Q.      And -- but you had already taken in 118,000; is that

13   consistent?

14   A.      Yeah, gross, before all the expenses and the repairs

15   and the salary.

16   Q.      And I guess if you had finished -- December would have

17   been part of peak, right?

18   A.      Right.

19   Q.      And you'd probably make more settlement during peak;

20   is that correct?

21   A.      Yes, that's correct.

22   Q.      So you were on pace for actually even more money in

23   2004 if you hadn't been terminated, correct?

24   A.      Yeah, it looks that way.

25   Q.      And what was your expectation of what you typically

**8/18/2006  Henderson, Jerrett**

1    could earn or thought you could earn in December of 2004 from

2    peak?

3    A.      I probably could have told you two or three years ago,

4    but there's a lot of different numbers and things that they

5    calculate and provide.  I really don't know off the top of my

6    head.

7    Q.      Do you remember in 2001, so we had said you brought in

8    about $40,000.  Do you remember about how much you had to

9    spend in expenses?

10   A.      Again, no, I don't.

11   Q.      So you don't remember what your net income was?

12   A.      No, I don't.  I mean it was a new van, I don't know

13   that I would've had all that many repairs or expenses for the

14   new van, I don't know what the gas price was that year, so

15   yeah, I'm sorry.  I don't know exactly.

16   Q.      Did you keep records of what your expenses were for

17   each year?

18   A.      I believe I did, yes.

19   Q.      And those you would have turned over to your lawyers

20   as well?

21   A.      Yes, absolutely.

22   Q.      So we should have that then?

23   A.      Right.

24   Q.      And if we don't, then there's some problem in the

25   production?

**8/18/2006  Henderson, Jerrett**

1    A.    Yeah.

2    Q.    And then do you recall sort of in 2004 then -- I'm

3    assuming if I asked you what your expenses were for any of

4    the years, you just don't remember as you sit here today?

5    A.    Well, I mean, you know 2004, you know, like I say, I

6    can't give you exactly, but...

7    Q.    Ballpark.

8    A.    But, yeah, somewhere around the neighborhood of

9    70,000, something like that.

10   Q.    In expenses?

11   A.    I think so, yeah.  I mean take home, we're only

12   looking at like 40, something like that, from both combined,

13   everything combined, but I'm not positive.

14   Q.    And in terms of that 70,000 or so of expenses, what

15   would you say the largest components of that were?  Was it

16   maintenance?  Was it because of the people you had to pay?

17   A.    Probably I would say a large portion of that was gas

18   and, you know, paying the second driver.  There was a lot of

19   gas, a lot of gas.

20   Q.    Okay.  Were you ever worried that you would not be

21   able to make enough money from your work as a Home Delivery

22   contractor?

23   A.    I'm sorry.  Make enough money for what?

24   Q.    Just for your living.

25   A.    I guess I could say yes to that towards the end of --

**8/18/2006  Henderson, Jerrett**

1    the last few months when I was being terminated, yeah.

2    Q.    Were you ever concerned that you would not make enough

3    money to cover your expenses?

4    A.    Again, in that same frame of year, same time frame,

5    yes, I was.

6    Q.    And why were you concerned in that time frame?

7    A.    Because they had reconfigured the route and taken a

8    portion of it away, and then they were, you know, harassing

9    the supplemental and not approving the other supplemental,

10   and just, you know, putting up road blocks in every

11   direction.  That's why.

12   Q.    So you actually in 2004 still grossed about the same

13   as in 2003 even after the reconfiguration?

14   A.    Well, the reconfiguration only happened at the very

15   short back end of it.

16   Q.    Oh, okay.  Right before the termination?

17   A.    Well, yeah.  Near the termination, yes.

18   Q.    When you were terminated -- how did you first hear

19   that you were going to be terminated?

20   A.    I had just heard that morning when I was called into

21   the office.  That was the first time.

22   Q.    So the day you were terminated?

23   A.    The day I was terminated, yeah.

24   Q.    And did they give you the reasons why you were

25   terminated?

**8/18/2006  Henderson, Jerrett**

1    A.      No, other than telling me that it was because I didn't

2    purchase a larger vehicle.  I mean I had -- I had James and

3    Eric both, you know, say directly that it was because I

4    didn't purchase a larger vehicle, but that was the only

5    reason, and there was no reason given on the termination

6    form.

7    Q.      And so it's your testimony that the first time you

8    even suspected that you were going to be terminated was the

9    day you were terminated?

10   A.      You have to, you know, rephrase that because you're

11   getting into a technical term there.

12   Q.      Well, let's just say your contract being terminated or

13   being fired or whatever word you want to use.

14   A.      Right.

15   Q.      My question is was it -- and I think you just said a

16   moment ago, but I just wanted to clarify, when was the first

17   time that you even heard you might be terminated, that it was

18   actually going to happen?

19   A.      Yeah, actually going to happen, I would say the

20   morning that I came in.

21   Q.      And you're sure about that?

22   A.      Because the other times were threats, and you heard

23   that, like I said, you know, with everything that -- you

24   know, if you didn't follow this instruction or you didn't

25   follow that instruction, you know, you could be terminated,

**8/18/2006  Henderson, Jerrett**

1    so -- you know, but as far -- you know, I had a feeling like

2    it, you know, I had maybe a thought that that might happen

3    when they reconfigure the route, and -- but, you know, I

4    couldn't say for certain.  You know, I was still delivering

5    on the smaller reconfigured portion of it for, you know, a

6    few weeks, up to the time until they called me into the

7    office, so...

8    Q.    Okay.

9    A.    And that's the best answer I can give you.  I don't

10   know.

11   Q.    Okay.  Isn't it true, though, that you hired a lawyer

12   to fight termination, someone named Lindsey Nayduch?

13   A.    Yes, that's true, yes.

14   Q.    Okay.  Well, then how could it be that -- and in fact

15   didn't your lawyer send a letter saying, "Look, don't

16   terminate him"?

17   A.    She might have, yeah.  I don't -- I mean I don't know

18   for sure, but yeah, I mean if she sent it, sure, yeah.

19   Q.    Well, then how could it be that sort of the first time

20   you heard you were actually in the process of being

21   terminated was the day of termination?

22          MS. ZERGER:  Objection.  Argumentative.  Do you have

23   some documents there for him to look at?

24          BY MR. JIH:  Q.  Well, I'm asking about your

25   recollection.

2/5/2007  10:34 AM

8/18/2006 Henderson, Jerrett

1      MS. ZERGER:  He's answered.

2      BY MR. JIH:  Q.  Okay.  So is it still your

3   recollection that the first time you heard that you were

4   actually in the process of being terminated was the day you

5   were terminated?

6   A.    That's exactly what I was stating before, is that yes,

7   when they reconfigured the route, I did have a feeling and a

8   thought that they might do this to me.  I felt that the

9   reconfiguration was wrong and I didn't agree with it.  I was

10  very upset by it.  I thought that it might be heading in that

11  direction, but I don't know what they're thinking, and no one

12  communicated, no one came up to me at any time and said, you

13  know, "You're out of here in the next two weeks" or "You're

14  out of here in the next week."  No one ever said that to me.

15  Q.    So when did you hire Lindsey Nayduch?  I don't how --

16  how do you pronounce her name?

17  A.    Yeah, I'm not sure either.

18  Q.    You know who I'm talking about?

19  A.    I know who you're talking about, yeah.

20        I brought my concerns to her, and I don't remember

21  what month it was, but it was probably within a month after

22  the reconfiguration.

23  Q.    Okay.

24  A.    But, I mean, like I said, as far as I knew, you know,

25  no one had come and said it directly to me.  I just had

8/18/2006 Henderson, Jerrett

1     concerns, and I didn't think that it was right what they did

2     to me.

3     Q.    Did anyone from Home Delivery tell you that there were

4     integrity issues involved as a reason for termination?

5     A.    No.

6     Q.    They didn't tell you that?

7     A.    No.

8     Q.    So no one ever told you that there were integrity

9     issues with you signing your own name on packages that

10    required customer signatures?

11    A.    That was -- yes, they did.  That was not at the time

12    of termination.

13    Q.    Okay.

14    A.    That was beforehand; but yes, they did.

15    Q.    But you -- did you do that?

16    A.    I did do that.

17    Q.    But you understood that that was inconsistent with

18    what Home Delivery's requirements were?

19    A.    I don't know if I understand that question.

20    Q.    In other words, when you signed your own name on

21    packages that required the signature of the customer, did you

22    know that that was something you weren't supposed to be

23    doing?

24    A.    Okay.  That was something that, yeah, they had said

25    that -- well, and actually, technically, they had said that

**8/18/2006 Henderson, Jerrett**

1    you were supposed to obtain a customer's signature for the

2    package, and I wanted -- any time I signed my own name, it

3    was because of a situation that I felt that the customer

4    would be getting the package rather than not getting the

5    package, and that I was taking responsibility for that

6    package for myself, which I thought, you know, again was a

7    choice, but apparently turned out not to be a choice, so I

8    was intending to accept the responsibility for that package

9    myself so that it could get to the customer rather than not

10   get to the customer.

11   Q.    Okay.

12          MR. JIH:  We're about to run out of tape.

13          THE VIDEOGRAPHER:  That's the end of Tape 6.  We're

14   off the record at 4:53 p.m.

15          (4:53 p.m., off the record)

16          (5:00 p.m., back on the record)

17          THE VIDEOGRAPHER:  This is the beginning of Tape 7.

18   We're back on the record at 5:00 p.m. in the matter of

19   Alexander, et al., versus FedEx Ground Package System, Inc.,

20   Case No. 3-05-MD-527-RM.

21          MR. JIH:  All right.  Twenty minutes and counting.

22          THE WITNESS:  Twenty minutes.

23          BY MR. JIH:  Q.  When you were terminated, what

24   happened to your two vehicles?

25   A.    I took them home to my house.

**8/18/2006  Henderson, Jerrett**

1    Q.    So they were yours, right?

2    A.    Yeah.

3    Q.    Did you sell them?

4    A.    Eventually I did sell them, yes.

5    Q.    When did you sell them?

6    A.    I'm going to say -- I want to say maybe April-May of

7    the next year, somewhere right around there.

8    Q.    You sold both at about the same time or separate

9    times?

10   A.    Fairly close to each other, yeah.

11   Q.    Who did you sell them to?

12   A.    I sold them just to a person who answered an ad,

13   someone locally.

14   Q.    Two different people?

15   A.    No, I think it was the same person.

16   Q.    Oh, the same person, just at two different times?

17   A.    Yeah, just at two different times.

18   Q.    Who was that person?

19   A.    I don't know his name.

20   Q.    How much did he pay for -- did he pay the same amount

21   for each vehicle?

22   A.    No, huh-uh.

23   Q.    How much did he pay for the first vehicle?

24   A.    I think it was -- I think it was somewhere around -- I

25   want to say three thousand, something like that.

**8/18/2006  Henderson, Jerrett**

1    Q.    And how much did he pay for the second vehicle?

2    A.    Four, I think.  Something like that.

3    Q.    Why did he pay more for the second vehicle than the

4    first?

5    A.    Maybe it was the other way around.  Maybe it was four

6    and three.  All I know is that one was in better condition

7    than the other.

8    Q.    Got it.

9    A.    That's the only --

10   Q.    So the one in better condition got the four thousand?

11   A.    Yeah, I got more.

12   Q.    Did you understand that in the operating agreement you

13   had the right to seek arbitration of any termination?

14   A.    I had heard of that at one point.

15   Q.    Did you ever try to start an arbitration?

16   A.    No, I didn't.

17   Q.    Why not?

18   A.    Well, I didn't feel that at the time that it was --

19   the outcome was what I wanted, you know.  It was my

20   understanding that the outcome of an arbitration would be,

21   even if it was -- even if it was found in my favor, that it

22   would only be, I guess you want to say compensated or

23   whatever, for the last portion of my contract, which at that

24   time was only a few months, from what I understood.  So not

25   only was it not really worth the time of everybody involved,

**8/18/2006 Henderson, Jerrett**

1    but it wasn't what I wanted and so it just didn't seem like

2    what I wanted to do.

3    Q.    Now, you mentioned the first senior manager you dealt

4    with at the terminal was Peter Van Buskirk, right?

5    A.    Right.

6    Q.    And then at some point it became -- the next person, I

7    think you said, was -- who was the next person after Peter?

8    A.    Darrell, wasn't it?

9    Q.    Yeah, okay.  Was there any change sort of in how the

10   terminal was run or managed when Peter left and Darrell came

11   in?

12   A.    Well, I mean it seemed like there were slight changes

13   for every manager, but, yeah, you'd really have to ask

14   something specific for that because I'm sure -- you know,

15   Peter was a completely different personality-type person and

16   any, you know, initial change from one manager to another

17   there's going to be some differences or seemed like it, I

18   don't know.

19   Q.    Well, did you find that certain managers were more

20   helpful to contractors than other ones?

21        MS. ZERGER:  Objection.  Vague and ambiguous.

22        THE WITNESS:  I guess in certain cases, I guess, but

23   again, like I say, without asking me about something

24   specific, I can't really -- I mean, it seemed like there was

25   a little bit of difference in style, but without being

**8/18/2006  Henderson, Jerrett**

1    specific I can't tell you exactly.

2         BY MR. JIH:  Q.  Well, do you think certain managers

3    treated contractors more fairly than other managers?

4    A.    Not necessarily.  I think that we still had the same

5    issues and the same things that we brought up to every

6    manager, so I don't see a big difference, no.

7    Q.    Well, were certain senior managers sort of more

8    controlling than other senior managers.  Like, for example,

9    you said one of them locked gates.

10   A.    Yeah, if you want to maybe define that term in

11   "controlling," possibly, yeah, Darrell was a little more

12   controlling.

13   Q.    Well, would you say Darrell as opposed to the other

14   senior managers -- well, would you say certain managers

15   micro-managed the contractors a little bit more than others?

16        MS. ZERGER:  Objection.  Vague and ambiguous.  Calls

17   for speculation.

18        THE WITNESS:  I really --

19        MS. ZERGER:  Assumes facts not in evidence.

20        THE WITNESS:  I really don't know the answer to that

21   question.

22        BY MR. JIH:  Q.  Now, you told me that -- well, you

23   said earlier there were sort of slight changes with every

24   manager, certainly at least with respect to style, right?

25   A.    I guess so.

**8/18/2006  Henderson, Jerrett**

1   Q.    Can you tell me, what other changes would you say

2   happened, depending on which senior manager was in charge?

3   And I think we also talked about locking gates was another

4   one.  But anything else?

5   A.    Well, I mean, you know, just like I say, even

6   differences in, you know, personality.  Darrell was a little

7   more, you know, gruff, a little more, you know, loud and

8   boisterous.

9         Eric was a little more reserved and quieter.

10        But, you know, as far as most of the things that they

11  told us, you know, there wasn't a whole lot of difference.

12  Like I said, we still had the same issues and the same, you

13  know, arguments and stuff that we would go through with every

14  manager.  There was no change.  Their stance and their answer

15  all seemed to be the same on it, pretty much.

16  Q.    In your time -- at any time in the terminal did you

17  ever feel that you were treated more harshly or more

18  favorably than the other contractors?

19  A.    No, I didn't think that they -- no.

20  Q.    So you thought you were being treated the same as

21  every other contractor?

22  A.    That's -- yeah, seemed to me.

23  Q.    How did you become a named plaintiff?

24  A.    Well, I -- I, you know, talked to the lawyers

25  about the case --

**8/18/2006  Henderson, Jerrett**

1    MS. ZERGER:  And I'm going to direct the witness at

2    this point not to reveal any conversations that he had with

3    his attorneys.  It's privileged information.

4    BY MR. JIH:  Q.  How did you learn about the lawyers

5    or a potential lawsuit?

6    A.    I think that I just heard it in passing from other

7    drivers that were, you know, around on the same route.  It

8    just, you know, came up in casual conversation, so that's how

9    I heard about it.

10   Q.    While you were still working at Home Delivery?

11   A.    Yes, while I was still working there, yeah.

12   Q.    Do you remember who talked to you about it?

13   A.    Not specifically, no.  It was just, like I said, in

14   driving on the route, you know, you would come across, you

15   know, delivering to the same house with another driver, and

16   it would come up in conversation.  That's how I heard about

17   it.

18   Q.    Did you ever ask for leave due to a serious medical

19   condition that you had or someone in your family had?

20   A.    No, huh-uh.  Wait.  Let me think because I know my mom

21   had a serious condition.  I just -- let me think and see if

22   that was at the time I worked there.

23   Okay.  I do remember -- I do remember going out there,

24   but I don't remember that it was asking specifically because

25   it was medical related.  I just -- I went through the normal

**8/18/2006  Henderson, Jerrett**

```
1    procedure for taking time off, and it was, I believe -- it

2    was a whole week, and I did set up with another temporary

3    driver to cover that shift.

4    Q.      But do you remember making a request from the terminal

5    for official leave as a result of the medical condition?

6    A.      And we're not talking about my medical condition at

7    all; we're just talking about the fact that I had parents t

8    8hat had a medical condition.

9    Q.      Correct.

10   A.      No, huh-uh, I don't remember having that as a basis

11   for my leaving.

12   Q.      How about for you?

13   A.      No.

14   Q.      Any medical condition for you?

15   A.      No.  No medical conditions for me, no.

16   Q.      Are you claiming that you should have received

17   employee benefits from FedEx Home Delivery?

18   A.      I'm not sure I understand the context of the question.

19   I was a part of an employee benefit hearing.  I did receive

20   benefits.

21   Q.      That's the unemployment.

22   A.      Oh, that's the unemployment?  So what are you -- what

23   was your question?

24   Q.      I'm asking you, do you believe there are any -- are

25   you claiming that there are any employee benefits that you
```

**8/18/2006  Henderson, Jerrett**

1    believe you're entitled to that you were denied?

2         MS. ZERGER:  I'm going to object to the extent that

3    it calls for a legal conclusion.

4         THE WITNESS:  Like I said, I believe that I reviewed

5    the document that has all the allegations that we have on

6    there, and I agree with those, you know, everything from, you

7    know, the overtime to the medical, to, you know, things that

8    are stated in that document, yes.

9         BY MR. JIH:  Q.  Did you ever apply for employee

10   benefits with Home Delivery or make any claim for any

11   employee benefits?

12   A.    I don't believe so, no, huh-uh.

13   Q.    Did anyone ever tell you that you could not make a

14   claim for employee benefits from Home Delivery?

15   A.    No, I don't think that conversation ever happened.

16   Q.    So it just never came up?

17   A.    Never, yeah.  We were -- I mean we were always aware

18   that that was something that, you know, they had stated that

19   that wasn't a position that had benefits.  I mean...

20   Q.    Another one of the interrogatories that you responded

21   to asked for what statements you believed were made by anyone

22   at Home Delivery that were fraudulent or a misrepresentation,

23   and the answer, I will just read it to you, it's one

24   sentence.

25   A.    Okay.

**8/18/2006  Henderson, Jerrett**

1    Q.    "The claims for fraud and misrepresentations stated in

2    the Complaint are based on the written misrepresentations

3    made by Defendant."

4         Do you remember agreeing to that statement?

5    A.    Right.

6    Q.    You do remember that?

7    A.    Right.

8    Q.    Okay.  What written misrepresentations did anyone at

9    FedEx make to you?

10   A.    Well, I feel that a lot of it was the operating

11   agreement, and, you know, there were portions of that, like I

12   described previously, that I felt were misrepresentating

13   (sic) in there; that, you know, how we had the means and the

14   manner to control, and we didn't and, you know, we were

15   subject to the packages that the managers put on our pallet

16   and the volume and had no control or say over that, so...

17   Q.    Anything else?

18   A.    I don't recall.

19        MR. JIH:  I'm going to mark as Henderson Exhibit 4

20   the Addendum Response to the First Set of Interrogatories

21   that was signed by you.

22        (Exhibit No. 4 was marked for identification)

23        BY MR. JIH:  Q.  Do you remember seeing this

24   document?

25        MS. ZERGER:  Take a minute to look at the whole

**8/18/2006  Henderson, Jerrett**

1    document.

2             BY MS. JIH:  Q.  My question was only do you

3    recognize this document?

4    A.      I'm not sure.

5    Q.      Okay.  Well, the last page, you saw that you signed

6    the Verification, right?

7    A.      Let me see.

8    Q.      That's you, right?

9    A.      Right, right.

10   Q.      Did you sign that?

11   A.      Yes, I did.

12   Q.      And it says you have read the foregoing in that

13   Verification under penalty of perjury?

14   A.      Right.

15   Q.      Do you remember doing that?

16   A.      I think so, yes.

17   Q.      So you do remember now reading this document?

18   A.      I know that I discussed this with my lawyer.

19   Q.      That's not my question.  Do you remember reading it as

20   you said you did under penalty of perjury?

21   A.      I think so.

22   Q.      So you think you did read it?

23   A.      I think so.

24   Q.      Did you -- who prepared the answers?

25             MS. ZERGER:  Okay.  I'm going to object at this

Case 4:06-cv-00175-KGB   Document 10-9   Filed 04/06/15   Page 833 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-3   Filed 02/05/07   Page 288 of 305
8/18/2006 Henderson, Jerrett

1    point.  He said he discussed this document with his attorney,

2    and I'm going to direct him not to answer any further

3    questions, attorney-client privilege and attorney work

4    product.

5         BY MR. JIH:  Q.  Did you prepare the answers?

6         MS. ZERGER:  I'm going to direct the witness not to

7    answer any further questions related to what he did with his

8    attorney around this document.  Attorney-client privilege and

9    attorney work product.

10        MR. JIH:  All right.  So instruction even on whether

11   or not he prepared the answers?

12        MS. ZERGER:  I'll repeat it again.  I'm going

13   to instruct him not to --

14        MR. JIH:  I don't want to run out of time.  I

15   understand your objection.  You've already said it.

16   Q.   So, for example, in the directions it says on the

17   bottom of that first page, "I was required to paint my truck

18   when FedEx told me to."

19        Do you see that at the very bottom?

20   A.   The first page?

21   Q.   Yes.

22   A.   I see that.  I was required to paint my truck, right.

23   Q.   Did that ever happen?  Because you told me earlier

24   today that you never painted your truck.

25   A.   Right.  I was told that I --

**8/18/2006 Henderson, Jerrett**

1    Q.    Were you required to paint your truck at any point in

2    time?

3    A.    I was -- I was told that they wanted me to paint my

4    truck, but I did not do it.

5    Q.    You did not.  Okay.  The next sentence is, "FedEx took

6    my truck out of service."

7          Do you see that next sentence onto the next page?

8    A.    Right.

9    Q.    Did they ever take your truck out of service?

10   A.    Again, no, but they were going to that day.

11   Q.    Well, if the answer is no, why did you say under

12   penalty of perjury that FedEx took your truck out of service?

13         MS. ZERGER:  Objection.  We're getting argumentative

14   here.  Give the witness a chance to explain and not berate

15   him with questions, please.

16         BY MR. JIH:  Q.  My question is why did you say

17   "FedEx took my truck out of service" when it never happened?

18         MS. ZERGER:  Objection.  Mischaracterizes the

19   testimony.

20         THE WITNESS:  Well, the answer is, the way the

21   question was stated, it -- I felt in answering the question

22   that I was answering for that one specific incident where,

23   you know, it did happen to me, personally, that they were

24   going to take that out.  It was going to happen right there

25   unless I did take that van over to get it taken -- and put

**8/18/2006 Henderson, Jerrett**

1    tires on it.

2          So if there was a case where it was just talked

3    about or said, I would not have answered that question that

4    way, but the way that the question was worded, I felt that I

5    had to include that one incident that happened to me,

6    personally, and that's the reason I answered it that way.

7          BY MR. JIH:  Q.  Uh-huh.  So, for example, on Page 4

8    it says, "FedEx would not allow me to split my route in two,"

9    that's not true, is it, right, because you did split your

10   route in two?

11         MS. ZERGER:  Objection.  Argumentative.

12         THE WITNESS:  Where is that?

13         BY MR. JIH:  Q.  Page 4, middle of the page.

14   A.    Oh, Page 4, sorry.

15   Q.    Third paragraph, it says in the middle, "FedEx would

16   not allow me to split my route in two."  That's not true,

17   right, because they did allow you to split your route in two?

18         MS. ZERGER:  Objection.  Argumentative.

19         THE WITNESS:  My answer to that is that they also

20   did not allow me to split the route in two.  I mean they did

21   decline several times, and then they agreed, so both -- in my

22   opinion both are correct.

23         BY MR. JIH:  Q.  Okay.  So it's your testimony

24   though that everything that appears in this answer was

25   something that you considered and specifically agreed was

**8/18/2006 Henderson, Jerrett**

1    true under penalty of perjury?

2            MS. ZERGER:  Asked and answered.

3            BY MR. JIH:  Q.  You're prepared to do that on the

4    record, that you read this, every sentence, and you swore

5    under penalty of perjury that it was correct?

6            MS. ZERGER:  And I'm going to object to the

7    argumentative tone that's being taken here.  He has answered

8    that question, and he doesn't need to be talked to that way.

9            BY MR. JIH:  Q.  Yes or no?

10   A.    I have already answered that I discussed the document

11   with my lawyer.

12   Q.    No, that's not my question.  I don't want to get into

13   what you discussed.  I'm basically giving you a chance to

14   either right now as we sit here right now --

15   A.    Right.

16   Q.    -- stand behind every sentence in this interrogatory

17   response and say on the record again that yes, it is in fact

18   true under penalty of perjury, or you can tell me, you know

19   what, I really didn't study it that closely, I don't really

20   know.  I just want to know which it is.

21           MS. ZERGER:  I'm going to object.  Argumentative,

22   compound.  You're harassing the witness.

23           BY MR. JIH:  Q.  Which is it?

24   A.    My statement again is that I feel that I answered

25   these questions correctly to the best of my knowledge, and

**8/18/2006  Henderson, Jerrett**

1    that, depending on the way that the questions were worded, I

2    could have had a reason for answering that because they

3    directly involved me.

4              MR. JIH:  All right.  I think it's your time now.

5              MS. ZERGER:  Okay.  Can we go off the record for

6    about 30 seconds.

7              (5:22 p.m., off the record)

8              THE VIDEOGRAPHER:  We're off the record at 5:22 p.m.

9              MS. ZERGER:  I'm ready.

10             (5:24 p.m., back on the record)

11             THE VIDEOGRAPHER:  We're back on the record at 5:24

12   p.m.

13                       EXAMINATION BY MS. ZERGER

14   BY MS. ZERGER:

15   Q.    Okay.  Mr. Henderson, I want to direct your attention

16   to Exhibit 4 in front of you, your Answers to

17   Interrogatories, Page 12.

18   A.    Okay.

19   Q.    Actually we can start on Page 11.

20   A.    Okay.

21   Q.    Which is responding to a question about if anyone

22   assisted you in the performance of your duties.

23   A.    Okay.

24   Q.    And then on Page 12 you answer.  And in that answer

25   there is a reference to a helper, but not a name, to Sam

**8/18/2006  Henderson, Jerrett**

1    Dibble and to Ray Valverde.  Do you see that answer there?

2    A.    Yes.

3    Q.    And we've had some conversation here.  You've

4    testified today to clarify that the helper was Kyle, someone

5    named Kyle?

6    A.    Right.

7    Q.    And you explained in more detail the circumstances of

8    the help that you had when you were working at FedEx.

9    A.    Right.

10   Q.    Do you recall that?

11   A.    Yes.

12   Q.    When was it that you recalled the name of Kyle and the

13   clarifying details about helpers that you had?

14   A.    Recently.  Today and yesterday.  I mean...

15   Q.    Did you deliberately omit Kyle's name and those

16   details that you shared today when you answered this

17   previously?

18   A.    No.  I again was under the impression that they were

19   referring to more long-term drivers and not ones that were

20   just used on a short basis is why.  I didn't think of the

21   other names.

22   Q.    Okay.  You're a named plaintiff in this case and a

23   complaint was filed on your behalf in this lawsuit; is that

24   correct?

25   A.    Yes.

**8/18/2006  Henderson, Jerrett**

1   Q.    And you have seen that complaint, have you not?

2   A.    Yes, I have.

3   Q.    Does that list all of the legal claims you have

4   asserted against the company?

5   A.    Yeah, I believe it does.

6   Q.    You testified that you've worked for, I believe you

7   indicated four senior managers and then Mr. Cumberland, a

8   service manager --

9   A.    Right.

10   Q.    -- during the time you worked for FedEx?

11   A.    Right.

12   Q.    Is it accurate to say that under all of those

13   managers, the rules, policies and procedures that we have

14   been talking about here today were uniform?

15         MR. JIH:  Objection.  Vague, leading, it misstates

16   the testimony from today.

17         THE WITNESS:  Yes, yes.  Pretty much.

18         BY MS. ZERGER:  Q.  Did you ever lose pay because

19   other people in your terminal did not meet the service

20   percentages set by the company even though you met your

21   service percentage?

22         MR. JIH:  Objection.  Vague, leading and incomplete

23   hypothetical.

24         THE WITNESS:  I believe so, yes.

25         BY MS. ZERGER:  Q.  Do you recall grease boards or

**8/18/2006 Henderson, Jerrett**

1    some other kind of boards at the terminal that had various

2    entries on them?  I believe you referenced these boards

3    earlier that indicated service percentages?  Do you recall

4    that?

5          MR. JIH:  Objection.  Vague, leading.

6          THE WITNESS:  Yes, I recall talking about that.

7          BY MS. ZERGER:  Q.  Okay.  Did those boards include

8    information about the numbers of packages delivered?

9          MR. JIH:  Same objections.

10         BY MS. ZERGER:  Q.  Do you recall?

11         MR. JIH:  Same objections.

12         THE WITNESS:  I think so.  I remember the

13   percentages the most.

14         BY MS. ZERGER:  Q.  Okay.

15   A.    Could be number of packages also.

16   Q.    Okay.  Do you recall whether those boards indicated

17   the number of complaints or accidents as well?

18         MR. JIH:  Same objections.

19         THE WITNESS:  I think they did, and the reason I

20   think they did is because I do remember them, you know,

21   actually posting them, a complaint on the board, I mean an

22   actual --

23         BY MS. ZERGER:  Q.  And did each manager that you

24   worked under retain that board in that fashion?

25         MR. JIH:  Same objections.

8/18/2006  Henderson, Jerrett

1      THE WITNESS:  I believe so.  It seemed to be the

2   same.

3      BY MS. ZERGER:  Q.  Did you have to go through the

4   same check-in and check-out procedures under each manager?

5      MR. JIH:  Leading.

6      THE WITNESS:  I did, yes.

7      BY MS. ZERGER:  Q.  Did you have the same experience

8   with terminal managers conducting meetings with you in which

9   they told you what they wanted you to do or objected to

10   things that they thought you hadn't done?

11      MR. JIH:  Objection.  Vague, leading.

12      THE WITNESS:  I remember -- I remember meetings with

13   -- terminal meetings where they did discuss those things.

14      MR. JIH:  Move to strike as nonresponsive.

15      BY MS. ZERGER:  Q.  Do you recall those kinds of

16   meetings with each of the managers that you worked under?

17      MR. JIH:  Objection.  Vague and leading.

18      THE WITNESS:  Yes, I do.

19      BY MS. ZERGER:  Q.  Did you use the same forms like

20   the door knocker that you've talked about under each of the

21   managers that you worked with?

22      MR. JIH:  Vague and leading.

23      THE WITNESS:  Well, I remember each of the managers

24   telling us that we should, you know, use them and, you know,

25   us disagreeing with that, but yeah, there was discussions

8/18/2006  Henderson, Jerrett

1    with every manager there about that.

2              BY MS. ZERGER:  Q.   Okay.   And that door knocker had

3    a FedEx logo?

4    A.      Right, yeah.

5    Q.      Do you recall that you testified that you -- in

6    response to a question from FedEx counsel, that you started

7    the day, a typical day around, it was 6:00, 6:15, 6:30,

8    somewhere in there, do you recall that testimony?

9    A.      Yes, 6:30.

10   Q.      Did you -- is that what was considered start time for

11   purposes of recordkeeping on your scanner, do you know?

12             MR. JIH:  Objection.  Calls for speculation.  Vague

13   and leading.

14             BY MS. ZERGER:  Q.  Let me ask you this.  What was

15   the start time you were instructed to input on your scanner?

16             MR. JIH:  Same objection.  Assumes facts not in

17   evidence.  Leading.

18             THE WITNESS:  We were always told that our start

19   time was when we left the terminal to head to our first stop.

20             BY MS. ZERGER:  Q.  Were you ever required to tint

21   or paint a window on your vehicle by managers, terminal

22   managers?

23             MR. JIH:  Objection.  Vague, leading.

24             THE WITNESS:  Yeah, I mean I couldn't say whether it

25   was the terminal manager or the actual, you know, corporate

**8/18/2006  Henderson, Jerrett**

1    office itself; but yes, I was required to do that.

2            BY MS. ZERGER:  Q.  Did you ever have dents and

3    scratches on your vehicle?

4    A.      Yes, I did.

5    Q.      And were you ever -- did any terminal manager or

6    service manager ever talk to you about those dents and

7    scratches?

8            MR. JIH:  Objection.  Vague as to time.

9            THE WITNESS:  Yes, they pointed them out from time

10   to time, yes.

11           BY MS. ZERGER:  Q.  And did they ask you to do

12   anything about them?

13           MR. JIH:  Same objection.

14           THE WITNESS:  Yes, they asked me to fix, repair and

15   paint over the scratches.

16           BY MS. ZERGER:  Q.  Did you do that?

17   A.      I did repair one dent, and the others I did not.

18   Q.      Did you have the right to choose how you were going to

19   actually deliver the packages?  Could you choose any system

20   you wanted?

21           MR. JIH:  Objection.  Vague, leading.

22           THE WITNESS:  The -- I mean the only way that I knew

23   to deliver the packages was, you know, using the FedEx

24   scanner and, you know, delivering it according to their

25   system.

**8/18/2006 Henderson, Jerrett**

1          BY MS. ZERGER:  Q.  Could you have delivered

2    packages -- you referred to the use of certain marks on the

3    packages.  Are you familiar with something called the

4    "service cross"?

5    A.     Yes, I am.

6    Q.     Could you have delivered a package without putting the

7    service cross on?

8          MR. JIH:  Same objections.  Vague, calls for

9    speculation.

10         THE WITNESS:  The service crosses were mainly put on

11   for packages coming back in that weren't delivered.  We were

12   supposed to put service crosses on every package, and the

13   managers would reprimand us, tell us that if we didn't put

14   service crosses on there that, you know, that could be noted

15   in the file and used at a later time towards termination.

16         BY MS. ZERGER:  Q.  Was there a certain way of

17   filling in the service cross?

18   A.     Yeah, there were certain things that they wanted on

19   the service cross.  As far as my experience, they didn't have

20   to be in a particular order or space, but they wanted, you

21   know, date, code, you know, specific things on that service

22   cross.

23   Q.     And you've -- there's been some reference to driver

24   release in the testimony.  Can you describe briefly what that

25   is, the driver release process?

**8/18/2006  Henderson, Jerrett**

1    A.    It's when you go to deliver a package to someone's

2    home and they are not at home, then you can place that

3    package in a spot, you know, away -- you're supposed to away

4    from public view as best you can, and release that package as

5    delivered to the customer, and that's what a driver release

6    is.

7    Q.    OKAY.  And are there certain ways to do a driver

8    release that you were trained in?

9         MR. JIH:  Objection.  Vague, leading, assumes facts

10   not in evidence.

11        THE WITNESS:  Well, I mean we were shown driver

12   release procedure on the training video and we were also --

13   you know, when the managers would go out on rides or, you

14   know, follow on checkups on us, we would be talked to about

15   things that we did incorrectly according to their procedures

16   if we did in fact do things incorrectly for driver releases.

17   Q.    What were those follow-ups that you were talking about

18   when you were followed?

19   A.    Those were periodic reports I guess that the managers

20   would, you know, come behind you at some point in your route

21   and check on your deliveries for a certain amount of

22   deliveries and review if you had, you know, done those

23   correctly according to their procedures.

24   Q.    And "those" refers to -- you said they would check and

25   see if you had done those correctly, "those" being?

**8/18/2006  Henderson, Jerrett**

1    A.    The deliveries, if you had done all the deliveries and

2    all the door knocker and all the things that they had

3    discussed.

4    Q.    Okay.  I think that you referred at one point to

5    driver audits.  Is that the same thing as a customer service

6    ride?

7          MR. JIH:  Objection.  Leading, misstates the prior

8    testimony.

9          THE WITNESS:  I'm not sure if the audit is used to

10   describe the thing I previously talked about where they

11   followed you around to look at your deliveries or if they're

12   using that to describe the ride-along, but both those --

13         BY MS. ZERGER:  Q.  And what is the ride-along?

14   A.    The ride-along is again the manager, you know, reviews

15   all of your, you know, your habits of delivery.  I mean, you

16   know, your driving habits, the way you deliver the package,

17   if you, you know, left door knockers, how long it takes you

18   to deliver for each stop, you know, how much time it takes

19   you.  And if there's anything that you're not doing correctly

20   or according to the procedures that they've talked about,

21   then that's noted on the form and they talked to you about

22   that at the end of the ride-along.

23   Q.    And how often did you have those ride-alongs if you

24   can recall?

25   A.    Generally it was once a month.  There was occasions

**8/18/2006 Henderson, Jerrett**

1    where managers missed a month so they may have more than one

2    in a month.

3    Q.    Could you ever put anyone -- were you free to put any

4    person in the driver's seat of one of your vehicles to drive

5    one of your routes that you chose?

6         MR. JIH:  Objection.  Vague, leading.

7         THE WITNESS:  I guess I would have to answer that

8    question no because of my previous experience and what I had

9    stated before where they declined two people that I had

10   brought in that I felt -- you know, I wanted to use on my

11   routes, and they, you know, outright declined one person and

12   the other person they just let hang out to dry and never got

13   back to them and never put them through their training

14   procedures in order for him to be accepted and approved,

15   so...

16        BY MS. ZERGER:  Q.  So it was your understanding

17   that only drivers approved by FedEx could drive your -- the

18   vehicles on your route?

19        MR. JIH:  Same objections.

20        THE WITNESS:  Well, yeah, that's what I was told

21   that they could not drive unless they were approved and went

22   through that system.

23        BY MS. ZERGER:  Q.  And you were asked several

24   questions about an incident where you signed your name on a

25   customer's signature-required package.  Do you recall that,

8/18/2006 Henderson, Jerrett

1    those questions?

2    A.    I recall the questions, yes.

3    Q.    And what led you to put your name where it seemed

4    to -- where it required a customer's signature?  Why did you

5    choose to do that?

6    A.    Again, I felt that -- I felt that it was necessary to

7    do that in order to get the delivery to the customer, and in

8    some cases -- at the time that that happened, I had a large

9    volume of packages that, you know, were -- I was finding it

10    hard to fit in the van, and so by bringing these packages

11    back, you know, at these certain times I was concerned that

12    the following day that either the same package would not get

13    delivered again or someone else's would not get delivered

14    because of the amount of volume that I was trying to fit in

15    the van.

16         So, for those particular instances I felt that it was

17    best to take the responsibility for the package and try and

18    at least deliver it to the customer so that, you know, there

19    would be more room for the next day for more deliveries.

20    Q.    Were you trying to be deceptive or cheat in any way

21    when you did that?

22    A.    No, no.  I did not make an attempt to, you know, sign

23    their name.  I signed my own name and accepted responsibility

24    if the package was missing.

25         MS. ZERGER:  No further questions.


2/5/2007  10:34 AM                                                    303

8/18/2006  Henderson, Jerrett

```
 1              THE VIDEOGRAPHER:  That's the end of Tape 7 and

 2       we're off the record at 5:42 p.m.

 3              (5:42 p.m, deposition adjourns)

 4              THE REPORTER:  Do you want a copy?

 5              MS. ZERGER:  Yes.  I'm thinking if I want a rough.

 6       Yes, send me a rough.

 7              THE REPORTER:  Okay.  To the email on your card?

 8              MS. ZERGER:  Yes.

 9              (Off the record)

10

11                              --oOo--

12

13                      PENALTY OF PERJURY

14

15

16              I declare under penalty of perjury that the

17       foregoing is true and correct.

18              Subscribed at _____, California, this

19       _____ day of _____, 2006.

20

21

22

23              _____

24                      JERRETT W. HENDERSON

25
```

**8/18/2006  Henderson, Jerrett**

```
1              CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2

3         I, LISA R. OLLAR, a Certified Shorthand Reporter,

4    licensed by the State of California, being empowered to

5    administer oaths and affirmations pursuant to Section 2093(b)

6    of the Code of Civil Procedure, do hereby certify:

7         That the witness named in the foregoing deposition

8    was present at the time and place specified, and was by me

9    administered an oath to testify as to the truth, the whole

10   truth, and nothing but the truth; that the said proceeding

11   was taken before me, in shorthand writing, and was thereafter

12   transcribed, under my direction, by computer-assisted

13   transcription;

14        That the foregoing transcript constitutes a full,

15   true and correct report of the proceedings which then and

16   there took place; that I am a disinterested person to the

17   said action.

18        IN WITNESS WHEREOF, I have hereunto subscribed my

19   signature on this _____ day of _____, 2006.

20

21

22             _____

23             LISA R. OLLAR, CSR

24             Certified Shorthand Reporter

25             California License #4114

26

27
```

**8/14/2006  Allen, Peter**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

--oOo--

| | |
|---|---|
| IN RE:  FEDEX GROUP PACKAGE | ) |
| SYSTEM INC., EMPLOYMENT | )  No. 93:05-MD-527 |
| PRACTICES LITIGATION | )      RM |
| | ) |
| _____ | ) |

DEPOSITION OF

PETER ALLEN

_____

August 14, 2006

REPORTED BY:  ANGELA T. KOTT, CSR 7811

EXHIBIT C

**8/14/2006  Allen, Peter**

I N D E X

INDEX OF EXAMINATIONS


BY MR. GARRISON                        7

BY MS. ZERGER                        340



EXHIBITS MARKED FOR IDENTIFICATION


Exhibit No.              Description              Page

**8/14/2006  Allen, Peter**

Contractor/Driver Information          81

    13               Sheet for Peter R. Allen, Bates

FXG_ALEXANDER0003655 - 3658

    14

New Contractor form dated 2/25/03,    85

    15               for Peter Allen, Bates FXG_ALEXANDER

0003792

    16

Driver's Annual Certifications of     86

    17               Motor Vehicle Violations for

Peter Allen, Bates FXG_ALEXANDER

    18               0003621, 3624, 3628

    19     4     FedEx Home Delivery Standard         99

Contractor Operating Agreement,

    20               Bates PCA0023706 - 23756

    21     5     Purchase and Sale Agreement dated    142

June 27, 2006 between Peter Allen

    22               and Anas Benyazed, Bates PCA0029868 -

29870

    23

Kelley Blue Book Valuation, Bates     145

    24               PCA0029871 - 29874

    25

**8/14/2006  Allen, Peter**

EXHIBITS CONTINUED:

| | | |
|---|---|---|
| 7 | Sticker Price Sheet for 2003 Express Commercial Cutaway, Bates PCA0021757 | 147 |
| 8 | Addendum 6, FHD Contractor Operating Agreement Business Support Package, Bates PCA0021871 | 246 |
| 9 | Addendum Response of Peter Allen to Defendant's First Set of Interrogatories | 322 |

**8/14/2006  Allen, Peter**

                         APPEARANCES

 FOR THE PLAINTIFFS:

      LEONARD CARDER, LLP

      BY: KIRSTEN L. ZERGER, ESQ.

      1330 Broadway, Suite 1450

      Oakland, California 94612

      Telephone:  (620) 345-3275

 FOR DEFENDANTS:

      O'MELVENY & MYERS LLP

      BY:  MICHAEL W. GARRISON, JR., ESQ.

      400 South Hope Street

      Los Angeles, California 90071-2899

      Telephone:  (213) 430-6000

 ALSO PRESENT:  JENNIFER McKAY, Video Solutions

**8/14/2006  Allen, Peter**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF INDIANA

SOUTH BEND DIVISION

--oOo--


IN RE:  FEDEX GROUP PACKAGE        )

SYSTEM INC., EMPLOYMENT            )   No. 93:05-MD-527

PRACTICES LITIGATION               )        RM

                                   )

_____)

--oOo--

        BE IT REMEMBERED that, pursuant to Notice,

and on Monday, August 14, 2006, commencing at 8:28

a.m. thereof, at 1215 K Street, Sacramento,

California, before me, ANGELA T. KOTT, a Certified

Shorthand Reporter, personally appeared


PETER ALLEN

_____


Called as a witness by the Defendants, who, having

been first duly sworn, was examined and testified as

follows:

--oOo--

**8/14/2006  Allen, Peter**

1          THE VIDEO OPERATOR:  Here begins Videotape

2    No. 1 in the deposition of Peter Allen in the matter

3    of Federal Express Group Package System, Inc.

4    Employment Practices Litigation in U.S. District

5    Court North District of Indiana South Bend Division,

6    Case No. 93:05-MD-527 RM.  Today's date is August

7    14, 2006.

8          The time on the video monitor is 8:29.  The

9    video operator today is Jennifer McKay, a notary

10   public contracted by LegaLink, New York, New York.

11   This video deposition is taking place at 1215 D

12   Street, 16th Floor, and was noticed by O'Melveny &

13   Myers.

14         Counsel, please identify yourselves and

15   state whom you represent.

16         MR. GARRISON:  Mike Garrison for Defendant

17   FedEx Ground.

18         MS. ZERGER:  Kirsten Zerger with Leonard

19   Carder for Plaintiffs.

20         THE VIDEO OPERATOR:  The court reporter is

21   Angela Kott of LegaLink.  Would the reporter please

22   swear in the witness.

23         (Witness sworn)

24         THE VIDEO OPERATOR:  Please begin.

25

8/14/2006  Allen, Peter

1                    EXAMINATION

2     BY MR. GARRISON:

3         Q.  Good morning, Mr. Allen.

4         A.  Good morning.

5         Q.  As you probably deduced, I'm Mike Garrison.

6     I'm an attorney for FedEx Ground in this case.

7     Before we get into the questioning, counsel has

8     reached a stipulation that my use of the term

9     "contractor" in a question and Mr. Allen's use of

10    the same term in an answer shall not constitute an

11    admission regarding his either independent

12    contractor or employee status.

13            Is that accurate, Counsel?

14            MS. ZERGER:  Yes.

15    BY MR. GARRISON:

16        Q.  Mr. Allen, please state your full name for

17    the record.

18        A.  Peter Robert Allen.

19        Q.  Have you ever used any other names?

20        A.  No.  Well, I go by Pete, excuse me.

21        Q.  Have you ever had your deposition taken

22    before?

23        A.  No.

24        Q.  I'm going to give you a few general ground

25    rules.

8/14/2006  Allen, Peter

1        A.   Okay.

2        Q.   As you can figure out, I'm going to ask

3   questions.  You're going to answer questions.  Your

4   attorney may interpose objections from time to time.

5             Even though we're in a fairly informal

6   setting, you are under oath as if you were

7   testifying in court.

8             Do you understand?

9        A.   Yes, sir.

10       Q.   The court reporter will transcribe all of

11  my questions and your answers.  To help her, please

12  don't speak over me and I'll try not to speak over

13  you.

14            Also, you'll need to answer audibly.  For

15  example, nodding of your head, she can't get that

16  down, or "huh-uh" or "uh-huh," those are hard to

17  catch.  So if you'd please try to do that.

18            If you do not understand one of my

19  questions, please let me know and I'll be happy to

20  clarify it or rephrase it.

21       A.   Okay.

22       Q.   But if you don't ask me to clarify or

23  rephrase, I will assume you understood the question.

24            Is that fair?

25       A.   Yes, sir.

**8/14/2006  Allen, Peter**

1      Q.  I'm entitled to your best estimate, but I

2    don't want you to guess or speculate.

3          Do you understand the difference?

4    A.  Yes.

5      Q.  Okay.  Is that fair?

6    A.  Yes.

7      Q.  After the deposition, the court reporter

8    will take her transcription and print it up in a

9    formal booklet.  You'll have an opportunity to

10   review that booklet.  You'll have an opportunity to

11   make any changes or corrections if you want to.

12   However, if you do make changes, I or any other

13   attorney for the company will have an opportunity to

14   comment on those changes at trial.

15          Do you understand?

16   A.  Yes.

17     Q.  Are you represented by counsel today?

18   A.  Yes.

19     Q.  And that is --

20   A.  Kirsten.

21     Q.  Okay.  Have you taken any alcohol,

22   medication or any other substance which could

23   interfere with your ability to testify?

24   A.  No, sir.

25     Q.  Is there any other reason we cannot proceed

**8/14/2006  Allen, Peter**

1    with your deposition?

2           A.   No, sir.

3           Q.   What did you do to prepare for today's

4    deposition?

5           A.   I just met with counsel last Sunday.

6           Q.   Any other times?

7           A.   Last night.

8           Q.   How long did you meet last Sunday?

9           A.   It was about two and a half hours.

10          Q.   And last night?

11          A.   About two and a half hours.

12          Q.   Did you review any documents to prepare for

13   your deposition?

14          A.   Just the complaint and the answers to my

15   discovery questions.

16          Q.   Anything else?

17          A.   No, sir.

18          Q.   Have you done anything else to prepare for

19   today's deposition?

20          A.   No, sir.

21          Q.   Visited any websites, chat rooms, that sort

22   of thing?

23          A.   No.

24          Q.   Talked with any other contractors or FedEx

25   people or former FedEx people?

**8/14/2006  Allen, Peter**

1       A.  No.

2       Q.  Other than your attorney, have you

3   discussed your deposition with anyone?

4       A.  Only in our meeting last week with other

5   named plaintiffs.

6       Q.  And was that the meeting of last Sunday

7   that you mentioned?

8       A.  Yes, sir.

9       Q.  Who else was at that meeting?

10      A.  Just other attorneys that are representing

11  the plaintiffs and the plaintiffs themselves.

12      Q.  About how many plaintiffs?

13      A.  I think it was 12, I believe.

14      Q.  Do you know any of their names?

15      A.  Just two.  Dean Alexander and Susan -- I

16  don't know her last name.  She was --

17      Q.  Ms. Andrade, maybe?

18      A.  Yeah.

19      Q.  And that meeting lasted about two and a

20  half hours?

21      A.  Yes, sir.

22      Q.  Was anyone there who wasn't either a lawyer

23  for the plaintiffs or a member of the lawyers' staff

24  or a plaintiff?

25      A.  No.

**8/14/2006  Allen, Peter**

1      Q.  Where did this meeting occur?

2      A.  In Oakland at Leonard Carder's office.

3      Q.  Today is typically a day off for you; is

4    that right?

5      A.  Yes, sir.

6      Q.  Are you being reimbursed for any expenses

7    incurred to be here today?

8      A.  No.

9      Q.  Are you being compensated for your time?

10      A.  No.

11      Q.  So since today is normally your day off,

12    you're not experiencing any lost settlement for

13    today; is that right?

14      A.  No.

15      Q.  Have you ever testified in court or in an

16    administrative hearing?

17      A.  No.

18      Q.  What is your date of birth?

19      A.  June 29th, 1962.

20      Q.  And do you still live on Theresa Way in

21    Yuba City?

22      A.  Yes, sir.

23      Q.  Are you married?

24      A.  Yes.

25      Q.  And your wife's name is Laura?

**8/14/2006  Allen, Peter**

1      A.  Yes.

2      Q.  Do you have any children?

3      A.  Yes, I have four daughters.

4      Q.  What are their names?

5      A.  Kirsten, Lisha, L-i-s-h-a, Kelsey, that's

6  with a K, K-e-l-s-e-y.

7      Q.  Thank you.

8      A.  And then Jillian with a J.

9      Q.  How old are they?

10     A.  Kirsten is 20, Lisha is 17, Kelsey is 15,

11  and Jillian is six.

12     Q.  Are you a high school graduate?

13     A.  Yes.

14     Q.  What year?

15     A.  1980.

16     Q.  What high school?

17     A.  HH Arnold High School in Wiesbaden,

18  Germany.

19     Q.  Were your folks in the service?

20     A.  My father was, yes.

21     Q.  Are you a college graduate?

22     A.  No.

23     Q.  Have you taken any college courses?

24     A.  Yes, I have.

25     Q.  What ones?

2/5/2007  10:35 AM

**8/14/2006  Allen, Peter**

```
 1          A.  I've taken some general ed, history and

 2     also I have college credit for a lot of my military

 3     training that I received.

 4          Q.  And in what areas was that military

 5     training?

 6          A.  In communication and ground radio

 7     maintenance repair, specialty career.  Air field

 8     systems maintenance -- basically it's all the

 9     communications for the air field systems.

10          Q.  Have you taken any classes in business?

11          A.  No.

12          Q.  Accounting?

13          A.  No.

14          Q.  Tax?

15          A.  No.

16          Q.  Law?

17          A.  No.

18          Q.  Employee -- employment issues?

19          A.  No.

20          Q.  Employee benefits?

21          A.  No.

22          Q.  Okay.  Any training in wage and hour

23     matters?

24          A.  No.

25          Q.  Do you have any professional licenses or
```

**8/14/2006  Allen, Peter**

```
 1    certifications?

 2         A.  I have or I had for 15 years in the

 3    military a top secret clearance.

 4         Q.  Anything else?

 5         A.  No.

 6         Q.  Do you have any sort of commercial driver

 7    license or permit?

 8         A.  No.

 9         Q.  Have you ever had a license or

10    certification suspended or revoked?

11         A.  No.

12         Q.  Are you a member of any professional

13    associations or clubs?

14         A.  No.

15         Q.  Now, you were in the Air Force?

16         A.  Yes, sir.

17         Q.  And that was from June -- you tell me.

18         A.  I'm sorry, June of 1982 until December of

19    2002.

20         Q.  And you put in your 20?

21         A.  Yeah, a little bit over 20 years, yes, sir.

22         Q.  So you have a pension from that?

23         A.  Yes, sir.

24         Q.  Did you wish to stay on or did you --

25         A.  I chose to retire.
```

8/14/2006  Allen, Peter

1       Q.  Did you ask or apply to be permitted to

2    continue in the service?

3       A.  No.

4       Q.  And while in the Air Force you worked in

5    ground radio communications and as a craftsman; is

6    that right?

7       A.  Yes.  And I was also a manager.  In my --

8    the last few years of my career I actually was in

9    charge of a flight of about -- it varied between 65

10   and 100 people.

11      Q.  In what area?

12      A.  It was all in communications, the

13   maintenance side of it.

14      Q.  And you received an honorable discharge?

15      A.  Yes, sir.

16      Q.  And that was in 2002?

17      A.  Yes, sir.

18      Q.  Have you ever filed or been involved in any

19   other lawsuits?

20      A.  No, sir.

21      Q.  Have you ever been convicted of a felony?

22      A.  No, sir.

23      Q.  Have you ever been convicted of a

24   misdemeanor?

25      A.  No, sir.

**8/14/2006  Allen, Peter**

1    Q.  When did you first contract with FedEx?

2    A.  Contracted with them in March of 2003.  I

3    actually started in November of 2002, the training

4    process, and working as a temp at the Chico

5    terminal.

6    Q.  So you started in what month in '02 as a

7    temp?

8    A.  It was either late October or early

9    November.  I'm not exactly sure on the exact time.

10    Q.  Okay.  And then when were you discharged in

11    '02 from the service?

12    A.  In December -- I went -- I'm not sure if

13    you're familiar with the discharge process when you

14    retire, but you can take up to 70 days of your

15    vacation time, which we call leave in the military,

16    plus they give you 20 days processing time.  So my

17    last day working was in August and then -- but I

18    didn't actually retire until 31 November, 1 December

19    was my official discharge date.

20    Q.  I understand.  So there's a little bit of

21    overlap when you were not physically performing

22    services for the Air Force?

23    A.  Yes, sir.

24    Q.  Okay.  Did you hold any jobs before you

25    went into the Air Force?

8/14/2006  Allen, Peter

1        A.  Yes, I did.

2        Q.  What job did you have immediately before

3    the Air Force?

4        A.  I worked for IT&T.  It was an assembly line

5    job making fertilizer, Scott's fertilizer spreaders.

6        Q.  And when did you work for them?  You can

7    give me an estimate.  I know it's been a long time.

8        A.  Let me think.  We moved there in 2001.  So

9    sometime in 2001 until -- sorry, 1981 until early

10   1982, first couple months or so.

11       Q.  And were you an employee?

12       A.  Yes.

13       Q.  Do you remember how much you made?

14       A.  Like four something an hour or something.

15   Something close to that.

16       Q.  Did you have benefits?

17       A.  I couldn't tell you.  I don't believe I was

18   really concerned about that at that time, but I

19   don't know.

20       Q.  You were 18, 19, right?

21       A.  Yeah.

22       Q.  Okay.  Why did you leave that position?

23       A.  I decided to join the Air Force.

24       Q.  Were you terminated?

25       A.  No.

8/14/2006  Allen, Peter

1        Q.  Were you asked to resign?

2        A.  No.

3        Q.  Why did you join the Air Force?

4        A.  It was kind of a family tradition, I guess.

5   My father was in, my brother was in.  We were

6   actually all three in at the same time.

7        Q.  All in the Air Force?

8        A.  Yeah.

9        Q.  Where did you work before IT&T?

10       A.  I was in -- it was in Wiesbaden, Germany,

11  and I worked at the commissary as a warehouseman.

12       Q.  And when did you work there?

13       A.  Sometime in '79 or, excuse me, sometime in

14  '80 I started there until I left in like July of

15  1981.  I think it was roughly about a year time

16  frame.  I'm not positive, though.

17       Q.  And do you recall how much you made there?

18       A.  Yeah, I believe it was around $8 an hour.

19       Q.  Better than IT&T?

20       A.  Yeah, much better at that time.

21       Q.  And you probably already had benefits

22  because your dad was already in the service?

23       A.  Yeah, right.  We didn't draw benefits from

24  them because it was, I think, some kind of dependent

25  hiring status or something for kids, so --

**8/14/2006  Allen, Peter**

1      Q.  Why did you leave that job?

2      A.  Because my father was reassigned to

3   Valdosta Georgia Moody Air Force Base.

4      Q.  And you were not terminated?

5      A.  No.

6      Q.  And you were not asked to resign?

7      A.  No.

8      Q.  Based on your work experience before

9   contracting with FedEx, were you prepared -- did you

10   have the necessary skills to be a temp driver?

11      MS. ZERGER:  Objection.  Vague and

12   ambiguous.

13      THE WITNESS:  Can you rephrase it -- or I'm

14   not sure what you're getting at here.

15   BY MR. GARRISON:

16      Q.  Sure.  When you became a temp driver, did

17   you have the skills to do that or did you have to

18   get some training?

19      A.  We received training from FedEx.

20      Q.  Okay.  Did you need that training because

21   you hadn't done that sort of work before?

22      A.  Well, yeah.  I mean, just to make -- to

23   receive the training.  It was a requirement that

24   they put on us.  I mean, I couldn't just walk in and

25   drive for them without their training.

**8/14/2006  Allen, Peter**

1      Q.  So you hadn't driven or hadn't provided

2   pick-up and delivery services in a van prior to

3   becoming a temp for FedEx?

4      A.  No.

5      Q.  Did any of your prior experiences, either

6   work experience or life experiences, prepare you to

7   be a temp driver with FedEx?

8         MS. ZERGER:  Vague and ambiguous.

9         THE WITNESS:  Can you clarify?  I mean, I'm

10   not --

11   BY MR. GARRISON:

12      Q.  Had you driven trucks, had you worked in a

13   customer service-type industry?  I'm just trying to

14   get a sense of how much -- how many of the skills

15   you needed to be a temp driver you brought to the

16   job as opposed to how much you had to learn on the

17   job or through training that was provided to you.

18      A.  Well, I worked when I was younger in a

19   customer service-type environment in like a

20   cafeteria, but nothing similar to FedEx.

21      Q.  And you didn't have any truck driving

22   experience?

23      A.  No.

24      Q.  And you hadn't been a delivery person?

25      A.  No.

**8/14/2006  Allen, Peter**

1       Q.  You mentioned FedEx provided training.  Did

2    you feel like that training was adequate to help you

3    learn the skills that you needed to be a temp

4    driver?

5       A.  At the time I didn't know.  I mean, I

6    didn't know what it entailed.  So I mean, I just

7    assumed that what they provided us was good enough

8    to get us at least started, but --

9       Q.  Fair enough.  Looking back today, was the

10   training adequate?

11      A.  I think it was, yeah.  I mean, probably

12   overkill as far as the way they explained it step by

13   step everything we had to do.

14      Q.  How long did the training last?

15      A.  A week.

16      Q.  Roughly how many hours a day?

17      A.  Eight.

18      Q.  Where was it?

19      A.  At the Chico terminal.

20      Q.  So it was local?

21      A.  Yes.

22      Q.  Do you recall who provided it or who the

23   trainer was?

24      A.  I don't recall his name, but I know he came

25   out of the Oakland area.

8/14/2006  Allen, Peter

1        Q.   Was it a FedEx employee?

2        A.   Yes, it was.

3        Q.   And that training included driving the

4    truck?

5        A.   Yes, some classroom study and then

6    behind-the-wheel training.

7        Q.   Do you recall approximately how much

8    behind-the-wheel training you had?

9        A.   It was about, I think -- about half, a

10   little over half of the training of the five days

11   was behind the wheel.  And it wasn't all -- I mean,

12   I wasn't behind the wheel the entire time.  We had,

13   I think it was five or six people in a class in each

14   one, and we were in a passenger van and each one of

15   us drove for a little bit.

16       Q.   So you traded off?

17       A.   Yeah, we traded off.

18       Q.   I understand you're selling your route; is

19   that correct?

20       A.   That's correct.

21       Q.   But as of today you're still under

22   contract; is that right?

23       A.   Yes, I am.

24       Q.   And I think you mentioned you've been under

25   contract since March '03?

**8/14/2006  Allen, Peter**

1        A.   '03, that's correct.

2        Q.   And have you been at the Sacramento

3    terminal that whole time?

4        A.   Yes.  A little bit before then.  Actually,

5    in February of '03 is when I went down to the

6    Sacramento terminal.

7        Q.   Why did you move?

8        A.   Because there was -- there was a route

9    opened up in the Chico terminal.  And there was two

10   of us going for it.  And the terminal manager told

11   us that whoever got their vehicle first got the

12   contract, so the other individual got his vehicle

13   first.

14            At first he was giving it to me, but then I

15   was taking time because I was shopping around trying

16   to find the vehicle that they specified and trying

17   to find the cheapest deal I can find.  And in the

18   meantime, he told the other guy go ahead and look

19   for a vehicle, and he got it first so I lost the

20   contract.

21       Q.   I see.  There was a route open down in

22   Sacramento?

23       A.   When I first went down there, there was a

24   couple routes open.

25       Q.   And you ultimately did obtain a route in

**8/14/2006  Allen, Peter**

1    March '03, right?

2         A.  Correct.

3         Q.  Did you have to pay any money for that

4    route?

5         A.  No, I did not.

6         Q.  During your time under contract with FedEx

7    have you thought about applying for any other

8    positions, other companies?

9         A.  Not really because I didn't want to eat the

10   cost of a vehicle and just walk.  So I decided to

11   stick it out until my vehicle was paid off.

12        Q.  Have you been offered any jobs since you

13   were under contract with FedEx?

14        A.  No.

15        Q.  When do you expect your route sale to be

16   final?

17        A.  Hopefully, if FedEx gets everything

18   approved by this coming Saturday, should be my last

19   day.

20        Q.  And what are you going to do after you are

21   no longer working with FedEx?

22        A.  Take a couple months off and then I'm not

23   sure yet.  I may go back into my chosen profession

24   from the military.

25        Q.  Back in the service?

**8/14/2006  Allen, Peter**

1        A.  Not in the service but as a civilian in the

2    service.

3        Q.  How does that work?

4        A.  Well, they have positions out there that

5    are available, government service positions, GS

6    positions, and I may apply for that.

7        Q.  Have you applied for any jobs?

8        A.  Not yet, no.

9        Q.  Have you talked to anyone or communicated

10   with anyone or any company about the potential of

11   working for them or with them?

12       A.  One individual, yes.  A Gilbert Mendival.

13   He has a friend that works in Oregon that was

14   looking to start a produce company in Yuba City.

15   And he asked me if I would like to work for him and

16   I said I'd think about it.

17       Q.  And what would that entail?

18       A.  Managing the warehouse operations.

19       Q.  As an employee?

20       A.  Yes.

21       Q.  Did you get far enough down the line to

22   talk about whether or not you'd receive benefits?

23       A.  No, I haven't even discussed anything

24   because it's just in the beginning stages.

25       Q.  Have you spoken or communicated with anyone

**8/14/2006  Allen, Peter**

1       else about the possibility of a job?

2              A.  No.

3              Q.  Have you thought about starting your own

4       business?

5              A.  No.

6              Q.  During -- strike that.

7                  While you've been under contract with FedEx

8       have you had any other jobs?

9              A.  No.

10             Q.  Part time jobs, full time?

11             A.  No.

12             Q.  You mentioned you receive your military

13      pension from your 20.  How much is that?

14             A.  Probably roughly around $16-1,700 a month.

15             Q.  And then you have your settlement, of

16      course.

17             A.  Yes.

18             Q.  Do you have any other sources of income?

19             A.  My wife's.

20             Q.  What does she do?

21             A.  She's an assessment clerk for Yuba County.

22             Q.  And how much does she make a month?

23             A.  I think around $3,800 a month.

24             Q.  Any other sources of income?

25             A.  No.

**8/14/2006  Allen, Peter**

1      Q.  You've never owned your own business, have

2    you?

3      A.  No.

4      Q.  And I'm talking about aside from being a

5    contractor from FedEx which is in dispute in this

6    case.

7          MS. ZERGER:  I'm going to object that that

8    calls for a legal conclusion as to whether he had a

9    business and was a contractor.

10         You can go ahead and answer.

11         THE WITNESS:  No, I haven't had any.

12   BY MR. GARRISON:

13     Q.  Do you have any friends or have you ever

14   had any friends who owned their own business?

15     A.  Yes.

16     Q.  What business?

17     A.  I have a friend right now that owns

18   Superior Fence in Yuba City, California.

19     Q.  How big an operation is that?

20     A.  I'm not positive.  I think he has probably

21   eight to ten people working for him.

22     Q.  Have you ever talked to him about the

23   demands of owning his business?

24     A.  Oh, sure.

25     Q.  What types of things has he mentioned or

8/14/2006  Allen, Peter

1   did he discuss?

2        A.  He says it's a lot of work, but he also

3   says whenever he wants a day off he just closes shop

4   and takes a day off.  When he -- I mean, he puts --

5   it's a demanding job, I know that, or task.  But

6   like he said, he works hard but then when he needs

7   time off, he'll take it.

8        Q.  But if no one else is around and something

9   has to get done, he has to do it, right?

10       A.  I don't know that for sure.  I haven't

11  talked to him about that.

12       Q.  And presumably he has to pay for his own

13  benefits, right?

14           MS. ZERGER:  I'm going to object.  Lack of

15  personal knowledge.

16           THE WITNESS:  I don't know.

17  BY MR. GARRISON:

18       Q.  And he has to be sensitive to his

19  customers' needs if he wants to be successful,

20  right?

21       A.  I haven't talked to him on that, so I

22  couldn't tell you.

23       Q.  When did you first learn about the

24  possibility of working with FedEx?

25       A.  I had a friend retire about a year prior to

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 881 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-4   Filed 02/05/07   Page 31 of 358
8/14/2006  Allen, Peter

1    when I retired and he moved to Connecticut.  And he

2    worked for Ground.  And he just mentioned that he

3    was working for Ground.  And I never thought

4    anything of it.

5          But then when I retired -- well, when I was

6    on my terminal leave and I happened to be looking on

7    Monster.com or one of the job sites, I saw an

8    advertisement for temporary work for over the

9    holidays for FedEx Home Delivery.

10         Q.  What was your friend's name who worked for

11   FedEx?

12         A.  Gary Glassmyer.

13         Q.  And was he a contractor?

14         A.  Yes, he was, for Ground.

15         Q.  Does he still work for the company?

16         A.  No.

17         Q.  When did he stop working for the company?

18         A.  I don't know, to be honest with you.  I

19   just know he's not anymore.  I believe they moved

20   from Connecticut to San Antonio, and when he moved I

21   think they gave him a route that he didn't like, so

22   he ended up getting rid of his route.

23         Q.  Can you give me an estimate of when that

24   was -- a couple years, more than that?

25         A.  No idea.

8/14/2006  Allen, Peter

1        Q.   What did you do next in connection with

2    FedEx?

3        A.   Excuse me?

4        Q.   After you learned of the possibility of a

5    position or that they were looking for temp drivers,

6    did you contact the company?

7        A.   Yeah, I believe I contacted Lisa Beck, who

8    was a human resource person for this region at the

9    time.  And she instructed me to go up to the Chico

10   terminal and fill out an application.

11       Q.   Did you and Ms. Beck discuss anything else

12   during that call?

13       A.   No.

14       Q.   And is that what you did, went to Chico and

15   filled out an application?

16       A.   Yes, I sure did.

17       Q.   And what happened after that?

18       A.   Filled out the application.  And James

19   Cumberland was the service manager up there and

20   there wasn't a terminal manager, so he was actually

21   acting as a terminal manager.  Said they'd do a

22   background investigation and get back to me.  A

23   couple days later they said they were having a

24   class, I believe it was the following week, and

25   that's when I started the training.

8/14/2006  Allen, Peter

1     Q.   Okay.  And you said that lasted a week?

2     A.   Yeah, the training lasted a week, yes.

3     Q.   Okay.  Was Mr. Cumberland your supervisor

4    or contact at the company while you were a temp

5    driver?

6     A.   Yes.

7     Q.   What were you told about your employment

8    status, if anything, as a temp driver?

9     A.   What was I --

10     Q.   I mean, were you told you were an employee,

11    were you told you were an independent contractor?

12     A.   I was told I was an employee through one of

13    the temp service agencies.  I can't remember the

14    name of it, but whichever one they were using at the

15    time.

16     Q.   Was it Adecco by any chance?

17     A.   Yeah, it was.  That's it.

18     Q.   Did you receive any paperwork either from

19    Adecco or FedEx as a temp driver?

20     A.   Paperwork?

21     Q.   Or any documents.

22     A.   Pay statements when I got paid.

23     Q.   Were you paid through Adecco?

24     A.   Yes, sir.

25     Q.   Any other documents that you remember?

**8/14/2006  Allen, Peter**

1       A.  Not that I can recall, no.

2       Q.  How frequently were you paid?

3       A.  Weekly.

4       Q.  And how much were you paid?

5       A.  It was nine something an hour.  I'm not

6    positive of the exact amount.

7       Q.  Did you receive benefits?

8       A.  No.

9       Q.  Did you provide services as a temp driver

10   anywhere other than the Chico terminal?

11      A.  Yes, at the Sacramento, too.

12      Q.  Sacramento?

13      A.  Yes.

14      Q.  So there's a little bit of overlap there?

15      A.  Yes.

16      Q.  About how long did you provide temp

17   services in Sac?

18      A.  I never -- in Sacramento I never

19   provided -- worked as a temp driver for FedEx.  I

20   worked for a contractor that had just had a heart

21   attack, and it was a route I was looking at

22   purchasing.

23          So I worked for him until they -- because

24   they wanted him to take on another route and hire a

25   driver.  And they wanted me to take over the Davis

**8/14/2006  Allen, Peter**

1    route, so I worked for him for, I don't know,

2    probably, I don't know, probably two or three weeks,

3    something like that.

4         Q.  Now, at that point you'd already had your

5    training?

6         A.  Yes.

7         Q.  And you'd already been acting as a temp

8    driver?

9         A.  Yes.

10        Q.  So did you need any additional training or

11   were you good to go?

12        A.  No, I didn't.

13        Q.  What was the name of the contractor you

14   just mentioned?

15        A.  Mike Meisner.

16        Q.  M-e-i-s-n-e-r?  That's a yes?

17        A.  Sorry, yes.

18        Q.  Thanks, that's a good example.  You said

19   you worked for him for about two or three weeks?

20        A.  Couple, yeah.  Two or three weeks.

21        Q.  How did you hear about that possibility?

22        A.  Well, after I lost the contract up in Chico

23   I decided to go down to the Sacramento terminal and

24   see what they had available down there.  And I spoke

25   with Scott Dolan, the terminal manager at the time,

1702

8/14/2006  Allen, Peter

1    and he said they had a couple routes available, so I

2    went down there and spoke with him.

3           And they presented that opportunity to

4    drive for him.  At first they had me go with one of

5    their temp drivers up to the Grass Valley area to

6    see whether or not I wanted to do that area, and I

7    chose not to.  And then I went on the Woodland route

8    and the Davis route and I chose the Davis route.

9           Q.  Those are separate routes, Woodland and

10   Davis?

11          A.  Yes.  Well, now Woodland does part of

12   Davis, but --

13          Q.  So the company let you know about the

14   possibility of driving for Mr. Meisner with the idea

15   being that you would take over that route?

16          A.  Never taking over his specific route, no.

17   But they did some juggling.  They convinced Mike

18   Meisner to take the Woodland route after he had his

19   heart attack and hire a driver to do the Woodland

20   route and they wanted me to do the Davis route.

21          Q.  I see.

22          A.  Because when I got in there I impressed

23   them, I guess.  I did quite a few stops.  And they

24   decided they wanted me in Davis, so they spoke with

25   Meisner and convinced him to take the Woodland

**8/14/2006  Allen, Peter**

1    route, swap his route to the Woodland and give me

2    the Davis.

3         Q.  Did you have a look around?

4         A.  Yes.

5         Q.  The idea was, other than the being a temp

6    for a short amount of time, that you'd get your own

7    route?

8         A.  Yes.

9         Q.  And that ended up being the Davis route?

10        A.  Yes.

11        Q.  Okay.  So during this two- to three-week

12   period you were working for Mr. Meisner; is that

13   right?

14        A.  That's correct.

15        Q.  Did you consider yourself to be his

16   employee?

17        A.  Yes.

18        Q.  How much did he pay you?

19        A.  I want to say $1.50 a stop.  I think that's

20   pretty accurate.

21        Q.  Did you and he negotiate that?

22        A.  Well, that's just what he said he'd pay me.

23        Q.  That's what he offered?

24        A.  Right.

25        Q.  That worked for you?

**8/14/2006  Allen, Peter**

1        A.  Yes, sorry.

2        Q.  Thanks.  Any benefits or anything like

3    that?

4        A.  Pardon?

5        Q.  Did he provide you with any benefits or

6    anything like that?

7        A.  No.

8        Q.  Did you receive any documents regarding

9    your working for Mr. Meisner?

10       A.  No.

11       Q.  So at that time, was Mr. Meisner off

12   completely because of his heart attack?

13       A.  Yes, he never returned as a driver.

14       Q.  Okay.  So while, just so I understand, so

15   while you were working for him, it was his route but

16   you were doing all the pick-ups and deliveries?

17       A.  Correct.

18       Q.  And he was recuperating but he wasn't

19   providing services with FedEx at that point?

20       A.  Correct.

21       Q.  Okay.  Do you know if he was doing anything

22   as a FedEx contractor during the time you drove for

23   him?

24       A.  I don't have any -- he wasn't, as far as

25   performing his duties, no.

**8/14/2006  Allen, Peter**

1      Q.  Did you handle paperwork associated with

2    the route during that time?

3           MS. ZERGER:  Objection.  Vague.

4           THE WITNESS:  What are you talking about?

5    BY MR. GARRISON:

6      Q.  For example, daily settlement statements,

7    did you fill those out and sign them at that time?

8      A.  No, I believe he came in and did it on a

9    weekly basis.  He'd come in a couple times a week

10   and fill those out.

11     Q.  Okay.  Did he only come in about once a

12   week?  I realize this was a short period of time.

13     A.  Once or twice a week.

14     Q.  But not every day?

15     A.  No.

16     Q.  Does Mr. Meisner still have the Woodland

17   route?

18     A.  No.

19     Q.  Was there some period of time where he kept

20   it after you took over the Davis route?

21     A.  Yes.

22     Q.  Was he able to service it himself?

23     A.  Never.

24     Q.  Do you know who he used to service with

25   him?

**8/14/2006  Allen, Peter**

1          A.   I believe it was Gilbert Mendival.

2          Q.   Did Mr. Meisner show you how to work the

3     Davis route?

4          A.   No.

5          Q.   Did he provide you any instruction in terms

6     of working his route?

7          A.   No, FedEx did that.

8          Q.   And how was that?

9          A.   They sent me out with one of their drivers,

10    employee driver, temp driver.

11         Q.   And he or she sort of showed you how the

12    route worked?

13         A.   Yes.

14         Q.   Was that one day or more than one day?

15         A.   It was, I think, a couple days.  Two, I

16    believe.

17         Q.   So who at FedEx did you first speak with

18    about owning your own route?  Was that Mr. Dolan?

19         A.   Owning my own route with FedEx would be

20    James Cumberland in Chico.

21         Q.   Okay.  And when did you first talk to

22    Mr. Cumberland about this?

23         A.   In November of 2002.

24         Q.   Okay.  Why did you decide you might be

25    interested in changing from being a temp driver to

1707

8/14/2006  Allen, Peter

1    being a contractor?

2            A.  Because as a temp driver you're not --

3    there's, you know, you're just that, temporary.  You

4    may get called one day to drive and then not be

5    called again for a month.  So the contractor thing

6    was steady employment.

7            Q.  What did you discuss with Mr. Cumberland

8    about being a contractor, or potentially being a

9    contractor?

10           A.  Just talked to him about the areas that

11   were available in Chico, in the Chico terminal, and

12   what kind of vehicle requirements there were for

13   those routes.  And you know, how much the core zone

14   was for each route and --

15           Q.  Did you and he discuss what your

16   responsibilities would be as a contractor?

17           A.  No.

18           Q.  Did you discuss how you would be paid and

19   by whom?

20           A.  I'm trying to think.  No, not with James,

21   no.

22           Q.  Did you discuss hours?

23           A.  Yes, and he said it would vary.

24           Q.  Did you discuss what it meant to be an

25   independent contractor?

8/14/2006  Allen, Peter

1        A.  I believe so, yes, we did.

2        Q.  And what did you discuss in that regard?

3        A.  Just basically what the -- what my

4   responsibility was as far as, you know, servicing

5   the area and stuff.

6        Q.  Anything else in that regard?

7        A.  I asked him about being flexed off.  You

8   know, was I going to be flexed off to certain areas.

9        Q.  And how did he respond to that?

10       A.  He said the possibility always existed that

11  you'd be flexed to a different area.  Never got to

12  that because I didn't get a route there, but --

13       Q.  Okay.  Did you and Mr. Cumberland discuss

14  anything else regarding being an independent

15  contractor?

16       A.  Not to my knowledge.

17       Q.  Did you discuss what your proprietary

18  interest would be?

19            MS. ZERGER:  Objection.  Calls for a legal

20  conclusion.

21            THE WITNESS:  Can you explain that a little

22  bit more as far as what you mean?

23  BY MR. GARRISON:

24       Q.  Do you understand -- strike that.

25            The operating agreement that you signed

8/14/2006  Allen, Peter

```
1    talks about a proprietary interest.  On the HD side,

2    typically it's the zip code.

3         A.  Okay.

4         Q.  Did you talk about that you would own a

5    route or that you would have any sort of ownership

6    in part of the work you did as an independent

7    contractor?

8         A.  With James Cumberland, no.

9         Q.  Do you have an understanding of what

10   proprietary interest means with respect to your

11   operating agreement?

12        A.  Yes, I do.

13        Q.  And what is your understanding?

14        A.  That my primary zip code, 95616, is my area

15   of responsibility.

16        Q.  Any other understanding with respect to

17   your proprietary interest?

18        A.  It's my area to service.  It's also that if

19   they are to flex any of my area off of me without my

20   consent that I'm supposed to be compensated for it.

21        Q.  Anything else?

22        A.  No.

23        Q.  And that area is what you're selling as

24   your route sale, right?

25        A.  Correct.  Well, that area and my vehicle.
```

1710

**8/14/2006  Allen, Peter**

1    Q.  Okay.  Thanks for clarifying that.  Did you

2    discuss with Mr. Cumberland Department of

3    Transportation requirements?

4    A.  No, because I never got a vehicle, so it

5    wasn't -- when I was driving up there, I was driving

6    in a cargo van as a temp, so it was never an issue.

7    Q.  And I take it for the same reason you

8    didn't discuss truck leasing regulations?

9    A.  No, because he just gave -- when the route

10   issue came up with myself and the other individual,

11   he just gave me a couple names of companies that

12   provided vehicles.  And I chose to go with a local

13   company and see if they could make it, but in that

14   time is when the other individual got the truck and

15   the route.

16   Q.  The process kind of stopped at that point?

17   A.  Yes.

18   Q.  Did you discuss renewal of a contract, or

19   nonrenewal, or termination?

20   A.  With James Cumberland?

21   Q.  Correct.

22   A.  No, I never had a contract, so --

23   Q.  Sure.  I understand.  Just in terms of how

24   the process worked and that sort of stuff.

25   A.  No.

**8/14/2006  Allen, Peter**

1       Q.  Did you discuss the potential of becoming a

2    contractor with anybody else up in Chico?

3       A.  No.

4       Q.  And then you come down to Sacramento.  Did

5    you have a discussion with someone there about the

6    potential?

7       A.  Scott Dolan.

8       Q.  That was Mr. Dolan?

9       A.  Yes.

10      Q.  Okay.  And would that have been in early

11   2003?

12      A.  Yes, sometime in February, I believe, of

13   2003.

14      Q.  Did you discuss what your responsibilities

15   as a contractor would be with Mr. Dolan?

16      A.  Yes.

17      Q.  And what was said?

18      A.  He just told me that this would be your

19   area, you're responsible for maintenance of your

20   vehicle, fuel, the whole gambit, you know.

21   Discussed that.  If you needed any time off, you had

22   to find a driver.  He also discussed with me that

23   the growth was there for my route because Davis, my

24   primary -- my proprietary zip code should be split

25   within a year, which it hasn't since, but --

**8/14/2006  Allen, Peter**

1       Q.   I'm sorry, it has or has not?

2       A.   It has not.

3       Q.   The idea being if it split you'd get

4    both --

5       A.   Supposedly what he told me was when your

6    primary zip code splits you have first choice of

7    establishing another route.

8       Q.   Did he promise that the zip code would

9    split?

10      A.   No, he did not promise anything, but he

11   just said that it all went by terminal volume.  But

12   mine was one of the largest routes in the terminal,

13   so it should split within a year and I would have

14   first chance at establishing another route.  And it

15   never did.

16          All they did was take some of my stuff off

17   of me and flex it on to the Woodland route.  And for

18   what reason, I don't know, because I never had an

19   issue with servicing my route, so --

20      Q.   Did you ever ask that some of your packages

21   in the Woodland area be shifted off to the Woodland

22   area?

23      A.   During peak, yes.

24      Q.   Only during peak?

25      A.   Yes.

8/14/2006  Allen, Peter

1       Q.   And why did you ask that that happen?

2       A.   Because the volume was so high I couldn't

3    handle it myself.

4       Q.   Just too much?

5       A.   Yes.

6       Q.   Okay.  Did you and Mr. Dolan discuss

7    anything else regarding your responsibilities as a

8    contractor?

9       A.   I can't recall anything else.

10      Q.   Did you discuss that, kind of obvious, but

11   that you would have to provide your own truck?

12      A.   Oh, yes, definitely.  As a matter of fact,

13   I had to purchase the truck before I could sign the

14   contract.

15      Q.   Did you discuss that FedEx would not

16   provide benefits, medical, retirement, that sort of

17   stuff, that you would be responsible for that?

18      A.   Yes.

19      Q.   Did you discuss that if you wanted to take

20   time off you would need to arrange to have someone

21   else service your route?

22      A.   Yes, we discussed that, but he said there

23   was always temps available that they had around that

24   would be able to, you know, if you needed time off,

25   you'd be able to hire on and use for time off.

**8/14/2006  Allen, Peter**

1        Q.  Have you been able to do that?

2        A.  I have on occasion, yes.

3        Q.  I'm sorry, have?

4        A.  Yes, I have on occasion.

5        Q.  Thank you.

6        A.  And then they started the time-off program

7    about a year or so ago.

8        Q.  And you participated in that, right?

9        A.  Yes, I did.

10       Q.  That's voluntary, isn't it?

11       A.  It is.

12       Q.  And how much do you pay for that?

13       A.  I think it's $1.75 a day per week you take

14   off.  And last year I had three weeks.

15       Q.  Do you have to decide in advance how many

16   weeks?

17       A.  Yes, a year in advance.  Well, not in a

18   year in advance, but sometime in May because it

19   starts on the new fiscal year in June, so they start

20   the new vacation program then.  So you have to in

21   May choose your weeks that you want for the

22   following year.

23       Q.  Did you and Mr. Dolan discuss how you'd be

24   compensated?

25       A.  Yes.

**8/14/2006  Allen, Peter**

1       Q.  And what did you discuss in that regard?

2       A.  He just went over one of the addendums to

3    the contract stating how much I'd be paid per stop,

4    per package.

5           They discussed the fuel supplement because

6    a lot of the drivers with diesels can go over to the

7    hub and get their diesel for $1.25 a gallon.  But

8    those of us who have gas vehicles have to pay street

9    price for it.  And they pay us on either a ten- or

10   12-mile-per-gallon basis a supplement, I think it's

11   over $1.33 a gallon they start supplementing us for

12   fuel, which didn't cover much of it, but -- my

13   vehicle only gets about six to seven miles to the

14   gallon.

15      Q.  Do you wish the fuel supplement was higher?

16      A.  Well, that's obvious, yes, I do.

17      Q.  Put money in your pocket, right?

18      A.  Yes.

19      Q.  Did you discuss anything else with

20   Mr. Dolan regarding compensation?

21      A.  We may have discussed like bonuses.  I

22   can't remember if it was exactly at that time.  I

23   mean, I knew I had to be there a certain period of

24   time before I started getting them.

25      Q.  Anything else you recall regarding

**8/14/2006  Allen, Peter**

1    compensation?

2         A.  Not to my knowledge, no.

3         Q.  Did you discuss hours?

4         A.  Yes.

5         Q.  And what was discussed?

6         A.  It was a combination of hours and what his

7    expectations were of what the -- basically, when I

8    got there, he said their objective was for each

9    contractor to average out to do 108 packages a day.

10            And he also told me that, yeah, you

11   basically -- we couldn't get in the terminal before,

12   I think it was 5:45 or 6:00 at the time in the

13   morning and we couldn't leave until after the sort

14   was completed.

15        Q.  And that's because packages wouldn't be in

16   the right spot?

17            MS. ZERGER:  Objection.  Mischaracterizes

18   the testimony.

19   BY MR. GARRISON:

20        Q.  Well, you tell me.  Why couldn't you leave

21   before the sort was completed?

22        A.  Because they told us that we had to have

23   all our packages loaded before we could leave.  And

24   they would -- when we turned in our scanner -- after

25   we did our load, we'd turn our scanners in.  And if

**8/14/2006  Allen, Peter**

1    there were still packages remaining that weren't

2    scanned, they'd have service managers go out and

3    look for them and wouldn't release us until the

4    individual doing the computer got approval from one

5    of the service managers.

6        Q.  So just so I understand the process, the

7    sort is -- a bunch of packages come in.  Is the sort

8    where they figure out which ones go on which truck?

9        A.  Yeah, the package handlers, they mark the

10   packages with the route number and the sequence

11   number and sort it to the correct pallet where they

12   have us park.

13       Q.  Okay.

14       A.  Each route is assigned a number and you

15   park at that spot every day.

16       Q.  So you come in, park in your spot.  The

17   packages are on a pallet?

18       A.  Yeah, not all of it.  It depends on the

19   time.

20       Q.  Sure.

21       A.  There was times where you'd be there for

22   three or four hours before the sort was done.  So --

23   and supposedly all your packages were there, but

24   they weren't and you'd have packages for other

25   routes on your pallets.

**8/14/2006  Allen, Peter**

1      Q.  So package handlers weren't perfect?

2      A.  No.

3      Q.  Okay.  So as far as process goes generally,

4    so once the packages are on your pallet, you load

5    your own truck; is that right?

6      A.  That's correct.

7      Q.  Do you load your truck however you want?

8      A.  I load the truck the way I was trained in

9    the video, basically, the training video, which is

10   split it from side to side on the vehicle.  The

11   first stops are up front.  I'd go through the bulk

12   head and out the side door.

13     Q.  If you wanted to load your truck

14   differently, you could have, right?

15     A.  Yes.  But this way is the most efficient

16   way for my choice.

17     Q.  For your route?

18     A.  Yes.

19     Q.  Okay.  So you come in, the packages are

20   either on the pallet or being put on the pallet?

21     A.  Right.

22     Q.  You deal with any strays or sort of

23   misdelivered packages.  You load them on your truck

24   and then you scan them as you load them?

25     A.  They are on a pallet.  I start scanning

**8/14/2006  Allen, Peter**

1   them, make sure the sequence numbers that they wrote

2   down on the packages are correct, which they are not

3   most of the time, but -- and I change them as

4   appropriate.

5          Once we're done with that, then we turn our

6   scanner in so they can upload the information and

7   give us our delivery manifests and turn-by-turns.

8          Q.  Now, using the manifest is optional, right?

9          A.  I don't know.  I've never asked if it's

10  optional.  I just use it because that's -- having a

11  written guidance there, basically to see what my day

12  is going to be like.  I've always used it.  I don't

13  know if it's optional or not.

14         Q.  So it's a list of all your deliveries?

15         A.  Yes.

16         Q.  And it's got addresses?

17         A.  In the order that we deliver them, yes.

18         Q.  Okay.  And did you generally follow that?

19         A.  Always.

20         Q.  Is that because it's the most efficient?

21         A.  Yes.

22         Q.  If you wanted to, you could change the

23  order, right?  It might take you longer, but you

24  could if you wanted?

25         A.  Sure.

8/14/2006  Allen, Peter

1      Q.  You mentioned the turn-by-turn, what's

2    that?

3      A.  Well, the manifest has a list of each

4    delivery stop.  The turn-by-turn actually gives you

5    directions, like turn left on First Street, take a

6    right on 2nd Street, take a left on Fourth Street

7    and your address is 1124 Fourth Street.  Basically

8    it tells you exactly how to go.

9      Q.  Do you follow your turn-by-turn or do you

10   know your route well enough?

11     A.  I know my route, but I use my turn-by-turn

12   because I write a lot of information on there,

13   whether it's a signature stop or how many packages.

14     Q.  So you choose to use your turn-by-turn for

15   this --

16     A.  Yes.

17     Q.  I'm sorry, if you would please, let me

18   finish my -- you're doing a good job of anticipating

19   my questions, but we need to not talk over each

20   other so there's a clean record.

21     A.  Sorry.

22     Q.  You use your turn-by-turn because that's

23   used to place that other information?

24     A.  Excuse me?

25     Q.  Strike that.  Let me ask a better question.

**8/14/2006  Allen, Peter**

1      So you choose to use the turn-by-turn

2   because it makes sense for you to do so?

3      A.  Yes, because it's the most efficient way to

4   do it.

5      Q.  You could disregard the turn-by-turn if you

6   wanted, couldn't you?

7      A.  Yeah, if I wanted to spend more money on

8   gas, sure.

9      Q.  Okay.  So you load your truck, you said you

10  turn your scanner in, they upload it.  Is that what

11  allows that to generate, the company to generate the

12  manifests and the turn-by-turn?

13     A.  Yes.

14     Q.  After you were done loading your truck, if

15  you didn't want the manifest and turn-by-turn, could

16  you just get in your truck and go?

17      I guess let me ask a better question, which

18  is, do you have to turn the scanner back in or is

19  that what you are choosing to do?

20     A.  Yes, they have to do something with the

21  scanner, too.  I don't know what they do, but --

22     Q.  Do you know of anybody who -- any other

23  contractor in the Sacramento terminal or any other

24  terminal who doesn't turn their scanner in, that

25  come in, load up, drive out?

**8/14/2006  Allen, Peter**

1       A.  No.

2           Q.  Would it surprise you to learn that there

3    are some contractors in the Sacramento HD terminal

4    who do just that?

5           A.  It wouldn't surprise me, no.

6           Q.  Well, why would it you surprise you?

7    You're saying it's required.

8           A.  I never said it was required.

9           Q.  Okay.  So you do it.  Is it required?

10          A.  It's an efficient way of doing things.

11   That's why I use it.

12          Q.  That's why you do it.  We got a little off

13   track.  We were talking about hours and

14   expectations.

15              Did you and Mr. Dolan talk about when your

16   days would end?

17          A.  When I completed my stops.  I never talked

18   about ending times, no.

19          Q.  So the expectation is you service your

20   route, you deliver all the packages on the route

21   that are assigned to you; is that right?

22          A.  Right.

23          Q.  And then whenever you're done, whether

24   that's noon or whenever, that's when you're done?

25          A.  Correct.

8/14/2006  Allen, Peter

1        Q.   Okay.  So there's no sort of fixed -- it's

2    not a 9:00 to 5:00 deal?

3        A.   No, other than you can't -- I mean, the

4    time you start is pretty much determined by them

5    because the sort has to be done first.

6        Q.   Fair enough.  So if you work very

7    efficiently during the day, you might be able to

8    deliver your packages on your route faster than,

9    say, somebody else could; is that right?

10       A.   Sure.

11       Q.   Did you and Mr. Dolan discuss anything else

12   regarding hours and expectations?

13       A.   I can't recall anything else, no.

14       Q.   Did you and Mr. Dolan discuss what it meant

15   to be an independent contractor?

16       A.   What it meant to be an independent

17   contractor?

18            MS. ZERGER:  I'm going to just object and,

19   you know, that we're -- to the extent it's calling

20   for a legal conclusion.

21   BY MR. GARRISON:

22       Q.   You can understand I'm asking as a

23   layperson, not as a lawyer, obviously.

24       A.   Pardon?

25       Q.   I'm asking you as a layperson, not as a

8/14/2006  Allen, Peter

1    lawyer, just your understanding.

2         MS. ZERGER:  I'm going to object to the

3    extent it's calling for an answer as to whether the

4    discussion involved a legal discussion of

5    independent contractor or the practical aspects of

6    being what was called an independent contractor.

7         THE WITNESS:  I mean, we discussed what we

8    mentioned.  I mean, in the past what we've discussed

9    as far as hours of service, you know, that I was to

10   provide my own fuel, maintenance costs, all that.

11   But not specifically the meaning of an independent

12   contractor, no.

13   BY MR. GARRISON:

14        Q.  Okay.  But you discussed the ways being --

15   I don't want to put words in your mouth, so tell me

16   if this is wrong.  You discussed the things you've

17   identified that are associated with being an

18   independent contractor as opposed to Mr. Dolan

19   saying, "You're going to be our employee and we're

20   going to provide all these things to you"?

21        A.  Yes.

22        Q.  Did you discuss your proprietary interest

23   with Mr. Dolan?

24        A.  Yes, we discussed my primary zip code.

25        Q.  And that's the Davis zip code you

**8/14/2006  Allen, Peter**

1   previously identified?

2        A.  Yes.  And he also told me that I would be

3   flexed to other areas at times, which I was for the

4   first couple years to Dixon and West Sacramento on a

5   regular basis.

6        Q.  And were you able to handle both your

7   primary zip code and those other areas?

8        A.  I didn't have a choice because if you

9   brought packages back you'd be putting your contract

10   in jeopardy, so --

11        Q.  But my question is, were you able -- when

12   you were flexed to those other areas, were you able

13   to deliver all your packages in a day?

14        A.  Yeah.

15        Q.  Did you discuss driver safety

16   requirements -- excuse me.

17            Did you discuss DOT requirements with

18   Mr. Dolan?

19        A.  Yes.

20        Q.  And what did you discuss?

21        A.  Hours of service.  And I believe at the

22   time it was still, like, 12 hours in a day and 60

23   hours in a week.  And there were other requirements,

24   but I don't recall as far as the whole DOT thing

25   was --

**8/14/2006  Allen, Peter**

1       Q.  Did you discuss truck leasing regs?

2       A.  Excuse me?

3       Q.  Did you discuss truck leasing regulations?

4       A.  Truck leasing regulations?

5       Q.  With Mr. Dolan.

6       A.  I don't know what that is.  I mean --

7       Q.  Did you discuss that for certain purposes

8   your truck would be treated as if you were leasing

9   it to FedEx while you were providing services for

10   the company?

11       A.  I don't believe so, no.

12       Q.  Did you discuss how your contract or your

13   operating agreement could end with Mr. Dolan?

14       A.  Could end?

15       Q.  Yes.

16       A.  Yes.

17       Q.  And what was discussed there?

18       A.  If I was in breach of contract or they were

19   in breach of contract, with giving a 30-day notice

20   by myself, or they could terminate if they felt it

21   was necessary at any time.

22       Q.  And if the company was going to terminate,

23   did there have to be a reason, like a service

24   failure or some sort of problem, or could they wake

25   up one day and say you're gone?

8/14/2006  Allen, Peter

1       A.  After the initial period, basically, they

2    could just terminate whenever they wanted, and --

3       Q.  And you could give notice and terminate

4    yourself at any time, right?

5       A.  Yeah, 30-day notice.  And if we didn't give

6    30 days, we lost our escrow account.

7       Q.  And that's $500?

8       A.  Yes.  And we'd be charged if we didn't turn

9    in uniforms.  If we didn't take the signage off the

10   vehicle, we'd be charged additional funds.

11      Q.  Did you discuss anything else with

12   Mr. Dolan regarding being a contractor in your

13   contract?

14      A.  I don't believe so.

15      Q.  Was it important -- strike that.

16         Was it important to your decision to become

17   a contractor, independent contractor, with FedEx --

18   that you would be an independent contractor as

19   opposed to an employee?

20      A.  Well, yes.  To have the freedom to be able

21   to do what I wanted to do, you know, work when I

22   wanted to work.

23      Q.  Any other reasons?

24      A.  Not really.  That was it, basically.  I

25   wanted to have that freedom.

**8/14/2006  Allen, Peter**

1     Q.  How long did your meeting with Mr. Dolan

2     last?  Sounds like you all covered a fair amount of

3     material.

4     A.  Maybe an hour.

5     Q.  And did you go through the contract, the

6     operating agreement during the meeting?

7     A.  No, he gave it to me on a Friday.  He said

8     read it and if you'd like to bring it to a lawyer,

9     go ahead.  And on Tuesday, brought it back in and we

10    signed it.

11    Q.  And did you read it?

12    A.  Yes.

13    Q.  Were there any parts that you didn't

14    understand?

15    A.  A lot of it I didn't understand.  A lot of

16    technical legal issues that I wasn't sure of.

17    Q.  Did you ask anybody at the company to

18    clarify the parts you didn't understand or to

19    explain them?

20    A.  Yeah, I had a few areas that I highlighted.

21    And I asked Scott and he answered some and others he

22    didn't.  He said he'd get back to me.  But I signed

23    the contract anyways because I was already paying on

24    a vehicle that I wasn't making any money off of, so

25    I needed to get started.

**8/14/2006  Allen, Peter**

1    Q.  If you wanted -- if you'd wanted to, you

2    could have waited until Scott clarified those other

3    areas?

4    A.  Sure, and not signed the contract for

5    another week and lost wages and been paying on a

6    vehicle that I wasn't making any profits from.

7    Q.  I'm not suggesting you should have, but you

8    could have?

9    A.  Yes.

10   Q.  Did you show the operating agreement or

11   contract to a lawyer?

12   A.  No, I didn't have time.

13   Q.  If you wanted to take a little bit more

14   time, you could have shown it to a lawyer, right?

15   A.  Yes.

16   Q.  Before signing your contract, did you speak

17   with anyone else at FedEx about what it meant to be

18   an independent contractor?  Strike that.

19       Before you signed your contract, did you

20   speak with anyone else at FedEx about what signing

21   an operating agreement and being an independent

22   contractor with the company would involve?

23   A.  No.

24   Q.  Okay.  So it was just Mr. Cumberland and

25   Mr. Dolan?

**8/14/2006  Allen, Peter**

1      A.  Yes.

2          Q.  You mentioned when you took the contract

3   home and read it there were some issues you didn't

4   understand.  Did you do anything other than you've

5   already described to get clarification on what some

6   of those issues meant?

7          A.  No, just spoke with Scott about them.

8          Q.  Okay.  But you didn't speak, for example,

9   with any other contractors?

10         A.  No.

11         Q.  Did you speak with an accountant?

12         A.  No.

13         Q.  Did you speak with anybody else?

14         A.  No.

15         Q.  Have you ever looked into working with any

16  other package pick-up and delivery companies, for

17  example UPS, DHL, Postal Service?

18         A.  No.

19         Q.  Between the time you received -- strike

20  that.

21             Between the time you met with Mr. Dolan and

22  received the contract and the time that you signed

23  it, did you speak with any other contractors?

24         A.  No.

25         Q.  I appreciate you might not have understood

8/14/2006  Allen, Peter

1    every single thing in the contract, but did you read

2    the entire contract?

3        A.  Yes.

4        Q.  When you were speaking with Mr. Dolan, were

5    you speaking about the Davis route specifically?

6        A.  At that point, yeah.

7        Q.  Okay.  So you knew what route you would

8    receive if you contracted with the company?

9        A.  Yes.

10       Q.  Did you do anything to investigate the

11   potential profitability of the Davis route?

12       A.  No, just other than asking them how many

13   stops it had averaged, basically, over the year.

14       Q.  And were you provided that information?

15       A.  Yeah.  Scott did.

16       Q.  Okay.  Anything else?

17       A.  No.

18       Q.  And you'd been working the route for

19   Mr. Meisner for a couple weeks; is that right?

20       A.  Yeah, two or three weeks.  Actually, like I

21   said, I worked -- they had me in the Woodland route

22   and that route for him.

23       Q.  But you had some sense of how the route

24   worked, number of stops, that sort of thing?

25       A.  Yes.

**8/14/2006  Allen, Peter**

1      Q.  Before you contracted for the Davis route,

2    did you try to figure out how much money you would

3    make?  And I'm not talking gross settlement, how

4    much profit you would make if you contracted for

5    that route?

6      A.  Well, I didn't have any idea because I

7    didn't know fuel costs and all that other -- I

8    didn't know every aspect of it.  It wasn't really

9    explained that great as far as -- you know, because

10   each vehicle -- at the time there were several

11   different type of vehicles because they were just

12   starting.  So you had the cargo vans and then you

13   had the 400s and 450s so everybody was getting

14   different gas mileage.  I didn't understand the fuel

15   supplement.

16     Q.  Did you ask for an explanation of the fuel

17   supplement?

18     A.  Yeah.  And he basically said everything

19   over $1.33 a gallon, and it goes up in two-cent

20   increments for how much you get depending on how

21   much each threshold that's busted -- that it goes

22   over.

23     Q.  So Mr. Dolan gave some explanation of how

24   it works?

25     A.  Yes.  But it was never explained how many

**8/14/2006  Allen, Peter**

1    miles per gallon they based their supplement on.  I

2    found that out probably a year later.

3         Q.  How did you find that out?

4         A.  In one of their meetings with one of their,

5    I believe, the regional manager.  I asked the

6    question.

7         Q.  Now, you mentioned there were several types

8    of vehicles.  How did you know which vehicle to

9    purchase?

10        A.  He told me which one to purchase.

11        Q.  And which one was that?

12        A.  The P550.

13        Q.  That's a 550?

14        A.  Yeah.

15        Q.  And how large a vehicle is that?  Do you

16   know, how long is it?

17        A.  It's a 12-foot box and then the length of

18   the cab.  I'm not positive.  Probably somewhere

19   between 16 feet or so, I imagine.

20        Q.  Do you know how much it weighs?

21        A.  It's over 10,000 pounds, I believe.  I'm

22   not exactly sure.

23        Q.  Before contracting for the Davis route, I

24   assume you made a decision that you thought it would

25   be financially worth your while, right?

**8/14/2006  Allen, Peter**

1          MS. ZERGER:  Objection.  Mischaracterizes

2     the testimony.

3          THE WITNESS:  Can you rephrase that?

4     BY MR. GARRISON:

5          Q.  Sure.  I mean, I guess before contracting

6     for the route, you decided that you'd make enough

7     money or you thought you'd make enough money that it

8     was worth doing, right?

9          A.  I assumed it was, yes.  From what the

10    information I was given, I assumed that I'd make a

11    decent living at it.

12         Q.  And have you been able to do so?

13         A.  I haven't made as much as I assumed I was

14    going to make, no.  My expenses were more than I

15    anticipated.

16         Q.  But you have made money?

17         A.  Yes.

18         Q.  Did you think about any other factors or

19    any other issues when making your decision whether

20    or not to accept the Davis route?

21         A.  Yeah, I did.  I mean, as far as the days

22    that we were supposed to deliver, I thought hard

23    about that prior to signing the contract.  But other

24    than that, nothing else.

25         Q.  And what days were you supposed to deliver?

**8/14/2006  Allen, Peter**

1      A.   Tuesday through Saturday.

2      Q.   Did you have -- before you signed the

3   contract, did you have any understanding as to how

4   much money you potentially could make with that

5   route?

6      A.   Not the potential, no, because --

7      Q.   But you weren't promised, for example, by

8   someone at the company that if you take this route

9   you can make X thousand dollars a year?

10     A.   They gave me a ballpark figure, basically.

11  They said that route will make between 60 and

12  $75,000 a year, gross.

13     Q.   Gross?

14     A.   Yes.

15     Q.   And who told you that?

16     A.   When I went out with Jan Stevens on a --

17  she went out with me on a, I don't know what they

18  call them.  Right after you contract, they go out

19  and they send a service manager out with you.  And

20  even prior to she said -- she told me it had the

21  potential for that.

22     Q.   Anybody else at the company talk to you

23  about earning potential?

24     A.   Not at that one, but James Cumberland at

25  the Chico terminal when I was going for the other,

8/14/2006  Allen, Peter

1    competing for that other contract, had mentioned the

2    potential income for that route, which was much less

3    because it was a smaller route.

4        Q.  Anybody else?

5        A.  No.

6        Q.  Jan Stevens, is she a service manager?

7        A.  She was, yes.

8        Q.  Was, okay.  And you have been able to gross

9    between 60 and 70; isn't that right?

10        A.  Yes.

11        Q.  Do you believe you had a good understanding

12    of how FedEx worked or operated before you

13    contracted for your route?

14        A.  How FedEx worked or operated?  I mean, what

15    part of FedEx?  I mean --

16        Q.  How things worked at the local level at the

17    terminal, sort of who did what?

18        A.  Yes.

19        Q.  And did you have a good sense of how the

20    company overall worked?

21        A.  No.

22        Q.  Did you -- was that something that

23    concerned you?

24        A.  Well, no.  I mean, in the training videos

25    they explain how we fit into their family, and --

8/14/2006  Allen, Peter

1    but it didn't explain all the management issues and

2    decisions that were made above our level at the

3    terminal.

4        Q.  Was that of concern to you when you

5    contracted?

6        A.  Not really, because at the time I wanted a

7    job, so it wasn't an issue for me.

8        Q.  So you didn't ask Mr. Dolan, for example,

9    to explain that to you?

10       A.  No.

11       Q.  But you could have if you had wanted to,

12   right?

13       A.  Yeah, I guess I could have, yes.

14       Q.  Now, when you contracted with the company,

15   you knew you were going to be an independent

16   contractor, right?

17            MS. ZERGER:  Objection as to the legal term

18   and the meaning.

19            THE WITNESS:  I assumed, yeah, I was going

20   to be an independent contractor.  And I was going to

21   be able to make decisions on my own, yes.

22   BY MR. GARRISON:

23       Q.  That's the deal, right, that you were going

24   to be an independent contractor, right?

25       A.  I assumed that, yes.

**8/14/2006  Allen, Peter**

1       Q.   And that's what you were told, right?

2       A.   Yes.

3       Q.   And you testified that was important to you

4    to be your own boss, right?

5       A.   Sure.

6       Q.   So you didn't expect to be an employee; is

7    that right?

8       A.   Correct.

9       Q.   And you've explained to me -- strike that.

10           What do you understand the differences to be

11   between being an independent contractor and an

12   employee?

13      A.   I don't know the legal differences as far

14   as that goes.  I mean, me being an independent

15   contractor, I feel that I should be allowed to make

16   more decisions in what I do, negotiate on my, the

17   benefits and the pay I receive, and I didn't get to

18   do any of that.  Decide when I deliver packages, and

19   we don't have that decision-making process in our

20   hands.  An employee is told when to deliver -- you

21   know, when, what, where and how to do things.

22      Q.   Anything else?

23      A.   No.

24      Q.   Now, I realize you're not a lawyer so I'm

25   not asking you for a legal answer, but you've just

**8/14/2006  Allen, Peter**

1   described to me sort of your understanding of how an

2   independent contractor is different from an

3   employee.  What do you base that understanding on?

4        A.  What do I base that on?  Well, I base it on

5   being a self-employed individual, talking -- like my

6   friend that owns Superior Fencing.  He makes all his

7   own decisions.  He decides what work they take on,

8   what work they don't.  He told me all that.  He

9   decides if he wants to take a day off, he can take a

10  day off.

11       Q.  Anything else?

12       A.  No.

13       MR. GARRISON:  We've been going about an

14  hour and a half.  Why don't we take a short break.

15       THE VIDEO OPERATOR:  Going off the record.

16  The time is 10:00.

17       (Recess taken)

18       THE VIDEO OPERATOR:  Back on the record.

19  The time is 10:10.

20  BY MR. GARRISON:

21       Q.  Mr. Allen, when you contracted for the

22  Davis route, what was your understanding of the

23  services you were to provide to FedEx?

24       A.  That whatever packages were given to me on

25  each particular day I was to deliver them all.  If

**8/14/2006  Allen, Peter**

1    it required a premium service, such as a signature,

2    appointment delivery or evening delivery, I was

3    responsible for doing them within the prescribed

4    time frame that FedEx established.

5         Q.   Anything else?

6         A.   No.

7         Q.   How about any recordkeeping or

8    documentation requirements?

9         A.   Just everything in the scanner.  And then

10   we had to verify our -- the following day, we had to

11   verify on a daily settlement sheet how many -- they

12   printed out a daily settlement sheet that said how

13   many stops we had, how many packages we delivered,

14   how many nondeliveries.

15          And then they also posted a board now, a

16   computer print-out of our service record of each

17   individual in the terminal on a bulletin board there

18   in the terminal.

19        Q.   Now, on this daily settlement statement --

20   so you'd come in on a Wednesday and the one from the

21   prior day, Tuesday, would be ready?

22        A.   Yes.

23        Q.   And then you'd review that?

24        A.   Not always, but most of the time.  There

25   were a few days where they weren't in there.

**8/14/2006  Allen, Peter**

1        Q.   Typically.  So you look at the statement,

2    it's got information on there about stops and

3    mileage and that sort of thing?

4        A.   Correct.

5        Q.   And you'd confirm that that was accurate?

6        A.   Correct.

7        Q.   And then you'd sign it?

8        A.   Yes.

9        Q.   If you caught an inaccuracy, would you

10   correct it?

11       A.   I would bring it up to them and explain it

12   to them and then they would go in and correct it.

13       Q.   They'd fix it.  So when you signed those

14   statements on a daily basis, unless there was a

15   glitch in the system, everything in those statements

16   that you signed was accurate, right?

17       A.   Yes.

18       Q.   Now, you just described to me your

19   understanding of the services you were to provide.

20   That understanding, I guess, was based on your

21   discussions with Mr. Dolan; is that right?

22            Well, you tell me.  What was the basis for

23   that understanding?

24       A.   Just what I was told from Mr. Dolan and

25   service managers that I'm required to deliver

**8/14/2006  Allen, Peter**

1    whatever's sorted to my pallet.

2         Q.  And also from reading the contract.  Is

3    that fair?

4         A.  Yes.  Yes.

5         Q.  Also, was it based on your experiences as a

6    temp driver and working with Mr. Meisner, sort of

7    what the job involved?

8         A.  Yes and no.  I mean, as a temp driver, they

9    don't give you as many stops.  But I knew as a temp

10   driver, whatever I was given I had to deliver.

11          Meaning that I couldn't put a status code

12   27 on packages which meant did not attempt.  So I

13   had to attempt every package.

14        Q.  And then when you were driving the Woodland

15   and Davis routes for Mr. Meisner, you knew you had

16   to deliver all those packages too, right?

17        A.  Yes.

18        Q.  Other than as you already described, did

19   you base your understanding of what services you

20   were expected to provide on anything else?

21        A.  No.  Well, let me rephrase.  Yeah, other

22   than the training we received from the training

23   videos.

24        Q.  Anything else?

25        A.  Not that I can think of, no.

**8/14/2006  Allen, Peter**

1      Q.  Do you believe it was reasonable for FedEx

2    to expect you to provide the services you just

3    described?

4          MS. ZERGER:  Objection.  Vague and

5    ambiguous.

6          THE WITNESS:  Can you expand on that as far

7    as reasonable to what issue?  I mean -- the number

8    of packages, the volume every day, the time periods

9    that they set?  I don't understand what you're

10   saying here.

11   BY MR. GARRISON:

12     Q.  You've described that you were expected to

13   deliver all the packages that were assigned to you

14   on a given day?

15     A.  Right.

16     Q.  Correct?  And that was the deal you agreed

17   to, right?

18     A.  Yes.

19     Q.  Okay.

20     A.  I agreed to service my area, yes.

21     Q.  And you agreed to deliver the packages that

22   were assigned to you on a daily basis, right?

23     A.  Yes.

24     Q.  You also agreed to complete these daily

25   settlement statements or to provide FedEx with

1744

8/14/2006  Allen, Peter

1    scanner and documentation involved with the

2    business, right?

3         A.  I don't believe I ever signed anything

4    saying I would do that.  It's just that they

5    verbally told us on a daily basis we need to do

6    that, otherwise our settlements could be messed up,

7    our weekly settlements could be messed up.

8         Q.  So that information was important to get

9    paid, right?

10        A.  Yes.

11        Q.  Did you have any problem with providing

12   this information so that your settlement could be

13   processed?

14        A.  Well, no.  I wanted to be paid correctly.

15        Q.  At the time you contracted for the Davis

16   route, what was your understanding of FedEx's

17   responsibilities to you?

18        A.  The only thing I can recall being told is

19   that FedEx would do all the -- they would go out and

20   recruit all the new business, basically.  Get our

21   business for us and provide us packages to deliver

22   on a daily basis.

23        Q.  And did the company agree to try to provide

24   you enough packages to fully utilize your truck?

25             MS. ZERGER:  Mischaracterizes the

**8/14/2006  Allen, Peter**

1    testimony.

2    BY MR. GARRISON:

3        Q.  I'm just asking.

4        A.  Did they -- can you repeat that again?

5        Q.  Sure.  I mean, they are going to provide

6    you packages and you're going to deliver them,

7    right?

8        A.  Correct.

9        Q.  Sort of the most basic level?

10        A.  Correct.

11        Q.  Was there an expectation that they'd give

12    you enough packages so that you'd get a full day in?

13        A.  I don't recall there being an issue as far

14    as it being discussed, no.

15        Q.  Did you have any idea, I'm talking at the

16    front-end of your contract, whether you'd have

17    enough packages to work two hours a day or eight

18    hours a day?

19        A.  Well, just from going on the, delivering

20    the route for the few days that I did prior to

21    contracting it, I knew there was enough at that

22    time.  And after I started it after, obviously I was

23    out there quite a bit when I was out there learning

24    the route.  I was out there pretty late every day.

25        Q.  So you had a sense of it?

**8/14/2006  Allen, Peter**

1       A.   Yes.

2       Q.   What was the basis -- strike that.

3            You testified that you were told FedEx

4    would recruit new business, get it for you and

5    provide packages for you to deliver on a daily

6    basis.

7            Did Mr. Dolan tell you that?

8       A.   I believe it was in the training video that

9    we -- during our first week of training.

10      Q.   Did you have any other understanding --

11   strike that.

12           Did you have any understanding as to any

13   other responsibilities that the company had to you,

14   other than the ones you've already described?

15      A.   Not that I can recall.

16           Can I go back and say something real quick?

17      Q.   Sure.

18      A.   On that one I do recall something else.

19   They did explain the fact that for a nominal fee

20   that they would provide us uniforms on a, which was

21   part of the business support package that we paid

22   for.  And on an annual basis, we would get another

23   full issue of uniforms.

24      Q.   And was that voluntary?

25           MS. ZERGER:  Vague.  What does "that" refer

**8/14/2006  Allen, Peter**

1    to?

2              THE WITNESS:  As far as?

3    BY MR. GARRISON:

4         Q.  Let me ask a better question because your

5    lawyer made a good objection.

6              Did you have to buy a uniform through them,

7    through the company?

8         A.  We had to have FedEx uniforms, yes.

9         Q.  I understand that, but did you have to

10   participate in this -- you mentioned this program, I

11   guess it's part of the business support package.

12   Were there any other sources to get uniforms if you

13   didn't want to participate in the business support

14   package?

15        A.  Not to my knowledge.  You had to buy them

16   from whoever they purchased them from.

17        Q.  Do you know if you could have bought the

18   uniforms directly from FedEx outside the business

19   support package?

20        A.  I know they have some site or something

21   that you can purchase stuff from, but I don't know

22   if those specific uniforms are on there because I've

23   never been to it, so --

24        Q.  So you didn't look into whether you could

25   get the uniforms other than through the BSP, did

**8/14/2006  Allen, Peter**

1    you?

2          A.  No.

3          Q.  But you could have, if you wanted to?

4          A.  I don't know.

5          Q.  You could have looked into it?

6          A.  Yes.

7          Q.  Sir, I've handed you a document that I'd

8    like to have marked as Allen 1 for identification,

9    please.

10              (Whereupon, Deposition Exhibit 1 was marked

11              for identification)

12   BY MR. GARRISON:

13         Q.  For the record, it's a four-page document,

14   Bates FXG_Alexander 3655 through 3658.

15              Sir, do you recognize this document?

16         A.  Yes.

17         Q.  What is it?

18         A.  Looks like the job application.

19         Q.  And it's entitled, "Contractor/Driver

20   Information Sheet" at the top, right?

21         A.  That's correct.

22         Q.  Okay.  And is this your handwriting on each

23   of the four pages?

24         A.  Yeah, it appears to be, yes.

25         Q.  Looks like the last page is blank.  Is the

8/14/2006  Allen, Peter

1     information on the first page accurate?

2          A.   Yes.

3          Q.   And same question, is the information on

4     the second page accurate?

5          A.   No.

6          Q.   Was it accurate at the time you filled it

7     out?

8          A.   No.

9          Q.   How is it inaccurate?

10         A.   Because the one, did I know anybody

11    employed or contracted by FedEx Ground, I had

12    already mentioned to you that I had a friend that

13    was contracted by FedEx ground.  It just must have

14    slipped my mind when I was filling it out.  That was

15    my friend Gary Glassmyer.

16         MR. GARRISON:  Okay.  So he was employed --

17    strike that.  Let's go off the record for a tape

18    change.

19         THE VIDEO OPERATOR:  This marks the end of

20    Tape No. 1 in the deposition of Peter Allen.  Going

21    off the record.  The time is 10:24.

22         (Discussion off the record)

23         THE VIDEO OPERATOR:  This marks the

24    beginning of Tape No. 2 in the deposition of Peter

25    Allen.  Back on the record.  The time is 10:26.

8/14/2006  Allen, Peter

```
 1              MR. GARRISON:  Jennifer, would you please

 2      read back the last question and answer.  I'm sorry,

 3      I misspoke, Angela.

 4              (Record read by the reporter as follows:

 5              "Q.  How is it inaccurate?

 6              "A.  Because the one, did I know anybody

 7              employed or contracted by FedEx Ground, I

 8              had already mentioned to you that I had a

 9              friend that was contracted by FedEx ground.

10              It just must have slipped my mind when I

11              was filling it out.  That was my friend

12              Gary Glassmyer.")

13      BY MR. GARRISON:

14          Q.  Okay.  Is there anything else, Mr. Allen,

15      on the second page of this document that's

16      inaccurate?

17          A.  Let me go back to that one again, actually.

18      I happened to look at the last page here, or the

19      third page, and saw his name and his address.  So

20      the reason why I put no, that is actually correct,

21      no, because he had already moved to Texas and he was

22      no longer employed by FedEx Ground.  So no, that was

23      correct.

24          Q.  How about the third page, is everything on

25      that accurate?
```

**8/14/2006  Allen, Peter**

1        A.  Yes, as far as my information is concerned,

2    yes.

3        Q.  And is that your signature?

4        A.  Yes, it appears to be, yes.

5        Q.  And you dated this November 20, 2002; is

6    that right?

7        A.  Correct.

8        Q.  Did you discuss this form with anybody

9    before you filled it out?

10       A.  No.

11       Q.  Now, on page 1 under "Position Sought," you

12   checked the box, "Pick-Up and Delivery Contractor";

13   is that right?

14       A.  Yes.

15       Q.  This form doesn't say you're applying to be

16   an employee, does it?

17       A.  No, it doesn't.  But the ad for the

18   position on the Internet was for a temporary driver

19   for seasonal work.

20       Q.  So this is the form that you filled out

21   when you became a temp at Chico?

22       A.  Yes.

23       Q.  Thanks for clarifying that.  You can set

24   that aside, sir.  Sir I'm handing you what I'd like

25   to have marked as Allen 2, please.

8/14/2006  Allen, Peter

1                For the record, it's Bates FXG_Alexander

2      3792.

3                (Whereupon, Deposition Exhibit 2 was marked

4                for identification)

5      BY MR. GARRISON:

6          Q.  Sir, do you recognize this document?

7          A.  I don't recognize it, but I mean I don't

8      recall seeing it, but --

9          Q.  Is that your signature at the bottom?

10         A.  It appears to be, yes.

11         Q.  Above the word "Contractor," correct?

12         A.  Yes.

13         Q.  Looking at this one-page form, is the

14     information on it accurate?

15         A.  Yes.

16         Q.  And this is the form you filled out in

17     connection with the process to contract for the

18     Davis route, right?

19         A.  I didn't fill it out, Scott Dolan did.  And

20     he handed it to me to sign, yes.

21         Q.  It was associated to becoming a contractor

22     as opposed to being a temp driver, right?

23         A.  Yes.

24         Q.  And this form doesn't say you were becoming

25     employed, does it?

8/14/2006  Allen, Peter

1      A.   No.

2           Q.   You can set that aside, sir.  Sir, I'm

3      handing you what I'd like to have marked as Allen 3.

4      It's a three-page document consisting of -- strike

5      that.

6                Bates stamped FXG_Alexander 3621, 3624 and

7      3628.

8                (Whereupon, Deposition Exhibit 3 was marked

9                for identification)

10     BY MR. GARRISON:

11          Q.   Do you recognize these documents?

12          A.   Yes.

13          Q.   What are they?

14          A.   Annual certification of motor vehicle

15     violations.

16          Q.   Is this a DMV document?

17          A.   It appears to be a FedEx Ground document.

18          Q.   Dealing with motor vehicle violations?

19          A.   Yes.

20          Q.   Is this your signature or is your signature

21     on each of these forms?  Appears to be.

22          A.   Yes, it appears to be, yes.

23          Q.   And did you fill these out?

24          A.   Yes.

25          Q.   Is the information on them accurate?

8/14/2006  Allen, Peter

1        A.  Yes.

2        Q.  Did you have any discussion with anyone

3    before you filled these forms out?  And I'm talking

4    about discussion about how to fill them out, that

5    sort of thing.

6        A.  Yes.

7        Q.  Who did you discuss these with?

8        A.  Jan Stevens.

9        Q.  And what did you discuss?

10       A.  I just asked her basically how to fill it

11   out.  Not all -- the first one.

12       Q.  The first one only?

13       A.  Yes.

14       Q.  Because you knew how to after that, right?

15       A.  Right.

16       Q.  And what did she tell you?

17       A.  She basically just went over it

18   step-by-step.  Because of the fact that on the first

19   one I had -- I was issued a citation for not

20   stopping at a weigh station, but asked her if I

21   should put it on it and she said no.  Because FedEx,

22   during their training, and I asked afterwards if we

23   were required to stop the weigh station.  They told

24   me no.  Well, I got cited for it.

25       Q.  Any other moving violations that aren't

**8/14/2006  Allen, Peter**

1     reflected on these forms?

2          A.  No.

3          Q.  Now, at the top of each form, or towards

4     the top, there's a "Status" box, do you see that?

5          A.  Yes.

6          Q.  And in each of the three forms, "Regular

7     Contractor" is checked, right?

8          A.  Correct.

9          Q.  And you checked that, correct?

10         A.  Yes.

11         Q.  Did you have any understanding that some of

12    the information on these forms was required by DOT?

13         A.  I wasn't sure if it was a DOT requirement

14    or a FedEx requirement or they track it.  They just

15    handed us and asked us to fill it out and turn it

16    back in.

17         Q.  So you don't know one way or the other?

18         A.  No.

19         Q.  These forms do not state that you are an

20    employee, do they?

21         A.  No.

22         Q.  You may set that aside, sir.

23              So FedEx at some point offers you the Davis

24    route, right?

25         A.  Correct.

**8/14/2006  Allen, Peter**

1       Q.  And would that have been February or March

2    2003?

3       A.  It had to be in February.

4       Q.  Had to be in February.  Had to get the ball

5    rolling.

6            And did Mr. Dolan make that offer?

7       A.  Yes.

8       Q.  Other than as you've already described, did

9    Mr. Dolan tell you anything else in connection with

10   becoming -- contracting for the Davis route?

11      A.  Other than that I had to have a vehicle

12   up-front approved by RT prior to signing the

13   contract.

14      Q.  Anything else?

15      A.  Not that I can recall, no.

16      Q.  Do you know if anyone else was being

17   considered for the Davis route?

18      A.  Not to my knowledge, no.

19      Q.  Did you accept the route, you know, on the

20   spot when it was offered to you?  Did you go think

21   about it, or how did that work?

22      A.  I made a decision between the Davis and the

23   Woodland route, basically.  I had a choice of either

24   one of those routes.  And on the advice of Jan

25   Stevens, she said I would have -- the potential for

**8/14/2006  Allen, Peter**

1    growth was better in Davis than in Woodland, and it

2    was less miles, so she recommended that I take the

3    Davis route.

4          Q.  Is that the one you took?

5          A.  Yes.

6          Q.  Okay.  Is it less miles than the Woodland?

7          A.  Yes.

8          Q.  And what's the significance of that?  Why

9    would that make it better?

10         A.  Fuel, maintenance costs on the vehicle, the

11   time out on your route.

12         Q.  Did the Davis route grow over time?

13         A.  Sure, yes.

14         Q.  So Mr. Dolan offers the routes to you.  How

15   long after he first offered them to you did you tell

16   him, sure, you know, I'd like the Davis one?

17         A.  Within two or three days, I believe.

18         Q.  So you thought about it a little bit, slept

19   on it?

20         A.  Yes.

21         Q.  Talked to Ms. Stevens?

22         A.  Yes.

23         Q.  Why did you ultimately decide to contract

24   with FedEx?

25             MS. ZERGER:  I think it's asked and

8/14/2006  Allen, Peter

1     answered, but go ahead.  You can answer it.

2               THE WITNESS:  Excuse me?

3               MS. ZERGER:  It was, I think, asked and

4     answered, but you can go ahead and answer it again.

5               THE WITNESS:  Because I needed employment.

6     BY MR. GARRISON:

7          Q.  Why FedEx and not some other company?

8          A.  Because at the time that's who was offering

9     the job, so --

10         Q.  Any other reason?

11         A.  No.

12         Q.  Had you applied for other jobs at that

13    time?

14         A.  No.

15         Q.  Why not?

16         A.  Because I just started looking and FedEx,

17    that was one of the first that I saw and I went

18    right up there and --

19         Q.  Took it?

20         A.  Accepted it, as a temp and then eventually

21    as a contractor.

22         Q.  And just so the record is clear, I was

23    focusing on when you became a contractor.

24              At the time you became a contractor, why

25    did you decide to make that change?

**8/14/2006  Allen, Peter**

1      A.  To make --

2      Q.  To become a contractor as opposed to a temp

3  driver?

4          MS. ZERGER:  I think that was also asked

5  and answered.  You may answer again.

6          THE WITNESS:  The biggest issue was it was

7  involved, from what everything appeared, was a

8  larger monetary compensation, basically.  And the

9  fact that I'd have steady employment.

10  BY MR. GARRISON:

11      Q.  And you did mention that before.  At the

12  time you made the decision to switch from being a

13  temp driver to a contractor, were you thinking about

14  possibly working anywhere else?

15      A.  No.

16      Q.  And had you applied to do so?

17      A.  No.

18      Q.  Why not?

19      A.  Because I already made a decision that I

20  wanted to do this.

21      Q.  Did you expect to face any challenges as a

22  contractor?

23      A.  In what way?  I mean, I'm not sure what --

24      Q.  I'll clarify a little bit.  In terms of

25  how, you know, what it would take to provide the

**8/14/2006  Allen, Peter**

1   services required of you, or the services that you

2   contracted to provide?

3        A.   Just the possibility existed that they were

4   going to give me more packages than I could handle.

5   And within that time period, you know, also meet the

6   DOT requirements of the 12 hours a day, ten hours

7   driving, 12 hours, 60 hours in a week, whatever it

8   was.

9        Q.   Any other challenges?

10       A.   Just getting out there, meeting those DOT

11  requirements with -- especially the first year and a

12  half, two years, the sort took forever.  There were

13  times that we wouldn't get out of there until 9:30,

14  10:00 and we started at 6:00.  And we were supposed

15  to put our start time as 5:45 or 6:00, so by the

16  time we got out of there, sometimes they'd give us

17  ten hours of delivery, but we only had eight hours

18  left in the DOT, as far as DOT requirements go.

19            So Scott Dolan had told me one time, "I'm not

20  telling you to do this, but you can put, you know,

21  instead of putting your start time in your scanner,"

22  because that's how they track DOT requirements is

23  through the scanner, he said, "instead of putting your

24  start time this, put it as when you leave instead."

25            So I knew several individuals that did that.

8/14/2006  Allen, Peter

1        Q.  Did you do that?

2        A.  Yes.

3        Q.  Did you think it was wrong to do that?

4        A.  Well, sure I thought it was wrong.  But I

5    had a choice, I'd do that or lose my contract, so --

6        Q.  Why did you believe if you didn't do that

7    you'd lose your contract?

8        A.  Because I wouldn't be able to deliver all

9    the packages they gave me and I'd have to DNA them,

10   and that would put my contract in jeopardy.

11       Q.  Did anybody tell you that if you don't

12   change the, or put this false start time in your

13   scanner you'd lose your contract?

14       A.  I'm not talking about the false start time.

15   I'm talking about the number of packages given.  If

16   I brought back DNAs, we were told that you would be

17   putting your contract in jeopardy.

18       Q.  Backing up for a minute.

19       A.  Sure.

20       Q.  The issue about the sort taking a long

21   time.  Were you ever told by someone at FedEx that

22   if you didn't put a false start time in your scanner

23   you'd lose your contract?

24       A.  No.

25       Q.  About how frequently would you put a start

**8/14/2006  Allen, Peter**

1    time in your scanner that wasn't accurate?

2        A.   For the first couple years, quite often.   I

3    think probably two -- at least two or three days a

4    week.

5        Q.   And obviously it varied day-to-day, but on

6    average, how much time were you moving your start

7    time forward from when you'd actually started?

8        A.   Anywhere from an hour to four hours.   And

9    if you complained about it, they'd say come in

10   later.

11       Q.   Could you have come in later if you wanted?

12       A.   Sure I could have come in later.

13       Q.   But you would have had to work later,

14   right?

15       A.   Correct.   And getting packages to customers

16   at 10:00 at night isn't kosher either.   They don't

17   particularly like that.

18       Q.   You mentioned as one of the challenges the

19   possibility of having more packages than you could

20   handle.

21            Well, let me ask you, not tell you.   Did

22   you talk to FedEx management about what would happen

23   if that were the case?

24       A.   With more packages than I could handle?

25       Q.   Let me ask it a different way because you

8/14/2006  Allen, Peter

1    seem a little bit confused.

2              Did you speak with FedEx management at the

3    front end about what would happen if there was a day

4    when there were just more packages than you could

5    handle?

6         A.  Yes, I spoke with them on a couple

7    occasions when they flexed me and gave me more

8    packages than I felt I could handle.  We had a

9    discussion because at first I refused to take them.

10   And then in one instance Scott Dolan and the

11   regional manager, Dan Rubito (phonetic), I believe

12   his name was, sat -- had a meeting with me and

13   discussed the possibility of my contract being in

14   jeopardy if I didn't do what they gave me.

15        Q.  And what did they say, as best you can

16   recall, or was that it?

17        A.  They basically said that we have certain

18   numbers that are your min/maxes, and you don't

19   follow in them and we're authorized to flex you off

20   to West Sac or Dixon, so they did.  And they told me

21   if I didn't do them I was putting my contract in

22   jeopardy.  I was still servicing my primary area,

23   but they wanted me to go off into another area.

24        Q.  And did you do so?

25        A.  Yes.

**8/14/2006  Allen, Peter**

1     Q.  And were you able to deliver the packages?

2     A.  Yes.

3     Q.  Did you have any discussions with FedEx

4   management about shifting packages off of you if it

5   was a day when there were just too many packages to

6   deliver?

7     A.  Yes, I have.

8     Q.  And did you have an expectation that that's

9   what would happen?

10    A.  The only time it ever happened when I asked

11  for it was during peak.

12    Q.  And that's when packages were, some of the

13  Woodland packages were --

14    A.  No, that's when I had all of Davis.  They'd

15  take some of the west part of Davis off of me and

16  put it on other people.

17    Q.  Okay.  Thanks for clarifying that.

18    A.  That's only after they discussed about my

19  responsibility to take on supplemental route drivers

20  to -- when the volume increased like that, and I

21  refused.

22    Q.  And that was your choice, right?

23    A.  Yes.  And it also states in the contract if

24  my route gets too large that they take some of them

25  off and put them on other individuals, so --

8/14/2006  Allen, Peter

1       Q.   Okay.  So that worked out?

2       A.   Yes, only after some serious complaining.

3       Q.   So you all discussed it?

4       A.   On my part with the regional manager.

5       Q.   And was that Dan?

6       A.   Rubito, yeah, I think his name was Rubito.

7       Q.   So they didn't force you to take on a

8    supplement?

9       A.   Not in that instant, no, but they have in

10   the past, yes.

11      Q.   They have?

12      A.   Sure.  I mean, when they flexed me to West

13   Sac.

14      Q.   I'm sorry, let's be more clear.  They

15   didn't force you to take on a supplemental driver or

16   a second truck?

17      A.   No.

18      Q.   And when you said you refused to take on a

19   supplemental, were you talking about additional

20   packages or were you talking about a supplemental

21   driver?

22      A.   Driver route for the peak period.

23      Q.   Got it.  Just wanted to make sure we're

24   clear.

25           So they talked to you about potentially

8/14/2006  Allen, Peter

1    taking on a supplemental, you said no.  The contract

2    said I don't have to.  You should divert some of

3    these packages off to someone else and that's what

4    they did, right?

5        A.  Yes, because it's not profitable for us to

6    take on a second route.  You have to have at least

7    two or three before you make any money.

8        Q.  Taking on supplementals?

9        A.  Right, during the peak season.

10       Q.  Okay.

11       A.  They showed us documents basically -- last

12   year they showed us some spreadsheets on what you

13   would make if you take on supplementals, if you did

14   this many stops, and basically you had to have two

15   to three before you made any money.

16       Q.  Sir, I'm handing you what I'd like to have

17   marked as Allen 4, please.

18           (Whereupon, Deposition Exhibit 4 was marked

19           for identification)

20   BY MR. GARRISON:

21       Q.  Do you recognize this document?

22       A.  Yes.

23       Q.  And if you'd please flip to page 29.  I

24   should ask you before you do that, what is it?

25       A.  It's the standard operating agreement.

**8/14/2006  Allen, Peter**

1       Q.   Okay.  If you'd flip to page 29, please.

2            Is that your signature under, "Contractor"?

3       A.   It appears to be, yes.

4       Q.   And did you sign this on March 4th, 2003?

5       A.   It states that, so I'm assuming I did, yes.

6       Q.   Does that sound right?

7       A.   It looks -- yes.

8       Q.   It says at 0800 hours.  Does that sound

9    right?

10      A.   Yes.

11      Q.   Is this a true and correct copy of the

12   operating agreement you signed on March 4th, 2003?

13      A.   I don't know.  I haven't reviewed the whole

14   thing, so I couldn't tell you.  I don't know.  Do

15   you want me to sit here and review, go through this

16   whole thing?

17      Q.   Why don't you spend just a minute flipping

18   through it.  I don't want you to spend an hour

19   reading every page.  And tell me if it looks like

20   the operating agreement that you signed on that day.

21      A.   Yes, it appears to be.

22      Q.   On the page -- 29 is the signature page.

23   The next page is Addendum 1, description of vehicle?

24      A.   Yes.

25      Q.   Is that your vehicle?

8/14/2006  Allen, Peter

1        A.  Yes, it is.

2        Q.  Okay.  If you look at Addendum 3, and then

3    there's an attachment, 3.1, if it's helpful it's

4    page 23747.

5            MS. ZERGER:  And that's the Bates number.

6            MR. GARRISON:  Yes, ma'am.

7            MS. ZERGER:  Just for the record.

8            THE WITNESS:  Yes, I'm there.

9    BY MR. GARRISON:

10       Q.  Is that your signature?

11       A.  It appears to be, yes.

12       Q.  Dated March 4, 2003?

13       A.  Correct.

14       Q.  And the next page, Addendum 4, is that your

15    signature?

16       A.  It appears to be, yes.

17       Q.  And page 23750, Addendum 6, are those your

18    initials -- or strike that.

19            Did you initial down where it talks about

20    electing the business support package?

21       A.  It appears I did, yes.

22       Q.  Okay.  And then the very last page is

23    another signature page that deals with some of the

24    addendums.

25            Is that your signature there as well?

**8/14/2006  Allen, Peter**

1       A.   It appears to be, yes.

2           Q.   Counsel, you raise a good point, just for

3       the record, this document is a multi-page document,

4       Bates PCA 23706 through 23756.  So you know,

5       Mr. Allen, this was produced by your side in this

6       case.

7                You signed this contract voluntarily, right?

8       A.   Yes.

9           Q.   Nobody forced you to sign?

10      A.   No.

11          Q.   When did you first see it?  Was it during

12      that meeting with Mr. Dolan you've described?

13          A.   Like I said, I believe it was like Friday

14      or Saturday prior to signing it, and I signed it on

15      a Tuesday, so that was the first time I saw it.

16          Q.   And Mr. Dolan, was he the one who

17      physically handed it to you?

18      A.   Yes.

19          Q.   Okay.  And you've described everything that

20      was said at that meeting, haven't you?

21      A.   To my recollection, yes.

22          Q.   Everything you remember?

23      A.   Yes.

24          Q.   Okay.  Did you ask FedEx to change any

25      terms or provisions or anything having to do with

8/14/2006  Allen, Peter

1    the agreement before you signed it?

2         A.  I don't believe so, no.  Actually, let me

3    rephrase.  Let me go back.  Can I add --

4         Q.  Please, go ahead.

5         A.  Yeah, I spoke with Scott Dolan about

6    increasing the core zone because of the amount of

7    apartments and the number of stops in there.  And he

8    said he'd have to do three manager service rides or

9    something to that effect to do a core zone analysis.

10   But he said it wouldn't be changed in the contract.

11   It would be after the fact.

12        Q.  And did you ask him to go ahead with that?

13        A.  They never did.  I stopped pursuing it

14   after a while.

15        Q.  Did your core zone ever change while you

16   were servicing the Davis route?

17        A.  Sure, it went down several times.

18        Q.  And is that as package volume increased?

19        A.  Yes.

20        Q.  And the contract contemplates that a core

21   zone will go down?

22        A.  It states it's a temporary core zone.

23        Q.  So you knew that going into the contract?

24        A.  Yes.  And it did go up one time when we

25   went from the West Sacramento terminal to the South

8/14/2006  Allen, Peter

1    Sacramento terminal.  It went up $5 and it ended up

2    costing me probably $15 in gas a day to get there.

3    And I asked about that and they said they could only

4    raise it $500 in any six-month period.

5         Q.  Did you wait six months and go back at them

6    on it?

7         A.  No, because the six months just ended in

8    May of this year, and I already intended on selling

9    my route so I didn't pursue it.

10        Q.  Did you ask FedEx to change any other terms

11   other than as you already described?

12        A.  No, I didn't.

13        Q.  Would you turn to Addendum 5, please.  It's

14   page 23749.

15        A.  Sure.  Okay.  I'm there.

16        Q.  It says, "Proprietary interest," do you see

17   that?

18        A.  Yes, up on the top, yes.

19        Q.  And you've already described to me your

20   understanding of proprietary interest, right?

21        A.  Correct.

22        Q.  Did anyone at FedEx tell you what

23   proprietary interest meant?

24        A.  They just briefly discussed that that

25   primary zip code, 95616, was my zip code, and that

**8/14/2006  Allen, Peter**

1    was my area of responsibility.  And I believe I even

2    asked Scott Dolan on this page what that meant about

3    relinquishing -- I know what relinquish means, but I

4    mean how the compensation worked as far as per

5    package, if they flexed off packages from my route

6    or gave me packages from someone else, just to

7    clarify that.

8         Q.  And did he explain that to you?

9         A.  Yes, he did.

10        Q.  Did you -- strike that.

11             Did anyone else at FedEx tell you anything

12   about proprietary interest, other than as you've

13   already described?

14        A.  No.

15        Q.  Would you look at page 1 of the agreement,

16   please.  This is after the Table of Contents, 23709.

17        A.  Got it.

18        Q.  About seven lines up from the bottom it

19   says, "Both FHD and contractor intend that

20   contractor will provide these services strictly as

21   an independent contractor and not as an employee of

22   FHD for any purpose."

23             Did I read that right?

24        A.  Yes, you did.

25        Q.  So when you signed the operating agreement,

**8/14/2006 Allen, Peter**

1      you understood and agreed that you'd be an

2      independent contractor, not an employee, right?

3          A.   I assumed that, yes.

4          Q.   I mean, that's the deal you struck, right?

5          A.   Yes.  I assumed I was going to be an

6      independent contractor, yes, I did.

7          Q.   Okay.  And I'm not trying to give you a

8      hard time.  You're using the word "assumed".  The

9      contract you signed says you're going to be an

10     independent contractor, right?

11         A.   Yes, it does.

12         Q.   And that was your intention when you signed

13     it, right, to be an independent contractor, not an

14     employee?

15         A.   Yes, it was.

16         Q.   Do you still want to be an independent

17     contractor and not an employee?

18         A.   I don't want to be either, to be honest,

19     that's why I'm selling my route, so --

20         Q.   Why are you selling your route?

21         A.   Because as a self-employed individual I

22     feel I should have more say in my business and I

23     basically have no say other than what time I get

24     there during the day.  And even that's debatable

25     because of the fact that I don't have 24-hour access

**8/14/2006  Allen, Peter**

1    to that, so I have to go in when they open the

2    facility, so I can't -- we can't say we're going

3    to -- we're only going to work for two hours today

4    and make it up tomorrow.  That's not acceptable to

5    them.  So there's a lot of things that just

6    accumulated and made my decision for me.

7         Q.  What other reasons other than as you've

8    already described?

9         A.  The lack of FedEx compensating me

10   adequately for fuel expenses.

11        Q.  What else?

12        A.  And it just, it was time.  I mean, for me

13   it was just time.  I was basically fed up doing

14   this.

15            I missed -- I mean, I tried to get off for

16   my daughter's high school graduation.  I asked them

17   to give me a light day, and I ended up missing half

18   of her graduation because they wouldn't do it.  So I

19   mean, there's just several little things like that.

20        Q.  Okay.  Any other reasons or is that pretty

21   much it?

22        A.  That's pretty much it.

23        Q.  Now, if you're an independent contractor,

24   why do you believe that the company should reimburse

25   you for fuel?

**8/14/2006  Allen, Peter**

1           MS. ZERGER:  I'm going to object that it

2     assumes a legal understanding of that term as

3     opposed to the practicality of the relationship at

4     FedEx.

5           THE WITNESS:  So explain that again,

6     please.

7     BY MR. GARRISON:

8        Q.  Let me rephrase it.  Why do you believe

9     FedEx should reimburse you for fuel?

10       A.  Because -- I mean, they dictated a lot of

11    the things that I did, so I felt I was being treated

12    as an employee, so I felt they should also pay for

13    my fuel and expenses.

14       Q.  Any other reasons?

15       A.  To be compensated rightfully for the work I

16    was performing for them.

17       Q.  Any others?

18       A.  No.

19       Q.  Now, the contract doesn't provide that they

20    would reimburse you for fuel more than they did,

21    does it?

22       A.  No.

23       Q.  Okay.  And the contract doesn't provide

24    that they would compensate you at a higher level

25    than they did, does it?

**8/14/2006  Allen, Peter**

1       A.  At a higher level?

2       Q.  More money?

3       A.  No.

4       Q.  And the contract doesn't say that the

5   company would pay your other expenses, does it?

6       A.  No.

7       Q.  So I understand that you want these other

8   things, but that's not what you contracted for,

9   right?

10      A.  No.

11      Q.  I can certainly appreciate it would be

12  frustrating to miss part of your daughter's

13  graduation.  Could you have hired a temp driver?

14      A.  There weren't any available.  There's like

15  one in the whole terminal and he was already busy.

16  He already committed to someone else.

17      Q.  Did you check?

18      A.  Yes.

19      Q.  Did you ask anyone at the company if

20  somehow another temp could be located or made

21  available?

22      A.  I asked them to lighten my load for me.

23      Q.  And they didn't?

24      A.  No.

25      Q.  Were they required to lighten your load

**8/14/2006  Allen, Peter**

1    under the contract?

2          A.  Well, no, obviously not.

3          Q.  I appreciate you asked them to lighten your

4    load.  Did you ask them to help you find a temp

5    driver?

6          A.  Yes.

7          Q.  And they couldn't?

8          A.  No, he was already committed.

9          Q.  Did you ask another contractor to help you

10   with your route that day?

11         A.  No.

12         Q.  Could you have done that?

13         A.  Yes, I could have.

14         Q.  If you turn to page 4 of the operating

15   agreement, please.  At the top under 1.4, "Operation

16   of the Equipment," it says, "Contractor agrees to

17   direct the operation of the equipment and to

18   determine the methods, manner and means of

19   performing the obligations specified in this

20   agreement."

21             Did I read that correctly?

22         A.  Yes.

23         Q.  So when you signed the contract, you

24   understood that it was your responsibility to figure

25   out how to provide the services each day; is that

8/14/2006  Allen, Peter

1    right?

2             MS. ZERGER:  Assumes facts not in evidence.

3    You can ask him what he understood.

4             MR. GARRISON:  I did ask him.  You've made

5    your objection.  Please answer the question.

6             THE WITNESS:  Can you repeat that again?

7             MR. GARRISON:  Would you read it back,

8    please.

9             (Record read by the reporter as follows:

10            "Q.  So when you signed the contract, you

11            understood that it was your responsibility

12            to figure out how to provide the services

13            each day; is that right?")

14            THE WITNESS:  I was trained in the training

15   how to provide the service every day.  I just

16   followed the training that I was provided.

17            The manner and means, I was told what

18   vehicles I had the option of buying between two of

19   them.

20   BY MR. GARRISON:

21        Q.  And what were those choices?

22        A.  A Freightliner and a Chevy Express Cutaway

23   P550.

24        Q.  And you went with the P550?

25        A.  Yes.

**8/14/2006  Allen, Peter**

1          Q.   Now, you did decide certain things, though.

2     You decided whether to use the manifest; is that

3     right?

4          A.   Yes.

5          Q.   And you decided whether to use the

6     turn-by-turn?

7          A.   Yes.

8          Q.   And you decided what time to come to work

9     today -- come to work each day, I know understanding

10    that the sort had to be done first?

11         A.   Correct.

12         Q.   And you decided the order you'd deliver the

13    packages?

14         A.   Correct.

15         Q.   You decided whether you would hire a

16    supplemental driver?

17         A.   Whether I wouldn't.

18         Q.   Either way, it was your decision to make?

19         A.   Yes.

20         Q.   You decided whether you would add a second

21    truck, which I guess goes with the supplemental,

22    right?

23         A.   Correct.

24         Q.   You decided whether you would deliver the

25    packages yourself or whether you would hire someone

**8/14/2006  Allen, Peter**

1    to deliver them for you?

2         A.   Correct.

3         Q.   Now, you told me a little bit about the

4    compensation that you discussed with -- it was

5    Mr. Dolan; was that right?

6         A.   Yes.

7         Q.   Okay.  And did the two of you talk about

8    how you would be paid under the contract?

9         A.   How I would be paid?

10        Q.   Yes, sir.

11        A.   You mean on a weekly basis or the amounts?

12   What are you talking about?

13        Q.   Yes.  Let's just talk about -- frequency

14   was weekly, right?

15        A.   Yes.

16        Q.   Okay.  And then the amounts, how did that

17   work?

18        A.   He just told me that there was a core zone.

19   I mean, when he went through -- had me initial off

20   on the contract, he said this is your core zone,

21   this is how much you get paid for this core zone.

22   You also deliver this other zip code, that's the

23   core zone.

24             And at that time I wasn't sure, I had to go

25   back and ask for clarification later because I

**8/14/2006  Allen, Peter**

1    didn't know it worked off a percentage.  Say I

2    delivered 98 percent of my packages in my primary

3    core zone and two percent in the other one, they

4    based -- they pay me 90 percent of my primary core

5    zone money and two percent of the other core zone

6    money.

7            Q.  You may have misspoken, 98 and 2?

8            A.  Right.

9            Q.  So it's proportional?

10           A.  Right.  They told me that.  They told me --

11   he discussed how much you get paid per stop and per

12   package.  He also stated how much a signature stop

13   was, an appointment delivery, evening delivery.

14           Q.  Are those the -- I'm sorry to interrupt.

15   Are those the premium services you mentioned?

16           A.  Yes, sir.

17           Q.  Okay.  What else?

18           A.  I believe that was it.  I don't remember --

19   recall if it came up, about loading your vehicle

20   where you received five cents per package that you

21   loaded, in that conversation or if it was later.

22   I'm not sure.  But --

23           Q.  Okay.

24           A.  At some point in time it was mentioned.

25           Q.  And you get paid for making your van

8/14/2006  Allen, Peter

1      available, correct?

2          A.   Correct, at $25 a day.

3          Q.   Okay.  And you mentioned before that there

4      were some bonuses, or at least at some point there

5      were some bonuses?

6          A.   At the time you had to be there three

7      months, then you started getting some bonuses.  And

8      then other bonuses you had to be there a while

9      longer than that.

10             But, yeah, there was service bonuses, and I

11     don't recall because they've changed.  And that was

12     based on servicing the area, but also on the

13     terminal service, which meant everyone, so if

14     someone else messed up in the terminal, I could lose

15     my bonus, part of it.

16         Q.   Got it.

17         A.   There was a driver-release audit bonuses

18     where they would randomly go out and, on a day that

19     you delivered, and verify that you delivered

20     correctly.

21         Q.   During peak if you delivered over a certain

22     amount, was there a bonus there?

23         A.   Yeah, my threshold was so high I couldn't

24     do it anyway, so -- one time I made peak money.  It

25     was based on certain thresholds that the company

**8/14/2006  Allen, Peter**

1    established.  We had no say in it.

2        Q.  And you mentioned the fuel reimbursement,

3    right?

4        A.  Yes.

5        Q.  Okay.

6        A.  That wasn't the entire time.  I think there

7    was a time where fuel costs were low enough to where

8    we weren't getting fuel supplement.  Maybe one or

9    two months in that period.

10       Q.  Not a lot of cheap gas in California.

11       A.  Not anymore, no.

12       Q.  No.  Anything else?

13       A.  Let me think.

14       Q.  And I'm just talking in terms of

15   settlements.

16       A.  I'm trying to think, picture my weekly

17   settlement sheet.  They have what they call two

18   different types of oversized packages that you get

19   paid for.  It's not much.  Usually it's a couple

20   dollars a week, but depending on the girth and the

21   size of the package, you get paid seven cents a

22   package or a dollar a package.  There's two

23   different ones.  But I think the most I've ever

24   received in a week is maybe three bucks or something

25   like that.

**8/14/2006  Allen, Peter**

1    Q.  So if you have to lug big packages, you at

2    least get a little.  Anything else?

3    A.  They had the service account matching fund.

4    If you kept $500 in a service account for --

5    consecutively for three months after you'd been

6    there for so long, they would match that.  Not match

7    it, excuse me, but deposit $100 in there for you.

8    Q.  And they paid you interest on your escrow

9    account, right?

10    A.  Yes.

11    Q.  Was there any sort of 401(K) or HR10 or

12    anything like that?

13    A.  No.  And they also had the other, I think

14    it was the longevity bonus, too.  Once you've been

15    there so long each quarter you got, I think it

16    started out at $100, then it goes to $150 after so

17    many years, but I'm not exactly sure on the exact

18    amount.

19    Q.  Okay.

20    A.  And I think that's it.

21    Q.  That's a pretty good recall.  Now, you

22    understood that there was no base pay, right, no

23    guaranteed minimum pay?

24    A.  Well, with the exception of your core zone,

25    as long as you were there and -- your van

**8/14/2006  Allen, Peter**

1    availability and your core zone was guaranteed

2    money.

3        Q.   Okay.  But there wasn't any sort of

4    guaranteed salary, "We're going to pay you $30,000 a

5    year," or something like that?

6        A.   No.

7        Q.   Other than the contractual obligations?

8        A.   Correct.

9        Q.   It's certainly fair to point that out.  And

10   you understood you had to pay your own expenses,

11   except for the things we've talked about, for

12   example, the fuel reimbursement, which I appreciate

13   was only partial?

14       A.   Yes.

15       Q.   Okay.  At the time you contracted, I mean,

16   did you assume that you if you worked hard and

17   managed your expenses you'd be able to turn a

18   profit?

19       A.   Yes.

20       Q.   That's why you went into business, right?

21           Did anyone ever tell you that your

22   settlement was supposed to pay for certain of your

23   expenses or all of your expenses?

24       A.   Did they tell me my settlement -- I don't

25   believe it ever came out that my settlement was to

**8/14/2006  Allen, Peter**

1    pay for any of those expenses.  It's just they

2    explained that I was responsible to pay for gas and,

3    you know, maintenance of the vehicle, the costs of

4    the vehicle, all that.  It never came out that it

5    was out of the settlement, no.

6         Q.  Now, the fuel reimbursement, does it make

7    sense that that would go to help offset your fuel

8    costs -- I'm sorry, the fuel supplement, I misspoke?

9         A.  Well, yeah, that's what it's stated as.

10   Yeah, I assume that it's for that, yes.

11        Q.  Are there any other of the settlement

12   payments or other payments from the company that

13   you're aware of that sort of are intended to offset,

14   whether in part or in full, any type of expense?

15        A.  No, not directly.  It doesn't state

16   anywhere that they are for expenses, no.

17        Q.  Have you received any documents, other than

18   the contract, explaining how settlement works?

19        A.  No.  A note on that.  No documents, but we

20   did -- periodically had a meeting with typically the

21   regional manager explaining -- any time settlements

22   changed, they would go through and explain the

23   changes.  Like a per stop went up, packages went up,

24   core zone goes down, whatever, they would explain it

25   in there, all the changes for each year.

**8/14/2006  Allen, Peter**

1      Q.   Okay.  About how often would these meetings

2    happen?

3      A.   Once a year.

4      Q.   Were they mandatory?

5      A.   Not mandatory, but there were times on some

6    of these meetings where they wouldn't give us our

7    scanner until after the meeting was over.  So you

8    either had the option of sitting in the meeting or

9    waiting until it was done.  So basically, yes, we

10   went in there and sat in the meetings.

11     Q.   How many times did that happen?

12     A.   Two or three times while I was there.

13     Q.   Did you say -- did you tell anybody you

14   wanted your scanner, you needed to roll?

15     A.   Yeah, and they said, no, the terminal

16   manager said no not until after the meeting is over.

17     Q.   And who was that?

18     A.   Robert -- I don't know his last name, but

19   he's the one that takes the scanners and uploads the

20   information onto them for FedEx.

21     Q.   Is he the terminal manager or a different

22   manager?

23     A.   No, he's a package handler that after they

24   are done with the sort, he goes in and runs the

25   computer and does all the information as far as

8/14/2006  Allen, Peter

1    uploading information into our scanner.

2        Q.  Is he the one who said you couldn't have it

3    back or was that somebody else?

4        A.  That was him.  He was told he can't process

5    them until after the meeting is done.

6        Q.  Did he say who told him that?

7        A.  He said it came from the terminal manager.

8        Q.  Who was who at that time?

9        A.  Once was Scott Dolan and once with Leonard

10   Levoir.

11       Q.  Is Mr. Levoir the manager now?

12       A.  No, Travis.  I'm not sure Travis's last

13   name.

14       Q.  Okay.  How is owning your own route --

15   strike that.

16           Going back for a second.  You mentioned

17   this happened two to three times.  On each of those

18   occasions, did you go to this Robert person and say,

19   "Hey, I want my scanner back, I'm out of here"?

20       A.  Yeah.

21       Q.  And each time he said, no, he couldn't?

22       A.  He said, "No, you have to attend this

23   meeting."

24       Q.  And did you attend the meeting?

25       A.  Yes.

**8/14/2006  Allen, Peter**

1       Q.  If you wanted to, could you have just gone

2    and hung out by your truck?

3       A.  Sure.

4       Q.  How long did the meeting last each time?

5       A.  Anywhere from 30 minutes to an hour, hour

6    and fifteen minutes.

7       Q.  Do you have a specific recollection or is

8    that just generally how long they last?

9       A.  Those meetings, they were anywhere from 30

10   minutes to probably 45, an hour.

11      Q.  Okay.  How was being a temp driver

12   different from owning your own route?

13      A.  As a temp employee of FedEx getting paid by

14   Adecco, they would only -- they had to get

15   authorized to have you work more than eight hours.

16   As a contractor, they can give you as many stops as

17   they wanted, basically.

18      Q.  How else is it different?

19      A.  Well, they specified what time I had to be

20   in there in the morning as a temp.

21      Q.  As a temp?

22      A.  As a contractor, they didn't do that other

23   than the fact that I couldn't come in before they

24   opened the doors and couldn't leave before the sort

25   was done.

**8/14/2006  Allen, Peter**

1        Q.   Okay.  How else?

2        A.   Not a lot -- not a whole lot difference.

3        Q.   Potential to make more money as a

4    contractor?

5        A.   I don't know.  I don't know how much they

6    make now as a temp driver, so --

7        Q.   Well, how about as compared to how much you

8    made as a temp driver?

9        A.   A little bit more.

10       Q.   You have made a little bit more?

11       A.   A little bit, yes.

12       Q.   Was being a temp easier than being a

13   contractor?

14       A.   You had less -- there was less time on the

15   road.

16       Q.   Less paperwork as a temp?

17       A.   Same paperwork.

18       Q.   Same paperwork?

19       A.   Other than you didn't have to fill out the

20   daily settlements.  But some do.  It just depends on

21   the contractor.  If you're working as a temp or

22   contractor, if you're working for FedEx it's the

23   same basically you have to fill out.

24       Q.   Probably as a temp, simpler taxes, right,

25   because you're not your own company?

**8/14/2006  Allen, Peter**

1     A.   It depends.  I don't know how they file

2    their taxes because I don't know how they do that.

3          Q.   Which did you prefer, being a temp or

4    beeping a contractor?

5          A.   In retrospect, I would have stayed a temp.

6          Q.   And why is that?

7          A.   Because I wouldn't have had the headache of

8    basically dealing with all the issues that we've had

9    to deal with as far as, you know, the number of

10    stops and everything else.  I would have worked for

11    either them or someone else and wouldn't have had

12    any expenses, basically.

13          Q.   Any other reasons?

14          A.   No.

15          Q.   Okay.  Did you ever think about -- strike

16    that.

17              You didn't incorporate, did you?

18          A.   No.

19          Q.   Did you ever think about it?

20          A.   No.

21          Q.   One way or the other?

22          A.   No.

23          Q.   Okay.  Did anyone ever mention to you that

24    possibility?

25          A.   FedEx has mentioned it several times,

**8/14/2006  Allen, Peter**

1    posted it on boards, fliers.

2        Q.  And why didn't you consider it?

3        A.  Because I didn't want additional routes.

4        Q.  So if you incorporate -- I'm sorry, I guess

5    I don't understand that.

6        A.  I don't either because I didn't check into

7    it, so I couldn't tell you.

8        Q.  But was it your understanding you'd only

9    incorporate if you had more than one route?

10        A.  No.  I just heard if you -- I've heard if

11    you do get more than one route, you should

12    incorporate.

13        Q.  You're just not interested in it, though,

14    right?

15        A.  No.

16        Q.  I think I get it.  And of course, you could

17    have looked into it if you wanted to, right?

18        A.  Sure.

19        Q.  Do you like working with FedEx now?

20        A.  Now?

21        Q.  Yeah.

22        A.  No.

23        Q.  Was there a time when you did?

24        A.  When I first started.

25        Q.  As a temp or as a contractor or both?

**8/14/2006  Allen, Peter**

1     A.   Both.  It was all right at first.

2     Q.   Let's skip the temp part and go to the

3    contractor part.  What changed?

4     A.   The amount of hours I was putting in at the

5    time.  Not having any say-so in what I delivered.

6    At that time, I was having the issues that I already

7    mentioned to you about being flexed and not having

8    any say whether I was flexed or not.

9     Q.   And that's, just to be clear, that's

10   flexing additional work to you as opposed to the

11   opposite?

12    A.   Correct.  FedEx making the decision what my

13   workload should be on a daily basis and me having no

14   say in it.  So I just -- it just -- I thought it was

15   going to be more of a two-way street, not a one-way

16   street as far as that was concerned.

17    Q.   Now, were these not issues when you started

18   out being a contractor?

19    A.   No, it's not, because typically when you

20   first start as a contractor, they don't give you as

21   much stops.  They start you out slow and then they

22   work you up.

23    Q.   I see.

24    A.   And like I mentioned to you earlier, Scott

25   Dolan also mentioned that their goal was 108

**8/14/2006  Allen, Peter**

1    packages per contractor.  But I want to say within

2    probably two or three months after I contracted, and

3    I was still -- I mean, I was kind of comfortable

4    with the route, but I had one day where I had like

5    150 stops, which was just, I mean, nonstop for

6    probably 14 hours without a lunch break, without a

7    bathroom break, without any type of break

8    whatsoever, just so I could get them done.

9         Q.  Now, you earn more money -- obviously it's

10   more work if you have more packages, but you also

11   earn more money, right?

12        A.  Sure.

13        Q.  Other than this initial period when you

14   were sort of starting out and getting used to being

15   a contractor, what was your average?  And just give

16   me an estimate, I'm not looking for hard number.

17        A.  Average what?

18        Q.  Number of packages per day?

19        A.  It varies, I mean, from year to year.  I

20   mean, it's different now because they are taking a

21   lot of the stuff off of me.  They are just pulling

22   stuff to make sure the guy in Woodland has enough

23   stops.  So I mean, it depends on the time of year.

24   I deliver in Davis.  When UC Davis is in session, my

25   numbers are probably averaging 150 to 170 packages a

8/14/2006  Allen, Peter

1      day.

2              Q.   And how about when school is out?

3              A.   School's out, 120.   During peak last year,

4      I had one day where I had almost 400 stops.

5              Q.   Stops?

6              A.   Stops.

7              Q.   How many packages?

8              A.   Who knows.   I don't really count packages.

9      I count more of the stops than the packages, but --

10             Q.   Just so the record is clear, the numbers

11     you gave me, the 150, 170, the 120, are those stops

12     or packages?

13             A.   Packages, you asked for packages so --

14             Q.   Right.   I wanted to make sure we were all

15     on the same page here.

16                  Is that during the time when you asked that

17     some of your packages be given to the --

18             A.   What was what?

19             Q.   You just mentioned during peak last year

20     where you had over 400 stops.

21             A.   Well, once it got to a certain point where

22     I had so many stops, they actually brought in temps

23     to do some of the area.   They flexed some of it off

24     on the Woodland guy, sometimes the Dixon guy.

25             Q.   When you were overloaded like that, you

**8/14/2006  Allen, Peter**

1    agreed to have them flexed off, right?

2        A.   Yes.

3        Q.   Because it was just too much?

4        A.   Right.

5        Q.   So whether or not to your satisfaction, the

6    company did address you having a huge number of

7    stops; is that right?

8        A.   During peaks, yes.

9        Q.   During peak, okay.  Now, you mentioned the

10   packages were flexed on to you, is that the right

11   terminology?

12       A.   Yes.

13       Q.   You were given additional packages?

14       A.   Yes, from West Sacramento and Dixon.

15       Q.   Now, the contract does provide that FedEx

16   can give you additional packages beyond your zip

17   code, right?

18       A.   Yes, if we're notified prior to.  And I

19   questioned that one time and they said, "Your

20   notification is right now," when I walked in.

21       Q.   Who told you that?

22       A.   Scott Dolan.

23       Q.   Where did you like working more, Chico or

24   Sacramento?

25       A.   I wasn't really at Chico long enough to

**8/14/2006  Allen, Peter**

1    say.  I'd probably say Sacramento at first when it

2    was in the West Sac location because it was a lot

3    easier to get to.

4        Q.  Shorter?

5        A.  Yes.

6        Q.  Because West Sacramento is out towards

7    Davis?

8        A.  I live in between Chico and Sacramento.  I

9    live in Yuba City, so it's 45 miles either way, but

10   it was easier for me to get to West Sac than the

11   Chico terminal, so --

12       Q.  Any other reasons why you like West Sac

13   better?

14       A.  For the most part, other than the times I'd

15   mentioned to you earlier, the sort was done a lot

16   earlier at the Sacramento terminal than the Chico

17   terminal because it was a smaller terminal and they

18   had fewer package handlers.

19       Q.  Which one was smaller?

20       A.  The Chico.

21       Q.  Chico was smaller.  They had fewer

22   handlers, took them longer?

23       A.  A little, yes.  They were both basically

24   the same in that respect.  You still had to wait for

25   the sort to be done.  You had assigned parking

**8/14/2006  Allen, Peter**

1    spaces inside and stuff.  So the function was

2    basically the same, so it really didn't matter other

3    than for personal preferences on getting there.

4         Q.   About how many contractors worked in Chico

5    when you were there?

6         A.   I believe it was eight.

7         Q.   And I'm sure it's varied over time, but

8    about how many contractors worked in the West Sac

9    terminal?

10        A.   When I first started, I believe it was 28

11   and now I think there are like 37.

12        Q.   And then you mentioned at some time the

13   Sacramento terminal moved?

14        A.   Yes, it moved last November from West Sac

15   to South Sacramento.

16        Q.   Kind of on average, what time did the sort

17   end at the Chico terminal when you were there?

18        A.   Anywhere from 8:00 to 9:00.

19        Q.   You're an early riser.  You want to get a

20   start to your day, right?

21        A.   Yes.

22        Q.   A holdover from the service.

23        A.   Punctuality is a necessity in the military.

24        Q.   Getting up at 0 dark 30.

25             What time, on average, is the sort done in

**8/14/2006  Allen, Peter**

1    West Sac?

2        A.   Now, 6:15, 6:30, but that's only been

3    recent within last year, year and a half.  Prior to

4    that there was -- it was so sporadic, it wasn't even

5    funny.  It could be anywhere from 7:30, 8:00 to

6    10:00 or 11:00.

7        Q.   And do you have any sense why it varied so

8    much?

9        A.   Yeah.  I mean, they couldn't keep package

10   handlers, so they'd end up not having enough package

11   handlers.  They had service managers that wouldn't

12   show up until late to open the facility up.  I mean,

13   there was several issues.

14           They'd have power outages there because

15   they were overloading the circuits with the belts.

16   I guess at times they would have power outages.

17       Q.   You mentioned that you had your choice of

18   two routes in Sacramento, I think it was Woodland

19   and Davis; is that right?

20       A.   Yes.

21       Q.   And you picked Davis because -- I know you

22   mentioned --

23       A.   Tighter, less miles, better possibility of

24   growth.

25       Q.   Okay.  Possibility to make more money?

8/14/2006  Allen, Peter

1        A.   Yes.

2        Q.   Okay.   Now, your single zip code that

3    obviously includes Davis, does that include part of

4    West Sac as well?

5        A.   No.

6        Q.   It's only Davis?

7        A.   Right.   I have another zip code, it's just

8    they only put your primary on there.

9        Q.   I see.   What's your other zip code?

10       A.   95618.

11       Q.   Where is that?

12       A.   El Macero.   It's basically part of South

13   Davis.   It's just a little community around a golf

14   course, basically.

15       Q.   Is it on the other side of the freeway from

16   Davis?

17       A.   Yeah, the south side of Davis.   Davis is

18   right there.   I mean, right across the road is

19   south -- so it's all one another, but I guess

20   they -- and I just found out recently that actually

21   almost half of Davis is going to go to 95618.   They

22   are changing the zip codes there, so --

23       Q.   That will be confusing for everyone.

24       A.   Yeah.

25       Q.   Now, your route's fairly dense, right?

8/14/2006  Allen, Peter

1        A.   Correct.

2        Q.   Compact or however you'd describe it.   Are

3    there routes in Sacramento that are much less dense?

4        A.   Yes, there's mountain routes.

5        Q.   And they cover multiple zip codes?

6        A.   I don't know, to be honest with you.   I

7    just know they go up in the mountains.   I don't

8    discuss a lot of these guys' routes with them.

9        Q.   And they go up towards Tahoe?

10        A.   I don't know what the extent of their

11    service area is up there.

12        Q.   Do you know if the Sacramento terminal

13    services all the way out to the Emmigrant Gap?

14        A.   I have no idea.

15        Q.   Okay.   How would having a less dense route

16    impact how the contractor goes about servicing?

17        A.   Impact?

18        Q.   Would you service it differently if you had

19    a less dense route?

20        A.   I don't know.   Never had one.   I couldn't

21    tell you.

22        Q.   The core zero is different, do you know?

23        A.   I know that they are higher.

24        Q.   They are higher.   Is that to compensate for

25    the additional miles?

2/5/2007  10:35 AM

**8/14/2006  Allen, Peter**

1        A.  I couldn't tell you why they do that.

2        Q.  Now, home delivery is mostly delivery,

3    right?

4        A.  Yes.

5        Q.  Is it all delivery or do you have a few

6    pick-ups?

7        A.  We have what we call call tags.

8        Q.  How does that work?

9        A.  They issue it.  The customer either calls

10   in and says that it could be a damaged call tag

11   where something in the package was damaged, or they

12   didn't want it, or whatever.  They'll call it in and

13   then FedEx gives us a -- it's just like a label on

14   an UPS package or FedEx package.  It's just a label

15   basically returning it to wherever they want it

16   returned.  And we get paid a little bit more for

17   picking up call tags.

18       Q.  Any other pick-ups that aren't call tags?

19       A.  No.

20       Q.  And when you signed the contract, you

21   agreed to do pick-ups as well as deliveries, right?

22       A.  Call tags.

23       Q.  So that's a yes?

24       A.  Yes.

25       Q.  Okay.  Do you know if certain routes in

**8/14/2006  Allen, Peter**

1     your terminal have more call tags than others?

2          A.  I don't believe so.

3          Q.  And why is that your belief?

4          A.  Because I -- they put them in our little

5     cubbyhole boxes outside and everyone can see them.

6     There's never anyone with more than one or two in a

7     day.  Every now and then -- like just recently in

8     the last two weeks I had one stop with 25 and one

9     with 12 because it was somebody moving, one of the

10    college kids moving back home, and I just picked up

11    their stuff, basically.

12         Q.  I see.

13         A.  But on a normal basis, I may get maybe two

14    to five a week, that's it.

15         Q.  You've spoken with other contractors about

16    their routes, I take it?

17         A.  Some.

18         Q.  Some.  Based on your understanding, is

19    there anything unique to your route that makes it

20    more challenging to service than, say, another

21    route?

22             MS. ZERGER:  Assumes a fact not in

23    evidence.

24             THE WITNESS:  Not really.  We all deliver

25    the same.  We deliver mainly to residential, so it's

8/14/2006  Allen, Peter

1    all basically the same.

2            We're required to deliver the exact same as

3    anyone else.  We all get audited just like each

4    other.  We're required to make sure the package

5    isn't seen from the street when we deliver it.  We

6    are required to -- you know, basically all the

7    requirements are the same for every route.

8    BY MR. GARRISON:

9        Q.  Now, with the college campus, do you have

10   fewer stops than some other routes?

11       A.  Do I have fewer stops, no.

12       Q.  That gives you more stops?

13       A.  No.  I mean, it's all -- I mean, it's all

14   pretty much averaged out.  There are -- mountain

15   routes don't have as many stops because they have to

16   drive farther to get to their core, to their area.

17       Q.  College has a lot of people in a pretty

18   dense area so you've got lots of stops, right?

19       A.  I have about an average of what most people

20   do.

21       Q.  Your stops are about average?

22       A.  Yeah.

23       Q.  Okay.  Do you deliver to the dorms, for

24   example?

25       A.  Yes.

8/14/2006  Allen, Peter

1        Q.   Can you park your truck, say, near a dorm

2    and do a whole bunch of deliveries?

3        A.   No.

4        Q.   Not how it works?

5        A.   No, I have to actually -- you have to go --

6    in UC Davis you have to go through the north

7    entrance to the gate.  There are several other

8    entrances, but they want you to pay to get in there,

9    and I'm not doing that.  I'm not paying for that.

10           And then they have service desk areas, and

11   you have to -- like, for some of the dorms, you may

12   have three stops.  You have to take it to the

13   service desk area because all the dorms are locked

14   facilities, and you have to have a badge or

15   something to get into them, or a code.

16       Q.   Security issues, sort of?

17       A.   Correct.

18       Q.   So it's not simply a matter of parking your

19   truck in the lot and run into the dorms?

20       A.   And I don't just deliver to the dorms

21   either.  I also deliver to all the departments on

22   campus.

23       Q.   Okay.  Did you ever think about acquiring

24   another route?

25       A.   I did at first when they told me that my

**8/14/2006  Allen, Peter**

```
1      route was one of the larger in the terminal and it

2      would split eventually and I would be given first

3      opportunity, but that never happened.  They

4      established several other routes, but never one in

5      Davis.  So eventually I just decided, no, I just

6      wanted to fulfill paying off my vehicle and then

7      finishing with FedEx.

8          Q.  Did you ever consider acquiring another

9      route, maybe not in Davis, but say you acquire

10     another route and then put on a truck?

11         A.  No.

12         Q.  Why not?

13         A.  Because I didn't have a pool of individuals

14     as far as -- some of the guys at the terminal, I

15     know they have family members and friends.  I'm not

16     from this area.  I'm not from California, so I don't

17     have a pool of people to pick from to get.  And the

18     only time FedEx ever had drivers available was

19     around peak when they train a bunch up to help out

20     during peak.  And then some of them get absorbed,

21     other drivers decide to, but I wasn't willing to do

22     that because I saw on numerous occasions where these

23     guys would hire these guys, not knowing their work

24     ethic, and end up paying claims constantly because

25     they didn't care.  It wasn't on their shoulders,
```

8/14/2006  Allen, Peter

1    so --

2         Q.   So you just weren't interested in that?

3         A.   No.

4         Q.   Do you have any understanding as to what

5    the requirements are to acquire a second vehicle?

6         A.   Well, I know what it used to be.  Used to

7    be you had to be a contractor for six months prior

8    to even consider, be considered for a second route.

9    I believe now they are giving it right away.  They

10   just had an individual buy two routes, so --

11        Q.   Who is that?

12        A.   I don't know his name.  I just know he just

13   bought it off of -- oh, God, I think his name is

14   Pablo is selling his route and the guy buying it

15   just bought two routes.  That's all I know.  I don't

16   know his name.

17        Q.   Okay.  What was the basis of your

18   understanding in the past that you needed to be a

19   contractor for six months?

20        A.   That's what Scott Dolan told me.

21        Q.   Any other requirements in the past that

22   you're aware of?

23        A.   Just that you had to have an approved FedEx

24   vehicle again for the second route.

25        Q.   Okay.

2/5/2007  10:35 AM

**8/14/2006  Allen, Peter**

1       A.   And the driver would have to be approved by

2       FedEx, go through their training.

3            Q.   Anything else?

4            A.   No, not that I can think of.

5            Q.   Now, you mentioned before that you're

6       selling your route?

7            A.   Yes.

8            Q.   And who are you selling it to?

9            A.   Anas -- oh, gosh, I forget his last name.

10      I don't remember his last name.

11           Q.   Is it Benyazed?

12           A.   Yeah.

13           Q.   And how much is he paying?

14           A.   He's paying me $30,000.

15           Q.   How did you all reach that price?

16           A.   I reached that price.  That was my asking

17      price because that's how much I paid for my vehicle,

18      so I wanted to get reimbursed for my vehicle.

19           Q.   How much is your vehicle worth today?

20           A.   Book value is between ten and $15,000.

21           Q.   Is that retail book?

22           A.   15 is.  11 is wholesale.  Not wholesale --

23      yeah, wholesale.  Private party.  I'm not positive

24      on that.

25           Q.   So if the truck's worth, let's say, high

8/14/2006  Allen, Peter

1    range of your estimate, the truck's worth 15, then

2    you're getting 15 for the route; is that right?

3         A.  I'm selling both of them together, so --

4         Q.  I understand.

5         A.  Like I said, I'm just trying to be

6    reimbursed for what I lost over the years as far as

7    my vehicle expenses.

8         Q.  I understand what you're saying.  That's

9    not quite responsive to my question.

10             If you're selling a truck that's worth

11   $15,000 and you're selling the truck and the route

12   for $30,000, that means the route is worth about

13   $15,000, right?

14        A.  I guess, yeah.

15        Q.  I'd like to mark this as the next exhibit,

16   please.

17             (Whereupon, Deposition Exhibit 5 was marked

18             for identification)

19   BY MR. GARRISON:

20        Q.  Sir, I've handed you what's been marked as

21   Allen Exhibit 5.  It's a three-page document

22   produced by your side.  For the record it's Bates

23   PCA29868 through 29870.

24             Do you recognize this document?

25        A.  I sure do.

**8/14/2006  Allen, Peter**

1          Q.   And what is it?

2          A.   It's a sales agreement for my route from

3     myself to Anas.

4          Q.   And this is the transaction we've been

5     talking about, right?

6          A.   Correct.

7          Q.   And on the second page, is this your

8     signature?

9          A.   That is.

10         Q.   And do you recognize the signature below

11    that to be his?

12         A.   I assume it is, yes.

13         Q.   Did he sign it in your presence?

14         A.   Yes, he did.

15         Q.   And on the back is some sort of

16    verification, right?

17         A.   Right.  It was where we had it notarized.

18         Q.   Okay.  So the terms, "The seller is the

19    owner of Federal Express Route No. 5 in Davis,

20    California."  It mentions your 2003 Chevy Express

21    box truck.  Is that the P550 you referenced earlier?

22         A.   Yes.

23         Q.   It's the truck you used the whole time you

24    had the Davis route?

25         A.   Yes.

**8/14/2006  Allen, Peter**

1       Q.   And you're selling both the route and the

2    truck to Mr. Benyazed for, it says here, a total of

3    $30,000; is that right?

4       A.   Correct.

5       Q.   Okay.   I apologize if I already asked this,

6    has Mr. Benyazed finished the FedEx training?

7       A.   Yes.

8       Q.   Okay.   And is he going to ride along with

9    you for a while first or how does that work?

10      A.   Yeah, Tuesday he -- I believe he's going

11   with one of the service managers.   And because he

12   has prior experience through California Overnight --

13   the standard policy now is that they go five times

14   out with a service manager.   But because he has

15   prior service, they are not requiring him to do

16   that, only one time, and then he's going to go out

17   with me the rest of the week.

18      Q.   And then you'll hand him the keys, huh?

19      A.   Yes, sir.

20      Q.   Now, is your van a 3,500?

21      A.   Yes, Chevy Express 3,500 Cutaway with a

22   12-foot box.

23      Q.   Have you upgraded it in any way?

24      A.   No, other than the actual shelf in the box,

25   there's one shelf in the box, but --

**8/14/2006  Allen, Peter**

1      Q.  Did you have to pay for that shelf?

2      A.  It was part of the sales agreement when I

3   bought it.

4      Q.  Do you know how much a shelf costs?

5      A.  I have no idea.

6      Q.  Was it broken out even or did it just come

7   with the truck?

8      A.  I can tell you now to build those shelves,

9   I mean, for -- for people to have three of them

10   made, it's costing them roughly around $2,000.  So

11   I'm assuming somewhere around 700 bucks apiece,

12   $6-700 apiece.

13      Q.  And you have one?

14      A.  Yes.

15      Q.  Okay.  I'd like to mark this as Allen 6,

16   please.

17          (Whereupon, Deposition Exhibit 6 was marked

18           for identification)

19   BY MR. GARRISON:

20      Q.  Sir, I've handed you what's been marked as

21   Allen Exhibit 6.  For the record, it's a four-page

22   document produced by your side, Bates PCA29871

23   through 29874.

24          Do you recognize these documents?

25      A.  Yes, Kelley Blue Book.

**8/14/2006  Allen, Peter**

1          Q.   And did you print these out?

2          A.   I don't know if I did these exact ones, but

3    I'm sure I did, yes.

4          Q.   And are these Kelley printouts for your

5    truck?

6          A.   Yes.

7          Q.   Okay.  It looks like there's two of them,

8    right?

9          A.   Yes.  One was private party and the other

10   one was Blue Book suggested retail.

11         Q.   And which is which?

12         A.   The top one is private party, the first two

13   pages.  And then the third and fourth pages are the

14   suggested retail.

15         Q.   Now, is your truck in good or excellent

16   condition?  I assume not fair.

17         A.   Based on what this is, it's in good

18   condition.

19         Q.   It's in good condition.  Okay.  So for the

20   first one, private party under good condition it

21   says $10,510, is that right?

22         A.   Right.

23         Q.   The second one only has excellent, it

24   doesn't have good.  For excellent it says $13,750?

25         A.   Right.

**8/14/2006  Allen, Peter**

1       Q.   And that's retail?

2       A.   Right.

3       Q.   If it's going to be good, it's going to be

4    something south of that, right?

5       A.   No, because retail, they don't express it

6    as good.

7       Q.   I see.  So according to Kelley Blue Book,

8    at least, the range is up to $13,750?

9       A.   Yes.

10      Q.   And that's less than 15,000, right?

11      A.   Sure.

12      Q.   Okay.  How much did you pay for the truck?

13      A.   $30,000, right at $30,000 with financing

14    and the down payment and everything.  A little bit

15    like a couple dollars over.

16      Q.   Okay.  And you bought it new, right?

17      A.   Yes.

18      Q.   Okay.  I'd like to have this marked as

19    Allen 7, please.

20           (Whereupon, Deposition Exhibit 7 was marked

21            for identification)

22    BY MR. GARRISON:

23      Q.   Mr. Allen, I've handed you what's been

24    marked as Exhibit 7.  It's a one-page document Bates

25    PCA0021757.

**8/14/2006  Allen, Peter**

1          Do you recognize this document?

2          A.  It could be the one from the sale of my

3    vehicle -- I mean when I purchased the vehicle,

4    sure.

5          Q.  You don't know?

6          A.  No, I don't know.

7          Q.  Is this a document you provided to your

8    counsel in this case?

9          A.  Possibly, yeah.  I'm not positive.  I'm

10   sure I did earlier on.

11         Q.  If you just look at the -- where it talks

12   about standard equipment, sort of how it's equipped,

13   does it sound like your vehicle?

14         A.  Yep.

15         Q.  And then the sticker price plus destination

16   charge is $24,239, right?

17         A.  Correct.

18         Q.  Did you pay sticker for this?

19         A.  I have no idea.  I have a financial

20   statement at home that states what I paid totally,

21   that's all I know.  I don't know if I paid this or

22   not.  I honestly couldn't tell you.

23         Q.  Have you given your counsel a copy of that

24   financial statement you just referenced?

25         A.  I'm not positive, but if I haven't I can

**8/14/2006  Allen, Peter**

1    provide it.

2         Q.   Great, thanks.  So whether or not this is

3    your truck with tax, title, license, finance

4    charges, everything, it was $30,000 and change?

5         A.   Yes.

6         Q.   Okay.  How did you go about finding a buyer

7    for your route?

8         A.   Actually, he approached me in Davis.

9         Q.   He approached you?

10        A.   Yes.  I was on my route one day and he

11   approached me.

12        Q.   Okay.  Were you trying to sell it before

13   you were approached?

14        A.   I was contemplating at the time.  And he

15   approached me and asked me about it and --

16        Q.   Had you taken any steps to sell it,

17   advertising, that sort of thing, before you were

18   approached?

19        A.   No.

20        Q.   Okay.  Were there any restrictions on your

21   ability to sell your route?

22        A.   Restrictions, I'm not sure.  Restrictions

23   from whom?

24        Q.   Say from the company?

25        A.   Restrictions, no restrictions that I can

**8/14/2006  Allen, Peter**

1    think of other than, of course, the driver had to be

2    FedEx approved.

3        Q.   And part of that deals with --

4        A.   Training.

5        Q.   Training and DOT, right?

6        A.   Correct, and having a physical, drug

7    screening and all that.

8        Q.   Okay.  Nothing else, though?

9        A.   No, other than the vehicle had to meet

10   their standards.

11       Q.   And do you know if some of that has to do

12   with regulations, federal regulations as well?

13       A.   I don't believe so.  I think that's just

14   for aesthetic purposes for FedEx.

15       Q.   And in your contract you agreed to have a

16   vehicle that is free of dings, dents, visible rust,

17   that sort of thing, right?

18       A.   Correct.

19       Q.   You couldn't sell your work if you were an

20   employee, could you?

21       A.   Couldn't sell it, no.  I don't own it.

22       Q.   Have other -- actually, strike that.

23            You mentioned a guy just bought two routes

24   in your terminal.  Do you know what he paid for

25   them?

**8/14/2006  Allen, Peter**

1    A.   No idea.

2         Q.   Have you heard about any other route sales

3    in your terminals?

4         A.   I've heard people selling routes, but I

5    don't know how much they are getting for them.

6         Q.   Have you ever talked to someone who was

7    selling his or her route and either asked them or

8    been told how much they were selling them for?

9         A.   No, when I sold mine, all I wanted to do is

10   recoup the cost for what I paid for my vehicle.

11        Q.   So do you know what any route in your

12   terminal has sold for in the last couple of years,

13   other than yours, of course?

14        A.   Not exact amounts, no.

15        Q.   Have you heard estimates?

16        A.   One of my friends, I think he sold his for

17   like somewhere around 28 or 30.

18        Q.   Any others?

19        A.   No.

20        Q.   Have you ever heard the term route

21   reconfiguration?

22        A.   Route reconfiguration.  Vaguely, yes.

23        Q.   What does that mean to you?

24        A.   That they can reconfigure routes any time

25   they want to.  Basically take stops away from you or

**8/14/2006  Allen, Peter**

1   give you additional stops in a different zip code.

2        Q.   Does the contract provide for route

3   reconfiguration?

4        A.   I believe it says, states something in

5   there about it when it was talking about the

6   one-dollar and two-dollar compensation if stops are

7   given or taken away from you.

8        Q.   Let me back up.  What is the basis for your

9   understanding about what reconfiguration is or what

10   it means, rather?

11        A.   From what I just read in the contract,

12   basically, when you showed it to me.

13        Q.   Route reconfiguration, to you is that a

14   permanent thing or a temporary thing?

15        A.   I have no idea.

16        Q.   Has your route been reconfigured, as you

17   understand the term?

18        A.   Yeah, they've taken stops away from me, but

19   it's not permanent.  When some of the West Sac stops

20   they took away from me, whenever the Woodland route

21   gets heavy, they push some of them -- or West Davis,

22   excuse me, not West Sac.  When some of my West Davis

23   stops get taken off and given to Woodland and then

24   when he gets heavy, they put some of them back on to

25   me.

**8/14/2006  Allen, Peter**

1       Q.  Based on volume, sometimes they take some

2   away, sometimes they add some?

3       A.  Correct.

4       Q.  You've not been permanently told every stop

5   on this side of Highway 10 -- fictitious, that's

6   down in Southern California -- is now going to be

7   for Woodland?

8       A.  No.

9       Q.  Okay.  Have you heard of situations with

10  other contractors in your terminal where their

11  routes were permanently reconfigured?

12      A.  Yes.  Actually, I think I spoke with

13  Jerrett Henderson who worked up in the Chico

14  terminal, and he was permanently reconfigured.

15      Q.  Do you have an understanding as to how that

16  process works?

17      A.  His process?  From what I was told from him

18  is, they wanted -- FedEx wanted him to purchase a

19  larger vehicle.  And there was nothing wrong with

20  the one he was using so he did not, so they took

21  away his primary area and gave him a different area.

22      Q.  And your understanding, this is from

23  talking with him?

24      A.  Yes.

25      Q.  Any other sources?

**8/14/2006  Allen, Peter**

1        A.   No.

2             Q.   Did he indicate whether that was voluntary

3   or involuntary?

4        A.   He said it was involuntary.

5             Q.   Did he indicate whether his new area had

6   more or less stops than his old one?

7        A.   Had less stops, more miles.

8             Q.   Setting aside Mr. Henderson's specific

9   situation, do you have a general understanding, one

10  way or the other, how the reconfiguration, I'm

11  talking about permanent, reconfiguration process

12  works?

13       A.   No.

14            Q.   Do you and other contractors ever sort of

15  amongst yourselves, not formally, either give

16  someone a few packages or give up a few packages?

17       A.   I never have, no.

18            Q.   Have you ever been approached to do that?

19       A.   No.

20            Q.   Are you aware of any other contractors ever

21  doing that?

22       A.   (Shakes head.)

23            MS. ZERGER:   I didn't hear -- do you want

24  to say your answer?

25            THE WITNESS:   I'm sorry, no.

**8/14/2006  Allen, Peter**

1    BY MR. GARRISON:

2         Q.  Just for clarity, that was no to the last

3    three questions, right?

4         A.  Right.  Sorry.

5         Q.  Good catch.  After you signed the operating

6    agreement, what did you do, if anything, to prepare

7    for your first day for servicing your route?

8         A.  What did I do?  Nothing, because I had

9    already been delivering for someone else, so --

10        Q.  So you kind of knew the route at that

11   point, right?

12        A.  Correct.

13        Q.  Did you have a ride-along with management

14   at that point or had it been earlier when you were

15   working for --

16        A.  It was actually after.

17        Q.  It was after?

18        A.  Yes.  Yeah.  I'm trying to think.  I

19   believe my first ride-along was with Jan Stevens

20   and, as a contractor, and I want to say it was in

21   the first month or two.

22        Q.  And that was just on one occasion with her,

23   or was it more?

24        A.  One time, at that point.  I mean, I had

25   ride-alongs, of course the customer service rides

**8/14/2006  Allen, Peter**

1    that they do, I've had several of them as well.

2         Q.  And did Ms. Stevens spend the whole day

3    with you?

4         A.  Yes, she did.

5         Q.  And under the contract it's up to four

6    customer service rides or up to four a year; is that

7    right?

8         A.  That's correct.

9         Q.  Did you have any problems with Ms. Stevens

10   riding along with you that day?

11        A.  No.

12             MR. GARRISON:  Let's go off the record.  We

13   need to change the tape.

14             THE VIDEO OPERATOR:  This marks the end of

15   Tape No. 2 in the deposition of Peter Allen.  Going

16   off the record.  The time is 12:11.

17             (Lunch recess taken)

18             THE VIDEO OPERATOR:  This marks the

19   beginning of Tape No. 3 in the deposition of Peter

20   Allen.  Back on the record.  The time is 12:55.

21   BY MR. GARRISON:

22        Q.  Mr. Allen, during the lunch break did you

23   consume any alcohol, medication or anything else

24   that would affect your ability to testify this

25   afternoon?

**8/14/2006  Allen, Peter**

1        A.  No, I did not.

2        Q.  Okay.  Would you please turn to page 7 of

3    the operating agreement, which is Exhibit 4, I

4    believe.

5        A.  Page 7, that was --

6        Q.  Page 7, Section 1.10.

7        A.  Okay.

8        Q.  "Agreed Standard of Service."  This

9    provides that "FHD has represented to shippers and

10   consignees that, in arranging transportation of

11   packages within the FHD system, it will provide a

12   standard of service which is fully competitive with

13   that offered of other national participants in the

14   industry.  Contractor acknowledges the benefits to

15   his/her business of participation in the FHD

16   national system, and agrees to conduct activities

17   under the terms of this Agreement to achieve the

18   results represented to shippers and cosignees."

19           Do you see that?

20       A.  Yes.

21       Q.  Did I read that accurately?

22       A.  Yes.

23       Q.  When you signed this operating agreement

24   you agreed to provide a standard of service to your

25   customers and FedEx customers, right?

**8/14/2006  Allen, Peter**

1          A.   Yes.

2          Q.   And you understood that this standard was

3     based on the market requirements set by other

4     national participants in the small package industry,

5     correct?

6          A.   Yes.

7          Q.   Before starting your route, were you asked

8     to create an action plan?

9          A.   No.

10         Q.   Does the term "action plan" mean anything

11    to you?

12         A.   No.

13         Q.   Still in Section 1.10, if you drop down to

14    sub (a) please, we're still on page 7.

15         A.   Okay.

16         Q.   It also states -- well, "To achieve these

17    business objectives, Contractor agrees," and it

18    drops down to sub (a), "Agrees to provide daily

19    delivery and pick-up service to consignees and

20    shippers on days and at times which are compatible

21    with their schedules and requirements within

22    Contractor's Primary Service Area," and skip down a

23    couple lines, "all consistent with the competitive

24    standards within the industry..."

25              Do you see that?

**8/14/2006  Allen, Peter**

1       A.   Hm-hmm.

2       Q.   And did I read it clearly -- or correctly?

3       A.   Yes, sir.

4            MS. ZERGER:  I'm going to say the document

5       speaks for itself and we didn't read the whole

6       document.

7            MR. GARRISON:  That's fine.  That's not a

8       form of objection, but objection noted.

9       Q.   When you signed the operating agreement,

10      you understood that customers could require you to

11      pick up and deliver packages at times, quote, "which

12      are compatible with their schedules and

13      requirements," close quote; is that right?

14      A.   Yes.

15      Q.   And did you do everything you could to

16      fulfill that requirement?

17      A.   Yes.

18      Q.   And did you deliver packages compatible

19      with the customers' schedules and requirements?

20      A.   Yes.

21      Q.   Now, you understood that you had to provide

22      pick-up and delivery -- excuse me.

23           Now, you understood that you provide

24      pick-up and delivery service for every package in

25      your primary service area, right?

**8/14/2006  Allen, Peter**

1        A.   Yes.

2        Q.   Okay.

3             MS. ZERGER:   Wait.   Can you restate his

4    question.   I'm not sure you -- pick-up and delivery

5    service for every package?

6             MR. GARRISON:   In his primary service area,

7    focusing on his zip code for now.

8             MS. ZERGER:   Focusing on the package.   I

9    was wondering if you meant package or customer?

10       Q.   I meant package.   Thank you, though.

11            And if you didn't accomplish that task,

12   that would be known as a service failure, right?

13       A.   As a did not attempt, yes, a DNA.

14       Q.   Have you heard of the term service failure?

15       A.   For premium services, yes.

16       Q.   And what does service failure mean to you?

17       A.   Service failure to me, premium service is

18   meaning there was a signature-required service that

19   I didn't get a signature on.   It was an evening

20   delivery that I didn't deliver at the correct time.

21   Or an appointment delivery that I didn't deliver at

22   the correct time.

23       Q.   During the time you've been a contractor

24   with FedEx, have you had service failures?

25       A.   To my knowledge, I don't believe so, no.

**8/14/2006  Allen, Peter**

1    Q.  What are you supposed to do if you have too

2    many packages to deliver in a given day?

3    A.  Bring it up to service manager that handles

4    my side of the belt.

5    Q.  And you've done that in the past?

6    A.  Yes.

7    Q.  And on occasion they've given some of those

8    packages or helped you arrange to have somebody else

9    deliver some of those packages?

10   A.  During peak, yes.

11   Q.  You've mentioned that as your route has

12   grown it's gotten pretty busy, lots of stops?

13   A.  Yes.

14   Q.  Are you able to get all your packages

15   delivered every day?

16   A.  Yes.

17   Q.  Is that hard to get it done in a day?

18   A.  Not now because I took -- they took West

19   Davis away from me, so no.

20   Q.  But you agreed to that, right?

21   A.  No.  Never even told that they were doing

22   it.

23   Q.  When did that happen?

24   A.  It's been happening since peak.  After peak

25   was over when the volume got back down again, they

**8/14/2006  Allen, Peter**

1    continued to give the west side of Davis to the

2    Woodland contractor to make sure that he had enough.

3    That's speculation, I guess.  I can't say that for

4    sure, but they gave it to him.  Never asked me once

5    if it was all right with me.

6        Q.  This is since peak last year?

7        A.  It's happened, yeah, since --

8        Q.  So how long has this been happening?

9        A.  Peak ends right after Christmas, so ever

10   since then.  With the exception of when he was

11   heavy, then they'd put some of it back on me.  I

12   think maybe twice -- two or three times I've had all

13   of Davis since then.

14       Q.  And what is his name, the Woodland guy?

15       A.  Jagish (phonetic) Singh.

16       Q.  S-i-n-g-h?

17       A.  Yeah.

18       Q.  Have you talked to FedEx management about

19   packages being shipped off to Mr. Singh?

20           No?

21           Sorry, you need to answer audibly.

22       A.  No, I have not.

23       Q.  Why haven't you?

24       A.  Because in the past I found it kind of

25   useless to talk to them about anything so I just

**8/14/2006  Allen, Peter**

1   said no.  I just decided it didn't matter anymore.

2   At that point I had already decided I was getting

3   rid of my route.  Didn't care anymore.

4        Q.  When did you make that decision?

5        A.  Probably two years ago.

6        Q.  Going back to Section 1.10 (a) at the

7   bottom, sort of the middle it says, "(provided,

8   however, that on any day where the volume of

9   packages is available for delivery or pick-up in

10  Contractor's Primary Service Area exceeds the volume

11  that Contractor can reasonably be expected to handle

12  on such day, FHD may reassign a portion of such

13  packages to another contractor)."

14       Did I read that correctly?

15       A.  Yes.

16       Q.  And so when you contracted, you contracted

17  that under certain circumstances the company could

18  shift off packages, right?

19       A.  Sure.  But in this situation that we've

20  been talking about, they -- I mean, I could have

21  handled every bit of what was left in West Davis and

22  with no problems whatsoever.

23       Q.  But you didn't go to them and say, "Hey,

24  I'm light, load me up"?

25       A.  No.

**8/14/2006  Allen, Peter**

1      Q.  If you turn to the next page, please, and

2    look at subparagraph (b).  "The contractor agrees to

3    make reasonable efforts to retain and increase the

4    base of shippers and consignees served and the

5    number of packages handled per shipper within

6    Contractor's Primary Service Area."

7          Did I read that right?

8      A.  Yes.

9      Q.  So when you signed the OA, you understood

10   that you were obligated to make some effort to grow

11   your customer base, right?

12     A.  Yeah, but I have no means of growing it

13   because I don't deal directly with the shipper.  I

14   deal with the consignees, and that's it.  I don't

15   have any contact with the shipper because we don't

16   do pick-ups like Ground, so I don't have any --

17   other than the few call tags I was telling you

18   about.  So I don't know how I would increase that.

19     Q.  Well, you could do a great job and make the

20   consignees happy with FedEx and want to use it when

21   they ship packages, right?

22     A.  Sure.

23     Q.  And you could develop relationships with

24   them, to the extent you have face-to-face contact,

25   to put a good face on the company, that sort of

**8/14/2006  Allen, Peter**

1    thing.

2            Subparagraph (c), says, "Handle, load, unload

3    and transport packages using methods that are designed

4    to avoid theft, loss and damage."

5            So you agreed to do this as part of your

6    contract, right?

7        A.   Yes.

8        Q.   And you didn't have a problem loading your

9    own truck, did you?

10       A.   No.

11       Q.   Okay.  What methods did you use to avoid

12   theft, loss and damage?

13       A.   Made sure my vehicle is in my presence at

14   all times.  If it wasn't, then I would lock the

15   vehicle.

16       Q.   How about theft after you've dropped a

17   package off, would you be careful where you'd leave

18   it?  Are there procedures when you'd leave it?

19       A.   Yeah, I'd leave it out of sight from the

20   street.

21       Q.   And how would you make efforts to prevent

22   damage to packages?

23       A.   If it was -- I mean, the way I load it, I

24   make sure I loaded the fragile items on top, unlike

25   FedEx package handlers that would load them on the

**8/14/2006  Allen, Peter**

1    bottom of the pallet and load 50-pound packages on

2    top of them.  I would just make sure anything

3    fragile is put on the top or on my shelf where the

4    possibility of damage was limited.

5        Q.   And you'd handle the packages with care,

6    right?

7        A.   Yes.

8        Q.   Did you ever throw a package?  Say

9    delivering a package, did you ever, you know, throw

10   it through the air as opposed to setting it down

11   where it was being delivered?

12       A.   Yes.

13       Q.   Under what circumstances would you do that?

14       A.   At apartments that managers didn't sign for

15   the package.  And typically in Davis most neighbors

16   won't sign for packages either because they don't

17   know one another.  So if I felt it wasn't a fragile

18   item, I would toss it on a balcony.

19       Q.   So you'd toss it up?

20       A.   Actually, not even up.  Typically straight

21   across because they've got stairs going up.

22       Q.   I see.

23       A.   Straight across.

24       Q.   Were any of those packages damaged?

25       A.   Yes.

**8/14/2006  Allen, Peter**

1       Q.   And what happened then?

2       A.   One was a used frying pan with a glass top,

3    didn't have any markings on the package saying it

4    was fragile so I didn't know and there was nothing

5    moving.  Customer called in and complained that the

6    handle was busted on it, and I was charged with a

7    customer complaint.  Lost my bonus.

8       Q.   Did you have to pay for the frying pan?

9       A.   No.

10      Q.   Okay.  So you lost your -- is that the CCS

11   bonus?

12      A.   Yeah, $120, or whatever it is, a month.

13      Q.   Any other ramifications that you're aware

14   of?

15      A.   Yeah, one other.  Threw a package on a

16   balcony, same apartment complex.  And apparently

17   there was an expensive item or a pot, flower or

18   something on there that you couldn't see from where

19   I was standing on the stairs, and it broke the

20   flower pot or something, and they complained as

21   well.

22      Q.   And what happened then?

23      A.   Same thing.

24      Q.   So you don't have to pay for the value of

25   what was broken, but you do lose the CCS bonus for

**8/14/2006  Allen, Peter**

1    that period, is that how that works?

2         A.  Yeah.

3         Q.  If you look at subparagraph (d) please,

4    still on page 8.  "Contractor agrees to cooperate

5    with FHD's employees, customers and other

6    contractors to achieve the goal of efficient

7    pick-up, delivery, handling, loading and unloading

8    of packages and equipment, and provide such

9    electronic and/or manual data pertaining to package

10   handling as is reasonably necessary to achieve this

11   goal."

12         So when you signed the operating agreement, you

13   agreed to cooperate with FedEx and other contractors to

14   efficiently provide pick-up and delivery services,

15   right?

16         A.  Yes.

17         Q.  And that was a mutual goal both for you and

18   the company?

19         A.  Yes.

20         Q.  It was mutual because both you and the

21   company benefited if packages were picked up and

22   delivered more efficiently; is that right?

23         A.  Yes.

24         Q.  And by signing your operating agreement,

25   you also agreed to provide FedEx Ground electronic

**8/14/2006  Allen, Peter**

1    data to help achieve your mutual goal, didn't you?

2        A.  Yes.

3        Q.  And you also agreed to cooperate with

4    FedEx's employees, customers and contractors, right?

5        A.  Correct.

6        Q.  What did you do to cooperate with the

7    employees, customers and contractors?

8        A.  I intermingled with the customers on a

9    daily basis.  Contractors, I had casual

10   conversations with them.  And employees, I mean I

11   still -- I -- there was issues and times where we

12   disagreed on things, but, as a small-business

13   independent contractor, I felt I had the right

14   when -- to speak up when I felt something wasn't

15   right.

16       Q.  And you did, right?

17       A.  Yes, I did.

18       Q.  What did you do to provide your pick-up and

19   delivery services in as efficient manner as

20   possible?

21       A.  Went by the turn-bys and the manifests that

22   FedEx provided me.

23       Q.  And you thought those were the most

24   efficient way to do it?

25       A.  Yes, it was.

**8/14/2006  Allen, Peter**

1        Q.   Anything else?

2        A.   No.

3        Q.   If you look at subparagraph (e), please.

4    "Contractor agrees to foster the professional image

5    and good reputation of FHD and Contractor with

6    shippers and consignees, including adhering to the

7    vehicle identification and operator appearance

8    standards specified in Paragraphs 1.5 and 1.12 of

9    this Agreement."

10           Did I read that correctly?

11       A.   Yes.

12       Q.   So when you signed the agreement, you

13   agreed to maintain a professional-looking image and

14   appearance when delivering and picking up packages,

15   right?

16       A.   Right.

17       Q.   What did you understand those appearance

18   requirements to be?

19       A.   Wearing the uniform.  And when I was

20   trained, actually in the training course, it was

21   wearing the uniform that they rented to us or we

22   paid for in our business support package.

23           And at the time of my training it was

24   either black or brown shoes, but I later found out

25   from James Cumberland -- I tried to wear brown shoes

**8/14/2006  Allen, Peter**

1    one day and I was told no.  If I don't come tomorrow

2    in black shoes that I won't be able to deliver, so

3    it was black shoes.

4         Q.  Were you able to deliver in brown that day?

5         A.  Yes.

6         Q.  Any grooming standards that you're aware

7    of?

8         A.  Nothing specific that I've seen in writing,

9    no.

10        Q.  Anything else?

11        A.  No.

12        Q.  In your experience, some customers might

13   not want to work with someone who's not neatly

14   dressed or neatly groomed; is that right?

15        A.  In my experience?

16        MS. ZERGER:  Objection.  Calls for

17   speculation.

18        THE WITNESS:  I can only speak for myself.

19   BY MR. GARRISON:

20        Q.  Sure.

21        A.  And I never was in a situation like that,

22   so I wouldn't be able to tell you.

23        Q.  Are you aware of anyone in a customer

24   service industry not wanting to work with a person

25   in that industry because that person is disheveled

**8/14/2006  Allen, Peter**

1    or not well groomed?

2          A.   No.

3          Q.   Have you ever had an experience where you

4    just didn't want to work with someone, just someone

5    in retail, because they were a mess, their clothes

6    were a mess, they were dirty, not well groomed?

7          A.   Not to my knowledge, no.

8          Q.   What did you do to foster the professional

9    image of FedEx?

10         A.   Wore the uniform that they provided, get my

11   hair cut, went out in a professional manner every

12   day.

13         Q.   Kept your truck up?

14         A.   Yes.

15         Q.   Flip to page 9, please.  Actually, I'm

16   sorry, if you'd go back to 8, please.  Subparagraph

17   (f), "Conform to all applicable federal, state and

18   local laws, regulations and ordinances."

19              Do you see that?

20         A.   Yes.

21         Q.   So when you signed this agreement, you

22   agreed to comply with state and federal law when

23   doing your job, right?

24         A.   Whatever that may be, yes.

25         Q.   Did you have any understanding as to what

**8/14/2006  Allen, Peter**

1    that meant?

2        A.  No, other than just the DOT requirements

3    that they went over a little bit in training on.

4        Q.  Did you ask anybody, "Hey, what's this

5    mean," or anything to that effect?

6        A.  No.

7        Q.  Why not?

8        A.  Because I figured FedEx gave me all the

9    information I needed to perform the duties, so it

10   wasn't necessary as far as I was concerned.

11       Q.  Sitting here today, having been a

12   contractor for several years, do you have a better

13   understanding of what these legal requirements are?

14       A.  What legal requirements?  I mean, other

15   than DOT requirements, I don't know of any other

16   legal requirements.

17       Q.  Okay.  That's what I'm asking.  And during

18   your time as a contractor, I was sort of focused on

19   the beginning, but during your time as a contractor,

20   you haven't asked anyone from FedEx to clarify what

21   this subsection (f) is referring to, have you?

22       A.  No.

23       Q.  And why not, same reason that you talked

24   about a minute ago?

25       A.  Correct.

**8/14/2006  Allen, Peter**

1       Q.  Subparagraph (g), same page, "Cause the

2    Equipment to be operated safely and in compliance

3    with all applicable laws and regulations."

4            So you agreed to do that, right?

5       A.  Yes.

6       Q.  And what is your understanding of what this

7    involves, DOT?

8       A.  Well, that and common traffic laws.

9       Q.  California DMV requirements?

10      A.  Correct.

11      Q.  Anything else?

12      A.  No, not that I can think of.

13      Q.  Now, you mentioned that in some instances

14   packages would be added to your route or at least to

15   your load?

16      A.  Right.

17      Q.  And in some instances packages would be

18   taken off.  Did you all refer to that informally as

19   flexing?

20      A.  Yes.

21      Q.  Okay.  Was there any sort of formal flex

22   program that you're aware of?

23      A.  Formal flex, like Ground, you mean?

24      Q.  Yes.

25      A.  No.

**8/14/2006  Allen, Peter**

1     Q.  So HD doesn't have what they refer to on

2     the Ground side as the flex program?

3     A.  Correct.  We had no option.  We had to

4     participate in it.

5     Q.  Because that's what you agreed to do in

6     your contract, right?  I'm sorry, is that a yes?

7     A.  If it says it in there, yes, that's what I

8     agreed to do.

9     Q.  You mentioned that during peak, or you

10    testified previously during peak, packages were

11    taken off your route and given to Mr. Singh on some

12    occasions and that you were fine with that because

13    volume was so heavy; is that right?

14    A.  Yeah, it wasn't just Mr. Singh.  I also

15    stated it was -- sometimes they'd hire a temp in

16    there, and the Dixon route.

17    Q.  Thank you for reminding me.  And you

18    already talked about since last year's peak, some of

19    your packages have still gone -- that went to Mr.

20    Singh, right?

21    A.  Correct.

22    Q.  Were there other instances when packages

23    would be taken off your route and given to someone

24    else, other than as you've already described?

25    A.  No, just like I said, no.

**8/14/2006  Allen, Peter**

1       Q.  How frequently were packages added to your

2    route?

3       A.  The first couple years, at least two to

4    three times a week, at least.  Sometimes every day

5    of the week.  In the past, about a year and a half

6    to two years, it hasn't happened, not outside my

7    primary service area.

8       Q.  So the last one and a half to two years,

9    Davis has been full work?

10      A.  Correct.

11      Q.  And you haven't been asked to do more?

12      A.  Correct.

13      Q.  And before that, you mentioned it sort of

14   varied, but anywhere between two to three days per

15   week up to every day?

16      A.  Correct.

17      Q.  Did you have less stops in Davis at that

18   time?

19      A.  At times, yes.  At times there were more.

20   The reason why is they had -- at the time, they

21   didn't have a contractor for the Dixon area, so

22   myself and the Vacaville contractor would get stuck

23   doing the Dixon area all the time.  And when I first

24   started there, they didn't have a West Sac

25   contractor, so they would put it on us, on myself

8/14/2006  Allen, Peter

1    and the Woodland driver.

2         Q.  And then as they filled those routes they

3    shifted the work back to whoever those contractors

4    were; is that right?

5         A.  Correct.

6         Q.  Now, during this one and a half to

7    two-year -- excuse me.  During the first couple of

8    years when they were asking you to deliver packages

9    in addition to your primary zip code, I think you

10   mentioned that on occasion you had a problem with

11   that; is that right?

12        A.  Yes.

13        Q.  And you talked to them and they pretty much

14   said you need to do it, right?

15        A.  Yes.

16        Q.  Was it okay with you sometimes?

17        A.  Okay with me what?

18        Q.  To handle the additional packages.

19        A.  If the volume in my area was light enough,

20   yes, it was okay.  But when they were extending me

21   out that far to work ten, 11, 12 hours, knowing that

22   I couldn't take a lunch break, then no, it wasn't

23   okay.  And that's when I made objections to it.

24            Because I knew if I go out with that many

25   stops that there was no way I was going to have time

**8/14/2006  Allen, Peter**

1    to take any type of break whatsoever and get done

2    within the DOT requirements.

3        Q.  Did you tell them that, that if I have to

4    deliver all these, I can't take breaks?

5        A.  We, as contractors, told them everything.

6    It didn't matter.  It was still you either do it or

7    you're threatening your contract, so yes, it was

8    mentioned to them.

9        Q.  So you specifically mentioned to them?

10       A.  Yes.

11       Q.  That's my question is whether you

12   specifically said, "Hey, if I deliver all these, I

13   can't take a lunch break.  There's just too much"?

14       A.  Yeah.

15       Q.  And what did they say?

16       A.  Basically it came back as, you know, "It's

17   your area of responsibility for today and you do

18   what you got to do."

19       Q.  And who said that?

20       A.  Service managers, Larry Davis, Letisha, I

21   don't know Letisha's last name, Scott Dolan, Leonard

22   Levoir.  All of them have said it.

23       Q.  Did they threaten your contract?

24       A.  Yes.

25       Q.  Did they say, "If you don't deliver this

**8/14/2006  Allen, Peter**

1    we're going to terminate your contract"?

2         A.  They said this, "If you don't do this,

3    depending on your personnel file, this puts your

4    contract in jeopardy."

5         Q.  And who said that?

6         A.  I've heard it from Travis, the current

7    terminal manager, I've heard it from Scott Dolan,

8    and I heard it from Leonard.

9         Q.  How many times did you hear it from Travis?

10        A.  I believe just the one time recently for an

11   evening delivery, but --

12        Q.  And what were the circumstances there, you

13   mentioned evening delivery?

14        A.  It was on a Saturday.  And I had a

15   scheduled evening delivery and I saw it on my

16   pallet, so I attempted at least eight times to try

17   to call the customer because I knew my load was

18   fairly light because they flexed off all my west

19   side again.

20            So I knew I was going to be done about noon

21   to 1:00.  So I asked Travis if I could leave the

22   packages because I made every attempt to contact the

23   customer.  And I was calling anywhere from about

24   6:00 to 7:00 in the morning so I figured they would

25   answer the phone.  And asked them if I could leave

**8/14/2006  Allen, Peter**

1    the delivery because it wasn't an appointment

2    delivery, it was an evening delivery, a signature

3    required.

4            And he told me, no, he said, but why don't

5    you just take the package, if they are not home,

6    call them after 5:00 and then deliver it.  Well, I

7    live 45 miles from Davis.  I'm not going -- I said,

8    "Look, I don't want to sit around for five hours to

9    deliver one stop and make $2.50 off the evening

10   delivery."

11           He said, "Well, then you don't want -- then

12   you're going to have a premium service failure.  And

13   depending on how your record looks, that could put

14   your contract in jeopardy."  He wasn't willing to

15   work with me at all.

16       Q.  Now, under the contract you do agree to

17   deliver the packages that are provided to you for

18   that day, right?

19       A.  Sure.

20       Q.  How many times were you told your contract

21   could be put in jeopardy by Mr. Dolan?

22       A.  A few times.  I don't know exactly the

23   exact number.

24       Q.  Can you give me an estimate?

25       A.  Two or three, maybe.

8/14/2006  Allen, Peter

1       Q.   What were the circumstances of the first

2   time?

3       A.   Flexing most -- with him, most of it was

4   the fact that they were flexing me off to other

5   routes.

6       Q.   And what was discussed?

7       A.   Just that I didn't think it was fair that

8   we were getting flexed when we already had, you

9   know, a full day's work in our primary area.  And it

10  didn't matter.

11      Q.   And what did he say?

12      A.   The same thing, basically.  That if you

13  don't do them, you're going to have to DNA them.  If

14  you DNA them, then that affects your record and it

15  could put your contract in jeopardy.

16      Q.   Was anyone else present when this

17  discussion occurred?

18      A.   The first one, yes, Dan Rubens.

19      Q.   And who is he?

20      A.   He was the regional director.

21      Q.   Is that the same as Rubito?

22      A.   Or Rubito, sorry.

23      Q.   That's fine.  I just want to make sure

24  we're clear.

25      A.   Yeah, it was Rubito, I'm sorry.

**8/14/2006  Allen, Peter**

1        Q.   Okay.  How about the second time you had

2    one of these conversations with Mr. Dolan?

3        A.   No, I'm sure that was just between him and

4    I.

5        Q.   Similar conversation?

6        A.   Yes.

7        Q.   Was there a third time, do you recall?

8        A.   I can't recall.  There might have been out

9    at my pallet -- oh, I remember.  I'm trying to

10   think.  No, that wasn't with Scott.  That was with

11   Leonard.  There was another one, so --

12       Q.   How many of these conversations did you

13   have with Mr. Levoir?

14       A.   Not many.  Because by the time he got

15   there, they weren't flexing me that often.

16            But I recall one situation where I loaded

17   my entire truck and then they decided to throw West

18   Davis back on to me.  And the packages are numbered

19   with our route number and sequenced.  And when they

20   put those packages -- I had already loaded.  I had a

21   heavy day.  I already loaded my entire load.  And

22   they decided to put West Davis back on me.  When

23   they did that it changed all my sequence numbers.

24   So I had to go, unload my entire van again.  They

25   wasted over four hours of my time.

**8/14/2006  Allen, Peter**

1      I got frustrated.  I just decided -- I went

2  outside -- unloaded my van, went outside for an hour

3  and then I decided to go back in and finish loading

4  it.  I had a conversation with him and Larry Davis

5  saying I did not appreciate them wasting my time.

6  He said sometimes things change and we need to

7  change and be flexible.  That's basically what they

8  said.

9      Q.  Did they threaten your contract?

10     A.  I don't know on that -- I don't believe so.

11     Q.  Okay.  Any other instances with Mr. Levoir?

12     A.  I don't believe so, no.

13     Q.  Are there any other instances that anybody

14  threatened your contract?

15     A.  I don't think so.

16     Q.  Do you think you did an average, below

17  average or better than average job of servicing your

18  route?

19     A.  I think I did better than average.

20     Q.  Why?

21     A.  Because I attempted every package I ever

22  was given.  Did everything that I felt was within my

23  means without backtracking to -- I'd make an attempt

24  two or three times a day, which I wouldn't do, but

25  everything else to get those packages off on a daily

**8/14/2006  Allen, Peter**

1   basis.  If the apartment manager signed for

2   packages, I'd take them there.

3        Q.  Why do you think some other contractors are

4   less good at servicing their routes?

5        A.  I couldn't speak for them because I don't

6   go out with them so I don't know why.

7        Q.  Do you think you're more committed than

8   other contractors in getting your packages delivered

9   every day?

10        A.  I can't speak for them again.  I don't

11   know.

12        Q.  Do you know from talking with other

13   contractors if there are any who don't try to

14   deliver every package every day?

15        A.  No, I don't know anybody that doesn't.  I

16   mean, most people that I -- I mean, all the people I

17   know, they attempt -- they don't go in there

18   thinking that they are not going to deliver packages

19   on a daily basis.

20        Q.  I'm not talking about all their packages.

21        A.  Not even one.  I mean, their main goal is

22   to get them all off because we don't like carrying

23   them a second day and a third day out there with us.

24        Q.  Now, as an HD contractor, do you work five

25   days a week?

**8/14/2006  Allen, Peter**

1        A.   That's correct.

2        Q.   Have you always worked five days a week?

3        A.   Yes.

4        Q.   You talked about a little bit earlier how

5    you would arrive at the terminal and sometimes the

6    sort would still be going on.  Obviously it varies a

7    little, maybe it doesn't.  On average, what time do

8    you arrive at the terminal?

9        A.   5:45 to 6:00 a.m. in the morning every day.

10       Q.   Do you ever arrive earlier?

11       A.   Yes, if they say the terminal is going to

12   be open earlier.

13       Q.   What's the earliest you've arrived that you

14   can think of?

15       A.   5:00.

16       Q.   Do you ever arrive later?

17       A.   Yes.

18       Q.   How much later?

19       A.   I believe the latest I ever arrived was

20   about 8:30 or 9:00 because I had a problem with my

21   vehicle.  I had a dead battery, so --

22       Q.   Do other contractors arrive later than you,

23   on average?

24       A.   I couldn't tell.  I'm not there, so I can't

25   tell you.

**8/14/2006  Allen, Peter**

1      Q.  Aren't you there loading your truck when

2    they pull in?

3      A.  Well, within a few minutes, obviously I

4    don't know all that arrive after me, so --

5      Q.  I'm not asking you about all.  I'm just

6    saying, you get there 5:45 or 6:00, you're out at

7    your truck.  Have you seen other contractors come in

8    later and park their trucks in their parking spot?

9      A.  Sure.

10     Q.  How much later?

11     A.  Up until I leave.

12     Q.  And what time do you leave, on average?

13     A.  Now, 7:00, 7:30, 8:00, somewhere between

14   7:00 and 8:00.

15     Q.  In the past you've left later because of

16   the sort?

17     A.  Yes.

18     Q.  And were contractors still arriving when

19   you left in the past?

20     A.  Not some of the days, no.

21     Q.  Were they still arriving some of the days?

22     A.  Yes.

23     Q.  And what time was that usually?

24     A.  What time was it that they were arriving,

25   the latest?

**8/14/2006  Allen, Peter**

1       Q.  What's the latest you ever saw another

2   contractor arrive?

3       A.  I don't know, probably 9:00 or 10:00.

4       Q.  Other than the limits you explained before

5   about the terminal being open, the building being

6   open and the sort having to be done, you can arrive

7   whenever you want, right?

8       A.  Not really.

9       Q.  Why not?

10      A.  Because if they give you, let's say they

11  give you 180 stops, and you know that's going to

12  take you ten hours and you don't want to come in

13  until 2:00, well, they don't want you delivering

14  after 8:00 p.m., so how are you going to do that?

15      Q.  But you can certainly arrive within the

16  range that you've just described, within a several

17  hour window, right?

18      A.  Sure.

19      Q.  They don't say you have to be here at 7:00

20  exactly?

21      A.  Another thing as well is, on appointment

22  deliveries, they don't even contact you.  They

23  assume you're going to come in the same time you

24  came in yesterday and set up an appointment

25  delivery.

**8/14/2006  Allen, Peter**

1    They speak with the customer and they

2    choose to decide on your behalf when you're going to

3    deliver that package.  So when you get in that -- if

4    you happen to come in late and you had an

5    appointment delivery, you just failed a premium

6    service.

7        Q.  Could you call in and check whether you're

8    going to have one that morning?

9        A.  Call in and check.

10       Q.  Could you, I'm asking?

11       A.  Who?  Nobody answers the phone until

12   probably some people in the office get there.  When

13   they were doing the sort, they don't answer the

14   phone.

15       Q.  Has that happened to you that you've come

16   in and missed a scheduled premium service?

17       A.  No, but I've had appointments and evening

18   deliveries.  And I even brought it to their

19   attention, if they could determine that we were

20   going to have evening deliveries or appointment

21   deliveries, why they can't call us, you know, as

22   soon as they find out and let us know.

23       So for my situation, I live in Yuba City, I

24   get there every day at 5:45 to 6:00.  If I had an

25   evening delivery, I'd probably wait, stay home a

**8/14/2006  Allen, Peter**

```
 1    couple hours so I could make that evening delivery

 2    and not disrupt my entire day, but they said, no,

 3    there's no way to do it.

 4        Q.  Did they say why?

 5        A.  They just said -- no, they didn't explain

 6    themselves.  They don't very often -- they don't

 7    explain themselves that often anyways, so --

 8        Q.  Did you ask them to?

 9        A.  Yeah, I asked them several times why can't

10    we do this and they just said it's not possible.

11        Q.  Now, before you drive to the terminal, do

12    you do anything business related in the morning?

13            Do you have to do any paperwork or fiddle

14    with your truck or --

15        A.  Well, once I get to my truck, I do a

16    preinspection, make sure all the lights and stuff

17    are working.

18        Q.  Is your truck in the terminal?

19        A.  No, I park my truck over at the regional

20    office.

21        Q.  Why do you do that?

22        A.  Because it makes my life a lot easier

23    because when I get done during the day, if I have to

24    go all the way back to South Sac and then come all

25    the way over to basically West Sacramento to go to
```

8/14/2006  Allen, Peter

1    my house up in north of Yuba City, that adds like

2    three hours to my day.

3        Q.  It's shorter for you?

4        A.  Yes.

5        Q.  Okay.  So you get to your truck, you do a

6    preinspection.  How long does that take?

7        A.  Not very long.  Ten, fifteen minutes.

8        Q.  And what does that involve?

9        A.  Checking light operations, tires, making

10    sure everything is operational, basically.

11        Q.  And then what do you do next?

12        A.  Drive to the terminal.

13        Q.  So you get to the terminal.  You've

14    described for me a little bit the process about

15    loading your truck, scanning your packages, turning

16    your scanner in, getting your manifests and

17    turn-by-turns.  What else, if anything, do you do

18    before you leave the terminal?

19        A.  Nothing.

20        Q.  Okay.  So those are the steps that you --

21        A.  I get in and get out as fast as I possibly

22    can.  Except, excuse me, on Thursdays, they have --

23    well, we pay for, in our business support package,

24    they have -- and that wasn't even optional, that was

25    like you will pay for a car washing on a weekly

**8/14/2006  Allen, Peter**

1    basis.

2              So on Thursdays the people they hired come

3    and clean our vehicles are there.  So after I'm done

4    loading my truck, I take it out there they wash it

5    while I'm waiting for my scanner and my manifest.

6         Q.  How long does that take?

7         A.  Depends.  Varies.

8         Q.  Ballpark.

9         A.  Recently, it takes ten or fifteen minutes,

10   unless they are -- unless Robert, the individual I

11   spoke to you about earlier, the one that handles all

12   the scanners and uploads the information is

13   instructed not to release them yet by a service

14   manager.

15        Q.  You mentioned he's done that two or three

16   times; is that right?

17        A.  Yes.

18        Q.  Any other times?

19        A.  No.

20        Q.  Just the two or three you mentioned?

21        A.  Yes.

22        Q.  How long does it take them to wash your

23   truck?

24        A.  Ten minutes, maybe.

25        Q.  So it's pretty quick?

**8/14/2006  Allen, Peter**

1       A.  Yes.

2       Q.  Car washing, you said, is mandatory or

3    truck washing, rather.  Is that in the contract?

4       A.  You do not have the option to have the

5    business support plan without the car washing.

6       Q.  So if you elect the business support plan

7    that comes with it?

8       A.  You can't pick and choose in the business

9    support plan what you want and what you don't want.

10      Q.  Do you do anything else on an average day

11   other than what you already described before you

12   leave the terminal?

13      A.  No, I can't think of anything else, no.

14      Q.  At your terminal, were the gates ever

15   locked to keep the contractors from leaving before a

16   certain time?

17      A.  We don't have gates.

18      Q.  Is there a door to the terminal?

19      A.  There's doors, yes.  No, they just hold

20   your scanners for meetings.  There were some

21   meetings they'd hold the scanners until the meeting

22   was over.

23      Q.  And you mentioned that happened two or

24   three times?

25      A.  Yes.

**8/14/2006  Allen, Peter**

1       Q.  No other times?

2       A.  No.

3       Q.  Was anything else ever done to keep you

4   from leaving the terminal when you wanted?

5       A.  Other than what I mentioned about when we

6   finished doing our scan, if there were still

7   packages on when we turned in the scanner, they'd

8   call the service manager.  And sometimes they'd look

9   on other pallets and sometimes they wouldn't.

10      Q.  So that could hold you up a little bit?

11      A.  Yes.

12      Q.  Anything else other than as you've already

13  described?

14      A.  No.

15      Q.  Have you ever been pushed by management to

16  get out of the terminal by a certain time so you

17  could get going on your packages?

18      A.  No.

19      Q.  Okay.  So --

20      A.  I have heard of others, though.  I mean, I

21  haven't because of the fact that I get there early.

22      Q.  You're early?

23      A.  Right.  But I've heard of other people

24  saying, just overhearing them in conversation

25  saying, that, yeah, they told me I need to get in

**8/14/2006  Allen, Peter**

1   here earlier so I can get the packages out.

2       Q.  Who did you hear say that?

3       A.  I don't recall their names.  We hear casual

4   conversation all the time over by where we turn in

5   our scanners.  And to be honest with you, I don't

6   know half the guys' names in there, probably

7   three-quarters of their names, so --

8       Q.  How many times have you heard?

9       A.  A few, couple times.

10      Q.  Do you know the names of any of those

11  persons?

12      A.  No.

13      Q.  How long ago was that?

14      A.  It was recently as about, I think it was a

15  couple months ago.  And then I've heard it back when

16  Scott Dolan was the terminal manager when I first

17  started there.

18      Q.  Okay.  So you're in your truck, you've got

19  your packages, you drive out of the terminal.  What

20  happens next?

21      A.  Well, first, I have to log in and put my

22  start time.

23      Q.  That's in the scanner?

24      A.  That's after we've done all our loading

25  inbound, it's called AMV operations when we go in

**8/14/2006  Allen, Peter**

1    when.  We go out, it's called delivery -- the

2    delivery function of the scanner.  And we have to

3    scan our ID badge and our vehicle identification

4    label, put the time we started work and then the

5    time we left to service our area and the mileage,

6    and all that.

7        Q.  Okay.  So do you do that while you're

8    stopped like at a red light or do you pull over and

9    do it to start?

10       A.  You have to do it within the range of the

11   terminal.

12       Q.  It automatically transmits it if it's close

13   enough?

14       A.  Yes.

15       Q.  I see.

16       A.  That portion doesn't go over the GPS

17   system.  Like you know they have -- once you get out

18   in the area, stuff is transmitted over a satellite.

19   But that portion of it when you're loading it, you

20   have to do it right at the terminal because it's

21   done just between the line of sight, an antenna

22   that's in a line of sight within the terminal.  So

23   you have to log in before you leave the area.

24       Q.  Okay.  So you do that.  What happens next?

25       A.  Then I drive over to my area.  Some days I

**8/14/2006  Allen, Peter**

1    have to get gas, some days I don't.

2         Q.  Okay.  And you said you generally follow

3    the order in the manifest?

4         A.  Yes, I do.  It's the most efficient way.

5         Q.  Sir, if you would please, let me finish my

6    question before you answer.

7         A.  I'm sorry.

8         Q.  That's going to let her get a better

9    record.

10        A.  Sorry.

11        Q.  No problem.  It's human nature.

12             Do you always follow the exact order on the

13    manifest?

14        A.  Yes.

15        Q.  But you could deviate if you wanted to,

16    right?

17        A.  Actually, I don't follow it any day.  I

18    follow it -- except with the -- I follow it to a T

19    with the exception of the college because it doesn't

20    know how to route the college.  Because in the

21    college, they address everything to One Shields

22    Road, so if that's the case, I usually turn them in

23    to quality assurance there or quality control at QA

24    and say I need a department and a building and room

25    number, basically.

**8/14/2006  Allen, Peter**

1           But because they do that, I, you know, I

2       have to figure out myself at what point in my day do

3       I want to take the college stuff and deliver it.

4           Q.   You figured out by servicing the route what

5       the most efficient way to do it is, right?

6           A.   Yeah, by the turn-by-turns with the

7       exception of the college, yes.

8           Q.   So you follow the turn-by-turns with the

9       exception of the college because that doesn't make

10      sense?

11          A.   Correct.

12          Q.   Now, if a new stop is added to your route,

13      how do you figure out the most efficient way to

14      service that stop?

15          A.   A new stop, I don't have any new stops.

16          Q.   You don't?

17          A.   They don't build in Davis.  There's a

18      moratorium out, so they don't build in Davis.

19          Q.   Oh, I didn't know that.  How about a new

20      customer on an existing stop?

21          A.   The way we operate is not like Ground.  Our

22      customers change daily.  It's not like Ground where

23      they have the same businesses on a daily basis.  We

24      don't have that.  So I have new customers.

25          Q.   All the time?

**8/14/2006  Allen, Peter**

1        A.  Every day.

2        Q.  But the stops are the same?

3        A.  Right.  It might be 727 Falcon this day and

4    835 the next day, five houses down.

5        Q.  Okay.  But they are -- it's all pretty much

6    the same area on a day-to-day basis?

7        A.  Correct.

8        Q.  Thanks for clarifying that.  We've talked

9    about the manifests and the turn-by-turns.  Do you

10   think FedEx has done enough to help you service your

11   route efficiently?

12       A.  I think they provided me with the tools

13   they feel necessary for me to do my route, sure,

14   yes.

15       Q.  You've chosen to use those tools; is that

16   right?

17       A.  Yes.

18       Q.  Because you think it's the most efficient

19   way, right?

20       A.  Correct.

21       Q.  Except where you deviate as you've

22   explained?

23       A.  Right.

24       Q.  Because you get to choose how you service

25   the route; is that right?

**8/14/2006  Allen, Peter**

1     A.   Correct.

2          Q.   What do you do if you can't find an address

3     on your manifest?

4          A.   If I can't find an address, it depends.   If

5     it's a street name I don't know of, I leave it at

6     the terminal.   If it's -- if I bring it out and it

7     doesn't have the right address, if there's a phone

8     number on it, I'll call.

9               I also have a phone book, the Davis phone

10    book.   I'll look in there to see if their name is in

11    the phone book.   If it's not, then I take it back to

12    the terminal and allow QA to do their job.

13         Q.   So they'll try to track down more

14    information for you?

15         A.   Yes.

16         Q.   And if you don't recognize the street name

17    you said you leave it at the terminal?

18         A.   I leave it there, yes.

19         Q.   Why is that?

20         A.   Because I know every street in Davis.

21         Q.   So if it's a name you don't recognize,

22    somebody has messed up?

23         A.   Yes.

24         Q.   What is the process when a customer

25    complains?

**8/14/2006  Allen, Peter**

1        A.  As far as what process?

2        Q.  Well, are you given an opportunity to tell

3    your side of the story?

4        A.  Yeah.

5        Q.  How does that work?

6        A.  They just -- they confront you on a

7    complaint, ask you what happened.  And you tell them

8    your side.  And then they make a determination

9    whether it's your fault or you're going to be

10   charged with a customer complaint.

11       Q.  Okay.  Is there any written part to that

12   process that you're involved with?

13       A.  I honestly don't know.  I don't believe so.

14   I've never written a response to one, no.

15       Q.  What do you do if you have -- do you have

16   COD packages?

17       A.  No.

18       Q.  The premium services, do they ever have to

19   pay you?

20       A.  No, we never take any monetary means from

21   anyone.

22       Q.  What's the process if someone's not there

23   to sign for the package?

24       A.  Depends.  If it's not a signature required

25   then we're allowed to driver-release it, as long as

**8/14/2006  Allen, Peter**

1    it's not visible from the street.

2         Q.   Stick it behind a plant or behind a fence,

3    or whatever?

4         A.   Right.

5         Q.   If it's a signature required you have to

6    come back later?

7         A.   They just changed that.  It used to be any

8    signature required, you had to get a signature.

9    Now, they have what they call indirect.  You can

10   deliver it to a neighbor or the following day --

11   they can sign the door tag and the following day you

12   can leave it, and just put their signature from the

13   door tag on the signature card.

14        Q.   So that's what you see on apartments when

15   someone put their name on one of the slips and stuck

16   it up by the mailbox?

17        A.   Yes.

18        Q.   Okay.  Has your truck ever broken down

19   while you were in route?

20        A.   One time, yes.

21        Q.   What did you do then?

22        A.   I rented a vehicle and had the truck

23   repaired and put it back in service.

24        Q.   Did the company help you obtain that rental

25   vehicle?

**8/14/2006  Allen, Peter**

1       A.  Yes.

2       Q.  How did that work?

3       A.  I just -- I contacted them and they made

4    some phone calls and got a vehicle.  They actually

5    had one there -- both days they had one there and

6    then they charged me for them.

7       Q.  Okay.  So you rented that vehicle from the

8    company for two days?

9       A.  Well, yeah, because it was a Saturday and I

10   had almost 200 stops.  And I only -- by the time I

11   got the vehicle taken care of, I could only get 70

12   out, so I came in on a Sunday and delivered the rest

13   of them.

14      Q.  Has your scanner ever broken down in the

15   middle of the day?

16      A.  No.

17      Q.  Have you ever had problems with your

18   scanner?

19      A.  Yes.

20      Q.  What problems?

21      A.  Uploading.  When you're done, the thing

22   would lock up and never upload.  You'd constantly

23   have to reboot the system several times.  Then if

24   that didn't work, you'd have to go home and you have

25   your modems at home.  You'd have to call FedEx and

**8/14/2006  Allen, Peter**

1    get some customer work order number or tag number

2    because if you didn't then you didn't upload twice

3    in a month, you'd lose your bonus, too.

4         Q.  Now, if it's working can you upload from

5    your truck?

6         A.  Yes.

7         Q.  Does it go over the satellite that you

8    mentioned?

9         A.  Yes.  That's the new scanners.  The old

10   scanners -- the original scanners when I first got

11   there you had to be at the terminal or at home via

12   modem.

13        Q.  Assuming your scanner's working, you don't

14   have to go back to the terminal at the end of the

15   day; is that right?

16        A.  No.

17        Q.  When did you get the new scanners that can

18   transmit?

19        A.  The old ones -- I'm trying to think, did

20   they do it, no, they didn't.  They were just from

21   inside.

22            I want to say -- I was actually a Guinea

23   pig.  I was the first one to use it.  And who was

24   here?  I think, I believe Scott Dolan was still

25   here, so that would have put it somewhere around

**8/14/2006  Allen, Peter**

1      October/November 2004, I believe it was then.

2      That's just a rough guess.

3          Q.   Okay.   During the day did you ever take

4      breaks, either just a break or for lunch?

5          A.   Not just a break for lunch -- well, not

6      never.   One time I had to go to the bank to take

7      care of a financial situation.   And that's about it.

8          Q.   So you don't normally stop for lunch?

9          A.   No, I do not.

10         Q.   Ever stop for a Coke?

11         A.   No.

12         Q.   Use the bathroom?

13         A.   No.

14         Q.   Did anyone at the company tell you either

15     you could take breaks or you could not take breaks?

16         A.   No.

17         Q.   If you wanted to stop for five minutes and

18     get a Coke, you could do that, right?

19         A.   Yeah, but on certain days I may bust DOT

20     requirements because of the volume I had.

21         Q.   On certain days would that not be an issue?

22         A.   Yes, that's correct.

23         Q.   And would stopping for a quick bite for

24     lunch be the same?

25         A.   That's correct.

8/14/2006  Allen, Peter

1       Q.  Some days yes, some days no?

2       A.  Correct.

3       Q.  So you chose not to stop for breaks because

4    that worked for you, right?

5       A.  In some situations, yes.  Other situations

6    I chose because I didn't want to break DOT

7    requirements.

8       Q.  Did you ever discuss with anybody at the

9    company that given your load on certain days you

10   didn't have time for breaks?

11      A.  I can't recall of any time, no.

12      Q.  Was this something you were real concerned

13   about?

14      A.  Excuse me?

15      Q.  Was this something that you were really

16   concerned about?

17          MS. ZERGER:  I'm going to say vague and

18   ambiguous.  What was the something?

19   BY MR. GARRISON:

20      Q.  Taking breaks.

21      A.  On days that my load was so heavy, yeah,

22   because I didn't have the option.  I mean, not only

23   working 12, 14 hours on those days, but not being

24   able to stop and get something to eat, drink,

25   without violating DOT requirements and then getting

**8/14/2006  Allen, Peter**

1    fined from them.

2              And if I chose not to do it then I'd end up

3    hearing it from FedEx because I DNA'd packages.  So

4    I had a choice to make and I had to make a decision

5    what was more important, feeding my kids or getting

6    a DOT requirement, so --

7         Q.  You could have raised this concern with the

8    company, right?

9         A.  Well, I found out early on that there was

10   no negotiation with the company.  So I, after a

11   while, I just stopped bringing up information

12   because we all did it and it never got us anywhere.

13        Q.  But you didn't try with respect to this

14   issue?

15        A.  No.

16        Q.  About what percentage of the time could you

17   have stopped for a break if you had chosen to?

18        A.  I couldn't speculate on that.  I have no

19   idea.

20        Q.  You mentioned one time you had to go to the

21   bank, was it?

22        A.  Yeah.

23        Q.  And you did that in the middle of your

24   workday?

25        A.  Correct.  When I got over to that area

**8/14/2006  Allen, Peter**

1   where I needed to go, sure.

2        Q.   Sure.  Were there other times when you did

3   any personal business or ran an errand during the

4   workday?

5        A.   Not to my knowledge because most of my

6   errands would have been in Yuba City and I wasn't

7   running all the way home.

8        Q.   Fair enough.  It's a little bit out of the

9   way.

10        Did anyone at the company ever tell you

11   that you could not do personal business or run

12   errands during the middle of the day?

13        A.   No.

14        Q.   So at the end of the day you'd drive your

15   truck to the regional office and then pick up your

16   vehicle and drive home.  Is that what happens?

17        A.   Correct.

18        Q.   What do you do with -- let's say at the end

19   of the day and you've still got a couple packages,

20   say nobody was there to sign or something like that.

21   What's the process with respect to handling those

22   packages?

23        A.   We're supposed to secure our vehicle.  I

24   lock all the doors and padlock the doors.

25        Q.   You lock them all up and you try again the

**8/14/2006  Allen, Peter**

1    next day?

2         A.   Correct.

3         Q.   If you try a certain number of times and

4    can never just hook up --

5         A.   Three attempts.

6         Q.   And then what, it goes back to the

7    terminal?

8         A.   Yes.

9         Q.   About what time do you end work each day?

10        A.   Varies.  Depends on the number of stops I

11   have, so --

12        Q.   And when you get started, right?

13        A.   Excuse me?

14        Q.   It would also vary depending on what time

15   you start?

16        A.   Well, I always start the same way.  The

17   only variance there is as to whether the sort is

18   done, so --

19        Q.   Sort of on average or you can give me a

20   range what times you end?

21        A.   Anywhere from -- now are you talking

22   scanner times or actual times here?

23        Q.   You'll have to explain the difference to

24   me.

25        A.   Because there's times in the scanner that

**8/14/2006  Allen, Peter**

1    we -- they tell us to put the time we ended in our

2    area in the scanner and then add fifteen minutes for

3    postservice and getting back.  But those times don't

4    coincide with actual times at all.

5            And like I said, in the past I've had Scott

6    Dolan tell me, "Oh, yeah," you know, "if you've got

7    too many stops, then just --" like I was telling you

8    earlier -- "then just put -- just fudge the numbers

9    on the scanner."  But the scanner times doesn't

10   account for everything.

11       Q.  So scanner times typically are what time

12   you finish in your area plus fifteen minutes?

13       A.  Correct, that's what -- you have a time of

14   your last stop and then, I think it's a return home,

15   and I can't remember, there's one other one, I don't

16   know exactly what it says.  But -- and there's time

17   for postinspection, and all this stuff, of your

18   vehicle, so -- but they don't allow for -- like, for

19   the scanner, it doesn't allow time, you know, to get

20   home.  It's basically just from your last stop.

21       Q.  So --

22       A.  They add mileage and stuff, but that's it.

23       Q.  So last stop plus fifteen minutes, that

24   doesn't get you back to the regional office?

25       A.  Not always, no.

**8/14/2006  Allen, Peter**

1       Q.   Does it sometimes?

2       A.   Sometimes, yes.

3       Q.   Okay.   And sometimes it doesn't?

4       A.   Correct.

5       Q.   And who told you that that's the process

6    you should use?

7       A.   That's what I've always been told since

8    I've been there.   They tell you -- because before I

9    wasn't -- I was putting the same times and they are

10   like, "No, you have to have at least fifteen minutes

11   difference there.   The scanner won't even let you

12   put in times unless there's at least fifteen minutes

13   difference.

14      Q.   And about what time of day is that, the

15   scanner time plus 15?

16      A.   You mean what time do I typically get done

17   then?

18      Q.   Right.

19      A.   Anywhere from 1:00 to 6:00, 7:00.   I mean,

20   early on in my FedEx career it could be as late as

21   8:00 or 9:00.   One time up in Chico I was up until

22   quarter to 12 at night.

23      Q.   So it varies?

24      A.   Yes.

25      Q.   And that depends on the load?

**8/14/2006  Allen, Peter**

1    A.  That depends on the load.

2    Q.  And then once you get back to the regional

3    office, do you do any other work?  You mentioned

4    post?

5    A.  No.

6    Q.  Okay.  So once you get back there, you park

7    your truck and you're done for the day?

8    A.  Correct, other than lock my vehicle up.

9    Q.  Sure.  When you go home, is there anything

10   else you have to do?

11   A.  As long as my scanner uploaded via

12   satellite, no.  Other than -- well, excuse me, I

13   have to plug my scanner into my modem so it charges

14   it, so the batteries get charged.

15   Q.  That's just popping it in, though?

16   A.  Yes.

17   Q.  Doesn't take too long?

18   A.  No.

19   Q.  You've never been told by the company that

20   you need to stop at a certain time, have you?

21   A.  No.

22   Q.  Would you rather have a fixed stop time?

23   You know, the company says everybody is going to be

24   done at 6:00, whatever is left we'll deal with

25   later?

**8/14/2006  Allen, Peter**

1      A.  Depends what time you start.

2      Q.  Fair enough.  Would you rather have a fixed

3   number of hours each day?

4      A.  Well, if it were considered employee status

5   and I was given all the benefits, sure.  As an

6   independent contractor, I would just -- you know,

7   that doesn't matter so much to me as long as I'm

8   afforded all the benefits that should come along

9   with it as an independent contractor, so --

10     Q.  What's your preference as the world exists

11  today?

12     A.  I --

13     Q.  None?

14     A.  No, just that I'm treated fairly either

15  way.  It doesn't matter.  And those -- and everyone

16  that works for them as contractors.

17     Q.  Do you know if other contractors end work

18  earlier or later than you?

19     A.  I'm sure they do.  I have -- I mean, every

20  now and then I hear somebody that might say, you

21  know, I didn't get done until 6:00 or 8:00 or

22  whatever, 9:00 or 10:00.  But I never specifically

23  sit there and say, "Hey, what time did you get

24  done?"

25     Q.  But you've heard folks talk about it in the

**8/14/2006  Allen, Peter**

1    hall and that sort of thing?

2         A.   Yes.

3         Q.   Have you received any documents from FedEx

4    about the length of work days?

5         A.   Any documents about the length, no.

6         Q.   Did anyone at the company ever tell you

7    that you could not end your day early?

8         A.   Earlier than the amount of work that they

9    gave me?  Meaning, if I had 150 stops and I had

10   to -- let's say I had to something to do at 2:00,

11   but I knew I wasn't going to be done, did they

12   specifically say, "No, you could not end early."

13   No, but they did specifically say, "If you don't get

14   your stops done, then that could put your contract

15   in jeopardy."

16        Q.   And that's what you described earlier,

17   right?

18        A.   Yes.  No one has ever come out and said,

19   "You can't stop at 2:00 or 4:00, no.

20        Q.   And if you needed to be somewhere, say,

21   early on a certain day, the company hasn't prevented

22   you from, for example, working something out with

23   Mr. Singh where he takes some packages off of you

24   for that day?

25        A.   No.

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 1065 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-4   Filed 02/05/07   Page 215 of 358
8/14/2006  Allen, Peter

1      Q.  So you could do that if you wanted?

2      A.  If he didn't have, you know, already a full

3  load.

4      Q.  If he agreed, of course?

5      A.  Right.

6      Q.  Not try to impose it on him?

7      A.  Right.

8      Q.  But you could do that if you wanted?

9      A.  Sure.

10     Q.  Have you ever done that?

11     A.  No.

12         MR. GARRISON:  We've been going well over

13  an hour.  Why don't we take a short break.

14         THE VIDEO OPERATOR:  Going off the record.

15  The time is 2:09.

16         (Recess taken)

17         THE VIDEO OPERATOR:  Back on the record.

18  The time is 2:18.

19  BY MR. GARRISON:

20     Q.  Mr. Allen, earlier you talked a little bit

21  about scheduled deliveries; is that right?

22     A.  Evening and appointment deliveries, yes.

23     Q.  Okay.  Have you ever tried to work out with

24  the customer a time other than was specified for an

25  evening or appointment delivery?

**8/14/2006  Allen, Peter**

1    A.  Calling and, like I told you earlier, I

2    called that one individual and could never make any

3    contact with them.

4        Q.  I don't want to revisit tried ground.  Were

5    you there any instances you tried to do that and

6    were able to contact the person?

7        A.  Yes.

8        Q.  And were you able to negotiate a different

9    time?

10       A.  Well, I just called basically and said,

11   like I believe it was on an appointment delivery,

12   which you have -- the problem with appointment

13   deliveries, you have an hour window on either side

14   of the appointment that you have to be there.  So

15   there's not a lot of negotiation there because you

16   can't scan it in.  If you do, you get a service

17   failure, and there's nothing the terminal can do

18   about it.

19       Q.  So why did you call the person?

20       A.  It was on an evening delivery.

21       Q.  That was on an evening delivery?

22       A.  Yes.

23       Q.  Which is different?

24       A.  Correct.  Because in the past on evening

25   deliveries you could not deliver them before 5:00,

**8/14/2006  Allen, Peter**

1    5:00 p.m., excuse me.  There was no ifs, ands or

2    buts about it, you couldn't deliver before 5:00 p.m.

3            So we would try to call them and, first of

4    all, see if they are home.  Unlike an appointment

5    delivery, it's scheduled for a specific day.

6    Evening delivery, it's three days in a row.

7            Basically, you make one attempt, if they

8    are not there after 5:00 and it is a signature

9    required, then you got to come back the following

10   day after 5:00.  So try to make every effort

11   possible to contact them just to determine whether

12   or not they are going to be there to sign for the

13   package.

14       Q.  Were you -- so the reason you call is to

15   confirm, essentially, you're not going to waste your

16   trip, right?

17       A.  Right, you still have to do it regardless.

18       Q.  I understand that, but you're trying to

19   make sure they are going to be there?

20       A.  Correct.

21       Q.  Did you ever try to call and say, "Hey,

22   would it be okay if I delivered quarter to 5:00

23   today," or later if you're running later?

24       A.  No.

25       Q.  And why not?

1884

**8/14/2006  Allen, Peter**

1    A.  Because it would still be a service failure

2    in FedEx's mind.  It doesn't matter with the

3    customer.  Because it's not the consignee that pays

4    for that, typically it's the shipper.  So a lot of

5    times the shipper doesn't care.  They pay for a

6    service, I don't know how much they pay for those

7    services, but they pay it, they want to receive it,

8    basically.

9    Q.  Okay.  And so with the evening deliveries,

10   it's not a fixed time but it had to be after 5:00?

11   A.  Between 5:00 and 8:00.

12   Q.  And it's tied to your scanner to make sure

13   you hit that window; is that right?

14   A.  Correct.  But that has just changed

15   recently.

16   Q.  Oh.

17   A.  Now you can go at any time during the day

18   as long as you get a customer signature.  So if they

19   are home at 6:00 in the morning -- not at 6:00,

20   never get over that early.  But if they are home

21   7:30, 8:00 in the morning and you can get their

22   signature -- because not all evening signatures --

23   excuse me, evening appointments require a signature.

24       But as long as they are there and you get a

25   signature, then it will show up as a premium service

8/14/2006  Allen, Peter

1    failure, but they don't count it against you, as

2    long as you got a signature.

3         Q.  So the signature proves it was okay with

4    the customer?

5         A.  Correct.  A lot of times the customers

6    don't know it's even an evening delivery.

7         Q.  You just call them up or just show up?

8         A.  No, the shipper determines that.

9         Q.  Okay.  But now if you have an evening

10   delivery and you want to get it dropped off or

11   delivered earlier, do you call the customer?

12        A.  On occasion, yes.

13        Q.  And on occasion the customer said, sure,

14   come on over?

15        A.  I've only tried it the once and couldn't

16   get ahold of them.

17        Q.  That's the only time you've tried?

18        A.  Right.

19        Q.  But you could try if you wanted to?

20        A.  Yes.  I mean, because of the policy

21   changes.  In the past, no.  But now because they

22   changed the policies, yes, you can do that.

23        Q.  Okay.

24        A.  Typically, I mean, even on situations like

25   that, I would never go out of my way to do it.  I'd

**8/14/2006  Allen, Peter**

1    tell them when I was going to be there in the normal

2    course of my day.  And say, "Look, I'm going to be

3    here at this time, are you going to be available?"

4    I wouldn't, you know -- and if they say, no, well,

5    then I say well then it will be when it's normally

6    scheduled in my route for me to come.

7        Q.  So you would try to pop it into your route

8    where it made the most sense given where you're

9    going to be?

10        A.  FedEx's system does that for you.

11        Q.  Okay.  So you would just be able to deliver

12    it -- if the customer agreed you'd be able to

13    deliver whenever they came up as opposed to waiting

14    until evening?

15        A.  Right.  When you get an evening delivery,

16    basically the software will route you back and forth

17    through that area a couple times.  But it's -- you

18    know, because it has you deliver everything on the

19    right and it's the most efficient way, and that's

20    the way the training tapes always showed us is the

21    best way to do it.

22            Because as long as you're on the right,

23    you're not crossing traffic, you're not putting

24    yourself or others in jeopardy if you're parking on

25    the left side of the street to deliver a package.

**8/14/2006  Allen, Peter**

1    So it routes you so your stops -- it tries to route

2    you so your stop is always on the right-hand side of

3    the route.

4        Q.  Is that a safety issue?

5        A.  Yes.  It's not a requirement, per se, any

6    type of regulation, but it's the safest way to

7    deliver packages because you're not crossing traffic

8    and then when you pull out you don't have any blind

9    spots because --

10       Q.  You mentioned a few minutes ago that while

11   it varies, you usually finish between about 1:00 and

12   6:00; is that right?

13       A.  Correct.

14       Q.  Is that in the parking lot at the regional

15   office?

16       A.  Yes.

17       Q.  Okay.  On average, and I understand it

18   varies, but on average, how many hours a day do you

19   work?

20       A.  I would say during the summer months,

21   probably eight hours, eight to nine hours on average

22   with no lunch break, no breaks whatsoever.  When

23   school gets back in session and closer to peak, ten

24   to 12 hours.  And on occasion over 12 hours.

25       Q.  About how frequently is it over 12?

**8/14/2006  Allen, Peter**

1      A.  Not very often.  Probably, during that peak

2      period, probably maybe one to two of those days a

3      week.

4          Q.  For about how many weeks, a couple months?

5          A.  Yeah, roughly.

6          Q.  Okay.  Does the scanner -- the scanner does

7      keep track of hours worked each day; is that right?

8          A.  Yeah, what you put in, yes.

9          Q.  And I think you mentioned that it has

10     separate time in the terminal, time departing the

11     terminal, and then your in time; is that right?

12         A.  Correct.  The time you arrive to the time

13     you depart.

14         Q.  Do the daily settlement records also have

15     time in/time out information?

16         A.  Yes.

17         Q.  Are they generated in part by the scanner?

18         A.  Yes.

19         Q.  But then there are also parts you fill in,

20     right?

21         A.  Just miles to the terminal and your

22     signature in a couple areas and that's it.

23         Q.  Okay.  Are there any other written records

24     that show the time you work each day?

25         A.  Yes.

**8/14/2006  Allen, Peter**

1    Q.   What are they?

2    A.   They have what they call a service -- used

3    to be a board, but now it's a computer-generated

4    form that shows how many stops you had, how many

5    hours you were out in your zone, what your service

6    percentage was for that day.  And if you met 100

7    percent, you're highlighted in green.  And if you

8    met, you know, 98.1, I think it is, and above up to

9    100 percent you're in yellow.  And below 98.1 it was

10   like red.  And that basically stated how many hours

11   you're in your zone.

12   Q.   Is that on a TV screen or --

13   A.   No, it's posted on a computer-generated

14   form, basically, like the old tractor-fed paper.

15   Q.   Sure.

16   A.   And it's posted right by the driver's

17   window where we pick-up our scanners and drop them

18   off.

19   Q.   And is there a -- what's it called?

20   A.   I have no idea what they call it.  Just a

21   tool they use to show, they write comments on there,

22   "Great job," these people, "You guys need to pick it

23   up."

24   Q.   What color are you most of the time?

25   A.   Green.

**8/14/2006  Allen, Peter**

1       Q.  Good.

2       A.  But not always.

3       Q.  I think you mentioned that after you leave

4    the parking lot, the regional parking lot, you drive

5    home.  If you were having problems with your

6    scanner, you deal with the modem.  If not, you put

7    your scanner in the modem to charge up; is that

8    right?

9       A.  If I don't have any problems?

10      Q.  Yes.

11      A.  Yeah.

12      Q.  Any other business at night that you do?

13      A.  No.

14      Q.  When do you do your bookkeeping or taxes or

15    that kind of stuff?

16      A.  When do I do my taxes?  I don't do my

17    taxes.

18      Q.  You have an accountant?

19      A.  Yes.  I track -- I do, I track some of my

20    expenses -- I track all my expenses and stuff on an

21    Excel spreadsheet, but I don't actually do my taxes,

22    no.

23      Q.  When do you update your Excel spreadsheet?

24      A.  Varies.  Whenever I get around to it.  I

25    don't have any set time.

**8/14/2006  Allen, Peter**

1        Q.   Okay.  So that would be on a day off or in

2    an evening, or something like that?

3        A.   Typically on a day off.

4        Q.   About how often do you update that

5    spreadsheet?

6        A.   There's no set pattern.  Sometimes I'll do

7    it weekly.  Sometimes not for a month.

8        Q.   On an average day, how many times do you

9    speak with a FedEx employee?

10       A.   I don't speak -- on the telephone when I'm

11   out at my route, are you saying, or every day?

12       Q.   Let's start with that on your telephone.

13   Do you talk to them while you're in your truck?

14       A.   On occasion, yes.

15       Q.   How frequently?

16       A.   It varies.  Some days it will be two,

17   three, four times a day.  Other days it won't

18   happen, so --

19       Q.   On average, how many days a week do you

20   speak with somebody from FedEx while you're in your

21   truck?

22       A.   I don't know.  I couldn't speculate on

23   that.  I don't know.

24       Q.   Can you give me an estimate, half the time,

25   more or less than half the time?

**8/14/2006  Allen, Peter**

1      A.  Probably two days a week, maybe, if you

2   averaged it out.

3      Q.  Two days a week you do speak with someone

4   from the company?

5      A.  On the phone, yes.

6      Q.  On the phone, okay.

7      A.  Daily at the terminal.

8      Q.  And what do you all talk about when you're

9   talking on the phone?

10      A.  Well, on the phone, typically it's all,

11   "Can you go back to this stop?  You've already gone

12   there and left the door knocker but the customer is

13   wondering can you go back to this stop."

14      Q.  Okay.  Anything else?

15      A.  The one time Travis called me on that one

16   customer complaint that we had talked about earlier

17   on the broke --

18      Q.  Broken pot plant?

19      A.  Yeah, that one there.

20      Q.  Anything else you can remember?

21      A.  There was times when I first started where

22   they called me, asked me if they could use my truck

23   to deliver some packages.

24      Q.  They wanted you to take on more packages?

25      A.  No, they used my truck, Larry Davies --

8/14/2006  Allen, Peter

1    Davis used my truck.

2        Q.  On a day you weren't working?

3        A.  No, I was working.  When I got back they

4    took my truck.  They asked if they could.

5        Q.  So you let them do that?

6        A.  Yes.

7        Q.  Did they pay for the gas?

8        A.  Yeah, that was about it.  They didn't pay

9    me like they charged me when I get a vehicle from

10   them, though.

11       Q.  Did you or do you ever call the terminal

12   when you're in your truck on the phone?

13       A.  Not very often.  Maybe once or twice in a

14   six-month period.

15       Q.  And why did you call them?

16       A.  Recently, to speak with Larry Davis about

17   the sale of my route basically.  You know, where it

18   stood, what all we needed to do.  And the majority

19   of the time is just returning their call if I didn't

20   catch it when they called.

21       Q.  At the terminal you speak with them every

22   day, right?

23       A.  Yes.

24       Q.  What type of things do you talk about?

25       A.  Well, right when we get there, they check

**8/14/2006  Allen, Peter**

1    all our packages in and make sure, you know, we made

2    our service crosses on them and applied our door

3    knocker tags to them, the portion that belongs on

4    the package.  Questions, whether or not -- you know,

5    why didn't you try this.  If we 04'd something,

6    which is a business that is not open at the time we

7    went there.  Sometimes they'll ask you, why didn't

8    you try it another time, or whatever.

9         Q.  Is this in the morning asking about the

10   previous day?

11        A.  Yes.

12        Q.  Okay.

13        A.  The packages that you bring back that were

14   nondelivered.

15        Q.  Anything else?

16        A.  Just turn in your call tags.  They have a

17   little board there, do this, basically says, make

18   sure you bring all your businesses out on Saturday.

19   Even though we know our businesses aren't open on

20   Saturday, they won't let us leave them at the

21   terminal.  They make us take them out because -- I

22   guess they had a situation where one or two

23   contractors, you know, were fudging the system and

24   saying they were businesses and in reality they

25   weren't, so they punished all of us for it.

**8/14/2006  Allen, Peter**

1    Q.  So they were gaming the system?

2    A.  I imagine.  I don't know exactly.  I just

3    know that's what was said.

4    Q.  Saying someone who wasn't in business was

5    so they could get away from --

6    A.  So they wouldn't have to take it and lessen

7    their number of stops on a Saturday.  And that was

8    like one or two out of 30 or 40 contractors, so then

9    they decided to punish all of us for it and make us

10   take them out every weekend.

11   Q.  Who at the terminal do you most frequently

12   speak with?

13   A.  Larry Davies at this point.

14   Q.  And what's his job title?

15   A.  He's assistant terminal manager.

16   Q.  And do you talk to him every day?

17   A.  Yes, pretty much, because he does the -- he

18   checks in our vans for the most part.

19   Q.  And you talk to him about the issues you've

20   just described?

21   A.  Yes.

22   Q.  Who else at the terminal management do you

23   communicate with on a regular basis?

24   A.  Jeremy, I don't know his last name.  He's

25   the service manager.  Brian, I don't know his last

8/14/2006  Allen, Peter

1    name either.

2        Q.   Do you know his job title?

3        A.   They are all service managers.

4        Q.   And how many days a week, on average, do

5    you speak with Jeremy?

6        A.   Jeremy and Brian both daily.

7        Q.   Daily?

8        A.   Yeah.

9        Q.   Anybody else you speak with daily?

10       A.   Travis.  Daily?

11       Q.   Yes.

12       A.   Travis pretty much.  I mean, at times --

13   some days he may not be in early or something,

14   but --

15       Q.   Anybody else?

16       A.   Marsharicky (phonetic), Marsha she goes by

17   in the office.  If I happen to call in the

18   afternoon, I'll speak with her.  And then the new

19   receptionist, Vickie, every now and again, not daily

20   though, but every now and again.  And both of those

21   individuals.

22       Q.   Anyone else?

23       A.   Not that I can think of.  Well, no, there

24   is one other service manager.  He's part time.

25   Donovan.  And sometimes she's checking in the vans

**8/14/2006  Allen, Peter**

1    in the previous day's nondeliverables with Larry,

2    so --

3         Q.  Anybody else?

4         A.  No, I don't believe so.

5         Q.  How often on an average day do you speak

6    with another contractor?

7         A.  Daily, the ones that are right next to me

8    on a daily basis.

9         Q.  Do you ever talk to contractors once you're

10   out in the field?

11        A.  No.  Excuse me, Greg, he works the Dixon

12   route.  He's called me once asking -- when they

13   changed the scanner, he asked me what he had to do.

14   Every now and then they update the software and he

15   asked me how do you -- it was a question about --

16        Q.  Scanner issue?

17        A.  Right.  And I just answered it for him.

18        Q.  But you don't regularly speak with

19   contractors --

20        A.  No.

21        Q.  -- once you're out there?

22        A.  No.

23        Q.  What do you talk about with the contractors

24   on either side of you?

25        A.  Personal stuff.

**8/14/2006  Allen, Peter**

1        Q.  Shoot the breeze?

2        A.  Yes.

3        Q.  Do you discuss work?

4        A.  Not really.  I get in there, I don't sit

5   there and BS around.  I just get my stuff done and

6   get out of there, so -- I have four kids that I

7   would like to spend some time with, so --

8        Q.  So you're all about business?

9        A.  Yes.

10        Q.  Could you look at the operating agreement,

11   please?

12        A.  Sure.

13        Q.  Section -- page 7, Section 1.10(a).

14        A.  Okay.

15        Q.  About -- well, it's the first five -- four

16   or five lines.  We talked about part of this, but

17   this is talking about what you're agreeing to do

18   with respect to service, "Provide daily delivery and

19   pick-up service to consignees and shippers and days

20   and at times which are compatible with their

21   schedules and requirements within Contractor's

22   Primary Service Area."

23            Did I say all that right?

24        A.  Correct.

25        Q.  And then it says as is defined in the

**8/14/2006  Allen, Peter**

1    agreement, "and in such other areas as Contractor

2    may from time to time be asked to service."

3         Did I say that right?

4    A.   Yes.

5         Q.   So you agreed in the contract that they

6    could add packages to you other than in your primary

7    service area, right?

8         A.   I agreed in the contract?

9         Q.   I'm asking you.

10        A.   I agreed because I didn't have a choice in

11   the matter.  I mean, I didn't have any negotiation

12   power in this.  So yeah, I mean I had to agree to it

13   or I didn't get a contract, and I already paid for a

14   vehicle, so --

15        Q.   But by signing the contract, you agreed to

16   deliver packages outside to your primary service

17   area that they assigned to you, right?

18        A.   Yes.

19        Q.   Now, you have a 550, or at least for a few

20   more days; is that right?

21        A.   Correct.

22        Q.   And you mentioned you were given another

23   choice, was it a 400?

24        A.   500.

25        Q.   How are they different?

**8/14/2006  Allen, Peter**

1      A.  Price was about $18,000 different, so --

2      Q.  Are they different sizes?

3      A.  Yeah, one's a 500, one's a 550.

4      Q.  That's Martian to me.  How are they

5  different?

6      A.  500 is 500 cubic feet of storage capacity

7  in the cargo area, and 550 is 550.

8      Q.  Got it.  That's helpful.  That's a lot of

9  money for 50 cubic feet.

10      A.  A lot has to do with gross vehicle weight

11  where you're getting in below 10,000 and 1,000 and

12  above.  That's the basic difference, the

13  cargo-carrying capacity of it.

14      Q.  Why did you go with the bigger one?

15      A.  It was cheaper, much cheaper.

16      Q.  The bigger one is cheaper?

17      A.  Yes.  Because it wasn't a diesel.  It's a

18  gas engine.

19      Q.  Do other contractors in the Sacramento

20  terminal drive 500s?

21      A.  Most of them do now because they won't

22  approve 550s anymore, not for new contractors, new

23  routes.  They will if you're selling your route, but

24  they won't if you're coming in and buying a new

25  route or establishing a new route, they have to get

8/14/2006  Allen, Peter

1     a 500.

2         Q.   And how do you know that?

3         A.   Because everyone that has bought them has

4     mentioned that, that that was the vehicle they had

5     to buy.  They had a choice between a Dodge Sprinter

6     or and I think it's a Freightliner, whatever their

7     vehicles are, I don't know, but Freightliners.  They

8     both have the same carrying capacity but a little

9     bit different in the way they look.

10            MR. GARRISON:  Let's go off the record to

11     change the tape.

12            THE VIDEO OPERATOR:  This marks the end of

13     Tape No. 3 in the deposition of Peter Allen.  Going

14     off the record.  The time is 2:43.

15            (Recess taken)

16            THE VIDEO OPERATOR:  This marks the

17     beginning of Tape No. 4 in the deposition of Peter

18     Allen.  Back on the record.  The time is 2:48.

19     BY MR. GARRISON:

20         Q.  Mr. Allen, when we went off the record you

21     were explaining the difference or the choice,

22     rather, between a Freightliner and a Sprinter.  Were

23     those both 500s or different cubic capacity?

24         A.  They were both 500.

25         Q.  Even within the size, there's a choice of

8/14/2006  Allen, Peter

1    manufacturers?

2         A.   Correct.

3         Q.   For your 550, did you have a choice in

4    manufacturers?

5         A.   Chevy or Ford.

6         Q.   Okay.  Who at the company told you you

7    needed to get a 500 or a 550?

8         A.   Well, during the training they told us we

9    could get a 400, or 450, or a 350, 400, 450, 500,

10   550, or whatever.  And then when I went to get my

11   route, Scott Dolan told me that it required a 550.

12        Q.   And did he say why?

13        A.   Because that was -- he says that's what's

14   required for that route and that's what Pittsburgh

15   will approve.

16        Q.   Did he say if that was based on the number

17   of stops and packages on that route?

18        A.   No.  I just -- he just said that's what is

19   required for this route.  Didn't say -- I mean, it

20   was never said that's because of the number of

21   packages or number of stops or anything, no.

22        Q.   How full is your truck on an average day?

23        A.   It depends what time of year.  But I mean,

24   during my heavy time, in school time, it's full,

25   pretty much.

**8/14/2006  Allen, Peter**

1    Q.  Did you try to negotiate with Mr. Dolan and

2    say, "Hey, I need a 450 or something smaller"?

3    A.  It wasn't allowed.  Couldn't do it.

4    Q.  Did you try?

5    A.  Yeah.  I asked him if I could get a smaller

6    cargo van and they said, no, you have to have a 550

7    for that route.

8        The only area they were approving cargo

9    vans was the mountain routes, the smaller cargo

10   vans, because they don't do as many stops because

11   they have to drive an hour and a half, two hours

12   just to get to their area, so --

13   Q.  And what made you pick Chevy over Ford?

14   A.  Price.

15   Q.  Did you look at new vans from both, or

16   trucks rather?

17   A.  Yeah, both of them were brand-new.

18   Q.  Did you look at any used ones?

19   A.  Nowhere to look.

20   Q.  So Chevy was cheaper?

21   A.  Yes.

22   Q.  Quality similar?

23   A.  I don't know.  I haven't been inside the

24   Ford, so I couldn't tell you.

25   Q.  Did you even look at the Ford or just on

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 1088 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-4   Filed 02/05/07   Page 238 of 358
8/14/2006 Allen, Peter

1    paper?

2          A.   Just on paper, basically.

3          Q.   And who did you finance your truck through?

4          A.   GMAC.

5          Q.   And how did you get hooked up with them?

6          A.   Well, through Sopp Chevrolet where I

7    purchased.

8          Q.   But the company didn't tell you you had to

9    use GMAC?

10         A.   No.

11         Q.   Did the -- other than as you've already

12   described, did anyone from the company tell you

13   anything else about acquiring your vehicle?

14         A.   No, not to my knowledge.  They just

15   basically told me that's the size requirements.  And

16   they told me -- they gave me Sopp Chevrolet and

17   Fritz Ford, basically, and Bush Leasing.  But that

18   was a Freightliner.  That was way overpriced, as far

19   as I was concerned.

20         Q.   Do you know if you could have gone to

21   somebody that they did not give you the name for?

22         A.   For that vehicle there was nobody that was

23   making it with that type of box on it.  Just

24   basically Fritz and Sopp Chevrolet.  And FedEx had

25   some kind of agreement with them, so we got a

**8/14/2006  Allen, Peter**

1     special price on it.

2          Q.   When you got your truck, did it have the

3     logos on it?

4          A.   No.

5          Q.   How did you get those?

6          A.   Actually, did it have them -- FedEx put

7     them on.

8          Q.   Does that come with the business support

9     package or how does that work?

10         A.   They provided them.  It doesn't when you

11    sell your route, but I know now they provided them

12    then.

13         Q.   Okay.

14         A.   They actually put one of the wrong ones on

15    and they had to redo it before my route was

16    approved.

17         Q.   So when you sell your route, are they going

18    to take their logos back?

19         A.   No, I have to take them off because, of

20    course, they change them quite frequently as well.

21    They can't -- they don't make us change them while

22    we still hold the contract.  But if we sell it, the

23    new person has to put on the new signage.

24         Q.   Did FedEx charge you for the signage?

25         A.   When I initially started?

**8/14/2006  Allen, Peter**

1       Q.  Right.

2       A.  Not to my knowledge, no.  But when we

3   leave, we do have to pay to have it taken off.

4       Q.  How much is that?

5       A.  I have no idea.  I took it off myself.

6       Q.  Are they magnetic?

7       A.  No.

8       Q.  Are they attached?

9       A.  Adhesive backing.

10      Q.  Were you able to get them off without

11  destroying them?

12      A.  Yeah.  It was a lot of work, blow dryer,

13  heating them up, getting them.

14      Q.  Now, some contractors lease their vehicles;

15  is that right?

16      A.  Correct.

17      Q.  Is that mainly through Bush?

18      A.  I don't know.

19      Q.  Okay.  Did you consider leasing?

20      A.  It was more expensive, so I didn't do it

21  that route.

22      Q.  So it was your choice whether to lease or

23  buy, right?

24      A.  Yes.

25      Q.  What did you do to ensure that your vehicle

**8/14/2006  Allen, Peter**

1    was maintained so that you could operate it safely?

2         A.   I followed the training I received from

3    FedEx, basically.

4         Q.   And what's that involve?

5         A.   What I heard from them and on a monthly

6    basis them giving us monthly inspection sheets, that

7    we had to document any inspections that we performed

8    during the month.  And we -- they required us to

9    follow whatever the manufacturer's requirements were

10   for maintenance.

11        Q.   Is any maintenance involved in the business

12   support package?

13        A.   Any maintenance?

14        Q.   Does the business support package address

15   maintenance, or --

16        A.   Not to my knowledge.

17        Q.   Do you know if maintenance is regulated by

18   the governmental regulations, either DOT or Safety?

19        A.   I don't know.  I would imagine some of it

20   is, tire depth and stuff.  I don't know if all of it

21   is.  I don't have any idea.

22             Basically, they told us, and I assumed that

23   what I was given in training was what I was supposed

24   to do.  And they told us on a monthly basis, well,

25   you know, when they did their inspections, you need

**8/14/2006  Allen, Peter**

1    to -- your tires are getting close or something,

2    basically you need to take care of that.

3            And there have been situations where they

4    actually didn't allow somebody to load their pallet

5    until they went and changed vehicles or did

6    something to that effect.

7        Q.  So the monthly inspections, I think you

8    just mentioned that included a tire check?

9        A.  Yes.  And any maintenance that you perform

10   during the month of the inspection sheet because

11   it's for the previous month.  So any oil changes,

12   tires, you know, any type of maintenance you do you

13   have to document on there and provide them, FedEx,

14   with copies of the receipts.

15       Q.  And you contracted you'll give them

16   maintenance receipts, right?

17       A.  Pardon?

18       Q.  And that's in the contract you'll get the

19   maintenance receipts?

20       A.  I don't know if it is or not.  I couldn't

21   tell you.  I just know that's what we were told to

22   do, so --

23       Q.  How about paint, does paint get inspected

24   or how does that work?

25       A.  I believe on the annual DOT inspection is

**8/14/2006  Allen, Peter**

1    when they bring in somebody to do the DOT

2    inspections, yes.  They look at all that stuff.

3        Q.  And you said the washes, they are weekly;

4    is that right?

5        A.  Correct.

6        Q.  Okay.  Did you buy -- I presume at some

7    point you had to buy new tires; is that right?

8        A.  Yeah, several times.

9        Q.  Did you use FedEx-suggested vendors for

10   that or did you go do it on your own?

11       A.  I went on my own.

12       Q.  So you could choose, right, whether to go

13   on your own or use one of their companies?

14       A.  They suggested there because they said

15   you'd get a discount through them, but doing

16   research I found them cheaper.

17       Q.  So you bought what was the best deal for

18   you?

19       A.  Yes.

20       Q.  Did you ever have to paint your truck?

21       A.  No.

22       Q.  Because it's new, right, relatively new.

23           Did you ever think about upgrading or

24   replacing your truck?

25       A.  No.

**8/14/2006  Allen, Peter**

1     Q.  No need?

2     A.  Who is going to pay off the vehicle -- the

3   one I already had, they won't take it on a trade

4   because there's not a market for it, so --

5           They pushed it, though.  They always

6   offered $2,000 bonus every year if you'd upgrade

7   your vehicle to a diesel Freightliner or Sprinter.

8     Q.  But that didn't work out for you

9   practically?

10    A.  No, not losing $20,000 that I already owed

11  on a vehicle, so --

12    Q.  And they certainly never required you to

13  upgrade or replace your truck, right?

14    A.  No.

15    Q.  Are you familiar with the term "deadlined"?

16    A.  Deadlined?

17    Q.  Yes, sir.

18    A.  Kind of vague.  In what context?

19    Q.  The context of a vehicle at FedEx?

20    A.  Deadline?

21    Q.  Deadlined?

22    A.  Deadlined.  No, I'm not.  I might have an

23  idea.  I think it might mean something where they

24  ground it, basically, and don't let you out.  Is

25  that what it means?

**8/14/2006  Allen, Peter**

1        Q.  I'm asking for your understanding.

2        A.  I don't know.

3        Q.  You mentioned that someone, I think, wasn't

4    allowed to load their truck until they changed their

5    tires; was that right?

6        A.  Right.

7        Q.  When did that happen?

8        A.  That was during Scott Dolan's tenure there.

9        Q.  Do you know who the contractor was?

10       A.  No, I don't remember the names.  The

11   turnover there has been probably four, 500 percent,

12   so --

13       Q.  Do you know, do you have knowledge of what

14   kind of shape the tires were in?

15       A.  No, I didn't personally go up to them and

16   look at them, no.

17       Q.  So you don't know whether they were bald or

18   whether they were fine?

19       A.  No idea.

20       Q.  Have you ever, regardless of what they call

21   it, it might be deadlined, but have you ever been

22   told by the company, "You can't leave the terminal

23   until you do this with your truck"?

24       A.  No.

25       Q.  You mentioned, I think on one occasion, you

8/14/2006  Allen, Peter

1    went to the bank in the middle of the day.  Have you

2    ever used your truck --

3         A.  Yes, I did.  Sorry.

4         Q.  It's getting on in the afternoon.  Have you

5    ever used your truck, other than that occasion, for

6    non-FedEx purposes on the weekend, on a day off?

7         A.  The only other time it was used was one of

8    the service managers borrowed it to move her

9    belongings from an apartment to another.  When she

10   was moving, basically.

11        Q.  And you let her do that?

12        A.  Yes.

13        Q.  Other than that and your bank run, you've

14   never used it for nonbusiness purposes?

15        A.  No.

16        Q.  Could you if you wanted to?

17        A.  Well, yeah, I own it.  I mean, it's still

18   mine.  I'm paying for it.  So yes, I would --

19        Q.  And no one from the company ever told you

20   that you couldn't use your vehicle?

21        A.  No, they just told us if we use it we have

22   to cover up the signage.

23        Q.  And that's in the operating agreement,

24   right?

25        A.  I don't know if it is or not.

**8/14/2006  Allen, Peter**

1       Q.   I'd like to mark this as the next exhibit,

2    please.

3            (Whereupon, Deposition Exhibit 8 was marked

4            for identification)

5    BY MR. GARRISON:

6       Q.   Mr. Allen, if you would first look at

7    addendum six of Exhibit 4 which is the operating

8    agreement.  It's page 23750, if that helps.

9       A.   Okay.

10      Q.   That's the original Addendum 6.  And you

11   said these are your initials on it, right?

12      A.   Yes.

13      Q.   Okay.  And then at some point it looks like

14   it was replaced by an updated Addendum 6, the one I

15   just handed you, which is marked as Exhibit Allen

16   Exhibit 8?

17      A.   Correct.

18      Q.   Says at the top, "Effective 06/04/2005."

19           Do you see that?

20      A.   Yes.

21      Q.   And then down at the bottom it's got some

22   information that's unique to you.  It's got your

23   name, terminal number, contract number, that sort of

24   thing.  Is that all accurate?

25      A.   Yes.

8/14/2006  Allen, Peter

1        Q.   And then --

2        A.   FedEx ID, that's -- I don't --

3        Q.   Is that wrong?

4        A.   I don't know what that number is.  That's

5    not my FedEx ID that I know of.

6        Q.   Okay.

7        A.   If it's a van number, that's not correct.

8    Otherwise I don't know what that number is.  I can't

9    tell you if that's right or not.  Or the contract

10   number, I don't know if that's correct.

11       Q.   Okay.  This updated Addendum 6, it looks

12   like the materials provided or services provided are

13   slightly different.  And one of the differences is

14   the price is different, right?  It was $3.50

15   originally, this is $4.25 per day.

16       A.   $21.25 a week now, I know.  I don't

17   remember what it was originally.  Yes, it is

18   different than it used to be.

19       Q.   It looks like it was $3.50 on Exhibit 4,

20   $3.50 per day.  You've continued to participate in

21   the business support package, right?

22       A.   Yeah, I didn't think I had a choice in the

23   matter because if I didn't have a scanner, I didn't

24   know how I was going to deliver packages.  So yes, I

25   did.

**8/14/2006  Allen, Peter**

1      Q.  Did you ever look into obtaining a scanner

2    other than through the BSP?

3      A.  No, I didn't know where to begin, so I

4    wouldn't have.  And I -- they had mentioned when

5    these new scanners came out that they were like two

6    or three thousand dollars.  Well, I didn't have two

7    or three thousand dollars to buy a scanner.  So I

8    just assumed the entire time it was always -- the

9    training always stressed the use of a scanner.

10        I mean, the scanner was their main

11    communications piece of equipment.  So I assumed

12    that -- and was under the understanding it was a

13    requirement we had to have, whether we pay for it or

14    not.

15      Q.  But you didn't look into buying your own

16    scanner?

17      A.  No, I couldn't afford a $3,000 scanner.

18      Q.  And you didn't talk to the company about,

19    say, for example, whether there were any used ones

20    available?

21      A.  What company?

22      Q.  FedEx.

23      A.  No.

24      Q.  Okay.  Now, I understand your belief based

25    on the scanner and the price of a new scanner that

**8/14/2006  Allen, Peter**

1    you needed to participate in the business support

2    package.  But you could have chosen not to

3    participate in the package, correct?

4         A.  I didn't see how.  I mean, it was made

5    apparent that we required a scanner to do the job.

6    So I elected to be in the business support package

7    because that's what the training showed, basically,

8    was using that item.

9         Q.  But to acquire it through the business

10   support package and not go outside and purchase one,

11   that was your choice, right?

12        A.  Go outside where?  I didn't know where -- I

13   mean, they didn't make it publicly knowledgeable to

14   us who made these things, so --

15        Q.  But you didn't ask?

16        A.  No, and they didn't force the issue,

17   either.  They pressed the issue on signing up for

18   the business support package.  They didn't give you

19   information on where you could purchase them if you

20   did want to.  It was mainly stressed to sign up --

21   it was in the training program.  It was stressed

22   when you signed the contract.  "Now you don't have

23   to sign this, but you need this stuff," but they

24   never gave you information like they do on

25   everything else as far as where to purchase it, so

**8/14/2006  Allen, Peter**

1    no.

2         Q.  But they told you you didn't have to sign

3    this, right?

4         A.  Yes.

5         Q.  And it says right here on Allen 8 in the

6    middle, "Contractor is not required to purchase the

7    Business Support Package," right?

8         A.  Yeah, says a lot of things in the contract

9    like that, yes.

10        Q.  And you didn't ask them about how you would

11   go about obtaining a scanner other than through a

12   business support package?

13        A.  No, and they didn't offer it up either,

14   so --

15        Q.  Do you use any other equipment for the

16   company?  You mentioned a phone, is that a cell

17   phone?

18        A.  My cell phone?

19        Q.  Let me back up.  Let me ask a better

20   question.

21        A.  Okay.

22        Q.  What other equipment do you use, other than

23   as we've already discussed, to service your route?

24        A.  None.  Every now and then I might call them

25   on my cell phone, but --

**8/14/2006  Allen, Peter**

1       Q.   And that's your phone?

2       A.   That's correct.

3       Q.   You picked the provider?

4       A.   Yes.

5       Q.   You pay the bill?

6       A.   Yes.

7       Q.   Do you use a pager?

8       A.   No.

9       Q.   You mentioned the modem, do you use that

10   with your home computer?

11      A.   Directly on my phone line, yes.  But it's

12   not hooked through my computer, no.

13      Q.   It just hooks into your land line at home?

14      A.   Correct.

15      Q.   That's your line?

16      A.   Correct.

17      Q.   You picked the provider, you pay the bill,

18   right?

19      A.   Yes.

20      Q.   Anything else?

21      A.   Other than it was required to have a land

22   line.  You had to have one to upload.  When I first

23   started, that was a requirement, you had to have a

24   land line or they would not sign a contract with

25   you.

**8/14/2006  Allen, Peter**

1        Q.   Was that put in writing with you somewhere?

2        A.   No, it was mentioned.

3        Q.   And who mentioned that to you?

4        A.   I forget if it was Scott or what.  I'm not

5    positive.  But I know it was said that you had to

6    have a land line at home.

7        Q.   Is that still required, do you know?

8        A.   I don't know because everything is uploaded

9    via satellite right now.  You just use it for

10   charging, so I don't know.

11       Q.   And you mentioned your Excel spreadsheet,

12   you use your home computer for that?

13       A.   Yes.

14       Q.   And that's your computer?

15       A.   Correct.

16       Q.   You paid for it?

17       A.   Yes.

18       Q.   You picked what brand to buy?

19       A.   Actually, it was a present for me, but --

20       Q.   That's good.  From your kids?

21       A.   No, from a friend of mine.

22       Q.   And you choose to keep track of certain

23   expenses on an Excel spreadsheet on that computer;

24   is that right?

25       A.   Yes, because I'm given a 1099 by FedEx, so

**8/14/2006  Allen, Peter**

1    I got to have some records of expenses.

2        Q.  But you pick how to keep your records.

3    They don't tell you how to keep your records, right?

4        A.  No, they don't.

5        Q.  Your land line, you use that for personal

6    calls as well, don't you?

7        A.  Yes, I do.

8        Q.  And your computer is personal as well,

9    right?

10        A.  Not very often, but yes.

11        Q.  Do your kids use it?

12        A.  No.

13        Q.  And your cell phone, you said that's your

14    personal cell phone.  You use that mostly for

15    personal calls, right?

16        A.  Yes.

17        Q.  You've never hired an employee to help you

18    service your route, have you?

19        A.  To help me service my route, no, I've never

20    had somebody driving with me when I serviced my

21    route.

22        Q.  Or a helper to help you with packages?

23        A.  A helper to do what?  To help deliver

24    packages?

25        Q.  Correct.

**8/14/2006  Allen, Peter**

1         A.   No.

2         Q.   Okay.  Have you ever hired someone to

3    service your route for you?

4         A.   Yes.

5         Q.   When was that?

6         A.   I've done it a few times for time off.   I

7    think the first time was back in September of 2003.

8         Q.   And who did you hire?

9         A.   Gilbert Mendival.  He serviced my area.

10        Q.   Was he a contractor at that time?

11        A.   No.

12        Q.   Temp driver?

13        A.   Yes.

14        Q.   How did you go about finding him?

15        A.   He was there at the terminal already

16   working, so --

17        Q.   You just asked him?

18        A.   Yes.

19        Q.   And how long did he service your route that

20   time?

21        A.   Just for a week.

22        Q.   You took a week off?

23        A.   Yes.

24        Q.   Was that for deer season?

25        A.   Yes.

**8/14/2006  Allen, Peter**

1      Q.  Did you consider anyone except

2   Mr. Mendival?

3      A.  I believe at the time there was only one

4   other one, Trevor Adams.  And he wasn't available.

5   He was working for somebody else at the time.

6      Q.  How much did you pay Mr. Mendival for

7   servicing your route for a week?

8      A.  Oh, let me think.  I can't remember.  It

9   was either $120 or $150 a day, but I don't remember.

10      Q.  And how did you --

11      A.  Actually, I think it was per stop.  It was

12   either $1.20 or $1.50 per stop that time.

13      Q.  And was there negotiations or did you just

14   say, "This is what I'll pay you," and he said,

15   "Fine"?

16      A.  No, that's what he said.  He said, "This is

17   what I normally get," and I said, "Okay, that's

18   fine."

19         There wasn't a lot of opportunity to take

20   time off, so you took advantage of it when you

21   could.

22      Q.  Sure.  Was the company involved in this

23   process between you and Mr. Mendival at all?

24      A.  Yeah.  They actually kept his name and

25   Trevor's name up on a board and who they were

**8/14/2006  Allen, Peter**

1    driving for at certain times.  So if you needed

2    them -- and that way if they needed them they knew

3    whether or not they were working for someone or not.

4        Q.  But they didn't get involved in the actual

5    transaction, did they?

6        A.  No.

7        Q.  And they didn't tell you that you couldn't

8    hire Mr. Mendival to service your route temporarily,

9    did they?

10        A.  No.

11        Q.  Did you let them know that you would be

12    using Mr. Mendival to service your route for that

13    week?

14        A.  Well in advance, yes.

15        Q.  Was that so they could take his schedule

16    into account?  You mentioned the board.

17        A.  Well, that, and you couldn't just not show

18    up and have someone else driving your route.  They

19    had to know about it.

20        Q.  And did he drive your truck?

21        A.  Yes.

22        Q.  And did you employ him for that week as an

23    employee or independent contractor?

24        A.  I just paid him cash.

25        Q.  Did you think one way or the other whether

**8/14/2006  Allen, Peter**

1       he was an independent contractor or an employee?

2               A.   No.

3               Q.   Did you do anything to ensure that he did a

4       good job of servicing your route that week?

5               A.   Did I do anything?

6               Q.   Did you call him, did you check in?

7               A.   Didn't call him.  I was in an area where

8       you couldn't.

9               Q.   Out in the woods?

10              A.   Yeah, no phone coverage.

11              Q.   Did you do anything to ensure that he

12      serviced your route properly or did you just hire

13      him and let him do his thing?

14              A.   Well, I already knew his previous, you

15      know, work ethics, so I knew he would do a good job,

16      and he did.  When I got back I asked and they said

17      it was fine.  FedEx, so --

18              Q.   Okay, good.  Was there any other time when

19      you hired somebody to work your route?

20              A.   Yeah, Trevor Adams.  And I don't remember

21      if it was Gilbert -- I can't remember, but in April

22      of '94 -- '94, 2004, excuse me, I used -- I don't

23      remember if it was Gilbert or Trevor, but one of

24      them.  And I -- we went to Laughlin, Nevada, some

25      friends of mine, we went there on our Harleys.

**8/14/2006  Allen, Peter**

1       Q.   And they were both temps?

2       A.   Trevor and Gilbert?

3       Q.   Yes.

4       A.   Yes.

5       Q.   How long did you hire one of them for that

6   time?

7       A.   I believe it was Wednesday through

8   Saturday, so four days.

9       Q.   And do you recall how much you paid

10   whichever one of them it was?

11       A.   I think it was $1.20 a stop, or -- yeah, I

12   think it was still by the stop then.  I think it was

13   like $1.20 a stop or something.  I don't know.  I'm

14   not positive on that.

15       Q.   And how was that number reached?

16       A.   That's what their asking price was, so --

17       Q.   So it was a seller's market for temps?

18       A.   Yes.

19       Q.   Was the company involved in the financial

20   transaction?

21       A.   Not the financial portion of it, no.

22       Q.   But you let the company know that one of

23   them would be driving for you that week?

24       A.   Yes.  Again, it was one of those situations

25   where they had a board, so --

**8/14/2006  Allen, Peter**

1       Q.   Okay.  Other than letting them know, was

2    the company involved at all with you hiring one of

3    these guys to cover your route?

4       A.   No.

5       Q.   When you hired one of these guys to cover

6    your route, did you do so as a -- did you hire him

7    as an independent contractor or your employee?

8       A.   Again, I told you, I paid them under the

9    table, so I didn't give him a status.

10       Q.   Okay.  Cash?

11       A.   Yes.

12       Q.   Did you report your payments to them to any

13    taxing authorities, state or federal?

14       A.   No.

15       Q.   Either time?

16       A.   No.

17       Q.   And the company didn't prevent you from

18    hiring one of them to service your route for those

19    few days?

20       A.   No, they almost did on one of the issues,

21    but no, they didn't.

22       Q.   What was the concern?

23       A.   Because they had something go on with

24    another route and they were going to pull one of

25    them away from me and have one of the service

**8/14/2006  Allen, Peter**

1   managers deliver my route for one of those days and

2   then bring them back on it.

3        So they control the individuals.  And there

4   was -- you know, if these guys still wanted to work

5   for them they would basically listen to what they

6   had to say because they controlled whether or not

7   they could work for anybody or not, any driver.

8        Q.  They controlled the temp drivers, is what

9   you're saying?

10       A.  Yes.

11       Q.  Now, did -- sounds like you worked it out

12   with them, though, that that did not happen?

13       A.  I didn't work it out.  Just what they --

14   they finally -- they came to some resolution.  They

15   said, all right, the individual is going to be able

16   to -- the service manager drove my route one day.

17       Q.  Did he do a good job?

18       A.  I don't know.

19       Q.  Did you hear about any complaints after the

20   fact?

21       A.  It wouldn't come to me anyways because it

22   was him that delivered them as a FedEx employee,

23   so --

24       Q.  Were there any other occasions when you

25   hired someone to service your route for some amount

8/14/2006  Allen, Peter

1      of time?

2           A.  Yes.

3           Q.  When was the next time?

4           A.  Mohammed Masood.  And this was after all

5      that period and just before they started the -- it

6      was last -- let me see.  It was last spring, he

7      started working for me on Saturdays just to get some

8      time off because we didn't have any temp drivers

9      anymore.  Gilbert had already started working as a

10     contractor and Trevor was working for a contractor

11     permanently.  So there was no drivers around to do

12     any type of time off.  So he said he'd be willing --

13     and Mohamed Masood was a contractor that just got

14     rid of his route.

15          Q.  I see.

16          A.  So he said he'd work Saturdays for me when

17     I wanted him to, so I had him work -- it was a few

18     Saturdays in a row and then he ended up getting a

19     job, and that ended.

20          Q.  And when you said last spring, spring '06

21     or spring '05?

22          A.  '05.

23          Q.  Okay.  How much a day did you pay him?

24          A.  $120.

25          Q.  Was that negotiated or that's just what he

**8/14/2006 Allen, Peter**

1    wanted, or how did that work?

2         A.  That's just what we -- he said he wanted

3    that, and I said that's fine.

4         Q.  So you agreed to his demand?

5         A.  Yes.

6         Q.  And did you inform the company that time

7    that you were using him on Saturdays?

8         A.  Yeah, they knew.

9         Q.  Were they involved in the economics of the

10   deal?

11        A.  No, they were not.

12        Q.  And did they have any involvement other

13   than you letting them know that Mr. Masood was going

14   to be delivering for you on some Saturdays?

15        A.  Other than they said you need to watch him.

16   Basically, they just said, "You need to watch him.

17   We're not sure about him," blah, blah, blah, you

18   know, on his trustworthiness, so --

19        Q.  Anything else?

20        A.  No.

21        Q.  And did you pay him cash?

22        A.  Yes.

23        Q.  That was under the table?

24        A.  Yes.

25        Q.  And you didn't report that to the taxing

**8/14/2006  Allen, Peter**

1       authorities?

2              A.   No.

3              Q.   You stopped using Mr. Masood you said when

4       he got another job?

5              A.   Yeah.

6              Q.   Did you terminate him or decide to stop

7       using him or did he come to you and say, "Hey, I've

8       got another job and can't drive"?

9              A.   He said, "I found a position.  This will be

10      the last week I'm able to do that for you."  I said,

11      "That's fine."

12             Q.   Did you have any problems on any of the

13      Saturdays that Mr. Masood delivered for you?

14             A.   The only -- I believe on -- when he was

15      delivering for me, I believe there was a package

16      that a consignee said he didn't get or something,

17      but he resolved it.

18             Q.   Mr. Masood did?

19             A.   Yes.

20             Q.   Okay.

21             A.   So there was never anything.  I think it

22      was just a terminal message or something.  I'm not

23      sure.

24             Q.   Okay.  Anything else?

25             A.   Not that I can think of, no.

**8/14/2006  Allen, Peter**

1      Q.  So you weren't charged with a --

2      A.  Claim?

3      Q.  Yeah.

4      A.  No.

5      Q.  Okay.  Any other times you hired someone to

6  work your route?

7      A.  Not to my knowledge.  That's it.

8      Q.  When did the time-off program start?

9      A.  Last year we had the full year and then

10  this year.  So basically, I think they informed us

11  in late May or early June of 2005.  And it goes from

12  June to June, or June to the end of May, so --

13      Q.  And you participated in the time-off

14  program; is that right?

15      A.  Yes.

16      Q.  Other than as you've already described, did

17  you ever ask another contractor for help servicing

18  your route?

19      A.  No.

20      Q.  Other than as you already described, did

21  you ever ask anybody for help servicing your route

22  whether or not they were a contractor?

23      A.  No.

24      Q.  Did you have a back-up plan in place if,

25  say, you were sick one day and couldn't work?

**8/14/2006  Allen, Peter**

1      A.  No.

2          Q.  Did that ever happen?

3          A.  No, never been sick in 25 years at work.

4      I've never taken a day off, so no.

5          Q.  Never been sick?

6          A.  I've been sick, but never taken a day off.

7          Q.  Worked through it?

8          A.  Was I ever sick in the last four years,

9      yes, but didn't have much choice in the matter.

10         Q.  Could you have tried to get a temp?

11         A.  Depends on when it was.  I mean, I was sick

12     a few times with colds and stuff, but it depends on

13     what it is, whether they had any, you know, in the

14     terminal.

15             The individual had to be -- I couldn't go

16     pick Joe Blow off the street and say come here and

17     drive for me.  Even a friend of mine that I trusted,

18     I couldn't put him behind the wheel.  It had to be

19     an approved driver.  So they never kept a lot of

20     approved drivers around because they wouldn't use

21     them enough.  So we had the option of one or two, at

22     best two at times, and for the most part they were

23     already being used, so --

24         Q.  Did you ever try -- on a day you were sick,

25     did you ever try to see if one was available?

**8/14/2006  Allen, Peter**

1       A.  Did I ever try?  No, I just worked through

2    it.

3       Q.  So you just worked through it?

4       A.  Yeah.  Because, I mean, basically I wasn't

5    going to screw somebody else because I was sick if

6    they were already working for someone.

7       Q.  Did you ever ask the company to help you

8    figure something out on a day you were sick?

9       A.  No.

10      Q.  Why not?

11      A.  Because I already knew -- like I said, you

12   typically -- it was just one or two contractors.

13   And I already knew they would go up -- and

14   typically, when you ask them for anything like that,

15   they are going to say, all right, go talk to the

16   contractor they were working for and see if you can

17   work something out.  As far as -- instead of going

18   through that, I'd say forget it.  You know, I'm not

19   going to put that guy in jeopardy of losing his time

20   off because I'm sick, you know.  They won't drive

21   for you.

22      Q.  Okay.

23      A.  FedEx isn't going to drive for you.  Has to

24   be an available driver.

25      Q.  Now, when you signed up for the time-off

8/14/2006  Allen, Peter

1      program, that was voluntary, right?

2          A.   Yeah.

3          Q.   And did you feel like that was better than

4      hiring people on the side to get time off?

5          A.   Well, no.  But I mean, it cost me $1.75 a

6      day for a week a year.  In addition to that, I lose

7      my entire pay for that week.  I'd much prefer hiring

8      a temp driver.  The problem is they are not --

9          Q.   Hard to get?

10         A.   Yes.  I mean, having a week off a year

11     costs me $1,800, $1,900.  Having a temp driver costs

12     me $600, $700, somewhere in that neck of the woods.

13         Q.   So it's a more expensive proposition but

14     it's guaranteed.

15         A.   Right.

16         Q.   Tradeoff, right.  Now, do you pick the --

17     you testified this morning that you have to pick

18     either one week, two weeks or three weeks at the

19     front end.

20         A.   You can pick as many as you want.  They

21     offer them to you.

22         Q.   Do you pick the actual weeks at that time?

23         A.   Well, I had seniority in the terminal, so I

24     got to pick the first week.  Then they go through

25     every contractor that signed up.  And then you pick

**8/14/2006  Allen, Peter**

1    your second week.  And everyone that signed up for

2    two weeks, they go through and pick their weeks.

3    And it continues on until everyone's chosen all

4    their weeks.

5         Q.  Have you ever had a -- I guess you haven't

6    had a serious illness where you had to take some

7    time off; is that right?

8         A.  Not in FedEx, no.

9         Q.  Have you ever had, again limited to Fed Ex,

10   have you ever had a serious family illness where you

11   needed to take some time off?

12        A.  No.

13        Q.  Did you ever ask for time off based on

14   either your own or somebody else's illnesses?

15        A.  No.

16        Q.  You never asked anybody at the company for

17   any sort of medical leave, right?

18        A.  No, I didn't because I saw other

19   contractors, Rodrigo specifically, he was loading

20   next to me.  And he was deadly sick with some kind

21   of flu or something, and they made him work.  So it

22   was kind of fruitless to ask for it anyways.

23             The only people I ever -- I saw, I think, I

24   believe, one time Gilbert called in, Gilbert

25   Mendival, he was a contractor.  He was too sick to

**8/14/2006  Allen, Peter**

1    come in.  And I mean, he was in meetings for days

2    after that trying to explain why he did that, but --

3          Q.  Did Rodrigo tell you that he had tried to

4    get the day off and they wouldn't let him?

5          A.  I was right there when he talked to him.

6          Q.  Who was he talking to?

7          A.  Scott Dolan and I believe Letisha was

8    there.

9          Q.  And what did they say to Rodrigo?

10         A.  They said, "It's your responsibility to get

11   a replacement driver."

12         Q.  Do you know if he tried to?

13         A.  It was kind of hard.  He was throwing up

14   constantly, so I don't know.

15         Q.  You don't know, do you?

16         A.  No.  But I know the two available drivers

17   that were in the terminal weren't available, I know

18   that.  They were already committed.

19         Q.  If you're an independent contractor and

20   you're responsible for getting your route serviced,

21   do you think it's FedEx's job to provide somebody to

22   cover your route if you're sick?

23         A.  If I truly believed I was an independent

24   contractor, no, I'd have the decision not to come

25   into work that day and service my route an

**8/14/2006  Allen, Peter**

1    additional day during the week to make up for that

2    day.  But we're not given that option, so no.

3         Q.  Do you believe it's okay under the

4    operating agreement that you signed to deliver

5    packages on a day other than when they were given to

6    you to deliver?

7         A.  Do I believe it's okay, no.  I mean, I

8    believe that FedEx doesn't believe it's okay.  They

9    tell us it's not okay, so that's the way it's going

10   to be.

11        Q.  But isn't there an expectation under the

12   contract that you signed that you'll deliver the

13   packages the day they are given to you to deliver?

14        A.  The day they are given to us, right.  If

15   we're not there that day, then they are not given to

16   us, right?

17        Q.  Well, I guess -- and that's a fair enough

18   point.  I mean, isn't there an expectation under the

19   operating agreement you signed that your route will

20   be serviced on a daily basis?

21        A.  Yes.

22        Q.  Now, FedEx did not provide you paid

23   vacation, did it?

24        A.  No.

25        Q.  Did you ever have any expectation that it

1938

**8/14/2006  Allen, Peter**

1    would?

2          A.  Not initially, no.

3          Q.  Is that because it's not in the contract?

4          A.  It's because I went under -- actually went

5    to work as an independent contractor thinking I was

6    going to have the full rights as an independent

7    contractor, and I don't believe that's the case.  So

8    I believe they should have started providing us with

9    it because they directed us in every other way as

10   far as how we do things, so --

11         Q.  Now, setting that aside, the contract

12   doesn't promise you paid vacation, does it?

13         A.  No.

14         Q.  And no one at FedEx ever promised you paid

15   vacation, did they?

16         A.  No.

17         Q.  Do you believe FedEx should provide you

18   paid sick days?

19         A.  Do I believe FedEx -- if they were going to

20   treat me as an employee, yes, I do believe they

21   should provide me paid sick days.

22         Q.  Is that for the same reasons you believe

23   they should provide you paid vacation?

24         A.  The --

25         Q.  You just mentioned that if you, in your own

**8/14/2006  Allen, Peter**

1    mind, truly were or if you truly believed you were

2    an independent contractor that you wouldn't be

3    entitled to vacation, but since you believe you're

4    an employee, you should be?

5         A.  Because, yeah, if we're treated like that,

6    which we are -- I mean, we have no -- we have no say

7    in our business, so I believe that, yes, they should

8    be providing us, or providing us with a replacement

9    driver when somebody is sick.

10        Q.  Of course it's in dispute whether or not

11   you have any say in your business, but that's what

12   this case is about.

13            You've already testified you keep track of

14   your expenses on this Excel spreadsheet that you

15   update periodically.  Do you also keep track of your

16   revenue?

17        A.  Revenue from what?

18        Q.  Settlement.

19        A.  Yes.

20        Q.  How do you keep track of that?

21        A.  Same spreadsheet.

22        Q.  Same spreadsheet.  Have you ever sat down

23   and tried to predict future expenses or figure out

24   how to better control expenses?

25        A.  Better control expenses.  No idea how to

**8/14/2006  Allen, Peter**

1    better control expenses when you have to use fuel

2    and you have to maintain a vehicle, no idea.

3         Q.  Let's start at the beginning first.  Have

4    you ever sat down and tried to project out your

5    expenses?

6         A.  For an annual basis, yes.

7         Q.  Kind of a rough budget?

8         A.  Sure.

9         Q.  Do you do that annually?

10        A.  Not all -- I mean, I did at first, but then

11   I realized it's going to be the same.  The only

12   variance is the cost of the fuel.

13        Q.  Do you run the numbers each year, changing

14   that variable just to get a sense of it?

15        A.  No.

16        Q.  Do you make projections about, or have you

17   in the past made projections about your settlement?

18        A.  About my what?

19        Q.  Your settlement, how much that would be?

20        A.  No.

21        Q.  You mentioned your accountant does your

22   taxes; is that right?

23        A.  Yes.

24        Q.  Have you ever represented to a taxing

25   authority that you are self-employed?

**8/14/2006  Allen, Peter**

1     MS. ZERGER:  I'm going to note for the

2   record that that's been answered in an admission.

3   BY MR. GARRISON:

4     Q.  Fair enough.  You may answer, sir.

5     A.  Yeah, because FedEx sends me a 1099 and I

6   didn't know any other way to file, so --

7     Q.  Any other reasons you reported you're

8   self-employed?

9     A.  No.

10     Q.  Now, your take home settlement would

11   decrease or increase depending on your number of

12   packages, right?

13     A.  Yeah, well, more so number of stops because

14   we get paid more for a stop than we do a package,

15   so --

16     Q.  Okay.  Can you estimate for me your gross

17   annual income in each of the years you've been a

18   FedEx contractor?

19     A.  2003 was somewhere in the $40,000s.  2004

20   was about $70,000, or, excuse me, 73 or 74,000.

21   2005 was about $71,000.

22     Q.  And then how much have you earned sort of

23   up to now this year?

24     A.  I don't know.  I haven't been tracking it.

25     Q.  Can you estimate?

**8/14/2006  Allen, Peter**

1    A.   Probably half of that.  So I would say

2    somewhere a little over probably around $40,000 or

3    so, maybe.

4        Q.   So 2004 and 2005, which were the only two

5    full years, you made slightly over 70, which is

6    pretty consistent with what -- I have forgotten her

7    name, Samantha told you back in the beginning; is

8    that right?

9        A.   Lisa Beck.

10       Q.   Was it Lisa?

11       A.   Yes.

12       Q.   So was that about what you expected to

13   make?

14       A.   Yeah.

15       Q.   Obviously it varies, but on average, what

16   is your weekly settlement before expenses, your

17   gross check?

18       A.   Average probably around $1,400 throughout

19   the year.

20       Q.   And on average, what are your monthly

21   expenses?

22       A.   I don't know.  I'd say about half.

23       Q.   So do you believe you earned, we'll call it

24   profit, but income after expenses, about half of the

25   amounts you just told me your gross is?

**8/14/2006  Allen, Peter**

1     A.  45, 50 percent, probably, yes.

2     Q.  Now, I think you testified that you gave

3  maintenance expenses to the company; is that right?

4     A.  Excuse me?

5     Q.  Your monthly maintenance expenses, did you

6  give copies of those to the company?

7     A.  Report, yes, and copies of the documents.

8     Q.  How about gas receipts, does the company

9  get those?

10    A.  No.

11    Q.  What -- let me back up.

12        Does the company get copies from you of

13  anything other than the monthly maintenance reports?

14    A.  As far as vehicles are concerned?

15    Q.  As far as any expenses you have to run your

16  business?

17    A.  Expense-wise.  No, I don't -- that's it.

18    Q.  Okay.  And do you keep your gas receipts?

19    A.  Yes.

20    Q.  Have you produced all of them to your

21  lawyer in this case?

22    A.  Yes, up until the time that I went in with

23  them, yes.

24    Q.  I'm sorry, I don't quite understand that.

25    A.  I went in back in February and produced all

8/14/2006  Allen, Peter

1     these documents.  I haven't produced anything since

2     February.

3          Q.   Okay.  Do you have any other receipts for

4     expenses associated with running your business that

5     you haven't given to the company?

6          A.   Not to my knowledge, no.  Well, actually,

7     that's not true.  They may or may not have -- I have

8     the sales agreement on the vehicle, the actual

9     financial statements, I believe it is, that they

10    gave you when you purchase a vehicle where I was

11    telling you the $30,000 for the vehicle.

12         Q.   Right.

13         A.   I don't know if they have that or not, but

14    I am going to produce it.

15         Q.   Now, are those statements from GMAC?

16         A.   I can't remember exactly if they were from

17    GMAC or from Sopp Chevrolet, but it's -- I'm not

18    sure when you purchase a vehicle if you finance them

19    or not, but --

20         Q.   Yeah.

21         A.   It states on there the cost of the vehicle

22    and the additional finance charges and then the

23    total, any down payment you put and any total

24    out-the-door price on it.  And that's what I have at

25    home that states -- and my signature and their

8/14/2006  Allen, Peter

1       signature on it.

2               Q.   But you haven't given that to your lawyer

3       yet?

4               A.   I don't know.

5               Q.   But if you haven't, you will?

6               A.   Yes.

7               Q.   Okay.  So it's not the monthly statements,

8       it's the actual sale documents when you bought the

9       truck?

10              A.   Correct.

11              Q.   Thanks for clarifying that.

12              A.   They have monthly statements, I believe.

13              Q.   I've seen a few of those.  So other than

14      that bill of sale, up to February of this year, have

15      you produced all expense documents in this case to

16      your lawyers?

17              A.   As far as I know, yes.

18              Q.   As a contractor, have you ever been worried

19      that you wouldn't be able to make enough money to

20      support yourself and family?

21              A.   If my wife didn't work, sure, I definitely

22      would have been.

23              Q.   But with your wife it's been okay?

24              A.   It's been all right, yes.

25              Q.   Have you ever been worried that you

**8/14/2006  Allen, Peter**

1   wouldn't have enough money to cover your expenses?

2   And I'm talking about your expenses for running your

3   company as a contractor.  Company is the wrong word,

4   but for being a contractor?

5        MS. ZERGER:  I'll object.  That's a legal

6   conclusion.

7        THE WITNESS:  Can you rephrase it again?

8   BY MR. GARRISON:

9        Q.  Let's try again.  You get a settlement.

10       A.  Right.

11       Q.  You have expenses.  Set aside your wife,

12   your kids, all that other stuff.  I'm talking about

13   business-related with FedEx.

14       Have you ever been worried that you

15   wouldn't be able to earn enough settlement to cover

16   your FedEx-related expenses?

17       A.  My finances aren't segregated as far as

18   business and otherwise, so my money is all put

19   together between my wife's money, my retirement.

20   It's all in one pot, so there is no segregation, so

21   no.  I would have money to pay for that.  Not

22   necessarily from the settlement, but from my bank

23   account, yes.

24       Q.  To your knowledge, have you always earned

25   enough settlement to at least cover your expenses?

**8/14/2006  Allen, Peter**

1       A.  Not every -- I mean, depending on the

2    situation.  Like if there was a week where I had to

3    buy tires and my van payment was at the same time,

4    then no.

5       Q.  How about if we pull it back a little bit

6    and looked at it on a monthly basis?

7       A.  No, there never was a time that I couldn't

8    cover my expenses from my bank account, no.

9       Q.  So you weren't losing money at least on a

10   monthly basis?

11      A.  No.

12      Q.  Do you know any contractors who have failed

13   financially?

14      A.  I don't talk --

15         MS. ZERGER:  Object.  Lack of personal

16   knowledge.

17         MR. GARRISON:  He may if --

18         MS. ZERGER:  You can answer.

19         THE WITNESS:  I don't talk to anybody, so I

20   don't know.

21   BY MR. GARRISON:

22      Q.  The question is to elicit whether he has

23   personal knowledge from speaking with another

24   contractor, but you don't?

25      A.  I don't talk to anybody about their

8/14/2006  Allen, Peter

1    finances, so no.

2         Q.  I think you said earlier you should be more

3    highly compensated by FedEx; is that right?

4         MS. ZERGER:  I'm not sure that that

5    accurately reflects the testimony.  You can go ahead

6    and answer.

7    BY MR. GARRISON:

8         Q.  You know what, you're correct, Counsel.  I

9    think something to the effect -- I don't remember

10   your exact words, paraphrase, something to the

11   effect you felt you were not adequately compensated?

12        A.  I don't remember what you're talking about,

13   honestly.

14        Q.  Let me just ask you.  Do you believe you're

15   adequately compensated by FedEx?

16        A.  For the work I do, no.

17        Q.  Why do you feel that way?

18        A.  Because more than 50 percent of what I'm

19   bringing in is going out on expenses, and I don't

20   think that's right.

21        Q.  Any other reasons?

22        A.  When you look at the fact that -- if you

23   break it down with no benefits, no medical, none of

24   that, if you break it down how many hours we work,

25   we're not making -- we're lucky if we're making a

8/14/2006  Allen, Peter

1     minimum wage or above.

2         Q.  Have you sat down and actually done the

3     math to see if that's the case?

4         A.  No, because I don't sit there and document

5     my hours either.

6         Q.  Any other reasons?

7         A.  No.

8         Q.  Whether or not you feel like it's enough,

9     are you claiming in this case that FedEx hasn't paid

10    you any of the things they agreed to pay you in the

11    operating agreement -- categories of settlement and

12    amounts?

13        A.  No, they've paid me what they state in

14    their operating agreement, yes.

15        Q.  Do you consider yourself to be a business

16    person?

17        A.  A business person, no.

18        Q.  Why not?

19        A.  I have no background in business.

20        Q.  Did you consider yourself to be running a

21    small business?

22        A.  No.

23        Q.  Why not?

24        A.  Because I make no decisions for myself,

25    so --

**8/14/2006  Allen, Peter**

1       Q.  But you've testified that you do make a lot

2   of decisions for yourself, right?

3       A.  Like?

4           MS. ZERGER:  Object.  Mischaracterizes the

5   testimony.  You can answer.

6   BY MR. GARRISON:

7       Q.  You testified you decide within a range

8   when you come to work; is that right?

9       A.  After the sort is done, yes.  I still have

10  constraints there, yes.

11      Q.  You testified you decide whether or not to

12  use the manifest and turn-by-turn, right?

13      A.  Yes.

14      Q.  You've testified you decide what order to

15  service your route or to do your deliveries, right?

16      A.  No, basically during the training, that's

17  the way they present it to you, that's the way they

18  tell you how to do it and that's the way I've done

19  it because that's the way that works best.  It's the

20  most efficient way to do my route.

21      Q.  That's a choice.  It would be crazy, but if

22  you wanted to do it less efficiently, you could,

23  right?

24          MS. ZERGER:  Argumentative.  You can

25  answer.

**8/14/2006  Allen, Peter**

1        THE WITNESS:  Yeah, I could choose to do

2    that if I wanted to lose money, additional money on

3    fuel, yes, I could.

4    BY MR. GARRISON:

5        Q.  And you decided which vendor to buy your

6    truck from?

7        A.  Of the two options they gave me, yes, I

8    did.

9        Q.  And you decided which model of truck to

10   buy?

11       A.  Which model?  No, they told me which model.

12       Q.  Whether to go 500 or 550?

13       A.  That's from the two different vendors, so

14   yes.  I chose the different vendor, but I didn't

15   have the option.  If I -- I mean, it's basically the

16   same question, I think.

17       Q.  And you choose whether or not to

18   participate in the time-off program, right?

19       A.  Yes, I choose.

20       Q.  And you've chosen whether or not to try to

21   add a supplemental truck and driver, right?

22       A.  Yes.

23       Q.  And you've chosen whether to try to acquire

24   a second route, become a multiple route contractor?

25       A.  I chose not to, yes.

**8/14/2006  Allen, Peter**

1        Q.   Okay.

2        A.   On the second route or the supplemental

3    driver, the reason why is because I have to hire two

4    to three in order to make any money in doing that.

5    Because they pay you no compensation for having a

6    second driver other than per stops.

7            And they've come up with some new thing,

8    but you have to pay for the vehicle.  They don't

9    provide you a vehicle allowance for supplementals,

10   yet they push supplementals, so that's why I don't

11   do the supplemental route.

12       Q.   But that's your choice?

13       A.   Sure.  My choice in not to lose money in

14   hiring another individual, yes.

15       Q.   Earlier you testified about some meetings

16   that were held.  What are the different types of

17   meetings that are held, if different types are held?

18           MS. ZERGER:  Objection.  Vague and

19   ambiguous.  What kind of meetings are you talking

20   about?

21           THE WITNESS:  What are you asking?

22   BY MR. GARRISON:

23       Q.   Safety meetings.

24       A.   Yes, there are safety meetings.

25       Q.   What other kinds?  What types of topics are

**8/14/2006  Allen, Peter**

1    addressed?

2          A.   There have been them on -- like we

3    discussed earlier on settlement, new settlement

4    compensation, yearly settlement compensation.

5                Meetings on customer complaints.  When the

6    terminal starts getting a lot of customer

7    complaints, they bring the regional manager down to

8    discuss it.

9                Meetings out at the belt by the terminal

10   manager on customer complaints.

11               Just after the new terminal manager got

12   there, Travis, and that was one of the situations

13   where he wouldn't let anyone get their scanner and

14   leave.  They weren't allowed to close any routes out

15   until after he was done with his meeting.

16         Q.   What other topics?

17         A.   Any time they had new -- like new things

18   that were coming down the pipe, new customers, they

19   would have meetings on that.

20         Q.   Anything else that comes to mind?

21         A.   Just procedures as far as delivery

22   procedures, filling out door -- you know, just

23   procedures that are supposed to be followed.

24         Q.   Anything else?

25         A.   I can't think of anything else at the time.

**8/14/2006  Allen, Peter**

1   Q.  On average, how often does the company have

2   a meeting for contractors or with contractors?

3   A.  Over the last six months, it's been almost

4   at least monthly with the regional manager, Rock

5   Sherman.

6   Q.  On average, how long do they last?

7   A.  With him, an hour.

8   Q.  Different time with others?

9   A.  Yeah, it's been shorter with others.

10   Q.  Now, are these meetings mandatory?

11   A.  Well, obviously some of them.  If they are

12   not going to give you your scanner, you might as

13   well attend it because you can't get out of there

14   so --

15   Q.  You mentioned that was only two or three of

16   them, right?

17   A.  Right.

18   Q.  The rest, are they optional?

19   A.  I'm sure that they are optional -- I mean,

20   if you don't go to them there's going to be an

21   annotation somewhere in your file stating such, that

22   you're not cooperative, but --

23   Q.  Why do you believe that?

24   A.  Because they are constantly telling you,

25   "Come on, you need to go to this meeting.  It's

**8/14/2006  Allen, Peter**

1    beneficial to you.  It's beneficial to you."

2        Q.  Did they tell you they are going to write

3    you up if you don't?

4        A.  No, we just assume that because they write

5    up everything.

6        Q.  Have you attended all these meetings?

7        A.  Probably not all.

8        Q.  Do you attend most of them?

9        A.  Yes, I did for the most part, yes.

10       Q.  And you choose whether or not to attend,

11   right?

12       A.  No, not all of them, no, I didn't.  Only --

13   the ones where they held my scanner, no, I didn't

14   choose not to attend.

15       Q.  You testified those were voluntary.  That

16   you couldn't get your scanner, but that you could

17   have gone and sat by your truck if you wanted,

18   right?

19       A.  Okay, yes.  I chose to stay at the

20   terminal, yes.

21       Q.  Other than those two or three that you

22   testified about earlier, were the rest voluntary?

23       A.  Yes.

24       Q.  And did you make the decision whether or

25   not to attend those, whether you did or not?

**8/14/2006  Allen, Peter**

1     A.  Excuse me?

2         Q.  Did you make the decision whether or not to

3     attend those?

4         A.  Yes.

5         Q.  Did most of the other contractors seem to

6     attend these meeting?

7         A.  Majority of them, yes.

8         Q.  Not all?

9         A.  I don't know.  I don't keep track of them

10    at meetings, so I couldn't tell you.

11        Q.  Earlier you testified about a couple of

12    instances where a package had either -- either a

13    package had been damaged or was one, I believe, the

14    frying pan, the other one was either the pot or the

15    plant was damaged?

16        A.  Correct.

17        Q.  Did those rise to the level of what's

18    sometimes referred to as a business discussion?

19        A.  In a formal setting?

20        Q.  Yes.

21        A.  The second one with the -- where the pot or

22    the plant busted, the conversation was on the phone

23    with Travis.

24            The first one, I believe I talked to

25    Leonard informally.  It wasn't any type of formal

**8/14/2006  Allen, Peter**

1   situation.  He just came and asked me what happened

2   and I told him.  And he told me if I took the care

3   program I'd get reimbursed for my loss of my bonus.

4        Q.  Okay.

5        A.  And but he failed to -- he failed to find

6   out that it had to be done in two weeks.  And he had

7   me do it, but it was after two weeks, so I didn't

8   get reimbursed.  And he said he owed me one.  And

9   then he departed, so I never got -- he could never

10  pay up on what he owed me.

11          And of course, I got one right after that,

12  and that was when Travis was -- well, it happened

13  during Travis' tenure as the terminal manager right

14  now.

15       Q.  And is that one you've talked about

16  already?

17       A.  Yeah.

18       Q.  Which one was that?

19       A.  The one on the broken pot.

20       Q.  Okay.  Have you -- does the term business

21  discussion mean anything to you as far as a formal

22  process goes?

23       A.  No, I've never -- when you go in there and

24  talk to them, they don't say, "We're having a

25  business discussion."

**8/14/2006  Allen, Peter**

```
1          Q.  Now, have you had three senior managers or

2     terminal managers?

3          A.  Yes.

4          Q.  Let me see if I got this right.  Scott

5     Dolan, Steve -- no, Scott Dolan --

6          A.  Leonard.

7          Q.  Leonard and Travis?

8          A.  Correct.

9          Q.  Okay.

10          A.  Well, and up at the Chico terminal, James

11    Cumberland was an acting terminal manager.

12          Q.  Sure.

13          A.  They didn't have one at the time.

14          Q.  But that's while you were a temp, right?

15          A.  Right.

16          Q.  Of those three, who did you like working

17    with the best?

18          A.  Didn't care for any over the other.  I

19    mean --

20          Q.  No preference?

21          A.  No.

22          Q.  Did they have different styles?

23          A.  Sure.

24          Q.  How were they different?

25          A.  Scott was more a people person.  Leonard
```

**8/14/2006  Allen, Peter**

1   was hard-nosed, wasn't very good with people.  And

2   then Travis seems to be more of a people person.

3   But as far as just communications go, but not -- I

4   don't know.  He's not as visible as Scott was, but

5   more so than Leonard.

6          Q.  And you're talking about Travis?

7          A.  Correct.

8          Q.  Okay.  Did Leonard make any changes when he

9   came in after Scott left?

10         A.  I don't know.

11         Q.  How about Travis when Leonard left?

12         A.  None of them made changes that affected us

13   all that much, no.

14         Q.  Did the three of them run the terminal

15   differently in any way?

16         MS. ZERGER:  I'm going to say vague and

17   ambiguous.  I don't know that all three ever ran the

18   terminal together or individually.

19   BY MR. GARRISON:

20         Q.  I mean individually.  How they ran the

21   terminal, whether they relied heavily on their

22   subordinates, whether they were real hands-on

23   themselves, any way they ran the terminal

24   differently as compared to each other.

25         A.  I didn't get involved in them, so I don't

**8/14/2006  Allen, Peter**

1    know.  I didn't have much contact with them other

2    than when they had a problem with me, so --

3        Q.  So you don't know one way or the other?

4        A.  No.  The only thing I know is the sort,

5    basically.

6        Q.  Now, you mentioned the sort got better over

7    time, right?

8        A.  Right.

9        Q.  Who sort of was responsible for that?

10       A.  Well, it started out with Leonard, but a

11   lot of it had to do with the fact that they got more

12   service managers and package handlers in there.  So

13   I don't know if that was his doing or what.

14       Q.  Okay.  Has it continued to get better under

15   Travis?

16       A.  Well, it's stabilized, basically.

17       Q.  Anything else stand out to you about how

18   these three gentlemen ran the terminal either the

19   same or differently?

20       A.  No.

21       Q.  Do you think any of the senior managers

22   were biased against you, personally, any of the

23   three guys -- Scott, Leonard, Travis?

24       A.  Do I think they had favorites or biased

25   against me or favorites -- is that what you're

**8/14/2006  Allen, Peter**

1    trying to say here?

2        Q.  I think the flip side of favorites.  Do you

3    think any of them sort of had an axe to grind with

4    respect to you in particular?

5        A.  No.

6        Q.  Was there favoritism?

7        A.  I think so, yes.

8        Q.  Why do you think that?

9        A.  Because during the period right after

10   Leonard got there, they started requiring shelves in

11   vehicles that they already approved that didn't have

12   but one shelf.  They wanted four shelves.

13       So Gilbert Mendival, Mohammed Masood,

14   several individuals sold their route and had to

15   spend $2,000 putting shelves in it.  After that

16   fact, Leonard allowed Bill Madera to sell one of his

17   routes without changing the signage and without

18   putting new shelves in.

19       Q.  I'm sorry, what was Bill's last name?

20       A.  Madera.

21       Q.  Madera?

22       A.  Yes.

23       Q.  And do you know the details of why he was

24   allowed?

25       A.  I mean, they come out now, even with my

**8/14/2006  Allen, Peter**

1    sale, "This is required.  This is what's required on

2    your vehicle."

3         Q.  So are you having to put shelves in it

4    before you can sell it?

5         A.  I'm not because I put it in my sales

6    agreement that the buyer puts them in.  He has to

7    have them put in.

8         Q.  He will?

9         A.  Yes.

10         Q.  Any other instances that leads you to

11    believe there's favoritism?

12         A.  No, that was one of the major ones.

13         Q.  What do you want from FedEx in this

14    lawsuit?

15         A.  I just want fair -- a fair resolution to

16    this for everyone involved, all the class members

17    involved.

18         Q.  And what does that mean to you?

19         A.  As equitable across the board.

20         Q.  What does that mean?

21         A.  Well, I -- specifically, I can't tell you,

22    I mean, a monetary value.  I just want equity for

23    the losses that they've incurred as far as their

24    expenses and stuff.

25         Q.  Expenses.  By equity, you're talking money,

**8/14/2006  Allen, Peter**

1    right?

2         A.   Money, time, you know, be treated fairly

3    either way, whether it be an employee or independent

4    contractor.

5         Q.   What do you want with respect to time?

6         A.   Time?

7         Q.   You just mentioned time.

8         A.   Well, to work reasonable hours for people.

9         Q.   And what do you consider that to be?

10        A.   Well, a normal workweek, eight hours a day.

11   You know, and then if you're going to consistently

12   work people, you know, longer hours, then compensate

13   them for them -- compensate them for it, excuse me.

14        MR. GARRISON:  Let's go off the record for

15   just a minute.

16        THE VIDEO OPERATOR:  Going off the record.

17   The time is 4:08.

18        (Recess taken)

19        THE VIDEO OPERATOR:  Back on the record.

20   The time is 4:16.

21   BY MR. GARRISON:

22        Q.   Mr. Allen, we were talking about what you

23   want in this lawsuit, and you mentioned you wanted a

24   fair resolution, you wanted it to be equitable.  We

25   talked a little bit about time.  You also mentioned

8/14/2006  Allen, Peter

1    that you wanted contractors to be treated fairly.

2           What does that mean to you?

3        A.  If they are going to be classified as

4    contractors, give them all the benefits of a

5    contractor as far as their rights.  And if they are

6    going to be classified as employees, give them all

7    the benefits of an employee.  That's it.

8        Q.  And what benefits as a contractor would you

9    want them to have?

10       A.  I don't know all the legal ramifications

11   behind being a contractor and an employee, but

12   whatever they may be, that's what I would hope that

13   they would receive.

14       Q.  And you're not a lawyer.  I'm not asking

15   you for all legal ramifications.  But based on your

16   understanding, what else would they receive or what

17   else do you think an independent contractor should

18   receive because they are independent contractors?

19       A.  I don't know.  I don't know all the legal

20   details behind being a --

21       Q.  Do you think that any of the three terminal

22   managers we talked about were more respectful of the

23   independent contractor model than others?

24           MS. ZERGER:  I'm going to object in terms

25   of his personal knowledge and speculation.  You can

**8/14/2006  Allen, Peter**

1    answer.

2            THE WITNESS:  I didn't deal with them

3    enough to know.

4    BY MR. GARRISON:

5        Q.  So you don't have a belief one way or

6    another?

7        A.  No.  And what model are you talking about?

8        Q.  Well, I just meant, you know, you are

9    supposed to be independent contractors.  Whether you

10   felt like any of the senior managers respected that

11   more than others.  You've complained, stated that

12   you know --

13       A.  I complained with all of them.

14       Q.  But no, that's not what I meant.  Poor

15   choice of word by me.  I'm not talking about

16   complaints with them.  But your position is that the

17   company controls you more than it should if you're

18   an independent contractor.  And what I'm asking is

19   whether any of the three senior managers you

20   interacted with exercised less control than the

21   others, or you feel like treated you more like an

22   independent contractor, as you understand it to

23   mean?

24       A.  I just think they were all always

25   consistent in giving the FedEx answer whenever you

**8/14/2006  Allen, Peter**

1    questioned or asked for anything.  So I didn't --

2    and other than that, I stopped dealing with them, so

3    I couldn't tell you.

4         Q.  And why did you stop dealing with them?

5         A.  Because you never -- it was always a

6    one-way street.  It was always FedEx's way, so it

7    was useless.

8         Q.  Do you want as part of this lawsuit for

9    FedEx to convert its independent contractors to

10   employees?

11        A.  I just want whichever way they go to be

12   fair and equitable as far as if they are employees,

13   treat them as employees.  If they are contractors,

14   treat them as contractors.

15        Q.  So you don't care whether they are one or

16   the other?

17        A.  I have no preference, no.

18        Q.  Now, you've sold your route.  You're going

19   to terminate your operating agreement.  How are you

20   going to go about that, or have you already?

21        A.  Expand on that some.  I mean, explain it as

22   far as --

23        Q.  Well, I'm actually following up on this

24   morning you explained there are several ways the

25   agreement could end.  And one of them, I think,

Case 4:06-cv-00175-KGB    Document 10-9    Filed 04/06/15    Page 1151 of 1363
Case 3:05-md-00527-RLM-CAN   Document 497-4   Filed 02/05/07   Page 301 of 358
8/14/2006  Allen, Peter

1    either party gives notice; is that right?

2         A.   With FedEx?

3         Q.   Yeah.   Talking about your operating

4    agreement, Exhibit 4.

5         A.   They just -- they have us give a copy of

6    the registration, the sales agreement -- not the

7    entire sales, just the sales agreement stating the

8    VIN number of the vehicle and who I'm selling the

9    route to and his signature, my signature on it.   And

10   then the process gets going.

11        Q.   Do you know what the process is?

12        A.   I have no idea.   It has something to do

13   with sending files up to Pittsburgh.   Other than

14   that, no.   And other than them coming back every

15   week saying, you have to do this now or that now.

16   No idea.

17        Q.   What have they come back to you and said

18   they had to do?

19        A.   Get another DOT inspection.   Because when I

20   originally approached Larry Davies on selling it, he

21   told me I didn't have to get another DOT inspection

22   because we just had one.

23             And then Saturday, Anas was actually in the

24   terminal just to see how the shelves in some of the

25   other vehicles were built.   And Larry approached him

**8/14/2006  Allen, Peter**

1    and gave him the letter saying that it required

2    another DOT inspection because by the time the

3    pictures of the vehicle were taken, it would be

4    three days past the 90 days that -- who requires, he

5    didn't know.  He just said that Pittsburgh told him

6    that another DOT inspection would have to be done.

7        Q.  Do you know if that 90 days is a DOT thing?

8        A.  I have no idea.

9        Q.  What else, if anything, has the company

10    made you do in connection or asked you to do in

11    connection with the sale of your route?

12        A.  Well, get the shelves done and the signage,

13    change the signage out.

14        Q.  Okay.  Anything else?

15        A.  No, not yet, but there's still a week.

16    Something will come.

17        Q.  Well, I hope not.  Now, the shelves,

18    everybody now has to have more than one shelf,

19    right?

20        A.  I don't know.  They are just telling me we

21    have to.  So like I said, I've told you in previous

22    testimony that it depends which person is selling

23    their route.

24        Q.  Now, I believe you testified that,

25    typically, if someone is going to sell their route

**8/14/2006  Allen, Peter**

1    and they only have one shelf, they have to add more;

2    is that right?

3        A.  Yes.

4        Q.  And the signage, I think you explained, was

5    you don't have to change the signage if it changes

6    while you're a contractor, but if you sell your

7    route you have to update the signage; is that right?

8        A.  Yeah, if there's new signage that FedEx is

9    using at the time, it's a requirement.

10        Q.  And that's a general requirement.  They are

11    not singling you out, are they?

12        A.  No, it's happened in the past, except that

13    one that I told you about where he didn't have to

14    change the signage.

15        Q.  Right.  Do you have to give FedEx a letter

16    or something that lets them know you're terminating

17    your operating agreement?  How does that work?

18        A.  I asked Larry and all he told me was to

19    give him a copy of a letter stating that I was

20    selling my route to this individual.  If I was

21    terminating completely with no buyer, I know I have

22    to give 30-days notice.

23        Q.  Okay.  And I'm not asking you for a legal

24    opinion because you're not a lawyer, but your

25    understanding is you don't have to give 30-days

8/14/2006  Allen, Peter

1    notice?

2         A.  No, because I have a buyer, so --

3         Q.  Got it.

4         A.  And I've given -- verbally they've had a

5    lot longer than 30 days anyways.

6         Q.  But the company didn't tell you they were

7    going to nonrenew you next year?

8         A.  No.

9         Q.  And the company is not terminating your

10   contract, anything like that?

11        A.  Not to my knowledge, no, but I'm not privy

12   to that.

13        Q.  As far as you know.  I'm just asking about

14   your personal knowledge.

15        A.  Not to my knowledge, no.

16        Q.  How did you become a named plaintiff?

17        A.  I was already -- my name was already down

18   at the firm and they asked me if I would be a named

19   plaintiff, and I said yes.

20        Q.  That's the Leonard Carder firm?

21        A.  Yes.

22        Q.  Now, I don't want you to tell me about

23   discussions you've had with your lawyers.  What is

24   your understanding of your responsibilities as a

25   named plaintiff?

**8/14/2006  Allen, Peter**

1      A.  To represent the class as far as across the

2   board with similar situations.

3      Q.  And what does that involve?  What does

4   representing a class mean?

5      A.  Giving this deposition today.

6      Q.  Sure.

7      A.  And possibly if it goes to trial, testify

8   in the trial.

9      Q.  You mentioned that you'd attended a meeting

10  with other class members at Leonard Carder's

11  offices.  Have you attended other meetings with

12  potential plaintiffs?

13     A.  Can you explain that, potential plaintiffs?

14     Q.  People who could be class members in the

15  lawsuit.  Let me back up.

16     A.  Okay.

17     Q.  Have you attended any meetings with other

18  named plaintiffs?

19     A.  No.

20     MS. ZERGER:  Before you go further, I want

21  to get on the record an objection to the question or

22  the answer that came out before I could issue the

23  objection about what his attorney asked him about

24  becoming a named plaintiff.  That's privileged.

25     MR. GARRISON:  I did not ask that question.

**8/14/2006  Allen, Peter**

1            MS. ZERGER:  I didn't say you asked.

2            MR. GARRISON:  I did not ask that question.

3            MS. ZERGER:  You didn't ask the question.

4            MR. GARRISON:  You're objecting to his

5     answer?

6            MS. ZERGER:  Yes.  I want to remind the

7     deponent to slow down in answering so I have a

8     chance to --

9            THE WITNESS:  Sorry.

10    BY MR. GARRISON:

11       Q.  That's fine.  As long as we don't have

12    speaking objections.

13           Do you understand that you have any other

14    responsibilities as a named plaintiff?

15       A.  I don't know of any others, no.

16       Q.  Have you spoken with any other contractors

17    who could be class members but aren't named

18    plaintiffs about this case?

19       A.  No.

20       Q.  Have you attended any other meetings where

21    other contractors who aren't named plaintiffs but

22    potentially could be named plaintiffs or class

23    members were present?

24           I could try that again if it's too

25    complicated.

**8/14/2006  Allen, Peter**

1      A.  You said non-named plaintiffs or named

2      plaintiffs?

3          Q.  Other meetings where non-named plaintiffs

4      who were contractors were present regarding this

5      case.

6          A.  I believe one other time back in February

7      there was a meeting, just an informational meeting.

8          Q.  And that included plaintiffs?

9          A.  Yes.

10         Q.  And it included nonplaintiffs as well?

11         A.  Yes.

12         Q.  And where was that?

13         A.  Somewhere around here in this area in

14     Sacramento.

15         Q.  Sacramento?

16         A.  Yes.

17         Q.  Were any lawyers for the named plaintiffs

18     there?

19         A.  Lynn Faris, and at the time I believe Hina

20     Shaw.

21         Q.  I'm sorry?

22         A.  Hina Shaw.

23         Q.  Hina Shaw.  And how many people attended

24     that meeting?

25         A.  I have no idea.  Maybe 20 or so.  I don't

8/14/2006  Allen, Peter

1    know.

2         Q.  And was it named plaintiffs and contractors

3    and the lawyers?

4         A.  I don't believe the -- it might have been.

5    It may have been -- no, it was before February, now

6    that I think about it.  It was -- I don't remember

7    when it was.  I want to say sometime mid to late

8    last year.

9             And I didn't, at the time didn't know who

10   was a named plaintiff and who wasn't, so I couldn't

11   tell you.

12        Q.  Contractors were there mainly?

13        A.  Sure.  Ex -- there was a lot of ex-people

14   there.  I don't know if there was any other existing

15   drivers there or not.  I don't -- I don't know that

16   there was.  I don't know.

17        Q.  Were there people there both from the Home

18   Delivery and the Ground side?

19        A.  Yes.

20        Q.  What was discussed?

21             MS. ZERGER:  I'm going to object in terms

22   of attorney-client privilege.

23             MR. GARRISON:  I don't know how an

24   informational meeting with people who are not your

25   clients -- are you going to allow him to answer?

2/5/2007  10:35 AM                                              308

8/14/2006  Allen, Peter

1          MS. ZERGER:  I understand.

2          MR. GARRISON:  You're objecting, you're not

3     instructing?

4          MS. ZERGER:  To the extent that there was

5     conversation between him and his attorney in a

6     representational capacity, I would direct him not to

7     answer.  To the extent it was informational, you may

8     answer.

9     BY MR. GARRISON:

10         Q.  Okay.  So don't tell me about anything that

11    was said between you and your lawyers, but if things

12    were discussed informational to nonplaintiffs, what

13    was said?

14         A.  I don't know who was a plaintiff and who

15    was a nonplaintiff in the Ground case, so I couldn't

16    tell you.  I don't know.  I don't know the

17    individuals that were there, so from the Ground side

18    I have no idea.

19         Q.  Was anyone there from the HD side who you

20    knew not to be a named plaintiff at that time?

21         A.  There may have been.  I just don't remember

22    all the people there, so I wasn't paying attention.

23         Q.  You don't know?

24         A.  No.

25         Q.  What have you done, if anything, to keep

**8/14/2006  Allen, Peter**

1    track of the status and development of this lawsuit,

2    other than talking with your lawyers?

3        A.  I haven't done anything.  I get my

4    information from them.

5        Q.  And I don't want to know what you said, but

6    how frequently do you communicate with them?

7        A.  It spans months.  And then depending on,

8    most recently because of the depositions, it's been

9    more frequent because of getting scheduling and

10   everything else involved.  But prior to that, not

11   that often, unless they needed -- during discovery

12   then of course, but other than that, not very often.

13       Q.  How many times have you communicated with

14   them in the last six months?

15       A.  I don't know.  Maybe six, eight times,

16   maybe.

17       Q.  How about the six months before that?

18       A.  Maybe three or four.

19       Q.  Now, we talked about already that you

20   gathered expense documents for this case and you

21   gave them to your lawyer?

22       A.  Right.

23       Q.  Have you gathered any other documents in

24   this case?

25       A.  No.

**8/14/2006  Allen, Peter**

1      Q.  Have you looked for any other documents in

2    this case?

3      A.  No.

4      Q.  Have you been provided a copy of a request

5    for documents that describe categories of documents

6    to be searched for?

7      A.  No.

8      Q.  Do you keep copies of your tax returns?

9      A.  Yes.

10     Q.  How far back do you have them?

11     A.  Probably 1984, probably.

12     Q.  That's good recordkeeping.

13     A.  Somewhere around there, you know.  I don't

14   know exactly, but I know I keep more than I need to.

15     Q.  Give or take.  Do you believe FedEx

16   controls the manner and means by which you service

17   your route?

18     A.  I believe to an extent, yes, because they

19   can -- they tell me what kind of vehicle I use.

20   They tell me when I can leave because I have to wait

21   for the sort to be done.  So they determine time of

22   departure for the most part.  And the training, I

23   believe, specified how I should deliver the packages

24   in the most efficient way, so that's the way I do

25   it.

8/14/2006  Allen, Peter

1        So pretty much I believe they do.  They had

2    us trained under the Smith system and basically tell

3    us that's the way we need to drive.

4        Q.  Anything else?

5        A.  No.

6        Q.  Now, you can't come in earlier than a

7    certain time either because the terminal is closed

8    or the sort's not done, but you can come in later if

9    you want, right, later than you do?

10       A.  Yes.  But if you come in too late, again,

11   and you've got the volume, you're not going to get

12   your package delivered.  So -- and because you don't

13   know on a daily basis what your packages are going

14   to be, you have no clue.

15       So say I wanted to come in at 12:00 one

16   day, and I did because I had something going on, and

17   I came in with 200 stops, I'd end up DNAing

18   packages.

19       Q.  And I'm not suggesting you come in at noon,

20   but you could come in at 7:00 or 8 as opposed to

21   6:00, couldn't you?

22       A.  Yes.

23       Q.  And you mentioned the training.  They

24   trained you about the most efficient way to do your

25   deliveries.  You choose to follow those methods

**8/14/2006  Allen, Peter**

1   because they are the most efficient?

2        A.   Actually, the training didn't come across

3   as we had a choice.  It came across as that's the

4   way you will deliver.  When you're driving as a temp

5   and even evaluated other times, they evaluate you to

6   those standards.

7        Q.   Now, you choose the order of deliveries,

8   right?

9        A.   Well, I choose the manifest order, yes.

10       Q.   Right.  Because it's the most efficient?

11       A.   It's the way that they suggest I deliver,

12   yes.

13       Q.   But that's a suggestion, right, you make

14   that choice?

15       A.   Yes.

16       Q.   And you follow it because it's the most

17   efficient, which makes sense, right?

18       A.   Correct, because it's the most efficient

19   and cheapest way for me to deliver, yes.

20       Q.   Do you -- with respect to your deliveries,

21   do you do anything else differently than the

22   training provided?

23       A.   With respect to my deliveries, do I do

24   anything else differently?

25       Q.   How you deliver, how you make them.

**8/14/2006  Allen, Peter**

1      A.  I don't believe so.

2      Q.  Could you if you wanted to?

3          MS. ZERGER:  Objection.  Speculation.

4          THE WITNESS:  Yeah, I don't know.  I mean,

5  it's possible I could, but would I get written up,

6  possibly.

7  BY MR. GARRISON:

8      Q.  So you just don't know?

9      A.  So I don't know.

10     Q.  As a contractor do you want to be

11  represented by a union?

12     A.  I don't know.  I'm not going to be a

13  contractor for much longer, so I really don't care.

14     Q.  You don't have a preference one way or the

15  other?

16     A.  I don't care.  I'm not going to be there,

17  so I don't care.

18     Q.  Are you claiming that you should have

19  received employee benefits from FedEx?

20     A.  I'm claiming if they choose to treat me as

21  an employee, then yes, I should be treated and

22  receive the appropriate benefits that come with

23  employee status.

24     Q.  I hear what you're saying, but that's not

25  responsive.

**8/14/2006  Allen, Peter**

```
1              Is one of your claims in this lawsuit that
2     you should have been provided benefits?
3          A.  Yes.
4          Q.  Okay.  Have you ever made a claim to FedEx
5     for benefits?
6          A.  Can you be more specific as far as
7     benefits?
8          Q.  Sure.  Vacation, have you ever told FedEx,
9     "Hey, I want to take a paid vacation on you"?
10         A.  No, because it would be fruitless if I did.
11    Their response would have been laughter.
12         Q.  Paid sick days?
13         A.  No.
14         Q.  Health insurance?
15         A.  I asked them about insurance and they
16    directed me to their to a company that they
17    recommend we buy insurance through.
18         Q.  And did you do so?
19         A.  No.
20         Q.  Did you ever tell them, "Hey, you owe me
21    employee insurance and I want to make a claim"?
22         A.  Every day -- no, I'm just kidding.  No, I
23    didn't.
24              MR. GARRISON:  No.  Okay.  Let's go off the
25    record to change the tape.
```

**8/14/2006  Allen, Peter**

1     THE VIDEO OPERATOR:  This marks the end of

2  Tape No. 4 in the deposition of Peter Allen.  Going

3  off the record.  The time is 4:41.

4     (Off the record)

5     THE VIDEO OPERATOR:  This marks the

6  beginning of Tape No. 5 in the deposition of Peter

7  Allen.  Back on the record.  The time is 4:43.

8  BY MR. GARRISON:

9     Q.  Okay.  Mr. Allen, we were talking about

10  benefits when we went off the record.  And I think

11  you confirmed that, at least the categories we

12  talked about, you never requested those benefits

13  from FedEx, did you?

14     A.  No.

15     Q.  And did you have any expectation that FedEx

16  would provide those things to you as a contractor?

17     A.  Not initially, no.  I mean --

18     Q.  And in fact, the operating agreement

19  provides that they won't pay those benefits to you;

20  is that right?

21     A.  It states that, I'm sure.

22     Q.  Okay.  As a contractor, you also were

23  responsible for your own taxes, right?

24     A.  Yeah, because FedEx sends me a 1099, so

25  that's the only way I know how to file it.

**8/14/2006  Allen, Peter**

1    Q.  I understand that.  But you didn't have an

2    expectation that, as a contractor under your

3    operating agreement, that FedEx would pay -- for

4    example, do withholding tax for payroll, did you?

5    A.  No.

6    Q.  Okay.  And the contract actually provides

7    that the company won't, right?

8    A.  I don't know if it states that

9    specifically.  I have no idea.

10    Q.  Okay.  Let's look at page 18, Section 4.2.

11    Sort of in the middle of that section it says, "FHD

12    shall have no responsibility to make deductions for

13    or to pay wages, benefits, health, welfare and

14    pension costs, withholding for income taxes,

15    unemployment insurance premiums, payroll taxes,

16    disability insurance premiums, social security

17    taxes, or any other similar charges with respect to

18    Contractor or Contractor's employees."

19    Did I read that accurately?

20    A.  You did.

21    Q.  So you didn't expect FedEx to provide you

22    these things based on the deal you struck with them,

23    right?

24    A.  No.  I didn't draw up any of this contract,

25    but no, what they wrote in there, I didn't expect

**8/14/2006  Allen, Peter**

1      them to pay any of it, no.

2          Q.  Why do you believe now that FedEx should

3      pay for your benefits?

4          A.  Again, because of the fact the way they

5      controlled us.

6          Q.  And when in time did you first decide

7      that --

8          A.  There was no specific time period that I

9      decided it just over -- I mean, over the entire

10     period I've been working there it's consistently

11     control issues with them, so --

12         Q.  So have the control issues changed or have

13     they been pretty consistent over time?

14         A.  Pretty much consistent as far as

15     controlling our situations.

16         Q.  For all the reasons you've already

17     described?

18         A.  Yes.

19         Q.  Are you claiming that you've been defrauded

20     by FedEx?

21         A.  Yes.

22         Q.  And how do you believe FedEx has committed

23     fraud against you?

24         A.  Because basically in the training and

25     talking with individuals they told us that we had --

**8/14/2006  Allen, Peter**

1    we were contractors, we're self-employed contractors

2    and we had a say in everything we did, when, in

3    fact, we didn't.

4           So they -- I believe they fraudulently told

5    us incorrect information just to get us to purchase

6    a vehicle and establish a route.

7           Q.  So what misrepresentations do you claim

8    they made to you?

9           A.  The fact that, again, that we had a say in

10   how we -- you know, in what we delivered, when we

11   delivered, when, in fact, we don't.

12          Q.  What else?

13          A.  I can't think of anything off --

14          Q.  Now, who made these misrepresentations to

15   you?

16          A.  Across the board.  I mean, all the terminal

17   managers.

18          Q.  So the three gentlemen we discussed

19   earlier?

20          A.  Yes.

21          Q.  Anybody else?

22          A.  I don't believe so.

23          Q.  What specifically did they tell you that

24   you believe was a misrepresentation?

25          A.  I can't recall anything specific.

**8/14/2006  Allen, Peter**

1       Q.   Now, is your fraud claim in this lawsuit

2    based on oral misrepresentations or written

3    misrepresentations, or both?

4       A.   Both.

5       Q.   What written misrepresentations do you

6    claim the company made to you?

7       A.   Well, I believe in the operating agreement.

8       Q.   What statements?

9       A.   The compensation for flexing off your route

10   where you're supposed to be paid.  That never

11   happens.

12      Q.   Anything else?

13      A.   I don't know.  I can't think of it right

14   now without going through this completely.

15      Q.   Which of these representations, either oral

16   or written do you -- strike that.

17           These misrepresentations you identified, do you

18   believe that FedEx knew and intended them to be false

19   when it made them to you?

20      A.   Well, I can't speak for them, no.  I don't

21   know.

22      Q.   So you don't know one way or the other?

23      A.   No.

24      Q.   Did you rely on these alleged

25   misrepresentations that you identified?

**8/14/2006  Allen, Peter**

1      A.  Excuse me?

2          Q.  I said, did you rely on these alleged

3      misrepresentations that you identified?

4          A.  Did I rely on them?

5          Q.  Yes, sir.

6          A.  I don't --

7              MS. ZERGER:  Well, I'm going to object.

8      It's vague and ambiguous.  Can you -- for what

9      purpose?

10             THE WITNESS:  I don't understand anyways

11     the question.  I mean, did I rely on the

12     misrepresentations for what?

13     BY MR. GARRISON:

14         Q.  Did you take any action based on statements

15     or written -- statements, either verbal or written,

16     that were provided to you by the company that you

17     now believe to be misrepresentations?

18         A.  Oh, did I pursue any of them, basically,

19     with the company, is that what you're asking as far

20     as trying to resolve these, or --

21         Q.  No, what I'm saying is the company made

22     certain statements to you.

23         A.  Right.

24         Q.  You believe, whether written or verbal, you

25     now believe those -- or some point in the past you

**8/14/2006  Allen, Peter**

1    formed a belief that sitting here today you believe

2    those were misrepresentations.  Do you follow that

3    part?

4        A.  Yes.

5        Q.  Did you take action based on those

6    statements that you now believe to be

7    misrepresentations thinking that they weren't

8    misrepresentations, that the company was just making

9    statements to you?

10       A.  I'm not sure what you're asking.  I don't

11   understand it.

12       Q.  The statements or what you believe to be

13   misrepresentations, those statements that were made

14   to you.

15       A.  Right.

16       Q.  Did you treat those as true and take action

17   based on them?

18       A.  Treat them as true statements and take

19   action -- do you mean as far as what FedEx was

20   telling me to do, did I take action that way or

21   against -- I don't understand.

22       Q.  I guess I'm just asking, did you take any

23   action or not take any action based on reliance on

24   whatever was communicated to you that you now

25   believe was a misrepresentation?

8/14/2006  Allen, Peter

1       A.  I don't know.

2           MR. GARRISON:  I'd like to mark this as the

3   next exhibit, please.

4           (Whereupon, Deposition Exhibit 9 was marked

5           for identification)

6   BY MR. GARRISON:

7       Q.  Mr. Allen, I've handed you what's been

8   marked as Allen Exhibit 9.  It's a multi-page

9   document entitled, Addendum Response of Peter Allen

10  to Defendant's First Set of Interrogatories."

11          Do you recognize this document?

12      A.  Yes.

13      Q.  And is this your addendum response to

14  interrogatories that were served by the company?

15      A.  Yes.

16      Q.  What did you do to prepare these responses?

17      A.  Answered discovery questions and then my

18  lawyers drafted this up.

19      Q.  So you didn't write this up yourself?

20      A.  No, I did not.

21      Q.  I don't want to know the substance, you

22  said answered discovery questions.  Did you answer

23  questions -- did you look at the request from the

24  company and then answer them?

25          MS. ZERGER:  We're getting real close here

**8/14/2006  Allen, Peter**

1    to the content of conversations between him and his

2    attorneys, and I'm going to object to the extent

3    that it's asking that and caution the witness.

4    BY MR. GARRISON:

5        Q.   I'm intentionally not asking that.  And I

6    don't want to know what you discussed with your

7    lawyers.  If your lawyer instructs you not to

8    answer, that's fine, but otherwise she can make her

9    objections and you need to answer.

10           You testified that you answered discovery

11   questions.  What did you mean by that?

12       A.   Just discovery -- I mean things -- that

13   during discovery we had conversations and I answered

14   questions.

15       Q.   Did you look at questions that had been

16   sent to your side by FedEx, questions specific --

17   well, these are responses to what are called

18   interrogatories, which are just written questions.

19           Did you look at the actual requests from

20   FedEx?

21       A.   Requests from FedEx?

22       Q.   Yes.

23       A.   No, I never saw anything from FedEx.

24       Q.   Okay.  Did you review this response before

25   it was final -- strike that.

**8/14/2006  Allen, Peter**

1          Did you review this response before you

2    signed it?

3          A.  Before I signed it, yes.

4          Q.  Okay.  And is everything in here truthful

5    and accurate?

6          A.  Number 4, I've already explained it to you.

7    But no, because when I signed this I thought that

8    when they said assist, I thought they meant as a

9    worker that went along with me on my route when, in

10   fact, yes, I have had people drive for me.

11         Q.  The people you explained, right?

12         A.  Yes.

13         Q.  Okay.  But you never had someone ride along

14   in your truck and help you?

15         A.  No.  And I thought that's what it meant,

16   so --

17             I believe the rest to be true, yes.

18         Q.  In fact, on page 14 you signed this subject

19   to perjury, right?

20         A.  Yes.

21         Q.  And that is your signature on page 14?

22         A.  Just a minute.  There it is.  Yes, it

23   appears to be, yes.

24         Q.  And did you date it there where it says,

25   "Executed the 12th day of April 2006 in Yuba City"?

**8/14/2006  Allen, Peter**

1       A.  Yes, I did.

2       Q.  Do you know what perjury means?

3       A.  Yes.

4       Q.  Means you got to tell the truth subject to

5  criminal sanction, right?

6       A.  Yes, sir.

7       Q.  Okay.  If you'd please turn to Response No.

8  1.

9       A.  Okay.

10      Q.  In the second paragraph, I guess it's three

11  going to the forth line, it says, "FedEx required me

12  to report for work each day with my truck clean,

13  free of dents, rust or other visible defects."

14          Did I read that correctly?

15      A.  Yes.

16      Q.  Now, in Section 1.12 of the operating

17  agreement, which is page 9, you contracted to

18  maintain your equipment, which is your vehicle, in a

19  clean and presentable fashion, free of body damage

20  and extraneous markings, didn't you?

21      A.  Yes.

22      Q.  Okay.  Now, the next sentence in Special

23  Interrogatory No. 1, says, "FedEx did not permit me

24  to use my vehicle for any purpose other than the

25  delivery or pick-up of packages for FedEx's

**8/14/2006  Allen, Peter**

1    customers unless I covered up the huge FedEx logo."

2         A.  Correct.

3         Q.  Now, if you would look at Section 1.5, it's

4    page 4 of the operating agreement.  It says,

5    "Contractor may use the Equipment," which is your

6    truck, "for other commercial or personal purposes

7    when it is not in the service of FHD, with the

8    understanding that all such identifying numbers,

9    marks, logos, insignia will be removed or masked (by

10   paper or plastic overlay) when the Equipment is so

11   used."

12        A.  Correct.

13        Q.  So you contracted that the deal would be if

14   you were going to use your truck when you weren't

15   working with FedEx or doing FedEx work that you

16   needed to cover up the logos, right?

17        A.  Yeah.  Have you ever tried doing that

18   driving 55 miles an hour down the road?

19        Q.  Sir, I can appreciate it may be a

20   challenge, but I'm asking, you contracted that that

21   would be the deal, right?

22        A.  Yes.

23        Q.  The next sentence in your interrogatory

24   says, "FedEx required me to come to work wearing a

25   FedEx uniform with company logo," and then it goes

8/14/2006  Allen, Peter

1       on.

2                    Section 1.12 of your operating agreement,

3       which is page 9, in the middle says, "Each person

4       having contact with the public under the provisions

5       of this Agreement will wear an FHD-approved uniform

6       maintained in good condition, and will otherwise

7       keep his or her personal appearance consistent with

8       reasonable standards of good order as maintained by

9       competitors and promulgated from time to time by

10      FHD."

11                   So you contracted to wear an FHD-approved

12      uniform and to comply with their standards, right?

13           A.   Yes.  As I told you before, in the

14      training, the training contradicted what the

15      terminal managers were telling us.  Their training

16      said -- the trainers said we could wear black or

17      brown shoes.  I wore brown shoes and was told, no,

18      you got to wear black shoes, so there wasn't any

19      consistency there.

20           Q.   How else did it contradict it?

21           A.   Just mainly that.

22           Q.   Any other way?

23           A.   Not to my knowledge.  I mean, the only

24      other issue with that was that I had an individual

25      say he was the receptionist at the terminal at the

8/14/2006  Allen, Peter

1    time.  I came in one day and they had reflective

2    strips on the jackets, and one of them was unsewn.

3    And he said, "You need to get a new jacket," and

4    basically he went in the closet and got me a new

5    jacket and made me give that one up right away.

6        Q.  The next sentence in your interrogatory

7    response says, "I was required to keep the FedEx

8    uniform in a condition acceptable to FedEx, clean

9    and free of any damage."

10          In this Section 1.12 of your operating

11   agreement you agreed to wear an FHD uniform

12   maintained in good condition, correct?

13       A.  Yes, because if I didn't I wouldn't have a

14   contract, so I didn't have any choice in the matter.

15   I had to do it.

16       Q.  Well, this is the deal you struck, right?

17       A.  I didn't strike any deal.  That's the deal

18   that was given to me.  I didn't have any say in this

19   contract.  I only had a say in whether I could sign

20   it or not.  No say in the content whatsoever.

21       Q.  Nobody forced you to be a FedEx contractor,

22   did they?

23       A.  You're right, but I had to purchase my

24   vehicle before I could sign the contract, so had I

25   not signed the contract, I would have had a $30,000

**8/14/2006  Allen, Peter**

1   vehicle and nothing to do with it.  I would have

2   been paying with no job to use it on.  A piece of

3   business equipment I bought prior to signing the

4   contract, never seeing the contract.  And if I

5   hadn't signed it, I would have been stuck with

6   $30,000.

7       Q.  Did you ask to see the contract before you

8   bought your vehicle?

9       A.  No, I didn't know how the whole process

10  worked, so I just went along with the flow.  I

11  assumed that they were going to be up front with me

12  and tell me how things operated, so I went with what

13  they told me.

14      Q.  Okay.  So you did not ask to see the

15  contract before you bought your vehicle?

16      A.  No.

17      Q.  If you please turn to page 2 of your

18  interrogatory response.  At the end of that first

19  long paragraph, it says, "Any time FedEx determined

20  that I breached any of the many 'Safe Driving

21  Standards,' FedEx could discipline me by terminating

22  my indemnity and requiring me to purchase expensive

23  insurance that I could not afford."

24          Did FedEx ever threaten to terminate your

25  indemnity?

**8/14/2006  Allen, Peter**

1          A.   No, they stated in your contract that if

2     you received so many -- I think it even lists it --

3     so many points on your driving record, then you may

4     have to go and purchase your own insurance,

5     basically.

6          Q.   But they never threatened yours, your

7     indemnity?

8          A.   No.

9          Q.   And they never terminated your indemnity?

10         A.   No.

11         Q.   The contract provides under certain

12    circumstances they could, in fact, terminate your

13    indemnity, right?

14         A.   Yes.

15         Q.   The last paragraph, still on page 2, starts

16    out saying, "FedEx terminal management conducted

17    Customer Service Rides."

18              You contracted that they could conduct up

19    to four per year, correct?

20         A.   Yes.

21         Q.   Next sentence, "After the ride, I received

22    a form evaluating my work and telling me how to

23    'improve'".

24              Were those suggestions or requirements?

25         A.   Any time they said anything to me I took it

1998

8/14/2006  Allen, Peter

1    as a requirement.

2         Q.  Did you ask, "Is this a requirement?"

3         A.  The threat of a contract termination is

4    always in the air with everyone there.  They are

5    afraid to do anything that doesn't follow suit with

6    FedEx's wishes.  So most of the time when -- whether

7    they are suggestions or not, most people don't know.

8    They just take them as a requirement and do them.

9         Q.  Okay.  But you didn't ask for clarification

10   whether it was a suggestion or a requirement?

11        A.  No, I did not.

12        Q.  It goes on to say, "FedEx's terminal

13   management 'mapped' and told me the 'most efficient'

14   way to run my route."

15            What is the mapped, is that the

16   turn-by-turn?

17        A.  Yes.

18        Q.  And you testified you follow that because

19   it's the most efficient, right?

20        A.  Yes.

21        Q.  It would be less efficient, but if you

22   wanted to, you could choose not to follow it, right?

23        A.  Again, if I choose to spend more money to

24   perform those duties, yes, I could.

25        Q.  If you would please turn to the next page

2/5/2007  10:35 AM

**8/14/2006  Allen, Peter**

1    of your interrogatory responses.  The first full

2    paragraph, not the partial one at the top, it says,

3    "FedEx 'flexed' packages to me, requiring me to

4    delivery -- deliver -- packages outside of my route

5    to meet its needs."

6            You contracted that FedEx could add packages to

7    your route from time to time, right?

8        A.  Yes, with some kind of notice, as it states

9    in the contract.  I should be given some kind of

10   notice.  And if you consider when you get there to

11   load your vehicle notice, then, if that's

12   sufficient, then so be it.  But I don't consider it

13   to be sufficient notice.

14       Q.  Where in the contract does it talk about

15   the notice piece?

16       A.  I don't know exactly, but I recall us

17   reading about it and they said -- but I don't

18   remember exactly where it says it.  I'd have to read

19   through the whole contract.

20       Q.  Section 1.10(a), which is on page 7, we did

21   read about.  And that talks about delivering

22   everything in your primary service area and in such

23   other areas as contractor may from time to time be

24   asked to service.

25            So I think that latter part is where the

**8/14/2006  Allen, Peter**

1    additional comes from, but where I don't see is the

2    notice.  You think it's in there somewhere?

3         A.  I thought it was, and I know I've had a

4    discussion with the terminal manager, with Scott

5    about it, about being reasonable notice to let us

6    know.  Because of the fact that, you know,

7    regardless of what they say, we still like to make

8    plans, and we were never able to do that because we

9    didn't know from a day-to-day basis whether they

10   were going to flex us or not.

11        So anybody trying to make plans for any

12   time in the afternoon or evening were just hoping

13   that they could follow through with their plans,

14   their personal plans, so --

15        Q.  Now, two paragraphs down it says, "I could

16   not and did not deliver packages for any company

17   other than FedEx."

18        A.  Where --

19        Q.  I'm still on your special interrogatories,

20   page 3.  It's the beginning of the last paragraph at

21   the bottom of the page.

22        A.  Okay.

23        Q.  "I could not and did not deliver packages

24   for any company other than FedEx."

25        Section 1.5 of your operating agreement

**8/14/2006  Allen, Peter**

1    says, it's the second sentence, "Contractor may use

2    the Equipment for other commercial or personal

3    purposes," and then that's when you've got to cover

4    up the logo.

5            So I guess I don't quite understand your

6    response.  What does that mean?

7            A.  All of that tied into your time of service

8    as well.  So if you worked -- I know if you worked

9    eight hours for another company, being that I was

10   driving a 550, that added on to the time of service

11   that I could drive for FedEx as well.

12           Q.  So you'd be out of time?

13           A.  Yes.  And they told us that, you know --

14   I'm trying to think of where I --

15           Q.  But that's a DOT requirement, right?

16   That's not a FedEx requirement?

17           A.  Correct.  But also, I mean, at the same

18   time -- I mean, I couldn't go in there -- again,

19   like I said, if I had a morning job, I couldn't go

20   in there at 12:00 and get everything that they had

21   for me delivered.  There's just no way.

22           Q.  But you made that decision.  FedEx didn't

23   tell you you can't deliver packages for any other

24   company, did it?

25           A.  No.

**8/14/2006  Allen, Peter**

1        Q.  If you turn to page 4, please, of your

2    interrogatory responses.  It says, "I was required

3    to timely deliver packages assigned to me to FedEx's

4    customers," do you see that?

5        A.  And that's where again?

6        Q.  At the very top of page 4?

7        A.  First sentence?

8        Q.  Yes, sir.

9        A.  Second sentence.  No, first.

10       Q.  First complete sentence.

11       A.  Gotchya, yes.

12       Q.  Now, Section 1.10(a) of your operating

13   agreement provides that you'll provide daily

14   delivery and pick-up services to consignees and

15   shippers on days and at times which are compatible

16   with their schedules and requirements.

17           So you contracted to pick up or deliver at

18   times that were convenient for the shippers and

19   consignees, right?

20       A.  I signed the contract, yes.

21       Q.  And then the next sentence says, "As

22   required to timely pick up packages assigned to me

23   from FedEx's customers."

24       A.  Again, like I told you, I don't do a lot of

25   pick-ups, so --

**8/14/2006  Allen, Peter**

1        Q.  I understand.  But again, you contracted to

2    do both pick-ups and deliveries at times that were

3    convenient to the customers, right?

4        A.  According to this, yes.

5        Q.  According to the operating agreement that

6    you signed?

7        A.  Yes.

8        Q.  The first full paragraph on page 4, second

9    sentence, "I was told I needed to purchase Workers'

10   Compensation insurance through a FedEx-sponsored

11   group plan using Protective Insurance and the cost

12   was deducted from my pay."

13           Do you see that?

14       A.  Yes.

15       Q.  Did you purchase through Protective?

16       A.  Yes.

17       Q.  Did you have to purchase through

18   Protective?

19       A.  I didn't know anywhere else to go.  I

20   mean --

21       Q.  Were you told you could only purchase

22   through them?

23       A.  No.

24       Q.  Same question with your deadhead insurance?

25       A.  No.  But that was a suggestion --

**8/14/2006  Allen, Peter**

1    basically, like I said, they came across, this is --

2    the way it was presented to me, this was the

3    cheapest -- there's no way you can find it any

4    cheaper.  "This is the best because we get group

5    rates, so I make the suggestion that you take this

6    insurance."

7            And because, again, it was a time issue.

8    I'd already bought the vehicle, purchased the

9    vehicle, and I needed to start making money to pay

10   for it, so --

11       Q.  And then the next paragraph says, "I had no

12   choice but to pay for the Business Support Package,"

13   we're looking at the interrogatories, the last

14   paragraph.

15       A.  On which, on page 4 again?

16       Q.  Yes, sir.

17       A.  Last paragraph, okay, I see it now.

18       Q.  Now, the business support package, we've

19   talked about this.  You didn't look into whether you

20   could get a scanner elsewhere, did you?

21       A.  No.

22       Q.  And you didn't look into whether you could

23   get uniforms elsewhere, did you?

24       A.  No.  But again, we were required to wear

25   the uniforms.  We were required to deliver with a

**8/14/2006  Allen, Peter**

1    scanner, so -- and I wouldn't have a clue, and I'm

2    sure no one else does, where to look for these

3    things.

4         Q.  But you didn't ask, did you?

5         A.  I asked them if we -- I asked them, is it

6    possible to deliver without a scanner.

7         Q.  And they said no, I take it?

8         A.  Yes.

9         Q.  Did you ask them to help you acquire a

10    scanner outside the business support package?

11        A.  No.

12        Q.  At the bottom of page 4 it says, of your

13    interrogatories again, "FedEx determined the rate,"

14    it says "that", but, "the rate I was paid for 'van

15    availability,' 'core zone,' and all other aspects of

16    my pay."

17             Those were the amounts that you contracted

18    for in your operating agreement, right?

19        A.  Yeah, the amounts that they stipulated in

20    there, yes.

21        Q.  Okay.  But you agreed to that when you

22    signed the contract?

23        A.  Sure.

24        Q.  That was the deal you already struck?

25        A.  Again, I already purchased the vehicle, so

**8/14/2006  Allen, Peter**

1    what choice did I have?  I had to make money to pay

2    for that vehicle.

3         Q.  Now, over time, some of those settlements

4    went up.  I assume you don't have a problem getting

5    paid more for doing the same work?

6         A.  No, but some of them went down as well.

7              MS. ZERGER:  Objection.  Argumentative.

8    BY MR. GARRISON:

9         Q.  Which ones went down?

10        A.  Your core zones go down every year.

11        Q.  And the agreement expressly contemplates

12   that the core zone goes down as density increases,

13   right?

14        A.  Sure.

15        Q.  So that's what you agreed to; is that

16   right?

17        A.  That's what I signed, yes.

18        Q.  On page 6 of your interrogatories, three

19   lines in, it says, "FedEx gave me at the beginning

20   each day a chart or map of my route and a manifest

21   which listed all of my deliveries in the order I

22   should deliver them."

23            We've discussed that you picked to deliver

24   them in that order or you decided to deliver them in

25   that order because it was the most efficient,

8/14/2006  Allen, Peter

1    correct?

2         A.  Correct.

3         Q.  But you could vary from that if you wanted

4    to, right?

5         A.  Like I said, if I wanted to spend more

6    money for fuel, yes, I could.

7              MR. GARRISON:  No more questions.

8              THE VIDEO OPERATOR:  Going off the record.

9    The time is 5:21.

10             (Recess taken)

11             THE VIDEO OPERATOR:  Back on the record.

12   The time is 5:23.

13

14                      EXAMINATION

15   BY MS. ZERGER:

16        Q.  Okay.  Mr. Allen, you recall you testified

17   that when you got your route in March of '03 you

18   didn't pay for that route.

19             Do you recall that?

20        A.  Yes, I do.

21        Q.  And can you tell us why you didn't pay for

22   it?

23        A.  Because at the time they didn't have enough

24   people to fill the routes, so they were just filling

25   routes that were coming available, so --

**8/14/2006  Allen, Peter**

1       Q.  They were just getting drivers in?

2       A.  Correct.

3       Q.  Okay.  You testified earlier that in the

4   morning after your van was loaded, everything was

5   put into the scanner, that you were required to give

6   the scanner to the terminal manager or service

7   manager and that you couldn't leave before that.

8           Do you recall that testimony?

9       A.  It was given to an employee Robert.

10      Q.  Robert?

11      A.  Okay.

12          MR. GARRISON:  Objection.  Misstates the

13  testimony.

14  BY MS. ZERGER:

15      Q.  Okay.  So you gave it to Robert.  And I

16  believe there was a question as to whether, from

17  opposing counsel, as to whether you could leave

18  without turning in the scanner.  And you

19  indicated -- well, let me just ask you.

20          Could you leave without turning in the

21  scanner?

22          MR. GARRISON:  Objection.  Asked and

23  answered.

24          THE WITNESS:  No.

25          MS. ZERGER:  You can answer.

8/14/2006  Allen, Peter

1        THE WITNESS:  No, you could not leave

2    without turning in the scanner.

3    BY MS. ZERGER:

4        Q.  Can you explain why you say that?

5        A.  Sure.  Because your delivery information

6    had to be uploaded in order for tracking purposes.

7    So we had to have our scanner -- you could leave

8    without your manifest and your turn-by, but your

9    scanner had to be turned in and you had to utilize

10   your scanner to deliver.

11       Q.  So if you left without turning in your

12   scanner and getting it uploaded, how would it

13   function during the day?

14       A.  I mean, you'd have to manually input every

15   package, meaning you'd have to type in the address,

16   everything.

17       Q.  Okay.  All right.  And would it surprise

18   you to learn that some drivers left without turning

19   in their scanner?

20       MR. GARRISON:  Objection.  Asked and

21   answered.  Assumes facts not in evidence.

22       THE WITNESS:  Yes.  Because previously I

23   thought he meant without manifests.  But yes, it

24   would.

25   BY MS. ZERGER:

2/5/2007  10:35 AM

**8/14/2006  Allen, Peter**

1        Q.   You're not aware that ever happened?

2        A.   Because that increases your workload

3    tremendously when you've got to manually input every

4    address into that scanner.

5        Q.   Okay.  And you're not aware of anybody

6    doing it that way?

7        A.   No.

8            MR. GARRISON:  Objection.  Leading.

9            Mr. Allen, would you please let me state my

10   objections before you answer.

11           THE WITNESS:  Sorry.

12           MR. GARRISON:  Thank you.

13   BY MS. ZERGER:

14       Q.   You testified earlier that it was important

15   to your decision to come to work for FedEx that you

16   would be an independent contractor.

17           Do you recall that?

18       A.   Can you repeat that again, please?

19       Q.   You testified that it was important in

20   making a decision to come to work for FedEx that you

21   would be an independent contractor?

22           MR. GARRISON:  Objection.  Misstates the

23   witness' testimony.

24           Mr. Allen, would you please let me object

25   before you answer.

**8/14/2006  Allen, Peter**

1              THE WITNESS:  Yes.

2    BY MS. ZERGER:

3         Q.  You can answer, okay.  Did it turn out that

4    you were an independent contractor?

5              MR. GARRISON:  Objection.  Calls for a

6    legal conclusion.

7    BY MS. ZERGER:

8         Q.  As you understood the term.

9         A.  No.  I felt that we weren't independent

10   contractors.  Again, because there were so many

11   constraints on us and we had no control over as far

12   as our operation or our business.

13        Q.  We've had a lot of testimony about what is

14   contained in the operating agreement in terms of

15   core zone rates, fuel reimbursement rates,

16   requirements for appearance, for trucks, et cetera.

17             Were you able to negotiate any part of that

18   operating agreement before you signed it with

19   someone from FedEx?  Was there a negotiation

20   process?

21             MR. GARRISON:  Objection.  Asked and

22   answered.

23             THE WITNESS:  No, there wasn't.

24   BY MS. ZERGER:

25        Q.  Okay.  You mentioned a service cross.

**8/14/2006  Allen, Peter**

1    Could you tell us what a service cross is?

2        A.   Yes.  On a daily basis, when we do not

3    deliver a package for whatever reason, we're

4    required to put a cross on the box, mark down what

5    code we entered in the scanners for nondelivery,

6    whether it be an 07, or whatever the code may be, we

7    put the code on there.  We'd also put our van

8    number, the time and the date.

9        Q.   Okay.

10       A.   Which was pretty much a duplication of

11   effort of the portion of the door knocker that we

12   put on there as well.

13       Q.   Okay.  Could you choose not to use the

14   service cross?

15       A.   Could you choose -- no, as far as I know,

16   it was a mandatory item to do.  If you didn't, they

17   told you, "Why aren't you doing service crossings?

18   You need to do these.  If you don't do these, this

19   could put again your contract in jeopardy."

20       Q.   Okay.  Did you have any special training in

21   safe driving before you either -- before or after

22   you came to work for FedEx?

23       MR. GARRISON:  Objection.  Vague and

24   ambiguous as to special training and safe driving.

25       THE WITNESS:  Yes, the Smith system through

8/14/2006  Allen, Peter

1    FedEx.

2    BY MS. ZERGER:

3         Q.  Okay.  And could you have chosen to use a

4    different system for safe driving?

5              MR. GARRISON:  Objection to the extent it

6    calls for a legal conclusion.

7              THE WITNESS:  No.  We had to complete the

8    training or else we couldn't drive for FedEx.

9    BY MS. ZERGER:

10        Q.  Okay.  Would you look at Exhibit 8 again.

11   And I believe that you -- it's right there on top.

12        A.  Okay.

13        Q.  I believe that you testified that this is

14   not your FedEx ID number; is that correct?

15        A.  Correct.

16        Q.  All right.  And what about a contract

17   number, are you familiar with that?

18        A.  I don't know.  Like I said, I'm not

19   familiar with the contract number.  The only two

20   numbers I use for FedEx IDs are my van number and my

21   social security number, and that's not either one of

22   them, so --

23        Q.  Okay.  You see there just before there's an

24   "X" by elect.  Above that it says, "By initialing

25   the appropriate space below Contractor elects or

**8/14/2006  Allen, Peter**

```
 1    elects not to participate in the Business Support

 2    Package."

 3            Do you see that?

 4       A.  I do.

 5       Q.  Are your initials on there?

 6       A.  No, they are not.

 7       Q.  All right.  Were you advised by your

 8    attorneys -- well, strike that.  I'll go on here.

 9            Can you look at Exhibit 9, which is the

10    addendum response.  Did you -- I think you testified

11    that you read this document before you signed it; is

12    that correct?

13       A.  Yes.

14       Q.  And do you see that the first item listed

15    is something called Interrogatory No. 1?

16       A.  Yes, I do.

17       Q.  Do you understand that that's the question

18    from FedEx that you were being asked?

19            MR. GARRISON:  Objection.  Leading.

20            THE WITNESS:  Did I understand that was the

21    question from FedEx?

22    BY MS. ZERGER:

23       Q.  This is the question that you're being

24    asked and then there's a response that follows.

25    That the response is --
```

**8/14/2006  Allen, Peter**

1        A.  I wasn't sure, no, I don't.

2        Q.  Okay.  All right.  Turning also in number 9

3    to your answer to Interrogatory No. 4, which you've

4    indicated today -- you've explained why you answered

5    it the way you did, which said no one assisted you

6    because of your interpretation, if you look on page

7    8 and 9.

8        A.  Okay.  Yes.

9        Q.  Just asking for assistance in performance

10   and you had indicated no one assisted you because of

11   your interpretation --

12       A.  Yes.

13           MR. GARRISON:  Objection.  That's leading.

14   BY MS. ZERGER:

15       Q.  -- of what assisted meant.  And you

16   identified there that no one assisted you.

17           Do you see that on page 9?

18       A.  Yes.

19       Q.  Okay.  When was it that you recalled the

20   names of the people that you have told us here today

21   were substitutes so that you could take time off?

22           MR. GARRISON:  Objection.  Vague and

23   ambiguous as to "substitutes".  You may answer.

24   BY MS. ZERGER:

25       Q.  Drivers who helped you -- who drove for you

8/14/2006  Allen, Peter

1    when you took some time off, when did you recall

2    those names?

3         A.  Last night.

4         Q.  Okay.  Did you deliberately omit those

5    names that you shared today when you answered

6    Interrogatory No. 4?

7         A.  No, I did not.

8         Q.  Okay.  You're a named plaintiff in this

9    case and a complaint was filed on your behalf in

10   this lawsuit, correct?

11        MR. GARRISON:  Objection.  Leading.

12        THE WITNESS:  Yes.

13   BY MS. ZERGER:

14        Q.  Okay.  And you've seen the complaint, have

15   you not?

16        A.  Yes, I have.

17        Q.  Does that complaint list all of the legal

18   claims that you've asserted against FedEx?

19        A.  Yes.

20        Q.  Over the course of the years that you

21   worked for FedEx, you worked at two different

22   terminals; is that correct?

23        MR. GARRISON:  Objection.  Vague and

24   ambiguous as to "worked for".  Misrepresents the

25   record.  Argumentative.

**8/14/2006  Allen, Peter**

1          THE WITNESS:  Yes, that's correct.

2     BY MS. ZERGER:

3          Q.   Okay.   In those terminals, you worked for a

4     number of different terminal managers and P&D

5     managers, service managers; is that correct?

6          MR. GARRISON:  Objection.  Leading.  Calls

7     for a legal conclusion.

8          THE WITNESS:  Yes, I did.

9     BY MS. ZERGER:

10         Q.   Is it accurate to say that in those

11    terminals with those managers, the rules, policies

12    and procedures that we have talked about here today

13    about how to do your work, were uniform at both

14    terminals?

15         MR. GARRISON:  Objection.  Vague and

16    ambiguous as to "uniform".  Leading.  Calls for a

17    legal conclusion.

18         THE WITNESS:  Yes, they all used similar,

19    if not identical, boards with customer complaints on

20    them.  They would list the customer complaints and

21    the name.

22         They used the similar things that show our

23    service for each day.  Similar -- pretty much

24    identical as far as how you turned in your scanner.

25    You had to wait until they completed it.  How you

8/14/2006  Allen, Peter

1    scanned your packages.  I mean, they were all loaded

2    on a pallet, you have to scan it -- turn in the

3    scanner and wait for you to get it prior to your

4    departure, so everything was pretty much identical.

5    BY MS. ZERGER:

6        Q.  Did you ever lose pay because other people

7    in your terminal did not meet the service

8    percentages set by the company, even though you did

9    meet the service percentages?

10       A.  Yes, on several occasions.

11       Q.  Okay.  In both the terminals, did you go

12   through the same check-in and check-out procedures?

13           MR. GARRISON:  Objection.  Compound.  Vague

14   and ambiguous as to check-in and check-out.  Vague

15   as to time.

16           THE WITNESS:  Yes.  Yes, when we got to

17   both terminals, we had our previous day's packages

18   scanned that weren't delivered.  And then we went in

19   and started scanning our load for the day and then

20   had to turn it in.  And they had to approve -- if

21   there were any left, they would go and either search

22   for the packages or have the individual loading the

23   scanner delete them and then continue on.

24   BY MS. ZERGER:

25       Q.  And at both of the terminals you worked at,

**8/14/2006  Allen, Peter**

1    did you have the same experience of terminal

2    managers, including the acting terminal manager,

3    conducting meetings with you in which they told you

4    what they wanted you to do or objected to things

5    that you were -- they thought you hadn't done?

6         MR. GARRISON:  Objection.  Leading.

7    Compound.

8         THE WITNESS:  Yes, it happened at both

9    terminals.

10   BY MS. ZERGER:

11        Q.  And at each terminal, were you provided

12   with videotapes that described to you how the

13   company wanted you to pick up and deliver packages?

14        MR. GARRISON:  Objection.  Leading.

15   Compound.  Assumes facts not in evidence.

16        THE WITNESS:  Yes.

17   BY MS. ZERGER:

18        Q.  At each of the terminals, did you receive

19   manuals and other written directives from the

20   company about how to pick up and deliver packages?

21        MR. GARRISON:  Objection.  Leading.

22   Compound.  Vague as to time.

23        THE WITNESS:  Yes, we did.  And the

24   training at Chico, since I accomplished the training

25   at Chico, most of the training manuals were issued

**8/14/2006  Allen, Peter**

1    to me there.  But at the Sacramento terminal,

2    whenever we had a meeting or an issue, they would

3    always provide you with some type of piece of paper

4    telling you this is how something is supposed to be

5    done.

6    BY MS. ZERGER:

7        Q.  The forms that you use when delivering

8    packages, like the door knocker that you've talked

9    about or something of that nature, did they always

10   have the FedEx Home Delivery logo on them from both

11   terminals?

12           MR. GARRISON:  Objection.  Compound.  Vague

13   as to time.  Leading.

14           THE WITNESS:  Yes.  As long as I've been

15   with -- working with FedEx, the door knockers stayed

16   the same, as they always had the FedEx logo on it.

17   BY MS. ZERGER:

18       Q.  Was there any significant difference

19   between the way the two terminals functioned when

20   you worked for them?

21           MR. GARRISON:  Objection.  Calls for a

22   legal conclusion.  Vague and ambiguous as to

23   "significant".  Compound and leading.

24           THE WITNESS:  No, there wasn't.

25   BY MS. ZERGER:

**8/14/2006  Allen, Peter**

1    Q.   Okay.  And did terminal management treat

2    you essentially the same in all the terminals where

3    you worked?

4         MR. GARRISON:  Objection.  Vague and

5    ambiguous as to "essentially the same".  Compound.

6    Leading.

7         THE WITNESS:  Yeah, the treatment was the

8    same, basically.  Do what you're told and get out of

9    the terminal and get it delivered, so yes.

10   BY MS. ZERGER:

11        Q.  You indicated that there was a recent

12   change in the policy on delivering evening

13   deliveries.  And that now, as long as you get a

14   signature by the customer, you can deliver before

15   5:00.

16        Do you recall that testimony?

17        A.  Yes, I do.

18        Q.  Do you recall when that change went into

19   effect?

20        A.  I believe some time this spring.

21        MS. ZERGER:  Okay.  I have no more

22   questions, I don't believe.  I think that's it.

23        THE VIDEO OPERATOR:  This marks the end of

24   Tape No. 5 in the deposition of Peter Allen.  The

25   original videotapes will be retained by LegaLink New

**8/14/2006  Allen, Peter**

1       York, 420 Lexington Avenue, No. 2108 and 2112, New

2       York, New York.  Going off the record.  The time is

3       5:40.

4

5                    (Whereupon, the deposition was

6                    adjourned at 5:40 p.m.)

7

8

9                              --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**8/14/2006  Allen, Peter**

```
1

2                    CERTIFICATE OF WITNESS

3

4              I, the undersigned, declare under penalty

5      of perjury that I have read the foregoing

6      transcript, and I have made any corrections,

7      additions, or deletions that I was desirous of

8      making, that the foregoing is a true and correct

9      transcript of my testimony contained therein.

10

11

12

13

14

15             EXECUTED THIS_____day of_____,

16     2006, at _____, _____

17

18

19

20

21

22             _____

23                    Signature of Witness

24

25
```

**8/14/2006  Allen, Peter**

```
1                   CERTIFICATE OF REPORTER

2

3          I, ANGELA T. KOTT, a Certified Shorthand

4     Reporter, hereby certify that the witness in the

5     foregoing deposition was by me duly sworn to tell

6     the truth, the whole truth and nothing but the truth

7     in the within-entitled cause;

8          That said deposition was taken down in

9     shorthand by me, a disinterested person, at the time

10    and place therein stated, and that the testimony of

11    the said witness was thereafter reduced to

12    typewriting, by computer, under my direction and

13    supervision;

14         I further certify that I am not of counsel

15    or attorney for either or any of the parties to the

16    said deposition, nor in any way interested in the

17    event of this cause, and that I am not related to

18    any of the parties thereto.

19

20         DATED                      , 2006.

21

22

23

24         ANGELA T. KOTT, CSR 7811

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| *All Coordinated Cases* | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

---

**DECLARATION OF LEE FINK IN SUPPORT OF
DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO
QUASH SUBPOENAS OF PUTATIVE CLASS MEMBERS**

I, Lee Fink, Declare

1.     I am an attorney licensed to practice in the State of California and a counsel in the law firm of O'Melveny & Myers LLP, located at 1999 Avenue of the Stars, Century City, California 90067. I represent Defendant FedEx Ground Package System, Inc. ("FedEx Ground") in the above-captioned matter. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2.     On August 29, 2006, I was in Austin, Texas to take the deposition of John Humphreys, lead Plaintiff in *Humphreys v. FedEx Ground*, Case No. 3:05-cv-00540-RLM-CAN.

3.     On the morning of August 29, 2006, I was informed that Mr. Pinkham would not appear at his scheduled deposition on August 31, 2006.

EXHIBIT D

4.     I conveyed this information to my colleagues at approximately 8:40 a.m. (Central

Time) on August 29, 2006.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th

day of February, 2007 in Los Angeles, California.

_____
Lee Fink

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | Case No. 3:05-MD-527-RM (MDL 1700) |
| THIS DOCUMENT RELATES TO: | |
| *All Coordinated Cases* | CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |

**DECLARATION OF GUY BRENNER IN SUPPORT OF
DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO
QUASH SUBPOENAS OF PUTATIVE CLASS MEMBERS**

I, Guy Brenner, Declare

1.     I am an attorney licensed to practice in the District of Columbia and an associate in the law firm of O'Melveny & Myers LLP, located at 1625 Eye St., NW, Washington, District of Columbia 20006. I represent Defendant FedEx Ground Package System, Inc. ("FedEx Ground") in the above-captioned matter. I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2.     On August 29, 2006, I traveled from Washington, District of Columbia to Austin, Texas as a member of the group of attorneys taking depositions in the MDL 1700 constituent case of *Humphreys v. FedEx Ground*, Case No. 3:05-cv-00540-RLM-CAN.

3.     The deposition of Mr. Pinkham was scheduled to go forward on August 31, 2006.

EXHIBIT E

4.    On August 29, 2006, I received notification via co-counsel that Mr. Pinkham would not be attending his deposition.

5.    This notification reached me approximately five hours before I was scheduled to depart for Austin and approximately 48 hours prior to Mr. Pinkham's scheduled deposition. The notification reached me after nearly all deposition preparations had been completed.

6.    Prior to receiving this notice, I spent approximately 15 hours preparing for Mr. Pinkham's deposition.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of February, 2007 in Washington, District of Columbia.

G. Br_____

Guy Brenner

2029

# Responses of Named Plaintiffs to Defendant's First Set of Interrogatories in *Humphreys v. FedEx Ground*

## ADDENDUM RESPONSE OF JEFF QUEBE TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff Jeff Quebe responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx imposed vehicle maintenance requirements in excess of the DOT regulations. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with. FedEx required me to perform repairs on my truck for appearance purposes which I did not agree with. I was required to have preventative maintenance on my truck more frequently than the manufacturer suggested, when FedEx told me to.

FedEx took my truck out of service for failing to meet one of its many standards; FedEx required me to rent a truck for that day instead of use my own truck.

FedEx required me deliver packages wearing a FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. I was required to meet FedEx grooming standards. I was told that if my appearance and grooming were not acceptable to FedEx, I would not be permitted to drive unless and until my appearance and grooming met FedEx standards. I was not allowed to provide service if my uniform was not complete or if my shoes were not black. I was told I could not provide service unless I changed my shirt.

FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx required me to pick up packages from its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. I was required to follow FedEx's "Safe Driving Standards"

which exceeded DOT requirements.

If FedEx determined that I had a "valid" customer complaint, I would lose my

bonus and if I had several such complaints FedEx threatened to terminate my contract.

FedEx determined that a customer complaint was valid without asking me about what

occurred; FedEx's terminal management told me that the customer "was always right." I

would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service

goals. Each day, my service percentage was posted in the terminal for all the other

drivers to see. If my service percentage fell below the goal, it would be posted in red for

all drivers to see. I would lose my CCS bonus for making pick-ups earlier than

scheduled, even by a minute. FedEx considers an early pick-up as a "missed" pick-up

and if I had several of these, FedEx would threaten to terminate my contract.

FedEx terminal management conducted Customer Service Rides, where terminal

management would ride along with me on my route to evaluate my performance and

efficiency. After the ride, I received a form evaluating my work and telling me how to

"improve." FedEx's terminal management "mapped" my route and told me the "most

efficient" way to run my route. FedEx decided the size and weight of packages I was

required to deliver and changed those to meet its own business goals without my

agreement. I was trained by FedEx to perform pick-up and delivery services the way

FedEx wanted me to. I was provided with detailed instructions about how to enter and

exit my truck, how to select my packages, how to deliver my packages and how to get the

customer's signature. I was required to follow FedEx procedures regarding call tags, and

other special services. All of the forms I used in performing my work were FedEx forms

with the company logo. I receive telephone calls on my cell phone from the terminal

during the day with instructions or additional work assignments. I was often required to

research past package deliveries whenever asked to by FedEx in order to avoid money

being withheld from my pay. I was sometimes followed on my route and reprimanded if I did not secure the truck exactly as FedEx wanted me to.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx could change the size and service area of my route based on its needs without my approval and without paying me. FedEx changed the size and service area of my route over my objections and without paying me. FedEx determined the "minimum" and "maximum" number of packages to assign to me ("the min and the max") to meet FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in my truck at any time. I could not sign up new customers myself to increase my route. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FedEx. Even though my route had enough packages and stops to be split into two routes, FedEx would not allow me to split my route in two, as only FedEx can create new routes or reconfigure routes. FedEx required me to "plan" for "peak season" and to hire a helper during the busy season. FedEx denied my request for a second route. FedEx denied my request to split my route into two routes even though the number of packages and stops warranted two routes. I had to get FedEx's approval to sell or transfer my truck to another driver. I had to get FedEx's approval to sell or transfer my route or part of my route to another driver. I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I could not decline to provide any assigned pick-up service. FedEx determined the pickups I was assigned on a daily

basis and I had to make each pickup assigned to me during the time agreed to by FedEx

regardless of the rest of my duties that day. I was required to make deliveries or pick-ups

that were not profitable, even if they were not on my route. I was required to timely

deliver packages assigned to me to FedEx's customers. I was required to timely pick up

packages assigned to me from FedEx's customers. I was required to return the packages I

picked up at the end of the day to the terminal. I was required to scan all undelivered

packages at the end of the day and upload the scanner information at night. I often could

not leave the terminal as soon as I was ready; if terminal management wanted me to wait,

I would be stopped from getting my equipment or paperwork until terminal management

was ready for me to leave.

FedEx would delay the printing of the paperwork and the availability to download

information to the scanners to prevent me and other drivers from leaving when we were

ready but FedEx was not ready for us to leave. I had to report on my deliveries at the end

of each day. Sometimes I was required to meet with the terminal manager to review the

previous day's deliveries in the morning when I was getting ready to service my route.

Terminal management regularly questioned whether I was properly coding packages I

returned to the terminal which I had been unable to deliver. Sometimes, terminal

management changed my accurate coding of a package as a misload to code it as a "did

not attempt" which would reduce my service percentage, threaten my  CCS bonus or

even my job, without investigation or any basis for doing so. Sometimes the terminal

manager would require me to have a meeting before I left the terminal, delaying me, to

complain about my performance, appearance, or "attitude."

By assigning me more stops that I wanted, FedEx required me to work more

hours each day than I would have chosen to work. I could never take a day off when I

wished unless I found a replacement driver, approved by FedEx, to take my place. Even

when I was ill or injured, I was forced to work because I did not have a readily-available

replacement driver. At FedEx's insistence, I hired and paid for a supplemental driver to

help deliver packages assigned to me, even though I did not want to. I added a

supplemental vehicle and driver at FedEx' insistence, even though I did not want to.

When I asked for a second route, FedEx required me to acquire a second truck and run it

as a supplemental at a financial loss, even though I did not want to.

    I could not negotiate any of the terms of the Operating Agreement. I was told I

needed to purchase workers compensation insurance through a FedEx-sponsored group

plan using Protective Insurance and the cost was deducted from my pay. I was told I

needed to purchase deadhead insurance through a FedEx-sponsored group plan using

Protective Insurance and the cost was deducted from my pay. FedEx deducted money

from my pay for "cargo" claims without providing me with information about the claims

before the deduction was made and without my approval. FedEx also deducted money

from my pay for "insurance" claims without providing me with information about the

claims before the deduction was made and without my approval.

    FedEx determined the rate I was charged for the Business Support Package for the

scanning, uniforms, and other services required by FedEx. I had no choice but to pay for

the Business Support Package. I had no choice but to rent the scanner from FedEx.

FedEx determined the rate I was paid for pickup and delivery services. FedEx

determined that rate I was paid for "van availability," "core zone," and all other aspects

of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx

refused to do so. FedEx required me to install a rear-backing camera on my truck.

FedEx makes maintenance loans to its drivers. If I keep a balance in my Service

Guarantee Account, FedEx contributes additional money to it which I may use for any

purpose. FedEx required me to pay $1,000 into an Escrow Account and to leave that

amount in the account for the duration of my work there. My core zone pay was reduced when FedEx made me deliver to areas outside my route. My core zone pay was reduced for any day that I worked less than seven hours.

I rarely if ever worked fewer than 10 hours in a work day. I often worked 12 hours or more in a work day. I often had no time for a meal break or even a rest break in a work day. FedEx gave me the option to have my pay directly deposited into my bank account. FedEx sends me a monthly magazine and other materials to my home.

FedEx trained me in its methods of package handling, delivery, pick-up and customer service. I was required to attend ongoing trainings and meetings at FedEx which included topics such as performance, productivity, and customer service standards. I was given training and promotional videotapes which I was required to watch. FedEx required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often on topics that had nothing to do with safety. During Roundtable Meetings, FedEx management discussed new company policies and accounts and promoted its business goals.

When I contacted the Contractor Relations manager for my area about issues, he sided with terminal management and tried to justify whatever decision terminal management made. I was required to use a scanner each day to permit customers to track the time of the deliveries on FedEx's website. I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last stop, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of

deliveries, number of pick-ups, and delivery information. I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was told by terminal management to enter a start time later than my real start time into my scanner so that I would not exceed DOT hours of service. I was required to provide service on each day FedEx decided to provide service to its customers.

FedEx changed the days of service it offered its customers, without consulting me. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. I was reprimanded for not following, FedEx's "recommended" delivery sequence for the day. FedEx required to me to work a sixth day in any week when I was unable to deliver all of my required packages in the normal five day week.

I was threatened with contract termination on multiple occasions for not being able to deliver all of the packages assigned to me in a given day, no matter how many there were. I was threatened with contract termination on multiple occasions over invalid customer complaints. I was threatened with contract termination on multiple occasions for allegedly not complying with FedEx's customer service requirements. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in jeopardy or might be sent to Pittsburgh for "review." FedEx deducted from my escrow accounts amounts it claimed I owed FedEx, without my consent. I was threatened with contract termination on multiple occasions for allegedly not complying with FedEx's maintenance requirements. I was threatened with contract termination for declining to use a supplemental vehicle or to get a bigger vehicle.

## INTERROGATORY NO. 2:

If you contend that any term of your relationship with Defendants was not directly governed by the written Operating Agreement you entered into, please state every such term and how it affected your relationship with Defendants.

## RESPONSE NO. 2:

Without waiving and subject to the General and Specific Objections to Response No. 2, Named Plaintiff Jeff Quebe responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten policies and procedures not mentioned in the Operating Agreement control my relationship with FedEx. These policies imposed additional controls over every aspect of my working relationship with FedEx. It is impossible to name all such terms, as some are written but not given to me and some are orally communicated. To the best of my knowledge and understanding, these extra-contractual sources include, but are not limited to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies. These written policies subjected me to additional requirements regarding grooming, my vehicle's appearance and size, Business Support Package, insurance, flexing of packages, hours and days of work, replacement drivers, cargo claims, reconfigurations, customer service rides, driver release audits, maintaining of files on my performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources include, but are not limited, to written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures,

memorandum and directives to terminal management and other rules concealed

from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations

    personnel, and other employees and agents of FedEx provided verbal information

    and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to

absolute control over me and created an employer-employee relationship between FedEx

and me.

**INTERROGATORY NO. 3:**

Please state in detail every effort you made to maximize your earnings and/or

maximize the efficiency of pick up or delivery to your route(s) with Defendants,

including, but not limited to, having others assist you, acquiring or taking on additional

routes or portions of routes, operating supplemental vehicles, utilizing trailers or

acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries,

participating in the flex program, and any other steps you took.

**RESPONSE NO. 3:**

Without waiving and subject to the General and Specific Objections to Response

No. 3, Named Plaintiff Jeff Quebe responds as follows:

I am employed by FedEx and I do what I am told. I do my best to deliver all

packages assigned to me each day. There is nothing beyond this that I can do to

maximize my "earnings" or maximize my "efficiency." There is a limit to the number of

packages my truck can hold and there is a limit to the number of packages and stops I can

deliver in one day. I can only deliver the packages the company gives me and must

follow the company's detailed procedures for pick-up and delivery. Hiring helpers,

adding supplemental vehicles and/or drivers, servicing an additional route have high costs

associated with them and generally do not substantially increase "earnings."

## INTERROGATORY NO. 4:

If anyone assisted you in the performance of your duties, please state the identities

of those individuals including their name, last known address and telephone number, the

dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

## RESPONSE NO. 4:

Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff Jeff Quebe responds as follows:

In December 2003, I used Keith Cessna to drive my supplemental truck for one

month. I paid Mr. Cessna $40.00 per day plus $1.36 per stop. Mr. Cessna provided the

same pickup and deliver service that I performed for FedEx, under the same controls.

## INTERROGATORY NO. 5:

If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

## RESPONSE NO. 5:

Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff Jeff Quebe responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned. This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked approximately 12 hours in a day and far more than

40 hours each week. During peak season, I estimate that I worked 12-14 hours a day

JEFF QUEBE ADDENDUM                    11
RESPONSE TO FIRST SET INTERROGATORIES

because of the increase number of packages I had to deliver.

## INTERROGATORY NO. 6:

Please state in detail the circumstances surrounding the termination of any

contractual relationship(s) with Defendants, including whether and to whom you sold

your truck(s) and/or route(s), and the consideration you received for each sale.

## RESPONSE NO. 6:

Without waiving and subject to the General and Specific Objections to Response

No. 6, Named Plaintiff Jeff Quebe responds as follows:

I left FedEx and did not sell my route.

## VERIFICATION

I, Jeff Quebe, declare under penalty of perjury under the laws of the United States

that I have read the foregoing and know that the responses to the interrogatories

propounded to me are true and correct to the best of my knowledge.

Executed this _____ day of September 2006 at _____ (City,

State).


_____

Jeff Quebe

## VERIFICATION

I, Jeff Quebe, declare under penalty of perjury under the laws of the United States

that I have read the foregoing and know that the responses to the interrogatories

propounded to me are true and correct to the best of my knowledge.

Executed this 5<u>th</u> day of September 2006 at _Louisville, KY_____ (City,

State).


_____
Jeff Quebe

**ADDENDUM RESPONSE OF NILES PINKHAM TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES**

### INTERROGATORY NO. 1:

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

### RESPONSE NO. 1:

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff Niles Pinkham responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. The truck I used for my route had to have certain shelving and meet other specifications FedEx required. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. I was required to have preventative maintenance on my truck more frequently than the manufacturer suggested, when FedEx told me to. I was required to paint my truck when FedEx told me to. FedEx took my truck out of service for failing to meet one of its many standards; FedEx required me to rent a truck for that day instead of

use my own truck.

FedEx required me to come to work wearing a FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. I was required to meet FedEx grooming standards.

FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx required me to pick up packages from its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. FedEx did take away my right to driver release packages. I was required to follow FedEx's "Safe Driving Standards" which exceeded DOT requirements. Any time FedEx determined that I breached any of the many "Safe Driving Standards," FedEx could discipline me by terminating my indemnity and requiring me to purchase expensive insurance that I could not afford.

If FedEx determined that I had a "valid" customer complaint, I would lose my bonus and if I had several such complaints FedEx threatened to terminate my contract. FedEx determined that a customer complaint was valid without asking me about what occurred; FedEx's terminal management told me that the customer "was always right." I would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service goals. Each day, my service percentage was posted in the terminal for all the other drivers to see. If my service percentage fell below the goal, it would be posted in red for all drivers to see. I would lose my CCS bonus for making pick-ups earlier than scheduled, even by a minute. FedEx considers an early pick-up as a "missed" pick-up and if I had several of these, FedEx would threaten to terminate my contract.

FedEx terminal management conducted Customer Service Rides, where terminal management would ride along with me on my route to evaluate my performance and efficiency. After the ride, I received a form evaluating my work and telling me how to "improve." FedEx's terminal management "mapped" my route and told me the "most efficient" way to run my route. FedEx decided the size and weight of packages I was required to deliver and changed those to meet its own business goals without my agreement. I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to.

I was provided with detailed instructions about how to enter and exit my truck, how to select my packages, how to deliver my packages and how to get the customer's signature. I was required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I used in performing my work were FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with instructions or additional work assignments. I was often required to research past package deliveries whenever asked to by FedEx in order to avoid money

NILES PINKHAM ADDENDUM
RESPONSE TO FIRST SET INTERROGATORIES                              3

being withheld from my pay. FedEx "flexed" packages to me, requiring me to delivery

packages outside of my route to meet its needs. FedEx determined the size and service

area of my route. FedEx could change the size and service area of my route based on its

needs without my approval and without paying me. FedEx changed the size and service

area of my route over my objections and without paying me. FedEx determined the

"minimum" and "maximum" number of packages to assign to me ("the min and the

max") to meet FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in

my truck at any time. I could not sign up new customers myself to increase my route. I

could not acquire or take on additional routes or portions of routes without the express

consent and approval of FedEx. FedEx required me to "plan" for "peak season" and to

hire a helper during the busy season.

I could not and did not deliver packages for any company other than FedEx. I

could not decline to deliver any package assigned to me by FedEx for any reason. FedEx

determined the total number of packages and location of deliveries it assigned to me on a

daily basis and I was required to deliver every package assigned to me on the day it was

assigned. I could not decline to provide any assigned pick-up service. FedEx determined

the pickups I was assigned on a daily basis and I had to make each pickup assigned to me

during the time agreed to by FedEx regardless of the rest of my duties that day. I was

required to make deliveries or pick-ups that were not profitable, even if they were not on

my route. I was required to timely deliver packages assigned to me to FedEx's

customers. I was required to timely pick up packages assigned to me from FedEx's

customers. On Saturdays, I was required to return the packages I picked up at the end of

the day to the terminal. I often could not leave the terminal as soon as I was ready; if

terminal management wanted me to wait, I would be stopped from getting my equipment

or paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route.

Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes, terminal management changed my accurate coding of a package as a misload to code it as a "did not attempt" which would reduce my service percentage, threaten my CCS bonus or even my job, without investigation or any basis for doing so. Sometimes the terminal manager would require me to have a meeting before I left the terminal, delaying me, to complain about my performance, appearance, or "attitude."

FedEx changed the days I was required to provide service without my agreement. By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver. At FedEx's insistence, I hired and paid for a helper to work with me on my route, even though I did not want to. At FedEx's insistence, I hired and paid for a supplemental driver to help deliver packages assigned to me, even though I did not want to.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx deducted money from my pay for "cargo" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx determined the rate I was charged for the Business Support Package for the scanning, uniforms, and other

services required by FedEx. I had no choice but to pay for the Business Support Package.

I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was

paid for pickup and delivery services. FedEx determined that rate I was paid for "van

availability," "core zone," and all other aspects of my pay. When I asked FedEx to adjust

my core zone because it was too low, FedEx refused to do so. FedEx required me to

install a rear-backing camera on my truck. FedEx has contractor assistance programs

through which I purchased tires, batteries or other maintenance services. If I keep a

balance in my Service Guarantee Account, FedEx contributes additional money to it

which I may use for any purpose. FedEx required me to pay $500 into an Escrow

Account and to leave that amount in the account for the duration of my work there. My

core zone pay was reduced when FedEx made me deliver to areas outside my route. My

core zone pay was reduced for any day that I worked less than seven hours.

I rarely if ever worked fewer than 10 hours in a work day. I often worked 12

hours or more in a work day. I often had no time for a meal break or even a rest break in

a work day.

FedEx trained me in its methods of package handling, delivery, pick-up and

customer service. I was required to attend ongoing trainings and meetings at FedEx

which included topics such as performance, productivity, and customer service standards.

I was given training and promotional videotapes which I was required to watch. FedEx

required that I attend weekly meetings at my terminal and sign attendance sheets showing

my attendance. Although these were called "Safety Meetings" they were often on topics

that had nothing to do with safety. During Roundtable Meetings, FedEx management

discussed new company policies and accounts and promoted its business goals.

The Contractor Relations manager for my area failed to help me when I had a

problem with the company not following the Operating Agreement. When I contacted

NILES PINKHAM ADDENDUM                    6
RESPONSE TO FIRST SET INTERROGATORIES

the Contractor Relations manager for my area about issues, he sided with terminal management and tried to justify whatever decision terminal management made. I was required to use a scanner each day to permit customers to track the time of the deliveries on FedEx's website. I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information.

I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was required to provide service on each day FedEx decided to provide service to its customers. FedEx changed the days of service it offered its customers, without consulting me. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. I was reprimanded for not following, FedEx's "recommended" delivery sequence for the day. FedEx required to me to work a sixth day in any week when I was unable to deliver all of my required packages in the normal five day week. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in jeopardy or might be sent to Pittsburgh for "review." FedEx deducted from my escrow accounts amounts it claimed I owed FedEx, without my consent.

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly governed by the written Operating Agreement you entered into, please state every such term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response No. 2, Named Plaintiff Niles Pinkham responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten policies and procedures not mentioned in the Operating Agreement control my relationship with FedEx. These policies imposed additional controls over every aspect of my working relationship with FedEx. It is impossible to name all such terms, as some are written but not given to me and some are orally communicated. To the best of my knowledge and understanding, these extra-contractual sources include, but are not limited to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies. These written policies subjected me to additional requirements regarding grooming, my vehicle's appearance and size, Business Support Package, insurance, flexing of packages, hours and days of work, replacement drivers, cargo claims, reconfigurations, customer service rides, driver release audits, maintaining of files on my performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources include, but are not limited, to written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures,

memorandum and directives to terminal management and other rules concealed

from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations

  personnel, and other employees and agents of FedEx provided verbal information

  and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to

absolute control over me and created an employer-employee relationship between FedEx

and me.

## INTERROGATORY NO. 3:

Please state in detail every effort you made to maximize your earnings and/or

maximize the efficiency of pick up or delivery to your route(s) with Defendants,

including, but not limited to, having others assist you, acquiring or taking on additional

routes or portions of routes, operating supplemental vehicles, utilizing trailers or

acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries,

participating in the flex program, and any other steps you took.

## RESPONSE NO. 3:

Without waiving and subject to the General and Specific Objections to Response

No. 3, Named Plaintiff Niles Pinkham responds as follows:

I was employed by FedEx and I did what I was told.  I did my best to deliver all

packages assigned to me each day.  There is nothing beyond this that I could do to

maximize my "earnings" or maximize my "efficiency."  There is a limit to the number of

packages my truck can hold and there is a limit to the number of packages and stops I can

deliver in one day.  I could only deliver the packages the company gave me and had to

follow the company's detailed procedures for pick-up and delivery.  Hiring helpers,

adding supplemental vehicles and/or drivers, servicing an additional route have high costs

associated with them and generally do not substantially increase "earnings."

## INTERROGATORY NO. 4:

If anyone assisted you in the performance of your duties, please state the identities of those individuals including their name, last known address and telephone number, the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation or consideration.

## RESPONSE NO. 4:

Without waiving and subject to the General and Specific Objections to Response No. 4, Named Plaintiff Niles Pinkham responds as follows:

I hired a helper for one day and I paid him $50 a day.

## INTERROGATORY NO. 5:

If you contend that you worked in excess of 40 hours in any given week, please state the dates and hours worked and the circumstances surrounding your need to work these hours.

## RESPONSE NO. 5:

Without waiving and subject to the General and Specific Objections to Response No. 5, Named Plaintiff Niles Pinkham responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and required me to deliver every package assigned to me on the day it was assigned.   This caused me to have to work in excess of 8 hours a day and 40 hours a week consistently. On average, I estimate that I worked approximately 12 hours in a day and far more than 40 hours each week.  During peak season, I estimate that I worked 12-14 hours a day because of the increase number of packages I had to deliver.

**INTERROGATORY NO. 6:**

Please state in detail the circumstances surrounding the termination of any contractual relationship(s) with Defendants, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale.

**RESPONSE NO. 6:**

Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff Niles Pinkham responds as follows:

I left FedEx and did not sell my route.

## **VERIFICATION**

I, Niles Pinkham, declare under penalty of perjury under the laws of the United

States that I have read the foregoing and know that the responses to the interrogatories

propounded to me are true and correct to the best of my knowledge.

Executed this ____ day of April 2006 at _____ (City, State).


_____
Niles Pinkham

**ADDENDUM RESPONSE OF TIM MERSHON TO
DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff Tim Mershon responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. The truck I used for my route had to have certain shelving and meet other specifications FedEx required. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx imposed vehicle maintenance requirements in excess of the DOT regulations. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with.FedEx required me to perform repairs on my truck for appearance purposes which I did not agree with. I was required to have preventative maintenance on

my truck more frequently than the manufacturer suggested, when FedEx told me to.

FedEx took my truck out of service for failing to meet one of its many standards; FedEx required me to rent a truck for that day instead of use my own truck.

FedEx required me to come to work wearing a FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. I was required to meet FedEx grooming standards. I was told that if my appearance and grooming were not acceptable to FedEx, I would not be permitted to drive unless and until my appearance and grooming met FedEx standards. I was not allowed to provide service if my uniform was not complete or if my shoes were not black. I was told by my terminal manager that I had to shave before going out on my route.

FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx required me to pick up packages from its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release

packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. FedEx did take away my right to driver release packages. I was required to follow FedEx's "Safe Driving Standards" which exceeded DOT requirements. Any time FedEx determined that I breached any of the many "Safe Driving Standards," FedEx could discipline me by terminating my indemnity and requiring me to purchase expensive insurance that I could not afford.

If FedEx determined that I had a "valid" customer complaint, I would lose my bonus and if I had several such complaints FedEx threatened to terminate my contract. FedEx determined that a customer complaint was valid without asking me about what occurred; FedEx's terminal management told me that the customer "was always right." I would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service goals. Each day, my service percentage was posted in the terminal for all the other drivers to see. If my service percentage fell below the goal, it would be posted in red for all drivers to see.

FedEx terminal management conducted Customer Service Rides, where terminal management would ride along with me on my route to evaluate my performance and efficiency. After the ride, I received a form evaluating my work and telling me how to "improve." FedEx's terminal management "mapped" my route and told me the "most efficient" way to run my route. FedEx decided the size and weight of packages I was required to deliver and changed those to meet its own business goals without my agreement. I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to. I was provided with detailed instructions about how to enter and exit my truck, how to select my packages, how to deliver my packages and how to get the customer's signature. I was required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I used in performing my work were

FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with instructions or additional work assignments. I was often required to research past package deliveries whenever asked to by FedEx in order to avoid money being withheld from my pay.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx could change the size and service area of my route based on its needs without my approval and without paying me. FedEx changed the size and service area of my route over my objections and without paying me. FedEx determined the "minimum" and "maximum" number of packages to assign to me ("the min and the max") to meet FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in my truck at any time. I could not sign up new customers myself to increase my route. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FedEx. Even though my route had enough packages and stops to be split into two routes, FedEx would not allow me to split my route in two, as only FedEx can create new routes or reconfigure routes. FedEx denied my request to split my route into two routes even though the number of packages and stops warranted two routes. I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I could not decline to provide any assigned pick-up service. FedEx determined the pickups I was assigned on a daily basis and I had to make each pickup assigned to me during the time agreed to by FedEx regardless of the rest of my duties that day. I was

required to make deliveries or pick-ups that were not profitable, even if they were not on my route. I was required to timely deliver packages assigned to me to FedEx's customers. I was required to timely pick up packages assigned to me from FedEx's customers. I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route.

Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes, terminal management changed my accurate coding of a package as a misload to code it as a "did not attempt" which would reduce my service percentage, threaten my CCS bonus or even my job, without investigation or any basis for doing so. Sometimes the terminal manager would require me to have a meeting before I left the terminal, delaying me, to complain about my performance, appearance, or "attitude." By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase workers compensation insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx deducted money

from my pay for "cargo" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx also deducted money from my pay for "insurance" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx determined the rate I was charged for the Business Support Package for the scanning, uniforms, and other services required by FedEx. I had no choice but to pay for the Business Support Package. I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was paid for pickup and delivery services. FedEx determined that rate I was paid for "van availability," "core zone," and all other aspects of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx refused to do so. FedEx required me to install a rear-backing camera on my truck. FedEx required me to pay $1,000 into an Escrow Account and to leave that amount in the account for the duration of my work there. My core zone pay was reduced when FedEx made me deliver to areas outside my route. My core zone pay was reduced for any day that I worked less than seven hours.

I rarely if ever worked fewer than 10 hours in a work day. I often worked 12 hours or more in a work day. I often had no time for a meal break or even a rest break in a work day. FedEx gave me the option to have my pay directly deposited into my bank account.

FedEx trained me in its methods of package handling, delivery, pick-up and customer service. I was required to attend ongoing trainings and meetings at FedEx which included topics such as performance, productivity, and customer service standards. I was given training and promotional videotapes which I was required to watch. FedEx required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often on topics that had nothing to do with safety. During Roundtable Meetings, FedEx management

discussed new company policies and accounts and promoted its business goals.

     The Contractor Relations manager for my area failed to help me when I had a problem with the company not following the Operating Agreement. When I contacted the Contractor Relations manager for my area about issues, he sided with terminal management and tried to justify whatever decision terminal management made. I was required to use a scanner each day to permit customers to track the time of the deliveries on FedEx's website. I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information.

     I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was told by terminal management to enter a start time later than my real start time into my scanner so that I would not exceed DOT hours of service. I was required to provide service on each day FedEx decided to provide service to its customers. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. FedEx required to me to work a sixth day in any week when I was unable to deliver all of my required packages in the normal five day week.

     I was threatened with contract termination on multiple occasions for not being able to deliver all of the packages assigned to me in a given day, no matter how many

there were. I was threatened with contract termination on multiple occasions for allegedly not complying with FedEx's customer service requirements. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in jeopardy or might be sent to Pittsburgh for "review." I was threatened with contract termination for declining to use a supplemental vehicle or to get a bigger vehicle.

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly governed by the written Operating Agreement you entered into, please state every such term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response No. 2, Named Plaintiff Tim Mershon responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten policies and procedures not mentioned in the Operating Agreement control my relationship with FedEx. These policies imposed additional controls over every aspect of my working relationship with FedEx. It is impossible to name all such terms, as some are written but not given to me and some are orally communicated. To the best of my knowledge and understanding, these extra-contractual sources include, but are not limited to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies. These written policies subjected me to additional requirements regarding grooming, my vehicle's appearance and size, Business Support Package, insurance, flexing of packages, hours and days of work, replacement drivers, cargo claims, reconfigurations,

customer service rides, driver release audits, maintaining of files on my

performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources

  include, but are not limited, to written rules on "contractor" termination,

  directives and training provided to terminal managers, written rules on driver

  appearance (with illustrative poster), written and oral complaint procedures,

  memorandum and directives to terminal management and other rules concealed

  from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations

  personnel, and other employees and agents of FedEx provided verbal information

  and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to

absolute control over me and created an employer-employee relationship between FedEx

and me.

## INTERROGATORY NO. 3:

Please state in detail every effort you made to maximize your earnings and/or

maximize the efficiency of pick up or delivery to your route(s) with Defendants,

including, but not limited to, having others assist you, acquiring or taking on additional

routes or portions of routes, operating supplemental vehicles, utilizing trailers or

acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries,

participating in the flex program, and any other steps you took.

## RESPONSE NO. 3:

Without waiving and subject to the General and Specific Objections to Response

No. 3, Named Plaintiff Tim Mershon responds as follows:

TIM MERSHON ADDENDUM                              9
RESPONSE TO FIRST SET INTERROGATORIES

I was employed by FedEx and I did what I was told. I did my best to deliver all packages assigned to me each day. There is nothing beyond this that I could do to maximize my "earnings" or maximize my "efficiency." There is a limit to the number of packages my truck can hold and there is a limit to the number of packages and stops I can deliver in one day. I could only deliver the packages the company gave me and had to follow the company's detailed procedures for pick-up and delivery. Hiring helpers, adding supplemental vehicles and/or drivers, servicing an additional route have high costs associated with them and generally do not substantially increase "earnings."

**INTERROGATORY NO. 4:**

If anyone assisted you in the performance of your duties, please state the identities of those individuals including their name, last known address and telephone number, the dates on which they assisted you, the details of the services they performed, and the nature of their relationship to you, including how they were compensated or received consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

Without waiving and subject to the General and Specific Objections to Response No. 4, Named Plaintiff Tim Mershon responds as follows:

No one assisted me in the performance of my duties.

**INTERROGATORY NO. 5:**

If you contend that you worked in excess of 40 hours in any given week, please state the dates and hours worked and the circumstances surrounding your need to work these hours.

**RESPONSE NO. 5:**

Without waiving and subject to the General and Specific Objections to Response No. 5, Named Plaintiff Tim Mershon responds as follows:

TIM MERSHON ADDENDUM                    10
RESPONSE TO FIRST SET INTERROGATORIES

FedEx determined the number of packages assigned to me on a daily basis and required me to deliver every package assigned to me on the day it was assigned. This caused me to have to work in excess of 8 hours a day and 40 hours a week consistently. On average, I estimate that I worked approximately 12 hours in a day and far more than 40 hours each week. During peak season, I estimate that I worked 12-14 hours a day because of the increase number of packages I had to deliver.

## INTERROGATORY NO. 6:

Please state in detail the circumstances surrounding the termination of any contractual relationship(s) with Defendants, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale.

## RESPONSE NO. 6:

Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff Tim Mershon responds as follows:

I left FedEx but did not sell my route.

## <u>VERIFICATION</u>

I, Tim Mershon, declare under penalty of perjury under the laws of the United

States that I have read the foregoing and know that the responses to the interrogatories

propounded to me are true and correct to the best of my knowledge.

Executed this _____ day of April 2006 at _____ (City, State).


_____

Tim Mershon

**ADDENDUM RESPONSE OF DAVID MEREDITH TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff David Meredith responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. The truck I used for my route had to have certain shelving and meet other specifications FedEx required. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx imposed vehicle maintenance requirements in excess of the DOT regulations. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with. FedEx required me to perform repairs on my truck for appearance purposes which I did not agree with. I was required to have preventative maintenance on

my truck more frequently than the manufacturer suggested, when FedEx told me to.

FedEx required me to come to work wearing a FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx required me to pick up packages from its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. FedEx did take away my right to driver release packages. Any time FedEx determined that I breached any of the many "Safe Driving Standards," FedEx could discipline me by terminating my indemnity and requiring me to purchase expensive insurance that I could not afford.

If FedEx determined that I had a "valid" customer complaint, I would lose my bonus and if I had several such complaints FedEx threatened to terminate my contract. Each day, my service percentage was posted in the terminal for all the other drivers to

see. If my service percentage fell below the goal, it would be posted in red for all drivers

to see. FedEx's terminal management "mapped" my route and told me the "most

efficient" way to run my route.   FedEx decided the size and weight of packages I was

required to deliver and changed those to meet its own business goals without my

agreement. I was trained by FedEx to perform pick-up and delivery services the way

FedEx wanted me to.  I was provided with detailed instructions about how to enter and

exit my truck, how to select my packages, how to deliver my packages and how to get the

customer's signature. I was required to follow FedEx procedures regarding call tags, and

c.o.d's, and other special services. All of the forms I used in performing my work were

FedEx forms with the company logo.  I receive telephone calls on my cell phone from the

terminal during the day with instructions or additional work assignments. I was often

required to research past package deliveries whenever asked to by FedEx in order to

avoid money being withheld from my pay.

   FedEx "flexed" packages to me, requiring me to delivery packages outside of my

route to meet its needs. FedEx determined the size and service area of my route.  FedEx

could change the size and service area of my route based on its needs without my

approval and without paying me.  FedEx changed the size and service area of my route

over my objections and without paying me.  FedEx determined the "minimum" and

"maximum" number of packages to assign to me ("the min and the max") to meet

FedEx's business needs regardless of my views.

   FedEx did not permit anyone that was not authorized by FedEx to ride with me in

my truck at any time.  I could not sign up new customers myself to increase my route.  I

could not acquire or take on additional routes or portions of routes without the express

consent and approval of FedEx.  Even though my route had enough packages and stops to

be split into two routes,  FedEx would not allow me to split my route in two, as only

DAVID MEREDITH ADDENDUM                          3
RESPONSE TO FIRST SET INTERROGATORIES

FedEx can create new routes or reconfigure routes. FedEx required me to "plan" for "peak season" and to hire a helper during the busy season. FedEx denied my request for a second route. I had to get FedEx's approval to sell or transfer my truck to another driver. I had to get FedEx's approval to sell or transfer my route or part of my route to another driver. FedEx refused to approve a buyer I had for my route even though he met FedEx's minimum requirements.

I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I could not decline to provide any assigned pick-up service. FedEx determined the pickups I was assigned on a daily basis and I had to make each pickup assigned to me during the time agreed to by FedEx regardless of the rest of my duties that day. I was required to make deliveries or pick-ups that were not profitable, even if they were not on my route. I was required to timely deliver packages assigned to me to FedEx's customers. I was required to timely pick up packages assigned to me from FedEx's customers.

I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route. Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes the terminal manager would require me to have a meeting before I left the

terminal, delaying me, to complain about my performance, appearance, or "attitude." By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. FedEx refuse to approve a replacement driver I proposed.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase workers compensation insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx determined the rate I was charged for the Business Support Package for the scanning, uniforms, and other services required by FedEx. I had no choice but to pay for the Business Support Package. I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was paid for pickup and delivery services. FedEx determined that rate I was paid for "van availability," "core zone," and all other aspects of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx refused to do so. FedEx required me to install a rear-backing camera on my truck. If I keep a balance in my Service Guarantee Account, FedEx contributes additional money to it which I may use for any purpose. My core zone pay was reduced when FedEx made me deliver to areas outside my route. My core zone pay was reduced for any day that I worked less than seven hours.

I rarely if ever worked fewer than 10 hours in a work day. I often worked 12 hours or more in a work day. I often had no time for a meal break or even a rest break in a work day. I was required to attend ongoing trainings and meetings at FedEx which included topics such as performance, productivity, and customer service standards. FedEx required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often

on topics that had nothing to do with safety.

The Contractor Relations manager for my area failed to help me when I had a problem with the company not following the Operating Agreement. When I contacted the Contractor Relations manager for my area about issues, he sided with terminal management and tried to justify whatever decision terminal management made. I was required to use a scanner each day to permit customers to track the time of the deliveries on FedEx's website. I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information.

I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was told by terminal management to enter a start time later than my real start time into my scanner so that I would not exceed DOT hours of service. I was required to provide service on each day FedEx decided to provide service to its customers. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. FedEx required to me to work a sixth day in any week when I was unable to deliver all of my required packages in the normal five day week.

I was threatened with contract termination on multiple occasions for not being able to deliver all of the packages assigned to me in a given day, no matter how many

there were.  Often if I disagreed with the terminal manager about something or

complained, I was told that my contract might be in jeopardy or might be sent to

Pittsburgh for "review."

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly

governed by the written Operating Agreement you entered into, please state every such

term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response

No. 2, Named Plaintiff David Meredith responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten

policies and procedures not mentioned in the Operating Agreement control my

relationship with FedEx.  These policies imposed additional controls over every aspect of

my working relationship with FedEx.  It is impossible to name all such terms, as some are

written but not given to me and some are orally communicated.  To the best of my

knowledge and understanding, these extra-contractual sources include, but are not limited

to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual
  and numerous other written and extra-contractual policies.  These written policies
  subjected me to additional requirements regarding grooming, my vehicle's
  appearance and size, Business Support Package, insurance, flexing of packages,
  hours and days of work, replacement drivers, cargo claims, reconfigurations,
  customer service rides, driver release audits, maintaining of files on my
  performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources

DAVID MEREDITH ADDENDUM                    7
RESPONSE TO FIRST SET INTERROGATORIES

include, but are not limited, to written rules on "contractor" termination,

directives and training provided to terminal managers, written rules on driver

appearance (with illustrative poster), written and oral complaint procedures,

memorandum and directives to terminal management and other rules concealed

from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations

  personnel, and other employees and agents of FedEx provided verbal information

  and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to

absolute control over me and created an employer-employee relationship between FedEx

and me.

**INTERROGATORY NO. 3:**

Please state in detail every effort you made to maximize your earnings and/or

maximize the efficiency of pick up or delivery to your route(s) with Defendants,

including, but not limited to, having others assist you, acquiring or taking on additional

routes or portions of routes, operating supplemental vehicles, utilizing trailers or

acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries,

participating in the flex program, and any other steps you took.

**RESPONSE NO. 3:**

Without waiving and subject to the General and Specific Objections to Response

No. 3, Named Plaintiff David Meredith responds as follows:

I was employed by FedEx and I did what I was told. I did my best to deliver all

packages assigned to me each day. There was nothing beyond this that I could do to

maximize my "earnings" or maximize my "efficiency." There is a limit to the number of

packages my truck can hold and there is a limit to the number of packages and stops I can

deliver in one day. I could only deliver the packages the company gave me and had to

follow the company's detailed procedures for pick-up and delivery. Hiring helpers,

adding supplemental vehicles and/or drivers, servicing an additional route have high costs

associated with them and generally do not substantially increase "earnings."

**INTERROGATORY NO. 4:**

If anyone assisted you in the performance of your duties, please state the identities

of those individuals including their name, last known address and telephone number, the

dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff David Meredith responds as follows:

I used a helper for 6 months during peak season.

**INTERROGATORY NO. 5:**

If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

**RESPONSE NO. 5:**

Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff David Meredith responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned. This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked approximately 12 hours in a day and far more than

40 hours each week.  During peak season, I estimate that I worked 12-14 hours a day

because of the increase number of packages I had to deliver.

## INTERROGATORY NO. 6:

Please state in detail the circumstances surrounding the termination of any

contractual relationship(s) with Defendants, including whether and to whom you sold

your truck(s) and/or route(s), and the consideration you received for each sale.

## RESPONSE NO. 6:

Without waiving and subject to the General and Specific Objections to Response

No. 6, Named Plaintiff David Meredith responds as follows:

I sold my route, with FedEx's approval.

DAVID MEREDITH ADDENDUM               10
RESPONSE TO FIRST SET INTERROGATORIES

## VERIFICATION

I, David Meredith, declare under penalty of perjury under the laws of the United

States that I have read the foregoing and know that the responses to the interrogatories

propounded to me are true and correct to the best of my knowledge.

Executed this _____ day of April 2006 at _____ (City, State).


_____

David Meredith

**FIRST AMENDED ADDENDUM RESPONSE OF JOHN HUMPHREYS TO
DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have
been classified as an employee, including, with specificity, any and every action taken by
Defendants or you that you believe demonstrates that Defendants exercised control over
the manner and means by which you performed your duties, including, how that action
affected your business.  For each incident or fact, please state the details, including, but
not limited to: how the company exercised or attempted to exercise the alleged control
over you individually, the identity of the person or policy to which you refer, the date(s)
of the incident or fact, and any communications you had with Defendants about the
incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response
No. 1, Named Plaintiff John Humphreys responds as follows:

I was required to purchase or lease a truck that FedEx specified.  FedEx required
me to have the truck before I could begin working for them.  The truck I used for my
route had to have certain specifications FedEx required.  FedEx required me to place a
large FedEx logo, colors and FedEx advertising on my vehicle at my expense.  I could
not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents,
rust or other visible defects.  FedEx imposed vehicle maintenance requirements in excess
of the DOT regulations.  FedEx did not permit me to use my vehicle for any purpose
other than the delivery or pick-up of packages for FedEx's customers unless I covered up
the huge FedEx logo.  FedEx required me to perform maintenance on my truck which I
did not agree with.  FedEx required me to perform repairs on my truck for appearance
purposes which I did not agree with.  FedEx required me to come to work wearing a

FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. I was required to meet FedEx grooming standards. I was told that if my appearance and grooming were not acceptable to FedEx, I would not be permitted to drive unless and until my appearance and grooming met FedEx standards.

FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. I was required to follow FedEx's "Safe Driving Standards" which exceeded DOT requirements. Any time FedEx determined that I breached any of the many "Safe Driving Standards," FedEx could discipline me by terminating my indemnity and requiring me to purchase expensive insurance that I could not afford.

If FedEx determined that I had a "valid" customer complaint, I would lose my bonus and if I had several such complaints FedEx threatened to terminate my contract. FedEx determined that a customer complaint was valid without asking me about what

occurred; FedEx's terminal management told me that the customer "was always right." I would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service goals. Each day, my service percentage was posted in the terminal for all the other drivers to see. If my service percentage fell below the goal, it would be posted in red for all drivers to see.

FedEx terminal management conducted Customer Service Rides, where terminal management would ride along with me on my route to evaluate my performance and efficiency. After the ride, I received a form evaluating my work and telling me how to "improve." FedEx's terminal management "mapped" my route and told me the "most efficient" way to run my route. FedEx decided the size and weight of packages I was required to deliver and changed those to meet its own business goals without my agreement. I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to. I was provided with detailed instructions about how to enter and exit my truck, how to select my packages, how to deliver my packages and how to get the customer's signature. I was required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I used in performing my work were FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with instructions or additional work assignments. I was often required to research past package deliveries whenever asked to by FedEx in order to avoid money being withheld from my pay. I was sometimes followed on my route and reprimanded if I did not secure the truck exactly as FedEx wanted me to.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx could change the size and service area of my route based on its needs without my approval and without paying me. FedEx changed the size and service area of my route

over my objections and without paying me. FedEx determined the "minimum" and "maximum" number of packages to assign to me ("the min and the max") to meet FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in my truck at any time. I could not sign up new customers myself to increase my route. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FedEx. Even though my route had enough packages and stops to be split into two routes, FedEx would not allow me to split my route in two, as only FedEx can create new routes or reconfigure routes. FedEx required me to "plan" for "peak season" and to hire a helper during the busy season. FedEx denied my request to split my route into two routes even though the number of packages and stops warranted two routes. I had to get FedEx's approval to sell or transfer my truck to another driver. I had to get FedEx's approval to sell or transfer my route or part of my route to another driver.

I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I could not decline to provide any assigned pick-up service. FedEx determined the pickups I was assigned on a daily basis and I had to make each pickup assigned to me during the time agreed to by FedEx regardless of the rest of my duties that day. I was required to make deliveries or pick-ups that were not profitable, even if they were not on my route. I was required to timely deliver packages assigned to me to FedEx's customers. I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or

paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route. Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes, terminal management changed my accurate coding of a package as a misload to code it as a "did not attempt" which would reduce my service percentage, threaten my CCS bonus or even my job, without investigation or any basis for doing so. Sometimes the terminal manager would require me to have a meeting before I left the terminal, delaying me, to complain about my performance, appearance, or "attitude."

FedEx changed the days I was required to provide service without my agreement. By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver. I added a supplemental vehicle and driver at FedEx' insistence, even though I did not want to.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase workers compensation insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx deducted money from my pay for "cargo" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx determined the rate I was charged for the Business Support Package for the scanning, uniforms, and other

JOHN HUMPHREYS FIRST AMENDED ADDENDUM          5
RESPONSE TO FIRST SET INTERROGATORIES

services required by FedEx. I had no choice but to pay for the Business Support Package.

I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was paid for pickup and delivery services. FedEx determined that rate I was paid for "van availability," "core zone," and all other aspects of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx refused to do so. FedEx required me to install a rear-backing camera on my truck. FedEx makes maintenance loans to its drivers. If I keep a balance in my Service Guarantee Account, FedEx contributes additional money to it which I may use for any purpose. FedEx required me to pay $500 into an Escrow Account and to leave that amount in the account for the duration of my work there. My core zone pay was reduced when FedEx made me deliver to areas outside my route. My core zone pay was reduced for any day that I worked less than seven hours.

I rarely if ever worked fewer than 10 hours in a work day. I often worked 12 hours or more in a work day. I often had no time for a meal break or even a rest break in a work day. FedEx gave me the option to have my pay directly deposited into my bank account.

FedEx trained me in its methods of package handling, delivery, pick-up and customer service. I was required to attend ongoing trainings and meetings at FedEx which included topics such as performance, productivity, and customer service standards. I was given training and promotional videotapes which I was required to watch. FedEx required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often on topics that had nothing to do with safety. During Roundtable Meetings, FedEx management discussed new company policies and accounts and promoted its business goals. The Contractor Relations manager for my area failed to help me when I had a problem with the company not following the Operating Agreement. I was required to use a scanner

each day to permit customers to track the time of the deliveries on FedEx's website. I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information. I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day.

I was told by terminal management to enter a start time later than my real start time into my scanner so that I would not exceed DOT hours of service. I was required to provide service on each day FedEx decided to provide service to its customers. FedEx changed the days of service it offered its customers, without consulting me. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. I was reprimanded for not following, FedEx's "recommended" delivery sequence for the day. FedEx required to me to work a sixth day in any week when I was unable to deliver all of my required packages in the normal five day week.

I was threatened with contract termination on multiple occasions for not being able to deliver all of the packages assigned to me in a given day, no matter how many there were. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in jeopardy or might be sent to Pittsburgh for "review." FedEx deducted from my escrow accounts amounts it claimed I

owed FedEx, without my consent.

I was required to purchase or lease a truck of the size specified by FedEx to obtain a second route. I had to get a second route to protect my first route after it expanded so much that I could not service it all myself. I was required to submit a "business plan" in order to obtain a second route. My service percentage was reviewed for several past years after I asked for a second route.

The driver of my second route was given instructions by the terminal manager directly. The driver of my second route was evaluated in Customer Service Rides by terminal management. The driver of my second route was required to attend meetings with the terminal management whenever they asked. The driver of my second route was subject to all of the same rules and requirements I was subject to as a driver. The driver of my second route was trained by FedEx in its pickup and delivery techniques, customer service requirements and other rules. The driver of my second route had to attend the same weekly meetings I had to attend and to sign attendance sheets showing he or she was there. I was repeatedly told by terminal management that my routes were in jeopardy if the driver of my second route did not adequately service that route. I helped the terminal out with a route when a another driver quit because he could not longer afford the expenses. FedEx used my second route driver because he had experience delivering that route. It was to be temporary until FedEx could get another driver for the route. FedEx never did get another driver and gave me no choice but to service this route despite my objections.

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly governed by the written Operating Agreement you entered into, please state every such term and how it affected your relationship with Defendants.

JOHN HUMPHREYS FIRST AMENDED ADDENDUM          8
RESPONSE TO FIRST SET INTERROGATORIES

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response
No. 2, Named Plaintiff John Humphreys responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten
policies and procedures not mentioned in the Operating Agreement control my
relationship with FedEx. These policies imposed additional controls over every aspect of
my working relationship with FedEx. It is impossible to name all such terms, as some are
written but not given to me and some are orally communicated. To the best of my
knowledge and understanding, these extra-contractual sources include, but are not limited
to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual
  and numerous other written and extra-contractual policies. These written policies
  subjected me to additional requirements regarding grooming, my vehicle's
  appearance and size, Business Support Package, insurance, flexing of packages,
  hours and days of work, replacement drivers, cargo claims, reconfigurations,
  customer service rides, driver release audits, maintaining of files on my
  performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources
  include, but are not limited, to written rules on "contractor" termination,
  directives and training provided to terminal managers, written rules on driver
  appearance (with illustrative poster), written and oral complaint procedures,
  memorandum and directives to terminal management and other rules concealed
  from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations

personnel, and other employees and agents of FedEx provided verbal information and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to absolute control over me and created an employer-employee relationship between FedEx and me.

## INTERROGATORY NO. 3:

Please state in detail every effort you made to maximize your earnings and/or maximize the efficiency of pick up or delivery to your route(s) with Defendants, including, but not limited to, having others assist you, acquiring or taking on additional routes or portions of routes, operating supplemental vehicles, utilizing trailers or acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries, participating in the flex program, and any other steps you took.

## RESPONSE NO. 3:

Without waiving and subject to the General and Specific Objections to Response No. 3, Named Plaintiff John Humphreys responds as follows:

I am employed by FedEx and I do what I am told. I do my best to deliver all packages assigned to me each day. There is nothing beyond this that I can do to maximize my "earnings" or maximize my "efficiency." There is a limit to the number of packages my truck can hold and there is a limit to the number of packages and stops I can deliver in one day. I can only deliver the packages the company gives me and must follow the company's detailed procedures for pick-up and delivery. Hiring helpers, adding supplemental vehicles and/or drivers, servicing an additional route have high costs associated with them and generally do not substantially increase "earnings." FedEx approved a second route for me which did increase my earnings, but not substantially.

JOHN HUMPHREYS FIRST AMENDED ADDENDUM          10
RESPONSE TO FIRST SET INTERROGATORIES

**INTERROGATORY NO. 4:**

If anyone assisted you in the performance of your duties, please state the identities

of those individuals including their name, last known address and telephone number, the

dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff John Humphreys responds as follows:

I used Cedric Mallet to drive my second route.  I paid Mr. Mallet (on days he

worked) sixty (60%) of the daily settlement after subtracting for expenses including

insurance, the business support package and the fuel supplement.  He provided the same

pickup and deliver service that I performed for FedEx, under the same controls.

**INTERROGATORY NO. 5:**

If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

**RESPONSE NO. 5:**

Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff John Humphreys responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned.   This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked approximately 12 hours in a day and far more than

40 hours each week. During peak season, I estimate that I worked 12-14 hours a day because of the increase number of packages I had to deliver.

**INTERROGATORY NO. 6:**

Please state in detail the circumstances surrounding the termination of any contractual relationship(s) with Defendants, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale.

**RESPONSE NO. 6:**

Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff John Humphreys responds as follows:

Not Applicable.

**INTERROGATORY NO. 7:**

Please state all class-wide proof on which you intend to rely to support that every member of the proposed class should have been classified as an employee.

**RESPONSE NO. 7:**

Without waiving and subject to the General and Specific Objections to Response No. 7, Named Plaintiff John Humphreys responds as follows:

*See*, Operating Agreement, all Addendum, FedEx Ground Manual, all other FEG policies, manual(s), recruiting materials, procedures and forms, e.g. OP-205, OP-152, the same or similar documents in each driver's files, contract discussion notes, letters and memorandum from corporate officers, terminal managers, regional management, and contractor relations, contract or business plans, customer service ride forms, driver release audits, Independent Times, weekly settlement statements, Estrada v. FedEx trial exhibits and trial transcripts, unit history files.

Additionally, discovery is continuing in this matter and Named Plaintiffs have not had the opportunity to review all the documents produced by Defendant to date, which

may contain additional documents responsive to this request or documents not yet

provided by Defendant. Named Plaintiffs will supplement this response after additional

discovery is conducted.

**INTERROGATORY NO. 8:**

Please state the dollar amounts you seek individually and on behalf of the class

for reimbursement of business expenses, statutory damages, punitive damages, and any

other categories of damages, including how you calculated such damages.

**RESPONSE NO. 8:**

Without waiving and subject to the General and Specific Objections to Response

No. 8, Named Plaintiff John Humphreys responds as follows:

All pick-up and delivery drivers incur the same categories of damages as

demonstrated by FedEx's recruiting data. (FedEx's Entrepreneurial Spirit attached

hereto). The categories of damages are: (a) un-reimbursed employment expenses (or

unjust enrichment) including the cost of leasing the required truck, (b) illegal wage

deductions, (c) fraud damages, (d) as well as punitive damages, fees and costs. All

estimates are derived from FedEx's recruiting information and are computed by using a

monthly estimate multiplied by the number of months each named plaintiff worked for

Defendant as a pickup and delivery driver.

In providing preliminary estimates of damages for unpaid expenses (including

truck lease), Named Plaintiffs rely on FedEx's recruiting data which includes a very

conservative estimate of most, but not all, expenses that drivers incur. In addition,

Named Plaintiffs have added maintenance costs, which were omitted from the

Entrepreneurial Spirit. The preliminary estimate for maintenance is based on Estrada v.

FedEx accounting, to which Defendant was a party. Further, Named Plaintiffs have

modified the estimate for the cost of the truck to reflect a higher rate for FedEx Ground

drivers who generally drive larger and more costly trucks than Home Delivery. Named

Plaintiffs also estimated health care costs based on FedEx's recruiting materials.

In providing preliminary estimates of illegal deductions from wages, Named

Plaintiffs are only able to provide a preliminary estimate for cargo claim deductions. In

providing preliminary estimates of damages for fraud, in addition to the truck lease

included in the category of reimbursable expenses, Named Plaintiffs include a

conservative estimate for down payment and balloon payment of the truck from FedEx

Ground's "Becoming an RPS Contractor." (A copy is attached hereto)  This conservative

estimate is reduced for Home Delivery drivers to account for the smaller truck.

In addition, Named Plaintiffs seek to recover punitive damages (fraud and other

claims), prejudgment interest, penalties, costs and attorney fees, which cannot currently

be estimated.

The preliminary estimate for me is $169,100 which include an estimate of

$144,000 for un-reimbursed expenses, $2,100 for illegal wage deductions, $18,000 for

meal and rest period violations and $5,000 for fraud damages.  Further, class damages

will include the same category of damages as applicable to the Named Plaintiffs and will

be calculated in the same manner and using the same methodology as used to calculate

damages for the Named Plaintiffs.

**INTERROGATORY NO. 9:**

Please state in detail the equitable, declaratory and injunctive relief that you seek,

including whether you seek a judgment that some or all putative class members should be

classified and treated as employees and, if so, which putative class members should be

treated as employees and for what purpose(s).

JOHN HUMPHREYS FIRST AMENDED ADDENDUM          14
RESPONSE TO FIRST SET INTERROGATORIES

**RESPONSE NO. 9:**

Without waiving and subject to the General and Specific Objections to Response No. 9, Named Plaintiff John Humphreys responds as follows:

FedEx misclassified pick-up and deliver drivers as independent contractors. On behalf of the class described in our complaint, Named Plaintiffs seek declaratory judgment that Plaintiffs and the plaintiff class are employees under FMLA, ERISA, and Texas law, that Defendant's conduct violated FMLA, ERISA, Texas statutory and common- law; that Plaintiffs and the plaintiff class are covered by those statutes and common-law applicable to employees. Named Plaintiffs also seek injunctive relief prohibiting Defendant from continuing to misclassify employees, from further violating federal and Texas statutory and common-law principles protecting employees and from continuing their unfair, unlawful and/or fraudulent business practices. Named Plaintiffs also seek restitution and reimbursement of defendant's unfairly or illegally gotten profits including but not limited to all un-reimbursed expenses, unpaid unemployment insurance benefits, monies unlawfully withheld from wages, a portion of self-employment tax paid by Plaintiffs and plaintiff class members which should have been paid by Defendant and other money due as part of a full restitutionary remedy.

## VERIFICATION

I, John Humphreys, declare under penalty of perjury under the laws of the United States that I have read the foregoing and know that the responses to the interrogatories propounded to me are true and correct to the best of my knowledge.

Executed this 11ᵀᴴ day of ~~April~~ MAY 2006 at AUSTIN, TX _____ (City, State).

_____
John Humphreys

**ADDENDUM RESPONSE OF CHARLES P. CAMPBELL TO**
**DEFENDANT'S FIRST SET OF INTERROGATORIES**

## INTERROGATORY NO. 1:

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

## RESPONSE NO. 1:

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff Charles Campbell responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. The truck I used for my route had to have certain shelving and meet other specifications FedEx required. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx imposed vehicle maintenance requirements in excess of the DOT regulations. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with. I was required to have preventative maintenance on my truck more frequently than the manufacturer suggested, when FedEx told me to. FedEx took my

truck out of service for failing to meet one of its many standards; FedEx required me to
rent a truck for that day instead of use my own truck.

FedEx required me to come to work wearing a FedEx uniform with company logo
and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I
rented my uniform from FedEx as part of the Business Support Package. I was required
to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any
damage. I was required to meet FedEx grooming standards.

FedEx determined the service goals I was required to meet in order to obtain
incentive payments in the Contractor Customer Service program. I was trained on
FedEx's minimum standards of customer service. If I did not comply with FedEx's
standards, I could lose my bonus or even my job. FedEx required me to pick up packages
from its customers at times requested by the customer and/or negotiated between FedEx
and the customer without my input. FedEx set the price it charged the customers and I
could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature
(driver release). If I did not comply with FedEx's driver release rules, I could lose my
bonus or even my job. I was required to follow FedEx's "Safe Driving Standards" which
exceeded DOT requirements. FedEx determined that a customer complaint was valid
without asking me about what occurred; FedEx's terminal management told me that the
customer "was always right."

FedEx terminal management conducted Customer Service Rides, where terminal
management would ride along with me on my route to evaluate my performance and
efficiency. After the ride, I received a form evaluating my work and telling me how to
"improve." FedEx's terminal management "mapped" my route and told me the "most
efficient" way to run my route but it was normally incorrect! FedEx decided the size and

CHARLES CAMPBELL ADDENDUM                    2
RESPONSE TO FIRST SET INTERROGATORIES

weight of packages I was required to deliver and changed those to meet its own business goals without my agreement. I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to. I was provided with detailed instructions about how to enter and exit my truck, how to select my packages, how to deliver my packages and how to get the customer's signature. I was required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I used in performing my work were FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with instructions or additional work assignments. I was often required to research past package deliveries whenever asked to by FedEx in order to avoid money being withheld from my pay.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx could change the size and service area of my route based on its needs without my approval and without paying me. FedEx changed the size and service area of my route over my objections and without paying me. FedEx determined the "minimum" and "maximum" number of packages to assign to me ("the min and the max") to meet FedEx's business needs regardless of my views. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FedEx

I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I could not decline to provide any assigned pick-up service. FedEx determined the pickups I was assigned on a daily basis and I had to make each pickup assigned to me during the time agreed to by FedEx regardless of the rest of my duties that day. I was

CHARLES CAMPBELL ADDENDUM                    3
RESPONSE TO FIRST SET INTERROGATORIES

required to make deliveries or pick-ups that were not profitable, even if they were not on my route. I was required to timely deliver packages assigned to me to FedEx's customers. I was required to timely pick up packages assigned to me from FedEx's customers. I was required to return the packages I picked up at the end of the day to the terminal. I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route.

FedEx changed the days I was required to provide service without my agreement. By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase workers compensation insurance through **a** FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx deducted money from my pay for "cargo" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx also deducted money from my pay for "insurance" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx determined the

CHARLES CAMPBELL ADDENDUM                4
RESPONSE TO FIRST SET INTERROGATORIES

rate I was charged for the Business Support Package for the scanning, uniforms, and

other services required by FedEx. I had no choice but to pay for the Business Support

Package. I had no choice but to rent the scanner from FedEx.

FedEx determined the rate I was paid for pickup and delivery services. FedEx

determined that rate I was paid for "van availability," "core zone," and all other aspects

of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx

refused to do so. FedEx required me to install a rear-backing camera on my truck.

FedEx required me to pay $500 into an Escrow Account and to leave that amount in the

account for the duration of my work there. My core zone pay was reduced when FedEx

made me deliver to areas outside my route. My core zone pay was reduced for any day

that I worked less than seven hours. I often had no time for a meal break or even a rest

break in a work day. FedEx gave me the option to have my pay directly deposited into

my bank account. FedEx sends me a monthly magazine and other materials to my home.

FedEx trained me in its methods of package handling, delivery, pick-up and

customer service. I was required to attend ongoing trainings and meetings at FedEx

which included topics such as performance, productivity, and customer service standards.

I was given training and promotional videotapes which I was required to watch. FedEx

required that I attend weekly meetings at my terminal and sign attendance sheets showing

my attendance. Although these were called "Safety Meetings" they were often on topics

that had nothing to do with safety. During Roundtable Meetings, FedEx management

discussed new company policies and accounts and promoted its business goals. The

Contractor Relations manager for my area failed to help me when I had a problem with

the company not following the Operating Agreement. I was required to use a scanner

each day to permit customers to track the time of the deliveries on FedEx's website. I

was required to input into the scanner the number of miles I had driven in the course of

CHARLES CAMPBELL ADDENDUM                    5
RESPONSE TO FIRST SET INTERROGATORIES

the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information.

I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was required to provide service on each day FedEx decided to provide service to its customers. FedEx changed the days of service it offered its customers, without consulting me. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in jeopardy or might be sent to Pittsburgh for "review." FedEx deducted from my escrow accounts amounts it claimed I owed FedEx, without my consent.

My contract was not renewed by FedEx but I was given no reason for the non-renewal. When I was not renewed, I lost everything I had invested and was stuck with a FedEx vehicle I could not use for any other purpose.

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly governed by the written Operating Agreement you entered into, please state every such term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response No. 2, Named Plaintiff Charles Campbell responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten policies and procedures not mentioned in the Operating Agreement control my relationship with FedEx. These policies imposed additional controls over every aspect of my working relationship with FedEx. It is impossible to name all such terms, as some are written but not given to me and some are orally communicated. To the best of my knowledge and understanding, these extra-contractual sources include, but are not limited to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies. These written policies subjected me to additional requirements regarding grooming, my vehicle's appearance and size, Business Support Package, insurance, flexing of packages, hours and days of work, replacement drivers, cargo claims, reconfigurations, customer service rides, driver release audits, maintaining of files on my performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources include, but are not limited, to written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures, memorandum and directives to terminal management and other rules concealed from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations personnel, and other employees and agents of FedEx provided verbal information and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to absolute control over me and created an employer-employee relationship between FedEx and me.

## INTERROGATORY NO. 3:

Please state in detail every effort you made to maximize your earnings and/or maximize the efficiency of pick up or delivery to your route(s) with Defendants, including, but not limited to, having others assist you, acquiring or taking on additional routes or portions of routes, operating supplemental vehicles, utilizing trailers or acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries, participating in the flex program, and any other steps you took.

## RESPONSE NO. 3:

Without waiving and subject to the General and Specific Objections to Response No. 3, Named Plaintiff Charles Campbell responds as follows:

I was employed by FedEx and I did what I was told. I did my best to deliver all packages assigned to me each day. There was nothing beyond this that I could do to maximize my "earnings" or maximize my "efficiency." There is a limit to the number of packages my truck can hold and there is a limit to the number of packages and stops I can deliver in one day. I could only deliver the packages the company gave me and had to follow the company's detailed procedures for pick-up and delivery. Hiring helpers, adding supplemental vehicles and/or drivers, servicing an additional route have high costs associated with them and generally do not substantially increase "earnings."

## INTERROGATORY NO. 4:

If anyone assisted you in the performance of your duties, please state the identities of those individuals including their name, last known address and telephone number, the dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

    Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff Charles Campbell responds as follows:

    No one assisted me in the performance of my duties.

**INTERROGATORY NO. 5:**

    If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

**RESPONSE NO. 5:**

    Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff Charles Campbell responds as follows:

    FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned.   This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked approximately 12 hours in a day and far more than

40 hours each week.  During peak season, I estimate that I worked 12-14 hours a day

because of the increase number of packages I had to deliver.

**INTERROGATORY NO. 6:**

    Please state in detail the circumstances surrounding the termination of any

contractual relationship(s) with Defendants, including whether and to whom you sold

your truck(s) and/or route(s), and the consideration you received for each sale.

**RESPONSE NO. 6:**

Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff Charles Campbell responds as follows:

My contract was not renewed by FedEx in January 2004, although I did not breach my contract and the company had no good reason for doing so. As a result of the non-renewal, FedEx took back my route and I was unable to sell my route and my truck. When I was non-renewed, I lost everything I had invested and was stuck with a FedEx vehicle I could not use for any other purpose.

## <u>VERIFICATION</u>

I, Charles Campbell, declare under penalty of perjury under the laws of the United States that I have read the foregoing and know that the responses to the interrogatories propounded to me are true and correct to the best of my knowledge.

Executed this _____ day of April 2006 at _____ (City, State).


_____

CHARLES CAMPBELL

# Responses of Named Plaintiffs to Defendant's First Set of Interrogatories in *Lester/Currithers v. FedEx Ground*

EXIHIBT G

**ADDENDUM RESPONSE OF RYAN TOMASKI TO
DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff Ryan Tomaski responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. The truck I used for my route had to have certain shelving and meet other specifications FedEx required. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx imposed vehicle maintenance requirements in excess of the DOT regulations. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with. FedEx required me to perform repairs on my truck for appearance purposes which I did not agree with. I was required to paint my truck when FedEx told

me to.

  FedEx required me to come to work wearing a FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. I was required to meet FedEx grooming standards. I was told that if my appearance and grooming were not acceptable to FedEx, I would not be permitted to drive unless and until my appearance and grooming met FedEx standards.

  FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx required me to pick up packages from its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

  FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. I was required to follow FedEx's "Safe Driving Standards" which exceeded DOT requirements. Any time FedEx determined that I breached any of the many "Safe Driving Standards," FedEx could discipline me by terminating my indemnity and requiring me to purchase expensive insurance that I could not afford.

RYAN TOMASKI ADDENDUM    2
RESPONSE TO FIRST SET INTERROGATORIES

If FedEx determined that I had a "valid" customer complaint, I would lose my bonus and if I had several such complaints FedEx threatened to terminate my contract. FedEx determined that a customer complaint was valid without asking me about what occurred; FedEx's terminal management told me that the customer "was always right." I would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service goals. Each day, my service percentage was posted in the terminal for all the other drivers to see. If my service percentage fell below the goal, it would be posted in red for all drivers to see. I would lose my CCS bonus for making pick-ups earlier than scheduled, even by a minute. FedEx considers an early pick-up as a "missed" pick-up and if I had several of these, FedEx would threaten to terminate my contract. FedEx's terminal management "mapped" my route and told me the "most efficient" way to run my route.

FedEx decided the size and weight of packages I was required to deliver and changed those to meet its own business goals without my agreement. I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to. I was provided with detailed instructions about how to enter and exit my truck, how to select my packages, how to deliver my packages and how to get the customer's signature. I was required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I used in performing my work were FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with instructions or additional work assignments. I was often required to research past package deliveries whenever asked to by FedEx in order to avoid money being withheld from my pay.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx

could change the size and service area of my route based on its needs without my approval and without paying me. FedEx determined the "minimum" and "maximum" number of packages to assign to me ("the min and the max") to meet FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in my truck at any time. I could not sign up new customers myself to increase my route. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FedEx. I had to get FedEx's approval to sell or transfer my truck to another driver.

I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I could not decline to provide any assigned pick-up service. FedEx determined the pickups I was assigned on a daily basis and I had to make each pickup assigned to me during the time agreed to by FedEx regardless of the rest of my duties that day. I was required to make deliveries or pick-ups that were not profitable, even if they were not on my route.

I was required to timely deliver packages assigned to me to FedEx's customers. I was required to timely pick up packages assigned to me from FedEx's customers. I was required to return the packages I picked up at the end of the day to the terminal. I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the

previous day's deliveries in the morning when I was getting ready to service my route.

Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes, terminal management changed my accurate coding of a package as a misload to code it as a "did not attempt" which would reduce my service percentage, threaten my CCS bonus or even my job, without investigation or any basis for doing so. Sometimes the terminal manager would require me to have a meeting before I left the terminal, delaying me, to complain about my performance, appearance, or "attitude." I was required to leave my truck at the terminal in my assigned parking space each evening for overnight loading. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx determined the rate I was charged for the Business Support Package for the scanning, uniforms, and other services required by FedEx. I had no choice but to pay for the Business Support Package. I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was paid for pickup and delivery services. FedEx determined that rate I was paid for "van availability," "core zone," and all other aspects of my pay. FedEx required me to install a rear-backing camera on my truck. FedEx makes maintenance loans to its drivers. FedEx required me to pay $1,000 into an Escrow Account and to leave that amount in the account for the duration of my work there. My core zone pay was reduced when FedEx made me deliver to areas outside my route. My core zone pay was reduced for any day that I worked less than seven hours. I often had no time for a meal break or even a rest

RYAN TOMASKI ADDENDUM                    5
RESPONSE TO FIRST SET INTERROGATORIES

break in a work day. FedEx gave me the option to have my pay directly deposited into my bank account.

FedEx trained me in its methods of package handling, delivery, pick-up and customer service. I was required to attend ongoing trainings and meetings at FedEx which included topics such as performance, productivity, and customer service standards. I was given training and promotional videotapes which I was required to watch. FedEx required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often on topics that had nothing to do with safety. During Roundtable Meetings, FedEx management discussed new company policies and accounts and promoted its business goals. I was required to use a scanner each day to permit customers to track the time of the deliveries on FedEx's website.

I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day. At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information. I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was told by terminal management to enter a start time later than my real start time into my scanner so that I would not exceed DOT hours of service. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in

jeopardy or might be sent to Pittsburgh for "review." FedEx deducted from my escrow

accounts amounts it claimed I owed FedEx, without my consent.

I was threatened with contract termination on multiple occasions for allegedly not

complying with FedEx's maintenance requirements.

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly

governed by the written Operating Agreement you entered into, please state every such

term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response

No. 2, Named Plaintiff Ryan Tomaski responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten

policies and procedures not mentioned in the Operating Agreement control my

relationship with FedEx. These policies imposed additional controls over every aspect of

my working relationship with FedEx. It is impossible to name all such terms, as some are

written but not given to me and some are orally communicated. To the best of my

knowledge and understanding, these extra-contractual sources include, but are not limited

to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual

  and numerous other written and extra-contractual policies. These written policies

  subjected me to additional requirements regarding grooming, my vehicle's

  appearance and size, Business Support Package, insurance, flexing of packages,

  hours and days of work, replacement drivers, cargo claims, reconfigurations,

  customer service rides, driver release audits, maintaining of files on my

  performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources include, but are not limited, to written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures, memorandum and directives to terminal management and other rules concealed from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations personnel, and other employees and agents of FedEx provided verbal information and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to absolute control over me and created an employer-employee relationship between FedEx and me.

**INTERROGATORY NO. 3:**

Please state in detail every effort you made to maximize your earnings and/or maximize the efficiency of pick up or delivery to your route(s) with Defendants, including, but not limited to, having others assist you, acquiring or taking on additional routes or portions of routes, operating supplemental vehicles, utilizing trailers or acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries, participating in the flex program, and any other steps you took.

**RESPONSE NO. 3:**

Without waiving and subject to the General and Specific Objections to Response No. 3, Named Plaintiff Ryan Tomaski responds as follows:

I was employed by FedEx and I did what I was told. I did my best to deliver all packages assigned to me each day. There was nothing beyond this that I could do to maximize my "earnings" or maximize my "efficiency." There is a limit to the number of

packages my truck can hold and there is a limit to the number of packages and stops I can

deliver in one day. I could only deliver the packages the company gave me and had to

follow the company's detailed procedures for pick-up and delivery. Hiring helpers,

adding supplemental vehicles and/or drivers, servicing an additional route have high costs

associated with them and generally do not substantially increase "earnings."

**INTERROGATORY NO. 4:**

If anyone assisted you in the performance of your duties, please state the identities

of those individuals including their name, last known address and telephone number, the

dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff Ryan Tomaski responds as follows:

No one assisted me in the performance of my duties.

**INTERROGATORY NO. 5:**

If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

**RESPONSE NO. 5:**

Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff Ryan Tomaski responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned. This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked approximately 12 hours in a day and far more than

40 hours each week. During peak season, I estimate that I worked 12-14 hours a day

because of the increase number of packages I had to deliver.

**INTERROGATORY NO. 6:**

Please state in detail the circumstances surrounding the termination of any

contractual relationship(s) with Defendants, including whether and to whom you sold

your truck(s) and/or route(s), and the consideration you received for each sale.

**RESPONSE NO. 6:**

Without waiving and subject to the General and Specific Objections to Response

No. 6, Named Plaintiff Ryan Tomaski responds as follows:

In 2002, I was terminated. As a result of the termination, FedEx took back my

route and I was unable to sell my route.

## VERIFICATION

I, Ryan Tomaski, declare under penalty of perjury under the laws of the United States that I have read the foregoing and know that the responses to the interrogatories propounded to me are true and correct to the best of my knowledge.

Executed this _____ day of April 2006 at _____ (City, State).


_____
Ryan Tomaski

## ADDENDUM RESPONSE OF JAMES KASSUBA TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff James Kassuba responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with. FedEx required me to perform repairs on my truck for appearance purposes which I did not agree with. I was required to paint my truck when FedEx told me to.

FedEx required me to come to work wearing a FedEx uniform with company logo

and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap.

I rented my uniform from FedEx as part of the Business Support Package. I was required

to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any

damage. I was required to meet FedEx grooming standards. I was told that if my

appearance and grooming were not acceptable to FedEx, I would not be permitted to

drive unless and until my appearance and grooming met FedEx standards. I was not

allowed to provide service if my uniform was not complete or if my shoes were not

black. I was told I could not provide service unless I changed the color of my shorts.

FedEx determined the service goals I was required to meet in order to obtain

incentive payments in the Contractor Customer Service program. I was trained on

FedEx's minimum standards of customer service. If I did not comply with FedEx's

standards, I could lose my bonus or even my job. FedEx required me to pick up packages

from its customers at times requested by the customer and/or negotiated between FedEx

and the customer without my input. FedEx set the price it charged the customers and I

could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature

(driver release). If I did not comply with FedEx's driver release rules, I could lose my

bonus or even my job. FedEx performed a monthly "driver release audit" to check up on

my compliance with its rules; terminal management would follow me on my route for

this purpose without my knowledge. FedEx could take away my right to driver release

packages if it determined that I did not comply with its standards. This could affect my

pay and the hours I worked. I was required to follow FedEx's "Safe Driving Standards"

which exceeded DOT requirements. Any time FedEx determined that I breached any of

the many "Safe Driving Standards," FedEx could discipline me by terminating my

JAMES KASSUBA ADDENDUM                    2
RESPONSE TO FIRST SET INTERROGATORIES

indemnity and requiring me to purchase expensive insurance that I could not afford.

If FedEx determined that I had a "valid" customer complaint, I would lose my bonus and if I had several such complaints FedEx threatened to terminate my contract. FedEx determined that a customer complaint was valid without asking me about what occurred; FedEx's terminal management told me that the customer "was always right." I would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service goals.

FedEx terminal management conducted Customer Service Rides, where terminal management would ride along with me on my route to evaluate my performance and efficiency. After the ride, I received a form evaluating my work and telling me how to "improve." FedEx's terminal management "mapped" my route and told me the "most efficient" way to run my route. FedEx decided the size and weight of packages I was required to deliver and changed those to meet its own business goals without my agreement. I was trained by FedEx to perform pick-up and delivery services the way FedEx wanted me to. I was provided with detailed instructions about how to enter and exit my truck, how to select my packages, how to deliver my packages and how to get the customer's signature. I was required to follow FedEx procedures regarding call tags, and c.o.d's, and other special services. All of the forms I used in performing my work were FedEx forms with the company logo. I receive telephone calls on my cell phone from the terminal during the day with instructions or additional work assignments. I was often required to research past package deliveries whenever asked to by FedEx in order to avoid money being withheld from my pay. I was sometimes followed on my route and reprimanded if I did not secure the truck exactly as FedEx wanted me to.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx

could change the size and service area of my route based on its needs without my

approval and without paying me. FedEx changed the size and service area of my route

over my objections and without paying me. FedEx determined the "minimum" and

"maximum" number of packages to assign to me ("the min and the max") to meet

FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in

my truck at any time. I could not acquire or take on additional routes or portions of

routes without the express consent and approval of FedEx. Even though my route had

enough packages and stops to be split into two routes, FedEx would not allow me to split

my route in two, as only FedEx can create new routes or reconfigure routes. FedEx

required me to "plan" for "peak season" and to hire a helper during the busy season.

FedEx denied my request to split my route into two routes even though the number of

packages and stops warranted two routes. I had to get FedEx's approval to sell or

transfer my truck to another driver. I had to get FedEx's approval to sell or transfer my

route or part of my route to another driver. FedEx refused to approve a buyer I had for

my route even though he met FedEx's minimum requirements.

I could not and did not deliver packages for any company other than FedEx. I

could not decline to deliver any package assigned to me by FedEx for any reason. FedEx

determined the total number of packages and location of deliveries it assigned to me on a

daily basis and I was required to deliver every package assigned to me on the day it was

assigned. I could not decline to provide any assigned pick-up service. FedEx determined

the pickups I was assigned on a daily basis and I had to make each pickup assigned to me

during the time agreed to by FedEx regardless of the rest of my duties that day. I was

required to make deliveries or pick-ups that were not profitable, even if they were not on

my route. I was required to timely deliver packages assigned to me to FedEx's

JAMES KASSUBA ADDENDUM                                4
RESPONSE TO FIRST SET INTERROGATORIES

customers. I was required to timely pick up packages assigned to me from FedEx's customers. I was required to return the packages I picked up at the end of the day to the terminal. I often could not leave the terminal as soon as I was ready; if terminal management wanted me to wait, I would be stopped from getting my equipment or paperwork until terminal management was ready for me to leave. I had to report on my deliveries at the end of each day. Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route. Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes, terminal management changed my accurate coding of a package as a misload to code it as a "did not attempt" which would reduce my service percentage, threaten my CCS bonus or even my job, without investigation or any basis for doing so. Sometimes the terminal manager would require me to have a meeting before I left the terminal, delaying me, to complain about my performance, appearance, or "attitude."

FedEx changed the days I was required to provide service without my agreement. By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver. FedEx refuse to approve a replacement driver I proposed.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase workers compensation insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx determined the rate

I was charged for the Business Support Package for the scanning, uniforms, and other services required by FedEx. I had no choice but to pay for the Business Support Package. I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was paid for pickup and delivery services. FedEx determined that rate I was paid for "van availability," "core zone," and all other aspects of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx refused to do so. FedEx required me to install a rear-backing camera on my truck. FedEx required me to re-paint my truck as part of their Van Re-imaging Program. FedEx makes maintenance loans to its drivers. If I keep a balance in my Service Guarantee Account, FedEx contributes additional money to it which I may use for any purpose. My core zone pay was reduced for any day that I worked less than seven hours.

I rarely if ever worked fewer than 10 hours in a work day. I often had no time for a meal break or even a rest break in a work day. FedEx gave me the option to have my pay directly deposited into my bank account. FedEx sends me a monthly magazine and other materials to my home.

FedEx trained me in its methods of package handling, delivery, pick-up and customer service. I was required to attend ongoing trainings and meetings at FedEx which included topics such as performance, productivity, and customer service standards. I was given training and promotional videotapes which I was required to watch. FedEx required that I attend weekly meetings at my terminal and sign attendance sheets showing my attendance. Although these were called "Safety Meetings" they were often on topics that had nothing to do with safety. The Contractor Relations manager for my area failed to help me when I had a problem with the company not following the Operating Agreement. When I contacted the Contractor Relations manager for my area about issues, he sided with terminal management and tried to justify whatever decision terminal

JAMES KASSUBA ADDENDUM                    6
RESPONSE TO FIRST SET INTERROGATORIES

management made. I was required to use a scanner each day to permit customers to track the time of the deliveries on FedEx's website. I was required to input into the scanner the number of miles I had driven in the course of the day. I was required to input into the scanner the time I arrived at the terminal, the time I departed from the terminal, the time of my first delivery, the time of my last pickup, and the time I arrived at the terminal or home at the end of the day.

At the end of the day, I was required to download the information in my scanner into FedEx's system. The scanner included the following information: mileage, hours of work, hours of service, number of stops, number of deliveries, number of pick-ups, and delivery information. I was required to follow the FedEx check in and check out procedures each day and to provide information about my service for that day. I was required to scan each customer pickup made during the course of the day. I was required to provide service on each day FedEx decided to provide service to its customers. FedEx changed the days of service it offered its customers, without consulting me. FedEx gave me at the beginning of each day a chart or map of my route and a manifest which listed all of my deliveries in the order I should deliver them. FedEx required to me to work a sixth day in any week when I was unable to deliver all of my required packages in the normal five day week.

I was threatened with contract termination on multiple occasions for not being able to deliver all of the packages assigned to me in a given day, no matter how many there were. Often if I disagreed with the terminal manager about something or complained, I was told that my contract might be in jeopardy or might be sent to Pittsburgh for "review."

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly governed by the written Operating Agreement you entered into, please state every such term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response No. 2, Named Plaintiff James Kassuba responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten policies and procedures not mentioned in the Operating Agreement control my relationship with FedEx. These policies imposed additional controls over every aspect of my working relationship with FedEx. It is impossible to name all such terms, as some are written but not given to me and some are orally communicated. To the best of my knowledge and understanding, these extra-contractual sources include, but are not limited to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies. These written policies subjected me to additional requirements regarding grooming, my vehicle's appearance and size, Business Support Package, insurance, flexing of packages, hours and days of work, replacement drivers, cargo claims, reconfigurations, customer service rides, driver release audits, maintaining of files on my performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources include, but are not limited, to written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures,

memorandum and directives to terminal management and other rules concealed

from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations

    personnel, and other employees and agents of FedEx provided verbal information

    and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to

absolute control over me and created an employer-employee relationship between FedEx

and me.

## INTERROGATORY NO. 3:

Please state in detail every effort you made to maximize your earnings and/or

maximize the efficiency of pick up or delivery to your route(s) with Defendants,

including, but not limited to, having others assist you, acquiring or taking on additional

routes or portions of routes, operating supplemental vehicles, utilizing trailers or

acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries,

participating in the flex program, and any other steps you took.

## RESPONSE NO. 3:

Without waiving and subject to the General and Specific Objections to Response

No. 3, Named Plaintiff James Kassuba responds as follows:

I was employed by FedEx and I did what I am told.  I did my best to deliver all

packages assigned to me each day.  There is nothing beyond this that I could do to

maximize my "earnings" or maximize my "efficiency."  There is a limit to the number of

packages my truck can hold and there is a limit to the number of packages and stops I can

deliver in one day.  I could only deliver the packages the company gave me and had to

follow the company's detailed procedures for pick-up and delivery.  Hiring helpers,

adding supplemental vehicles and/or drivers, servicing an additional route have high costs

JAMES KASSUBA ADDENDUM                            9
RESPONSE TO FIRST SET INTERROGATORIES

associated with them and generally do not substantially increase "earnings."

**INTERROGATORY NO. 4:**

If anyone assisted you in the performance of your duties, please state the identities

of those individuals including their name, last known address and telephone number, the

dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff James Kassuba responds as follows:

No one assisted me in the performance of my duties.

**INTERROGATORY NO. 5:**

If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

**RESPONSE NO. 5:**

Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff James Kassuba responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned.   This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked more than 10 hours in a day and far more than 40

hours each week.  During peak season, I estimate that I worked 12-14 hours a day

because of the increase number of packages I had to deliver.

**INTERROGATORY NO. 6:**

Please state in detail the circumstances surrounding the termination of any contractual relationship(s) with Defendants, including whether and to whom you sold your truck(s) and/or route(s), and the consideration you received for each sale.

**RESPONSE NO. 6:**

Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff James Kassuba responds as follows:

I left FedEx. I did not sell my route.

**INTERROGATORY NO. 1:**

Please state all class-wide proof on which you intend to rely to support that every member of the proposed class should have been classified as an employee.

**RESPONSE NO. 7:**

Without waiving and subject to the General and Specific Objections to Response No. 7, Named Plaintiff James Kassuba responds as follows:

*See*, Operating Agreement, all Addendum, FedEx Ground Manual, all other FEG policies, manual(s), recruiting materials, procedures and forms, e.g. OP-205, OP-152, the same or similar documents in each driver's files, contract discussion notes, letters and memorandum from corporate officers, terminal managers, regional management, and contractor relations, contract or business plans, customer service ride forms, driver release audits, Independent Times, weekly settlement statements, Estrada v. FedEx trial exhibits and trial transcripts, unit history files.

Additionally, discovery is continuing in this matter and Named Plaintiffs have not had the opportunity to review all the documents produced by Defendant to date, which may contain additional documents responsive to this request or documents not yet provided by Defendant. Named Plaintiffs will supplement this response after additional

discovery is conducted.

## INTERROGATORY NO. 8:

Please state the dollar amounts you seek individually and on behalf of the class for reimbursement of business expenses, statutory damages, punitive damages, and any other categories of damages, including how you calculated such damages.

## RESPONSE NO. 8:

Without waiving and subject to the General and Specific Objections to Response No. 8, Named Plaintiff James Kassuba responds as follows:

All pick-up and delivery drivers incur substantially the same categories of damages as demonstrated by FedEx's recruiting data. (FedEx's Entrepreneurial Spirit and Becoming an RPS Contractor, attached hereto). The categories of damages include: (a) un-reimbursed employment expenses (or unjust enrichment) including the cost of leasing the required truck, (b) illegal wage deductions, (c) special damages (excluding punitive damages), (d) as well as punitive damages, fees and costs. Estimates are derived from FedEx's recruiting information and are computed by using a monthly estimate multiplied by the number of months each named plaintiff worked for Defendant as a pickup and delivery driver.

In providing preliminary estimates of damages for unpaid expenses (including truck lease), Named Plaintiffs rely on FedEx's recruiting documents which include very conservative estimate of most, but not all, expenses that drivers incur. In addition, Named Plaintiffs have added maintenance costs using the Becoming an RPS Contractor estimations, which were omitted from the Entrepreneurial Spirit. The preliminary estimate for maintenance is based on Estrada v. FedEx accounting, to which Defendant was a party. Further, Named Plaintiffs have modified the estimate for the cost of the truck contained in the Entrepreneurial Spirit to reflect a higher rate for FedEx Ground

JAMES KASSUBA ADDENDUM                        12
RESPONSE TO FIRST SET INTERROGATORIES

drivers who generally drive larger and more costly trucks than Home Delivery. Named

Plaintiffs also estimated health care costs based on FedEx's recruiting materials.

In providing preliminary estimates of illegal deductions from wages, Named

Plaintiffs are only able to provide a preliminary estimate for cargo claim deductions. In

providing preliminary estimates of special damages (excluding punitive damages), in

addition to the truck lease included in the category of reimbursable expenses, Named

Plaintiffs include a conservative estimate for down payment and balloon payment of the

truck from FedEx Ground's "Becoming an RPS Contractor." (A copy is attached hereto)

This conservative estimate is reduced for Home Delivery drivers to account for the

smaller truck.

In addition, Named Plaintiffs seek to recover punitive damages (fraud and other

claims), prejudgment interest, statutory penalties, damages for all other claims asserted in

the amended complaint, costs and attorney fees, which cannot currently be estimated.

Further, Named Plaintiffs seek to recover damages under ERISA, which cannot be

currently estimated because Defendant has not produced the documents.

The preliminary estimate for me is $29,350 which include an estimate of

$24,000 for un-reimbursed expenses, $350 for illegal wage deductions, and $5,000 for

special damages (excluding punitive damages). Further, class damages will include the

same category of damages as applicable to the Named Plaintiffs and will be calculated in

the same manner and using the same methodology as used to calculate damages for the

Named Plaintiffs. These estimates are preliminary disclosures of initial theories of

damages and shall not be construed as a waiver of claims or relief asserted in the

complaint or amended complaint. Further, these preliminary estimates of damages made

prior to any discovery from Defendant shall not be construed as binding final damage

calculations.

JAMES KASSUBA ADDENDUM
RESPONSE TO FIRST SET INTERROGATORIES                13

**INTERROGATORY NO. 92:**

Please state in detail the equitable, declaratory and injunctive relief that you seek, including whether you seek a judgment that some or all putative class members should be classified and treated as employees and, if so, which putative class members should be treated as employees and for what purpose(s).

**RESPONSE NO. 9:**

Without waiving and subject to the General and Specific Objections to Response No. 9, Named Plaintiff James Kassuba responds as follows:

FedEx misclassified pick-up and deliver drivers as independent contractors. On behalf of the class described in our complaint, Named Plaintiffs seek declaratory judgment that Plaintiffs and the plaintiff class are employees under FMLA, ERISA, and Michigan law, that Defendant's conduct violated FMLA, ERISA, state statutory and common- law; that Plaintiffs and the plaintiff class are covered by those statutes and common-law applicable to employees. Named Plaintiffs also seek injunctive relief prohibiting Defendant from continuing to misclassify employees, from further violating federal and Michigan statutory and common-law principles protecting employees and from continuing their unfair, unlawful and/or fraudulent business practices. Named Plaintiffs also seek restitution and reimbursement of defendant's unfairly or illegally gotten profits including but not limited to all un-reimbursed expenses, unpaid unemployment insurance benefits, monies unlawfully withheld from wages, a portion of self-employment tax paid by Plaintiffs and plaintiff class members which should have been paid by Defendant and other money due as part of a full restitutionary remedy.

## **VERIFICATION**

I, James Kassuba, declare under penalty of perjury under the laws of the United States that I have read the foregoing and know that the responses to the interrogatories propounded to me are true and correct to the best of my knowledge.

Executed this _____ day of April 2006 at _____ (City, State).


_____
James Kassuba

# Expenses Per Week *(sample)*

| | |
|---|---|
| Van Payment | $ 125.00 |
| Insurance | $  41.25 |
| Work Accident Insurance | $  40.00 |
| Business Support Package | $  17.50 |
| Fuel | $  90.00 |
| Self Employment Tax | $  65.00 |
| Average Weekly Expenses (Health care expenses are not included) | $ 378.75 |
| | |
| Average Yearly Expenses (average weekly expenses x 52 weeks) | $ 19708.00 |



2134

## P&D CONTRACTOR ESTIMATED NET BUSINESS INCOME BEFORE TAXES

### P&D Contractor — Estimated Net Business Income Before Taxes

**Average Earnings**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Settlement for 252 Days* | 57,957 | 63,348 | 67,402 | 69,761 | 71,435 | 71,435 | 71,435 | 71,435 | 71,435 | 71,435 | 687,078 |
| **Expenses:**\*\* | | | | | | | | | | | |
| Vehicle Payment | 8,550 | 8,550 | 8,550 | 8,550 | 8,550 | | | | | | 42,750 |
| Start-up Expenses | 2,619 | | | | | | | | | | 2,619 |
| Balloon Payment | | | | | | 6,375 | | | | | 6,375 |
| Tires | 500 | 660 | 660 | | 660 | 240 | 660 | 660 | 240 | 660 | 4,940 |
| Preventive Maintenance | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 7,840 |
| General Maintenance | | 1,131 | 1,131 | 1,131 | 1,131 | 5,050 | 7,275 | 3,400 | 3,775 | 2,400 | 26,424 |
| Fuel @ 9 MPG & 1.15/gal | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 34,000 |
| Health Insurance | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 23,360 |
| Work Accident Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 8,240 |
| Vehicle Insurance | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 9,000 |
| Business Support Package | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 27,720 |
| Total Expenses | 22,685 | 21,357 | 21,357 | 20,697 | 21,357 | 22,681 | 18,951 | 15,076 | 15,031 | 14,076 | 193,268 |
| Net Income Before Taxes | 35,272 | 41,991 | 46,045 | 49,064 | 50,078 | 48,754 | 52,484 | 56,359 | 56,404 | 57,359 | 493,810 |

**Above Average Earnings**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Settlement for 252 Days* | 62,005 | 67,771 | 72,108 | 74,632 | 76,423 | 76,423 | 76,423 | 76,423 | 76,423 | 76,423 | 735,056 |
| **Expenses:**\*\* | | | | | | | | | | | |
| Vehicle Payment | 8,550 | 8,550 | 8,550 | 8,550 | 8,550 | | | | | | 42,750 |
| Start-up Expenses | 2,619 | | | | | | | | | | 2,619 |
| Balloon Payment | | | | | | 6,375 | | | | | 6,375 |
| Tires | 500 | 660 | 660 | | 660 | 240 | 660 | 660 | 240 | 660 | 4,940 |
| Preventive Maintenance | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 784 | 7,840 |
| General Maintenance | | 1,131 | 1,131 | 1,131 | 1,131 | 5,050 | 7,275 | 3,400 | 3,775 | 2,400 | 26,424 |
| Fuel @ 9 MPG & 1.15/gal | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 3,400 | 34,000 |
| Health Insurance | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 2,336 | 23,360 |
| Work Accident Insurance | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 824 | 8,240 |
| Vehicle Insurance | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 9,000 |
| Business Support Package | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 2,772 | 27,720 |
| Total Expenses | 22,685 | 21,357 | 21,357 | 20,697 | 21,357 | 22,681 | 18,951 | 15,076 | 15,031 | 14,076 | 193,268 |
| Net Income Before Taxes | 39,320 | 46,414 | 50,751 | 53,935 | 55,066 | 53,742 | 57,472 | 61,347 | 61,392 | 62,347 | 541,788 |

\* Includes CCS Payments at 100% attainment

DP50266

BECOMING AN RPS PICKUP AND DELIVERY CONTRACTOR

## P&D CONTRACTOR COST ESTIMATES

| | Weekly Expense Range | Average Weekly Expense | |
|---|---|---|---|
| • Equipment Lease Payment | $100 <——> $186 | $143 | Varies by vehicle type and year of vehicle. |
| • Maintenance* | $ 55 <——> $ 72 | $ 64 | Varies by vehicle type and daily mileage. |
| • Group Health Insurance Disability Insurance Life Insurance | $ 50 <——> $100 | $ 75 | Varies by type of plan (family or individual) and insurance company. RPS provides information on group rates of NAIT and Seabury & Smith. |
| • Physical Damage and Deadhead Liability Insurance | $ 16 <——> $ 19 | $ 18 | 1.77% of Vehicle Stated Value (per year). |
| • Work Accident Insurance | $ 16 <——> $ 30 | $ 23 | Varies by state and income level. |
| • Business Support Package | $55 | $ 55 | Weekly expense for uniform service, scanner, and 2 weeks of Time Off Program. |
| • Fuel (Diesel)** | $ 43 <——> $ 92 | $ 68 | Varies by daily mileage. |
| Weekly Expense Total | $320 <——> $539 | $446 | |
| Daily Expense Total | $ 64 <——> $108 | $ 86 | |

**NOTE:**   The cost estimates immediately above are provided for the purpose of illustration only.  The figures contained in this estimate are not guaranteed.  An RPS P&D contractor is an independent businessperson and his or her costs and income will vary depending on the economy, how well he or she manages his or her business, and how well RPS runs its business.

* Estimated average expense over five years.

**In the event of substantial increase in fuel price, contractor will receive an additional fuel/mileage settlement.

DP50263

2136

BECOMING AN RPS PICKUP AND DELIVERY CONTRACTOR

# INVESTMENT REQUIRED

The P&D contractor may purchase or lease equipment as shown in the section titled
"Vehicle Financing Options." A breakdown of the approximate initial investment for P&D
contractors is given below.

|  | P-1000 Van |
|---|---|
| Down payment* | $1,356 |
| Estimated Taxes** | $2,250 |
| D.O.T. physical*** | $50 |
| Drug screen | $22 |
| Total approximate initial investment | $3,678 |

\* Estimated cost including a $500 down payment, one month lease payment ($722)
and a $134 filing fee.

\*\* Estimated taxes at 6% of the $37,500 purchase price. For some contractors, this
cost may be built into the lease payment and will not necessarily be an initial
investment requirement.

\*\*\* Estimated average cost.

DP50287

*Becoming an RPS Pickup and Delivery Contractor, U.S. Version - Revised June, 1999*

42

2137

**ADDENDUM RESPONSE OF JAMES LESTER TO
DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state in detail every fact that supports your contention that you should have been classified as an employee, including, with specificity, any and every action taken by Defendants or you that you believe demonstrates that Defendants exercised control over the manner and means by which you performed your duties, including, how that action affected your business. For each incident or fact, please state the details, including, but not limited to: how the company exercised or attempted to exercise the alleged control over you individually, the identity of the person or policy to which you refer, the date(s) of the incident or fact, and any communications you had with Defendants about the incident or fact.

**RESPONSE NO. 1:**

Without waiving and subject to the General and Specific Objections to Response No. 1, Named Plaintiff James Lester responds as follows:

I was required to purchase or lease a truck that FedEx specified. FedEx required me to have the truck before I could begin working for them. FedEx required me to place a large FedEx logo, colors and FedEx advertising on my vehicle at my expense. I could not display anything else on my vehicle.

FedEx required me to report for work each day with my truck clean, free of dents, rust or other visible defects. FedEx imposed vehicle maintenance requirements in excess of the DOT regulations. FedEx did not permit me to use my vehicle for any purpose other than the delivery or pick-up of packages for FedEx's customers unless I covered up the huge FedEx logo. FedEx required me to perform maintenance on my truck which I did not agree with. FedEx required me to perform repairs on my truck for appearance purposes which I did not agree with.

FedEx required me to come to work wearing a FedEx uniform with company logo and colors, black shoes, and if I wore a jacket or hat, it had to be a FedEx jacket or cap. I rented my uniform from FedEx as part of the Business Support Package. I was required to keep the FedEx uniform in a condition acceptable to FedEx, clean and free of any damage. I was required to meet FedEx grooming standards. I was told that if my appearance and grooming were not acceptable to FedEx, I would not be permitted to drive unless and until my appearance and grooming met FedEx standards. I was not allowed to provide service if my uniform was not complete or if my shoes were not black. I was told I could not provide service unless I changed my shorts. I was told by my terminal manager that I had to shave before going out on my route.

FedEx determined the service goals I was required to meet in order to obtain incentive payments in the Contractor Customer Service program. I was trained on FedEx's minimum standards of customer service. If I did not comply with FedEx's standards, I could lose my bonus or even my job. FedEx required me to pick up packages from its customers at times requested by the customer and/or negotiated between FedEx and the customer without my input. FedEx set the price it charged the customers and I could not negotiate customer prices for my pickup and delivery services.

FedEx had strict rules about releasing packages without customer signature (driver release). If I did not comply with FedEx's driver release rules, I could lose my bonus or even my job. FedEx performed a monthly "driver release audit" to check up on my compliance with its rules; terminal management would follow me on my route for this purpose without my knowledge. FedEx could take away my right to driver release packages if it determined that I did not comply with its standards. This could affect my pay and the hours I worked. I was required to follow FedEx's "Safe Driving Standards" which exceeded DOT requirements. Any time FedEx determined that I breached any of

the many "Safe Driving Standards," FedEx could discipline me by terminating my

indemnity and requiring me to purchase expensive insurance that I could not afford.

If FedEx determined that I had a "valid" customer complaint, I would lose my

bonus and if I had several such complaints FedEx threatened to terminate my contract.

FedEx determined that a customer complaint was valid without asking me about what

occurred; FedEx's terminal management told me that the customer "was always right." I

would lose my CCS bonus if other drivers in my terminal did not meet FedEx's service

goals. Each day, my service percentage was posted in the terminal for all the other

drivers to see. If my service percentage fell below the goal, it would be posted in red for

all drivers to see.

FedEx terminal management conducted Customer Service Rides, where terminal

management would ride along with me on my route to evaluate my performance and

efficiency. After the ride, I received a form evaluating my work and telling me how to

"improve." FedEx's terminal management "mapped" my route and told me the "most

efficient" way to run my route. FedEx decided the size and weight of packages I was

required to deliver and changed those to meet its own business goals without my

agreement. I was trained by FedEx to perform pick-up and delivery services the way

FedEx wanted me to. I was provided with detailed instructions about how to enter and

exit my truck, how to select my packages, how to deliver my packages and how to get the

customer's signature. I was required to follow FedEx procedures regarding call tags, and

c.o.d's, and other special services. All of the forms I used in performing my work were

FedEx forms with the company logo. I receive telephone calls on my cell phone from the

terminal during the day with instructions or additional work assignments. I was often

required to research past package deliveries whenever asked to by FedEx in order to

avoid money being withheld from my pay. I was sometimes followed on my route and

reprimanded if I did not secure the truck exactly as FedEx wanted me to.

FedEx "flexed" packages to me, requiring me to delivery packages outside of my route to meet its needs. FedEx determined the size and service area of my route. FedEx could change the size and service area of my route based on its needs without my approval and without paying me. FedEx changed the size and service area of my route over my objections and without paying me. FedEx determined the "minimum" and "maximum" number of packages to assign to me ("the min and the max") to meet FedEx's business needs regardless of my views.

FedEx did not permit anyone that was not authorized by FedEx to ride with me in my truck at any time. I could not sign up new customers myself to increase my route. I could not acquire or take on additional routes or portions of routes without the express consent and approval of FedEx. FedEx denied my request for a second route. I had to get FedEx's approval to sell or transfer my truck to another driver. I had to get FedEx's approval to sell or transfer my route or part of my route to another driver. FedEx refused to approve a buyer I had for my route even though he met FedEx's minimum requirements.

I could not and did not deliver packages for any company other than FedEx. I could not decline to deliver any package assigned to me by FedEx for any reason. FedEx determined the total number of packages and location of deliveries it assigned to me on a daily basis and I was required to deliver every package assigned to me on the day it was assigned. I was required to make deliveries or pick-ups that were not profitable, even if they were not on my route. I was required to timely deliver packages assigned to me to FedEx's customers. I had to report on my deliveries at the end of each day.

Sometimes I was required to meet with the terminal manager to review the previous day's deliveries in the morning when I was getting ready to service my route.

JAMES LESTER ADDENDUM                                    4
RESPONSE TO FIRST SET INTERROGATORIES

Terminal management regularly questioned whether I was properly coding packages I returned to the terminal which I had been unable to deliver. Sometimes, terminal management changed my accurate coding of a package as a misload to code it as a "did not attempt" which would reduce my service percentage, threaten my CCS bonus or even my job, without investigation or any basis for doing so. Sometimes the terminal manager would require me to have a meeting before I left the terminal, delaying me, to complain about my performance, appearance, or "attitude."

FedEx changed the days I was required to provide service without my agreement. By assigning me more stops that I wanted, FedEx required me to work more hours each day than I would have chosen to work. I could never take a day off when I wished unless I found a replacement driver, approved by FedEx, to take my place. Even when I was ill or injured, I was forced to work because I did not have a readily-available replacement driver. FedEx refuse to approve a replacement driver I proposed. At FedEx's insistence, I hired and paid for a helper to work with me on my route, even though I did not want to.

I could not negotiate any of the terms of the Operating Agreement. I was told I needed to purchase deadhead insurance through a FedEx-sponsored group plan using Protective Insurance and the cost was deducted from my pay. FedEx deducted money from my pay for "cargo" claims without providing me with information about the claims before the deduction was made and without my approval. FedEx determined the rate I was charged for the Business Support Package for the scanning, uniforms, and other services required by FedEx. I had no choice but to pay for the Business Support Package. I had no choice but to rent the scanner from FedEx. FedEx determined the rate I was paid for pickup and delivery services. FedEx determined that rate I was paid for "van availability," "core zone," and all other aspects of my pay. When I asked FedEx to adjust my core zone because it was too low, FedEx refused to do so. FedEx required me to

install a rear-backing camera on my truck. FedEx required me to pay $1,000 into an

Escrow Account and to leave that amount in the account for the duration of my work

there. My core zone pay was reduced when FedEx made me deliver to areas outside my

route.

I rarely if ever worked fewer than 10 hours in a work day. I often worked 12

hours or more in a work day. I often had no time for a meal break or even a rest break in

a work day.

FedEx trained me in its methods of package handling, delivery, pick-up and

customer service. I was required to attend ongoing trainings and meetings at FedEx

which included topics such as performance, productivity, and customer service standards.

I was given training and promotional videotapes which I was required to watch. FedEx

required that I attend weekly meetings at my terminal and sign attendance sheets showing

my attendance. Although these were called "Safety Meetings" they were often on topics

that had nothing to do with safety. During Roundtable Meetings, FedEx management

discussed new company policies and accounts and promoted its business goals.

The Contractor Relations manager for my area failed to help me when I had a

problem with the company not following the Operating Agreement. I was required to use

a scanner each day to permit customers to track the time of the deliveries on FedEx's

website. I was required to input into the scanner the number of miles I had driven in the

course of the day. I was required to input into the scanner the time I arrived at the

terminal, the time I departed from the terminal, the time of my first delivery, the time of

my last pickup, and the time I arrived at the terminal or home at the end of the day. At

the end of the day, I was required to download the information in my scanner into

FedEx's system. The scanner included the following information: mileage, hours of

work, hours of service, number of stops, number of deliveries, number of pick-ups, and

delivery information. I was told by terminal management to enter a start time later than

my real start time into my scanner so that I would not exceed DOT hours of service. I

was required to provide service on each day FedEx decided to provide service to its

customers. FedEx changed the days of service it offered its customers, without

consulting me. FedEx prohibited my relatives from performing pick-up and delivery

services for FedEx from the same terminal as me. FedEx gave me at the beginning of

each day a chart or map of my route and a manifest which listed all of my deliveries in

the order I should deliver them. FedEx required to me to work a sixth day in any week

when I was unable to deliver all of my required packages in the normal five day week.

I was threatened with contract termination on multiple occasions for not being

able to deliver all of the packages assigned to me in a given day, no matter how many

there were. Often if I disagreed with the terminal manager about something or

complained, I was told that my contract might be in jeopardy or might be sent to

Pittsburgh for "review." FedEx deducted from my escrow accounts amounts it claimed I

owed FedEx, without my consent. After I decided to not renew my contraact, when I

attempted to sell my route, FedEx made it difficult for me to sell it or refused to approve

my buyer.

**INTERROGATORY NO. 2:**

If you contend that any term of your relationship with Defendants was not directly

governed by the written Operating Agreement you entered into, please state every such

term and how it affected your relationship with Defendants.

**RESPONSE NO. 2:**

Without waiving and subject to the General and Specific Objections to Response

No. 2, Named Plaintiff James Lester responds as follows:

In addition to the Operating Agreement, FedEx's numerous written and unwritten policies and procedures not mentioned in the Operating Agreement control my relationship with FedEx. These policies imposed additional controls over every aspect of my working relationship with FedEx. It is impossible to name all such terms, as some are written but not given to me and some are orally communicated. To the best of my knowledge and understanding, these extra-contractual sources include, but are not limited to:

- FedEx Ground Manual, Operations Management Handbook, Settlement Manual and numerous other written and extra-contractual policies. These written policies subjected me to additional requirements regarding grooming, my vehicle's appearance and size, Business Support Package, insurance, flexing of packages, hours and days of work, replacement drivers, cargo claims, reconfigurations, customer service rides, driver release audits, maintaining of files on my performance, etc..

- Other written handbooks and manuals and additional extra-contractual sources include, but are not limited, to written rules on "contractor" termination, directives and training provided to terminal managers, written rules on driver appearance (with illustrative poster), written and oral complaint procedures, memorandum and directives to terminal management and other rules concealed from and not provided me.

- FedEx through its terminal and regional managers, Contractor Relations personnel, and other employees and agents of FedEx provided verbal information and/or instructions to me on a regular basis on how to perform my job.

These extra-contractual sources along with the Operating Agreement created close to

absolute control over me and created an employer-employee relationship between FedEx

and me.

## INTERROGATORY NO. 3:

Please state in detail every effort you made to maximize your earnings and/or

maximize the efficiency of pick up or delivery to your route(s) with Defendants,

including, but not limited to, having others assist you, acquiring or taking on additional

routes or portions of routes, operating supplemental vehicles, utilizing trailers or

acquiring a larger vehicle, shorting the time or efficiency of your pick ups or deliveries,

participating in the flex program, and any other steps you took.

## RESPONSE NO. 3:

Without waiving and subject to the General and Specific Objections to Response

No. 3, Named Plaintiff James Lester responds as follows:

I was employed by FedEx and I did what I was told. I did my best to deliver all

packages assigned to me each day. There was nothing beyond this that I could do to

maximize my "earnings" or maximize my "efficiency." There is a limit to the number of

packages my truck can hold and there is a limit to the number of packages and stops I can

deliver in one day. I could only deliver the packages the company gave me and had to

follow the company's detailed procedures for pick-up and delivery. Hiring helpers,

adding supplemental vehicles and/or drivers, servicing an additional route have high costs

associated with them and generally do not substantially increase "earnings."

## INTERROGATORY NO. 4:

If anyone assisted you in the performance of your duties, please state the identities

of those individuals including their name, last known address and telephone number, the

dates on which they assisted you, the details of the services they performed, and the

nature of their relationship to you, including how they were compensated or received

consideration for their work, and the amount of that compensation or consideration.

**RESPONSE NO. 4:**

Without waiving and subject to the General and Specific Objections to Response

No. 4, Named Plaintiff James Lester responds as follows:

In the Summer of 2003, I used a helper to help me deliver packages because I had

a broken ankle. FedEx supplied me with the helper and told me to pay him $100 a day. I

used the helper for one week.

**INTERROGATORY NO. 5:**

If you contend that you worked in excess of 40 hours in any given week, please

state the dates and hours worked and the circumstances surrounding your need to work

these hours.

**RESPONSE NO. 5:**

Without waiving and subject to the General and Specific Objections to Response

No. 5, Named Plaintiff James Lester responds as follows:

FedEx determined the number of packages assigned to me on a daily basis and

required me to deliver every package assigned to me on the day it was assigned. This

caused me to have to work in excess of 8 hours a day and 40 hours a week consistently.

On average, I estimate that I worked approximately 12 hours in a day and far more than

40 hours each week. During peak season, I estimate that I worked 12-14 hours a day

because of the increase number of packages I had to deliver.

**INTERROGATORY NO. 6:**

Please state in detail the circumstances surrounding the termination of any

contractual relationship(s) with Defendants, including whether and to whom you sold

your truck(s) and/or route(s), and the consideration you received for each sale.

**RESPONSE NO. 6:**

Without waiving and subject to the General and Specific Objections to Response No. 6, Named Plaintiff James Lester responds as follows:

After I decided to not renew my contract, I tried to sell my route. When I tried to sell my route, FedEx told prospective buyers not to purchase my route because it would be given to them when I left. FedEx also told prospective buyers that my truck had too many miles and not to purchase it.

## **VERIFICATION**

I, James Lester, declare under penalty of perjury under the laws of the United States that I have read the foregoing and know that the responses to the interrogatories propounded to me are true and correct to the best of my knowledge.

Executed this _10_ day of April 2006 at _Johannesburg, Michigan_ (City, State).


James Lester

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

-------------------------------------------------------------

In re FEDEX GROUND PACKAGE
SYSTEM, INC., EMPLOYMENT
PRACTICES LITIGATION

-------------------------------------------------------------

THIS DOCUMENT RELATES TO:

*All Coordinated Cases*

-------------------------------------------------------------

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:05-MD-527-RM
(MDL 1700)

CHIEF JUDGE MILLER
MAGISTRATE JUDGE NUECHTERLEIN

---

## DECLARATION OF K. LEE BLALACK, II IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF PUTATIVE CLASS MEMBERS

---

I, K. Lee Blalack, II, declare:

1.      I am an attorney licensed to practice in the District of Columbia and a partner of the law firm of O'Melveny & Myers LLP, located at 1625 Eye St., NW, Washington, District of Columbia 20006.  I represent Defendant FedEx Ground Package System, Inc. ("Defendant") in the above-captioned matter.  I have personal knowledge of the facts set forth in this declaration and, if called to testify as a witness, could and would do so under oath.

2.      I am Defendant's counsel in charge of coordinating the scheduling of depositions with Plaintiffs' counsel Jordan Lewis.

3.      On August 23, 2006, I received notice from Mr. Lewis that he intended to schedule the depositions of named Plaintiffs in the state of Michigan for September 18-21, 2006.

4.     Attached to this declaration as Exhibit 1 is a true and correct copy of the document I received from Mr. Lewis on August 23, 2006.

5.     Consistent with prior practice in this litigation, my associates and I staffed and began to prepare for taking the deposition of all six named Plaintiffs in the Michigan action.

6.     On September 7, 2006, I received an email from Mr. Lewis informing me that Plaintiffs' counsel would be withdrawing from their representation of Michigan Plaintiffs Lester, Kassuba and Tomaski and that Plaintiffs further intended to withdraw them as named Plaintiffs.

7.     Attached to this declaration as Exhibit 2 is a true and correct copy of the email I received from Mr. Lewis on September 7, 2006.

8.     During a telephonic meet and confer with Plaintiffs' counsel Robert Harwood on December 11, 2006 regarding the third party subpoenas currently at issue before this Court, I asked Mr. Harwood whether he represented the subpoenaed individuals individually or only as putative class counsel.

9.     During this conference, Mr. Harwood stated that he represented the subpoenaed individuals only as putative class counsel.

10.    On December 15, 2006, I received correspondence via electronic delivery from Mr. Harwood confirming that his only relationship to the subpoenaed individuals was as "members of the proposed class in the various litigations . . .."

11.    Attached to the declaration of Robert Harwood in support of Plaintiffs' Motion to Quash Subpoenas of Absent Class Members as Exhibit 3 is a true and correct copy of the correspondence I received from Mr. Harwood on December 15, 2006.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th day of February, 2007.

/s K. Lee Blalack, II
K. Lee Blalack, II

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of February, 2007, I filed the foregoing ***DECLARATION OF K. LEE BLALACK, II IN SUPPORT OF DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO QUASH SUBPOENAS OF PUTATIVE CLASS MEMBERS*** with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By:      s/K. Lee Blalack, II

Case 3:05-md-00527-RLM-CAN   Document 498-2   Filed 02/05/07   Page 1 of 6

## August 2006

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| 7 **CA** – Oakland<br>Infantino (8)<br>Atty - ?? | 8 **CA** – Oakland<br>Mendoza (4) & Isla (4)<br>Marchedtti | 9 **CA** – Oakland<br>Ines (8)<br>Marchetti | 10 **CA** – Newport Beach<br>Ross (8)<br>Larson | 11 **CA** – Newport Beach<br>Wiley (4) & Padilla (4)<br>Larson |
| 14 **CA** – Sacramento<br>Allen (8); Zerger defending<br>**NJ** – Cureton Caplan<br>Tofaute (4).<br>Marchetti defending | 15 **CA** – Sacramento<br>Alexander (8); Zerger defending<br>**NJ** – Cureton Caplan<br>Cuinoti (4) & Carrigan (4)<br>Marchetti defending | 16 **CA** – Sacramento<br>Andrade (4) & Rodriguez (4); Zerger<br>**NJ** – Cureton Caplan<br>Lynch (8); Marchetti | 17 **CA** –HQ Regus, Sacramento<br>Jeppson (4); Zerger<br>**NJ** – Cureton Caplan<br>McMahon (8); Marchetti | 18 **CA** – Resident Inn, Chico.<br>Henderson (8); Zurger<br>**NJ** – Cureton Caplan<br>Mikulski (4), Kilmartin; Marchetti<br>defending. |
| 21 **OR** – Portland<br>Slayman (4); Larson | 22 **OR** – Portland<br>McHenry (8); Larson | 23 **NH** – Manchester<br>Gerrell, Fagan | 24 **NH** – Manchester<br>Terrio (4); Swazey (4); Fagan | 25 |
| 28 **NY** – Location?<br>Louzau (4); Marchetti | 29 **TX** – Austin<br>Humphreys (8); Lewis<br>**NY** –<br>Malkin (8); Marchetti | 30 **TX** – Austin<br>Campbell (4), Meredith (4); Lewis | 31 **TX** – Austin<br>Mershon (4), Pinkham (4); Tatum | |

2154

EXHIBIT 1

## September 2006

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 Florida | 12 **Texas** – Quebe. Columbus, OH.<br>Florida | 13 Florida | 14 Florida | 15 |
| 18 Michigan | 19 Michigan | 20 Michigan<br>Massachusetts<br>Wisconsin | 21 Michigan<br>Massachusetts<br>Wisconsin | 22 Massachusetts<br>Wisconsin |
| 25 | 26 **Maryland**<br>South Dakota<br>Alabama | 27 South Dakota | 28 Virginia<br>South Dakota | 29 Virginia<br>South Dakota |

2155

# October 2006

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|
| 2 | 3 | 4 | 5 | 6 |
| 9 Rhode Island | 10 Rhode Island | 11 Rhode Island | 12 Rhode Island | 13 Rhode Island |
| 16 Rhode Island | 17 | 18 Mississippi | 19 Mississippi | 20 Mississippi |
| 23 | 24 | 25 Kansas | 26 Kansas | 27 Kansas |
| 30 | 31 Missouri | | | |

2156

Case 3:05-md-00527-RLM-CAN   Document 498-2   Filed 02/05/07   Page 4 of 6

## November 2006

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|
| | | 1 Missouri<br>Tennessee | 2 Missouri<br>Tennessee | 3 Missouri<br>Tennessee<br>Pennsylvania |
| 6 | 7 | 8 | 9 | 10 |
| 13 | 14 | 15 | 16 | 17 |
| 20 | 21 | 22 | 23 | 24 |
| 27 | 28 | 29 | 30 | |

2157

# December 2006

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |
| 18 | 19 | 20 | 21 | 22 |
| 25 | 26 | 27 | 28 | 29 |

2158

2159

**From:**
**Sent:**
**To:**
**Subject:**





```
 -----Original Message-----
From:       Jordan Lewis [mailto:JordanLewis@SBGDF.COM]
Sent: Thu Sep 07 11:06:27 2006
To:   Blalack, K. Lee
Cc:   rfirsten@firstenlaw.com; amarchetti@curetoncaplan.com; bfagan@dibandfagan.com;
Ellingstad, Susan E.; jgr@zimmreed.com; jcureton@curetoncaplan.com;
lfaris@leonardcarder.com; rharwood@whesq.com
Subject:    Michigan FedEx depositions
```

Lee – I write concerning the scheduling and location of the Michigan FedEx plaintiffs.


First, as to location, our local counsel indicates that he has both the space and availability to handle the videotaped depositions, and accordingly we request that you use his office. His name is Robert Firsten, and his office is located at 30150 Telegraph Road, Suite 345, Bingham Farms, Michigan. His phone number is 248-290-5244.


Now, as to the order. Ty Hawkins, who is currently a driver, needs to be deposed on Monday, Sept. 18, and you have allocated 8 hours for his deposition. Currithers, who is scheduled for 4 hours, is available the morning of Sept. 19; and Lavake, who is also scheduled for 4 hours, is available in the afternoon of Sept. 19.


As for the remainder – Kassuba, Lester and Tomaski – please understand that we are withdrawing from their representation and will further withdraw them as named plaintiffs.


As always, please feel free to contact me with any questions or concerns.


jml

1

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

------------------------------------------------- )
                                                   )
In re FEDEX GROUND PACKAGE          )          Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT            )          (MDL 1700)
PRACTICES LITIGATION               )
------------------------------------------------- )
THIS DOCUMENT RELATES TO            )
ALL ACTIONS                        )
-------------------------------------------------)

---

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S
MOTION TO REMOVE FROM THE PUBLIC DOCKET DOCUMENTS FILED BY
PLAINTIFFS IN CONNECTION WITH THEIR MOTION TO REVIEW**

---

For the reasons stated in the accompanying memorandum, Defendant FEDEX GROUND

PACKAGE SYSTEM, INC hereby moves this Court to ORDER that Docket Entry 480 be

removed from the public docket, and DIRECT Plaintiffs to refile their motion and exhibits in

compliance with the Protective Order entered in the above-captioned action.


Dated:  February 5, 2007            Respectfully submitted,


                                    By:  _s/ Thomas J. Brunner_____
                                          Thomas J. Brunner

                                    John H. Beisner
                                    Robert M. Schwartz
                                    Evelyn L. Becker
                                    O'MELVENY & MYERS LLP
                                    1625 Eye Street, NW
                                    Washington, DC 20006-4001

                                    Thomas J. Brunner
                                    Alison G. Fox
                                    BAKER & DANIELS LLP

205 West Jefferson Blvd., Suite 250
South Bend, IN  46601

*Defendant's Liaison and Lead Counsel*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of February, 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net


By:  ___ s/ Thomas J. Brunner _____

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

```
-------------------------------------------------- )
                                                     )
In re FEDEX GROUND PACKAGE                            )        Cause No. 3:05-MD-527-RM
SYSTEM, INC., EMPLOYMENT                              )        (MDL 1700)
PRACTICES LITIGATION                                 )
-------------------------------------------------- )
THIS DOCUMENT RELATES TO                              )
ALL ACTIONS                                          )
-------------------------------------------------- )
```

**DEFENDANT FEDEX GROUND PACKAGE SYSTEM, INC.'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO REMOVE FROM THE**
**PUBLIC DOCKET DOCUMENTS FILED BY PLAINTIFFS IN CONNECTION**
**WITH THEIR MOTION TO REVIEW**

As this Court is aware, on January 22, 2007, Plaintiffs mistakenly filed on the public

docket certain materials the use of which, including in connection with any motion or brief, is

restricted by this Court's Protective Order.  After FedEx Ground alerted Plaintiffs to this

violation of the Protective Order, on January 25, 2007 Plaintiffs moved to have the documents

removed from the docket and refiled under seal.  [Docket No. 483.]  The Court denied that

motion without prejudice on January 31, 2007.  FedEx Ground now moves to remove the

documents from the public record, as they were filed in violation of the Protective Order.  Absent

such a ruling, the purposes of and protections provided by the Protective Order will be severely

eroded and the only consequence for the violation will fall on Defendant, through no fault of its

own.

It is vital that the Court recognize a remedy when the recipient of confidential

information inadvertently (or otherwise) files it without following the Protective Order's

procedures that govern such action.  During discovery, Plaintiffs repeatedly have pointed to the

Protective Order to support their various requests to receive sensitive FedEx Ground information, and this Court has on at least one occasion relied on the existence of those protections in granting Plaintiffs' access to such sensitive information.  (*In re FedEx Ground Package System, Inc.*, No. 3:05-MD-527, slip. op. at 6 (N.D. Ind. Jan. 5, 2007) [Docket No. 466].)  Until now, with limited exceptions, the protections provided by the Protective Order have worked well in guarding against public disclosure of the sensitive information that FedEx Ground has produced during discovery.  Moreover, Plaintiffs have invoked the existence of those protections to persuade FedEx Ground to withdraw objections to requested information and to avoid numerous other discovery disputes.  However, errors do occur and with regard to the information at issue here, Plaintiffs have by their own acknowledgement improperly filed documents containing confidential information without following the procedures required of them under the Protective Order.  The violation should be cured.

Defendant respects the public policies that underlie the high bar for limiting the public's access to judicial proceedings.  However, FedEx Ground believes that in this circumstance, the appropriate course of action is to have the documents removed from the docket and refiled under seal.  This is because Plaintiffs' filing did, in fact, violate the Court's Protective Order.  While this Court's January 31, 2007 Order was correct in noting that Paragraph 5 of the Protective Order lists the Court as one class of persons to whom disclosure of Confidential Discovery Materials may be made [Docket No. 466 at 2], such disclosures are permitted only in specific circumstances that were not met here.  Thus, Paragraph 5(e) of the Protective Order permits disclosure to the "Court and Court personnel," but only "in accordance with the procedures set forth in Paragraph 10" of the Protective Order.  (Protective Order ¶ 5(c) [Docket No. 101].)  Paragraph 10 provides that

> [t]his Stipulation and Protective Order shall not prevent any Confidential
> Discovery Materials from being used by the Court or counsel at any <u>hearing</u> in
> this action, or from being offered and received into evidence at <u>trial</u>, provided that
> such use is made <u>only in accordance with such appropriate procedures as may be</u>
> <u>approved by the Court</u>. The parties agree that they will attempt to reach agreement
> regarding the procedures to be recommended to the Court.

(*Id*. ¶ 10 (emphasis added).)  Moreover, the Protective Order makes clear that the appearance of

Confidential Discovery Materials in a publicly available forum makes such materials no longer

subject to the restrictions of the Protective Order only when such appearance is "without

violation of Paragraph 5" of the Protective Order.  (*Id*. ¶ 14.)  Without question, Plaintiffs' filing

disclosed documents to the public, which Paragraph 5 does not authorize.  Further, Paragraph 8

of the Protective Order sets forth the procedures to be used for <u>filing</u> confidential documents,

which Plaintiffs did not follow.  (*Id*. ¶ 8 ("<u>All</u> Confidential Discovery Materials submitted to or

filed with the Court in this action shall be submitted or filed under separate cover and <u>shall be</u>

<u>placed under seal</u>.  Such materials shall <u>only</u> be available to the Court and persons authorized by

this Stipulation and Protective Order.") (emphasis added).)  Given that Plaintiffs' filing of

Confidential Discovery Materials was not made in connection with a hearing or trial, and was not

subject to any Court-approved procedures, the filing was in violation of the Protective Order, and

the materials are still and should retain the status of Confidential Discovery Materials.

FedEx Ground does not ascribe any bad faith to Plaintiffs' conduct, and believes that the

filing was the result of human error.  The Court is correct that the Protective Order does not

cover such inadvertent disclosures, but that is simply the result of the parties' assumption that

this type of incident would not occur.[1]  However, the absence of such a provision does not, and

---

[1]     Even the form of Protective Order that this Court cited in its January 31, 2007 Order
would not have covered the instant situation.  In the *Markowitz* case, the Protective Order had a
provision covering inadvertent disclosure "to an opposing party."  *Markowitz v. Miller Brewing
Co.*, No. 06-C-1153, 2007 WL 162553, at 2 (E.D. Wis. 2007).

cannot mean that there can be no remedy for this violation.  Indeed, absent some action by this

Court violations of the Protective Order will be without consequence or remedy.  In fact, without

Court action, the only consequence of this violation will be that FedEx Ground, through no fault

of its own, would lose protections it has relied upon during the course of discovery.  FedEx

Ground believes that under the circumstances, the appropriate result would be to remove the

materials from the public docket and have them refiled under seal.  (*Cf. Baella-Silva v. Hulsey*,

454 F.3d 5, 8 (1st Cir. 2006) (noting that a filing that violated a confidentiality clause in a

settlement agreement was removed from the public docket upon request by the breaching party).)

Accordingly, FedEx Ground respectfully requests that the Court order Docket Entry 480

be removed from the public docket, and direct that Plaintiffs refile their motion and exhibits in

compliance with the Protective Order.

Dated:  February 5, 2007                    Respectfully submitted,


                                            By:  ___ s/ Thomas J. Brunner _____
                                                    Thomas J. Brunner

                                            John H. Beisner
                                            Robert M. Schwartz
                                            Evelyn L. Becker
                                            O'MELVENY & MYERS LLP
                                            1625 Eye Street, NW
                                            Washington, DC 20006-4001

                                            Thomas J. Brunner
                                            Alison G. Fox
                                            BAKER & DANIELS LLP
                                            205 West Jefferson Blvd., Suite 250
                                            South Bend, IN  46601

                                            *Defendant's Liaison and Lead Counsel*

### CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of February, 2007, I filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Susan E. Ellingstad
sellingstad@locklaw.com

Robert I Harwood
rharwood@whesq.com

Peter W. Overs, Jr.
povers@whesq.com

Lynn R Faris
lfaris@leonardcarder.com

John C Hamilton
jch@hamiltonfirm.com
hamiltonfirm@sbcglobal.net

By: ___s/ Thomas J. Brunner_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| In re FEDEX GROUND PACKAGE SYSTEM, INC., EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) ) ) ) ) | CAUSE NO. 3:05-MD-527 RM (MDL-1700)  THIS DOCUMENT RELATES TO ALL CASES |

**ORDER**

On January 22, 2007, Plaintiffs filed a motion to review the magistrate judge's ruling.
The motion, the supporting memorandum, and all exhibits were inadvertently filed electronically
rather than under seal.  On January 25, 2007, Plaintiffs filed a motion to remove the supporting
memorandum of law and supporting exhibits from the public docket.  On January 31, 2007, this
Court denied Plaintiffs' motion without prejudice for failure to file an accompanying
memorandum with their motion in accordance with the local rules.  On February 5, 2007,
Defendant Fedex Ground Package System, Inc. (Fedex) filed a motion with an appropriate
memorandum of law that renewed the same request made by Plaintiffs, to remove the
inadvertently filed documents from the public docket.

Because both parties have moved to remove the documents from the public docket, there
appears to be no debate between the parties that materials should have been filed under seal
pursuant to the protective order.  Furthermore, this Court finds that the documents were not filed
properly before this Court to guarantee the general public access to the information under the

terms of the protective order.[1]  This Court cannot recall materials that have been elicited to the

public.  In other words, if any member of the public has obtained the inadvertently filed

materials since they were filed, then those items are now in the public arena.  However, this

Court can prevent the public's access to the materials in the future through the public docket.  As

a result, Fedex's motion is **GRANTED** [Doc. No. 499].  The clerk is instructed to remove

attachments 1, 2, 3, and 4 of Doc. No. 480 in 3:05-cv-527.  Furthermore, Plaintiffs are

**ORDERED** to re-file these materials under seal with the clerk if they have not done so already.

The deadlines to respond and reply to Plaintiffs' original motion for review remain unchanged.

     **SO ORDERED.**

     Dated this 6th Day of February, 2007.


          S/Christopher A. Nuechterlein
          Christopher A. Nuechterlein
          United States Magistrate Judge

---

[1] Plaintiffs did not file the materials at any hearing, trial, or in any other manner approved by this Court to comport with Paragraph 5 of the protective order.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE | ) | |
| SYSTEM, INC., EMPLOYMENT | ) | Case No. 03:05-MD-527 RM |
| PRACTICES LITIGATION | ) | (MDL 1700) |
| ——————————————— | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | CHIEF JUDGE MILLER |
| ALL ACTIONS | ) | MAGISTRATE JUDGE NUECHTERLEIN |
| | ) | |
| ——————————————— | ) | |

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND**
**TO PLAINTIFFS' MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S**
**RULING REGARDING DEFENDANT'S SURVEY/FOCUS GROUP DOCUMENTS**

Defendant FedEx Ground Package System, Inc. ("FedEx Ground"), by its

attorneys, moves this Court for a four -day extension of time, to and including February 13,

2007, to file its response to plaintiffs' "Motion for Review of the Magistrate Judge's Ruling

Regarding Defendant's Survey/Focus Group Documents" [Docket Entry 480].  In support of this

motion, FedEx Ground states as follows:

        1.      Plaintiffs filed their Motion for Review on January 22, 2007.

        2.      FedEx Ground's response to Plaintiffs' Motion for Review is currently

due to be filed on February 9, 2007, which time has not yet passed.

        3.      Despite due diligence, FedEx Ground's counsel will be unable to complete

preparation of its response to Plaintiffs' Motion for Review within that time and needs an

additional four days in order to prepare an adequate response to the motion.

        4.      FedEx Ground therefore respectfully requests a four-day extension of time

(two business days) for FedEx Ground to file its response (to February 13, 2007).

BDDB01 4663036v1

5.     Counsel for Plaintiffs have indicated that they do not oppose this motion.

6.     This request is not made for the purpose of delay, and no party will be prejudiced if the Court grants this motion.

WHEREFORE, defendant, FedEx Ground Package System, Inc., moves this Court for a four-day extension of time, to and including February 13, 2007, within which to file its response to Plaintiffs' Motion for Review of the Magistrate Judge's Ruling Regarding Defendant's Survey/Focus Group Documents.

Dated: February  7, 2007                    Respectfully submitted,

By:    s/Thomas J. Brunner
       Thomas J. Brunner

John H. Beisner
Robert M. Schwartz
Evelyn L. Becker
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001

Thomas J. Brunner
Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, IN 46601

*Defendants' Liaison and Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on the 7th day of February, 2007, I filed the foregoing ***UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' MOTION FOR REVIEW OF THE MAGISTRATE JUDGE'S RULING REGARDING DEFENDANT'S SURVEY/FOCUS GROUP DOCUMENTS*** with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

   Susan E. Ellingstad
   sellingstad@locklaw.com

   Robert I Harwood
   rharwood@whesq.com

   Peter W. Overs, Jr.
   povers@whesq.com

   Lynn R Faris
   lfaris@leonardcarder.com

   John C Hamilton
   jch@hamiltonfirm.com
   hamiltonfirm@sbcglobal.net

      By:   s/Thomas J. Brunner

BDDB01 4663036v1

3

2172

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| In re FEDEX GROUND PACKAGE | ) | |
| SYSTEM, INC., EMPLOYMENT | ) | Case No. 03:05-MD-527 RM |
| PRACTICES LITIGATION | ) | (MDL 1700) |
| _____ | ) | |
| THIS DOCUMENT RELATES TO | ) | CHIEF JUDGE MILLER |
| ALL ACTIONS | ) | MAGISTRATE JUDGE NUECHTERLEIN |
| _____ | ) | |

**O R D E R**

Upon consideration of the Defendant's Unopposed Motion for Extension of Time to Respond to Plaintiffs' Motion for Review of the Magistrate Judge's Ruling Regarding Defendant's Survey/Focus Group Documents [docket entry 502], the Court hereby

GRANTS the Motion for Extension of Time and EXTENDS the deadline for Defendant to file its response to Plaintiffs' Motion for Review of the Magistrate Judge's Ruling Regarding Defendant's Survey/Focus Group Documents to February 13, 2007.

SO ORDERED.

ENTERED:  February 8, 2007

S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| IN RE FED EX GROUND PACKAGE SYSTEM, INC. EMPLOYMENT PRACTICES LITIGATION | ) ) ) ) ) ) | Case No. 03:05-MD-527 RM MDL Docket No. 1700 CHIEF JUDGE MILLER MAGISTRATE JUDGE NUECHTERLEIN |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) | |

REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION TO QUASH SUBPOENAS OF ABSENT CLASS MEMBERS

Defendant FedEx Ground Package Systems, Inc. ("FedEx Ground") is wrong about which

law to apply in deciding the motion to quash its subpoenas of absent class members.  FedEx

Ground attempts to avoid clear authority holding that such depositions are rarely sanctioned by

courts by misdirecting the Court to the inapposite and unremarkable proposition that it is

generally entitled to discovery concerning class certification issues.  Those issues, as defined by

FedEx Ground, include whether there are disparities in the management of its terminals and the

experiences of individual FedEx Ground drivers.  While FedEx Ground is free to argue these

issues at the class certification stage, it has failed to show why it requires the particular testimony

of Messrs. Lester and Pinkham about such issues.  FedEx Ground should be required to make a

particularized showing where it has already deposed at least three drivers from each of the states

where these individuals worked, and when it has named 45 Senior Managers and a Contractor

from Texas, and 18 Senior Managers and a Contractor from Michigan as potential witnesses

who, presumably, possess precisely the same information as these improperly subpoenaed absent

class members.  Moreover, there are a number of constituent actions in states where FedEx

Ground has deposed less than three drivers and it has not "carefully selected" other absent class members from those states to subpoena for similar testimony. This belies FedEx Ground's professed need for the depositions of Messrs. Lester and Pinkham and exposes its true intent: to harass these absent class members and distract class counsel on the eve of the deadline for moving for class certification.

## ARGUMENT

FedEx Ground opens its argument with a misstatement of the law. It asserts that prior to class certification members of purported classes are not "parties" and that they are therefore subject to the general procedures under Federal Rule of Civil Procedure Rule 45, including making a factual showing of "undue burden" in order properly to quash any subpoenas served on them. As Plaintiffs noted in their opening brief, FedEx Ground cannot sidestep Rule 33 by issuing subpoenas to absent class members under Rule 45. In re Publication Paper Antitrust Litig., 2005 WL 1629633, at *2 (D. Conn. July 5, 2005)(holding that for purposes of analyzing propriety of discovery of absent class members, analyses under Rules 33, 34 and 45 are equivalent because "[a]ny other holding would allow Rule 45 to be used as an end-run around Rule 23.")

FedEx Ground's citation to a single inapposite case does not change this analysis. Daniels v. Bursey, 430 F.3d 424 (7th Cir. 2006), stands for the non-controversial proposition that members of a proposed class that was never certified were not "parties" for purposes of standing to object to a settlement agreement to which they were not bound. See id. at 428-29. Nothing in that opinion addresses the issue of whether members of a proposed class are subject to Rule 45 subpoenas as third parties. Moreover, there is no meaningful distinction between a member of a

2175

proposed class and a member of a certified class for purposes of protecting such individuals from

needless harassment from class action defendants; both sets of individuals are equally vulnerable

in the absence of the protection of the heavy burden set by courts on those seeking discovery of

them.[1] Accordingly, it is FedEx Ground's burden to show a compelling need for these

depositions. Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir.)("[i]n light of the nature of

the deposition process - - namely, the passive litigants are required to appear for questioning and

are subject to often stiff interrogation by opposing counsel with a concomitant need of counsel of

their own - - we are of the view that **the burden confronting the parties seeking the deposition**

**testimony should be more severe than that imposed on the party requesting permission to**

**use interrogatories**."), cert. denied, 419 U.S. 1070 (1974). See also authority cited on pages 4-5

of Plaintiffs' Opening Brief.

Again, In re Currency Conversion Fee Antitrust Litig., MDL No. 1409, M 21-95, 2004

WL 2453927 (S.D.N.Y. Nov. 3, 2004), is directly on point. There, the court, relying on Clark,

held that a defendant could not conduct the deposition of a withdrawing class member to

ascertain why he chose to withdraw. 2004 WL 2453927, at *1. Because FedEx Ground's only

plausible reason for seeking these depositions is to ascertain the circumstances under which

Messrs. Lester and Pinkham decided to withdraw as named plaintiffs in their respective actions,

the subpoenas should be quashed under the teachings of Clark and In re Currency Conversion .

As explained in Plaintiffs' opening memorandum, FedEx Ground has already deposed

---

[1]   FedEx Ground attempts to draw a distinction between pre- and post-certification to
escape the clear authority in Plaintiffs' favor.  None of the cases cited by FedEx Ground make
any such distinction because there is no meaningful reason to do so.  FedEx Ground's lone
citation to Daniels v. Bursey is easily distinguishable for the reasons stated above.

many drivers in the states where Messrs. Lester and Pinkham worked. Specifically, FedEx

Ground has deposed five named plaintiffs in Texas and three in Michigan. In addition, FedEx

Ground otherwise has access to literally hundreds of senior terminal managers and contractors

from whom such information can be obtained. Indeed, FedEx Ground's belated Supplement to

Initial Disclosures, served on January 31, 2007 (a copy of which is annexed to the Declaration of

Robert I. Harwood, dated February 12, 2007 ("Harwood Dec.") as Exhibit 1, served herewith)

lists no less than 14 Senior Managers from Texas, 4 Senior Managers from Michigan and one

absent class member from each of these states. In total, FedEx Ground has named 45 Senior

Managers and one Contractor from Texas, and 18 Senior Managers and one Contractor from

Michigan as potential witnesses. Harwood Dec. ¶ 4. These witnesses come from 28 different

terminals in Texas and 14 different terminals in Michigan. Harwood Dec. ¶ 5.

Certainly, whatever FedEx Ground requires in terms of evidence of alleged disparities

between terminals and contractors in Texas and Michigan can be gleaned - - if it exists - - from

such a multitude of diverse sources. Indeed, FedEx Ground has admitted in its opposition papers

that "Defendant can, and will, provide declarations from non-Plaintiff contractors to rebut

Plaintiffs' allegations of control" in both Michigan and Texas. FedEx Ground's Memorandum of

Law in Opposition ("Opp. Mem."), at 13, 14. In light of these facts, deposing Messrs. Lester and

Pinkham is demonstrably unnecessary and redundant and would serve only to harass and to

punish them for their prior involvement in the actions.

FedEx Ground's harassment motive is made even clearer from the fact that it has not

sought the deposition of other absent class members in the five states where they have deposed

only one driver. These states are Alabama, Arkansas, Iowa, Maryland and Ohio. Harwood Dec.

-4-

¶ 6. In Alabama, FedEx Ground has 9 terminals; in Arkansas, it has 9 terminals; Iowa has 6

terminals; Maryland has 6 terminals; and Ohio has 14 terminals. Harwood Dec. ¶ 7. Thus, it is

clear that there exists no compelling need prompting FedEx Ground to "carefully select" Mr.

Lester to testify about Michigan when FedEx Ground elected not to seek analogous testimony in

five other states.

　　FedEx Ground's authorities do not change the outcome. Its flagship authority, Davenport

v. Gerber Prods. Co., Civ. A. No. 87-3198, 1988 WL 52098 (E.D. Pa. May 20, 1988), is the only

opinion to actually discuss the issue of the propriety of conducting discovery of absent class

members. However, the holding in Davenport is both inapposite and unsupported. Davenport

was a products liability case where the inherently complex issue of causation of physical injuries

to a proposed class of plaintiffs was raised in the context of pre-certification discovery. Id. at *2.

The sole reason the court offered to allow the deposition of unnamed class members there was to

ascertain the extent to which this distinguishable issue of causation might be individualized. Id.

In allowing such depositions, the court did not cite a single authority.

　　Here, no inherently complex issue of causation is presented. Instead, the central issue is

whether Plaintiffs are employees of FedEx Ground, an issue which has presented no obstacles to

courts routinely certifying class in misclassification actions. See, e.g., Breedlove v. Tele-trip, Co.

Inc., No. 91-C-5702, 1993 WL 284327, at *16 (N.D. Ill. July 27, 1993)(certifying class of airport

ticketing agents who alleged misclassification as independent contractors); Thomas v. Smithkline

Beecham Corp., 201 F.R.D. 386, 393-94 (E.D. Pa. 2001) (class certification appropriate where

workers had similar job descriptions); Lee v. ABC Carpet & Home, 236 F.R.D. 193, 203-04

(S.D.N.Y. 2006) (certification of a state law wage act claim was proper where defendants

"employed centrally administered policies and practices to treat the potential plaintiffs as independent contractors, not employees."); Godshall v. Franklin Mint Co., No. 01-CV-6539, 2004 WL 2745890, *2-3 (E.D. Pa. Dec. 1, 2004) (certifying settlement class of "freelancers" who alleged they had been treated uniformly and as employees); Smellie v. Mount Sinai Hospital, No. 03-Civ-0805, 2004 WL 2725124, *4 (S.D.N.Y. Nov. 29, 2004) (certifying class of hospital "patient companions" where key issue was whether workers were improperly labeled); Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81 (S.D.N.Y. 2001) (class certification appropriate where central issue was whether working conditions imposed on plaintiffs made them employees rather than independent contractors). As noted above, and conceded by FedEx Ground, none of the other cases it cites even discuss the issue of discovery of absent class members. See Opp. Mem. at 6-7.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion to Quash the Subpoenas of Absent Class Members.

Dated: February 12, 2007

Respectfully submitted,

**HARWOOD FEFFER LLP**

By: _Robert I. Harwood_

Robert I. Harwood (RH-3286)
Peter W. Overs, Jr.
488 Madison Avenue, 8th Fl.
New York, NY 10022
Tel.: (212) 935-7400

Lynn Rossman Faris
LEONARD CARDER LLP

-6-

2179

1330 Broadway Avenue, Suite 1450
Oakland, CA 94612
Tel.: (510) 272-0169

Susan E. Ellingstad
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900

*Co-Lead Counsel For Plaintiffs*

2180